UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
   Plaintiff,

-vs-                Case No. 15-cr-20652
                 Hon. George Caram Steeh

(D-13) ARLANDIS SHY, II,
   Defendant.
_____

### **DEFENDANT (D-13) SHY'S MOTION TO SEVER CO-DEFENDANTS' TRIALS**

  Defendant, (D-13) ARLANDIS SHY, II, moves this Honorable Court to sever his trial from the six capital co-defendants' trials who face unrelated death eligible counts and violent crimes, under the authority of Fed. R. Crim. P. 8(b) and 14(a), for the following reasons:

1. Defendant, (D-13) ARLANDIS SHY, II, is charged in the Third Superseding Indictment for being in violation of Count One, RICO Conspiracy, contrary to 18 U.S.C. §1962(d) and, Count thirty-two, possession of a Firearm in Furtherance of a crime of Violence, contrary to 18 U.S.C. §§924(c).

2. There are 18 co-defendants charged in this RICO conspiracy case, and the indictment alleges that the defendants were part of street gang known as the Seven Mile Bloods (SMB). (Doc. 321, Pg ID 1400-1403).

3. In the indictment, Defendant is accused of being in possession of drugs, and the indictment generally alleges that he possessed a firearm as well. (Doc. # 321, Pg ID 1419-20, 1448-49).

4. However, six co-defendants are charged with multiple counts of murder and attempted murder in aid of racketeering. (Billy Arnold (D-1); Eugene Fisher (D-3); Robert Brown

(D-6); Corey Bailey (D-4); James Robinson (D-16); and Matleah Scott (D-18)—Counts 2, 4, 6-8, 13, 16, 18-20, 25, and 28).

5. The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

6. Defendant has been improperly joined under Rule 8(b) because his offenses are unrelated to the six co-defendants charged with murder and attempted murder.

7. Alternatively, If multiple defendants are properly joined for trial and it "appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a).

8. Defendant will be prejudiced if he must go to trial for drug and firearm possession with 17 other co-defendants as well as co-defendants facing multiple counts of murder and attempted murder.

WHEREFORE, Defendant (D-13) Shy moves this Honorable Court to sever his trial from the trials of co-defendants Billy Arnold (D-1); Eugene Fisher (D-3); Robert Brown (D-6); Corey Bailey (D-4); James Robinson (D-16); and Matleah Scott (D-18).

Date: November 26, 2016

Respectfully submitted,

By: s/<u>Mark H. Magidson</u>
   MARK H. MAGIDSON (P25581)
   Attorney for Defendant Shy
   615 Griswold, Ste. 810
   Detroit, MI 48226
   (313) 963-4311

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-                                            Case No. 15-cr-20652
                                                Hon.  George Caram Steeh

(D-13) ARLANDIS SHY, II,

    Defendant.

_____

**BRIEF
IN SUPPORT OF
DEFENDANT (D-13) SHY'S MOTION TO SEVER CO-DEFENDANTS' TRIALS**

**FACTS**

The Third Superseding Indictment is 58 pages in length and consists of 36 counts. (Doc. # 321, Pg ID 1398-1455). Count I charges a RICO conspiracy, 18 USC 1962(d), and contains 102 numbered paragraphs detailing the allegations supporting the count. There are three specific allegations in Count I against Mr. Shy as follows:

> (77) On or about April 2, 2009, Arlandis Shy was arrested with marijuana and Oxycotin pills in Charleston, West Virginia. (Doc. # 321, Pg ID 1419).

> (82) On or about January 16, 2009, SMB enterprise member C and Arlandis Shy were found in an apartment in Charleston, West Virginia with drug packaging, marijuana and U.S. Currency. (Doc. # 321, Pg ID 1420).

> (85) On or about July 29, 2008, Arlandis Shy and other SMB enterprise members or associates were found in the area of Tacoma and Queen Streets, Detroit, Michigan with heroin, cocaine base (crack cocaine) and U.S. Currency. (Doc. # 321, Pg ID 1420).

In Count 32, Mr. Shy was lumped together with 17 other defendants where the Government alleges in a summary and precipitous fashion that these defendants possessed or aided and abetted one another in using a firearm in furtherance of a crime of violence. (Doc. #321, Pg ID 1448-49). There are no facts in this count setting forth any specific facts as to what Mr. Shy did to be guilty of this offense.

The Government alleges that

> The [MSB] enterprise makes its money predominately through the sale and distribution of controlled substances, including cocaine, heroin, marijuana, codeine promethazine, and various prescription pills. SMB members sell these controlled substances within the "Red Zone," outside of vacant houses known as "trap houses." Within the time frame of the charged enterprise, higher-ranking SMB members would often sell on the same block of Manning Street sharing workers and firearms to distribute and protect their narcotics. SMB members also travel to West Virginia, Ohio, Kentucky, and other states to sell controlled substances.
>
> The SMB is currently in an active gang war with an alliance of other gangs operating on Detroit's east side including, but not limited to: Hustle Boys, East Warren, Six Mile Chedda Ave., Gutta Boys, Maxout 220, BossHogs, and Hustle Hard. While the rivalries between these gangs has existed for some time, the murder of D.P. on July 14, 2014 by SMB members exacerbated the tension between the gangs and led to the alliance of the other east side gangs against the SMB. Since July 2014, these rivals are violently attacking one another and have posted respective "hit lists" on social media. The shooting of R.C. on May 1, 2015, as further described in Counts Ten through Twelve, was committed on the same day that SMB enterprise member A was killed and was a vengence shooting in this gang war.  [Doc. # 321, Pg ID 1402-1403.]

The Government also alleges that the manner and means that the SMB used to further its goals was to commit acts of violence involving murder and assaults with firearms, promoting a climate of fear, and threatening physical violence.

Six co-defendants are charged with multiple counts of murder and attempted murder (Billy Arnold (D-1); Eugene Fisher (D-3); Robert Brown (D-6); Corey Bailey (D-4); James Robinson (D-16); and Matleah Scott (D-18)—Counts 2, 4, 6-8, 13, 16, 18-20, 25, and 28). Those defendants are also charged with use of a firearm in furtherance of a crime of violence causing

death, 18 USC 924(c) and (j), and assault with a dangerous weapon in aid of racketeering, 18 USC 1959(a)(3).

The murder, attempted murder, assault, and firearm counts against the six co-defendants were alleged to have been committed on or about June 7, 2006; July 14, 2014; May 1, 2015; May 8, 2015; May 10, 2015; and June 7, 2015.

## ARGUMENT

**I.      Misjoinder under Fed. R. Crim. P. 8(b).**

The Federal Rules of Criminal Procedure provide that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b).

The failure to meet the requirements of Rule 8(b) constitutes misjoinder as a matter of law. *United States v. Hatcher*, 680 F.2d 438, 440-41 (6th Cir. 1982). If multiple defendants are improperly joined under Rule 8(b) because they are charged with offenses that are unrelated, then they are to be considered as prejudiced by that fact and the trial judge has no discretion on the question of severance. Severance in such a case is mandatory. *Id*. (citations omitted).

"The joinder of multiple defendants is proper under Rule 8(b) only if each of the counts of the indictment arises out of the same act or transaction or series of acts or transactions, even if all counts of the indictment include a common defendant." *United States v. Hatcher*, 680 F.2d 438, 441 (6th Cir. 1982).

"Foremost among the [] circumstances [relevant to a motion to sever] is a 'balancing of the interest of the public in avoiding a multiplicity of litigation.'" *United States v. Saadey*, 393

F.3d 669, 678 (6th Cir. 2005). "Under Rule 8(b), defendants who are 'indicted together, [ordinarily] should be tried together.'" *United States v. Breinig*, 70 F. 3d 850, 852 (6th Cir. 1995)(quoting *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992)). The Supreme Court has announced that "[t]here is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials play a vital role in the criminal justice system. They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993) (internal citations and quotations omitted).

In *Hatcher, supra*, two co-defendants, Hatcher and Manetas, were jointly indicted for federal narcotics crimes. *Id*. at 440. Although both defendants had been charged with three counts relating to the possession and distribution of heroin during the months of May to June 1978, Hatcher was charged with three counts relating to the possession and distribution of cocaine in an entirely unrelated series of offenses. *Id*. The government argued that because Manetas was Hatcher's source of heroin, joinder was proper. *Id*. at 442. The Sixth Circuit held that since there was "no connection between Manetas and the cocaine-related charges against Hatcher," the joinder of the two defendants was improper. *Id*. at 441.

Here, although the Government argues that Defendant Shy was small part of the overall SMB enterprise, on or about July 2008, January 2009, and April 2009 (Doc. # 321, Pg ID 1419-20), by possessing drugs (without stating amounts), there is no connection with the murders and attempted murders committed by six of the other co-defendants, on or about June 7, 2006; July 14, 2014; May 1, 2015; May 8, 2015; May 10, 2015; and June 7, 2015.

In the April 2, 2009 allegation against Defendant, he was arrested alone in West Virginia. There is no allegation linking that incident to the SMB enterprise. The other two allegations

involve SMB members, but not the six co-defendants charged with murder and attempted murder. Defendant's alleged acts occurred 2 years after the first murder, and over 5 years before the next murder.

This case is not like a typical conspiracy case such as *United States v. Beverly*, 369 F.3d 516 (6th Cir. 2004). In *Beverly*, five defendants were charged with conspiracy to commit armed bank robbery. *Id*. at 522. The defendant s robbed seven banks from September 1994 through October 1995. *Id*. 523. Two of the defendants, Warren and Rodgers, took a plea and testified at trial against the remaining three defendants. *Id*. Either Warren or Rodgers, or both, participated in each of the bank robberies. *Id*.

One of the defendants in *Beverly*, Turner, participated in four of the seven bank robberies, and he argued that his trial should not have been joined with the other two defendants'. *Id*. at 533. Turner argued that his conspiracy with Warren and Rodgers to rob four of the banks was separate from the conspiracy between Warren and Rodgers and the other two defendants to rob the remaining three banks. *Id*. at 533.

The Sixth Circuit held that the district court did not abuse its discretion in denying Turner's motion to sever trials. *Id*. The Court explained that all of the defendants committed bank robberies with Rogers and Warren during the course of the conspiracy and their testimony was admissible against all of the defendants. *Id*. The robberies were a series of offenses conducted over "a relatively short period of time and performed using a similar pattern of behavior." *Id*.

Each bank robbery could be viewed as part of one ongoing set of transactions, a common scheme, linked together by Rogers and Warren. *Id*. "[A] group of acts or transactions constitutes a 'series' if they are logically interrelated," and a "group of acts or transactions is logically

interrelated, for instance, if the acts or transactions are part of a common scheme or plan." *Beverly*, supra 369 F.3d at 533.

In this case, there is no common scheme or logically interrelated series of acts between the allegations of Defendant Shy possessing drugs on three incidents on or about July 2008, January 2009, and April 2009, and the murders and attempted murders on or about June 7, 2006; July 14, 2014; May 1, 2015; May 8, 2015; May 10, 2015; and June 7, 2015. The same defendants are not involved in the same incidents with Defendant Shy; they occur at distinct times and are not connected by a relatively short period, as in *Beverly*, *supra*; and, the crimes are distinct, drug possession versus murder. Also, evidence about the murders and attempted murders would not be admissible against Defendant.

Defendant's case is improperly joined with co-defendants Billy Arnold (D-1); Eugene Fisher (D-3); Robert Brown (D-6); Corey Bailey (D-4); James Robinson (D-16); and Matleah Scott (D-18).

**II.     Prejudicial Joinder under Fed. R. Crim. P. 14(a)**.

If this Court finds that joinder was proper under Fed. R. Crim. P. 8(b), the next determination is whether joinder prejudices Defendant. If the joinder and consolidation of defendants for trial "appears to prejudice a defendant . . . the court may . . . sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Questions of prejudice are properly raised under Rule 14 only if the joinder of multiple defendants is proper under Rule 8(b). *Id*.

"We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would

compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938 (1993).

In *United States v. Ayala Lopez*, 319 F. Supp. 2d 236 (D.P.R. 2004), a District of Puerto Rico case cited for persuasion, the co-defendants in a capital, death eligible case moved to sever trials. *Id*. at 237. At the time the motion were filed, there were three remaining non-capital defendants as well as one co-defendant who faced a possible sentence of death. *Id*. All defendants were charged with Counts One and Two of the Indictment, but only the capital defendant was charged with two separate counts, three and four. *Id*. The district court had determined that it was a complex case and held in abeyance the Speedy Trial Act's deadlines. *Id*. The was also a possibility that the Government would file a superceding indictment to include a juvenile defendant. *Id*. The court analyzed the circumstances and granted the motion to sever. *Id*.

In *Ayala Lopez*, the non-capital co-defendants argued that joining their cases affected their rights to due process and a speedy trial, and it prejudiced them because they would have to present antagonistic defenses before a death-certified jury. *Id*. at 238. The capital co-defendant also argued that a joint trial would infringe upon his right to individualized sentencing because the non-capital defendants could present evidence in their defense that would be damaging to him, and that a joint trial would produce problems related to jury selection and efficiency. *Id*.

At the time the defendants' motions to sever was heard (May 17, 2004, *Id*. at 240), the defendants been confined for over fourteen months. *Id*. at 238. The court estimated the time necessary to adequately prepare a capital case defense, without any additional delays, and determined that the case would not be ready for trial until at least early 2005, a year later. *Id*.

Which meant that the defendants would have been confined for approximately two years, "alarmingly in excess of the deadlines set by the Speedy Trial Act." *Id*.

The *Ayala Lopez* court found that the time required for two separate trials would not be substantially greater than the time required for a joint trial, *Id*. at 239, and that severance could allow for a quicker disposition of the non-capital cases. *Id*. The court also noted that in the majority of federal death penalty cases some type of severance has been granted. *Id*. at 240 (citation to the record omitted). In the twelve cases that reached the trial stage where there was a single capital defendant and one or more non-capital defendants, severance had been granted eight times (67%). *Id*.

The *Ayala Lopez* court cited the US Supreme Court's decision in *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938 (1993), regarding the standard for severing defendants and antagonistic defenses. *Ayala Lopez, supra* 319 F. Supp. 2d at 237. The US Supreme Court described the serious risks that would require severance:

> Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty. **When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened.** Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of prejudice. Conversely, a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial. The risk of prejudice will vary with the facts in each case, and district courts may find prejudice in situations not discussed here. (Emphasis added.) [*Zafiro v. United States*, *supra* 506 U.S. at 539 (citations omitted).]

The *Ayala Lopez* court granted severance and gave the issue of antagonistic defenses greater weight that the other arguments or factors:

> Although not necessarily antagonistic, a joint trial will necessarily result in Defendants pointing at each other in an attempt to exculpate themselves or ameliorate

guilt. This alone is not a reason to grant severance. However, we are not blind to the fact that "the dangers inherent in joint trials become intolerable when the co-defendants become gladiators, ripping each other's defense apart. In their antagonism, each lawyer becomes the government's champion against the co-defendant, and the resulting struggle leaves both defendants vulnerable to the insinuation that a conspiracy explains the conflict." *United States v. Romanello*, 726 F.2d 173, 182 (5th Cir. 1984). This danger is heightened given that no due process or prior notice requirements attach to Co-defendants, resulting essentially in the trial by ambush [*239] that the modern discovery procedure rules and court orders to that affect were explicitly designed to prevent.

> While the defenses … may not fully meet the mutually exclusive standard, there will be substantial and significant differences in the tactical approaches taken by their respective counsel. At times they will have different positions on evidentiary objections, and different approaches to the cross-examination of the government's witnesses and in the presentation of defense witnesses.

*United States v. McVeigh*, 169 F.R.D. 362, 370 (D. Colo. 1996). After reading the submitted briefs on the issue of conflicting defenses, inclusively that of the capital Defendant, we are of the impression that the Defendants, both the capital Defendant as well as the non-capital Defendants, face an unacceptable risk of prejudice if tried together. [*Ayala Lopez, supra* 319 F. Supp. 2d at 238-239.]

There are eighteen co-defendants in this case, with four death eligible defendants, which means that "a joint trial will necessarily result in Defendants pointing at each other in an attempt to exculpate themselves or ameliorate guilt." *Ayala Lopez, supra* 319 F.Supp. 2d. 238. "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." *Zafiro v. United States, supra* 506 U.S. at 539.

The capital defendants and non-capital defendants have antagonistic interests before going to trial. The death eligible and capital defendants have an interest in protracted pretrial proceedings in order to investigate, research, argue motions, and present mitigating evidence before going to trial in front of a death certified jury.

On the other hand, Defendant objects to any continuances in violation of his Speedy Trial Act rights and wants to go to trial as soon as possible. If the defendants' trials are not severed, the trial date will likely far exceed the time necessary to bring Defendant and the other non-capital defendants to trial because of the preparation necessary for four death eligible defendants out of eighteen total co-defendants.

Defendant Shy will also have to sit before a jury who will hear about the heinous murders and attempted murders committed by members of this alleged enterprise, and it is likely that Defendant will be convicted by association alone, despite his limited involvement in the enterprise as alleged by the Government.

Finally, the evidence necessary to convict Defendant Shy will not have to be reproduced to convict the six capital co-defendants for murder and attempted murder, and Defendant's case, as well as the other non-capital defendants will likely be disposed of in a timely manner.

Even if this Court determines that Defendant has not provided a sufficient showing of prejudice based upon traditional concerns such as antagonistic defenses and spillover from unrelated and inflammatory evidence of murder, this Court still retains the discretion and authority under Fed. R. Crim. P. 14(a) to sever the defendants' trials based upon the prejudice inherent in this type of case. "These rules are to be interpreted to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." Fed. R. Crim. P. 2.

"Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 538-39, 113 S. Ct. 933, 938 (1993). "[G]reat deference is due the trial judge in managing the proceedings of a criminal trial." *Sizemore v. Fletcher*, 921 F.2d 667,

672 (6th Cir. 1990). "In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Quercia v. United States*, 289 U.S. 466, 469, 53 S. Ct. 698, 698-99 (1933).

The same issue arose in *United States v. Delatorre*, 522 F. Supp. 2d 1034 (N.D. Ill. 2007), a joint mega-trial case addressing severance of defendants' trials. In *Delvatorre*, the government charged sixteen defendants who were part of a street gang with violating the RICO Act by committing various violent crimes in aid of the racketeering activity, and drug trafficking. *Id*. at 1037. The government estimated that the trial would last four to five months, even after the government announced it would not seek the death penalty against any defendant. *Id*. One defendant pleaded guilty, and another defendant remained a fugitive, leaving fourteen defendants to go to trial. *Id*. All of the defendants filed a motion to sever their trials, which the Illinois District Court granted. *Id*.

The trial court stated that "[w]hile no defendant has demonstrated the need for severance based on misjoinder or the traditional concerns of prejudice, the proposed four to five month long trial, and the likely jury prejudice that could result, are of vital concern to this Court. In addition, time delays and procedural complications from this 'mega-trial' have been and will continue to be significant." *Id*. at 1049.

The court went on to address each issue affecting the ability to provide a fair trial and judicial economy, which is reproduced below to fully convey the sound reasoning of the court:

> It has been long recognized that the risk of prejudice to the entire criminal justice system increases incrementally with the number of defendants and the length of the trial. The human limitations of the jury system are especially tested during a lengthy trial. [*Delatorre*, *supra* 522 F. Supp. 2d at 1050.]

\* \* \*

[L]ong and complex trials placed "in jeopardy the most important objective of a criminal trial: accurate fact finding." . . . "Jurors become overwhelmed by the volume of evidence and numbed by its repetitiousness. Their attention flags; their minds wander; the witnesses . . . get mixed up in the jurors' minds, or forgotten; the profusion of exhibits . . . makes the documentary record unintelligible. The impressions created by the closing arguments are likely to wipe out everything that went before." [*Id*. (citations omitted).]

* * *

"There are potentially limits to the complexity that a jury can handle." Jurors will be asked to keep an open mind during the government's months-long trial presentation, and at the close of the entire case, they will be asked to sift through the sea of evidence and determine how it relates to the alleged role of each of the fourteen individual defendants. The magnitude of evidence makes it almost impossible for the jury to separate evidence as it relates to each defendant when determining each defendant's innocence or guilt.

In such a case, "[e]vidence concerning the most guilty defendants might, in the eyes of the jury, implicate less guilty defendants by association. The sheer confusion resulting from trying numerous defendants together may also prejudice defendants." Although careful and frequent cautionary instructions can reduce or eliminate any prejudice which might otherwise result from a joint trial, "there are some situations that make frequent cautionary instructions a mere formality or a procedural nicety that substitutes a form of fairness for the substance of fairness."

This type of trial also imposes a substantial burden on the citizens who serve on the jury. Because of the length of the trial, this Court will be forced to use a special juror summons which will attempt to prequalify potential jurors who can serve on an extended trial without undue hardship. Nevertheless, the jurors who serve on this case will be asked to make a significant time commitment to the federal criminal justice system. [*Id*. at 1051 (citations omitted).]

* * *

The sheer number of defendants here--fourteen--has inherent risks of prejudice associated with it . . . . [T]he government initially announced its intent to seek the death penalty for eight of the fourteen defendants. The death penalty authorization process alone effectively delayed this case for one year as this Court was obligated to appoint a second, death penalty attorney for each of the eight affected defendants and allow for appropriate mitigation presentations. In the end, the government declined to proceed with death penalty proceedings. Throughout this entire period, the non-affected six defendants could only prepare for and await trial. During this entire extended time period, all defendants have been incarcerated . . . . This is a significant prejudice for defendants who are presumed innocent. [T]he defendants' "Sixth Amendment rights to a speedy trial are stretched about as far as can be without making a mockery of that constitutional protection." [*Id*. at 1052 (citations omitted).]

\* \* \*

The risk of prejudice is also inherent in lengthy trials. [T]he government estimates that the trial will consume four to five months of trial time. Each defendant will individually participate in each phase of the trial through counsel, which includes jury selection, opening statements, cross-examination of government witnesses, objections, sidebars, motions in limine, closing arguments and jury instruction conference. The multiplication of each phase of the trial with the proposed fourteen defendants will only lengthen the trial and may result in a trial beyond the estimated five months despite the best efforts of this Court. Furthermore, the trial will be lengthened by the scheduling conflicts, absences, or tardiness that will inevitably occur with the large number of jurors, alternates, defendants, witnesses, attorneys, and court personnel that must be present in court each day. [*Id*. at 1052 (citations omitted).]

\* \* \*

The sheer length of the trial may result not only in possible prejudice to the defendants and the jury [but] also to the defense attorneys, the government, the taxpayers, and this Court. Defense attorneys are drawn away for an extended period from other clients and matters; the government must commit experienced prosecutors to a single trial indefinitely; this Court's other pending cases--civil and criminal--would be unfairly delayed; and the taxpayers would ultimately have to pay for the extended criminal trial, including the costs of prosecution, court costs, and the public cost of providing defense counsel to each defendant, including two defense counsel for each defendant against whom the government considered seeking the death penalty. [*Id*. at 1053 (citations omitted).]

\* \* \*

[C]ontrary to the view that joint trials serve the goals of judicial efficiency and economy, the Ninth Circuit has aptly noted that in such large trials, judicial economy will often be better served by severance because: (1) as the government proceeds through separate trials, its presentation becomes sharper and more streamlined so that later trials move more quickly; (2) with fewer defendants and defense counsel, there will be fewer sidebars and continuances; and (3) the court becomes more familiar with the case and the evidence, allowing more expeditious and efficient rulings. Furthermore, the Ninth Circuit opined that "[d]isclosure of the government's method and quality of proof may even benefit the prosecution by inducing additional guilty pleas from severed defendants." [*Id*. at 1053 (citations omitted).]

\* \* \*

In evaluating the propriety of a trial of twenty-three defendants, the Fifth Circuit explained that the seating arrangements, while "suitable perhaps for enjoying an afternoon of football," were "of questionable propriety for a protracted trial." *United*

*States v. Ellender*, 947 F.2d 748, 754-55 (5th Cir. 1991). The Court described the courtroom scene as follows:

> Each defendant and attorney was limited to a small writing space crowded [**52] into a block-seating arrangement. Bleachers were installed. Seating charts were issued to jurors and trial participants to facilitate identification. A special intercom system of dubious efficacy was installed for 'bench conferences.' When an attorney wished to address the court and fellow counsel privately, the jurors were treated to background music. However, this intended distraction proved futile, and counsel turned to the time-honored method of hushed voices and bowed heads. In sum, the courtroom assumed the appearance of an overcrowded classroom. [*Id*. at 1054.]

The same considerations apply to this case. Defendant has been incarcerated since March 1, 2016. There are eighteen defendants, four of whom are death eligible capital defendants. The Government has moved for a continuance of 120 days, stating that it intends to call "numerous trial witnesses and introduce over one hundred pieces of physical evidence and expert testimony to address the forensic analysis conducted by the government." (Doc. # 419, Pg ID 1800-1801). Numerous trial witnesses and over one hundred pieces of physical evidence just for the forensic analysis alone means that the trial will be extremely lengthy, and the pretrial proceedings protracted because this is has been designated as a complex mega case with eighteen defendants.

The issue of the physical restrictions of the courtroom during trial, and pretrial motion hearings will also be a factor denying Defendant a fair trial. There will be eighteen defendants in the courtroom with at least eighteen attorneys, crowded together to confer, make objections, and address the Court outside of the jury's presence.

Defendant will also not receive a fair trial if a jury must sit for a protracted and lengthy time, hearing evidence for eighteen defendants about 140 allegations of criminal acts in the Indictment.

WHEREFORE, Defendant (D-13) Shy moves this Honorable Court to sever his trial from the trials of co-defendants Billy Arnold (D-1); Eugene Fisher (D-3); Robert Brown (D-6); Corey Bailey (D-4); James Robinson (D-16); and Matleah Scott (D-18).

Respectfully submitted,

Date: November 26, 2016

By: s/Mark H. Magidson
   MARK H. MAGIDSON (P25581)
   Attorney for Defendant Shy (D-13)
   615 Griswold, Ste. 810
   Detroit, MI 48226
   (313) 963-4311

## CERTIFICATE OF SERVICE

I certify that on November 26, 2016 I electronically filed the above motion and brief with the Clerk of the Court using the ECF system, which will send notification of such filing to the parties of record.

By: s/Mark H. Magidson
   MARK H. MAGIDSON (P25581)
   Attorney for Defendant Shy (D-13)