1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3

4    **UNITED STATES OF AMERICA,**

5                    Government,
                                          **HONORABLE GEORGE CARAM STEEH**
6         v.
                                          **No. 15-20652**
7    **D-3 EUGENE FISHER,**
     **D-4 COREY BAILEY,**
8    **D-6 ROBERT BROWN,**
     **D-13 ARLANDIS SHY,**
9    **D-19 KEITHON PORTER,**

10                   Defendants.
     _____/
11
                             **JURY TRIAL**
12
                     **Thursday, June 21, 2018**
13
                          -    -    -
14
     APPEARANCES:
15
     For the Government:          JULIE FINOCCHIARO, ESQ.
16                                JUSTIN WECHSLER, ESQ.
                                  TARE WIGOD, ESQ.
17                                MARK BILKOVIC,ESQ.
                                  Assistant U.S. Attorneys
18

19   For the Defendants:         HENRY M. SCHARG, ESQ.
                                  On behalf of Eugene Fisher
20
                                  CRAIG DALY, ESQ.
21                                KEITH SPIELFOGEL, ESQ.
                                  On behalf of Corey Bailey
22
                                  JAMES FEINBERG, ESQ.
23                                On behalf of Robert Brown

24
                                  MARK MAGIDSON, ESQ.
25                                JOHN THEIS, ESQ.
                                  On behalf of Arlandis Shy

1

STEVEN SCHARG, ESQ.

2                       On behalf of Keithon Porter

3

4                              -    -    -

5

*To Obtain Certified Transcript, Contact:*

6     *Ronald A. DiBartolomeo, Official Court Reporter*
      *Theodore Levin United States Courthouse*

7     *231 West Lafayette Boulevard, Room 1067*
      *Detroit, Michigan  48226*

8              *(313) 962-1234*

9        *Proceedings recorded by mechanical stenography.*
      *Transcript produced by computer-aided transcription.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

# I N D E X

2
_____   Page

3
**VICENTE RUIZ**
Direct examination cont. by Ms. Finocchiaro          5
4 Cross examination by Mr. H. Scharg                   10
Cross examination by Mr. Feinberg                     16
5 Cross examination by Mr. Spielfogel                  23
Cross examination cont. by Mr. Feinberg               25
6 Redirect examination by Ms. Finocchiaro             28

7 **ANDREW WHITE**
Direct examination by Mr. Wigod                       29
8 Cross examination by Mr. Feinberg                    44
Cross examination by Mr. Magidson                     53

9

**WILLIAM ASHFORD**
10 Direct examination by Mr. Bilkovic                  58
Cross examination by Mr. Feinberg                     68

11

**ROBERT GADWELL**
12 Direct examination by Mr. Wigod                     76

13 **JASON KLEINSORGE**
Direct examination by Mr. Wigod                       90

14

**HOWARD SWEENEY, III**
15 Direct examination by Mr. Bilkovic                 101
Cross examination by Mr. Daly                        112
16 Redirect examination by Mr. Bilkovic              122
Recross examination by Mr. Daly                      124

17

**LYNN MOORE**
18 Direct examination by Mr. Bilkovic                126

19 **MICHAEL PANACKIA**
Direct examination by Mr. Bilkovic                  136

20

**MOISES JIMENEZ**
21 Direct examination by Mr. Wigod                    143
Cross examination by Mr. Feinberg                    149
22 Redirect examination by Mr. Wigod                 160
Recross examination by Mr. Feinberg                  161

23

**JOHNNY JONES**
24 Direct examination by Ms. Finocchiaro             169

25

```
 1                        E  X  H  B  I  T  S

 2    Identification_____Offered    Received

 3    Government Exhibit No. 1AA              6            6

 4    Government Exhibit No. 1D               9            9

 5    Government Exhibit No. 174             135          135

 6    Government Exhibit No. 175             142          142

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                              Detroit, Michigan
 2                              Thursday, June 21, 2018
 3                              At 8:48 a.m.
 4                          -   -   -
 5              (Proceedings with jury at 8:48 a.m.)
 6
 7              THE COURT:  You can take a seat.  You are
 8      still under oath.
 9
10                    V I C E N E T   R U I Z
11
12                   DIRECT EXAMINATION CONT.
13
14              THE COURT:  You may continue.
15              MR. FINOCCHIARO:  Thank you.
16
17      BY MR. FINOCCHIARO:
18        Q.   Special Agent Ruiz, I believe we left off yesterday
19      afternoon talking about some rivals.  I will show what's
20      been marked as Government Exhibit 1AA for identification.
21        A.   Okay.
22        Q.   Can you explain to the jury who is in 1AA?
23        A.   That's Michael Davis also known as 42 Twin.  He is
24      Martez Davis' brother.
25        Q.   Is Mr. Michael Davis associated with any rival gang?
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   Hustle Boys.

2      **Q.**   In your review of social media, have you seen his

3      photo depicted?

4      **A.**   Yes, I have.

5      **Q.**   If we could go to Exhibit 42, which is the

6      000Bigblood Facebook account, Page 37, and who do we see

7      in the photo?

8      **A.**   We see a screen capture of Instagram account Twin

9      Mike, and that's a photo of Michael Davis there.

10             **MR. FINOCCHIARO:**   Move for admission of

11     Government Exhibit 1AA your Honor.

12             **THE COURT:**   All right.   The Court will

13     receive the item.

14

15  **BY MS. FINOCCHIARO:**

16     **Q.**   And publish 1AA, and again, who are we seeing in

17     this photo?

18     **A.**   Michael Davis.

19     **Q.**   And what nicknames does he go by?

20     **A.**   42 Twin or Twin.

21     **Q.**   Now in your investigation, have you come across the

22     name Lominel Jackson?

23     **A.**   Yes.

24     **Q.**   Does Mr. Jackson associate with any group?

25     **A.**   He associates with Six Mile.

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Did he go by my nickname?

2    **A.**  Lomel or Six Mile Lomel.

3    **Q.**  And have you seen him depicted in any social media?

4    **A.**  Yes.

5    **Q.**  Go to 000Bigblood, Exhibit 42, Page 21.  Who do we

6    see?

7    **A.**  That's a photo of Lominel Jackson.

8    **Q.**  Just to remind the jury, who is the user of the

9    000Bigblood Facebook account?

10   **A.**  Jeffrey Adams.

11   **Q.**  Have you come across the name Devonte Roberts?

12   **A.**  Yes, I have.

13   **Q.**  Was Devonte Roberts associated with my groups?

14   **A.**  He was RFE is the name of the group, which is a

15   subset of East Warren.

16   **Q.**  Now you said he was.  What do you mean he was?

17   **A.**  Devonte Roberts was killed on May 8, 2015.

18   **Q.**  Do you know how he was killed?

19   **A.**  He was in a car with three other individuals,

20   including his brother Darrio Roberts, Jesse Ritchie who

21   was the driver, and Marquis Wicker was in the vehicle.

22   They were gunned down at the corner of Duchess and Craft.

23   Devonte Roberts was shot and killed that day.  Darrio

24   sustained injuries do his head and ear area.  Marquis

25   Wicker was shot multiple times in the arm, chest, neck

*15-20652; USA v. EUGENE FISHER, ET AL*

1    area.   Jesse Richie did not suffer any gunshot wounds that

2    day.

3        Q.   And do you see Mr. Roberts depicted in social media?

4        A.   Yes, I do.

5        Q.   Go again to the 000Bigblood Exhibit 42, Page 34.

6    Who do we see?

7        A.   That's a photo of Devonte Roberts.

8        Q.   Go to the 000Bigblood caption, what does it say?

9        A.   He used the emojis in this post.  It says, he

10   thought he was laughing.  Got'em.

11       Q.   We talked a lot of social media, Facebook and

12   Instagram.  Could you explain to the jury how it is that

13   you get this information that we've seen over this last

14   day and a half?

15       A.   Certainly.  So in order to obtain these records,

16   this content, it requires a search warrant.  The search

17   warrant is drafted and an affidavit is drafted, probable

18   cause.  It's reviewed by the attorneys, and then beyond

19   that it's reviewed by U.S. Magistrate.  The magistrate

20   reviews it.  He or she determines if there is probable

21   cause.  Then they will sign it, and we execute that search

22   warrant.

23       Q.   So anyone cannot just go and get the information

24   we've seen here, is that right?

25       A.   That's correct.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. FINOCCHIARO:**  One moment, your Honor.

2          No more questions, but I believe did not move the

3     picture of Robert Brown in, Exhibit 1D, yesterday, and I

4     move for its admission today.

5               **THE COURT:**  All right.  Any objections?

6               **MR. DALY:**  No objections.

7               **MR. FEINBERG:**  No objection.

8               **THE COURT:**  Thanks.  The Court will receive

9     the item.

10              **MR. FINOCCHIARO:**  No further questions at

11    this time, your Honor.

12              **THE COURT:**  Thank you.  You can step down.

13              **MR. H. SCHARG:**  I think there is some cross

14    examination.

15              **THE COURT:**  You plan to cross?

16              **MR. H. SCHARG:**  I know I do.  I don't know if

17    anyone else does.

18              **THE COURT:**  Okay.

19              **MR. H. SCHARG:**  Before we even start, I have

20    been conferring with an individual at defense table who

21    has not been introduced, and that is Mr. Chris Anton who

22    is a discovery coordinator, and he will be working with

23    each of the defense counsel in this case.  So if you don't

24    know who he is, he's not an attorney, not a defendant, but

25    our discovery coordinator.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE COURT:**  All right.  Thank you.  Mr.

2     Scharg.

3                    **CROSS EXAMINATION**

4

5     **BY MR. H. SCHARG:**

6

7          **Q.**  Good morning.

8          **A.**  Good morning.

9          **Q.**  Could you put up Exhibit 1B.  There we go.  Agent

10    Ruiz, yesterday you identified Government Exhibit 1B of

11    that being Eugene Fisher, is that correct?

12         **A.**  That's correct.

13         **Q.**  And you also referred to him with the nickname of

14    Fes and Fester, correct?

15         **A.**  Correct.

16         **Q.**  As in Uncle Fester.  Did you ever see the Addams

17    Family?

18         **A.**  Yes, I have.

19         **Q.**  Ever see the character Uncle Fester?

20         **A.**  Yes, I have.

21         **Q.**  Would you agree with me that he looks like the black

22    version of Uncle Fester?

23         **A.**  Certainly.

24         **Q.**  Okay.  Do you know that he had that name from the

25    time he was in elementary school?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   I don't know that.

2      **Q.**   Through your investigation?

3      **A.**   I don't know when he acquired that name.

4      **Q.**   Okay.  In terms of other individuals that were

5      identified that were on this poster board, after they were

6      identified, you also -- there was a group of pictures

7      regarding tattoos?

8      **A.**   Yes, there was.

9      **Q.**   Gang related tattoos?

10     **A.**   Certainly.

11     **Q.**   Some that were not gang related?

12     **A.**   I would agree with that.

13     **Q.**   Would you also agree with me that Eugene Fisher,

14     Uncle Fester, doesn't have one tattoo on his body?

15     **A.**   I haven't examined his body.

16     **Q.**   I know there are certain areas that you didn't

17     examine, but you're not aware of any tattoos on his body?

18     **A.**   I would agree with you.

19     **Q.**   Would you agree with me if there were gang tattoos,

20     you believe that's relevant that you would have documented

21     and photographed that?

22     **A.**   Certainly.

23     **Q.**   Do you have any pictures in your files of Mr. Fisher

24     with my tattoos?

25     **A.**   I would have to review the photos to be certain.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   None that you know of?

2    **A.**   None that I know of.

3    **Q.**   Okay.  You were able to identify Exhibit Government

4    Exhibit 44, which is approximately 77 pages of Facebook

5    materials that were received pursuant to a search warrant

6    for the Facebook business account of Eugene Fisher?

7    **A.**   I will take your word that it is Exhibit 44.

8                **MR. H. SCHARG:**  Can I approach?

9                **THE COURT:**  Yes.

10               **THE WITNESS:**  Yes, this is Exhibit 44, and

11   this is the Facebook account for Eugene Fisher.

12

13   **BY MR. H. SCHARG:**

14   **Q.**   When you say it is the Facebook account, there are

15   77 pages here, correct?

16   **A.**   I would have to count them to be certain.

17   **Q.**   It looks like approximately 77 pages?

18   **A.**   Sure.

19   **Q.**   Are you aware of the fact that the Facebook business

20   account that was subpoenaed regarding Mr. Fisher's

21   Facebook account had over 4,000 pages?

22   **A.**   I believe that some of these returns are very large.

23   **Q.**   Is it fair that the government cherry picked or

24   selected certain pages of that 4,000 pages that would be

25   consistent with the government's theory of this case?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   If there are 77 pages in that exhibit, then
2    certainly only certain pages were selected from that
3    4,000.
4        **Q.**   So approximately 77 pages out of over 4,000 were
5    placed in this exhibit to promote the government's theory,
6    correct?
7        **A.**   Those would be the relevant pages for this
8    investigation.
9        **Q.**   So anything that was -- would have been favorable to
10   Mr. Fisher would not have been relevant?
11       **A.**   Well, it still would have been released to defense
12   in discovery.
13       **Q.**   Can we turn to -- do you know the difference between
14   posting and sharing on Facebook?
15       **A.**   Yes.
16       **Q.**   Posting is where you actually post a photo or
17   picture or some information data, is that correct?
18       **A.**   Correct.
19       **Q.**   And sharing is taking someone else's posting and
20   sharing, and putting that on your page, is that correct?
21       **A.**   That's fair, yes.
22       **Q.**   You see the President of the United States doing
23   that everyday, doesn't he?
24       **A.**   Very frequently.
25       **Q.**   Would you agree with me as to Exhibit 44, that out

*15-20652; USA v. EUGENE FISHER, ET AL*

1    of that -- you'll have to trust me that there are 77

2    pages -- that a number of the pages that we referred to

3    and you've identified, were not postings of Mr. Fisher,

4    but they were posting by other individuals that Mr. Fisher

5    shared?

6       **A.**   That could be the case.

7       **Q.**   Turn to 5.  This is one of the pages of Exhibit 44.

8    You see that?

9       **A.**   I do.

10      **Q.**   Do you know if it was posted or shared?

11      **A.**   I would have to look at the data for this to be

12   certain.

13      **Q.**   You don't know?

14      **A.**   I don't know.

15      **Q.**   Do you know if that photo was posted or shared?

16      **A.**   Not by looking at the photo.

17             **THE COURT:**  Do you have page numbers?

18             **MR. H. SCHARG:**  Do I have page numbers?

19             **THE COURT:**  Right.

20             **MR. H. SCHARG:**   The first one was Page 5.

21   The second one was Page 7.

22

23   BY MR. H. SCHARG:

24      **Q.**   Page 14, do you know if that posted or shared?

25      **A.**   It says posted.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   Page 16, do you know if that was posted or shared?

2    **A.**   There is no data with that photo.

3    **Q.**   Page 18?

4    **A.**   It says posted.

5    **Q.**   Posted for shared by Mr. Fisher?

6    **A.**   It says posted.

7    **Q.**   Would you agree with me that of the photographs that

8    you have identified throughout your testimony yesterday,

9    that some of the pictures were posted and some were

10   shared?

11   **A.**   Certainly.  To be clear, you know, someone can

12   receive a photo and post it, whether they received it

13   through a text or private message.  They can actually post

14   that even though it was not an image that they created.

15   **Q.**   But sometimes a picture photo or some words or data

16   are posted by someone else, and the person who receives

17   it, the recipient, can also share that with others?

18   **A.**   Correct.

19   **Q.**   That a person does not necessarily post something

20   that's on their Facebook account, but it is something that

21   they have received as a recipient, and go ahead and post

22   it -- repost it, which is called sharing, is that correct?

23   **A.**   You kind of stated they are reposting it.

24   **Q.**   Okay.  But the terminology is sharing?

25   **A.**   Okay.

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  Yes?

2     **A.**  Yes.

3                    **MR. H. SCHARG:**  No further questions.

4                    **THE COURT:**  Thank you, Mr. Scharg.

5                    **MR. FEINBERG:**  I have some questions.

6

7                         **CROSS EXAMINATION**

8

9     BY MR. FEINBERG:

10

11    **Q.**  Special Agent Ruiz, in your investigation, how many

12    years have you projected Mr. Brown being associated with

13    the Seven Mile Bloods?

14    **A.**  I learned of Mr. Brown's association with the Seven

15    Mile Bloods very early on in the investigation.  The

16    investigation started in June of 2015.  I couldn't tell

17    you exactly the date that I discovered that he was linked

18    to this organization.

19    **Q.**  Okay.  In your investigation, how many pages of Mr.

20    Brown's Facebook was received in total?

21    **A.**  That's an excellent question.  Without his Facebook

22    in front of me, I could not give you an exact number.

23    **Q.**  Would you agree that it was approximately 7,000

24    pages?

25    **A.**  That sounds fair.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.** And again, the pages that you chose to be part of

2    the exhibit were targeted by you to further your

3    investigation?

4    **A.** The entire Facebook account was investigated by me

5    to further the investigation.

6    **Q.** But the pages that you chose to be in the exhibit

7    were ones that you chose to use as an exhibit in the

8    prosecution?

9    **A.** It was probably a combination of myself, U.S.

10   Attorneys and trial attorneys.

11   **Q.** How many pages were part of the exhibit?

12   **A.** I would have to review the exhibit to be certain.

13   **Q.** Is that in court?

14   **A.** Yes.

15   **Q.** Would you like to take a look at it?

16   **A.** Sure.

17   **Q.** I show you Exhibit 46, is that correct?

18   **A.** That's correct.

19   **Q.** And approximately how many pages?

20   **A.** The last page of this exhibit is number 119.

21   **Q.** And how many of those are posted, shared or

22   comments?

23   **A.** I would have to review this entire 119 pages.

24   **Q.** Would you agree that there's a lot of comments and

25   shared throughout the exhibit?

*15-20652; USA v. EUGENE FISHER, ET AL*

1   **A.**   There certainly could be.  One thing that is

2   important to note too since we are talking about the

3   volume of pages received from Facebook, there's a lot of

4   extra data contained in the returns.  Oftentimes what you

5   will see, you get duplicates of the same images, sometimes

6   triple.  That adds to that number of pages in the return.

7   In addition to what one would see when they are reviewing

8   a Facebook account, to include the photo or video or

9   comments or whatever.

10   **Q.**   Over and over?

11   **A.**   Correct.  You get information such as, was it posted

12   by mobile device, you know, the date and time it was added

13   to the user account.

14   **Q.**   Okay.  That's beyond what I asked.

15   **A.**   Okay.

16   **Q.**   Also, in investigating Mr. Brown, did you find any

17   gang related tattoos on Mr. Brown?

18   **A.**   I don't recall.

19   **Q.**   If he had any, it would have been noted?

20   **A.**   Absolutely.

21   **Q.**   And it's not noted anywhere that Mr. Brown during

22   the so-called early on relationship with SMB, according to

23   your investigation, had any gang related tattoos anywhere

24   on his body?

25   **A.**   I don't recall seeing anything of gang related

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1    tattoos.
2                    MR. FEINBERG:  No further questions.
3                    THE COURT:  Thank you, Mr. Feinberg.
4              Any other questions?
5                    MR. MAGIDSON:  Yes, your Honor.  Just a
6    couple.
7                    THE COURT:  Okay.  Mr. Magidson?
8                    MR. MAGIDSON:  Thank you, your Honor.
9
10                      CROSS EXAMINATION
11
12   BY MR. MAGIDSON:
13
14     Q.  Good morning, Agent Ruiz.
15     A.  Good morning.
16     Q.  I represent Mr. Shy.  I would just like to ask you a
17   couple of questions along the same lines as the others in
18   terms of Mr. Shy's Facebook account.
19            Once again, you would agree with me that it was
20   in excess of 6,000 pages?
21     A.  I will agree with that.
22     Q.  In his case, you selected 75 to 100 pages of photos
23   that you believed were relevant to your case, is that
24   correct?
25     A.  There certainly could be more that would be
```

1    relevant, but we probably chose a lesser amount.

2        **Q.**  You didn't pick out photos that would be favorable

3    to him, correct?

4        **A.**  You can do that when you present your defense

5    exhibits.

6                **MR. H. SCHARG:**  I didn't hear that.

7

8    **BY MR. MAGIDSON:**

9        **Q.**  Would you repeat that?

10       **A.**  Any other photos that were in, you certainly can

11   present that as defense exhibits.

12       **Q.**  So you didn't include, for instance, pictures with

13   his mother, grandmother?  That was not part of the --

14       **A.**  No.

15       **Q.**  Playing with the dog or things like that?

16       **A.**  No.

17       **Q.**  You would agree with me there are no photos of Mr.

18   Shy with guns, pointing guns, putting guns against his

19   head or other peoples' heads?

20       **A.**  Without looking at all the photos, I would not agree

21   with that.

22       **Q.**  The ones that we've seen thus far, there was none

23   demonstrated here, would you agree with that?

24       **A.**  That may be correct.

25       **Q.**  You have been working on this case for how many

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    years?

2        **A.**   Approximately three.

3        **Q.**   Okay.  And you're familiar with Mr. Shy?

4        **A.**   Yes.

5        **Q.**   You're familiar whether there's -- whether he's had

6    a Facebook account and so forth?

7        **A.**   Yes.

8        **Q.**   And certainly you would be familiar with whether he

9    had a photo that -- where he was pointing a gun at one or

10   more people or himself, right?

11       **A.**   I have seen a lot of photos of many individuals.

12       **Q.**   So you're a little confused?

13       **A.**   I wouldn't say confused, but to be certain, which is

14   what I think we are here to do, I would have to review the

15   photos.

16       **Q.**   So the purpose of -- for instance, some of these

17   photos, particularly tattoos, is to show that your idea --

18   that the government's idea of that is to shows that he is

19   a member of a club or gang or organization?  Is that what

20   you're saying?

21       **A.**   Not a club.  A gang.

22       **Q.**   Okay.  A group of people?

23       **A.**   Sure.

24       **Q.**   And would you agree with me that just being a member

25   of a group or gang, that's not illegal, is it?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   No.   What's illegal is criminal activity that they

2      do.

3      **Q.**   So if I'm a member, I could be a member of the Seven

4      Mile Bloods, but -- I'm a member.   That doesn't make it an

5      illegal act, does it?

6                **MR. FINOCCHIARO:**   Objection, your Honor.

7      He's asking the witness to make a legal determination.

8                **MR. MAGIDSON:**   He's the agent, your Honor.

9                **THE COURT:**   I will permit the question.

10     Overrule the objection.

11     **A.**   I want you to repeat the question.

12

13     **BY MR. MAGIDSON:**

14     **Q.**   If I am member, if I have a tattoo with SMB on it,

15     I'm now a member of a -- am I committing a crime?

16     **A.**   Well, I guess that's up to the law to determine, but

17     if you become a member --

18     **Q.**   Yes or no, Agent Ruiz?   Yes or no?

19     **A.**   I don't think that you can answer it yes or no.

20     **Q.**   If you can't answer it yes or no, I don't want you

21     to add hypotheticals.

22     **A.**   It is not a hypothetical.

23     **Q.**   My question is, if I have a tattoo on my arm, am I

24     committing a crime?

25     **A.**   Getting a tattoo, no.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  But if I have a tattoo that says Seven Mile Bloods

2    with blood dripping off my arm, is that a crime?

3    **A.**  Being a member of a gang that's engaged in

4    criminal activities --

5    **Q.**  I didn't say engaged in criminal activities.  I have

6    a tattoo on my arm.  It's bloody.  It's has horrific

7    pictures on it.  Is that a crime?

8    **A.**  Getting a tattoo is not a crime.

9    **Q.**  Now you referred to some reference to Hard Work

10   Entertainment.  You heard that term?

11   **A.**  Yes.

12   **Q.**  Would you agree that's a record label?

13   **A.**  Yes.

14   **Q.**  Would you agree that Mr. Shy is a rapper and is

15   engaged and has made rap videos, and things of that

16   nature?

17   **A.**  Yes, he has.

18   **Q.**  And that he goes to a studio, and it's done by

19   production.  It's just not somebody holding a cell phone

20   up and taking pictures.  It is done by a studio, is that

21   correct?

22   **A.**  That would be my assumption.

23               **MR. MAGIDSON:**  Thank you, your Honor.

24               **MR. SPIELFOGEL:**  Two questions, your Honor.

25               **THE COURT:**  Okay.


*15-20652; USA v. EUGENE FISHER, ET AL*

1                          **CROSS EXAMINATION**

2

3    **BY MR. SPIELFOGEL:**

4

5       **Q.**   Good morning, agent.

6       **A.**   Good morning.

7       **Q.**   How are you today?

8       **A.**   I'm well.

9       **Q.**   Good.   How many pages of Facebook from looking into

10   the Facebook account, how many pages did you find of Corey

11   Bailey?   How many pages were on his Facebook account?

12      **A.**   I don't know.

13      **Q.**   Well, you do know that he doesn't have a Facebook

14   account, is that correct -- Strike that.

15             You're the one who subpoenaed all of these,

16   isn't that correct?

17      **A.**   These were search warrants.

18      **Q.**   Okay.   You're the one that got the search warrants,

19   correct?

20      **A.**   Correct.

21      **Q.**   Did you get a Facebook account for Corey Bailey?

22      **A.**   There were some accounts that we were not able to

23   get.

24             **THE COURT:**   I missed that.

25             **THE WITNESS:**   Were not able to get.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **BY MR. SPIELFOGEL:**

2        **Q.**  I take that as no?

3        **A.**  Sure is.

4                **MR. SPIELFOGEL:**  Nothing else.

5                **THE COURT:**  Anyone else?

6                **MR. S. SCHARG:**  On behalf of Mr. Porter, no

7    questions.

8                **MR. FEINBERG:**  May I ask another question?

9    I'm sorry that I omitted it.

10               **THE COURT:**  Go ahead.

11

12                      **CROSS EXAMINATION CONT.**

13

14   **BY MR. FEINBERG:**

15

16       **Q.**  In reviewing the Facebook material from Mr. Brown,

17   did you look at all the pages?

18       **A.**  I will say most of the pages.

19       **Q.**  Did you find any pages depicting Mr. Brown running a

20   day care or after school center on a daily basis?

21       **A.**  I don't recall.

22       **Q.**  Do you recall Mr. Brown with children in a play kind

23   of area?

24       **A.**  I do recall seeing photos of Mr. Brown with what I

25   believe is his child.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  One child.  What about many children?

2    **A.**  To be certain I would have to review the account.

3    **Q.**  Again?

4    **A.**  Again, yes.

5    **Q.**  Okay.  But in your memory, are you saying that you

6    never found anything positive for Mr. Brown running a day

7    care or after school care?

8    **A.**  I was not looking for Mr. Brown to be running a day

9    care when reviewing his Facebook.

10   **Q.**  You were not looking at Mr. Brown's Facebook account

11   for anything that was a very positive picture of Mr.

12   Brown, is that correct?

13   **A.**  I was investigating a gang involved in violent

14   crimes.  I was looking for evidence of that activity.

15   **Q.**  Did you investigate the Cleo McDougal homicide?

16   **A.**  I did.

17   **Q.**  In your investigation, did you talk to or find out

18   that Mr. McDougal's brother was a witness to the homicide?

19   **MR. FINOCCHIARO:**  Objection, your Honor.

20   This is beyond the scope of his direct examination.

21   **MR. SPIELFOGEL:**  Your Honor, I'm assuming

22   that the agent will be called again, and we can go into

23   those matters.

24   **THE COURT:**  Yes, that makes sense.

25   **MR. SPIELFOGEL:**  Does make sense?

*15-20652; USA v. EUGENE FISHER, ET AL*

1              **MR. FINOCCHIARO:**  Yes.

2              **MR. FEINBERG:**  Then I will wait for that,

3      your Honor.

4          But answer one question, did you find out that Mr.

5      McDougal's brother identified Elroy Lucky Jones --

6              **MR. FINOCCHIARO:**  Objection, your Honor.

7              **MR. FEINBERG:**  -- as the killer of Cleo

8      McDougal?

9              **THE COURT:**  Is there an objection?

10             **MR. FINOCCHIARO:**  Yes, same objection.  It is

11     outside the scope of direct examination.

12             **MR. FEINBERG:**  He's up there.  He is free to

13     answer whatever questions I am asking.

14             **THE COURT:**  Well, we do anticipate that he

15     will be called multiple times.  I'll permit the answer if

16     you have it at hand.

17     **A.**  I know the answer.

18

19     **BY MR. FEINBERG:**

20     **Q.**  In your investigation, did you find out that Cleo

21     McDougal's brother identified Elroy Lucky Johns who he has

22     known for a lengthy period of time as the killer of his

23     brother Cleo McDougal?

24     **A.**  There were flaws in that investigation.

25     **Q.**  I understand that.  Did you find out whether or not

*15-20652; USA v. EUGENE FISHER, ET AL*

1     Mr. McDougal's brother identified Elroy Lucky Jones as the
2     killer of his brother?
3         **A.**  Yes.
4              **MR. FEINBERG:**  Thank you.
5              **THE COURT:**  Anything further redirect?
6              **MR. FINOCCHIARO:**  Yes, your Honor.
7              **THE COURT:**  Okay.
8
9                    **REDIRECT EXAMINATION**
10
11  **BY MS. FINOCCHIARO:**
12
13        **Q.**  Are you aware of what happened with the conviction
14    of Mr. Elroy Jones?
15        **A.**  It was vacated.
16        **Q.**  When you say "vacated", what do you mean by that?
17        **A.**  They overturned his conviction.
18        **Q.**  And there was a lot of questions about social media
19    in this investigation.  Approximately how many social
20    media accounts did you review as part of your
21    investigation?
22        **A.**  It would be just a guess.  I would say over 50, and
23    many of those contained thousands of pages with many
24    images with many different individuals.
25              **MR. FINOCCHIARO:**  Nothing further, your

                 *15-20652; USA v. EUGENE FISHER, ET AL*

 1    Honor.

 2              **THE COURT:**  All right.  Thank you.  Thank

 3    you, sir.  You can step down.

 4              **THE WITNESS:**  Thank you.

 5

 6                   (Witness excused.)

 7

 8              **MR. S. SCHARG:**  Your Honor, may I make one

 9    request, please?  If Agent Ruiz is going to be testifying

10    at another time, can we ask that he be sequestered until

11    that time period?

12              **MR. FINOCCHIARO:**  Your Honor, I believe it's

13    been addressed, the fact that he is going to be recalled,

14    and he is the case agent.  So he does have the ability to

15    sit here during the trial to assist the trial team.

16              **THE COURT:**  He will be permitted to stay.

17              **MR. FINOCCHIARO:**  The government would call

18    Andrew White.

19              **THE COURT:**  Okay.

20

21                   **A N D R E W   W H I T E**

22

23    being first duly sworn by the Court to tell the truth, was

24    examined and testified upon his oath as follows:

25


                 *15-20652; USA v. EUGENE FISHER, ET AL*

 1                    **THE COURT:**  You can take a seat.  We'll start

 2    by having you state your name, and spelling your last

 3    name.

 4                    **THE WITNESS:**  Andrew White, W-h-i-t-e.

 5                    **THE COURT:**  Thank you.  You may proceed, Mr.

 6    Wigod.

 7                    **MR. WIGOD:**  Thank you, your Honor.

 8

 9                         **DIRECT EXAMINATION**

10

11    BY MR. WIGOD:

12

13       **Q.**  Tell the jury what you do for a living.

14       **A.**  I'm a state investigator for the state of Arizona.

15       **Q.**  How long you been an investigator for the state of

16    Arizona?

17       **A.**  Eight years.

18       **Q.**  How many?

19       **A.**  Eight.

20       **Q.**  What is it that you do as an investigator for

21    Arizona?

22       **A.**  I do investigation on massage therapists that commit

23    crimes, and I take them before the board and have

24    administrative hearings for their licenses.

25       **Q.**  Before you were an investigator with the state of

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    Arizona, where did you work?

2        **A.**   One year with the Wayne County Prosecutor's Office,

3    and before that 28 years total with the Detroit Police

4    Department, and 26 in narcotics.

5        **Q.**   You worked for the DPD for 28 years?

6        **A.**   Yes.

7        **Q.**   Twenty-six of them were narcotics?

8        **A.**   Yes.

9        **Q.**   So you know a little something about drug

10   trafficking in city of Detroit?

11       **A.**   Yes.

12       **Q.**   Now as an investigator with narcotics for 26 years,

13   can you just explain to the jury what type of cases you

14   handled, what your duties were?

15       **A.**   We conducted surveillance and arrest operations, buy

16   and bust operations, search warrants, street enforcement

17   operation, running source information, receive complaints

18   and investigate those complaints from bottom to top,

19   receiving complaints from community meetings, mayor's

20   office, court system.

21       **Q.**   I just want to follow up on some of those things

22   that you listed, and have you explain to the jury what

23   that involves.

24       **A.**   Yes.

25       **Q.**   I think one of the first things that you said was

*15-20652; USA v. EUGENE FISHER, ET AL*

1    surveillance.

2      **A.**   Yes.

3      **Q.**   What do you mean by surveillance?

4      **A.**   Surveillance is an operation where we have a

5    complaint.  We assigned an individual to do the

6    surveillance.  We monitor the location to see if it is

7    active.  Once we find out it is active, we act.  We

8    conduct street enforcement or search warrant, or we might

9    try a buy and bust operation.

10     **Q.**   So surveillance, you get a complaint that there are

11   drugs at x-y-z address.  You go out there kind of not so

12   you're obviously the police, right?

13     **A.**   Yes.

14     **Q.**   And take a look to see if there is any said

15   activity, drug activity?

16     **A.**   Correct.

17     **Q.**   Now in explaining the surveillance, you indicated

18   and before you indicated, buy and bust?

19     **A.**   Yes.

20     **Q.**   Explain to the jury what you mean by that.

21     **A.**   Buy and bust, we would issue an officer recorded

22   money, and he goes and attempts to make a purchase of

23   suspected narcotics, depending what it is, cocaine,

24   marijuana or pills or heroin.

25     **Q.**   So that would be an officer doing that?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   Yes.

2      **Q.**   Undercover officer?

3      **A.**   Yes.

4      **Q.**   So someone not dressed as a police officer and is in

5      plain clothes?

6      **A.**   Right.  I have bought drugs in uniform before but --

7      **Q.**   I imagine so.  Now you also mentioned source

8      information?

9      **A.**   Yes.

10     **Q.**   Are there times instead of an undercover police

11     officer going to purchase drugs from a particular person

12     or location, you use a cooperating informant?

13     **A.**   Yes.

14     **Q.**   Explain that process.

15     **A.**   There are two ways.  One could be just giving you

16     information, telling you about a certain location and we

17     act on it.  The other one is use the source of information

18     as a person who is supplied with money to make a purchase

19     at that location, and then we will make a -- get a search

20     warrant for that location and act on it.

21     **Q.**   For example, you have a source, a source meaning a

22     civilian --

23     **A.**   Yes.

24     **Q.**   -- not a police officer, will go under the direction

25     of law enforcement to a particular person or address to

*15-20652; USA v. EUGENE FISHER, ET AL*

1    purchase controlled substances, and then return to law

2    enforcement?

3        **A.**   Yes.

4        **Q.**   And based on that information, you would obtain a

5    search warrant from a court to search that location?

6        **A.**   That's correct.

7        **Q.**   I think you also mentioned that you follow up on

8    complaints?

9        **A.**   Yes.

10       **Q.**   Issues from either the citizens complaining or the

11   mayor's office?

12       **A.**   Yes.   We receive a list from the hot line.   We

13   receive complaints from the community meetings when people

14   write the location down on a piece of paper or something

15   like that, and we investigate it.   Sometimes we receive

16   complaints from other police officers that a location is

17   active, and we follow up and do an investigation from

18   there.

19       **Q.**   Are those reports from the citizens anonymous?

20       **A.**   Most are.   Most are.

21       **Q.**   Now during your 26 years, what was your -- were you

22   a supervisor or --

23       **A.**   Yes, I started as a PO.   I did --

24       **Q.**   PO?

25       **A.**   Police officer.   I did buys and raids and ran

1    sources and conducted a lot of street enforcement

2    activity.  I was promoted in 96, and I was supervisor

3    until 2010.

4    Q.  When you say street enforcement activity, you're

5    talking about the things that we just went over?

6    A.  Yes.

7    Q.  Now during your years in narcotics, did you come

8    across times where individuals selling narcotics would use

9    vacant dwellings?

10   A.  Yes.

11   Q.  What's the advantage of that?

12   A.  Ownership, kind of tied that individual to that

13   location.  You can actually put drugs and hide drugs in

14   the place because you can destroy the house, and place

15   stuff inside the house where probably only you know where

16   it's at.  It is the ability to make escape routes from

17   that location.  So our job is to circumvent the house, and

18   then make entry to keep everyone inside the house.

19   Q.  Okay.  So I think the first reason you said is that

20   house is not tied to the drug dealers?

21   A.  Correct.

22   Q.  Since it's -- typically vacant houses are not kept

23   up extremely well?

24   A.  No.

25   Q.  There's holes in the floor, behind walls, things of

*15-20652; USA v. EUGENE FISHER, ET AL*

1    that nature where controlled substances can be hidden?

2        A.  Yes.

3        Q.  Is it also fair to say there's not a lot foot

4    traffic in vacant houses?

5            **MR. MAGIDSON:**  Leading questions, your Honor.

6            **THE COURT:**  Okay.  You want to try to avoid

7    leading questions.

8            **MR. WIGOD:**  Of course, your Honor.

9        In your experience, a lot of foot traffic, meaning

10   a lot regular citizens going to vacant dwellings?

11       A.  I would not say regular citizens.  They might have a

12   route that they use might.  They might use the alley,

13   might use the side of the house.

14

15   **BY MR. WIGOD:**

16       Q.  You're talking about drug dealers?

17       A.  Yes.

18       Q.  During your time in narcotics, did you come across

19   individuals who would hide drugs?  You mentioned in

20   residences or vacant dwellings, but would you come across

21   individuals who would hide drugs on their person?

22       A.  Yes, in their socks, groin area, in the anus, taped

23   to the chest, arms, hats, up the sleeve, gloves.

24       Q.  You've actually experienced cases where you had

25   individuals hiding controlled substance in their body

*15-20652; USA v. EUGENE FISHER, ET AL*

1    cavity?

2       **A.**   Oh, yes.

3       **Q.**   What about individuals who -- did you find any

4    individuals who had large amount of cash on them?

5       **A.**   Oh, yes.   Yes.

6       **Q.**   Was that common?

7       **A.**   Yes.   A lot of times it is spread out, but you see

8    one individual who might control more money than others.

9       **Q.**   What about firearms?   Was it common for you to find

10   not only controlled substance, but firearms with the

11   controlled substances?

12      **A.**   On the individuals and stashed in locations also.

13      **Q.**   And the idea behind having a firearm with controlled

14   substances would be what?

15      **A.**   To protect their interest, which would be drugs and

16   money.

17      **Q.**   So you're aware of cases where individual drug

18   dealers would get robbed?

19      **A.**   Oh, yes.

20      **Q.**   Those individuals don't typically call the police.

21   The drug dealers don't call the police when they are

22   robbed?

23      **A.**   No.   I've seen it happened, but very rare.

24      **Q.**   Less rare than buying drugs in a uniform.   Just

25   kidding.

*15-20652; USA v. EUGENE FISHER, ET AL*

1             So those individuals who get robbed of their

2    drugs, obviously they are left to themselves to protect

3    themselves?

4        **A.**   Yes.

5        **Q.**   Thus the firearms?

6        **A.**   That's right.

7        **Q.**   So individuals sometimes have firearms on themselves

8    you mentioned?

9        **A.**   Yes.

10       **Q.**   You also mentioned firearms in the dwellings or the

11   locations where --

12       **A.**   A lot of times they are systematically placed so

13   they can get to that weapon very fast.

14       **Q.**   You heard vacant dwellings.  Is there another name

15   for vacant dwellings that deal drugs out of?

16       **A.**   Lots of time just a hole.

17       **Q.**   Now obviously you're not able to patrol the entire

18   city at the same time as far as drug dealing.  How is it

19   that you determine what areas to focus on?

20       **A.**   Each area has a sergeant and a crew assigned to it.

21   I was assigned to the Ninth Precinct for five years, and

22   then I was assigned to street enforcement from 1986 to

23   1996, and again from 2004 to 2005, and then central

24   enforcement from 2005 to 2010.

25       **Q.**   Does the Ninth Precinct cover the area of Seven Mile

*15-20652; USA v. EUGENE FISHER, ET AL*

1     and Gratiot?

2        A.   Yes.

3        Q.   And you're familiar with that area?

4        A.   Yes.

5        Q.   Basically because you worked narcotics in that area?

6        A.   Yes, and I lived in that area also.

7        Q.   Now when you were in narcotics in the Ninth Precinct

8     Seven Mile and Gratiot area, you conducted street

9     enforcement that you listed out?

10       A.   Yes.

11       Q.   I want to talk to you about two particular incidents

12    that you were involved in, one being December 10, 2008.

13    Do you recall that incident?

14       A.   Yes.

15              MR. FEINBERG:   What year?

16              MR. WIGOD:   December 12, 2008.

17

18    BY MR. WIGOD:

19       Q.   Did you have an opportunity to have contact with

20    several individuals who were suspected of participating in

21    narcotics activity?

22       A.   Yes.

23       Q.   Can you please simply just -- some were found in

24    possession of controlled substance, and some were in and

25    around that activity?

                    15-20652; USA v. EUGENE FISHER, ET AL

1    **A.**  Yes.

2    **Q.**  As far as the individuals -- all the subjects that

3    were found, do you remember -- this is the 2008 incident.

4    What location was that at?

5    **A.**  That was at 14110 Eastburn.

6    **Q.**  And there were several subjects that you and your

7    narcotic team were in contact with?

8    **A.**  Yes.

9    **Q.**  Just list for us the subjects that were involved in

10   that incident.

11   **A.**  Donald Gantt, Davon Fitzpatrick and Javonte Smith.

12   **Q.**  And were there other individuals as well?

13   **A.**  Yes.

14   **Q.**  Who were those individuals?

15   **A.**  May I refer to my PCR?

16   **Q.**  Please.

17   **A.**  That would be Robert Brown, Tynisha Mumford, Jeffrey

18   Adams, Cheyarian Burse, Steve Arthur.  That's it.

19   **Q.**  Now you mentioned an individual by the name of

20   Robert Brown.  Do you have a date of birth for that

21   individual?

22   **A.**  Yes 4-7-1982.

23   **Q.**  And you mentioned Jeffrey Adams and Steven Arthur

24   were there as well?

25   **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

**Q.**   Now -- go ahead.

**A.**   Jeffrey Adams' birthday was 3-13-89, and Mr. Arthur was 4-16-89.

**Q.**   Now what type of operation was this?

**A.**   We were doing a surveillance and arrest operation.

**Q.**   Meaning what?

**A.**   I set up a surveillance point a short distance away, monitor the individuals conducting narcotics transaction at the side of the location.  I notified my arrest team to move and to do an investigation.  There were individuals who were arrested with narcotics, and Mr. Smith was in possession of a weapon.

**Q.**   There were narcotics found on which individuals?

**A.**   Mr. Gantt, Mr. Fitzpatrick and Mr. Smith.

**Q.**   What types of narcotics?

**A.**   Marijuana.

**Q.**   And you mentioned there was a firearm?

**A.**   Yes.  It was a blue steel auto Colt .38 confiscated from Mr. Smith.

**Q.**   There were the other four individuals -- excuse me -- five individuals also were also present with those three individuals?

**A.**   Yes, they were issued ordinance violations for drug activity.

**Q.**   Okay.  Just real quick, I may have missed this, you

*15-20652; USA v. EUGENE FISHER, ET AL*

1       mentioned that you were doing surveillance at this time,

2       and what was it, and you ordered -- or you directed the

3       officers to go in.  What was it that made you direct the

4       officers to go in?

5           **A.**  I saw those three individuals greeting the suspected

6       buyers, accepting money, and giving the individuals what I

7       believe was a cupped hand position.  That's the normal way

8       of passing narcotics in the open.  Those individuals would

9       then walk away from that location and leave the area.  I

10      gave the description of those three individuals involved

11      to my arrest team.  They moved in and made the arrest.

12          **Q.**  You saw actually what you believed was a drug deal?

13          **A.**  Oh, yes.  Yes.

14          **Q.**  Mr. White, I want to go to an incident from

15      September 9, 2003.

16          **A.**  Yes, sir.

17          **Q.**  This was at Manning and Monarch?

18          **A.**  Yes.

19          **Q.**  Are you familiar with that location?

20          **A.**  Yes.

21          **Q.**  Also in the Ninth Precinct?

22          **A.**  Yes.

23          **Q.**  Near Seven Mile and Gratiot?

24          **A.**  Yes.

25          **Q.**  And this was a another street enforcement?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  And did you come in contact with multiple

3    individuals on that location?

4    **A.**  Yes, we did.

5    **Q.**  Could you just list the names of the individuals who

6    you had contact with?

7    **A.**  Yes, referring to the paperwork, Devon Patterson

8    4-16-85, Pernell Williams, 7-13-84, Edward Maddox,

9    4-12-82, Derrick Bush, 10-27-64, Robert Brown, 4-7-82,

10   James Jackson, 6-21-44, Anthony Lovejoy, 9-26-82, Deantre

11   Scalfe, 5-16-82, Lekeyshia Harris, 5-12-84, Tequila

12   Coleman, 10-11-81, Roderick Daniels, 9-16-81.

13   **Q.**  Now on some of those individuals controlled

14   substance were found?

15   **A.**  Yes.  Cocaine was confiscated from Mr. Devon

16   Patterson.  From Mr. Williams and Mr. Maddox marijuana was

17   confiscated.

18   **Q.**  How about any U.S. currency?  Was there any U.S.

19   currency on any of the individuals?

20   **A.**  $230 from Mr. Patterson, and I believe $57 from

21   Mr. Williams, and then $160 from Mr. Maddox.

22            **MR. WIGOD:**  One quick second.

23        Thank you for your time.  These gentlemen may have

24   some questions for you.

25            **THE COURT:**  Any cross examination?

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. H. SCHARG:** No questions on behalf

2    of Mr. Fisher.

3          **MR. FEINBERG:** Yes, sir. Just one second.

4          **MR. S. SCHARG:** No questions on behalf of Mr.

5    Porter.

6          **THE COURT:** Thank you, Mr. Scharg.

7

8                    **CROSS EXAMINATION**

9

10   **BY MR. FEINBERG:**

11

12   **Q.** May I see the documents that you were referring to?

13   **A.** Yes, sir.

14   **Q.** Let's go to the September 9, 2003 incident.

15   **A.** Yes.

16   **Q.** You mentioned a bunch of names. You also mentioned

17   Robert Brown?

18   **A.** Yes.

19   **Q.** Where was he located?

20   **A.** Actually, I don't remember any contact with him

21   personally. So I couldn't tell you. I was the officer in

22   charge, and I didn't make any arrests. I did confiscation

23   of money at that location.

24   **Q.** Are you saying he was in a particular dwelling?

25   **A.** At that time they were at the --

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.** Not they. Mr. Brown.

2    **A.** It would be at the Manning location.

3    **Q.** Inside a house?

4    **A.** No, no.

5    **Q.** Where was he?

6    **A.** If I remember correctly, they were on the street.

7    **Q.** Specifically, Mr. Brown, where was he?

8    **A.** I didn't have any contact with Mr. Brown personally.

9    **Q.** Do you know if his family lived in that area?

10   **A.** I couldn't tell you. I'm sorry.

11   **Q.** He wasn't arrested, was he?

12   **A.** Technically he was arrested and we did a warrant

13   check and issued violations. Some had violations. Some

14   were taken to the precinct.

15   **Q.** Was he charged with anything?

16   **A.** If I can refer to the report?

17   **Q.** Sure. Sure.

18   **A.** He was issued a misdemeanor ordinance violation.

19   **Q.** For what?

20   **A.** Probably loitering.

21   **Q.** Not probably.

22   **A.** I can't tell from this.

23   **Q.** Do you know what happened to the case?

24   **A.** No, I don't.

25   **Q.** You don't know. You can't verify the fact that the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    case was dismissed for lack of evidence?

2        **A.**  Lack of evidence?

3        **Q.**  Yes, lack of evidence that he was in violation of

4    any law?

5        **A.**  If the case was probably dismissed, we probably not

6    in the courtroom, but that's probably what happened.  Lot

7    of times we in multiple courtrooms.  I made over 58,000

8    narcotics arrests.

9        **Q.**  You don't know if the case was dismissed because of

10   lack of evidence?

11       **A.**  I couldn't tell you that.

12       **Q.**  Okay.  He wasn't found with any drugs or money?

13       **A.**  No.

14       **Q.**  Okay.  Let's go to the December 10, 2008.  You

15   mentioned that a number of people were found with drugs?

16       **A.**  Yes.

17       **Q.**  Correct?

18       **A.**  Yes.

19       **Q.**  Mr. Gantt, Mr. Fitzpatrick and Mr. Smith?

20       **A.**  Yes.

21       **Q.**  And some were found with money?

22       **A.**  Yes.

23       **Q.**  Where was Mr. Brown in relation to the

24   investigation?

25       **A.**  In the dwelling.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  In the house?

2    **A.**  Yes.

3    **Q.**  Did anyone see him drive up to the house?

4    **A.**  No, not while I was there.

5    **Q.**  I'm sorry?

6    **A.**  I was the surveillance officer, no.

7    **Q.**  Where in the house was he?

8    **A.**  I don't know exactly his location.  I was not the

9    arresting officer, but I was the officer on surveillance,

10   and the only people that left the house were the people

11   that made the purchase of narcotics.  No one else left the

12   house.

13   **Q.**  Mr. Brown never left the house?

14   **A.**  No.

15   **Q.**  So you're saying the sellers were in the house, and

16   then they left and were found with money and drugs?

17   **A.**  No.  The sellers were the three individuals at the

18   side of 14110, but the buyers would then leave the area.

19   The sellers would go back into the location.

20   **Q.**  So what you're saying is the sellers never went into

21   the house?

22   **A.**  Yeah, they did.  The sellers were in the house.  The

23   buyers never went in the house.

24   **Q.**  And Mr. Brown was in the house?

25   **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  During the whole time?

2     **A.**  Yes.

3     **Q.**  Did he ever come out?

4     **A.**  No.

5     **Q.**  According to you, did he make any sales?

6     **A.**  No, he didn't.

7     **Q.**  What kind of house was this?

8     **A.**  It was a single family, one and a half duplex type

9     house.  It's in a regular neighborhood about a block,

10    maybe two blocks from Gratiot, and about three blocks from

11    Eight Mile maybe.

12     **Q.**  It wasn't an abandon house?

13     **A.**  No.

14     **Q.**  Whose house was it?

15     **A.**  I don't know.  No one claimed it.

16     **Q.**  Did you ever find out?

17     **A.**  No.

18     **Q.**  Did you find any drugs or money on Mr. Brown?

19     **A.**  No.

20     **Q.**  He was never arrested?

21     **A.**  He was arrested and a warrant check was done on him,

22    and he was issued a citation and released at that time.

23     **Q.**  Citation for what?

24     **A.**  Loitering in the place of illegal occupation.

25     **Q.**  Are you aware that the case was dismissed for lack

*15-20652; USA v. EUGENE FISHER, ET AL*

1    of evidence?

2         **A.**   You keep saying lack of evidence, and probably 99

3    percent of the time the case is dismissed because we in

4    another courtroom.   I went to court almost everyday in my

5    whole career.

6         **Q.**   I understand that you said 99 percent.   Is that a

7    statistic that you kept in the normal course of your

8    business?

9         **A.**   I know that.

10        **Q.**   I'm asking you a question.

11        **A.**   No.

12        **Q.**   Do you keep records --

13        **A.**   At one point I did.

14        **Q.**   -- of cases that were dismissed because officers

15   were not available to be in court?

16        **A.**   At one point, yes.

17        **Q.**   Do you know whether or not the case that Mr. Brown

18   allegedly had was dismissed because lack of evidence or

19   the police officer not showing?

20        **A.**   I couldn't tell you right now.   I've been separated

21   from the police department for eight years.   I couldn't

22   tell you.

23        **Q.**   Nothing in the police records that you just showed

24   me show the disposition of Mr. Brown's case?

25        **A.**   No.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   Correct?

2    **A.**   No.

3    **Q.**   So you cannot say with any degree of certainty that

4    Mr. Brown's case was, in fact, dismissed for lack of

5    evidence?

6    **A.**   I can't say, no.

7    **Q.**   You can't dispute that?

8    **A.**   No.

9    **Q.**   Okay.  Where were you during the surveillance?

10   **A.**   One and a half houses away.  I was using -- I'm

11   trying to remember what vehicle I was in -- a conversion

12   van with tinted windows.  If I remember correctly it was a

13   burgundy van.

14   **Q.**   And you never saw some people driving up to the

15   area, and the gang squad stopped the car and ordered

16   people out?

17   **A.**   No.

18   **Q.**   Never saw that?

19   **A.**   No.  Not gang squad.  I worked narcotics.

20   **Q.**   Or anyone from the narcotic squad?

21   **A.**   No.

22   **Q.**   You sure?

23   **A.**   Yes.

24   **Q.**   Okay.  Can you show me anywhere in the -- when you

25   say PCR, preliminary complaint report?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Yes.

2      **Q.**  Can you show me anywhere in the preliminary

3   complaint report that says that Mr. Brown was found in the

4   house at the time of the bust and arrest?

5      **A.**  This right here is a --

6      **Q.**  I'm asking you.

7      **A.**  It wouldn't be in this report, no.

8      **Q.**  What report would it say that Mr. Brown was in the

9   house?

10      **A.**  It would be probably in the regular PCR, but I don't

11   have that.

12      **Q.**  You have no record to show that Mr. Brown was found

13   in the house at the time of the search?

14      **A.**  Not in this record right here, no.

15      **Q.**  Does it exist anywhere?

16      **A.**  I couldn't tell you.

17      **Q.**  Where he was found?

18      **A.**  I've been gone for eight years.  I couldn't tell you

19   where anything is at anymore.

20      **Q.**  Does it show that he was issued a citation or do you

21   think?

22      **A.**  I know that for sure.

23      **Q.**  How do you know that?

24      **A.**  Because I ordered it.

25      **Q.**  Okay.  You remember that?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Oh, yes.

2    **Q.**  But you don't remember where in the house that he

3    was?

4    **A.**  No.

5    **Q.**  Or even in the house?

6    **A.**  He was in the house.

7    **Q.**  Okay.  According to no record and memory of 10 years

8    ago?

9    **A.**  Yes.

10   **Q.**  How many arrests did you make from since

11   December 10, 2008?

12   **A.**  Probably about 6,000.

13   **Q.**  Any reason why you do not have the full file?

14   **A.**  I can't tell you where the records are.  At a lot of

15   records have been destroyed since I left.

16   **Q.**  So the potential records to show that you are in

17   potential error of something of 10 years ago among 6,000

18   arrests doesn't exist or may not exist?

19   **A.**  I don't know about being in error, but I don't -- I

20   don't have any ties to the Detroit Police Department

21   anymore at all.  I'm sorry.

22   **Q.**  You could be wrong among the 6,000 arrests since

23   2008?

24   **A.**  I don't think so.

25   **Q.**  I know you don't think so, but it is possible?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  I don't think so.

2      **Q.**  I know you don't think so, but it is possible based

3      on the amount of cases that you had, and how long ago it

4      was to remember one specific incident?

5      **A.**  I remember this incident.  I've never been on

6      Eastburn before but that one time.

7      **Q.**  Where is that written?

8      **A.**  In here, sir.

9              **MR. FEINBERG:**  I have no further questions.

10             **THE COURT:**  Thank you.

11             **MR. FEINBERG:**  I assume the witness is

12     excused so he can go back to Arizona where he is involved

13     in massage therapy?

14             **THE COURT:**  Mr. Magidson?

15             **MR. MAGIDSON:**  I have a couple of questions,

16     your Honor.

17

18                    **CROSS EXAMINATION**

19

20     BY MR. MAGIDSON:

21

22     **Q.**  Good morning.  Are you Detective White, or what's

23     your rank now?

24     **A.**  I'm an investigator.

25     **Q.**  Investigator?

                *15-20652; USA v. EUGENE FISHER, ET AL*

1   **A.**  Yes.

2   **Q.**  My name is Mark Magidson.  I represent Mr. Shy in

3   this case.  You started off in Detroit, correct?

4   **A.**  Yes.

5   **Q.**  And, in fact, you were raised here or not?

6   **A.**  Yes.

7   **Q.**  Okay.  And you were from the east side?

8   **A.**  No, I'm a west sider originally.

9   **Q.**  I thought you mentioned that at some point --

10  **A.**  I met an east side girl.

11  **Q.**  And you came across?

12  **A.**  I met an east side girl.

13  **Q.**  It's always the woman.

14  **A.**  Yes.

15  **Q.**  Okay.  And you wound up living, you said in the

16  Seven Mile Gratiot area?

17  **A.**  Not that area, but I stayed off of Moross.  I stayed

18  on Roxbury.

19  **Q.**  Okay.  That's further east, but you're familiar with

20  the area?

21  **A.**  Yes.

22  **Q.**  You have been familiar with that area going back

23  20-30 years?

24  **A.**  Yes.

25  **Q.**  And you remember that area when it was fully

*15-20652; USA v. EUGENE FISHER, ET AL*

1  occupied?

2   **A.**  Yes.

3   **Q.**  In fact, primarily was that the area that was known

4  as Copper Canyon?

5   **A.**  Yes, at one point.

6   **Q.**  That's where all the police --

7   **A.**  All the police officers stayed over there.

8   **Q.**  And as you recall it was primarily a Caucasian white

9  area?

10   **A.**  Yes.

11   **Q.**  And then sometime in the 70's, maybe the 80's, a few

12  black families started to move into the area.  Would that

13  be about right?

14   **A.**  I came over there in 90 I believe.

15   **Q.**  Right.  Based on your experience and knowledge of

16  the city, at some point a few black families started

17  moving into which was historically a white area?

18   **A.**  Yes.

19   **Q.**  When it was historically a white area, all of those

20  streets, those major streets like Gratiot, Kelly, all the

21  other streets over there on the east side, even Seven

22  Mile, Eight Mile, they all had businesses?

23   **A.**  Yes.

24   **Q.**  Actually thriving businesses because they supported

25  a thriving neighborhood?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**  Yes.

2     **Q.**  But then as black families started moving in, there

3     was an exodus of white families to the suburbs?

4     **A.**  Yes.

5     **Q.**  Ever hear the term "white flight"?

6     **A.**  Yes.

7     **Q.**  People would literally leave their homes, put up a

8     for sale, but they would leave before they were sold?

9                **MR. WIGOD:**  I object to the relevance.

10               **MR. MAGIDSON:**  Judge, they went into great

11    detail on direct about, you know, what he did in terms of

12    buys and busts in the neighborhood, and I want to set the

13    stage a little bit about what this neighborhood is about.

14               **THE COURT:**  I'll overrule the objection.

15               **MR. MAGIDSON:**  Thank you.

16          So as a result, there were a lot of abandon houses

17    in that area?

18     **A.**  Not in that general area of Eastburn area, but going

19    back west, yes.

20

21    BY MR. MAGIDSON:

22     **Q.**  As people left the area, values of the housing stock

23    went down.  Would you agree with that?  You could pick up

24    a house in that area for pretty cheap?

25     **A.**  Not that particular block, I don't think so.  I

*15-20652; USA v. EUGENE FISHER, ET AL*

1    think Eastburn at that time had maintained their value.  I

2    think more west they were losing value.

3        **Q.**  All right.  Talking about in the Seven Mile Gratiot

4    area.

5        **A.**  Oh, yes.  Yes.  I understand.  Some of areas, yes.

6        **Q.**  And the businesses that were once thriving, kids

7    picking up summer jobs, part-time jobs, those businesses

8    closed?

9        **A.**  Yes.

10       **Q.**  And then what was historically one hardware store,

11   grocery stores, butcher shops, shoe stores, clothing

12   stores would line Gratiot, Seven Mile, all of that area,

13   they were gone?

14       **A.**  The ones on Kelly stayed, but the ones on Seven Mile

15   left.

16       **Q.**  Gratiot?

17       **A.**  Yes.

18       **Q.**  You could go blocks and blocks, and just have maybe

19   one or two stores open and five or six empty?

20       **A.**  Yes.  I believe that, yes.

21       **Q.**  And the opportunity for -- and as the white people

22   left, the African American families moved in, correct?

23       **A.**  Yes.

24       **Q.**  But the opportunities for those kids were minimal,

25   the opportunities to get a job in the neighborhood store,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    at the grocery store, the shoe store, they didn't exist

2    anymore.  Would you agree with that?

3        **A.**  In some areas, yes.

4        **Q.**  And coincidently, you found kids hanging out on

5    street corners in the summer or wherever and selling

6    marijuana or doing whatever to pick up some extra change?

7        **A.**  Yes, I agree with that.

8              **MR. MAGIDSON:**  Thank you, your Honor.

9              **THE COURT:**  Thank you, Mr. Magidson.

10         Anyone else?  Any redirect?

11             **MR. S. SCHARG:**  No questions on behalf of Mr.

12   Porter.

13             **THE COURT:**  Thank you.  We'll have you step

14   down.

15             **THE WITNESS:**  Thank you.

16

17                   (Witness excused.)

18

19             **MR. FINOCCHIARO:**  Government would call

20   William Ashford.

21

22             **W I L L I A M   A S H F O R D**

23

24   being first duly sworn by the Court to tell the truth, was

25   examined and testified upon his oath as follows:


                    *15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE COURT:**  We will have you begin by having

2     you state your name and spelling your last name.

3          **THE WITNESS:**  William Ashford, A-s-h-f-o-r-d.

4          **THE COURT:**  Thank you.  Mr. Bilkovic, you may

5     proceed.

6          **MR. BILKOVIC:**  Thank you, your Honor.

7

8                    **DIRECT EXAMINATION**

9

10    BY MR. BILKOVIC:

11

12    **Q.**  How are you employed?

13    **A.**  Police officer with the University of

14    Michigan-Dearborn.

15    **Q.**  How long have you been a police officer with the

16    University of Michigan-Dearborn?

17    **A.**  One year.

18    **Q.**  Prior to becoming a police officer with the

19    University of Michigan-Dearborn, what did you do?

20    **A.**  I was a police officer for the Detroit Police

21    Department.

22    **Q.**  How long were a police officer with the Detroit

23    Police Department?

24    **A.**  Twenty-two years.

25    **Q.**  And what happened after the 22 years?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Retired at the rank of detective.

2    **Q.**   What type of things did you do with the Detroit

3    police Department?  What were some of your assignments?

4    **A.**   I began my career at the Eighth Precinct as a patrol

5    officer.  That expanded from the Eighth Precinct to vice,

6    internal controls, narcotics conspiracy.  I left narcotics

7    conspiracy and went to the Ninth Precinct and Twelfth

8    Precinct, and was promoted and went to sex crimes where I

9    retired.

10   **Q.**   Do you recall what you were doing with the Detroit

11   Police Department back in May of 2006?

12   **A.**   I was assigned to narcotics conspiracy for the

13   Detroit Police Department.

14   **Q.**   And in 2006, how long had you been assigned to that

15   unit?

16   **A.**   I had been there six years at that time.

17   **Q.**   I want to take your attention to May 31, 2006.  On

18   that day were you in the area of 14781 and 14791 Manning

19   in the city of Detroit?

20   **A.**   Yes, I was.

21   **Q.**   Is that an area that was referred to or was known as

22   the Red Zone?

23   **A.**   Yes.

24   **Q.**   And why were you in that area?

25   **A.**   In May of 2006, I executed a search warrant for the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    purposes of both addresses.

2       Q.   What led you to the interest of those addresses?

3       A.   I received information from a cooperating defendant

4    that gave me information regarding narcotics being sold

5    from those addresses.

6       Q.   When you say cooperating defendant, what is a

7    cooperating defendant?

8       A.   A cooperating defendant is someone that was arrested

9    and charged on a previous case that worked out details

10   with the prosecutor where he worked his time off.

11      Q.   Working his time off by cooperating in order to get

12   a better results for him?

13      A.   Yes, sir.

14      Q.   Now did you just go and get a search warrant based

15   on information given to you by that cooperating defendant,

16   or did you do something as well?

17      A.   No.  It required me first to listen to the

18   information, then in receiving that information from a

19   that cooperating defendant, I myself went and did

20   surveillance on the location to see if the activity that

21   was described to me or given to me was, in fact, visible

22   or I could confirm it rather.

23      Q.   Did you do that surveillance on May 31, 2006?

24      A.   I did.

25      Q.   What did you observe?  Did you go to that area of

*15-20652; USA v. EUGENE FISHER, ET AL*

1    14781 and 791 Manning?

2        **A.**  Yes, I did.

3        **Q.**  How long were you there for?

4        **A.**  I would say at least 15 to 20 minutes.

5        **Q.**  During that period of time, did you observe

6    anything?

7        **A.**  I did observe traffic that I had known to be

8    consistent with that of narcotic -- illegal narcotic

9    trafficking.

10       **Q.**  Do you recall what that traffic was?

11       **A.**  It would be different individuals or motorists that

12   would pull up, go to the house where they were met by an

13   individual, hand to hand exchange.  They were either

14   allowed in the house or they were kept on the front porch.

15       **Q.**  Do you recall why you were interested in both

16   houses?

17       **A.**  That was the information that was given.

18       **Q.**  Do you recall drafting a search warrant in this

19   case?

20       **A.**  I do.

21       **Q.**  And do you recall indicating in that search warrant

22   that people would go to one house, somebody would greet

23   them there, and go over to the other house, and then come

24   back?

25       **A.**  Yes.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  Can you kind of describe that in a little bit more

2     detail?

3     **A.**  If my memory serves correctly, the narcotics were

4     kept in one location and the money in another.  The

5     customer was never taken to the house where the narcotics

6     was actually confiscated from.

7     **Q.**  So the customer would go to one house, and somebody

8     at that house would go to the next house?

9     **A.**  Yes.

10    **Q.**  And then would go into the house?

11    **A.**  Yes.

12    **Q.**  And come back to the where the customer was?

13    **A.**  Yes.

14    **Q.**  And did you see any exchange that led you to believe

15    that there was some type of transaction?

16    **A.**  I did.

17    **Q.**  And based on what you observed, how many times did

18    you observe that in the 15-20 minutes that you believe

19    that you were there?

20    **A.**  I believe I observed three transactions, if my

21    memory serves correctly.

22    **Q.**  So as a result of what you observed, did you obtain

23    a search warrant?

24    **A.**  I did.

25    **Q.**  And were you -- did you execute the search warrant?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   I did.

2    **Q.**   Did you execute it the same day?

3    **A.**   The next day.

4    **Q.**   So that would have been what day, June 1st?

5    **A.**   Yes.

6    **Q.**   Did you do that by yourself or with others?

7    **A.**   I was assigned to a raid team.

8    **Q.**   What was your role with the raid team?

9    **A.**   I was the shotgun man on the raid team.

10   **Q.**   What is the shotgun man?

11   **A.**   You have a breach team that breaches the door.  The

12   shotgun man goes through the house, conducts what we call

13   a protective sweep to make sure the dwelling is secured,

14   and then at that point the rest of the team is brought in,

15   and we begin a search once it is declared all secured.

16   **Q.**   Do you recall if anybody was in either of the

17   residences?

18   **A.**   Yes.

19   **Q.**   Did you end up making a list or preparing what's

20   called a 24 hour information sheet that describes the

21   people that were found in the residences?

22   **A.**   I did.

23   **Q.**   And do you have that with you?

24   **A.**   I do.

25   **Q.**   Can you give the names and dates of births by memory

*15-20652; USA v. EUGENE FISHER, ET AL*

1    or would you need to refer to that?

2        A.   I would need to refer to it.

3        Q.   Would you please do that?  Do you have it in front

4    of you?

5        A.   I have.  I do not have the 24 hour sheet, but I have

6    the Aims report that the 24 hour sheet is drafted from.  I

7    stand corrected.  I do have the 24 hour sheet.

8        Q.   That is something that you prepare?

9        A.   It is in my handwriting.

10       Q.   Now are there names as well as dates of birth and

11   addresses on there?

12       A.   There is.

13       Q.   How would you have obtained that information?

14       A.   From identification.

15       Q.   Identification of who?

16       A.   Of the individual that the I.D. was taken from.

17       Q.   Can you go through the 24 information sheet and

18   identify who was at that residence, and the what date of

19   birth was?

20       A.   Yes.  The first name is Michael Alexander Scott

21   Gray.

22              MR. FEINBERG:   Could he spell the last name

23   of that person?

24              THE COURT:   Okay.

25

                15-20652; USA v. EUGENE FISHER, ET AL

1    BY MR. BILKOVIC:

2      Q.  Spell the last name, and also give their date of

3    birth.

4      A.  G-r-a-y, with a DOB of 11-29-81.  The address

5    recorded is 14992 Novara.

6              Next name is James Randall Robinson.  Date of

7    birth is 12-31-79, with an address of 15715 Coram.

8              Next is Robert Martin Brown, II.  DOB of 4-7-82.

9    Address, 14561 Manning.

10             Next name Prentice Lee Graham, with a date of

11   birth of 7-14-80.  No address recorded.

12             Next name is Quincy Lamar Graham.  DOB of

13   9-13-83.  Address, 23315 Pelkey.

14             And the last name, Alvin Ervin Fisher.  DOB of

15   3-1-85.  Address, 19319 Monarch.

16     Q.  Now those six individuals, were they found in one of

17   the houses or were they split between two of the houses,

18   if you remember?

19     A.  That I'm not sure of.  I believe it was split

20   between the two houses.

21     Q.  And can you identify who was in what house right

22   now?

23     A.  No, I cannot.

24     Q.  Based in part on the passage of time?

25     A.  Yes.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Do you recall whether or not controlled substances

2    were found in either location?

3    **A.**  Yes, I do know.

4    **Q.**  And what was found?

5    **A.**  Cocaine.  That would be from the address of 14781

6    Manning.  One brown bag containing one sandwich bag of

7    suspected crack cocaine with an approximate weight of

8    65 grams.

9    **Q.**  Officer Ashford, earlier you indicated that you

10   obtained the search warrant and executed the search the

11   next day.  Do you have a copy of the search warrant

12   affidavit with you?

13   **A.**  I do.

14   **Q.**  And do you have the copy of the request for

15   laboratory service controlled substances report?

16   **A.**  I do.

17   **Q.**  And could you look at those and indicate whether or

18   not after reviewing those, you still think that the search

19   warrant was executed on June 1st versus May 31st?

20   **A.**  It would be May 31st based on the lab analysis, and

21   going by the date of the search warrant which is also May

22   31st.

23   **Q.**  Okay.  So it would have been done the same day, the

24   search warrant and execution the same day?

25   **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1              **MR. BILKOVIC:**  May I have one moment, your

2      Honor?

3              **THE COURT:**  Yes.

4

5    **BY MR. BILKOVIC:**

6      **Q.**  And the year that we're talking about is 2006?

7      **A.**  Correct.

8              **MR. BILKOVIC:**  Nothing further.

9              **THE COURT:**  Any cross?

10             **MR. FEINBERG:**  Yes, sir.

11

12                      **CROSS EXAMINATION**

13

14   **BY MR. FEINBERG:**

15

16     **Q.**  May I see your report?

17     **A.**  Yes.

18     **Q.**  What is your present title?

19     **A.**  Police officer.

20     **Q.**  Okay.

21     **A.**  Campus police officer.

22     **Q.**  Okay.  Officer Ashford, there were two houses

23     involved?

24     **A.**  Yes, sir.

25     **Q.**  One was 14781, is that correct?

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  What was the other address?

3    **A.**  14791 Manning.

4    **Q.**  Were they next door to one another or were there

5    houses in between?

6    **A.**  Next door.

7    **Q.**  You conducted surveillance?

8    **A.**  Yes, sir.

9    **Q.**  And that was for approximately 15-20 minutes?

10   **A.**  Yes, sir.

11   **Q.**  Do you have your surveillance reports?

12   **A.**  I don't have my surveillance reports with me, sir.

13   **Q.**  Do you know if they exist?

14   **A.**  No, I do not at this time, no.

15   **Q.**  Do you have what's commonly known as a PCR,

16   preliminary complaint report?

17   **A.**  Not before me, no, I do not.

18   **Q.**  Do you know if that exists?

19   **A.**  No, sir, I do not.

20   **Q.**  During the surveillance, were you able to see both

21   houses?

22   **A.**  Yes, sir.

23   **Q.**  Okay.  Which house is the one that you say had the

24   drugs?

25   **A.**  14 -- referring to the preliminary analysis report,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    14781 Manning.

2       **Q.**  And you say that a 65 -- 65 grams of crack cocaine

3    was found at that location?

4       **A.**  That's as packaged, yes.

5       **Q.**  What was the net quantity?

6       **A.**  Would you rephrase that, please.

7       **Q.**  Sixty-five grams packaged.  That means whatever it

8    was in was also weighed for that amount, correct?

9       **A.**  Yes.

10      **Q.**  What was the unpackaged weight?

11      **A.**  That I don't know.  I don't have the final lab

12   analysis report in front of me.

13      **Q.**  During the 15 to 20 minutes surveillance, did you

14   ever see Mr. Brown?

15      **A.**  As I sit before you today, I could not tell you what

16   Mr. Brown looks like.  Going back to 2006, I could not

17   answer that, sir.

18      **Q.**  You don't know whether or not he was even in the

19   house or houses during your surveillance?

20      **A.**  I can tell you -- you said -- please ask that again.

21      **Q.**  You don't know whether or not Mr. Brown was in

22   either of the houses during your surveillance, is that

23   correct?

24      **A.**  That's correct.

25      **Q.**  Okay.  How long after the surveillance did you

*15-20652; USA v. EUGENE FISHER, ET AL*

1   execute the search warrant?

2       **A.**  I could not provide you with the time, sir.

3       **Q.**  It wasn't 15 minutes or an hour was it, because you

4   had to type up the search warrant, type up the affidavit,

5   find a judge to sign the search warrant, put together a

6   team, and go to the location, is that correct?  Is that

7   the normal sequence?

8       **A.**  That is the sequence of events.  As to whether or

9   not the search warrant was prepared on the 30th or the

10  31st as I sit before you today, I can't tell you.

11  Normally my surveillance is done one day.  The next day

12  the search warrant is done, and I say that to you because

13  I had to first take the information from the cooperating

14  defendants then go out.  So --

15      **Q.**  Where is the search warrant and the affidavit?  Does

16  that exist?

17      **A.**  It does.

18      **Q.**  I'm talking about the affidavit, not the search

19  warrant.

20      **A.**  It is right here, the affidavit portion.

21      **Q.**  May I see it please?

22      **A.**  Sure.  It is all in one body.

23      **Q.**  So according to the affidavit, the affidavit and the

24  surveillance was the same day, is that correct?  It says

25  on May 31st, affiant sets up a six -- fixed surveillance?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  And the search warrant was obtained on the 31st of

3    May?

4    **A.**  Same day, yes, sir.

5    **Q.**  So the sequence that I described, surveillance,

6    preparing the search warrant, and the affidavit, getting a

7    judge to sign it, put together a team, go to the location

8    and execute the search warrant, that's the normal

9    sequence, right?

10   **A.**  That was the sequence for the day, yes.  That's

11   accurately describes it, yes.

12   **Q.**  Does it indicate which dwelling Mr. Brown was

13   alleged to have been?

14   **A.**  No, it does not indicate a dwelling for Mr. Brown.

15   As I answered before, I could not tell you whether or not

16   Mr. Brown was, in fact, in any of the sequences that I

17   observed during my pre-raid surveillance.

18   **Q.**  At the time the search warrant was executed, does it

19   indicate where Mr. Brown was in the house or outside the

20   house?

21   **A.**  Mr. Brown would have been at 14781 Manning.

22   **Q.**  Where does that say that?

23   **A.**  The preliminary analysis report where the narcotics

24   were confiscated from, that was my address of execution.

25   There would have been two raid teams to execute on both

*15-20652; USA v. EUGENE FISHER, ET AL*

1    dwellings.  I only executed on 14781.  My sister crew

2    would have executed on the area of 14791.  We would not

3    bring individuals from one house and put them together in

4    another house.  Both raid teams would have conducted their

5    searches.  You don't commingle the people.  You keep them

6    separate.

7            So my 24 hour report that I comprised lists Mr.

8    Brown.  That would have been the target address that I

9    executed at 14781.

10   **Q.**  Again, you do not have a preliminary complaint

11   report as to the each -- everything that you did during

12   the execution of the search warrant and who participated

13   in the execution for each dwelling?

14   **A.**  If I understand your question, do I have a

15   preliminary complaint for the activities that I'm

16   responsible for?

17   **Q.**  Yes.

18   **A.**  No, I do not in front of me.  No.

19   **Q.**  Again, I asked you before, do you know if it exists?

20           **MR. BILKOVIC:**  Because he asked it before,

21   it's been asked and answered, and I would object.

22           **THE COURT:**  I will sustain the objection, and

23   try to speak more into the microphone as well, Mr.

24   Feinberg.

25           **MR. FEINBERG:**  I'm sorry, your Honor.  I

                    *15-20652; USA v. EUGENE FISHER, ET AL*

 1      thought I was speaking loud.

 2                    **MR. FEINBERG:**  Was Mr. Brown arrested?

 3      **A.**  No, sir.

 4

 5  **BY MR. FEINBERG:**

 6      **Q.**  He was not charged with anything?

 7      **A.**  At this point in time I could not answer that with a

 8      positive answer, no.

 9      **Q.**  You have no indication whether or not Mr. Brown was

10      ever charged with any crime resulting in the execution of

11      the search warrant on May 31, 2006, is that correct?

12      **A.**  No, not before me.  No.

13      **Q.**  If not before you, you don't have any recollection

14      of Mr. Brown being arrested and charged with anything, is

15      that correct?

16      **A.**  I have nothing to indicate that in front of me at

17      this point, no.

18      **Q.**  I understand.  At this point is when you're

19      testifying.  I'm not talking about next week or a month

20      from now, but right now.

21                    You have no recollection of whether or not he

22      was arrested or charged with anything?

23      **A.**  From 2006, sir, no, I can't tell you if he was --

24      **Q.**  A long time ago --

25      **A.**  If he was charged, no.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Was he found with any drugs on him?

2    **A.**  I have nothing in front of me to indicate that, no.

3    **Q.**  Any money on him that was seized?

4    **A.**  Again, I have nothing in front of me to indicate

5    that.

6    **Q.**  Do you remember where the drugs were?

7    **A.**  Without the file with the reports in it, no, I

8    cannot tell you that at this point in time.

9             **MR. FEINBERG:**  I have no further questions.

10            **THE COURT:**  Thank you, Mr. Feinberg.

11        Anyone else?

12            **MR. H. SCHARG:**  No questions on behalf of

13    Mr. Eugene Fisher.

14            **THE COURT:**  Okay.  Any redirect?

15            **MR. BILKOVIC:**  No, your Honor.

16            **THE COURT:**  Thank you, sir.  You can step

17    down.

18

19                    (Witness excused.)

20

21            **MR. MAGIDSON:**  Just for the record, we have

22    no questions on behalf of Mr. Shy.

23            **MR. S. SCHARG:**  On behalf of Mr. Porter, no

24    questions, your Honor.

25            **THE COURT:**  All right.  I gathered that.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      Thank you.

2              All right.  I think we will take a short break for

3      about 10 minutes.

4

5                  (Recess taken at 10:34 a.m.)

6      (Back on the record at 10:55 a.m.)

7              **THE CLERK:**  Please rise for the jury.

8              (Jury in at 10:55 a.m.)

9              **THE COURT:**  Okay, folks, you can take a seat,

10     and I'll call on the government for its next witness.

11             **MS. FINOCCHIARO:**  The government calls

12     Officer Gadwell.

13             **THE COURT:**  Okay.  Good morning.

14             **THE WITNESS:**  Good morning, sir.

15             **THE COURT:**  Raise your right hand, please.

16                      -   -   -

17                  **ROBERT GADWELL,**

18     being first duly sworn to tell the truth, was examined and

19     testified upon his oath as follows:

20             **THE COURT:**  All right.  Take a seat, please.

21     We're going to have you begin by stating your name and

22     spelling your last name.  You've got to find the sweet

23     spot with the microphone.  If it's too close, it's going

24     to cut off, and if it's too far, we're not going to hear

25     you.

                 *15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Gadwell - Direct*
*Thursday/June 21, 2018*
                                                                        77

 1                 **THE WITNESS:**  Okay.  Robert Gadwell, last

 2     name spelled G-a-d-w-e-l-l.

 3                 **THE COURT:**  Okay.  Thank you.

 4             You may proceed, Mr. Wigod.

 5                 **MR. WIGOD:**  Thank you, Your Honor.

 6                              -    -    -

 7                                              (10:57 a.m.)

 8                        **DIRECT EXAMINATION**

 9     BY MR. WIGOD:

10        **Q.**  Sir, can you please tell the jury what it is you do

11     for a living?

12        **A.**  I'm a Detroit police officer.

13        **Q.**  How long have you been a Detroit police officer?

14        **A.**  22 years this summer.

15        **Q.**  And can you tell the jury, please, what your current

16     assignment is?

17        **A.**  I work for Detroit Mounted Police.

18        **Q.**  Before being assigned to the Mounted Police

19     Division, what did you do?

20        **A.**  Directly before this I worked for the Gang

21     Intelligence Team for approximately five years.  I worked

22     at the Ninth Precinct before that, and before that I

23     worked at Narcotics Enforcement, and then one more stop

24     was at the Second or Southwest District.

25        **Q.**  Now, when you worked for the Narcotics Division,

                   *15-20652; USA v. EUGENE FISHER, ET AL*

 1    what type of cases did you handle?

 2        **A.**  Narcotics.

 3        **Q.**  I know.  More specifically.  Like street level?

 4        **A.**  Yeah, well, it depends.  Mostly street-level

 5    narcotics unless we had some kind of information that took

 6    us to anything further.

 7        **Q.**  Are you familiar with the Manning and Gratiot area?

 8        **A.**  Yes.

 9        **Q.**  I want to draw your attention back to April 25th of

10    2008.  Did you have an opportunity to conduct an

11    investigation of a residence there at 14164 Manning?

12        **A.**  Yes.

13              **MR. FEINBERG:**  I'm sorry, what's the address?

14              **MR. WIGOD:**  14164 Manning.

15              **MR. FEINBERG:**  Thank you.

16              **THE WITNESS:**  Yes.

17    BY MR. WIGOD:

18        **Q.**  Can you explain for the jury what your investigation

19    initially involved?

20        **A.**  I went there with the team members to execute a

21    search warrant.

22        **Q.**  Okay.  Let's back up.  Can we talk about the search

23    warrant before?

24        **A.**  Have we talked -- I'm sorry?

25        **Q.**  No.  Before you execute a search warrant at that

*Robert Gadwell - Direct*
*Thursday/June 21, 2018*

79

1     residence?

2         **A.**   Yes.

3         **Q.**   And you are the one who obtained the search warrant?

4         **A.**   Yes.

5         **Q.**   And what did you do to go about obtaining the search

6     warrant?  What was your reasoning for obtaining the search

7     warrant?

8         **A.**   We get information on locations, complaints, and

9     they may have or might just make some observations, but in

10    order to obtain a search warrant, I conducted an

11    undercover, not an undercover, but a SOI buy, which would

12    be a source of information, had an informant purchased

13    narcotics from the location, and that was what was used

14    for PC to get into the location.

15        **Q.**   Okay.  When you say PC?

16        **A.**   Probable cause, I'm sorry.

17        **Q.**   No, that's okay.  So just as far as the dates, you

18    had contact with a source of information?

19        **A.**   Yes.

20        **Q.**   And that was on April 25th, 2008?

21        **A.**   If I can double-check.

22        **Q.**   If you want to check your search warrant, that's

23    fine or --

24        **A.**   Yes, it was the 25th.

25        **Q.**   Okay.  And walk us through what occurred on that

*15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Dadwell - Direct*
*Thursday/June 21, 2018*

1    date.

2        **A.**   Well, what usually happens, and what happened in

3    this case, was went to the location with information as

4    possibly sales being conducted at the location.  I had a

5    source of information, an informant, and conducted a

6    search of the informant, issued that informant an amount

7    of currency and instructed the informant to purchase

8    narcotics from the location.  Physically watched the

9    informant approach the location and come directly back

10   with an amount of narcotics, and the informant was again

11   searched to make sure that there was no other contraband

12   on him or her.

13       **Q.**   So just to recap briefly, you received information

14   in some way, shape or form that there's potential

15   narcotics at this address?

16       **A.**   Yes.

17       **Q.**   You then have a source of information go and buy

18   narcotics there?

19       **A.**   Yes.

20       **Q.**   All right.  Now, you mentioned that you searched the

21   SOI or source of information before the source goes and

22   purchases the drugs from the residence?

23       **A.**   Correct.

24       **Q.**   And that's for what reason?

25       **A.**   To make sure they are not bringing any narcotics

*15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Gadwell - Direct*
*Thursday/June 21, 2018*

1    with them and lying and saying they bought it there.

2       Q.  Okay.  And you give the source money to buy drugs

3    there?

4       A.  Correct.

5       Q.  So in this instance you searched the source, you

6    gave the source money, the source went to that residence

7    and purchased narcotics, and then came back to you?

8       A.  Correct.

9       Q.  Do you recall what type of narcotics the source

10   purchased?

11      A.  On that date the source bought cocaine, I believe.

12   Let me check my report, I'm sorry.

13      Q.  No, that's fine.

14      A.  Yes, it was an amount of cocaine.

15      Q.  And, based on what happened with the source of

16   information, you obtained a search warrant to go and

17   conduct a search at that residence; is that right?

18      A.  Yes, the narcotics purchase was placed on evidence

19   and used for any future proceedings type thing, and I

20   prepared a search warrant and then the next day we

21   executed the search warrant.

22      Q.  Okay.  So that would have been April 26, 2008?

23      A.  Yes.

24      Q.  Can you walk us through the execution of the search

25   warrant?  Just start just generally, do you have a team,

*15-20652; USA v. EUGENE FISHER, ET AL*

 1   how many people, things of that nature.

 2       **A.**  Yes, there is a team of officers that I work with on

 3   a regular basis that is led by Sergeant Larry Meinke.  It

 4   was about four or five other officers there.  There was

 5   Jason Kleinsorge, Michael Rison, Sandra Chavez.  I'm

 6   drawing a blank, it's been so long --

 7       **Q.**  Okay.  No, that's fine.

 8       **A.**  -- who was there that day.

 9       **Q.**  You have a report, a brief report involving the

10   execution of the search warrant as well?

11       **A.**  Yes.

12       **Q.**  So if you need to refresh your memory with that,

13   that's fine, okay?

14       **A.**  The only other person I think I could add was

15   Larry Williams and Aaron Yopp.

16       **Q.**  Okay.  That's fine.  Now, what type of residence was

17   this?

18       **A.**  It's a private, single-family residence.

19       **Q.**  Was it occupied or vacant?

20       **A.**  You know, I believe it was vacant, but I can't

21   recall 100 percent.

22       **Q.**  Okay.  Would your report refresh your memory?

23       **A.**  Possibly.

24       **Q.**  Do you have it there in front of you?

25       **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Cadwell - Direct*
*Thursday/June 21, 2018*
                                                                    83

1          **MR. WIGOD:**  May I approach the witness,

2    Your Honor?

3          **THE COURT:**  Yes, you may.

4          **THE WITNESS:**  Okay.

5    **BY QUESTIONER:**

6       **Q.**  So does your report refresh your memory as far as

7    whether or not this dwelling was occupied or vacant?

8       **A.**  Yes.  We determined that it was vacant on that date.

9       **Q.**  Now, the various individuals who were on the team to

10   execute the search warrant had various responsibilities?

11      **A.**  Yes.

12      **Q.**  Such as?

13      **A.**  We usually have a shotgun person, which was my

14   duties that day.  We have somebody on the ram, somebody on

15   the halogen, some people on just entry.  Some people were

16   on outer security.

17      **Q.**  Okay.  So what's the shotgun position?  What does

18   that mean?

19      **A.**  As the shotgun man, I was the first person to enter

20   the location.  I physically cleared the entire location,

21   making sure if there was anybody inside that they were

22   secured and that nobody was hiding anywhere.

23      **Q.**  Okay.  And did you do that in this case?

24      **A.**  Yes.

25      **Q.**  And tell us what happened.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Gadwell - Direct*
*Thursday/June 21, 2018*

84

1      **A.**   Upon coming into the front of the location, an

2      individual exited a bedroom and ran into the bathroom.  I

3      pursued him into the bathroom.  As I entered the bathroom,

4      I seen him -- he was, when he exited, he had some baggies

5      in his hand and he was running towards the bathroom.  He

6      got into the bathroom, and when I got into the bathroom,

7      his right hand was in the toilet, like his hand was in the

8      hole going down the drain, and his left hand was flushing

9      the toilet.

10              One of the baggies that he was running into the

11     bathroom with fell onto the floor.  At that point of the

12     clearing the location we're not worried about securing

13     evidence, but I did let Officer Kleinsorge know that he

14     had dropped the narcotics on the floor after that

15     individual was detained, and once it was cleared, I

16     believe he confiscated the --

17              **MR. FEINBERG:**  Objection to what he believes.

18     **BY MR. WIGOD:**

19     **Q.**   What did you see?

20     **A.**   After we were secured, I know that I observed him

21     confiscate baggies off the floor.

22     **Q.**   You mentioned you were the first person through the

23     door?

24     **A.**   Yes.

25     **Q.**   Now, being the first person through the door, at

*15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Cadwell - Direct*
*Thursday/June 21, 2018*

85

1   that point in time you are not concerned with any sort of

2   evidence or actually executing the search warrant.  You

3   are concerned with what?

4      **A.**  My main concern is to secure the location.

5      **Q.**  Okay.  Safety?

6      **A.**  Safety.

7      **Q.**  All right.  So when you go in, you are going at --

8   you are announcing your presence?

9      **A.**  The entire time.

10     **Q.**  Meaning what?

11     **A.**  Upon approaching and in the midst of clearing the

12  location I continually announced, "Detroit Police, search

13  warrant."

14     **Q.**  And while you do that after you entered the house

15  you mentioned you saw someone do what?

16     **A.**  He came running out of the back bedroom and straight

17  into the bathroom.

18     **Q.**  And were you able at some point in time later on to

19  identify who that person was?

20     **A.**  Yes.

21     **Q.**  And who was that?

22     **A.**  That was Prentice Graham.

23     **Q.**  Prentice Graham?

24     **A.**  Yes.

25     **Q.**  So Mr. Graham, Prentice Graham was the individual

*15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Cadwell - Direct*
*Thursday/June 21, 2018*

1   who ran into the bathroom and had his hand in the toilet?

2   **A.**   Yes.

3   **Q.**   All right.  What did you believe him to be doing at

4   that point in time?

5   **A.**   Destroying evidence.

6   **Q.**   Were there other individuals also in the residence?

7   **A.**   I don't believe they were in.  I think they were in

8   the yard.  There was a Quincy Graham and a Steve Arthur.

9   **Q.**   So Quincy Graham and Steve Arthur were also at the

10  residence but not necessarily inside of the residence?

11  **A.**   Correct.

12  **Q.**   If we could go back for a second and talk about --

13  we got to the point where you indicated it was a vacant

14  dwelling?

15  **A.**   Yes.

16  **Q.**   Can you describe or does your report refresh your

17  memory as far as what sort of furniture was in there?

18  **A.**   No.  I don't recall that information, and it's been

19  so long.

20  **Q.**   Okay.  And what about any electricity?

21  **A.**   I believe the electricity was illegal.

22  **Q.**   Okay.  And how is illegal electricity obtained?  How

23  does that happen?

24  **A.**   There's several ways.  I don't particularly remember

25  the exact way that this one was done, but some of them are

*Robert Gadwell - Direct*
*Thursday/June 21, 2018*

1    either --

2                **MR. FEINBERG:**  Objection, Your Honor.  If he

3    doesn't remember, he can't testify as to this incident.

4                **MR. WIGOD:**  He can testify generally how

5    illegal electricity is attached to a vacant dwelling.

6                **THE COURT:**  The Court will permit the

7    question.

8                **THE WITNESS:**  And the ways that we determine

9    if electricity is illegal is like at the meter there is

10   either jump wires, bars or something to jump the

11   electricity over or cords running from either the pole or

12   another location.

13   **BY MR. WIGOD:**

14        **Q.**  Okay.  So it basically bypasses the meter?

15        **A.**  It's an obvious way to determine, yes.

16        **Q.**  You had an opportunity to seize some evidence during

17   your time at this vacant dwelling?

18        **A.**  Yes.

19        **Q.**  Do you recall what it was that you seized?

20        **A.**  I seized some marijuana from the back bedroom on a

21   small table, and I observed the narcotics that was dropped

22   on the floor in the bathroom, the sandwich bag containing

23   cocaine and heroin.

24                **MR. WIGOD:**  Okay.  Your Honor, may I approach

25   the witness?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Cadwell - Direct*
*Thursday/June 21, 2018*

88

1         **THE COURT:**  Yes.

2    **BY MR. WIGOD:**

3       **Q.**  Showing you what's been marked as Government's

4    Proposed Exhibit Number 198, can you tell us what this is,

5    please.

6       **A.**  This is three sandwich bags of marijuana.

7       **Q.**  Is this the marijuana that you seized from the back

8    bedroom?

9       **A.**  Yes.

10          **MR. WIGOD:**  Your Honor, at this time I would

11   move for admission of Government's Proposed Exhibit Number

12   198.

13          **MR. DALY:**  No objection.

14          **THE COURT:**  All right.  Thank you.  The Court

15   will receive it.

16          **MR. WIGOD:**  Your Honor, if I could have a

17   moment.

18          **THE COURT:**  Yes.

19          **MR. WIGOD:**  Your Honor, I don't have any

20   further questions of this witness.

21          **THE COURT:**  Thank you, Mr. Wigod.

22       Any cross-examination?

23          **MR. H. SCHARG:**  No questions on behalf of

24   Eugene Fisher.

25          **THE COURT:**  Thank you.


                *15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Cadwell - Direct*
*Thursday/June 21, 2018*
89

1        **MR. DALY:**  Your Honor, no questions on behalf

2   of Mr. Bailey.

3        **THE COURT:**  Thank you.

4        **MR. FEINBERG:**  No questions on behalf of

5   Mr. Brown.

6        **THE COURT:**  Thank you.

7        **MR. THEIS:**  None on behalf of Mr. Shy.

8        **MR. S. SCHARG:**  None on behalf of Mr. Porter.

9        **THE COURT:**  Okay.  Thanks.

10       We'll have you step down then.  Thank you.

11       **MS. FINOCCHIARO:**  At this time, Your Honor,

12   the government calls Officer Kleinsorge.

13       **THE COURT:**  Okay.

14       Good morning.

15       **THE WITNESS:**  Good morning.

16       **THE COURT:**  I'll have you take an oath.

17                    -   -   -

18            **JASON KLEINSORGE,**

19   being first duly sworn to tell the truth, was examined and

20   testified upon his oath as follows:

21       **THE COURT:**  All right.  Take a seat, please.

22   I'm going to have you begin by stating your name and

23   spelling your last name for us.

24       **THE WITNESS:**  Jason Kleinsorge.  Last name,

25   K-l-e-i-n-s-o-r-g-e.


                *15-20652; USA v. EUGENE FISHER, ET AL*

*Robert Gadwell - Direct*
*Thursday/June 21, 2018*
90

1          **THE COURT:**  All right.  Thank you.

2       You may proceed.

3          **MR. WIGOD:**  Thank you, Your Honor.

4               **-   -   -**

5                              (11:12 a.m.)

6                    **DIRECT EXAMINATION**

7    BY MR. WIGOD:

8       **Q.**  Sir, can you tell the jury what it is you do for a

9    living?

10      **A.**  I'm a sergeant for the Detroit Police.

11      **Q.**  How long have you been with the City of Detroit as a

12   police officer?

13      **A.**  Over 24 years.

14      **Q.**  And what are your current duties?

15      **A.**  I'm a supervisor at the Third Precinct.

16      **Q.**  What precinct are you currently at?

17      **A.**  The Third.

18      **Q.**  And your prior duties?

19      **A.**  I have worked Narcotics Section and street patrol

20   and Tactical Services.

21      **Q.**  I want to draw your attention to April 26th of 2008.

22   Do you recall where you were working back then?

23      **A.**  I would have been at the Narcotics Section.

24      **Q.**  Did you have an opportunity to assist in the

25   execution of a search warrant at 14164 Manning?

                 *15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*

91

1      **A.**  Yes.

2      **Q.**  And, just generally speaking, that's Seven Mile and

3    Gratiot area?

4      **A.**  Generally, yes.

5      **Q.**  Do you recall, were you on a team of individuals who

6    executed a search warrant?

7      **A.**  Yes, I was with the Narcotics Enforcement crew in

8    the Eastern District.

9      **Q.**  And do you recall who the other individuals were on

10   your team?

11     **A.**  It would have been Sergeant Meinke, Officer Gadwell,

12   Officer Williams, Officer Yopp, Officer Chavez.

13     **Q.**  You were there to execute a search warrant?

14     **A.**  That's correct, sir.

15     **Q.**  Do you recall what your assignment was that day?

16     **A.**  I was in charge of the ram position.

17     **Q.**  What does that mean?

18     **A.**  The ram position is the instrument that you use to

19   force the door open.  If the door is closed or if the door

20   is locked, you have to force the door open.

21     **Q.**  And did you do that in this case?

22     **A.**  The door was open, but there was a security grate on

23   the door.  The security grate had to be forced open.

24     **Q.**  Okay.  Do you remember what type of residence this

25   was?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  It's a single-family dwelling.

2      **Q.**  And was it vacant or occupied?

3      **A.**  It was vacant.

4      **Q.**  Okay.  When you rammed the door, what do you do?

5      **A.**  At that point in time I rammed the door, I step

6    back, the shotgun man goes in along with shotgun backup.

7      **Q.**  Are the individuals on the team announcing?

8      **A.**  Yes.

9      **Q.**  Announcing what?

10     **A.**  Presence and purpose of why we are there, and that's

11   before we hit the door.

12     **Q.**  Okay.  So you say what generally?

13     **A.**  "Search warrant, Detroit Police."

14     **Q.**  Do you remember who was the shotgun on that day?

15     **A.**  It would have been Officer Gadwell.

16     **Q.**  So he's the first one in?

17     **A.**  Correct.

18     **Q.**  After he's in -- and he goes in essentially to

19   secure the premise?

20     **A.**  Yes.

21     **Q.**  When I say "secure," basically make sure it's safe?

22     **A.**  Yes.

23     **Q.**  And after he goes in do the rest of the team members

24   follow?

25     **A.**  Yes, we would.  Shotgun backup and then whoever else

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*

93

1    is behind them, we go in as a team.

2       **Q.**  And do you remember where you went when you went

3    into the residence?

4       **A.**  If I could refer to my PCR for clarification, but I

5    pretty much remember.  I don't remember exactly where we

6    went.

7       **Q.**  If that will refresh your memory, please.

8       **A.**  Yes.

9              Yeah, on this incident Officer Gadwell was

10   pursuing individuals, and he pursued an individual into

11   the bathroom of the location and he -- Officer Ginsler was

12   behind him and then myself.

13      **Q.**  Okay.  So you followed Gadwell into the bathroom?

14      **A.**  Correct.

15      **Q.**  All right.  And what did you see in the bathroom?

16      **A.**  There was an individual in the bathroom on the

17   floor.

18      **Q.**  Okay.  Did you find any controlled substances in the

19   bathroom?

20      **A.**  I was advised by Officer Gadwell that --

21              **MR. FEINBERG:**  Objection, hearsay.

22              **MR. WIGOD:**  It's only to show what he did

23   next, Your Honor, not offered for the truth.

24              **THE COURT:**  I will allow the question.

25              **THE WITNESS:**  That narcotics was discarded,

*15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*                    94
*Thursday/June 21, 2018*

 1    and I confiscated narcotics.

 2              **MR. WIGOD:**  Okay.  Your Honor, may I approach

 3    the witness?

 4              **THE COURT:**  Yes.

 5    **BY MR. WIGOD:**

 6       **Q.**  Officer, I'm showing you what's been marked as

 7    Government's Proposed Exhibits 196 and 197.  Will you tell

 8    us what those are?

 9       **A.**  197 is going to be the lock seal folder.  It's the

10    evidence folder that we would put the evidence in once we

11    bring it in.  It's put in a lock seal folder.

12       **Q.**  And before we get to 196, is there actually evidence

13    in that folder?

14       **A.**  Yes.  Inside this folder appears to be a Ziploc of

15    what would be the heroin.  It comes in Lotto papers, in

16    small pieces that's folded up, and that would be the

17    heroin.

18       **Q.**  Did you find that and confiscate that from the

19    bathroom floor?

20       **A.**  Yes.  All of this stuff was inside of a sandwich

21    bag.  There was a Lotto pack of heroin and seven Ziploc --

22    or knotted bags of cocaine.

23       **Q.**  And that's 196?

24       **A.**  It's evidence tag 196.

25       **Q.**  So the heroin and the cocaine were all together

                *15-20652; USA v. EUGENE FISHER, ET AL*

1      essentially?

2          A.   Inside of a sandwich bag, correct.

3              **MR. WIGOD:**  Your Honor, at this time I move

4      for admission of Government's Proposed Exhibits Number 196

5      and 197.

6              **MR. DALY:**  No objection.

7              **THE COURT:**  All right.  Thank you.  The Court

8      will receive the item.

9  **BY MR. WIGOD:**

10         Q.   Just going back to 197 real quick, the heroin.  You

11     said it comes in, heroin, in Lotto folds?

12         A.   Correct.

13         Q.   Obviously it's not produced that way.  What do you

14     mean?

15         A.   No.  What happens is the Lotto pack, the Lotto

16     things that you go into parties stores and just pick up to

17     write on --

18         Q.   The ticket?

19         A.   The ticket, yeah, the Lotto tickets.  They are tore

20     up and folded in certain sections and that's what they

21     sell the heroin in.

22         Q.   So the heroin is put inside the Lotto folds and then

23     sold to users?

24         A.   Distributed that way, correct.

25         Q.   I'm sorry, going back to the cocaine for a minute,

                  *15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*

96

1    how many pieces of cocaine, crack cocaine are here, and

2    that's 196?

3        **A.**   It appears to be seven.

4        **Q.**   Okay.  And how were they packaged?

5        **A.**   They are individually knotted bags, torn off pieces

6    of plastic that they are put in and they are twisted.

7    It's like a corner of a sandwich bag, and then they put it

8    in the sandwich bag and twist it off and they can tie it

9    that way.

10       **Q.**   Okay.  And that's commonly how it's distributed as

11   well?

12       **A.**   Yes.

13       **Q.**   If I could also talk to you about an incident that

14   occurred back on November 28th of 2007.  Have you had an

15   opportunity to review your report regarding that incident?

16       **A.**   Yes, I was able to.

17       **Q.**   And can you tell us what was going on on that day?

18       **A.**   In 2007 that was a street enforcement operation.

19       **Q.**   What does that mean, street enforcement operation?

20       **A.**   Street enforcement operations are normally conducted

21   on vacant houses, on a vacant house.  You would not need a

22   search warrant.  So we would go by and we would check, and

23   I believe in this there was lights on inside of the vacant

24   house.  Either we had been there before or we had

25   complaints on the location, and that's why we were there.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*

97

1     **Q.**  You were, again, with other individuals on the

2     narcotics team?

3     **A.**  That's correct.

4     **Q.**  Do you recall who they were?

5     **A.**  I believe it was most of the same individuals.  It

6     would be the same raid crew.

7     **Q.**  Okay.  And do you recall why it was that you were

8     checking on -- and what address was this?

9     **A.**  This was -- if I could refer to my PCR.

10    **Q.**  If that will refresh your memory, that will be fine.

11    **A.**  Yes, it would.  This address is going to be 14754

12    Manning.

13    **Q.**  So, again, an address on Manning Street?

14    **A.**  That's correct.

15    **Q.**  And you were giving special attention for narcotics

16    activity at this address?

17    **A.**  Yes, sir.

18    **Q.**  Was that based on what?

19    **A.**  I don't recall whether it was a complaint through

20    224-dope or if it was a known narcotics location we were

21    at at another time.

22    **Q.**  And you mentioned -- because this was a vacant

23    dwelling, do you recall whether there was any running

24    water?

25    **A.**  According to my PCR, it was a vacant location.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*                                    98

 1    There was no running water.  It had illegal electrical
 2    hookup.
 3        **Q.**  Okay.  You mentioned because it was a vacant
 4    dwelling you don't need a search warrant to go in?
 5        **A.**  Correct.
 6        **Q.**  And so did officers go in as if you were executing a
 7    search warrant?
 8        **A.**  Yes.
 9        **Q.**  Okay.  So basically you, again, announced your
10    presence?
11        **A.**  Presence and purpose.  That's strictly for officer
12    safety also.
13        **Q.**  Okay.  And were there individuals inside the vacant
14    dwelling?
15        **A.**  Yes, there was.  There was five individuals.
16        **Q.**  Can you please tell us who they were?
17        **A.**  According to my PCR, Terrence Hampton,
18    Diondre Fitzpatrick, Juwan Adams, Quincy Jones and
19    Dominic Holloway.
20        **Q.**  Going back to Mr. Hampton for a minute, did you have
21    a middle name for him?
22        **A.**  Oh, Terrence Lee Hampton.
23        **Q.**  And a date of birth?
24        **A.**  It was 8-21-87.
25        **Q.**  And did you know if any narcotics were located

*15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*

1    inside of the residence or on any individuals inside of

2    the residence?

3        **A.**   When we approached the location, subjects were

4    running out of the location and there was a brief foot

5    chase.

6        **Q.**   Okay.  Was it your impression that they were running

7    based on your presence?

8        **A.**   Yes.  And there was a brief foot chase, and

9    individuals were caught, two individuals were caught with

10   narcotics on them.

11       **Q.**   And who were the two individuals who were caught

12   with narcotics on them?

13       **A.**   Number 1 is Terrence Lee Hampton and Number 2,

14   Diondre Barnett Fitzpatrick.

15       **Q.**   And do you recall what narcotics Mr. Hampton had on

16   himself?

17       **A.**   Mr. Hampton was possession with intent to deliver

18   marijuana.

19       **Q.**   So he had marijuana with distribution quantity?

20       **A.**   That's correct.

21       **Q.**   Or an indication that he was intending on selling

22   it?

23       **A.**   Yes.

24       **Q.**   And as far as Mr. Fitzpatrick?

25       **A.**   Mr. Fitzpatrick had cocaine in his possession.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*

100

1    **Q.**  Mr. Fitzpatrick had distribution quantities of

2    cocaine?

3    **A.**  That's correct.

4              **MR. WIGOD:**  Your Honor, if I could have a

5    moment.

6              **THE COURT:**  Yes.

7              **MR. WIGOD:**  Your Honor, I don't have any

8    further questions.

9              **THE COURT:**  Okay.  Thank you.

10          Any cross?

11          **MR. H. SCHARG:**  No questions on behalf of

12    Eugene Fisher.

13          **MR. DALY:**  We have no questions.

14          **MR. FEINBERG:**  No questions on behalf of

15    Mr. Brown.

16          **MR. THEIS:**  No questions, Your Honor.

17          **MR. S. SCHARG:**  No questions, Your Honor.

18          **THE COURT:**  All right.  Thank you.

19          Thank you, Officer.  You may step down.

20          **THE WITNESS:**  Thank you, Your Honor.

21          **MS. FINOCCHIARO:**  At this time, Your Honor,

22    the government calls Officer Howard Sweeney.

23          **THE COURT:**  Okay.

24          Mr. Sweeney?

25          **THE WITNESS:**  Yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Jason Kleinsorge - Direct*
*Thursday/June 21, 2018*

101

1         **THE COURT:**  Good morning.

2         **THE WITNESS:**  Good morning.

3                   -    -    -

4              **HOWARD SWEENEY, III,**

5    being first duly sworn to tell the truth, was examined and

6    testified upon his oath as follows:

7         **THE COURT:**  All right.  Take a seat, please.

8    I'll have you begin by stating your name and spelling your

9    last name for us, please.

10        **THE WITNESS:**  Howard Sweeney, III,

11   S-w-e-e-n-e-y.

12        **THE COURT:**  There is kind of a sweet spot

13   with this microphone.

14        **THE WITNESS:**  Yes, sir.

15        **THE COURT:**  If it's too close, it's going to

16   cut out.  If it's too far, we won't hear you, so ...

17        **THE WITNESS:**  Yes, sir.

18        **THE COURT:**  Okay, thanks.

19        **MR. BILKOVIC:**  It may cut out, make a loud

20   noise, and make you jump the first time it happens.

21                   -    -    -

22                                      (11:25 a.m.)

23              **DIRECT EXAMINATION**

24   BY MR. BILKOVIC:

25      **Q.**  Can you tell the jury how you are employed?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*                                    102

1       **A.**  I'm employed with the City of Detroit.  I'm employed

2   with the City of Detroit.  City of Detroit employee, 18

3   years.

4       **Q.**  And what do you do for the City of Detroit?

5       **A.**  I'm a police corporal with the City of Detroit

6   Training Section.

7       **Q.**  What does that mean?  What are your job

8   responsibilities?

9       **A.**  I'm one of the trainers.  I have been at the Detroit

10  Police Academy for four years.  I train all of the members

11  that come to the police academy as well as the in-service

12  members of all ranks.

13      **Q.**  Prior to doing that what did you do with the Detroit

14  Police Department?

15      **A.**  Worked several entities.  I was working Special

16  Operations in the Eastern District at the time of this

17  incident.

18      **Q.**  When you say "this incident," are you talking about

19  the incident that occurred back on August 30th, 2007?

20      **A.**  Yes, sir.

21      **Q.**  I'm going to take your attention back to that day

22  around 12:15 to 12:30 in the morning.  What was your

23  assignment back then?

24      **A.**  I was working the Eastern District Special

25  Operations Section.  I was assigned to the tire car at

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

103

1    that time with a Sergeant Corey Carson and Police Officer

2    James Ojay.

3        Q.   What is Special Operations?

4        A.   Special Operations Section, we work plain clothes,

5    we work plain clothes, primarily plain clothes, and we

6    work and deal with all of your narcotics, your handgun

7    violations so your concealed weapons, your shootings, your

8    robberies, your car jackings, rapes, all of your

9    high-priority crimes at a precinct level.

10       Q.   Are there special areas then that you focus on

11   within the city or that you were focused on within the

12   city?

13       A.   Yes, sir.

14       Q.   You said something about you were in a tire car?

15       A.   Yes, sir.  It's just an identification of the

16   vehicle.  It was an all-black Ford Crown Victoria.  I

17   believe it was a 2005 or '6 at the time.  It was all black

18   with the emergency lights in the front window and the rear

19   dash, in the rear window, as well as it says "Detroit

20   Police" in gold letters on both the driver and passenger

21   sides as well as it says in gold letters on back tire

22   unit.

23       Q.   Is there any reason that you would use that vehicle

24   versus a regular fully marked patrol vehicle?

25       A.   That was just one of the vehicles as well as our

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

104

 1   unmarked all black cars we use in the Special Operations

 2   as plain clothes officers.

 3       **Q.** On August 30th -- well, let me ask you this.  Are

 4   you familiar with the area around Seven and Gratiot in the

 5   City of Detroit?

 6       **A.** Yes, sir.

 7       **Q.** And are you familiar with Manning Street in that

 8   area?

 9       **A.** Yes, sir.

10       **Q.** Are you familiar with the term the Red Zone?

11       **A.** Yes.

12       **Q.** How are you familiar with the term the Red Zone?

13       **A.** Just an area that was referred to by being the Seven

14   Mile Bloods area.

15       **Q.** And is that something you were then familiar with

16   back in 2007?

17       **A.** Yes, sir.

18       **Q.** And does that area include the area on Manning

19   Street near Seven and Gratiot?

20       **A.** Yes, sir.

21       **Q.** So on August 30th, 2007 you were with the other

22   two officers riding around in your patrol car?

23       **A.** Yes, sir.

24       **Q.** And you were in the area of 14560 Manning in the

25   City of Detroit?

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

105

 1     **A.**  Yes, sir.

 2     **Q.**  Did something happen that -- well, first of all,

 3  what were you doing in that area?

 4     **A.**  Just on routine patrol at the time.

 5     **Q.**  And did something happen in that area that attracted

 6  your attention?

 7     **A.**  Yes, sir.

 8     **Q.**  What was that?

 9     **A.**  Just upon driving the area of Gratiot and Manning we

10  proceeded to turn onto Manning Street from Gratiot.  Upon

11  driving down the street, observed a known vacant dwelling,

12  observed movement in the top front window of that

13  location.

14     **Q.**  Now, you said you observed a known vacant dwelling?

15     **A.**  Yes, sir.

16     **Q.**  And would that have been the dwelling at 14560

17  Manning?

18     **A.**  Yes, sir.

19     **Q.**  Back at that time was it -- were there -- was it

20  common to have vacant dwellings or vacant houses in that

21  area?

22     **A.**  Yes, sir, it was.

23     **Q.**  When you say it was a known vacant dwelling, did you

24  know that pulling up that day?

25     **A.**  Yes, sir.  I had been to the location previously.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

106

1    **Q.**  And when you were pulling up or driving by that

2    location, what was it that you observed?

3    **A.**  I observed as we were pulling up to the location

4    there was some kind of backlight in the upstairs window

5    that you could see movement so it was not completely

6    blacked out.  You could see movement of an individual in

7    the top upstairs window.  We proceeded at that time to

8    decide to go and investigate same.

9    **Q.**  Why did you do that?

10   **A.**  Just because of the area and activity, we had been

11   over there and the arrests we made in the area of that

12   location, we decided to investigate for possible narcotics

13   or weapons.

14   **Q.**  Should there have been anybody in that house?

15   **A.**  No.

16   **Q.**  So what did you do at that point?

17   **A.**  Proceeded to exit the vehicle.  I proceeded up to

18   the left side of that house.  The house didn't have a

19   driveway on either side, but the left side of that house

20   had a side door.

21   **Q.**  And so what did you do?

22   **A.**  Proceeded to go towards the rear of the house.  At

23   that time I observed a female, I believe it was a white

24   female, exit the side door of that location.

25   **Q.**  And what was done with that female?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

107

1    **A.**  I briefly just detained her long enough to pass her

2    to one of my partners.

3    **Q.**  And did one of your partners end up having contact

4    with that female?

5    **A.**  Yes, sir.

6    **Q.**  So what did you do?

7    **A.**  I proceeded to go inside the side door of that

8    location.

9    **Q.**  When you went inside of the location, did you

10   announce your presence in any way?

11   **A.**  Yes, sir.

12   **Q.**  What did you do?

13   **A.**  Just identified myself as "Detroit Police

14   Department, police," as I'm coming in.

15   **Q.**  Did you do that one time or more than once?

16   **A.**  I believe more than once, sir.

17   **Q.**  Why would you have done that?

18   **A.**  Just to announce our presence at the location as

19   being police coming in the door.

20   **Q.**  And what would be the purpose?

21   **A.**  Just for the reason that if somebody was inside they

22   would know it's the police coming in versus someone else,

23   just for identification purposes to make our presence

24   known.

25   **Q.**  So what did you do once you got inside the location

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

108

 1    and did that?

 2        A.   I proceeded in that location.  I proceeded -- just

 3    because right inside the door was the basement right

 4    there, I proceeded down to the basement of that location.

 5        Q.   And what did you do down in the basement?

 6        A.   Proceeded to enter the basement and to check the

 7    location for any persons.

 8        Q.   Did you find anybody in the basement?

 9        A.   Yes, sir.

10        Q.   Who did you find in the basement?

11        A.   Mr. Corey Bailey.

12        Q.   And do you know -- do you have information as to

13    Corey Bailey's birth date?

14        A.   Not offhand, sir.

15        Q.   Okay.  Do you have your report with you or no?

16        A.   No, I don't, sir.

17        Q.   Okay.  Is Corey Bailey somebody that you had seen in

18    the past?

19        A.   Yes, sir.

20        Q.   So did you recognize him when you saw him?

21        A.   Yes, sir.

22        Q.   And what was Mr. Bailey doing in the basement?

23        A.   He was just behind -- he made himself pretty much,

24    concealed himself behind like a water heater/furnace

25    configuration.  He wasn't out visible when I went into the

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

```
 1    basement.  He was just behind it.

 2        Q.   And what did you do at that point?

 3        A.   I proceeded just to order him out, went over to him

 4    and detained him at the time.

 5        Q.   And did he follow your instructions at that point?

 6        A.   Yes, sir.  As I got over to him, I placed him in

 7    handcuffs, placed him under arrest, and then I proceeded

 8    to pat him down.

 9        Q.   During the pat-down did you find anything?

10        A.   Yes, sir.

11        Q.   What did you find?

12        A.   Sticking out the rear of his boxers, so he had some

13    boxers underneath his pants, he had -- it was a plastic

14    wrap sticking out from the top of it, pulled that out and

15    observed it to have a couple plastic wraps of suspected

16    cocaine, crack cocaine.

17        Q.   When you say "a couple," there were two?

18        A.   Yes, sir, two.

19        Q.   Two separate?

20        A.   Two separately packaged, individually packaged

21    suspected crack cocaine.

22        Q.   And did you then recover that from Mr. Bailey?

23        A.   Yes, sir.

24        Q.   Do you know if there was electricity on in the

25    residence?
```

*Howard Sweeney, III - Direct*
*Thursday/June 21, 2018*

110

1     **A.**  At the time there was, I believe it was, jumped

2     electricity.  I don't remember myself looking at it, but

3     it did have some kind of electricity because of the

4     lighting upstairs.

5     **Q.**  Okay.  That wasn't a flashlight then, there was a

6     light on up there?

7     **A.**  Yes, sir.

8     **Q.**  Do you know if anybody else was inside of that

9     location at that time?

10    **A.**  Yes, sir.  There was approximately five other

11    individuals in the location.

12    **Q.**  And that was done with those individuals?

13    **A.**  My partners issued them tickets.

14    **Q.**  And do you know where they were located?

15    **A.**  They were in the location.  I'm not sure.  I know

16    some were upstairs.  I'm not sure of their whole

17    configuration inside of the house at the time, but there

18    were I believe five individuals inside that location in

19    addition to Mr. Bailey.

20    **Q.**  Anybody else in the basement other than Mr. Bailey?

21    **A.**  No, sir.

22    **Q.**  If I were to show you your report, would that

23    refresh your memory with respect to Mr. Bailey's birth

24    date?

25    **A.**  Yes, sir.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1          Yes, sir.  Date of birth, January 29th of 1988.

2     **Q.**   What was done with the cocaine that was recovered?

3     **A.**   I placed it on evidence.

4     **Q.**   And what does that mean?

5     **A.**   I recovered it and then placed it on evidence so it

6     can be processed.  They will do -- will take it to

7     narcotics once it was placed on evidence.  They would do a

8     preliminary analysis of the narcotics, then it would go --

9     be placed on lock seal, at which time it would be sent

10    over for actual laboratory analysis to confirm that it is

11    in fact cocaine.

12              **MR. BILKOVIC:**  I have nothing further.

13    Hopefully you will find the sweet spot if there is

14    cross-examination questions.

15              **THE WITNESS:**  Thank you, sir.

16              **THE COURT:**  Thank you, Mr. Bilkovic.

17         Mr. Scharg?

18              **MR. H. SCHARG:**  No questions on behalf of

19    Mr. Eugene Fisher.

20              **THE COURT:**  Thank you.

21         Mr. Daly?

22              **MR. DALY:**  Thank you, Judge.

23                   -   -   -

24

25

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

112

1                                              (11:35 a.m.)

2                          **CROSS-EXAMINATION**

3     BY MR. DALY:

4         **Q.**   Officer Sweeney, good morning.

5         **A.**   Good morning, sir.

6         **Q.**   You are talking about an incident that happened in

7     2007; is that correct?

8         **A.**   Yes, sir.

9         **Q.**   So we're talking over ten years ago?

10        **A.**   Yes, sir.

11        **Q.**   And would it be fair to say you have no independent

12    recollection of this incident unless you look at your

13    report?

14        **A.**   Negative, sir.

15        **Q.**   You remember everything that happened, what was

16    done, who said what?

17        **A.**   I do remember the incident itself, sir, and I do

18    remember making an arrest.  I don't remember every

19    individual at the location besides Mr. Bailey, but I do

20    have independent recollection of the incident, yes, sir.

21        **Q.**   Okay.  A lot has happened since then; is that

22    correct?

23        **A.**   Yes, sir.

24        **Q.**   You have made a number of arrests?

25        **A.**   Yes, sir.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*                                113

1       **Q.**  Involving narcotics?

2       **A.**  Yes, sir.

3       **Q.**  Dozens, if not hundreds, right?

4       **A.**  Correct, sir.

5       **Q.**  And before you testified did you read your report to

6       refresh your recollection?

7       **A.**  Not today, sir, but yes, sir.

8       **Q.**  Previously, right?

9       **A.**  Yes, sir.

10      **Q.**  And on this particular day you were on routine

11      patrol?

12      **A.**  Yes, sir.

13      **Q.**  And this particular address, you didn't have any

14      information that day regarding narcotics activity,

15      correct?

16      **A.**  Correct, sir.

17      **Q.**  And so you are in this black Crown Vic, right?

18      **A.**  Yes, sir.

19      **Q.**  Basically cruising the neighborhood, right?

20      **A.**  Yes, sir.

21      **Q.**  No specific assignment with regards to any

22      particular person, right?

23      **A.**  No person, yes, sir.

24      **Q.**  You were not looking for Corey Bailey, right?

25      **A.**  Correct, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

114

1    **Q.**  You didn't have an arrest warrant for him, right?

2    **A.**  Correct, sir.

3    **Q.**  And are you the driver of the vehicle?

4    **A.**  I do not believe I was the driver, sir, but I do not

5    recall.  I don't remember driving.

6    **Q.**  It's late at night?

7    **A.**  Yes, sir.

8    **Q.**  Dark out, right?

9    **A.**  Yes, sir.

10   **Q.**  And as you go by this particular house, there's a

11   silhouette upstairs, right?

12   **A.**  Yes, sir.

13   **Q.**  And tell the jury who that person was, that

14   silhouette?

15   **A.**  I couldn't tell you who that was at the time.  I

16   couldn't even tell you that day because of the actual

17   shadowing of the individual.  I could tell it was a human

18   being.  I couldn't tell you if it was a male or female.

19   It was just the lighting.  They went past that lighting in

20   that window of the upstairs, and I knew there was a person

21   in that location.

22   **Q.**  All right.  You can't describe the person, right?

23   **A.**  Correct, sir.

24   **Q.**  And you're not saying it was Corey Bailey, are you?

25   **A.**  Correct, sir, I'm not.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*                                115

 1      **Q.**  But that drew your attention to the building to go
 2      inside, right?
 3      **A.**  Correct, sir.
 4      **Q.**  And when you went to the side of the house, there
 5      was a woman who was exiting; is that right?
 6      **A.**  Yes, sir.
 7      **Q.**  A white female?
 8      **A.**  Yes, sir.
 9      **Q.**  And was she detained?
10      **A.**  Yes, sir.
11      **Q.**  And do you remember what her name is or was?
12      **A.**  Not offhand, sir.
13      **Q.**  If you looked at your report, would that refresh
14      your memory?
15      **A.**  Yes, sir.
16                  **MR. DALY:**  May I approach the witness?
17                  **THE COURT:**  Yes, you may.
18                  **MR. DALY:**  Thank you.
19      **BY MR. DALY:**
20      **Q.**  I'm handing you a copy of your report; is that
21      correct?
22      **A.**  Yes, sir.
23              Yes, sir, the name would be Jacqueline Swanger.
24      I believe that's how you pronounce that.
25      Sam-William-Adam-Nora-George- Edward-Robert.  Listed as

                    *15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

1    Number 5.

2    **Q.**  Swanger?

3    **A.**  Yes, sir.

4    **Q.**  And she was detained; is that correct?

5    **A.**  Briefly by me and then passed to my partners, yes,

6    sir.

7    **Q.**  She was never arrested, right?

8    **A.**  Correct, sir.

9    **Q.**  Same thing with the other people that were there;

10   other than Mr. Bailey, they were not arrested, were they?

11   **A.**  Correct, sir.

12   **Q.**  They were given tickets and released?

13   **A.**  Correct, sir.

14   **Q.**  And do you know if Ms. Swanger was ever handcuffed?

15   **A.**  I do not recall that, sir.

16   **Q.**  What about the other people other than Mr. Bailey?

17   **A.**  I do not recall them being handcuffed either, sir.

18   **Q.**  Is it fair to say that the only person who was

19   handcuffed on the premises was Mr. Bailey?

20   **A.**  I only can speak for him because I actually had

21   contact and I know I cuffed him, but the other individuals

22   I'm not sure about.

23   **Q.**  You don't know?

24   **A.**  No, sir.

25   **Q.**  So once you are in the premises you went down to the

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

117

 1    basement, correct?

 2        **A.**  Yes, sir.

 3        **Q.**  Did you go by yourself?

 4        **A.**  At the time I believe I did, sir.

 5        **Q.**  And were you in uniform?

 6        **A.**  Plain clothes, sir.

 7        **Q.**  And did you have your weapon drawn?

 8        **A.**  I do not recall my weapon.  I know I had a

 9    flashlight out so I could see.  I don't remember my weapon

10    placement at the time.

11        **Q.**  All right.  And when you get down there, you see

12    Mr. Bailey, right?

13        **A.**  Not initially, but yes, sir.

14        **Q.**  Eventually, right?

15        **A.**  Yes, sir.

16        **Q.**  And you knew who he was?

17        **A.**  Yes, sir.

18        **Q.**  And you immediately handcuffed him?

19        **A.**  Yes, sir.

20        **Q.**  And did he give you a false name?  Did he say he was

21    somebody else?

22        **A.**  No, sir, he did not.

23        **Q.**  He did not.  Did he try to run away from you?

24        **A.**  No, sir.

25        **Q.**  Is this what you call an arrest without incident?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

1    **A.**  Yes, sir.

2    **Q.**  Okay.  Meaning that the person that's being arrested

3    is not resisting, right?

4    **A.**  Correct, sir.

5    **Q.**  Not trying to get away, right?

6    **A.**  Correct, sir.

7    **Q.**  And once you handcuffed him then you said that you

8    noticed that there was a bag in his trousers?

9    **A.**  The back of his boxers, yes, sir.

10   **Q.**  And it was just two packs; is that correct?

11   **A.**  Yes, sir.

12   **Q.**  And you removed those; is that right?

13   **A.**  Yes, sir.

14   **Q.**  And did you place them on evidence?

15   **A.**  Yes, sir, I did.

16   **Q.**  And when you searched Mr. Bailey, did you recover

17   any money?

18   **A.**  No, sir, I did not.

19   **Q.**  And in your experience when somebody is dealing

20   drugs they often have money on them, right?

21   **A.**  Sometimes, sir.

22   **Q.**  Often.  I didn't say sometimes.  I said often,

23   correct?

24   **A.**  I would still say sometimes, sir.  I used to work

25   narcotics, too, prior to that, and I would say sometimes.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

119

1    **Q.**  Okay.  More often than not; would you agree with

2    that?

3    **A.**  You could say that sir, yes.

4    **Q.**  All right.  And sometimes they have weapons on them,

5    correct?

6    **A.**  Yes, sir.

7    **Q.**  And did Mr. Bailey have a weapon on him?

8    **A.**  No, sir, he did not.

9    **Q.**  Was there a weapon nearby?

10    **A.**  No, sir, no weapons recovered.

11    **Q.**  Do you know what a drug ledger is?

12    **A.**  Yes, sir.

13    **Q.**  What is a drug ledger?

14    **A.**  Pretty much them keeping a tally and just record of

15    currency, transactions and what not.  I did not recover

16    any of that either, sir.

17    **Q.**  Okay.  So a ledger is a list of people with money

18    usually that is owed to the dealer, correct?

19    **A.**  Yes, sir.

20    **Q.**  No drug ledger taken from Mr. Bailey, right?

21    **A.**  No, sir.

22    **Q.**  Often when people are selling drugs do they have

23    scales to measure their drugs?

24    **A.**  Sometimes, sir.

25    **Q.**  Did you find any scales?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

120

1      **A.**   No, sir.

2      **Q.**   Now, do you know what the total weight of drugs

3      were, suspected drugs that you found?

4      **A.**   No, sir, I do not.

5      **Q.**   Would you agree that it was a small amount?

6      **A.**   Yes, sir.

7      **Q.**   That could be consistent with personal use, correct?

8      **A.**   I would say the packaging of -- I would say the

9      packaging of it would be consistent with possibly sales,

10     sir.

11     **Q.**   Okay.  The packaging could possibly be consistent

12     with sales, correct?

13     **A.**   Yes, sir.

14     **Q.**   But the amount could be consistent with personal

15     use, correct?

16     **A.**   Yes, sir, it's possible.

17     **Q.**   All right.  In fact, the amount, even though you

18     don't recall the exact amount that it weighed, you could

19     open your hand and put that suspected cocaine in your hand

20     and if you closed your hand, it wouldn't be visible to the

21     public, correct?

22     **A.**   Correct, sir.

23     **Q.**   That's how small of an amount this was, right?

24     **A.**   Yes, sir.

25     **Q.**   And did you ever weigh it?

*15-20652; USA v. EUGENE FISHER, ET AL*

1   **A.**  It was weighed, but not by myself, sir.

2   **Q.**  Do you know how much it weighed?

3   **A.**  No, sir.

4   **Q.**  And did you ask Mr. Bailey any questions about those

5   drugs themselves?

6   **A.**  I do not recall, sir.

7   **Q.**  So you didn't ask him where he got them from, right?

8   **A.**  At the time, sir, I do not recall myself asking him

9   that, but we do --

10  **Q.**  That's what I'm asking.  Excuse me.  I'm asking did

11  you ask him questions about these suspected narcotics?

12  **A.**  I myself did not, sir, that I recall, but we do an

13  interrogation and advice of rights that we have to do for

14  narcotics cases.  I'm not sure if I did that myself

15  without seeing it or one of my coworkers, but one would

16  have been done.  I'm just not sure.

17  **Q.**  All right.  But as far as you know, you didn't ask

18  any of those types of questions, correct?

19  **A.**  I didn't, sir, that I recall.

20          **MR. DALY:**  Right.  I have nothing further.

21  Thank you.

22          **THE COURT:**  All right.  Thank you, Mr. Daly.

23          **MR. FEINBERG:**  Nothing on behalf of

24  Mr. Brown.

25          **THE COURT:**  Thank you, Mr. Feinberg.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Cross*
*Thursday/June 21, 2018*

122

1     **MR. THEIS:**  No questions, Your Honor.

2     **THE COURT:**  Thank you.

3     **MR. S. SCHARG:**  On behalf of Mr. Porter, no

4     questions, Your Honor.

5     **THE COURT:**  All right.  Thank you,

6     Mr. Scharg.

7         Mr. Bilkovic?

8     **MR. BILKOVIC:**  Your Honor, I just have a

9     couple of questions on redirect.  Actually a few

10    questions.

11                    **-   -   -**

12                                       (11:45 a.m.)

13               **REDIRECT EXAMINATION**

14    BY MR. BILKOVIC:

15    **Q.**  Mr. Daly asked you about whether Mr. Bailey tried

16    running.  Was there anything between him and the door?

17    **A.**  Yes, sir, myself.

18    **Q.**  And when he said he tried running and you said no,

19    did you think he was hiding?

20    **A.**  Yes, sir.

21    **Q.**  You talked about not finding any money on

22    Mr. Bailey.  Did you guys have a search warrant for the

23    house that day?

24    **A.**  No, sir, we did not.

25    **Q.**  Did you go through the house the way you would have

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Redirect*
*Thursday/June 21, 2018*

1    gone looking for either narcotics, money, weapons like you

2    would had you had a search warrant for the house?

3    **A.**  No, sir, I did not.

4    **Q.**  Do you know in your experience how someone -- not

5    your personal experience -- how somebody uses or ingests

6    crack cocaine?

7    **A.**  Yes, sir.

8    **Q.**  And how is that?

9    **A.**  Crack cocaine, by smoking it through quite possibly

10   a glass pipe or something to that effect.

11   **Q.**  And did Mr. Bailey have a crack pipe on him?

12   **A.**  No, sir.

13   **Q.**  Did you see any crack pipes laying in the area

14   around him in the basement?

15   **A.**  No, sir.

16   **Q.**  Now, the baggy that you saw, and I can't remember if

17   you testified on direct on this but on cross, did you say

18   that it was sticking out of his --

19   **A.**  The top -- yes, sir -- the top part of it, so the

20   twisted part of it, was sticking out of the back side of

21   the boxers, upper part of it, yes, sir.

22   **Q.**  And did that attract your attention?

23   **A.**  Yes, sir.

24   **Q.**  Why did that attract your attention?

25   **A.**  Because I believed that the other end of it was

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Redirect*
*Thursday/June 21, 2018*

124

1    going to be suspected narcotics.

2      **Q.**  Do you know if any of the other people inside of the

3    house that you encountered had baggies sticking out of

4    them?

5      **A.**  No, sir, I do not.

6      **Q.**  And the other people that were located inside of the

7    residence, do you know or did you or somebody get an

8    identification and determine who those people were?

9      **A.**  Yes, sir.

10     **Q.**  Did any of those individuals reside in the City of

11   Detroit?

12     **A.**  As I recall, no, sir.

13          **MR. BILKOVIC:**  Thank you.  Nothing further.

14          **THE COURT:**  All right.  Thank you

15   Mr. Bilkovic.

16        Mr. Daly?

17          **MR. DALY:**  Yes, thank you.

18                - - -

19                                   (11:47 a.m.)

20              **RECROSS-EXAMINATION**

21   **BY MR. DALY:**

22     **Q.**  So, Officer Sweeney, tell the jury how long

23   Mr. Bailey was in the basement before you got down there?

24     **A.**  I do not know, sir.

25     **Q.**  You don't know when he got there, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Recross*
*Thursday/June 21, 2018*
125

 1    **A.**  Correct, sir.

 2    **Q.**  Did you determine where he got the suspected drugs

 3    from?

 4    **A.**  No, sir, I did not.

 5    **Q.**  Did you determine when he got them?

 6    **A.**  No, sir, I did not.

 7    **Q.**  Or who he got them from, you don't know any of that,

 8    do you?

 9    **A.**  Correct, sir, I do not.

10    **Q.**  And do you have with you an official lab report that

11    says these suspected narcotics were in fact drugs?

12    **A.**  I myself do not, sir.  That's something that gets

13    prepared down the line, sir.

14    **Q.**  Okay.  You have no knowledge of that one way or the

15    other, right?

16    **A.**  Correct, sir.

17    **Q.**  And all you can tell the jury is that the substance

18    that you saw you suspected to be cocaine, right?

19    **A.**  Yes, sir.  In my experience and years --

20    **Q.**  I'm not asking you about your experience.  I'm

21    asking you about based on what you saw -- you did no

22    preliminary analysis, right?

23    **A.**  Saw and smelled, sir, yes.

24    **Q.**  No, I asked did you do a field test or preliminary

25    analysis.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Recross*
*Thursday/June 21, 2018*

126

```
 1        A.  No, sir, I did not.
 2                MR. DALY:  Thank you.  Nothing further.
 3                THE COURT:  All right.  Thank you, Mr. Daly.
 4            Thank you, sir.  You can step down.
 5                THE WITNESS:  Thank you.
 6                MS. FINOCCHIARO:  At this time, Your Honor,
 7        the government calls Officer Moore.
 8                THE COURT:  Okay.
 9            Good morning.
10                THE WITNESS:  Good morning.
11                THE COURT:  I'll have you take an oath.
12        Would you raise your right hand, please.
13                        -    -    -
14                        LYNN MOORE,
15        being first duly sworn to tell the truth, was examined and
16        testified upon his oath as follows:
17                THE COURT:  All right.  Will you take a seat,
18         please.
19            I'm going to have you begin by stating your name
20        and spelling your last name.  Push that mike just a little
21        bit away maybe.  Actually away.  Hopefully -- we have
22        cutting in and out if you're too close.
23                THE WITNESS:  Okay.  My first name is Lynn,
24        L-y-n-n.  My last name is Moore, M-o-o-r-e.
25                THE COURT:  Okay.  Thank you, sir.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

*Howard Sweeney, III - Recross*
*Thursday/June 21, 2018*

127

1          You may proceed, Mr. Bilkovic.

2                        -   -   -

3                                        (11:50 a.m.)

4                    **DIRECT EXAMINATION**

5     BY MR. BILKOVIC:

6          **Q.**  Sir, how are you employed?

7          **A.**  I'm currently employed with the Detroit Police

8     Department.  I have been employed with the Detroit Police

9     Department over 22 years.

10         **Q.**  And what is your current assignment?

11         **A.**  My current assignment?  I'm assigned to the Cease

12    Fire Unit in the Eighth Precinct.

13         **Q.**  What is the Cease Fire Unit?

14         **A.**  The Cease Fire Unit is directly a response to the

15    gangs in the city.  Any type of gang or drug activity in

16    the Eighth Precinct is what I'm responsible for.

17         **Q.**  What were your duties back in September of 2007?

18         **A.**  In 2007 I was assigned to Narcotics Enforcement.  I

19    was at Narcotics Enforcement approximately 11, 12 years of

20    my career, and in 2007 that's where I was.

21         **Q.**  And at what stage of your 11 to 12 years in

22    Narcotics Enforcement would 2007 have been in, beginning,

23    middle, end?

24         **A.**  That would probably -- I would say around the

25    middle.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Lynn Moore - Direct*
*Thursday/June 21, 2018*                                    128

1    **Q.**  So you are, fair to say, you are familiar with

2    narcotics investigations and participated in narcotics

3    investigations prior to November 2007, fair to say?

4    **A.**  Yes.  As I said, most of my career was in narcotics,

5    yes.

6    **Q.**  Are you familiar with the area of Manning Street in

7    the City of Detroit near Gratiot and Seven Mile?

8    **A.**  Yes.

9    **Q.**  I'm going to take your attention to September 5th,

10   2007 at approximately 4:20 in the afternoon.  Were you

11   working that day?

12   **A.**  I was.

13   **Q.**  And do you know who you were working with?

14   **A.**  I was working -- I was assigned to a particular crew

15   at Narcotics Enforcement when I was there.  I could name

16   the people if you'd like.

17   **Q.**  That would be fine.

18          **MR. FEINBERG:**  I'm sorry, could he speak into

19   the microphone?

20          **MR. BILKOVIC:**  Hold on one second.  I think

21   Mr. Feinberg is having difficulty hearing him.

22          **THE COURT:**  All right.  Let's try a little

23   bit closer.

24          **MR. BILKOVIC:**  Maybe a little closer than

25   that.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Lynn Moore - Direct*
*Thursday/June 21, 2018*

1        **THE WITNESS:**  Better?

2        **THE COURT:**  That's better.

3   BY MR. BILKOVIC:

4        **Q.**  Do you recall who you were working with?

5        **A.**  Yes.  The OIC, the officer in charge, would be

6   Sergeant Roy Harris.  My partners were Officer Michael

7   Panackia, Officer William Morrison, myself, Officer

8   Lashawn Barnett, and I believe there might have been

9   another one or two officers that were with me at that

10  time, but I don't recall the names offhand.

11       **Q.**  Were all of these officers in one car or were you in

12  more than one car, if you remember?

13       **A.**  Honestly, I don't really remember.  Our standard

14  operation is usually we had a raid van and then a scout

15  car would trail us, but honestly from 2007 I don't recall.

16       **Q.**  Okay.  At around 4:20 in the afternoon were you in

17  the area of 14851 Manning in the City of Detroit?

18       **A.**  Yes.

19       **Q.**  And did you observe anything that attracted your

20  attention?

21       **A.**  Yes.

22       **Q.**  What did you observe?

23       **A.**  Two individuals standing in front of a vacant

24  location.

25       **Q.**  How did you know the location was vacant?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**  There was no windows in the location, and if I

2     recall correctly from my report, I had the front door was

3     listed as open and you could see through the dwelling.

4     **Q.**  And what did you do after you saw these

5     two individuals -- when you say standing in front, were

6     they in the yard, were they in the street?

7     **A.**  I believe they were in the yard, but as I stated,

8     this was a while ago, but they were on the curtilage of

9     that location.

10    **Q.**  Officer Moore, obviously it happened a while ago.

11    Do you have independent recollection of specifically what

12    occurred?

13    **A.**  Honestly, not, not too much, no.

14    **Q.**  Okay.  Did you write a report after what occurred?

15    **A.**  I did.

16    **Q.**  And did you detail the facts of what occurred in

17    your report?

18    **A.**  Yes.

19    **Q.**  And was that report accurate at the time you made

20    it?

21    **A.**  Yes.

22    **Q.**  And would you have made it the date that this

23    happened?

24    **A.**  Yes, that would have been drafted right after the

25    incident.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Lynn Moore - Direct*
*Thursday/June 21, 2018*                                      131

1    **Q.**  And do you have that report with you?

2    **A.**  Yes, sir.

3              **MR. BILKOVIC:**  Your Honor, at this time I

4    would ask for permission for Officer Moore to be able to

5    read his report into the record pursuant to Federal Rule

6    of Evidence 803(5), a recorded recollection.

7              **THE COURT:**  Any objection?

8          All right.  You may do so.

9              **THE WITNESS:**  This is my Preliminary

10   Complaint Report.

11             **MR. DALY:**  Hold on, please.

12             **MR. H. SCHARG:**  Your Honor, you have a juror

13   that's raised their hand.

14             **THE COURT:**  Excuse me?

15             **A JUROR:**  Can I go to the bathroom?

16             **THE COURT:**  Yeah, sure.

17             (Recess from 11:55 a.m. to 11:57 a.m.)

18   BY MR. BILKOVIC:

19   **Q.**  Do you have a copy of that report with you?

20   **A.**  Yes, I do.

21   **Q.**  And if you could go down to where it says "A:", do

22   you see that area?

23   **A.**  Yes.

24   **Q.**  Could you start there and just read the contents of

25   your report?

*15-20652; USA v. EUGENE FISHER, ET AL*

1       **A.**   Yes.   Under A is listed the defendants that were at

2       the location at this time.

3       **Q.**   And if you could just read those lines verbatim how

4       they appear.

5       **A.**   Okay.   "Defendant 1:  Jeffrey Donnell Adams, Black

6       male, 18, date of birth 3-13-1989, 6'2", 150 pounds, black

7       hair, brown eyes, 14431 Eastwood, Social Security number

8       unknown, wearing a red shirt, dark blue pants, red belt

9       and blue gym shoes."

10               "Defendant 2:  Kenyoda Holmes, Black male, 17,

11      date of birth 7-29-1990, 5'4", 140, black hair, brown

12      eyes, of 14795 Novara, Social Security number unknown,

13      wearing black t-shirt, blue dickey shorts, and black Nike

14      boots."

15      **Q.**   Continue.

16      **A.**   Okay.   The next down in the format I have written,

17      "It was a street enforcement activity.

18               Next paragraph.   "Writer -- which is myself --

19      was assigned to the arrest team during the above

20      operation.   Writer remembers traveling westbound on

21      Manning from Queen.   Observed above Defendant 1 -- which

22      is Mr. Adams -- and above Defendant 2 -- Mr. Holmes --

23      standing on the grass in front of the yard of a vacant

24      dwelling."   And I have, "dwelling missing the front

25      windows and an open front door, able to see through the

*15-20652; USA v. EUGENE FISHER, ET AL*

*Lynn Moore - Direct*
*Thursday/June 21, 2018*

133

1    entire house."

2            "Writer then observed above Defendant 2 run in a

3    southbound direction between the houses.  Writer then

4    observed Defendant 1 from his right hand discard

5    one orange potato chip bag to the ground.  Upon further

6    investigation, P.O. Barnett detained Defendant 1 while

7    writer recovered the orange potato chip bag.  Writer then

8    confiscated from the inside of the potato chip bag one

9    plastic wrap containing 16 knotted plastic wraps of

10   cocaine.  Writer advised members.  Writer made no further

11   confiscations or arrests."

12       Q.  Can you read the bottom line?

13       A.  And the bottom line on this format, this is the lock

14   seal that the narcotics were placed on, which is "LSF,"

15   which is lock seal folder, "N00202407, which contains

16   one orange Lays potato chip bag containing one plastic

17   wrap containing 16 knotted plastic wraps of cocaine."

18            **MR. BILKOVIC:**  Your Honor, may I approach the

19   witness?

20            **THE COURT:**  Yes.

21   BY MR. BILKOVIC:

22       Q.  I'm handing you what's been marked Government's

23   Proposed Exhibit 174.  Do you recognize that?

24       A.  This is the same -- if I can refer to my report on

25   the exact number for the lock seal.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Lynn Moore - Direct*
*Thursday/June 21, 2018*

134

1    **Q.**   Yes.

2    **A.**   All of the lock seals are the same.  The only

3    difference is the number at the top which sets them apart.

4    **Q.**   Okay.  You just read something from your report

5    indicating there was a potato chip bag and there were

6    things inside the potato chip bag containing suspected

7    cocaine?

8    **A.**   Correct, and on my report I have the lock seal

9    number listed, which is the same lock seal I'm holding in

10   my hand with the numbers at the top in the right-hand

11   corner.  Also, reviewing this lock seal folder, it has my

12   initials and my handwriting on it.

13   **Q.**   And, from looking at that, does that reassure you

14   that you are looking at the exhibit or the evidence that

15   you recovered that you just read to the jury was contained

16   in your police report including the potato chip bag and

17   the plastic wrap containing the 16 knotted plastic bags of

18   cocaine?

19   **A.**   Yes, sir.  You can see in the front the orange

20   potato chip bag plus the cocaine is apparent in the front.

21   **Q.**   Now, you indicated that you were Narcotics

22   Enforcement for approximately 11 years?

23   **A.**   11, 12 years, yes, sir.

24   **Q.**   The way this was packaged, was it packaged for

25   distribution?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Lynn Moore - Direct*
*Thursday/June 21, 2018*

135

1      **A.**  Sales/distribution, yes.  I wouldn't say that was

2   for personal use.  That was more for sales.

3                **MR. BILKOVIC:**  Your Honor, at this time I

4   would move for admission into evidence of Government's

5   Proposed Exhibit 174.

6                **THE COURT:**  Any objection?

7                **MR. DALY:**  No.

8                **THE COURT:**  All right.  Thank you.  The Court

9   will receive it.

10               **MR. BILKOVIC:**  I have no further questions.

11               **THE COURT:**  Okay.  Thank you.

12          Any cross-examination?

13               **MR. H. SCHARG:**  No questions on behalf of

14   Eugene Fisher.

15               **THE COURT:**  Thank you, Mr. Scharg.

16               **MR. DALY:**  Your Honor, no questions.

17               **MR. FEINBERG:**  No questions.

18               **MR. THEIS:**  No questions, Your Honor.

19               **MR. S. SCHARG:**  No questions, Your Honor.

20               **THE COURT:**  Okay.  Thank you.  You may step

21   down.

22               **MS. FINOCCHIARO:**  At this time, Your Honor,

23   the government calls Officer Panackia.

24               **THE COURT:**  Good afternoon.

25               **THE WITNESS:**  Good afternoon.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Lynn Moore - Direct*
*Thursday/June 21, 2018*                              136

1              **THE COURT:**  First witness after the morning.

2              **THE WITNESS:**  Morning.

3              **THE COURT:**  Raise your right hand, please.

4                         -   -   -

5                     **MICHAEL PANACKIA,**

6    being first duly sworn to tell the truth, was examined and

7    testified upon his oath as follows:

8              **THE COURT:**  Take a seat, please.  This

9    microphone is a little tricky.  You don't want to get it

10   too close.  That will be too close.  Push it away a little

11   bit, yeah.

12        And you will begin by stating your name and

13   spelling your last name for us.

14             **THE WITNESS:**  Michael Panackia.  Michael,

15   common spelling.  Last name, P-a-n-a-c-k-i-a.

16             **MR. BILKOVIC:**  Mr. Feinberg, can you hear

17   that okay?

18             **MR. FEINBERG:**  Yes.

19             **MR. BILKOVIC:**  Okay.

20                         -   -   -

21                                        (12:03 p.m.)

22                    **DIRECT EXAMINATION**

23   BY MR. BILKOVIC:

24      **Q.**  Sir, can you please tell the jury how you are

25   employed?

                 *15-20652; USA v. EUGENE FISHER, ET AL*

*Michael Panackia - Direct*
*Thursday/June 21, 2018*

137

1     **A.**   Detroit Police Department.

2     **Q.**   In what capacity?

3     **A.**   I'm in the Detective Unit, Investigative Operations.

4     **Q.**   Are you a detective?

5     **A.**   Officer.

6     **Q.**   Okay.  How long have you been assigned to the

7   Detective Unit?

8     **A.**   About four years.

9     **Q.**   And how long have you been a police officer with the

10   City of Detroit?

11     **A.**   Almost 22 years.

12     **Q.**   What have been some previous assignments you have

13   had with the City of Detroit Police Department in those 22

14   years?

15     **A.**   I worked patrol for about two years, and I worked

16   Narcotics for about 16 years.

17     **Q.**   Do you recall offhand what years you would have

18   worked Narcotics?

19     **A.**   From '98 to 2014.

20     **Q.**   I want to take your attention to September 5th, 2007

21   at approximately 4:20 in the afternoon.  Were you working

22   on that day?

23     **A.**   I was.

24     **Q.**   And were you working with anybody?

25     **A.**   Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Michael Panackia - Direct*                              138
*Thursday/June 21, 2018*

1      **Q.**   Who were you working with?

2      **A.**   Officer Lynn Moore, Sergeant Roy Harris, and other

3      crew members.

4      **Q.**   And while you were on duty that day, did you happen

5      to be in the area of 14815 Manning in the City of Detroit?

6      **A.**   Yes.

7      **Q.**   Why were you in the area?

8      **A.**   I was in the area conducting street enforcement for

9      narcotic activity or any criminal activity.

10     **Q.**   Now, do you decide at the beginning of the shift

11     where you are going to go or are you directed areas to

12     focus on?

13     **A.**   Usually directed by a supervisor.

14     **Q.**   And when you were in the area of 14815 Manning, did

15     you see anything that attracted your attention?

16     **A.**   Yes.  There was an individual standing in front of a

17     vacant dwelling.  There was actually two individuals

18     standing in front of a vacant dwelling, one of which took

19     off running, and I subsequently apprehended him along with

20     my sergeant in an ally.

21     **Q.**   Now, have you had an opportunity to review your

22     police report before testifying today?

23     **A.**   I did.

24     **Q.**   Do you have independent recollection of the facts

25     that occurred that day?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Michael Panackia - Direct*
*Thursday/June 21, 2018*

139

1      **A.**  I have no independent recollection other than what

2      my report says.

3      **Q.**  And so you did author a report in this case?

4      **A.**  Yes.

5      **Q.**  And did you author it shortly after observing what

6      you observed that day?

7      **A.**  Within that same day.

8      **Q.**  And when you authored it, would it have been

9      accurate at the time?

10     **A.**  Yes.

11              **MR. BILKOVIC:**  Your Honor, at this time I

12     would ask for permission for Officer Panackia to be able

13     to read the portion of his report that pertains to this

14     incident under Federal Rule of Evidence 803(5).

15              **THE COURT:**  All right.  Any objection?

16              **MR. DALY:**  No, sir.

17              **THE COURT:**  Okay.

18  **BY MR. BILKOVIC:**

19     **Q.**  Do you have your report with you?

20     **A.**  Yes.

21     **Q.**  Could you please refer to it.  If you could start

22     down where it says -- there's a letter C with a colon?

23     **A.**  Sure.

24     **Q.**  If you could just start from there and read down to

25     the bottom?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Michael Panackia - Direct*
*Thursday/June 21, 2018*

140

1    **A.**   "Writer was the assigned to the arrest team during

2    the above operation.  Writer remembers traveling westbound

3    on Manning from Queen.  Observed Defendant 1 and Defendant

4    2 standing on the grass of the front yard of a vacant

5    dwelling.  Dwelling missing all front windows with an open

6    front door, able to see through the entire house.

7         "Writer then observed Defendant 2 look in the

8    direction of the arrest team and run southbound direction

9    between the houses.  Writer along with Sergeant Harris

10   gave chase overtaking above Defendant 2 in the ally behind

11   above location.

12        "Writer then conducted a pat-down of Defendant

13   2.  Writer at this time felt a lumpy substance in the

14   above defendant right front pants pocket, which writer

15   immediately recognized to be a type of narcotics due to

16   writer's training and experience.  Writer then recovered

17   one plastic baggy containing suspected cocaine from the

18   above defendant right front pants pocket.  Writer advised

19   members, arrested above Defendant 2 for same.  Writer made

20   no further confiscations or arrests."

21   **Q.**   Could you read then the bottom line that starts with

22   LSF?

23   **A.**   Sure.  "One with plastic baggy containing 15 Ziplocs

24   of cocaine and three knotted plastic wraps of cocaine."

25   **Q.**   And where would those items have come from?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Michael Panackia - Direct*
*Thursday/June 21, 2018*

141

1      **A.**  Mr. Kenyoda Holmes.

2      **Q.**  And would that have been the Defendant 2 that you

3      had run after and had apprehended?

4      **A.**  That is.

5      **Q.**  What did you do with those items after

6      confiscating -- well, did you confiscate those items from

7      Mr. Holmes?

8      **A.**  I did.

9      **Q.**  And what did you do with those?

10     **A.**  They were placed in a lock seal folder.

11     **Q.**  I have handed you what's been marked Government's

12     Proposed Exhibit 175.  Do you recognize that?

13     **A.**  Yes, I do.

14     **Q.**  And what is that?

15     **A.**  This is a lock seal folder where I placed the

16     suspected cocaine inside of.

17     **Q.**  The items that you talked about, the plastic baggy,

18     the 15 Ziplocs of cocaine and the three knotted plastic

19     wraps of cocaine?

20     **A.**  Yes.

21     **Q.**  Those were placed in there and preserved for

22     evidence?

23     **A.**  That's correct.

24     **Q.**  And those were the items that were recovered from

25     Kenyoda Holmes?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Michael Panackia - Direct*
*Thursday/June 21, 2018*

142

1    **A.**  Yes.

2                **MR. BILKOVIC:**  Your Honor, at this time I

3    would move for admission into evidence of Government's

4    Proposed Exhibit 175.

5                **THE COURT:**  All right.  Any objection?

6                **MR. DALY:**  No, sir.

7                **THE COURT:**  All right.  Thank you.  The Court

8    will receive it.

9                **MR. BILKOVIC:**  And I have no further

10   questions.

11               **THE COURT:**  All right.  Thank you.

12          Any cross-examination?

13               **MR. H. SCHARG:**  No cross-exam on behalf of

14   Mr. Eugene Fisher.

15               **MR. DALY:**  Judge, no questions on behalf of

16   Mr. Bailey.

17               **MR. FEINBERG:**  No questions on behalf of

18   Mr.Brown.

19               **MR. THEIS:**  None, Your Honor.

20               **MR. S. SCHARG:**  No questions on behalf of Mr.

21   Porter.

22               **THE COURT:**  All right.  Thank you all.

23          You may step down.  Thanks.

24               **MS. FINOCCHIARO:**  At this time, Your Honor,

25   the government calls Officer Jimenez.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Michael Panackia - Direct*
*Thursday/June 21, 2018*

143

 1           THE COURT:  Okay.

 2      Good afternoon, sir.

 3           THE WITNESS:  Good afternoon, Your Honor.

 4           THE COURT:  Would you raise your right hand,

 5   please.

 6                      -    -    -

 7                **MOISES JIMENEZ,**

 8   being first duly sworn to tell the truth, was examined and

 9   testified upon his oath as follows:

10           THE COURT:  All right.  Take a seat.

11      Why don't you get about maybe a foot away.  That's

12   good.  If you get too close, it starts cutting out.

13           THE WITNESS:  Okay.

14           THE COURT:  All right.  Thank you.  If you

15   will begin by stating your name and spelling your last

16   name for us.

17           THE WITNESS:  My name is Moises Jimenez.

18   Last name is J-i-m-e-n-e-z M-o-i-s-e-s.

19           THE COURT:  Thank you.  You may proceed.

20           **MR. WIGOD:**  Thank you, Your Honor.

21                      -    -    -

22                                       (12:10 p.m.)

23                **DIRECT EXAMINATION**

24   BY MR. WIGOD:

25      **Q.**  Sir, can you tell the jury what it is you do for a

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Direct*
*Thursday/June 21, 2018*

1      living?

2      **A.**   I'm a Detroit Police Detective.

3      **Q.**   How long have you been a detective with DPD?

4      **A.**   I have been working that section since July of 2000.

5      **Q.**   And how long have you been in law enforcement?

6      **A.**   Law enforcement for Detroit, it's over 24 years and

7      a couple months, but I had prior law enforcement with the

8      military and campus police in Texas.

9      **Q.**   Can you just briefly summarize, we don't need to go

10     into your military, but the 24 years of experience with

11     DPD what sorts of the sections you have been assigned to?

12     **A.**   I was regular patrol for five years.  I was plain

13     clothes officer for almost three years.  I went to the

14     Homicide Section in July of 2000.  I had a 90-day hiatus

15     in the Ninth Precinct and then a 60-day hiatus in the

16     Sixth Precinct.

17     **Q.**   Detective Jimenez, I want to draw your attention to

18     September 18th of 2005.  Do you recall an incident that

19     occurred in front of 14777 Tacoma?

20     **A.**   Yes, sir.

21     **Q.**   And that's in the Ninth Precinct?

22     **A.**   Yes, sir.

23     **Q.**   Can you explain -- I'm sorry?

24     **A.**   I'm sorry.  The address, the Tacoma address?

25     **Q.**   Yes.

*Moises Urmenez - Direct*
*Thursday/June 21, 2018*

145

1    **A.**   Yes, it's in the Ninth Precinct right off of

2    Gratiot, south of State Fair.

3    **Q.**   Okay.  Can you explain for the jury what happened on

4    that day?

5    **A.**   Myself and my partner were full uniform, full police

6    car.  There was a group of individuals in the middle of

7    the street making the cars go around them so we stopped.

8    As soon as we stopped and as soon as we opened the doors,

9    one person ran.  I believe he was wearing a brown shirt

10   and blue jeans, and due to the fact it's just me and my

11   partner and there were still five other people out there,

12   I got out and I ordered everybody to get on the ground.

13   **Q.**   All right.  So you and your partner -- who was your

14   partner back then?

15   **A.**   I can't remember, sir.  This was in 2005.

16   **Q.**   Okay.  Do you have your report with you?

17   **A.**   Yes.

18   **Q.**   Would that refresh your memory?

19   **A.**   Yes, please.  Police Officer Howell.

20   **Q.**   Now, you and Officer Howell would have been in a

21   vehicle?

22   **A.**   Yes.

23   **Q.**   And you mentioned that you saw several individuals

24   in the middle of the street?

25   **A.**   Yeah, there was like five or six individuals.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Direct*
*Thursday/June 21, 2018*

146

1    **Q.** This would be in the middle of the street basically

2    in front of the 14777 Tacoma address?

3    **A.** Yes, sir.

4    **Q.** And could you tell what they were doing?

5    **A.** They were just scattered around in front of that

6    location, and because the vehicles in front of me had to

7    go around the individuals, we stopped.

8    **Q.** Okay. And approximately how many people were out

9    there?

10   **A.** At least six.

11   **Q.** You said at some point in time one of the

12   individuals you thought with a brown shirt ran?

13   **A.** Yes.

14   **Q.** All right. Did you notice anything unusual about

15   that person or that gave you cause for concern?

16   **A.** He ran as though -- he ran trying -- putting his

17   hand on his hip line as though armed, so therefore that

18   brought me to tell -- I ordered everybody on the ground.

19   **Q.** Okay. So the person who ran you thought might have

20   a firearm on them?

21   **A.** Yes, sir.

22   **Q.** Did you think that the person who ran had a firearm

23   on him?

24   **A.** Yes.

25   **Q.** And that's what caused you -- but the other people

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Urmenez - Direct*
*Thursday/June 21, 2018*                                    147

1    at that point in time, you don't know whether they are

2    armed or not armed?

3        **A.**   I didn't know if they were armed or not.

4        **Q.**   Okay.  So in an abundance of caution you had them --

5    you detained them?

6        **A.**   Yes.

7        **Q.**   Okay.  Explain what happened next.

8        **A.**   We had placed cuffs on Mr. Robert Martin Brown, and

9    when my partner tried to put him in the car cuffed --

10       **Q.**   Hold on.  There you go.

11       **A.**   When my partner had cuffed him and trying to place

12   him in the car --

13       **Q.**   Him being?

14       **A.**   Mr. Brown.  He started fighting.

15       **Q.**   Mr. Brown did?

16       **A.**   Correct.  So I maced him.

17       **Q.**   When you say Mr. Brown started fighting, can you

18   give more detail, what did he do?

19       **A.**   When my partner was placing him into the car, he

20   started pushing away from the car with his body even

21   though he was cuffed, and due to the fact that we still

22   had four more people on the ground, I went up and I maced

23   Mr. Brown.

24       **Q.**   Okay.  You were concerned for your safety?

25       **A.**   Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Direct*
*Thursday/June 21, 2018*

148

1      **Q.**  The safety of your fellow officer?

2      **A.**  Yes, sir.

3      **Q.**  Did you eventually get Mr. Brown into the patrol

4      cruiser?

5      **A.**  Yes.

6      **Q.**  Did you take any action to help Mr. Brown recover

7      from being maced?

8      **A.**  Yes, we rode, we rode to the precinct with the

9      windows rolled down.

10     **Q.**  Now, were you at some point in time able to get the

11     names of the other individuals who were blocking traffic

12     who were with Mr. Brown?

13     **A.**  Yes, sir, because we ticketed everybody.

14     **Q.**  Okay.  Can you give us some of the names of the

15     other individuals who were with Mr. Brown?

16     **A.**  Mr. Powell, Mr. Lovejoy.

17     **Q.**  Hold on.  If you could give first names as well.

18     **A.**  I would have to go through my report --

19     **Q.**  That's fine.

20     **A.**  -- if you don't mind.  Christopher Owens, John

21     Powell, Robert Murphy, Anthony Lovejoy.  These folks were

22     issued ordinances for loitering at the location and

23     released.

24     **Q.**  Okay.  The individual who ran, he was not caught?

25     He was a male?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Direct*
*Thursday/June 21, 2018*

149

1    **A.**  Yes.

2    **Q.**  No one gave chase or was able to find that person?

3    **A.**  No.  No, sir.

4    **Q.**  Okay.  At some point in time was an address for

5    Mr. Brown obtained?

6    **A.**  Yes, sir.

7    **Q.**  And what address was provided by Mr. Brown?

8    **A.**  14561 Manning.

9    **Q.**  That's 14561 Manning?

10   **A.**  Yes, sir.

11   **Q.**  In the City of Detroit?

12   **A.**  Yes, sir.

13              **MR. WIGOD:**  Your Honor, I don't have any

14   further questions of the witness.

15              **THE COURT:**  Okay.  Thank you, Mr. Wigod.

16              **MR. H. SCHARG:**  No questions on behalf of

17   Eugene Fisher.

18              **THE COURT:**  Okay.  Thank you.

19              **MR. DALY:**  We have no questions.  Thank you.

20              **MR. FEINBERG:**  Just one second, Your Honor.

21                       -    -    -

22                                      (12:17 p.m.)

23                    **CROSS-EXAMINATION**

24   BY MR. FEINBERG:

25   **Q.**  Detective Jimenez, you saw approximately six people

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Cross*
*Thursday/June 21, 2018*

150

1    in the street or on the sidewalk?

2        **A.**  At least six people on the street.

3        **Q.**  Will you look at your report and see whether or not

4    they were obstructing cars driving or pedestrians walking?

5        **A.**  Pedestrians.

6        **Q.**  Sidewalk, right?

7        **A.**  Yes, sir.

8        **Q.**  Okay.  Who was driving the vehicle that you were in?

9        **A.**  It had to be Police Officer Howell.

10       **Q.**  I'm sorry?

11       **A.**  It would have to be my partner, sir, Police Officer

12   Howell.

13       **Q.**  So as you were driving on Tacoma you saw six people

14   on the sidewalk congregating; is that correct?

15       **A.**  No, sir, that's not what I said.  I said I saw at

16   least six people in front of that location on the street.

17   That's what I said.

18       **Q.**  On the sidewalk.  On the sidewalk, right?

19       **A.**  No, sir.  I said on the street.

20       **Q.**  But you said in your report it says sidewalk.

21       **A.**  Yes, sir.

22       **Q.**  Okay.  So you were mistaken whether or not they were

23   in the street because they were on the sidewalk?

24       **A.**  No, sir, I said they were on the street.

25       **Q.**  But your report says sidewalk?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Cross*
*Thursday/June 21, 2018*

151

1      **A.**   The report does say sidewalk.

2      **Q.**   Okay.  You prepared the report 13 years ago?

3      **A.**   Yes, sir.

4      **Q.**   Okay.  And you prepared the report shortly after the

5      incident?

6      **A.**   Yes, sir.

7      **Q.**   So your memory would have been better then than it

8      is now; is that correct?

9      **A.**   That is correct.

10     **Q.**   Okay.  So if your report says you saw them on the

11     sidewalk, that would be correct?

12     **A.**   That's correct.

13     **Q.**   Okay.  How fast was your car going on Tacoma?

14     **A.**   I don't know, I wasn't driving, but it was going

15     slow enough for him to stop and me jump out.

16     **Q.**   Okay.  During the period of time that you were in

17     the car approaching this group of people, how many

18     pedestrians were on the sidewalk crossing where the people

19     were?

20     **A.**   I don't recall.

21     **Q.**   Do you recall any?

22     **A.**   No, I do not.  I don't recall.

23     **Q.**   Your report does not say that you saw any

24     pedestrians that were being blocked on the sidewalk by

25     these people, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Cross*
*Thursday/June 21, 2018*

152

1    **A.**  Can you repeat that question, sir?

2    **Q.**  There's nothing in your report that says that you

3    saw pedestrians being blocked by these people; is that

4    correct?

5    **A.**  No, it does say gathered in front of 14777 Tacoma

6    impeding the flow of pedestrian traffic on the sidewalk.

7    **Q.**  How many pedestrians were impeded by these people?

8    **A.**  I don't know, sir.  I don't recall.

9    **Q.**  Do you recall any?

10   **A.**  Sir, I don't recall if there was one, ten, fifteen.

11   I don't recall.

12   **Q.**  Or none?

13   **A.**  I don't recall.

14   **Q.**  Okay.  So let's assume that no pedestrians were

15   impeded.  What were these people doing wrong other than

16   hanging out on a sidewalk, on a city sidewalk at -- what

17   time was this?

18   **A.**  7:45 p.m.

19   **Q.**  It was still light out, wasn't it?

20   **A.**  Yes, because it's summer.

21   **Q.**  I'm sorry?

22   **A.**  Yes, because it's summer.

23   **Q.**  Right.  So let's assume that there were no

24   pedestrians that were impeding.  Why did you stop other

25   than six -- oh, let me just ask you this.  Were all of

*15-20652; USA v. EUGENE FISHER, ET AL*

1    these Black males?

2        A.   Yes.

3        Q.   Okay.  Other than six Black males standing on the

4    sidewalk when it was light out in September, why did you

5    approach them?

6        A.   Because not all of these individuals were on the

7    sidewalk.

8        Q.   I see.  Where in your report does it say that any of

9    the individuals were anyplace other than the sidewalk?

10       A.   In the second sentence on the first paragraph where

11   it says, "Observed several vehicles slow or vary their

12   course of travel in front of the location above," which is

13   14777 Tacoma.

14       Q.   And who were the persons that were in the street

15   blocking the traffic?

16       A.   I do not know exactly who was standing where.  The

17   only thing I do know is that one ran and five stayed.

18       Q.   Where was Mr. Brown, on the sidewalk or in the

19   street?

20       A.   I don't recall, sir.  I just, like I said, I know it

21   was six at least, and these are the individuals that were

22   detained.

23       Q.   So if Mr. Brown was on the sidewalk, why would you

24   order him to the ground because other people were in the

25   street and one person ran?

1    **A.**  Because he ran as though he was armed.

2    **Q.**  I understand.  That was the one person who ran?

3    **A.**  Yes, sir.

4    **Q.**  None of the other five gave you any indication that

5    they were armed; isn't that correct?

6    **A.**  No.

7    **Q.**  Okay.  No, that's not correct?

8    **A.**  I don't know if they were armed.

9    **Q.**  I'm saying no one gave you any indication that they

10   were armed; is that correct?

11   **A.**  I'll say okay.

12   **Q.**  Okay meaning yes?

13   **A.**  Yes.

14   **Q.**  Okay.  Mr. Brown didn't give you any indication he

15   was armed, did he?

16   **A.**  No, but it was Mr. Brown that gave us the most

17   problems.  That's why he got sprayed.

18   **Q.**  I understand.  He's the only one who exercised his

19   right to resist an unlawful arrest; isn't that correct?

20           **MR. WIGOD:**  I'll object, Your Honor.

21   Argumentative.

22           **THE COURT:**  Objection sustained.

23   BY MR. FEINBERG:

24   **Q.**  Okay.  Do you know if a person has a right to resist

25   an unlawful arrest?

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. WIGOD:**  Again, Your Honor, I would

2     object.  It's not relevant and it's argumentative.

3          **MR. FEINBERG:**  Of course it's relevant.

4     Mr. Brown did nothing wrong to be handcuffed, put in a

5     scout car and to be maced.  You are -- as the Court knows,

6     a person has a right to resist an unlawful arrest.  I'm

7     asking about the nature of the unlawful arrest of

8     Mr. Brown and the right for him to resist.

9          **THE COURT:**  Okay.

10          **MR. WIGOD:**  One, I don't think that's a

11     correct statement of the law, and two, this officer did

12     nothing wrong so I don't see the relevance of the

13     question.

14          **MR. FEINBERG:**  He may not, but I certainly

15     do, Your Honor, and I can certainly on behalf of

16     representing Mr. Brown, who was in fact unlawfully

17     arrested for resisting an unlawful arrest, I can pursue

18     that.

19          **THE COURT:**  I think the question was

20     argumentative, but I'll hear the question again.

21          **MR. FEINBERG:**  Yes.

22     BY MR. FEINBERG:

23       **Q.**  Are you aware that a person has a right to resist an

24     unlawful arrest?

25       **A.**  Yes.

*Moises Jimenez - Cross*
*Thursday/June 21, 2018*

1    **Q.**  What was Mr. Brown originally ordered to the ground

2    for and later handcuffed and arrested?

3    **A.**  He was ordered to the ground for our safety.  He was

4    arrested for his warrants that he himself said he had.

5    **Q.**  You say that he was ordered to the ground for your

6    safety.  What did he do that caused you to be concerned

7    about your safety?

8    **A.**  That they were all loitering in front of that

9    location.

10   **Q.**  I'm sorry?

11   **A.**  That they were all loitering in front of that

12   location.  We were going to stop and address the

13   situation.  One of his friends or somebody appointed to

14   the group ran away as though armed.  I ordered everybody

15   on the ground.  I asked Mr. Brown if he was on probation

16   or parole.  He answered the question.  I asked him if he

17   had any warrants.  He said yes, I do.  We cuffed him.  We

18   tried to put him in the car.  That's when Mr. Brown --

19   **Q.**  How do you know that the person that ran was a

20   friend or an associate of Mr. Brown?

21   **A.**  Because they were all together.

22   **Q.**  I see.  So we are all together.  Does that mean that

23   we all have to be associates and friends?

24   **A.**  No, but I'm pretty sure they all know each other.

25   **Q.**  Have you ever been in a group of people that you did

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Cross*
*Thursday/June 21, 2018*

1     not know and that you were talking, but you weren't

2     associates?

3        **A.**   No, sir.

4        **Q.**   Never?

5        **A.**   No.

6        **Q.**   Oh, okay.  Did you ask him about the warrants before

7     or after you ordered him to the ground and handcuffed him?

8        **A.**   After.

9        **Q.**   So when you ordered him to the ground, you didn't

10    order him to the ground and cuffed because he told you he

11    had a misdemeanor warrant; isn't that correct?

12       **A.**   Well, I ordered him to the ground --

13       **Q.**   Yeah.

14       **A.**   When I asked him the array of questions that I did

15    and he had the warrants, that's when he got cuffed.

16       **Q.**   But you ordered him to the ground before you

17    questioned him, right?

18       **A.**   Yes.

19       **Q.**   Okay.  And you ordered him to the ground to protect

20    yourself?

21       **A.**   Yes.

22       **Q.**   Was he armed?

23       **A.**   No, he was not.

24       **Q.**   Is it a crime to stand on the sidewalk in front of a

25    house and talk?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Cross*
*Thursday/June 21, 2018*

1    **A.**  That question in general?

2    **Q.**  Yes.

3    **A.**  No, it's not a crime.

4    **Q.**  So you arrested them for -- you ordered them to the

5    ground and arrested them for loitering for a crime that

6    didn't exist?

7    **A.**  No.  Yes, I detained them because they were

8    loitering in front of the location in traffic and

9    sidewalk.  That prompted me to have the right to stop and

10   detain them, identify them and do the proper sequence.  It

11   would have been a loitering ticket for all five.

12   **Q.**  Detective Jimenez, Mr. Brown -- you do not recall

13   whether or not Mr. Brown was just standing on the sidewalk

14   or in the street; is that correct?

15   **A.**  That's correct.

16   **Q.**  Okay.  So if he wasn't in the street causing

17   vehicles to go around, all he was doing was standing on

18   the sidewalk, on a public sidewalk in front of a house,

19   correct?

20   **A.**  That -- if it was -- without the totality of the

21   circumstances, you are correct, that is not a crime.

22   **Q.**  The totality of the circumstances is someone ran

23   away that you had no idea what that person's relationship

24   with Mr. Brown?

25   **A.**  That is correct.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Cross*
*Thursday/June 21, 2018*

159

1      **Q.**   Okay.  But you still ordered him to the ground?

2      **A.**   Yes, sir, but the person running away is not the

3      only totality of the circumstances that put Mr. Brown on

4      the floor.

5      **Q.**   Before you ordered him to the ground, other than

6      standing on the sidewalk what was his participation in the

7      totality of the circumstances?

8      **A.**   Well, you keep saying that Mr. Brown was on the

9      street.  I said I don't remember if Mr. Brown was on the

10     sidewalk or on the street.

11     **Q.**   I understand, but if you don't remember, you have to

12     assume --

13     **A.**   No, sir.

14     **Q.**   No, okay.  Detective Jimenez, apparently you have

15     your own agenda for this situation, and I don't think

16     there's any further questions that the jury could even

17     consider what you have to say.

18                   **MR. FEINBERG:**  No further questions.

19                   **MR. WIGOD:**  Is that a question, Your Honor?

20                   **THE COURT:**  No.  If that's an objection, it's

21     granted.

22                   **MR. WIGOD:**  That's an objection, Your Honor.

23                   **THE COURT:**  It's granted.

24                            -    -    -

25

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Redirect*
*Thursday/June 21, 2018*

160

1                                                    (12:33 p.m.)

2                          **REDIRECT EXAMINATION**

3      **BY MR. WIGOD:**

4        **Q.**  Detective, just a few follow-up questions, if I may.

5      Had there been complaints of narcotic sales in that area?

6        **A.**  Yes, sir.

7        **Q.**  So you were aware that that area was a high drug

8      trafficking area?

9        **A.**  Yes.

10       **Q.**  Okay.  And you saw several individuals in front of a

11     house loitering?

12       **A.**  Yes.

13               **MR. FEINBERG:**  Objection.  That's a legal

14     conclusion, loitering.  Standing.

15               **THE COURT:**  Go ahead.

16     **BY MR. WIGOD:**

17       **Q.**  Mr. Brown resisted after he was arrested?

18       **A.**  Yes.  After he was cuffed, that's when he started

19     fighting.

20       **Q.**  Being placed in the car, and at that point in time

21     he was arrested for having outstanding arrest warrants,

22     correct?

23       **A.**  Yes.

24       **Q.**  Okay.  And the other individuals at the scene,

25     Mr. Lovejoy, Mr. Murphy and the others, they were

                    *15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Redirect*
*Thursday/June 21, 2018*

161

 1   released?

 2   **A.**   They were ticketed and released, yes.

 3   **Q.**   So they went on their way?

 4   **A.**   Yes.

 5   **Q.**   But Mr. Brown had an arrest warrant so you are

 6   obligated to take him into custody?

 7   **A.**   Yes.

 8   **Q.**   And it was when you were placing him into the car or

 9   your partner was placing him into the car that Mr. Brown

10   resisted that arrest?

11   **A.**   Yes.

12             **MR. WIGOD:**   Okay.   Thank you, sir.

13             **THE COURT:**   All right.   Thank you.

14             **MR. FEINBERG:**   I have a few more follow-up

15   questions, Your Honor.

16             **THE COURT:**   You have what?

17             **MR. FEINBERG:**   I have a couple of follow-up

18   questions.

19             **THE COURT:**   Okay.

20                         -   -   -

21                                         (12:35 p.m.)

22                    **RECROSS-EXAMINATION**

23   BY MR. FEINBERG:

24   **Q.**   In relation to September 18, 2005, when was the last

25   complaint that you were -- specific complaint you were

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

162

1    aware of on Tacoma?

2        **A.**  Are you talking about back then or now?

3        **Q.**  I'm sorry?

4        **A.**  Are you talking about back then?

5        **Q.**  Yes, of course.

6        **A.**  They had numerous complaints.  I was new to the

7    precinct, sir.

8        **Q.**  You don't know when the last complaint was --

9        **A.**  No, sir, I don't.

10       **Q.**  -- and where it was and the nature of the complaint?

11       **A.**  No, I know the nature of the complaint was numerous

12   narcotics complaints alongside that street on Tacoma.

13       **Q.**  How do you know this?

14       **A.**  Because of the narcotics complaints that come into

15   the precinct.

16       **Q.**  How do you know that it had to do with Tacoma

17   Street?  Did you see the actual complaint?

18       **A.**  The complaints come in --

19       **Q.**  I'm asking you did you actually see the complaint?

20       **A.**  Are you talking about the report?

21       **Q.**  Yes.

22       **A.**  Yes, they come in reports and briefings about

23   numerous complaints where they call the 1-800-dope or

24   whatever that number is, and then they generate the

25   report, the report goes to the proper precincts, and then

                  *15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

163

1    that's when we read them.

2       **Q.**  So the question I'm asking you, when in relation to

3    September 8th, 2005, when was the last complaint called in

4    on?  Do you know?

5       **A.**  No, sir, I did not print it out.

6       **Q.**  Okay.  It could have been about barking dogs; isn't

7    that correct?

8       **A.**  No, sir.

9       **Q.**  You don't know what the nature, specific nature of

10   any complaint on September 8th, 2005 was; is that correct?

11      **A.**  No, that is not correct.  The nature was numerous

12   complaints of narcotic sales in the area.

13      **Q.**  And I'm asking was that on or around September 8th,

14   2005 of your own knowledge and recollection right now.

15   Any recollection of any specific complaints --

16      **A.**  No, sir, not any, no, not without printing the

17   reports or doing some research.

18      **Q.**  And you don't have any of those reports?

19      **A.**  No, sir.

20      **Q.**  Okay.  Who transported Mr. Brown into custody, into

21   the precinct?

22               (Loud noise interruption.)

23   **BY MR. FEINBERG:**

24      **Q.**  Who transported Mr. Brown into the precinct?

25      **A.**  We did.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

164

1  **Q.**  Okay.  And did you do any check to see whether or

2  not there were any warrants for Mr. Brown?

3  **A.**  Yes.  For the numbers, yes.

4  **Q.**  I'm sorry?

5  **A.**  Yes, we did.

6  **Q.**  And what was the warrant for?

7  **A.**  He had a misdemeanor warrant for $50, 36th District

8  Court.  Do you want the OC on the record, sir, which would

9  be the warrant number?

10  **Q.**  No, no.  This is what he told you?

11  **A.**  No, he said he had some warrants.  That's what he

12  told me.

13  **Q.**  Again, after you illegally ordered him to the

14  ground; isn't that correct?

15  **MR. WIGOD:**  I'm going to object as

16  argumentative, Your Honor.

17  **THE COURT:**  The Court will sustain the

18  objection.  Thank you, and you --

19  **MR. FEINBERG:**  Yes, sir.

20  BY MR. FEINBERG:

21  **Q.**  Again, these were all Black males, correct?

22  **MR. WIGOD:**  Objection, asked and answered and

23  relevance.

24  **THE COURT:**  I'll allow the question.  I have

25  heard the answer before.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

165

1    **BY MR. FEINBERG:**

2       **Q.**  Was your partner White or Black?

3                **MR. WIGOD:**  Objection, relevance, Your Honor.

4                **MR. FEINBERG:**  I'm going into racial

5    profiling, Your Honor.

6                **THE COURT:**  The Court will sustain the

7    objection.

8           Any re-redirect?

9                **MR. WIGOD:**  No, Your Honor.

10               **THE COURT:**  All right.  Thank you.

11          You may step down, sir.  Thank you.

12               **THE WITNESS:**  Thank you, Your Honor.

13               **MS. FINOCCHIARO:**  At this time, Your Honor,

14   the government calls Johnny Jones.

15               **THE COURT:**  Okay.

16               **MR. FEINBERG:**  Your Honor, may I approach the

17   bench for one second?

18               **THE COURT:**  Okay.

19               (The following sidebar conference was

20               held:)

21               **THE COURT:**  All right.  Mr. Feinberg?

22               **MR. FEINBERG:**  Yes.  Mr. Jones is a very key

23   witness in this case.  We have approximately 15 minutes

24   left.  I don't expect that the prosecution and the defense

25   will be able to finish their examination today.  I would

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

166

 1    hate to have to come back tomorrow in the middle of any

 2    examination.  I would ask that since there are other

 3    witnesses out in the hall that can be called that

 4    Mr. Jones wait until tomorrow.  I mean, that's -- it's an

 5    important case and has nothing to do with the drugs and

 6    whatever that has been previously testified to, and

 7    there's many other Detroit police officers who are on the

 8    witness list, who I was given a list of, who are going to

 9    be called.  So I would ask that Mr. Jones be held off

10    until tomorrow.

11              **THE COURT:**  Ms. Finocchiaro?

12              **MS. FINOCCHIARO:**  Your Honor, the government

13    controls the order in which we call witnesses, and I would

14    disagree with counsel that it doesn't have anything to do

15    with what's been talked about.  I think it's going to and

16    it's going to be relevant to that, and he's here, he's

17    present and he's ready to go and so I would ask that he be

18    allowed to start his testimony.

19              **THE COURT:**  If he's going to consume a fair

20    amount of time anyway, I would think you would rather have

21    the information elicited today to consider what your

22    cross-examination is going to be tomorrow.

23              **MR. FEINBERG:**  Well, it's a two-pronged

24    issue.  One is to let the jurors hear this and then go

25    home and thinking about what he testified to and then me

                *15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

167

1    cross-examining tomorrow or put it all together, which is

2    what I prefer, so that the jury doesn't have only part of

3    the story when they go home.

4        And we're not talking about a witness who is

5    capable of testifying for one, two, three, four days.

6    We're talking about a witness who probably is an hour-long

7    witness.

8        And I know that the government generally controls

9    the number of the witnesses and when they are called, but

10   not when it's prejudicial to the defense and they have an

11   alternative.

12       **THE COURT:**  I just don't get the prejudice

13   part of it so I'll allow the witness.

14       **MS. FINOCCHIARO:**  Also, I just want to put on

15   the record, too, I asked the defendants to put their name

16   tags down and I covered the board because it's a civilian

17   in case there's any ID questions and so that's why their

18   name tags are down.

19       **THE COURT:**  Oh, okay.

20       **MS. FINOCCHIARO:**  If that's okay with the

21   Court.

22       **THE COURT:**  Okay.

23       **MR. FEINBERG:**  I would ask, Your Honor, that

24   when the prosecution is done on their direct that even if

25   there's a few minutes left that we wait until tomorrow for

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

1   me to start my cross.

2                   **THE COURT:**  Yes.

3                   **MR. FEINBERG:**  Thank you.

4                   (End of discussion at sidebar.)

5                   **THE COURT:**  All right.  Do you have your next

6   witness?

7                   **MS. FINOCCHIARO:**  Yes.  Mr. Jones is on the

8   stand, Your Honor.

9                   **THE COURT:**  Mr. Jones.

10                   **THE WITNESS:**  Yes, sir.

11                   **THE COURT:**  Will you raise your right hand,

12   sir.

13                              -   -   -

14                          **JOHNNY JONES,**

15   being first duly sworn to tell the truth, was examined and

16   testified upon his oath as follows:

17                   **THE COURT:**  All right.  We're going to have

18   you begin by stating your name and spelling your -- well,

19   Jones, I think we can all figure that one out, right?  But

20   in the mean time if you would pull that microphone just a

21   little bit closer to you.  That's almost too close.  If it

22   gets too close, it cuts out.  If it's too far, we can't

23   hear you.  It looks like it's about right.  Thank you.

24          Mr. Jones, would you state your name for the

25   record.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Moises Jimenez - Recross*
*Thursday/June 21, 2018*

1          **THE WITNESS:**  Johnny Jones.

2          **THE COURT:**  Okay.  Thank you, sir.

3     You may proceed.

4          **MS. FINOCCHIARO:**  Thank you, Your Honor.

5                    **-   -   -**

6                              (12:45 p.m.)

7                    **DIRECT EXAMINATION**

8  BY MS. FINOCCHIARO:

9     **Q.**  Good afternoon, Mr. Jones.

10    **A.**  Good morning -- or afternoon.

11    **Q.**  Mr. Jones, where are you from?

12    **A.**  Detroit, Michigan.

13          **MR. FEINBERG:**  I'm sorry?

14  BY MS. FINOCCHIARO:

15    **Q.**  Can you speak just a little bit more into the mike.

16    **A.**  Detroit, Michigan.

17    **Q.**  And what kind of work do you do?

18    **A.**  Truck driver.

19          **THE COURT:**  What was that?

20          **THE WITNESS:**  Truck driver.

21          **THE COURT:**  Truck driver.  Pull it a -- we

22  could use the hand mike.

23     Try it now.

24          **THE WITNESS:**  Truck driver.

25          **THE COURT:**  All right.  Thank you, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

170

1          Go ahead.

2   BY MS. FINOCCHIARO:

3      **Q.**  And are you married?

4      **A.**  Separated.

5      **Q.**  And do you have any kids?

6      **A.**  Yes.

7      **Q.**  How many kids do you have?

8      **A.**  Seven.

9      **Q.**  Boys or girls?

10     **A.**  Both.

11     **Q.**  How many boys, how many girls?

12     **A.**  Three boys and four girls.

13     **Q.**  Now, you said you grew up in Detroit; is that right?

14     **A.**  Yes.

15     **Q.**  Okay.  What area of Detroit did you grow up in?

16     **A.**  Southeast side of Detroit, which is by Belle Isle.

17     **Q.**  Which is where, I'm sorry?

18     **A.**  By Belle Isle.

19     **Q.**  And what kind of neighborhood?

20          **MR. FEINBERG:**  I'm sorry, Your Honor, not to

21   belabor, could the witness please speak into the mike?

22          **THE WITNESS:**  By Belle Isle.

23   BY MS. FINOCCHIARO:

24     **Q.**  And what was the neighborhood like that you grew up

25   in?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

1    **A.**  That neighborhood was very rough as well as the

2    neighborhood I moved into afterwards, you know, as we got

3    older, which was Warren and Shoemaker area.

4              **MR. FEINBERG:**  Your Honor, I still can't hear

5    very well.

6              **MS. FINOCCHIARO:**  Your Honor, could we try

7    the handheld mike maybe?

8              **THE COURT:**  Maybe that's the answer.

9         Sounds good.

10   **BY MS. FINOCCHIARO:**

11   **Q.**  So, I'm sorry, if we could just start over again.

12   What was the area like that you grew up in?

13   **A.**  It was rough.

14   **Q.**  What do you mean by "rough"?

15   **A.**  Drug dealers, pimps, things of that sort.

16   **Q.**  And you said the neighborhood that you moved into

17   was also rough; is that right?

18   **A.**  Yes.

19   **Q.**  Okay.  And what neighborhood, what area of Detroit

20   was that?

21   **A.**  Warren and Shoemaker area.

22   **Q.**  So you said there was drugs and pimps.  Was there

23   gang activity in the areas you grew up in?

24   **A.**  Yes, off of east Warren it was.

25   **Q.**  And when you grew up in that environment, did you

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*                                        172
*Thursday/June 21, 2018*

1    engage in any of that activity?

2        A.   Yes, for a second.

3        Q.   And can you explain what you mean by that?

4        A.   I was less than 13 years old and I started selling

5    dope, and I decided to stop and change.

6        Q.   Why did you decide to stop and change?

7        A.   To make a better life for myself as well as my

8    mother and my grandmother, family.

9        Q.   So did you graduate school?

10       A.   Yes.

11       Q.   And what did you do after graduation?

12       A.   Worked in construction.  We rehab houses as a family

13   business as well.  Just basically work.

14       Q.   And do you have any military experience?

15       A.   Some, yes.

16       Q.   What branch of the military do you have experience

17   with?

18       A.   Navy.

19       Q.   How long were you in the Navy?

20       A.   I went through basic training, and I was sent home

21   because I got injured.

22       Q.   Do you know approximately how long that was?

23       A.   Probably a little bit over a month or so.

24       Q.   So at some point did you move to the east side of

25   Detroit?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*
173

1    **A.**  Yes.

2    **Q.**  And what brought you to the east side?

3    **A.**  The wife I was with at the time, she asked me to --

4    we looked at a house as we was visiting a friend, which is

5    down the street, and we saw the house.  She liked it from

6    the outside.

7    **Q.**  Do you remember what street that was on?

8    **A.**  Manning.

9    **Q.**  So your wife liked the house and so what steps did

10   you take to move in?

11   **A.**  The person that was selling the house, she -- it was

12   a couple.  We started talking with, conversating with them

13   and then we found out that they needed rehabbing.  So what

14   me and my uncle did was we talked to them and we started

15   doing favors for them as far as working with them on their

16   houses, and then we bought the house from them.

17   **Q.**  So your wife and did your family move with you into

18   the house?

19   **A.**  Yes.

20   **Q.**  And approximately what time period was this?

21   **A.**  It was during the summer.

22   **Q.**  Do you know what year approximately?

23   **A.**  Not offhand I don't.

24   **Q.**  Do you know how long that you lived on Manning?

25   **A.**  It was at least two years.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

174

1    **Q.**  And do you recall when it was that you actually

2    moved out of the area?

3    **A.**  Probably around the summer.

4    **Q.**  Do you remember what year that would have been?

5    **A.**  Not offhand I don't.

6    **Q.**  Well, let me ask you this.  Your family moved with

7    you.  How old were your kids at the time you lived there?

8    **A.**  We had an unborn son that was later born, and the

9    youngest girl was two years old.

10   **Q.**  And how old is your daughter now?

11   **A.**  15.

12   **Q.**  So was that approximately 13 years ago?

13   **A.**  Yes.

14   **Q.**  So you said you did some rehab on the house.  Did

15   you move in immediately to the house on Manning?

16   **A.**  No.  Basically I had to convince my wife, first of

17   all, when she seen the inside of the house, she was not

18   happy so I told her close her eyes and picture how she

19   wanted her house and that's how I was going to do it for

20   her and that's what we did.  It probably took us probably

21   about no more than a month to move in.

22   **Q.**  And what kind of a house was it?

23   **A.**  A single home.

24   **Q.**  Can you describe the area that you lived in, Manning

25   Street?

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

175

1      **A.**  When I first went over there, it was very quiet

2      every time we went over there.  Then after so long that's

3      when it started getting kind of rowdy.

4      **Q.**  And when you say "rowdy," what do you mean by that?

5      **A.**  For instance, we had an individual when we first

6      moved in, he came to knocking on the door approximately

7      between one and three o'clock in the morning asking for

8      drugs.  I went to the door, and by being a picture window

9      in the door, I stood off to the side and I asked who was

10     it.  He asked for a five-dollar rock.  I told him to get

11     away from my home, we don't sell that here.  And he kept

12     saying ain't this the place where -- I said, no, it's not.

13     He continued to keep persisting to ask for a rock, and I

14     told him, I said, "Well, I have a 12 gauge for you if you

15     want that."  And he said, "No."  And I said, "So leave my

16     home," and that's what he did.

17     **Q.**  Now, was this the only time that you encountered

18     drug activity near your home?

19     **A.**  No.

20     **Q.**  Can you describe some other times?

21     **A.**  There was an instance where one of my kids was --

22     well, actually all of them were sitting at the table in

23     the kitchen eating, and they look over and, for lack of a

24     better term, a female was providing a service to someone

25     on the side of the house and they were asked to move.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

176

1       There was another instance where Jonathan Murphy

2   was outside the home selling, and I asked him to leave and

3   he threatened me and I told him do what he had to do.

4   **Q.**   So let's stop there for a second.  Let's do the

5   first instance.  You said a female was servicing a male.

6   Do you mean sexually?

7   **A.**   Yes.

8   **Q.**   Okay.  And who had to ask them to leave?

9   **A.**   My wife did.

10  **Q.**   Now, you said there was an instance when Jonathan

11  Murphy sold drugs near your home; is that right?

12  **A.**   Yes.

13  **Q.**   Okay.  So what did you observe him actually do?

14  **A.**   He was sitting at the front of the house.  I came

15  out, and he was handing someone in the car something, you

16  know, product, and they pulled off and he continued to sit

17  there and in the process I asked him, you know, do not

18  sell that here, you know, and I appreciate it.

19       He told me that it was nothing that I could do

20  about it or the police could do about it and he going to

21  do what he want to do.  And I said, "Well, you do what you

22  want to do, and I'm going to do what I have to."

23       And as I turned around, he started making

24  threats.  He looked up the street.  He seen three guys

25  walking up.  And he was like, "I'll beat your ass.  Me,

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*                                    177
*Thursday/June 21, 2018*

1    that's who."

2              And like I turned around and looked at him once

3    I got to the porch and I said, "Well, like I told you

4    before, do what you have to do and I'm going to do what I

5    have to do."

6        Q.  And what happened?

7        A.  He just kept talking, and I wound up walking in the

8    house.

9        Q.  Now, you called him by his name, Jonathan Murphy.

10   How did you know his name?

11       A.  I learned that after he had hit me in the head with

12   a .357.

13             MR. FEINBERG:  I'm sorry, I didn't hear that.

14   BY MS. FINOCCHIARO:

15       Q.  Could you repeat that?

16       A.  He struck me in the head with a .357 chrome

17   revolver.

18       Q.  So along with the -- well, with the instance that

19   you just talked about was there other activity, drug

20   activity around your home that you recall?

21       A.  Yes.  Robert Brown and a couple of other guys was

22   selling.  I went to Robert, which I called him Rob, and I

23   asked him to stop selling and he agreed at the time when

24   we first moved over there, and he stopped pretty much all

25   the guys from pretty much selling it on that corner.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

178

1    **Q.**  Okay.  So you said Robert Brown, who you call Rob,

2    that's who you are talking about, right?

3    **A.**  Yes.

4    **Q.**  You said he was with others.  Do you remember how

5    many other people he was with?

6    **A.**  It was just a bunch of guys in the neighborhood.  I

7    couldn't really offhand say how many it was.

8    **Q.**  And did you actually see him sell?

9    **A.**  Him personally, no, I can't say I did.

10                 **MR. FEINBERG:**  I'm sorry, I didn't hear that

11   either.

12                 **THE WITNESS:**  Him personally no, I couldn't

13   say I did.

14   **BY MS. FINOCCHIARO:**

15   **Q.**  But did the others that he was with sell?

16   **A.**  Yes.

17   **Q.**  And so in your experience watching this drug

18   activity would there be multiple working together or how

19   would it be?

20   **A.**  Yes, it was multiple people.

21   **Q.**  And can you describe what you would see in terms of

22   multiple people?

23   **A.**  Well, Tacoma, they would have someone on Tacoma,

24   have someone on Manning, have someone on Liberal, on both

25   sides of the street just in case the police came, and they

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

179

1    either used cell phones or some type of communication with

2    each other to let each other know they was coming.  And

3    then the person, whoever had the drugs, they disappeared.

4       Q.  Now, so you said after you encountered this with

5    Rob, you asked him to stop; is that right?

6       A.  Yes.

7       Q.  And what did he do in return?

8       A.  He complied.  He asked -- well, I ain't going to say

9    asked, he told them to pretty much stop.

10      Q.  So he told the others that he was with?

11      A.  Yes.

12      Q.  And so did the activity stop around your house?

13      A.  As far as the rest of them, but the only person that

14   wouldn't stop was Jonathan Murphy.

15      Q.  So I just want to stop there for one second.  In

16   terms of drug activity, did you see any gang activity

17   around where you lived?

18      A.  There was gang signs on the side of my garage and

19   other instances, yes.

20      Q.  Okay.  And do you recall any of the gangs that you

21   encountered?

22      A.  The Bloods.

23      Q.  Did they go by any other names?

24      A.  As far as I know, they would call themselves the

25   Bloods, Seven Mile Bloods.

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*                                    180

1      **Q.**  And do you know any members of the Seven Mile

2      Bloods?

3      **A.**  Well, Corey, which called himself Sonny and C

4      Murder, he told me that he was a Blood as well as another

5      guy named Ryder.

6      **Q.**  Ryder.  And did you know anyone else to associate

7      with the Bloods?

8      **A.**  Well, pretty much all of them hung together.

9                **MR. FEINBERG:**  Objection.  If he's guessing,

10     that's one thing.  If he absolutely knows, then he can

11     testify to that.  We don't know the basis -- basically I'm

12     asking for foundation of why he knew or who he knew was a

13     Seven Mile Blood.

14               **MS. FINOCCHIARO:**  I can ask some more

15     foundational questions.

16               **THE COURT:**  All right.  Go ahead.

17     BY MS. FINOCCHIARO:

18     **Q.**  So you already talked about C Murder and Ryder told

19     you; is that right?

20     **A.**  Yes.

21     **Q.**  Based on your being in the area and witnessing what

22     you witnessed, how did you get other information that

23     there was other people associating with the Bloods?

24     **A.**  They came to my house.  My wife owned a candy store,

25     and in the process she invited people there to buy candy

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

181

1    and that's how we became friends or close to some of them.

2    And like with Rob, Rob would come over to the house, come

3    inside the house.  We fed Rob.  Corey came over and things

4    of that sort.

5        **Q.**  So now going back to you said Rob told the others to

6    stop, he stopped, but Jonathan Murphy continued.  Can you

7    describe what activity continued?

8        **A.**  Like I said, he would come on the side of the house,

9    and if he felt that he wanted to sell, that's what he

10   would do, you know.

11       **Q.**  Okay.  And how long did this go on for?

12       **A.**  Not too often because he wasn't a regular person

13   that was in that neighborhood, but when he did come over

14   and he decided what he was going to do, that's what he

15   did.

16       **Q.**  And did you ever speak with Rob again about stopping

17   that activity?

18       **A.**  Pretty much, yes.

19       **Q.**  Okay.  So can you describe what happened next after

20   Jonathan continued with this activity?

21       **A.**  Well, one day I came home from work and basically

22   when I pulled up into my garage the youngest girl at the

23   time that was, she was approximately about eight, nine,

24   somewhere up in there, she came and told me that Rob

25   and --

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. FEINBERG:**  Objection, hearsay.

2          **THE COURT:**  Ms. Finocchiaro.

3          **MS. FINOCCHIARO:**  I'm not offering it for the

4     truth of what she told him but what he did afterwards and

5     his reaction to what she said as to why he proceeded.

6          **MR. FEINBERG:**  The witness can say she told

7     me something and as a result of that this is what I did

8     rather than, you know, what allegedly was said, which is

9     hearsay.

10          **THE COURT:**  All right.  Well, I think at this

11     point we're going to break for the day in any event, it's

12     a little after 1:00, and we'll resume tomorrow at the same

13     time.  Tomorrow is Friday so we are actually going to be

14     concluding by 12:30 tomorrow rather than 1:00.

15          **THE CLERK:**  Please rise.

16          (Jury out at 1:02 p.m.)

17          **THE COURT:**  All right.  I'll give you the

18     chance to think about that last question and answer and

19     give me argument tomorrow, determine if there are any

20     hearsay objections.  I gather that the objection was

21     hearsay, but I don't know that.  Mr. Feinberg really

22     didn't specify.  Talk among yourselves.

23          **MS. FINOCCHIARO:**  Yes, we will, Your Honor.

24     We will resolve it before tomorrow.

25          **THE COURT:**  We'll be here at 8:30 so if we

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

183

1    need to we'll address the issue before we get started.

2            **MS. FINOCCHIARO:**  Yes, Your Honor.

3            **THE COURT:**  Okay.  Thanks.

4            (Recess from 1:03 p.m. to 1:20 p.m.)

5            **MS. FINOCCHIARO:**  I believe we need

6    Mr. Bailey back because defense counsel would like him

7    present.

8            **THE COURT:**  Okay.  Did defense counsel hear

9    the remark?

10           **MR. DALY:**  No.

11           **MR. SPIELFOGEL:**  No.

12           **MR. DALY:**  We are not witnesses to this.

13           (Discussion held off the record.)

14           **THE COURT:**  So do you want to tell me what

15   happened?

16           **MR. SPIELFOGEL:**  Your Honor, we just feel

17   that if the government is going to do that Mr. Bailey

18   should be here to hear any part of this accusation.

19           **THE COURT:**  Mr. Jones has left for the day?

20           **MS. FINOCCHIARO:**  Yes, he has.

21           **THE COURT:**  Okay.

22           **MR. SPIELFOGEL:**  No, we don't need to hear

23   the Mr. Jones part.  What the government is saying

24   occurred, I think Mr. Bailey needs to hear that, and then

25   if we decide we need Mr. Jones at some point, which --

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

184

1      **THE COURT:** Okay, all right.

2      **MR. SPIELFOGEL:** -- we can deal with that.

3      **THE COURT:** They are bringing him up.

4      (Recess from 1:22 p.m. to 1:29 p.m.)

5      **THE COURT:** All right.  Ms. Finocchiaro.

6      **MS. FINOCCHIARO:** Yes.  Your Honor, it's been

7  brought to the government's attention that there was just

8  an exchange within the last several minutes between our

9  witness, Mr. Jones, and the defendant, Mr. Bailey.

10  Special Agent Ruiz is the one who brought it to my

11  attention so if it would be okay if he could tell the

12  Court what it was that he understands to have happened.

13      **THE COURT:** Okay.

14      **MS. FINOCCHIARO:** Does he need to go up

15  there?

16      **THE COURT:** No, right here is fine.

17      **SPECIAL AGENT VICENTE RUIZ:** As I understand

18  it, Judge Steeh, as court was adjourning, I went up to the

19  witness box to escort Mr. Jones back out this way, and as

20  I went up there, the CSO nearest to Mr. Jones informed me

21  that there was a threat passed along from Mr. Bailey to

22  Mr. Jones.

23      I asked Mr. Jones what in fact was said, and he

24  informed me that what was said was something to the

25  effect of "I'm going to get mines" or "you're going to get

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

185

1    yours," something to that effect.  And then upon asking

2    the CSO, he said that Mr. Jones said, "Fuck you, Bailey"

3    or "Fuck you, bitch" or something to that effect, and

4    that's when I escorted him back out behind the court.

5              **THE COURT:**  Okay.

6              **MS. FINOCCHIARO:**  At this time, Your Honor, I

7    just would ask, given that Mr. Jones is still on the

8    stand, that there be no -- that it be reiterated that

9    there's no communications between the defendant and our

10   witnesses, threatening or nonthreatening.  If he wants to

11   talk to the witness, he can talk through his attorneys,

12   but we're concerned about our witnesses being intimidated

13   by things that are said or however it is that they are

14   interacting with the witness.

15             **MR. SPIELFOGEL:**  Okay.  Maybe Mr. Daly

16   understands this better than I do, but are we saying that

17   he was sitting here and conveyed something to the person

18   up there through somebody else?  I didn't understand that.

19             **SPECIAL AGENT VICENTE RUIZ:**  It's unclear to

20   me because I didn't actually observe it or witness it.

21   I'm only going by what I was told by the CSO and what

22   Mr. Jones said.

23             **MS. FINOCCHIARO:**  Sir, did you witness it?

24             **COURT SECURITY OFFICER B. JOHNSON:**  The only

25   thing I witnessed was what Jones said.  I didn't hear

 1    anything that he said down that way.

 2              MS. FINOCCHIARO:  Okay.  Could you tell the

 3    Court how far they were apart from each other?

 4              COURT SECURITY OFFICER B. JOHNSON:  He was

 5    standing in the witness stand, and Bailey was right over

 6    there.

 7              MR. SPIELFOGEL:  So that would be

 8    approximately what --

 9              COURT SECURITY OFFICER B. JOHNSON:  10 feet.

10              MR. SPIELFOGEL:  -- 15 feet, 20 feet.

11         So that's what makes no sense to me at all, Judge.

12    I mean, you've got three people -- three people?  You've

13    got one, two, three, four people in between him and him,

14    and he conveyed something from here over to there?  I

15    didn't hear anything, and I was right next to him.

16              THE COURT:  As I understand it, it was

17    several minutes after the court apparently broke and then

18    Agent Ruiz approached the witness box.

19              SPECIAL AGENT VICENTE RUIZ:  That's correct.

20    I believe it was at the time that the jury was exiting the

21    room.

22              THE COURT:  Yeah, and I don't know, we don't

23    know where you were or Mr. Daly was.

24              MR. SPIELFOGEL:  But he would not have been

25    going in that direction.

                *15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

187

1      **MS. FINOCCHIARO:**  It also could be the case

2   though that it happened earlier when he was walking past

3   all of the defendants.  We don't know when it happened,

4   and unfortunately we don't have that information.

5              **DEFENDANT BAILEY:**  Excuse me, Your Honor.

6              **THE COURT:**  We have Mr. Jones, who would be

7   able to provide the details of any communication.

8   Apparently I'm not being asked to exclude him or to take

9   other punitive action at this point.  Is that --

10             **MS. FINOCCHIARO:**  Just one moment,

11  Your Honor.

12             At this time, Your Honor, we're not going to ask

13  for anything.  We want to speak to Mr. Jones.  I learned

14  about this after he left so at this point we are not

15  asking for any specific action be taken, but we'll dig

16  further into it.

17             **THE COURT:**  I can address it in the morning

18  if there is -- first of all, if you have it clarified what

19  was said, if anything, to Mr. Jones, and I can hear from

20  the defendant as well and make a decision if you're asking

21  me to exclude him from the trial.  Consider that he's been

22  warned previously that he would be removed for disruptive

23  behavior.  Threatening a witness would at a minimum

24  represent -- would at a minimum be disruptive, and witness

25  intimidation is certainly not anything we are going to

*15-20652; USA v. EUGENE FISHER, ET AL*

*Johnny Jones - Direct*
*Thursday/June 21, 2018*

188

```
1    tolerate here.

2            So we'll wait to see what Mr. Jones has to say

3    tomorrow morning, and I can proceed further and hear from

4    the defendant's point of view as well and decide whether

5    or not other action is called for.

6            MS. FINOCCHIARO:  Thank you, Your Honor.

7            THE COURT:  But we'll do that in the morning.

8    So if everybody can be here by 8:30, we'll -- hopefully

9    Mr. Jones will be here as well.

10           MS. FINOCCHIARO:  Yes.  I'm going to try to

11   speak to him tonight, so ...

12           THE COURT:  All right.

13           MS. FINOCCHIARO:  Thank you.

14           DEFENDANT BAILEY:  Excuse me, Your Honor.

15   May I  please just say something just real brief?

16           THE COURT:  Yes.

17           DEFENDANT BAILEY:  I understand the

18   corruption of your courtroom.  I did not threaten nobody.

19   I never threatened this dude.  The Marshal right here was

20   standing right there as she always do.  If I would have

21   threatened him, she would have heard me threaten him, and

22   I never threatened him.  That's all I want to say.

23           THE COURT:  Okay.  Maybe we don't have to do

24   anything.  We'll see.

25           (Proceedings adjourned at 1:35 p.m.)
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1                          -   -   -

2                    **C E R T I F I C A T I O N**

3             We, Ronald DiBartolomeo and Sheri Ward, official

4      court reporters for the United States District Court,

5      Eastern District of Michigan, Southern Division, appointed

6      pursuant to the provisions of Title 28, United States

7      Code, Section 753, do hereby certify that the foregoing is

8      a correct transcript of the proceedings in the

9      above-entitled cause on the date hereinbefore set forth.

10

11     s/ Ronald DiBartolomeo_____          6/21/2018
       Ronald DiBartolomeo                     Date
12     Official Court Reporter

13

14     s/ Sheri K. Ward_____                6/21/2018
       Sheri K. Ward                           Date
15     Official Court Reporter

16                          -   -   -

17

18

19

20

21

22

23

24

25

                *15-20652; USA v. EUGENE FISHER, ET AL*