1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3

4   **UNITED STATES OF AMERICA,**

5                Government,
                                    **HONORABLE GEORGE CARAM STEEH**
6        v.
                                    **No. 15-20652**
7   **D-3 EUGENE FISHER,**
    **D-4 COREY BAILEY,**
8   **D-6 ROBERT BROWN,**
    **D-13 ARLANDIS SHY,**
9   **D-19 KEITHON PORTER,**

10               Defendants.
    _____/
11
                            **JURY TRIAL**
12
                   **Thursday, June 28, 2018**
13
                         -    -    -
14
    APPEARANCES:
15
    For the Government:        JULIE FINOCCHIARO, ESQ.
16                             JUSTIN WECHSLER, ESQ.
                               TARE WIGOD, ESQ.
17                             MARK BILKOVIC,ESQ.
                               Assistant U.S. Attorneys
18

19  For the Defendants:        HENRY M. SCHARG, ESQ.
                               On behalf of Eugene Fisher
20
                               CRAIG DALY, ESQ.
21                             KEITH SPIELFOGEL, ESQ.
                               On behalf of Corey Bailey
22
                               JAMES FEINBERG, ESQ.
23                             On behalf of Robert Brown

24
                               MARK MAGIDSON, ESQ.
25                             JOHN THEIS, ESQ.
                               On behalf of Arlandis Shy

2

1

2                                    STEVEN SCHARG, ESQ.
                                     On behalf of Keithon Porter

3

4                          -    -    -

5

6              *To Obtain Certified Transcript, Contact:*
           *Ronald A. DiBartolomeo, Official Court Reporter*
7             *Theodore Levin United States Courthouse*
            *231 West Lafayette Boulevard, Room 1067*
8                     *Detroit, Michigan  48226*
                         *(313) 962-1234*

9          *Proceedings recorded by mechanical stenography.*
10      *Transcript produced by computer-aided transcription.*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    _____    Page

3    **JARL TAYLOR**
     Direct examination cont. by Mr. Wigod                        5
4    Cross examination by Mr. Daly                               13
     Cross examination by Mr. Feinberg                           24
5
     **PETER KAPELUCK**
6    Direct examination by Mr. Wigod                             29

7    **ROBERT WELSH**
     Direct examination by Mr. Bilkovic                          35
8    Cross examination by Mr. Spielfogel                         40

9    **RYAN HIGGENBOTHAM**
     Direct examination by Mr. Bilkovic                          43
10
     **KEVEN ALLEN**
11   Direct examination by Mr. Bilkovic                          52
     Cross examination by Mr. Spielfogel                         77
12   Cross examination by Mr. Daly                               84
     Redirect examination by Mr. Bilkovic                        96
13   Cross examination by Mr. Feinberg                          100

14   **ERIC SMITH**
     Direct examination by Mr. Wechsler                         103
15   Cross examination by Mr. Magidson                          115
     Redirect examination by Mr. Wechsler                       124
16
     **CORY KARSSEN**
17   Direct examination by Mr. Bilkovic                         126
     Cross examination by Mr. Daly                              132
18   Redirect examination by Mr. Bilkovic                       139
     Recross examination by Mr. Daly                            141
19
     **LAVAR GREEN**
20   Direct examination by Ms. Finocchiaro                      143
     Cross examination by Mr. Daly                              154
21   Redirect examination by Ms. Finocchiaro                    159

22   **RYAN PAUL**
     Direct examination by Mr. Wechsler                         160
23   Cross examination by Mr. Magidson                          168
     Redirect examination by Mr. Wechsler                       174
24
     **WALTER ATKINS**
25   Direct examination by Ms. Finocchiaro                      174

1                              **E X H B I T S**

2    Identification_____ Offered    Received

3    Government Exhibit No. 291                    11          11

4    Government Exhibit No. 293                    12          12

5    Government Exhibit No. 276E                   47          47

6    Government Exhibit No. 276B                   58          58

7    Government Exhibit No. 276D                   61          61

8    Government Exhibit No. 276C                   64          64

9    Government Exhibit No. 353                    73          73

10   Government Exhibit No. 357                    73          74

11   Government Exhibit No. 359                    74          74

12   Government Exhibit Nos. 277,279, 280          76          76

13   Government Exhibit No. 228                   112         113

14   Government Exhibit No. 169                   131         131

15   Government Exhibit No. 297                   152         152

16   Government Exhibit No. 298                   153         153

17   Government Exhibit No. 524                   167         167

18   Government Exhibit No. 313                   183         183

19

20

21

22

23

24

25

                    *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1                               Detroit, Michigan
 2                               Thursday, June 28, 2018
 3                               At 8:41 a.m.
 4                          -   -   -
 5                  (Proceedings held with jury.)
 6
 7           THE COURT:  You can take a seat, and we'll
 8      call on the next witness for the government.
 9           MS. FINOCCHIARO:  Officer Taylor is
10      continuing.
11           THE COURT:  Okay.  Officer, you're still
12      under oath.
13
14                  J A R L   T A Y L O R
15
16                DIRECT EXAMINATION CONT.
17
18           THE COURT:  You may proceed.
19           MR. WIGOD:  Thank you, your Honor.
20
21  BY MR. WIGOD:
22
23      Q.  When we left off yesterday, we were talking about
24      Mr. Bailey and you sending fingerprints to the FBI.
25      A.  Yes.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   You confirmed that it was Mr. Bailey?

2    **A.**   That's correct.

3    **Q.**   Officer Bailey we introduced Government Exhibit 523.

4    **A.**   Okay.

5    **Q.**   Yes?

6    **A.**   Yes.

7    **Q.**   You remember that yesterday?

8    **A.**   Officer Taylor.

9    **Q.**   I'm sorry.  What did I call you?

10   **A.**   Bailey.

11   **Q.**   We introduced 523 in evidence?

12   **A.**   Yes.

13   **Q.**   These were the items Mr. Bailey dropped and you

14   subsequently recovered?

15   **A.**   That's correct.

16          **MR. WIGOD:**  I don't believe we published it.

17   We would like to publish 523.

18          **THE COURT:**  All right.  You may.

19

20   **BY MR. WIGOD:**

21   **Q.**   So Officer Taylor, you found three separate types of

22   controlled substances?

23   **A.**   Yes, that's correct.

24   **Q.**   The one that's enlarged, would be the what?

25   **A.**   The pills.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   And then the cocaine in the packets?

2    **A.**   Yes, smaller ziplock baggies along with the other

3    large ones.

4    **Q.**   Okay.  The green leafy substance?

5    **A.**   Marijuana.

6    **Q.**   I want to go back for a second -- actually, this was

7    not the last time you had contact with Mr. Bailey?

8    **A.**   No, it was not.

9    **Q.**   Before we get go to the next item, you had contact

10   with Mr. Bailey.  I want to go back for a second.

11           We talked about the hotels that you went to when

12   searching for the Detroiters.  This is back I believe in

13   January or so?

14   **A.**   Yes.

15   **Q.**   Not of this year, but of that year?

16   **A.**   Yes.

17   **Q.**   And you went to multiple hotels looking for

18   basically for Detroiters that you received information on?

19   **A.**   Yes.

20   **Q.**   At least three hotels or motels?

21   **A.**   Yes.

22   **Q.**   Some sort of the lodging establishment is that fair

23   to say?

24   **A.**   Yes.

25   **Q.**   Charleston Plaza Hotel?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   Yes.

2      **Q.**   Parsley Hotel.

3      **A.**   Yes.

4      **Q.**   Hampton Inn?

5      **A.**   That's correct.

6      **Q.**   Now when you went to the hotels, you had the names

7      of individuals that you had that you were looking for?

8      **A.**   That's correct.

9      **Q.**   I want to clarify something with regards to Mr. Shy.

10     At the Parsley Motor Inn there was confusion as to how you

11     received information on Mr. Shy, whether that was

12     paperwork that you saw or something that the clerk

13     informed you of?

14              **MR. MAGIDSON:**   I object as to hearsay.

15              **MR. WIGOD:**   I'm not asking what he said.

16     There was some confusion as to how he received the

17     information.   I'm simply clarifying whether it was

18     paperwork or clerk.

19              **THE COURT:**   You may proceed.

20              **MR. WIGOD:**   Thank you.

21          As it's related to the Parsley Motor Inn, you

22     spoke with the clerk?

23     **A.**   Yes.

24

25 **BY MR. WIGOD:**


                *15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.** And there was some confusion whether that was from

2     paperwork or from the clerk?

3     **A.** Not paperwork. It was the clerk's statement.

4     **Q.** Okay.

5             **MR. MAGIDSON:** Then we move to strike the

6     answer that was given yesterday.

7             **MR. WIGOD:** That's fair, your Honor.

8             **THE COURT:** All right. The jury is to

9     disregard the answer.

10            **MR. WIGOD:** Now Officer Taylor, if we could

11    talk about your next contact with Mr. Bailey, I want to

12    direct your attention to February 8, 2012. Do you recall

13    having contact with Mr. Bailey?

14     **A.** Yes.

15

16  **BY MR. WIGOD:**

17     **Q.** Describe your contact with him, please.

18     **A.** I received a phone call from the Metro Drug Unit

19    detectives. They advised that they had an individual.

20    They kind of knew who he was, but could not recollect who

21    he was. That actually brought him in the booking station

22    at that time. I was already in the booking station, and

23    immediately as soon as I saw the person, I knew who it

24    was.

25     **Q.** And upon seeing the person, who was that individual?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   It was Corey Bailey.

2     **Q.**   And you -- they didn't know who the individuals was?

3     **A.**   They kind of remembered, but didn't know the

4     specific name due to receiving different names over

5     previous times.

6     **Q.**   Okay.  And did you have personal contact with

7     Mr. Bailey?

8     **A.**   Yes.

9     **Q.**   In addition to seeing him, did you speak to him?

10    **A.**   Yes.

11    **Q.**   For what purpose?

12    **A.**   To gain a search warrant for his person due to him

13    concealing narcotics possibly on his body or possibly

14    inside of his body.  At that point I spoke to him pretty

15    much laughing it up, and he took out the bag that was

16    hidden in the crouch area.

17    **Q.**   When you say "crouch area", it was inside of him?

18    **A.**   I'm not for sure if it was physically inside, but he

19    removed it where the couch area was.

20    **Q.**   Okay.  So the officers were in the process of

21    obtaining a search warrant for Mr. Bailey?

22    **A.**   Yes.

23    **Q.**   Basically convinced him to --

24    **A.**   To remove the items and just hand it over to the

25    detective.

*15-20652; USA v. EUGENE FISHER, ET AL*

1       **Q.**   So the search warrant didn't happen?

2       **A.**   Correct.

3       **Q.**   Officer Taylor, I will show you Government Proposed

4       Exhibit Number 291.  Do you recognize that?

5       **A.**   The yellow pills.

6       **Q.**   Where are they from?

7       **A.**   Actually recovered from him.

8       **Q.**   These are the pills that were recovered from

9       Mr. Bailey?

10      **A.**   Yes.

11      **Q.**   These are the bags on top of them?

12      **A.**   Yes.

13              **MR. WIGOD:**   Move for admission of Government

14      Proposed Exhibit 291.

15              **THE COURT:**   Any objection?

16              **MR. DALY:**   No objection.

17              **THE COURT:**   The Court will receive it.

18

19      **BY MR. WIGOD:**

20      **Q.**   The yellow pills were inside of those bags?

21      **A.**   Yes, sir, that's correct.

22      **Q.**   That was actually somebody else's investigation?

23      **A.**   Yes, it was.

24      **Q.**   You were brought in because you had prior contact

25      with Mr. Bailey?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

12

1    **A.**  Yes.

2    **Q.**  You turned these items over to another officer?

3    **A.**  Yes.

4    **Q.**  Showing you what's been marked -- Officer Taylor

5    showing you what's been marked as Government Proposed

6    Exhibit 293, tell us what that is, please?

7    **A.**  This is the evidence bag with Detective Allen's name

8    on it, one of the officers that was there, detectives that

9    was there.

10   **Q.**  And contained in the bag?

11   **A.**  Yellow pills.

12   **Q.**  Obtained from Mr. Bailey?

13   **A.**  On that date, yes.

14           **MR. WIGOD:**  Your Honor, move for admission of

15   Government Proposed Exhibit 293.

16           **THE COURT:**  Any objection?

17           **MR. DALY:**  No.

18           **THE COURT:**  Thank you.  The Court will

19   receive it.

20

21   BY MR. WIGOD:

22   **Q.**  This was not your case.  You didn't take any action

23   in determining what the pills were or anything like that?

24   **A.**  No, I did not.

25           **MR. WIGOD:**  Your Honor, I don't have any

*15-20652; USA v. EUGENE FISHER, ET AL*

1      further questions of Officer Taylor.

2                    **THE COURT:**  Thank you, Mr. Wigod.

3           Mr. Daly?

4

5                      **CROSS EXAMINATION**

6

7   **BY MR. DALY:**

8

9      **Q.**  All right.  Detective Taylor, now that we're out of

10   the dark, good morning.

11      **A.**  Good morning.

12      **Q.**  How are you?

13      **A.**  So far so good.

14      **Q.**  Good.  I want to ask you about the November 6, 2009

15   incident that you testified to yesterday and a little bit

16   today.

17      **A.**  Yes, sir.

18      **Q.**  On this date, we're talking about almost nine years

19   ago?

20      **A.**  Approximately, yes, sir.

21      **Q.**  And you were with Detective Kuhner.

22      **A.**  Yes.

23      **Q.**  How do you spell his name?

24      **A.**  K-u-h-n-e-r.

25      **Q.**  K-u-h-n-e-r, but it is pronounced Keener, like

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    K-e-e-n-e-r?

2        **A.**   Yes, sir.

3        **Q.**   And you and Detective Kuhner are going to a specific

4    location on an unrelated investigation, right?

5        **A.**   Yes, sir.

6        **Q.**   And that involved a homicide, right?

7        **A.**   Yes.

8        **Q.**   And that homicide has nothing to do with this

9    particular case or any of the people here, right?

10       **A.**   Nothing whatsoever.

11       **Q.**   All right.  And you were in an unmarked vehicle,

12   right?

13       **A.**   Ford Taurus old style.

14       **Q.**   And that was unmarked.  By that it doesn't say

15   Charleston Police Department on it, right?

16       **A.**   Correct.

17       **Q.**   Just a black vehicle?

18       **A.**   Negative.  It was a white vehicle with antennas on

19   the trunk.

20       **Q.**   White vehicle with antennas on the back, and that's

21   it?

22       **A.**   Yes.

23       **Q.**   Other than that, nothing that indicates that the

24   vehicle was occupied by the police, right?

25       **A.**   Correct.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1        Q.   And you're in plain clothes, right?

2        A.   Yes.

3        Q.   And Detective Kuhner, he's in plain clothes?

4        A.   Yes.

5        Q.   So generally speaking, to the public you would agree

6    that the vehicle and the way that you were dressed, did

7    not make it known to the public that you were the police,

8    right?

9        A.   Well --

10       Q.   Generally speaking?

11       A.   Since that vehicle is a Charleston police car and

12   seen several times on crime scenes, people know that style

13   of vehicle is a police vehicle.

14       Q.   If somebody went to a crime scene and saw that

15   vehicle, they would know that's a police vehicle.  Other

16   than that, the general public would not know?

17       A.   The general public in Charleston would, yes.

18       Q.   Well, Mr. Bailey wasn't a person living down in West

19   Virginia in Charleston at the time, was he?

20       A.   Not to my knowledge.

21       Q.   Was not part of the public of Charleston, correct?

22       A.   Per se.

23       Q.   Okay.  And so now you're in plain clothes in an

24   unmarked vehicle.  It's at night, isn't it?

25       A.   Around 7:30ish, close to eight.  Somewhere in that
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    area.

2       **Q.**  And at the end of the October in Charleston, it's

3    dark out at this time?

4       **A.**  Well, it's usually probably little less than dusk.

5    Streetlights are on illuminating the area.

6       **Q.**  Dark enough that the streetlights have come on?

7       **A.**  Yes.

8       **Q.**  As I understand it you are in the vehicle.  Are you

9    driving the vehicle or the passenger?

10      **A.**  I was driving.

11      **Q.**  You were driving.  And you said that you were coming

12   up a steep hill?

13      **A.**  Right.

14      **Q.**  And you see somebody on the right side?

15      **A.**  Yes.

16      **Q.**  And the person is walking?

17      **A.**  Yes.

18      **Q.**  And that person is 50, 75 feet away?

19      **A.**  I would say about 50.

20      **Q.**  About 50 feet away?

21      **A.**  Yes.

22      **Q.**  When you saw that person, you didn't recognize that

23   person, did you?

24      **A.**  No, sir, I did not.

25      **Q.**  You did not see the person's face?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   No, sir, I did not.

2    **Q.**   And so you say that you were the person who looked

3    over at this other person that you had not seen, didn't

4    recognize, and that person dropped something.  You saw

5    that?

6    **A.**   Yeah, I saw a motion.

7    **Q.**   You saw a motion?

8    **A.**   Yes.

9    **Q.**   Okay.  And that motion was what, him -- the person

10   reaching into his pocket or what?

11   **A.**   You can actually see the movement of the arm going

12   back and something going to the ground.

13   **Q.**   So you're telling the jury the person dropped

14   something, but you couldn't tell what it was at all?

15   **A.**   No, I could not tell what it was.

16   **Q.**   You could not tell the jury what you saw was the

17   person dropping a bag.  You can't say that, can you?

18   **A.**   Repeat that again.

19   **Q.**   You can't tell the jury what you saw was the person

20   dropping a bag or bags?  You can't say that, can you?

21   **A.**   I can say that was the only person in that area at

22   that time when bag was dropped.  No one else was around.

23   **Q.**   That's not what I asked you.  I asked you when you

24   saw the person --

25   **A.**   Okay.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  -- and he dropped something?

2    **A.**  Yes.

3    **Q.**  You can't say to the jury that you saw that person

4    drop a bag at that time, correct?

5    **A.**  I just knew that the person dropped something.  Not

6    bag.  I didn't know what it was.

7    **Q.**  Right.  You had no idea what it was.  It was just

8    something?

9    **A.**  Yes, sir.

10   **Q.**  Okay.  And then that person leaves, right?

11   **A.**  Yes, sir.

12   **Q.**  And you're sure that's what you saw?

13   **A.**  Yes, sir.

14   **Q.**  And so did you make out a report in this case?

15   **A.**  Yes, sir, I did.

16   **Q.**  Did you review it before you testified here today?

17   **A.**  Not this morning, no.

18   **Q.**  Yesterday?

19   **A.**  I looked briefly over it.

20   **Q.**  And when you filled out the report, was it true and

21   accurate when you made it?

22   **A.**  To the best of my knowledge.

23   **Q.**  And still true and accurate today?

24   **A.**  Yes, sir.

25            **MR. DALY:**  May I approach the witness?

*15-20652; USA v. EUGENE FISHER, ET AL*

1                    **THE COURT:**  Yes.

2

3    **BY MR. DALY:**

4        **Q.**  There are three pages.  You recognize the document?

5        **A.**  Yes.

6        **Q.**  It's your report?

7        **A.**  Yes.

8        **Q.**  Does it have your signature on it?

9        **A.**  Yes, sir.

10       **Q.**  And in the first paragraph does it say that

11   Detective Kuhner saw something and told you about it?

12       **A.**  Yes, sir.

13       **Q.**  And it doesn't indicate in your report that you

14   yourself saw that.  It was something that was told to you,

15   correct?

16       **A.**  At that time we --

17       **Q.**  I'm asking what's in the report.

18       **A.**  Yes, sir.

19       **Q.**  The report actually says Detective Kuhner saw

20   something and told you about it, right?

21       **A.**  Yes, sir.

22       **Q.**  Doesn't say in the report that you saw it, right?

23       **A.**  Yes, sir.

24       **Q.**  Okay.  So now after the person walks away, did you

25   see where the person went?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  Went to a certain apartment number?

3    **A.**  Yes, 853.

4    **Q.**  851?

5    **A.**  Three.  I believe it was 853.

6    **Q.**  You were going to 806, right?

7    **A.**  No, sir.  I can look at the report.  I can advise

8    you of the correct address.

9    **Q.**  I will show you a copy of Detective Kuhner's report,

10   and at the top it indicates --

11   **A.**  I thought this was my report.

12   **Q.**  I just said it was Detective Kuhner's report?

13   **A.**  Okay.

14   **Q.**  Looking at the address that you were going to, does

15   that refresh your recollection?

16   **A.**  Yes, for the homicide.

17   **Q.**  That's what I was asking you.  Did you go to 806?

18   **A.**  Yes.

19   **Q.**  So you lose sight of the person that dropped the

20   bag?

21   **A.**  Yes.

22   **Q.**  And you continue on to your investigation?

23   **A.**  Yes, that's correct.

24   **Q.**  All right.  So you go to 806.  There's a person that

25   you and Detective Kuhner wanted to speak with?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  And was this person a witness or a suspect?

3    **A.**  At the time they had information on possibly the

4    homicide that occurred.

5    **Q.**  So probably a witness, correct?

6    **A.**  Probably.

7    **Q.**  So then you take that person, and you put him in the

8    marked vehicle or unmarked vehicle, correct?

9    **A.**  Yes.

10   **Q.**  And you and Detective Kuhner and this person go back

11   to the station in Charleston?

12   **A.**  Yes, sir.

13   **Q.**  And you continue that investigation.  You speak with

14   him, right?

15   **A.**  Yes.

16   **Q.**  And then you look in the bag that you recovered?

17   **A.**  Yes.

18   **Q.**  And you found generic Xanax, right?

19   **A.**  I believe it could be generic.  I'm not for sure of

20   the company that made it.

21   **Q.**  If I show you your report, does that help refresh

22   your recollection?

23   **A.**  Yes, sir.

24   **Q.**  Does that help you refresh your recollection as to

25   the type of pills?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   Yes.

2      **Q.**   What were they?

3      **A.**   Generic Xanax.

4      **Q.**   And then there was some cocaine, correct?

5      **A.**   Yes.

6      **Q.**   Small amount?

7      **A.**   Yes, sir.

8      **Q.**   Total weight with the bag was 1.8 grams, right?

9      **A.**   Yes.

10     **Q.**   And the smaller packets that you saw, the smaller

11     packets, the amount of cocaine in the smaller packet was

12     so small, that when you put it on the scale, it didn't

13     register a weight?

14     **A.**   Not that I can recall.

15     **Q.**   If I showed you your report, would that refresh your

16     memory?

17     **A.**   Sure.  Yes, sir.

18     **Q.**   The statement that I just made when you tried to

19     weigh the drugs in the small packet, it was so small it

20     didn't even register on the scale, is that a correct

21     statement?

22     **A.**   Yes, sir.

23     **Q.**   Okay.  So after all of that you decided to go back

24     to see if you could locate the person that dropped the

25     items, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   Yes.

2     **Q.**   You go to the apartment of 853, right?

3     **A.**   Yes, sir.

4     **Q.**   And now it's three hours later, three hours from the

5     point the items were dropped to the point that now you're

6     trying to locate that person?

7     **A.**   Yes.

8     **Q.**   And three hours later you go to 853, and you go to

9     the back while somebody else from the department is at the

10    front door, right?

11    **A.**   Yes, sir.

12    **Q.**   And there was a request whether or not a person was

13    present, right?

14    **A.**   Yes.

15    **Q.**   And then Mr. Bailey comes to the front door, right?

16    **A.**   I believe she went to get him.

17    **Q.**   She goes back to get him, and she and Mr. Bailey

18    come to the front door?

19    **A.**   Yes, sir.

20    **Q.**   And so you didn't say this is guy that I saw.  I

21    recognize his face.  That's the person who dropped the

22    bag.  You couldn't do that at that point?

23    **A.**   Not at that point, no, sir.

24    **Q.**   All right.  Now when Mr. Bailey was arrested, did

25    you take anything off of his person when he was arrested?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   As in identification?

2      **Q.**   Drugs, money, contraband?

3      **A.**   No, sir.

4      **Q.**   Nothing, right?

5      **A.**   No, sir, not that I recall.

6      **Q.**   So Detective Taylor, you knew this case was

7      ultimately dismissed, right?

8      **A.**   Yes.

9                **MR. DALY:**   Nothing further.

10               **THE COURT:**   Thank you, Mr. Daly.

11          Mr. Feinberg?

12               **MR. FEINBERG:**   Yes, sir.

13

14                          **CROSS EXAMINATION**

15

16   BY MR. FEINBERG:

17

18     **Q.**   Detective Taylor, I believe it was January 30, 2009

19     that you executed a search warrant at the Hampton Inn?

20     **A.**   Yes.

21     **Q.**   And that was for Robert Brown for a specific room?

22     **A.**   The specific room with the name Robert Brown.

23     **Q.**   Okay.  You gained entry, correct?

24     **A.**   Yes, sir.

25     **Q.**   Mr. Brown was searched and cuffed, correct?

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Yes, sir.

2      **Q.**  Did the search warrant say that you could search Mr.

3      Brown or just the room?

4      **A.**  Once the person is in the room, everything in the

5      room.

6      **Q.**  That's what the search warrant says, you can search

7      everything in the room including people?

8      **A.**  The people in the room, we have to check them to

9      make sure there's no weapons or anything like that.

10     **Q.**  Okay.  You patted him down before you cuffed him?

11     **A.**  Yes, sir.

12     **Q.**  Found no weapons?

13     **A.**  No, sir.

14     **Q.**  Then you found a receipt for the room?

15     **A.**  Yes, sir.

16     **Q.**  In Mr. Brown's name?

17     **A.**  Yes.

18     **Q.**  Social security card, Michigan I.D.?

19     **A.**  Yes.

20     **Q.**  And you found some paperwork for court that Mr.

21     Brown had posted bond for a Terrence Hampton?

22     **A.**  Yes.

23     **Q.**  And you found some money on him?

24     **A.**  Yes.

25     **Q.**  Did charge him with anything?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   I believe he was charged possibly with marijuana.

2    I'm not sure.

3    **Q.**   Do you have your report?

4    **A.**   No, sir, I don't have it in front of me.

5    **Q.**   Just looking at your report, the only question that

6    I have was Mr. Brown charged with any crime?

7    **A.**   It's not showing in my initial report, no.

8    **Q.**   So to the best of your recollection and your report,

9    Mr. Brown was not charged with any crime?

10   **A.**   Based off of mine, but there were other detectives

11   working the case.

12   **Q.**   I understand, but you wrote a report?

13   **A.**   Yes, sir.

14   **Q.**   Were you the officer in charge?

15   **A.**   I was the officer that initiated everything.

16   **Q.**   Okay.  So you have no knowledge if Mr. Brown was

17   ever charged with any crime?

18   **A.**   He was brought to the station and processed.

19   **Q.**   I understand, but just because he was taken to the

20   police station and processed, doesn't mean he was ever

21   charged with anything, correct?

22   **A.**   Usually when you go to a police station and you're

23   arrested, you're charged.

24   **Q.**   I'm not asking what's usual.  What was he charged

25   with?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  I would probably have to look at the other

2    detective's report.

3    **Q.**  You didn't compare them before you came to court

4    today?

5    **A.**  Yes, sir, I did.

6    **Q.**  So you have no information -- independent

7    information that Mr. Brown was ever charged with anything

8    other than handcuffed and taken to the station?

9    **A.**  Based off of my report, that's the only thing.

10   **Q.**  Right?

11   **A.**  Yes, I agree with you on that.

12   **Q.**  Any information if he was charged, whatever to the

13   case?

14   **A.**  I have no clue.

15   **Q.**  Because he was not charged with anything?

16   **A.**  Okay.

17   **Q.**  Was that your only contact with Mr. Brown?

18   **A.**  No, sir.

19   **Q.**  What other contact did you have?

20   **A.**  Well, I was in the criminal investigation division

21   when the shooting occurred.

22   **Q.**  Which shooting?

23   **A.**  The 4O2 Breen Street.

24   **Q.**  The one that he was shot?

25   **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   He was not charged with being shot?

2    **A.**   No, sir.  No, sir.

3    **Q.**   Okay.  Any other contact?

4    **A.**   No, sir.

5              **MR. FEINBERG:**  I have no further questions.

6              **THE COURT:**  Thank you, Mr. Feinberg.

7          Any redirect?

8              **MR. FEINBERG:**  Just one second, your Honor.

9              **MR. WIGOD:**  Your Honor, we have no further

10   questions.

11             **THE COURT:**  Thank you, Mr. Wigod.  You may

12   step down, Officer Taylor.

13             **THE WITNESS:**  Thank you.

14

15                  (Witness excused.)

16

17             **MS. FINOCCHIARO:**  Your Honor, the government

18   calls Officer Kapeluck.

19             **THE COURT:**  Okay.

20

21              **P E T E R   K A P E L U C K**

22

23   being first duly sworn by the Court to tell the truth, was

24   examined and testified upon his oath as follows:

25

                *15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE COURT:**  You can take a seat, and we will

2     have you begin by having you state your name and spelling

3     your last name.

4          **THE WITNESS:**  Peter Kapeluck,

5     K-a-p-e-l-u-c-k.

6          **THE COURT:**  All right.  Thank you.  You can

7     move the mic closer.

8

9                    **DIRECT EXAMINATION**

10

11    **BY MR. WIGOD:**

12

13     **Q.**  Sir, I will ask you to tell the jury what it is that

14    you do for a living?

15     **A.**  I am a police officer for the city of Charleston,

16    West Virginia.

17     **Q.**  How long have you been a police officer for

18    Charleston?

19     **A.**  About 13 and a half years.

20     **Q.**  And your current assignment is what?

21     **A.**  I am a crash investigator assigned to the traffic

22    division.

23     **Q.**  Car crashes?

24     **A.**  Yes.

25     **Q.**  And your assignment before that?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   Before that I was assigned to patrol and also the

2      bike unit, bicycle unit, and patrol before that.

3      **Q.**   You were a patrol officer on January 30, 2009?

4      **A.**   Yes.

5      **Q.**   Did you have an opportunity to go to the Hampton Inn

6      hotel on that date?

7      **A.**   Yes.

8      **Q.**   Was that Number 1 Virginia Street?

9      **A.**   Yes.

10     **Q.**   For what reason did you go to the hotel?

11     **A.**   I was to assist our special enforcement unit with

12     the search warrant at that location.

13     **Q.**   How did you assist with the search warrant?

14     **A.**   I was informed that there were --

15             **MR. FEINBERG:**   Objection.   Hearsay.

16

17     BY MR. WIGOD:

18     **Q.**   Tell us what you did.

19     **A.**   I went to the outside of the building and made

20     contact with the male and female that were outside.

21     **Q.**   When you say "outside", outside the hotel?

22     **A.**   Yes.

23     **Q.**   They are on the hotel grounds, but not inside the

24     hotel?

25     **A.**   Yes, they were outside on the grass.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Was it your understanding other officers were going

2    to the room to execute a search warrant?

3    **A.**  Yes.

4    **Q.**  Do you recall what room number that was?

5    **A.**  Number 302.

6    **Q.**  And you made contact with two individuals outside

7    the hotel?

8    **A.**  Yes.

9    **Q.**  Describe the contact for us, please.

10   **A.**  On my approach, I observed a female and male.  The

11   female was smoking something.  When I approached her, I

12   could smell an odor of burnt marijuana.  As I got closer,

13   she threw what she was smoking down on the ground.  That

14   female later identified what she had threw down on

15   ground --

16               **MR. FEINBERG:**  Objection.  Hearsay.

17

18   BY MR. WIGOD:

19   **Q.**  Based on the smell and training and experience, what

20   do you believe she threw on the ground?

21   **A.**  Marijuana blunt.

22   **Q.**  What happened then?

23   **A.**  We also made contact with the male that was with

24   her.  Small amount of marijuana was recovered from that

25   male's person.

                   *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1       Q.  Did you obtain the name or any identification of the

 2   female?

 3       A.  The female --

 4               MR. FEINBERG:  Objection.  Hearsay.

 5               THE COURT:  Overrule the objection.

 6

 7   BY MR. WIGOD:

 8       Q.  What was the female's name?

 9       A.  Kelsey James.

10       Q.  And the male's name?

11       A.  Jeffrey Adams, Jr.

12       Q.  Mr. Adams you mentioned was searched?

13       A.  Yes.

14       Q.  Was anything of significance located on Mr. Adams?

15               MR. FEINBERG:  Objection, relevancy.  There's

16   no testimony that Mr. Adams had anything to do with the

17   purpose of the officer being on the premises.

18               MR. WIGOD:  I'll ask a follow up question.

19               THE COURT:  All right.

20               MR. WIGOD:  Did you locate a room key on Mr.

21   Adams?

22       A.  Yes.

23

24   BY MR. WIGOD:

25       Q.  What room was the room key for?
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Number 302.

2    **Q.**   Same room that the search warrant was executed?

3    **A.**   Yes.

4    **Q.**   Okay.  And was anything else located on Mr. Adams?

5    **A.**   A large sum of money.

6    **Q.**   When you say "large sum of money", ball park figure

7    of how much money?

8    **A.**   It was over $1,000.

9    **Q.**   Would your report refresh your memory of how much

10   money was on Mr. Adams?

11   **A.**   It would.

12          **MR. WIGOD:**   Your Honor, may I approach the

13   witness?

14          **THE COURT:**   You may.

15

16   **BY MR. WIGOD:**

17   **Q.**   Does that refresh your memory?

18   **A.**   Yes.

19   **Q.**   How much money was located on?

20   **A.**   $2,789.

21   **Q.**   That was cash?

22   **A.**   Yes.

23   **Q.**   During your contact with Mr. Adams, did he have

24   anything in his hands?

25   **A.**   Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  Can you tell us what he had in his hands?

2      **A.**  He was concealing a plastic baggie in one of his

3      hands.

4      **Q.**  When you say "concealing", what do you mean?

5      **A.**  He had it balled up in his fist.

6      **Q.**  Were you able to determine what was in his hand?

7      **A.**  It was a clear plastic baggie filled with suspected

8      crack cocaine.

9      **Q.**  Did he eventually release whatever was in his hand?

10     **A.**  Yes.

11     **Q.**  You saw that to be what?

12     **A.**  Clear plastic baggie filled with individual baggies

13     of suspected crack cocaine.

14     **Q.**  So there is several bags inside a smaller bag?

15     **A.**  Yes.

16     **Q.**  Do you remember how many individual bags were inside

17     the smaller bag?

18     **A.**  Seven.

19     **Q.**  And there was a substance that you believed to be

20     what in the bags?

21     **A.**  Crack cocaine.

22     **Q.**  At some point in time were at least one of the items

23     field tested?

24     **A.**  Yes.

25     **Q.**  What did it field test reveal?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Tested positive for cocaine base.

2    **Q.**   When you say "cocaine base," what's the street name

3    for cocaine base?

4    **A.**   Coke, crack.

5    **Q.**   Crack?

6    **A.**   Yes.

7    **Q.**   So basically Mr. Adams had over $2,700 and seven

8    baggies of crack?

9    **A.**   Yes.

10   **Q.**   And a room key to 302?

11   **A.**   Yes.

12            **MR. WIGOD:**   No further questions.

13            **THE COURT:**   Thank you, Mr. Wigod.

14         Any cross examination?

15            **MR. FEINBERG:**   No, your Honor.

16            **THE COURT:**   Okay.   Thank you, officer.   You

17   may step down.

18

19                  (Witness excused.)

20

21            **MS. FINOCCHIARO:**   At this time the government

22   calls Officer Welsh.

23

24            **R O B E R T   W E L S H**

25

                *15-20652; USA v. EUGENE FISHER, ET AL*

1  being first duly sworn by the Court to tell the truth, was

2  examined and testified upon his oath as follows:

3

4        THE COURT:  We will have you begin by having

5  you state your name, and spelling your last name.

6        THE WITNESS:  Corporal Robert Welsh,

7  W-e-l-s-h.

8        THE COURT:  Thank you.

9

10                    DIRECT EXAMINATION

11

12  BY MR. BILKOVIC:

13

14    Q.  Corporal Welsh, how are you employed?

15    A.  I am with the Charleston Police Department in

16  Charleston, West Virginia.

17    Q.  How long have you been employed there?

18    A.  Approximately 13 years.

19    Q.  What is your current assignment there?

20    A.  Current assignment is in the training division for

21  Charleston P.D.

22    Q.  What does that mean?

23    A.  I assist which the state police academy in training

24  new officers.

25    Q.  What other responsibilities have you had as a police

                15-20652; USA v. EUGENE FISHER, ET AL

1    officer there?

2        A.   I was assigned with the Metro Drug Unit for seven

3    years.

4        Q.   What period of time would that have been?

5        A.   From approximately 2009 to 2016.

6        Q.   Are you familiar then during your time with the

7    Metro Unit group with the Greyhound bus station in

8    Charleston, West Virginia?

9        A.   Yes, sir.

10       Q.   I will take your attention October 27, 2009.  Do you

11   recall that day?

12       A.   Yes, sir.

13       Q.   And around on that day around 1:30 a.m. were you at

14   the Greyhound bus station?

15       A.   Yes.

16       Q.   How long had you been there?

17       A.   Approximately since 11:00.

18       Q.   In the evening?

19       A.   Yes, sir.

20       Q.   What were you doing there?

21       A.   We were doing bus interdiction which was a big

22   problem with drugs and money coming in and out of the

23   city.

24       Q.   Were you there by yourself?

25       A.   No, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Who were there with?

2    **A.**  Detective Hackney.  Lieutenant Napier was in a

3    different vehicle, but I was in the vehicle with Detective

4    Hackney.

5    **Q.**  Who?

6    **A.**  Hackney.

7    **Q.**  At some point in time did you receive instructions

8    from Lieutenant Napier to do something?

9    **A.**  We were instructed to follow a vehicle in order to

10   get a stop.

11   **Q.**  Where was the vehicle at that time?

12   **A.**  Greyhound bus station.

13   **Q.**  Where?

14   **A.**  Outside one of the bus bays.

15   **Q.**  Outside one of the bus bays?

16   **A.**  Yes.

17   **Q.**  Is that a normal area for vehicles to go?

18   **A.**  No, sir, it's not.

19   **Q.**  What did you do?

20   **A.**  We followed the vehicle.  We had a patrol unit that

21   was attempting to catch up with us to stop the vehicle

22   because it had a burned out brake light I believe.  The

23   patrol vehicle was not able to stop or get caught up with

24   us.  So we pulled up along side of the vehicle.  When we

25   stopped at a light, we showed our badges, and stopped the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    vehicle.

2        Q.  You and Detective Hackney were together?

3        A.  Yes.

4        Q.  Were you the driver or passenger?

5        A.  I was the passenger.

6        Q.  When you pulled up to the vehicle, could you see how

7    many people were in the vehicle?

8        A.  To my memory three, sir.

9        Q.  And do you recall the sex of the individuals?

10       A.  There was a female driver and two male passengers.

11       Q.  What happened at that point?

12       A.  We approached the vehicle.  Detective Hackney

13   approached the front passenger side and spoke with the

14   front passenger.  Detective Hackney got the front

15   passenger out of the vehicle or asked him to get out of

16   the vehicle.

17       Q.  And do you know if that person identified himself?

18       A.  I believe he identified himself as Dwayne Pruitt.

19       Q.  Dwayne Pruitt?

20       A.  Yes, sir.

21       Q.  What was done with the other passenger in the

22   vehicle?

23       A.  Detective Hackney asked him to step out with me.

24   When he stepped out, I patted him down for officer safety

25   to make sure he didn't have any weapons on him.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Did you obtain identification from that person?

2    **A.**  I believe he identified himself as Devon McClure.

3    **Q.**  Devon McClure?

4    **A.**  Yes, sir.

5    **Q.**  Do you know what the female's name was?

6    **A.**  Justine Parker I believe.

7    **Q.**  And do you know if it was her vehicle?

8    **A.**  I think it was, sir.

9    **Q.**  Do you know whether that vehicle was searched?

10   **A.**  It was searched.

11          **MR. BILKOVIC:**  Nothing further.

12          **THE COURT:**  Thank you.

13          **MR. SPIELFOGEL:**  Just a couple of questions.

14          **THE COURT:**  Okay.  Mr. Spielfogel?

15

16                    **CROSS EXAMINATION**

17

18   **BY MR. SPIELFOGEL:**

19

20   **Q.**  Was it corporal?

21   **A.**  Yes.

22   **Q.**  Good morning.

23   **A.**  Good morning.

24   **Q.**  So if I understand it, you started to follow the

25   vehicle?

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   That's correct.

2    **Q.**   And you said that you pulled the vehicle over

3    because the rear brake light was not working?

4    **A.**   That's correct.

5    **Q.**   Okay.  Was the person given a ticket for not having

6    a rear brake light?

7    **A.**   I don't recall, sir.

8    **Q.**   And do you recall whether photos were taken of that

9    vehicle?

10    **A.**   No, sir, I don't recall.

11    **Q.**   Have you reviewed any police reports in this case?

12    **A.**   Yes, sir.

13    **Q.**   I will ask you to take a look at this report, and

14    ask you if that was a report that was made out pursuant to

15    this incident?

16    **A.**   Yes, sir.

17    **Q.**   Okay.  And in that report does it indicate -- I

18    believe it is on the third page, that's the one that I

19    have marked -- that photos were taken of the vehicle?

20    **A.**   It says Detective Hackney took pictures of the

21    vehicle.

22    **Q.**   So it's indicated in the report, and it is on Page

23    3?

24    **A.**   Yes, sir.

25    **Q.**   So there were photos taken of that vehicle, is that

*15-20652; USA v. EUGENE FISHER, ET AL*

1    correct?

2        **A.**   It does a photo was taken.

3        **Q.**   Are you aware of any photo that existed that shows

4    that the rear brake light didn't work?

5        **A.**   Not to my knowledge, sir.

6        **Q.**   But that's why you pulled the vehicle over, is that

7    right?

8        **A.**   That's why the vehicle was stopped.

9        **Q.**   You went to the driver's side of vehicle, is that

10   right?

11       **A.**   I believe so.  I believe I was the back passenger

12   or -- yes, I was on the driver's side.

13       **Q.**   And your brother officer was on the passenger side,

14   is that correct?

15       **A.**   Correct, sir.

16       **Q.**   And that's where Mr. Pruitt, the person that gave

17   the name of Dwayne Pruitt, was on the passenger side, is

18   that correct?

19       **A.**   Yes.

20       **Q.**   Could you hear what was being said between Officer

21   Hackney and Mr. Pruitt?  Could you hear that conversation?

22       **A.**   After nine years I don't recall, sir.

23       **Q.**   Let me ask you this, you did see -- or do you recall

24   at all whether you saw Mr. Pruitt get out of the vehicle?

25       **A.**   I don't recall, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  You don't remember anything about this incident?

2    **A.**  Not as far as specifics, no, sir.

3    **Q.**  Do you recall whether any drugs were recovered at

4    all from Mr. Pruitt, the person who gave the name

5    Mr. Pruitt?

6    **A.**  Based on the report there was marijuana recovered.

7    **Q.**  Yeah, but it wasn't from him?

8    **A.**  No, I believe from a bag.

9    **Q.**  A bag that did not belong to him, isn't that

10    correct?

11    **A.**  I have no idea, sir.

12    **Q.**  Is there another officer that will testify about

13    this incident?

14    **A.**  I believe so.

15            **MR. SPIELFOGEL:**  Thank you very much.

16            **THE COURT:**  Thank you, Mr. Spielfogel.

17        Anybody else?

18            **MR. FEINBERG:**  No.

19            **THE COURT:**  Thank you, officer.  You may step

20    down.

21

22                    (Witness excused.)

23

24            **MS. FINOCCHIARO:**  The government calls

25    Officer Higgenbotham.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1              THE COURT:  Okay.
 2
 3          R Y A N    H I G G E N B O T H A M
 4
 5   being first duly sworn by the Court to tell the truth, was
 6   examined and testified upon his oath as follows:
 7
 8              THE COURT:  We will have you begin by stating
 9     your name and spelling your last name.
10              THE WITNESS:  Ryan Higgenbotham,
11     H-i-g-g-e-n-b-o-t-h-a-m.
12              THE COURT:  Thank you.  You may proceed.
13
14                   DIRECT EXAMINATION
15
16   BY MR. BILKOVIC:
17
18     Q.  Sir, please tell the jury how you are employed?
19     A.  Charleston Police Department.
20     Q.  In what capacity?
21     A.  I'm with the Metro Drug unit, assistant commander.
22              MR. FEINBERG:  Could the witness speak into
23     the mic?
24              MR. BILKOVIC:  Pull the mic closer to you.
25              THE WITNESS:  Okay.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **BY MR. BILKOVIC:**

2       **Q.**  Repeat your last answer.

3       **A.**  Metro Drug Unit, assistant drug unit commander.

4       **Q.**  How long have you been a police officer?

5       **A.**  Just over 13 years.

6       **Q.**  All at the same police department?

7       **A.**  Yes, sir.

8       **Q.**  Let me ask you about a couple of incidents that took

9    place several years ago.

10               First incident, drawing your attention to

11   January 20, 2011.  Did you have an opportunity on that day

12   to go 808 1/2 Park Drive in Dunbar, West Virginia?

13      **A.**  Yes.

14      **Q.**  Were you there with other officers or by yourself?

15      **A.**  With other officers.

16      **Q.**  Do you remember who the other officers were?

17      **A.**  Brandon Tagayun, Keven Allen, Tom Carper, Justin

18   Hackney.

19      **Q.**  When you went to the location, is this a house,

20   apartment?

21      **A.**  It was a house.  It was a half address.  So it

22   stepped back from another house.

23      **Q.**  Did you go to the front door of that residence?

24      **A.**  Yes.

25      **Q.**  With other officers to the front door?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  And what occurred when you went to the front door?

3    **A.**  Detective Allen knocked on the front door, didn't

4    initially get an answer, heard from the inside.

5    **Q.**  What occurred next?

6    **A.**  He -- we were there to serve an arrest warrant.  So

7    after we heard somebody inside, he tried the doorknob.  It

8    was unlocked, opened it up, announced police, and when he

9    opened the door, you can see another door straight through

10   that door to the bedroom, and he saw that door closed.  So

11   we went in, assuming that was the person to serve the

12   warrant on.

13   **Q.**  Did you ultimately go into that bedroom?

14   **A.**  Yes.

15   **Q.**  And did you locate any people in the bedroom?

16   **A.**  Yes.

17   **Q.**  Who was in the bedroom?

18   **A.**  Nicole Reed and Devon Patterson.

19   **Q.**  Nicole Reed is the person that you had the arrest

20   warrant?

21   **A.**  Yes.

22   **Q.**  Who was the other individual?

23   **A.**  Mr. Patterson.

24   **Q.**  What was done with Mr. Patterson and Ms. Reed?

25   **A.**  They were detained and escorted out of the bedroom.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  What did you do next?

2    **A.**  While in the bedroom, they were in the bed, and just

3    on the other side of the bed, I noticed a firearm

4    in-between the wall and bed on the floor.

5    **Q.**  Showing you what's been marked as Government

6    Proposed Exhibit 276E, do you recognize it?

7    **A.**  Yes, sir.

8    **Q.**  What is that?

9    **A.**  That's the firearm that I just mentioned.

10   **Q.**  Is that a photograph of the firearm in the condition

11   that you found it?

12   **A.**  Yes, sir.

13              **MR. BILKOVIC:**  Your Honor, move for admission

14   into evidence of Government Proposed Exhibit 276E.

15              **THE COURT:**  Any objection?

16              **MR. DALY:**  No, sir.

17              **THE COURT:**  Thank you.  The Court will

18   receive it.

19              **MR. BILKOVIC:**  Publish to the jury?

20              **THE COURT:**  You may.

21

22   **BY MR. BILKOVIC:**

23   **Q.**  Do you know what type of firearm that was?

24   **A.**  A Tec-9.

25   **Q.**  Tec-9?

*15-20652; USA v. EUGENE FISHER, ET AL*

48

1    **A.**  Yes, sir.

2    **Q.**  What did you do with the firearm when you saw it?

3    **A.**  I picked it up and cleared it of any rounds that
4    were loaded in it.

5    **Q.**  Was it loaded?

6    **A.**  Yes, sir.

7    **Q.**  And then what did you do after you cleared it?

8    **A.**  Set it back down.

9    **Q.**  Why?

10   **A.**  For photos.

11   **Q.**  Then what did you do with it?

12   **A.**  After the photos were taken, we collected it.

13   **Q.**  At some point in time was a search warrant obtained
14   for the residence?

15   **A.**  Yes.

16   **Q.**  When that was being done, where were you?

17   **A.**  Outside.

18   **Q.**  Doing what?

19   **A.**  Making sure nobody came to the residence and tried
20   to get in while the search warrant was applied for.

21   **Q.**  So when outside, was there anybody in the residence
22   while obtaining the search warrant?

23   **A.**  No, sir.

24   **Q.**  And did anybody come in during the period of time
25   that you were waiting for a search warrant?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   No, sir.

2     **Q.**   I will take your attention to an incident on

3     February 8, 2012.  Do you recall on that date proceeding

4     to 27 Hambrick Lane, Apartment D in Cross Lanes, West

5     Virginia?

6     **A.**   Yes.

7     **Q.**   What was the purpose of going in?

8     **A.**   We were there in order of a knock and talk based on

9     information regarding the person that lived there was

10    allowing people to stay with him and sell pills.

11    **Q.**   So did you go to that location with other officers?

12    **A.**   Yes.

13    **Q.**   Do you know who the officers were?

14    **A.**   Detective Allen, Petty, and I want to say Tom

15    Carper.

16    **Q.**   Carper?

17    **A.**   Carper.

18    **Q.**   What occurred when you went to that location?

19    **A.**   When we got there, Detective Allen knocked on the

20    door.  It was answered by the person who lived there.  I

21    can't remember his name right off, but after he answered

22    the door, Keven started talking to him, asked for consent

23    to search the place.  He granted written consent, and we

24    started searching.

25    **Q.**   Any other individuals in the location?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Yes, sir.

2      **Q.**  Who?

3      **A.**  Mr. Bailey, and I don't remember the second guy's

4      name.

5      **Q.**  When you say "Mr. Bailey", who are you referring to?

6      **A.**  Corey Bailey.

7      **Q.**  And is that how Mr. Bailey identified himself?

8      **A.**  No.

9      **Q.**  How did he identify himself?

10     **A.**  Initially he said his name was Eric Brown.

11     **Q.**  Do you know if he was arrested?

12     **A.**  He was.

13     **Q.**  And what was done with Mr. Bailey after he was

14     arrested?

15     **A.**  He was transported to our booking facility at the

16     station.

17     **Q.**  What was done there?

18     **A.**  Prior to going we believed that he was concealing

19     something on his person.  So we took him to the station

20     while a search warrant was being obtained, and while that

21     search warrant was being obtained, he turned over a

22     quantity of pills to us.

23     **Q.**  Do you know where he retrieved the pills from?

24     **A.**  From between his buttocks.

25     **Q.**  Do you know how they were packaged?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Just in a plastic bag.

2    **Q.**  Did you open the bag and count the pills?

3    **A.**  No.

4    **Q.**  Why not?

5    **A.**  It was covered in feces.

6    **Q.**  Do you know if the pills were ultimately counted by

7    somebody?

8    **A.**  They were.

9    **Q.**  Do you know how many pills there were?

10   **A.**  Fifty-four.

11   **Q.**  Do you know what type of pills they were?

12   **A.**  40-milligram Opana pills.

13   **Q.**  Opana pills?

14   **A.**  Yes, sir, Oxymorphone.

15   **Q.**  Oxymorphone?

16   **A.**  Yes, sir.

17                **MR. BILKOVIC:**  May I have moment, your Honor?

18                **THE COURT:**  Yes.

19                **MR. BILKOVIC:**  Nothing further at this time.

20                **THE COURT:**  Okay.  Thank you.  Cross

21   examination?

22                **MR. DALY:**  No questions.

23                **MR. FEINBERG:**  No questions.

24                **THE COURT:**  Thank you.  You may step down,

25   sir.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1              THE WITNESS:  Thank you, sir.

 2

 3                  (Witness excused.)

 4

 5              MS. FINOCCHIARO:  At this time the government

 6        calls officer Keven Allen.

 7

 8                    K E V E N   A L L E N

 9

10   being first duly sworn by the Court to tell the truth, was

11   examined and testified upon his oath as follows:

12

13              THE COURT:  We will have you begin by stating

14        your name, and spelling your last name.

15              THE WITNESS:  Detective Keven Allen,

16        A-l-l-e-n.

17              THE COURT:  Thank you.  You may proceed.

18

19                    DIRECT EXAMINATION

20

21   BY MR. BILKOVIC:

22

23        Q.  Sir, where are you employed?

24        A.  I work for the South Charleston Police Department.

25        Q.  In what capacity?
```

15-20652; USA v. EUGENE FISHER, ET AL

1    **A.**  I'm a patrol supervisor.

2    **Q.**  And how long have you been a police officer with

3    Charleston?

4    **A.**  Approximately 11 years.

5    **Q.**  What previous assignments have you had there?

6    **A.**  I was assigned to the Metro Drug Unit from 2009 to

7    December 2017 as a detective.

8    **Q.**  I want to take your attention to October 27, 2009 at

9    approximately 1:30 in the morning.  Do you recall that

10   day?

11   **A.**  Yes, sir, I do.

12   **Q.**  And did you proceed to an area near the Greyhound

13   bus station to meet with Detective Hackney and Detective

14   Welsh?

15   **A.**  I did.

16   **Q.**  When you arrived, what did you observe?

17   **A.**  Detective Hackney had a traffic stop on a black

18   Chrysler vehicle.

19   **Q.**  And do you know how many people were in the vehicle?

20   **A.**  I believe three, sir.

21   **Q.**  Do you know the names of the individuals?

22   **A.**  I believe the driver was Justine Parker from

23   Charleston, West Virginia.  The two passengers were Devon

24   McClure and Corey Bailey who originally gave a different

25   name.

*15-20652; USA v. EUGENE FISHER, ET AL*

**Q.**   What is name that Mr. Bailey gave?

**A.**   Dwayne Pruitt.

**Q.**   Dwayne Pruitt?

**A.**   Yes, sir.

**Q.**   At some point in time did Ms. Parker give consent to search the vehicle?

**A.**   She did.

**Q.**   Who searched the vehicle?

**A.**   I believe there were several of us.  I searched the trunk.  Detective Richardson may have assisted.

**Q.**   When you searched the trunk area, did you see anything?

**A.**   I did.

**Q.**   What did you see?

**A.**   A black duffel bag in the trunk.

**Q.**   What did you do with the black duffel bag?

**A.**   Searched it.

**Q.**   Were you able to determine if anybody claimed ownership?

**A.**   Nobody directly, but Devon McClure told me that he had a little bit of marijuana in the duffel bag.

**Q.**   And so what did you do with the duffel bag?

**A.**   I did searched it.

**Q.**   Did you find anything in the duffel bag?

**A.**   I did.

*15-20652; USA v. EUGENE FISHER, ET AL*

**Q.** What did you find?

**A.** There was a pair of white Nike shoes, and underneath of the in sole of one of the shoes, there was a large stack of money that was later counted and determined to be approximately $3,100.  There was also about a gram and a half of marijuana inside the bag.

**Q.** Did the person -- well, Corey Bailey, who identified himself as Dwayne Pruitt, have any identification on him?

**A.** No, sir, he didn't.

**Q.** Was anything done to ascertain his identification?

**A.** I'm not sure.  Detective Hackney was the lead investigator.  I believe that he took a photograph of him, and I'm not sure if he fingerprinted him or not.  We later found out his real name.  Not that night, but a period of time later.

**Q.** He was released then?

**A.** Yes, sir.

**Q.** Take your attention to January 20, 2011, did you have an opportunity to be at 808 1/2 Park Drive in Dunbar, West Virginia?

**A.** Yes.

**Q.** What was the reason for going to the location?

**A.** Received information from a confidential informant that the resident of that house, her name was Nicole Reed, had two guys staying with her that was selling Opana pain

*15-20652; USA v. EUGENE FISHER, ET AL*

1    pills and heroin.

2        **Q.**   And did you learn anything else about Ms. Reed?

3        **A.**   I talked to Detective Hackney who was also a

4    detective with the Metro Drug Unit, and he told me --

5                **MR. FEINBERG:**   Objection.   Hearsay.

6                **MR. BILKOVIC:**   Not offering it for the truth

7    of the matter asserted.   I'm offering it to show why the

8    detective did what he did.

9                **THE COURT:**   I'll permit the question.

10

11   BY MR. BILKOVIC:

12       **Q.**   What information did you learn?

13       **A.**   Detective Hackney told me that Nicole Reed had a

14   felony warrant for possession with intent to deliver.

15       **Q.**   Possession with intent to deliver?

16       **A.**   Yes, sir.

17       **Q.**   Controlled substance?

18       **A.**   Correct, I believe pain pills.

19       **Q.**   And so what did you do after you received this

20   information?

21       **A.**   Myself and a few other detectives went and knocked

22   on the door.

23       **Q.**   What happened when you knocked on the door?

24       **A.**   We could hear somebody walking around inside, but

25   nobody initially came to the door.   So I tried the door

                     *15-20652; USA v. EUGENE FISHER, ET AL*

1    knob.  It was unlocked.  So I opened it and announced

2    myself as police.  At that point a male opened the door.

3    When he opened the door, I could see into the house, and I

4    could see a bedroom door slam shut.  At that point we

5    entered the residence believing that Nicole Reed, who had

6    the felony warrant, was trying to flee from us.

7         **Q.**  Talk a little closer to the microphone.

8         **A.**  Yes, sir.

9         **Q.**  Thank you.  The individual that answered the door,

10   did you learn his identity?

11        **A.**  I did.

12        **Q.**  What was that?

13        **A.**  Robert Bellamy.

14        **Q.**  After you saw the door shut, what did you do?

15        **A.**  I went into the door and opened it up, and saw Devon

16   Patterson and Nicole Reed lying in the bed.

17        **Q.**  What occurred then?

18        **A.**  We got Nicole Reed up out of the bed and informed

19   her that she had a warrant.  Detective Higginbotham -- as

20   I was doing that, getting her out of the bed, I could see

21   a Tec-9 millimeter handgun laying next to the bed.  I

22   asked Detective Higginbotham to clear the weapon.  We got

23   Nicole Reed and Devon Patterson up and led them out to the

24   living room.  At that point Detective Hackney, he

25   initially saw it and then I saw it, two bags of pain pills

*15-20652; USA v. EUGENE FISHER, ET AL*

1    on the coffee table.

2        Q.  After you move out of the bedroom, you go to where?

3        A.  Back to the living room right next to the front door

4    where we initially went in.

5        Q.  What did you see?

6        A.  Two bags of pain pills, yellow Opana, 40 milligram

7    pain pills laying on the coffee table.

8        Q.  Showing you what's been marked as Government

9    Proposed Exhibit 276B, do you recognize that?

10              MR. FEINBERG:  276 what?

11              MR. BILKOVIC:  B as in boy.

12        A.  This is the coffee table inside Nicole Reed's

13    apartment that's got the two bags of pain pills and a few

14    loose pills on the table.

15              MR. BILKOVIC:  Move for admission into

16    evidence Government Exhibit 276B.

17              THE COURT:  Any objection?

18              MR. DALY:  No.

19              THE COURT:  Thank you.  The Court will

20    receive it.

21              MR. BILKOVIC:  Could I publish it to the

22    jury?

23              THE COURT:  Yes.

24

25  BY MR. BILKOVIC:


                15-20652; USA v. EUGENE FISHER, ET AL

1    **Q.**  Can you tell the jury what they are looking at?  You

2    can step down or you can see it from your screen.

3    **A.**  I can see it.

4    **Q.**  Okay.

5    **A.**  This is Nicole Reed's coffee table that was inside

6    808 1/2 Park Drive right in the middle of living room.

7    There's two bags depicted in the photograph.  Each bag

8    contained a quantity of 40-milligrams of Opana pills,

9    which is a Schedule II controlled substance, and about two

10   dozen or so of other pills that are sorted out on the

11   table.  They were also Opana pills.

12   **Q.**  What was done at that point?

13   **A.**  At that point all three individuals were placed

14   under arrest.  Ms. Reed was placed under arrest for not

15   only for the warrant, but everybody was placed under

16   arrest for the pills.  We all then backed out, and I

17   applied for a search warrant for the house.

18   **Q.**  Did you have an opportunity to search Mr. Bellamy or

19   somebody in your presence search Mr. Bellamy?

20   **A.**  Yes.

21   **Q.**  Do you know if anything was recovered from his

22   person?

23   **A.**  From his person, no.  Later, once the search warrant

24   was obtained, there was a pair of pants --

25   **Q.**  I will get to the pants.  I'm just wondering about

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Mr. Bellamy.

2    **A.**  There was small amount of money, approximately $308.

3    **Q.**  $308?

4    **A.**  Yes.

5    **Q.**  Did you ultimately obtain a search warrant?

6    **A.**  Yes.

7    **Q.**  Same day?

8    **A.**  Yes.

9    **Q.**  Did you go back to the residence?

10   **A.**  Yes.

11   **Q.**  Did you return to the residence with other officers?

12   **A.**  Yes.

13   **Q.**  Tell the jury what was found inside the residence?

14   **A.**  We went back into the residence and continued to

15   search.  On this coffee table off to the side outside of

16   this previous picture, there was an Old Spice deodorant

17   can.  You take the top off, and underneath the actual

18   deodorant part, there's a hollow space in deodorant cans

19   like roll-on deodorant.  Once we popped that out, we found

20   another bag of approximately 120 more Opana pills.  There

21   was small amount of marijuana on the entertainment center.

22   There was a pair of jeans draped over the chair in the

23   kitchen that had the I.D. for Devon Patterson.

24   **Q.**  Let me stop you.

25   **A.**  Yes.

1      **Q.**  Showing you what's been marked as Government

2   Proposed Exhibit 276D, do you recognize that?

3      **A.**  I do.

4      **Q.**  What is that?

5      **A.**  This is a photograph depicting the deodorant

6   container that had the bag of Opana pills underneath in

7   the hollow place.

8              **MR. BILKOVIC:**  Move into evidence Government

9   Proposed Exhibit 276D.

10             **THE COURT:**  Any objection?

11             **MR. DALY:**  No objection.

12             **THE COURT:**  The Court receive it.

13             **MR. BILKOVIC:**  And may I have it published to

14  the jury?

15             **THE COURT:**  Yes.

16

17  **BY MR. BILKOVIC:**

18     **Q.**  Tell the jury what they are looking at.

19     **A.**  This is the photograph of the deodorant container

20  that I just described.  Once the cap was removed and the

21  top gel portion that you apply to yourself is removed,

22  there was this bag of pills that was located in the

23  understand hollow portion.  It was located on the same

24  coffee table as the other two bags of pills.

25             **MR. BILKOVIC:**  May I have one moment, your

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Honor?

2                    **THE COURT:**  Yes.

3

4    **BY MR. BILKOVIC:**

5        **Q.**  I handed you three items.  The first is a box marked

6    as Government Proposed Exhibit 277.  Do you know what that

7    is?

8        **A.**  Yes, sir, I do.

9        **Q.**  What is that?

10       **A.**  This is the Intertec 9 millimeter pistol located

11   next to the bed that Nicole Reed and Devon Patterson were

12   laying in.

13       **Q.**  Take a look at Government Proposed Exhibit 279, and

14   tell me if you recognize that.

15       **A.**  Yes, sir, I do recognize it.

16       **Q.**  What is that?

17       **A.**  This is the Old Spice deodorant container and

18   approximately 120 Opana pills located in the living room.

19       **Q.**  And what about Government Proposed Exhibit 280?

20       **A.**  Yes, sir, I do recognize it.

21       **Q.**  What's that?

22       **A.**  Approximately 168 Opana pills initially found on the

23   coffee table when we first went in and arrested Nicole

24   Reed.

25       **Q.**  Have you come across Opana pills before?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yes, numerous times.

2    **Q.**   What are they?

3    **A.**   Schedule II controlled substance.  They are

4    Oxymorphone.  They are a very strong pain pill that at

5    that time was very commonly bought and sold on the streets

6    in Charleston, West Virginia.

7    **Q.**   Now you indicated that you had come across a pair of

8    pants as well?

9    **A.**   Correct, sir.

10   **Q.**   Where were those?

11   **A.**   In the kitchen off the living room there was a chair

12   and they were draped over the chair.

13   **Q.**   What did you do when you saw those?

14   **A.**   I searched them.

15   **Q.**   And did you find anything?

16   **A.**   Yes, sir, I did.

17   **Q.**   What did you find?

18   **A.**   In one of the pockets there was an I.D. card for

19   Devon Patterson.  There was also a sum of U.S. currency of

20   a little over $3,100.

21   **Q.**   Do you know the exact amount?

22   **A.**   I believe it was $3,190.

23   **Q.**   What did you do with that?

24   **A.**   Seize it as evidence, sir.

25   **Q.**   I've just handed you what's been marked as

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Government Proposed 276C.  Do you recognize that?

2       **A.**   Yes.

3       **Q.**   What is that?

4       **A.**   This is a photograph of the pair of pants that had

5    the U.S. currency and I.D. card for Devon Patterson in the

6    pocket.

7                **MR. BILKOVIC:**  Move for admission into

8    evidence of Government Proposed Exhibit 276C.

9                **THE COURT:**  Any objection?

10               **MR. DALY:**  No objection.

11               **THE COURT:**  The Court will receive it.

12               **MR. BILKOVIC:**  May I publish it?

13               **THE COURT:**  Yes.

14

15   **BY MR. BILKOVIC:**

16      **Q.**   What is the jury looking a?

17      **A.**   The photograph that I described as a pair of pants

18   with the I.D. card for Devon Patterson, and approximately

19   $3,190 in the front left pocket.

20      **Q.**   I want to take your attention to February 8, 2012.

21   Did you have an opportunity on that day to proceed to 27

22   Hambrick Lane, Apartments D in Cross Lanes, West Virginia?

23      **A.**   Yes, I did.

24      **Q.**   What was the reason for going to that location?

25      **A.**   The detective that I worked with had told me that he

*15-20652; USA v. EUGENE FISHER, ET AL*

1    received information that the resident of that apartment

2    was selling pain pills and heroin along with two guys from

3    Michigan.

4        **Q.**  Do you know what the resident's name was?

5        **A.**  Sir, if I could look at my report to confirm.

6        **Q.**  Would that refresh your memory?

7        **A.**  Yes, it would.  Adam Halstead.

8        **Q.**  Did you go do that location on February 8, 2012?

9        **A.**  I did.

10       **Q.**  With who?

11       **A.**  With Detective Higginbotham, Detective Petty,

12   Detective Carper, the four of us.

13       **Q.**  What did you do when you got there?

14       **A.**  We knocked on the door.

15       **Q.**  Do you recall approximately what time of day it was?

16       **A.**  I don't recall.  It was daylight hours.

17       **Q.**  During the day?

18       **A.**  Yes, sir, it was.

19       **Q.**  What happened when you knocked on the door?

20       **A.**  I identified myself as a detective with the Metro

21   Drug Unit, and I asked Mr. Halstead if we could come in

22   and speak to him, which he said we could.

23       **Q.**  What happened at that point?

24       **A.**  We came inside, and I told him that I received

25   information that drugs were sold within the residence.  I

*15-20652; USA v. EUGENE FISHER, ET AL*

1    then asked for and received written consent to search the

2    apartment.

3        **Q.**  You received that from who?

4        **A.**  Mr. Halstead.

5        **Q.**  Was there anybody else inside the apartment?

6        **A.**  Yes, sir, there was.

7        **Q.**  And do you know who that person was?

8        **A.**  There were two other individuals, one was Tyrone

9    Hawkins from Detroit, Michigan and Corey Bailey from

10   Detroit, Michigan.

11       **Q.**  And was Mr. Bailey asked to identify himself?

12       **A.**  Yes, sir, he was.

13       **Q.**  What name did he give?

14       **A.**  Eric Brown.

15       **Q.**  Was Mr. Bailey -- what was done with Mr. Bailey?

16       **A.**  Excuse me?

17       **Q.**  What was done with Mr. Bailey?

18       **A.**  He was subsequently arrested during this process.

19       **Q.**  Prior to him being arrested, was anything done with

20   him?

21       **A.**  He was searched.

22       **Q.**  Was anything discovered during the search?

23       **A.**  Yes.

24       **Q.**  What was that?

25       **A.**  During the search of him, I located a bag of what

*15-20652; USA v. EUGENE FISHER, ET AL*

1    was later determined to be Opana pills in his buttocks

2    area.  At that specific time, I didn't know what it was.

3    It was in-between his buttocks, and was not able to remove

4    it.  He was arrested for obstructing, and he was brought

5    out of the apartment.  We later at the police station

6    found out what it was.

7    **Q.**  Let me back up a little bit.  Did you recover any

8    money?

9    **A.**  We did.

10   **Q.**  Tell the jury about that.

11   **A.**  When I initially patted Mr. Bailey down, I felt a

12   large amount of money in his front left pocket.  I didn't

13   initially do anything with it.  Once he was arrested, the

14   money was removed.  I believe it was $2,910 to be exact.

15   Mr. Bailey took that money out of his pocket, and threw it

16   up in the air for Tyrone Hawkins to grab it as we were

17   leading him out of the apartment once he was under arrest.

18   **Q.**  And was the money recovered?

19   **A.**  Yes, sir.  At that point we recovered the money,

20   placed it in an evidence bag, and seized it as evidence.

21   **Q.**  So you indicated that you were also searching down

22   his buttocks area?

23   **A.**  Yes.

24   **Q.**  And was he clothed?

25   **A.**  He was.  I ran my hands through the crouch of his

*15-20652; USA v. EUGENE FISHER, ET AL*

1   buttocks.  That's a common area for drug dealers to hide

2   drugs.  I've experienced that location many times

3   throughout my course as a detective.  As soon as I ran my

4   hand up the crease of his buttocks, I immediately felt a

5   hard item that I knew was not natural, and he began to

6   fight, and I put handcuffs on him.

7   **Q.**  What was done at that point?

8   **A.**  He was placed under arrest and taken out of the

9   apartment.

10  **Q.**  What did you do?

11  **A.**  I went to apply for a search warrant for his body

12  while the other detectives took him to the police station

13  for processing.

14  **Q.**  And did you end up obtaining a search warrant?

15  **A.**  I wrote the search warrant.  I printed it.  I got in

16  my car to take it to the magistrate for review, and at

17  that point I got a phone call saying Mr. Bailey

18  voluntarily removed the pills from his butt.

19  **Q.**  Were those pills taken into evidence?

20  **A.**  Yes.

21  **Q.**  Do you know how many there were?

22  **A.**  Approximately 53 Opana pain pills.

23  **Q.**  What was done with Mr. Bailey at that point?

24  **A.**  He was processed and arraigned by a magistrate.

25  **Q.**  Did you take him to the courthouse?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   I did.

2      **Q.**   Did he volunteer any information as you were

3      transporting him to the courthouse?

4      **A.**   He did.   As Detective Higginbotham and I were

5      walking him across the street, we were -- myself and

6      Detective Higginbotham were talking amongst ourselves

7      about how these Opana pain pills were -- how the price

8      skyrocketed lately.   Mr. Bailey said that he was selling

9      them for $40 a piece.   He knew they were being resold for

10     $80 a piece on the street, and he was mad because he would

11     have taken a 10 stack back to Detroit.

12     **Q.**   Have you heard the term "stack" before?

13     **A.**   Numerous times.

14     **Q.**   In your experience what does stack mean?

15     **A.**   One stack is $1,000, 10 stacks being $10,000.

16     **Q.**   Take your attention to September 22, 2014.   On that

17     day did you have an opportunity to proceed to 1721 Clair

18     Street in Charleston, West Virginia?

19     **A.**   Yes, sir, I did.

20     **Q.**   Why did you go to that location?

21     **A.**   I had received an anonymous call from a female in

22     Detroit that Jerome Gooch had a house.

23              **MR. FEINBERG:**   Objection.   Hearsay.

24              **MR. BILKOVIC:**   Not offering it for the truth

25     of the matter asserted.   That's okay.   I'll move on.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE COURT:**  Okay.

2          **MR. FEINBERG:**  Of course it's for the truth.

3          **THE COURT:**  He's withdrawing the question.

4

5  BY MR. BILKOVIC:

6      **Q.**  Did you receive information?

7      **A.**  Yes, sir, I did.

8      **Q.**  As a result of that information, did you think it

9  was wise for you to proceed to 1721 Clair Street?

10     **A.**  Yes.

11     **Q.**  What did you do?

12     **A.**  Set up surveillance on the residence.

13     **Q.**  By yourself?

14     **A.**  I believe initially, yes.

15     **Q.**  And some point in time did other officers join you?

16     **A.**  Yes, sir.

17     **Q.**  At some point in time did you approach the

18  residence?

19     **A.**  I did.

20     **Q.**  Prior to approaching the residence did you see

21  anybody leave the residence?

22     **A.**  Jerome Gooch got into a rental vehicle and left the

23  residence.

24     **Q.**  So when you approached the residence, was Jerome

25  Gooch still away from the residence?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yes.

2    **Q.**   What did you do when you approached the residence?

3    **A.**   Knocked on the door.

4    **Q.**   What happened then?

5    **A.**   An individual came around the corner.  The door had

6    a very large glass portion to it that you could see

7    straight through it.  I knocked on the door.  The

8    individual came around the corner and saw me.  I held up

9    the badge and said police.  At that point he took off

10   running through the house.

11   **Q.**   What did you do at that point?

12   **A.**   I smelled a very strong odor of burnt marijuana from

13   the house.  I believe he was going to destroy evidence if

14   he was not detained.  So we made entry, detained him and

15   the other female.

16   **Q.**   Did you learn the female's identity?

17   **A.**   Yes.

18   **Q.**   Who was that?

19   **A.**   Lavona Haley from Detroit, Michigan.

20   **Q.**   What about the male?

21   **A.**   Quincy Graham from Detroit, Michigan.

22   **Q.**   What was done with Mr. Graham and Ms. Haley?

23   **A.**   They were detained outside while I obtained a search

24   warrant for the residence.

25   **Q.**   Did you?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yes.

2    **Q.**   And was the residence searched?

3    **A.**   Yes, sir, it was.

4    **Q.**   Do you know if anything was found in the residence?

5    **A.**   Yes, I do.

6    **Q.**   What was found in the residence?

7    **A.**   In one of the bedrooms there was a futon style couch

8    or bed, and in-between the cushion there was a bag of

9    approximately 330 oxycodone pills, which is a Schedule II

10   controlled substance.  It's a pain pill.  In the living

11   room I discovered underneath a black trash bag a loaded

12   .45 Glock pistol.  It had a round in the chamber and a

13   loaded magazine.  Ms. Haley had approximately $1700 in her

14   purse that was in a bathroom.  Mr. Graham had

15   approximately $1003 in his pocket.  Inside there's a drop

16   ceiling in the kitchen.  You can push the panels up, and

17   there were a bag that contained approximately 16 Xanax

18   pills.

19   **Q.**   Those were located where?

20   **A.**   In the drop ceiling of the kitchen on top of the

21   tiles.

22   **Q.**   What was done with all the items?

23   **A.**   All seized as evidence.

24   **Q.**   Take a look at the box that's in front of you marked

25   as Government Proposed Exhibit 353, and tell me if you

*15-20652; USA v. EUGENE FISHER, ET AL*

1    recognize that.

2        **A.**  I do recognize it, sir.

3        **Q.**  What is that?

4        **A.**  This is the .45 caliber Glock pistol that I located

5    in the living room floor under the black trash bag at 1721

6    Clair Street in the Charleston, West Virginia.

7                **MR. BILKOVIC:**  Move for admission into

8    evidence of Government Proposed Exhibit 353.

9                **THE COURT:**  Any objection?

10               **MR. DALY:**  No objection.

11               **THE COURT:**  Thank you.  The Court will

12   receive it.

13

14   **BY MR. BILKOVIC:**

15       **Q.**  Stand up briefly and hold the box up so the jury can

16   see the contents.

17              Also next to the gun there's a black object.

18   What's that?

19       **A.**  The magazine to the pistol that was loaded.  It is

20   inserted in the pistol.

21       **Q.**  You can sit back down.  Thank you.

22              Do you recognize what is in Government Proposed

23   Exhibit 357?

24       **A.**  Yes, I do.

25       **Q.**  What is that?

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   These are the approximately 330 oxycodone pills that

2    were located in a bag inside of -- between the futon

3    cushions within the residence.

4              **MR. BILKOVIC:**   At this time move into

5    admission evidence of Government Proposed Exhibit 357.

6              **THE COURT:**   Any objection?

7              **MR. DALY:**   No objection.

8              **THE COURT:**   Thank you.   The Court will

9    receive it.

10

11   **BY MR. BILKOVIC:**

12   **Q.**   You also have a proposed exhibit labeled Government

13   Proposed Exhibit 379, a plastic bag.   Do you recognize

14   that?

15   **A.**   Yes.

16   **Q.**   What's that?

17   **A.**   This is approximately 16 Xanax pills located inside

18   of the drop ceiling tiles inside 1721 Clair street.

19              **MR. BILKOVIC:**   Move for admission into

20   evidence of Government Proposed Exhibit 359.

21              **THE COURT:**   Any objection?

22              **MR. DALY:**   No, sir.

23              **THE COURT:**   The Court will receive it.

24

25   **BY MR. BILKOVIC:**

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  At some point in time did Mr. Gooch return to the

2    residence while you were there?

3    **A.**  Yes, sir.

4    **Q.**  Now Detective Allen, when you did surveillance, you

5    don't do it in a marked patrol car?

6    **A.**  Correct.

7    **Q.**  You're in an unmarked patrol car?

8    **A.**  Unmarked plain vehicle, yes, sir.

9    **Q.**  And is that something that other officers in your

10   department utilize, unmarked cars when doing surveillance?

11   **A.**  Yes, sir.

12   **Q.**  So if we go back to the October 27, 2009, the

13   incident where you encountered Mr. Bailey and Mr. McClure,

14   were you in a marked or unmarked patrol car?

15   **A.**  It was an unmarked vehicle, no lights or sirens or

16   markings of any sort.

17   **Q.**  Were there other officers on the scene as well?

18   **A.**  Yes.

19   **Q.**  Were they in unmarked or marked patrol vehicles?

20   **A.**  Everybody was in unmarked vehicles except for the

21   Charleston policeman that performed the traffic stop.

22   **Q.**  Did you ever do surveillances in a marked patrol

23   vehicle?

24   **A.**  I do now, but only because I have no choice.  I'm a

25   uniform officer, but it is not idea.  It is not effective.

*15-20652; USA v. EUGENE FISHER, ET AL*

**Q.**   Why not?

**A.**   Easily spotted.  You're spotted immediately.

**Q.**   Back in 2009, 10, 11, 12, did you ever do it in a marked patrol vehicle?

**A.**   No, from 2009 until December 2017, I had a plain vehicle, unmarked, and I was a plain clothes officer for that amount of time.

**Q.**   All of the pills that you recovered that you talked about today, were the pills submitted to the lab for processing?

**A.**   Yes, sir, they were.

                **MR. BILKOVIC:**  May I have one moment, your Honor?

                **THE COURT:**  Yes.

                **MR. BILKOVIC:**  Your Honor, I move into evidence Government Proposed Exhibits 279, 280, 277 that this witness testified to.

                **THE COURT:**  Any objections?

                **MR. DALY:**  No objection.

                **MR. FEINBERG:**  What were the numbers?  279, 280 --

                **MR. BILKOVIC:**  277.

                **THE COURT:**  The Court will receive the three items.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1   **BY MR. BILKOVIC:**

2      **Q.**  Government Exhibit 277.  Can you remind the jury

3   again where that was located?

4      **A.**  This is the Tec-9 pistol that was loaded with a

5   round in the chamber.  It was located at 808 1/2 Park

6   Drive, Dunbar, West Virginia.

7      **Q.**  And can you step down and raise it up so the jury

8   can see it?

9      **A.**  This was located next to the bed where Nicole Reed

10  and Devon Patterson were laying?

11          **MR. BILKOVIC:**  Detective Allen, no further

12  questions, but defense counsel may.

13          **THE COURT:**  Thank you.

14

15                      **CROSS EXAMINATION**

16

17  **BY MR. SPIELFOGEL:**

18

19      **Q.**  Detective Allen, I want to talk to you about the

20  October 27, O9 incident.

21      **A.**  Yes, sir.

22      **Q.**  So you weren't actually -- I should say, were you

23  actually there when the vehicle was stopped?

24      **A.**  At the initial traffic stop, no, sir.

25      **Q.**  You got there after approximately how long had the

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    vehicle been there?

2    **A.**   Sir, I don't know.  I don't remember.

3    **Q.**   This was quite sometime ago, is that correct?  This

4    is in O9?

5    **A.**   Correct, sir.  I just don't recall how much time

6    went by.

7    **Q.**   Sure.  I understand.  What you've done, you've

8    refreshed your recollection about the incident by reading

9    reports?

10   **A.**   Yes, sir.

11   **Q.**   And mostly Mr. Hackney's -- Officer Hackney's

12   report?

13   **A.**   That's correct.

14   **Q.**   So when you arrived, you don't know what occurred

15   when an officer asked Mr. Bailey to get out of the

16   vehicle, is that correct?

17   **A.**   That is correct.  I don't know.

18   **Q.**   You got no information whatsoever that he resisted

19   in any way, is that right?

20   **A.**   That's correct, sir.

21   **Q.**   So he gets out of the car, and it's your

22   understanding that it's common procedure that you would do

23   a pat down search of him?

24   **A.**   Yes, sir, for the initial --

25   **Q.**   For the safety of the officer, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Correct.   Typically it is done by the initial

2    officer who asked him to step out.

3    **Q.**   Obviously you have no information that he did other

4    than consent to that pat down search, is that correct?

5    **A.**   That's correct, sir.

6    **Q.**   Then you told us that there was a search done of the

7    trunk of the vehicle?

8    **A.**   That's correct.

9    **Q.**   That's because you got permission to do that from

10   the driver?

11   **A.**   Yes, sir.

12   **Q.**   And when the search was done, there was a bag, like

13   a duffel bag back there?

14   **A.**   Correct sir.

15   **Q.**   And when the duffel bag was exhibited, they were

16   asked whose duffel bag was it?

17   **A.**   Yes.

18   **Q.**   And Devon McClure said it is my duffel bag?

19   **A.**   He didn't say that.  He just said that he had a

20   little bit of marijuana in the duffel bag.  I don't

21   believe he said it's my duffel bag.

22   **Q.**   Okay.  So you said that you reviewed the report.  I

23   will give you the other copy.  You've reviewed the report

24   of Detective Hackney?

25   **A.**   Yes.

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  And I will ask you to turn to Page 3 of that report.

2    **A.**  Yes, sir.

3    **Q.**  Actually it would be the second sentence on Page 3.

4    **A.**  Yes, sir.

5    **Q.**  Does that refresh your recollection that Mr. McClure

6    spoke and stated that it was his bag?

7    **A.**  Yes, sir.  He told Detective Hackney that.  I

8    specifically asked him if there was anything illegal.  He

9    said a little bit of marijuana.

10   **Q.**  But he told -- I mean, Detective Hackney would not

11   have written this in the report if he had not said this is

12   my bag?

13   **A.**  Correct.  He didn't say it to me.  He told Detective

14   Hackney that.

15   **Q.**  He says it is his bag and in the bag is a small

16   amount of marijuana?

17   **A.**  Yes.

18   **Q.**  And some money?

19   **A.**  That's correct.

20   **Q.**  And McClure says it is his money?

21   **A.**  I don't recall that.

22   **Q.**  You have that report in front of you?

23   **A.**  Yes, sir.

24   **Q.**  Take a look at the second paragraph, third sentence

25   down?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Yes, sir, I see it.

2      **Q.**  Do you see where Mr. McClure says the money in the

3  bag was his?

4      **A.**  Yes, sir.

5      **Q.**  Mr. Bailey was not charged obviously with anything

6  in the bag, is that correct?

7      **A.**  That's correct.

8      **Q.**  Now you were -- you were doing this interdiction

9  thing for approximately how long were you involved in

10  this?

11      **A.**  At the Greyhound station?

12      **Q.**  Is that where you were doing it?

13      **A.**  Interdiction was all over of the place.

14      **Q.**  Let's talk about at the Greyhound station.

15      **A.**  Okay.

16      **Q.**  You were stopping vehicles that were suspicious, is

17  that correct?

18      **A.**  Yes.

19      **Q.**  And approximately how many -- Strike that.

20          You would stop approximately 10 vehicles a day,

21  is that correct?

22      **A.**  No, sir, not that many.

23      **Q.**  Never that many, is that right?

24      **A.**  Not 10 a day.

25      **Q.**  Must have been what, two or three?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   Depends.   Some days none.   Some days five.   Some

2     days six or seven.   It varied.

3     **Q.**   Do you remember testifying in this courtroom on --

4     what was the date?   You do remember testifying here on

5     this exact incident, is that correct?

6     **A.**   Yes, sir.

7     **Q.**   Okay.   And do you remember being asked these

8     questions -- and it was actually April 25, 2018.   Do you

9     remember being asked this question and giving this answer

10    on Page 170:

11          And were you stopping numerous vehicles

12    everyday, is that correct?

13          Answer:   Not everyday, but everyday that we

14    worked there.   We didn't work seven days a week, but when

15    we did work there.

16          Question:   Do you know on the evening --

17    probably don't recall that, officer -- but on the evening

18    this occurred, do you know how many vehicles you stopped

19    that day?

20          Answer:   I don't recall, sir.

21          Question:   What would be a typical amount that

22    you would stop on a day that you were working?

23          Answer:   Between our entire unit during that

24    time frame of 2009, 2010, I would say 10 vehicles.

25          Question:   Ten a day?

*15-20652; USA v. EUGENE FISHER, ET AL*

1              Answer:  Yes.

2              Were those the questions that were asked and the

3    answers that you had given?

4    **A.**  I believe you, yes, sir.

5    **Q.**  Did the Charleston Police Department keep any

6    statistics on the racial make up of the people who were

7    stopped pursuant to there interdiction?

8    **A.**  Not that I know of.

9    **Q.**  This car was stopped because the rear taillight was

10   supposedly out, is that correct?

11   **A.**  I believe so.

12   **Q.**  And photos were taken of the vehicle?

13   **A.**  I'm not sure.

14   **Q.**  Look in the report on Page 3.  That would be the

15   first, second, third paragraph, the end that paragraph.  I

16   took a picture of her vehicle.  Do you see that, officer?

17   **A.**  I do.  Detective Hackney must have taken a picture

18   of the vehicle.

19   **Q.**  Are you aware of any picture that exists of a rear

20   taillight being out on that vehicle?

21   **A.**  I don't know.

22              **MR. SPIELFOGEL:**  Thank you.  Nothing further.

23              **THE COURT:**  Thank you, Mr. Spielfogel.

24              **MR. DALY:**  I will question him about a

25   different incident with your permission?  I have no

*15-20652; USA v. EUGENE FISHER, ET AL*

84

```
 1      intention of repeating.

 2                      THE COURT:  Okay.  Fine.

 3                      MR. DALY:  Thank you.

 4

 5                   CROSS EXAMINATION

 6

 7   BY MR. DALY:

 8

 9      Q.  Detective Allen, good morning?

10      A.  Good morning.

11      Q.  Who how are you?

12      A.  Good.  Very well.

13      Q.  Good.  When the government lawyer was asking you

14   questions about the difference between a marked and

15   unmarked vehicle, do you remember him asking you about

16   that?

17      A.  Yes.

18      Q.  Okay.  And essentially the reason why you use an

19   unmarked vehicle is to conceal are identity, right?

20      A.  Correct.

21      Q.  Now I want to ask you questions about the

22   February 8th incident in 2012, okay?

23      A.  Yes, sir.

24      Q.  You said here today that the reason why you went to

25   that particular address is that you received information
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    from other officers that you worked with, right?

2       A.   Yes.

3       Q.   You didn't speak directly with the confidential

4    informant to get that information, correct?

5       A.   I don't believe I did.  I think I got it from

6    another officer.

7       Q.   Okay.  Are you saying that you don't remember, or

8    you don't know?  It can't be both, can it?

9       A.   I don't recall.  It was six years ago.  I reviewed

10   my report, and I think it came from another officer.

11      Q.   That's what you believe today?

12      A.   Yes, sir.

13      Q.   Mr. Spielfogel, my partner, asked you about

14   testifying on April 25, 2018.  Do you remember being in

15   this courtroom?

16      A.   Yes.

17      Q.   And testifying then, correct?

18      A.   Yes.

19           MR. DALY:  This is Page 194.  May I approach

20   the witness?

21           THE COURT:  Yes.

22

23   BY MR. DALY:

24      Q.   February 27, 2018, you testified in this courtroom,

25   correct?  Do you remember that?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  I believe you.  I have been up here a few times.

2    **Q.**  Let me show you a cover sheet of a transcript.

3    **A.**  Yes, sir.

4    **Q.**  The date is February 27, 2018, is that correct?

5    **A.**  Yes, sir.

6    **Q.**  And would you read Page 78 to yourself, the

7    questions beginning at Line 6 down to 14.  Read that to

8    yourself, and if you need to, read any other portion.

9    **A.**  Can you describe --

10   **Q.**  To yourself.

11   **A.**  I'm sorry.  Yes.

12   **Q.**  Have you read that?

13   **A.**  Yes, sir.

14   **Q.**  Okay.  So back when you testified under oath before

15   on February 27th of this year, you were asked the

16   following questions and gave the following answers:

17            Question:  Can you describe how you came to

18   search that address?

19            Answer:  I received information that Adam

20   Halstead who was a resident of Charleston, who I'm

21   familiar with, is a drug user.  He had two individuals

22   from Detroit, Michigan staying there.

23            Question:  Let me stop you.  How did you have

24   that information?

25            Answer:  From a confidential informant.

*15-20652; USA v. EUGENE FISHER, ET AL*

1              That's what you testified to under oath before,

2     correct?

3         A.  Yes, sir.

4         Q.  That's different than what you told the jury today,

5     correct?

6         A.  I believe I told them that I think it came from

7     another officer.  It may have come an informant.  I don't

8     remember.

9         Q.  My question was, is that different than what you

10    told the jury today?

11        A.  I don't believe it was.

12        Q.  You think they are one in the same thing?  Is that

13    what you're telling them?

14        A.  I don't remember where the information came from.

15    If I said that in February, I may have been mistaken or

16    maybe mistaken now.  It either came from a confidential

17    informant or another detective.

18        Q.  Well regardless where the information came from, you

19    knew that Adam Halstead was not only a heavy drug user,

20    but a drug dealer too, right?

21        A.  I don't know if -- I don't know if I knew that at

22    the time or not that he was a drug dealer.

23        Q.  Well, didn't you put that in the report that he was

24    a drug dealer too, that he was selling?

25        A.  I may have.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. DALY:**  May I approach the witness?

2          **THE COURT:**  Yes.

3

4   BY MR. DALY:

5     **Q.**  I will hand you a copy of your report and draw your

6   attention to the top portion of the first paragraph.

7     **A.**  Yes, sir.

8     **Q.**  Did you have information that he was a drug dealer?

9     **A.**  Yes, sir, at that time.

10    **Q.**  All right.  So now you're going to the apartment,

11  and you don't have a search warrant, right?

12    **A.**  Correct.

13    **Q.**  You don't have a arrest warrant, right?

14    **A.**  Correct.

15    **Q.**  The only person that you know for sure at this

16  address potentially is Adam Halstead, correct?

17    **A.**  Upon the information we got, he lived there.  He was

18  the tenant, but he had two other individuals who were also

19  staying there with him.

20    **Q.**  What were the names of the individuals that you had

21  before you went to the apartment?

22    **A.**  Did not have names.

23    **Q.**  Did you have a description of the people, the other

24  people?

25    **A.**  Two guys from Detroit, Michigan.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  Well, that's not very good description, is it?

2      **A.**  The one that I had.

3      **Q.**  I know, but it's not very good.  You don't have

4      height, weight.  You don't know who you're really looking

5      for other than two guys from Detroit?

6      **A.**  Correct.

7      **Q.**  You say that you go to the apartment, and you're

8      with other officers, correct?

9      **A.**  Yes.

10     **Q.**  Two other officers, correct?

11     **A.**  I believe there were four total, me and three

12     others.

13     **Q.**  The four of you are all armed with your sidearms?

14     **A.**  Yes.

15     **Q.**  You go to the door, knock on the door and

16     Mr. Halstead answered the door?

17     **A.**  I believe so.

18     **Q.**  And Mr. Halstead is a white male, correct?

19     **A.**  Yes.

20     **Q.**  And you say to Mr. Halstead we believe that drugs

21     are being sold out of your apartment, one of the first

22     things that you tell him?

23     **A.**  I don't know if it is one of the first things, but

24     that came out.

25     **Q.**  You may have identified yourself who you were,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    right?

2        A.   Yes, sir.

3        Q.   And then maybe the next thing was we're here because

4    we heard we got information that there are drugs being

5    sold out of your apartment, right?

6        A.   Yes.

7        Q.   And essentially what you wanted to do, you tell him

8    you want to search the apartment to look for drugs?

9        A.   Yes.

10       Q.   And then you say, he says sure.  Come on in, right?

11       A.   He didn't say it like that.

12       Q.   Essentially that's what he did?

13       A.   He granted us consent to search the apartment.

14       Q.   After you told him that you were going in to look

15   for drugs, right?

16       A.   No.

17       Q.   And when you searched for drugs, you did find some

18   pills in his apartment, right?

19       A.   We found a half of one Opana pill in the bathroom.

20       Q.   Well, that's a controlled substance?

21       A.   Yes.

22       Q.   You talked about how dangerous it was?

23       A.   Right.

24       Q.   So it's dangerous, and you found it in his

25   apartment, you arrested Mr. Halstead, and hauled him down

*15-20652; USA v. EUGENE FISHER, ET AL*

1    to the police department like you did with Mr. Bailey?

2       **A.**  No, sir.

3       **Q.**  You didn't do that?

4       **A.**  Did not do that.

5       **Q.**  So now once you're in the apartment, you see

6    Mr. Bailey, right?

7       **A.**  Yes.

8       **Q.**  And you say that what you did is you asked him if

9    you could search him, right?

10      **A.**  Initially, I asked if I could pat him down, and he

11   said yes.

12      **Q.**  So you're saying there is a difference between a

13   search and pat down?

14      **A.**  Yes.

15      **Q.**  When you say a pat down, you mean you will ask him,

16   can I pat you down for weapons.  Is that what you say?

17      **A.**  I don't remember if I said those words in that

18   order, but yes, I asked if I could pat him down.

19      **Q.**  Did you use the word "weapons"?

20      **A.**  I don't recall.

21      **Q.**  So you're saying that you asked Mr. Bailey, can I

22   pat you down.  You may have said weapons, and he says,

23   sure.  Go ahead?

24      **A.**  Correct.

25      **Q.**  You pat him down?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Yes.

2      **Q.**  Did you find any weapons?

3      **A.**  I did not.

4      **Q.**  You find what you believe in his pocket to be cash,

5      right?  That's what it felt like, right?

6      **A.**  Yes.

7      **Q.**  Certain amount of cash, right?

8      **A.**  Yes.

9      **Q.**  And did you ask him, can I go in and take out the

10     money?

11     **A.**  I don't remember.

12     **Q.**  You don't remember?

13     **A.**  I doubt I did because I didn't take out the money at

14     that point.

15     **Q.**  So shortly thereafter, you take the money out of his

16     pocket?

17     **A.**  I think at one point I may have pulled it out,

18     looked at it, and put it back in the pocket, but it wasn't

19     taken out and seized and put in our possession until he

20     took it out and threw it.

21     **Q.**  Let's back up for a moment.  Before you find what

22     you believe to be drugs, you found money, right, first?

23     **A.**  Correct.  I believe so.  I believe it was in that

24     order.

25     **Q.**  You pat him down.  You feel what you believe is

*15-20652; USA v. EUGENE FISHER, ET AL*

1    money.  You go in, reach in and pull out the money?

2    　　A.   I don't remember if I pulled it out or not.  I

3    remember I felt money in his pocket.

4    　　Q.   When you felt what you believed to be money in the

5    pocket, you asked him, do you have money?

6    　　A.   I don't remember if I asked him that or not.

7    　　Q.   He told you how much money was in the pocket before

8    you took it out, right?

9    　　A.   No.

10   　　Q.   No didn't you ask him how much money do you have,

11   and he said about $2,000?

12   　　A.   I don't think it was at that point.

13   　　Q.   At some point he told you that, right?

14   　　A.   I have to look at the report.

15   　　Q.   You don't remember?

16   　　A.   I don't.

17   　　Q.   Let me hand you your report to see if that refreshes

18   your recollection.  Read this portion here, sir.

19   　　A.   Yes, sir, I remember now.

20   　　Q.   Okay.  So now you remember that you asked him how

21   much money he had?

22   　　A.   Correct.

23   　　Q.   He told you around 2,000, correct?

24   　　A.   Yes.

25   　　Q.   That was consistent generally speaking with how much

*15-20652; USA v. EUGENE FISHER, ET AL*

1    money he ended up with?

2    **A.**   Yes, sir.

3    **Q.**   All right.  So if he said something like, I got 20

4    bucks, you reach in the pocket and pulled out 2,000, that

5    would be very suspicious?

6    **A.**   It would be very inconsistent.

7    **Q.**   And suspicious both?

8    **A.**   Sure.

9    **Q.**   You take the money out, and you had no reason to

10   keep the money, right?

11   **A.**   Correct.

12   **Q.**   And so you put the money back in his pocket?

13   **A.**   Yes.

14   **Q.**   So now you searched him and found no drugs, right?

15   **A.**   At that point I had not conducted a thorough search

16   of him.

17   **Q.**   Then according to you, after you had gone in and you

18   got the money, you patted him down and he has, Mr. Bailey,

19   drugs on him, you say to him, I want to search you

20   further, right?

21   **A.**   No, sir.  You're wrong about two things.

22   **Q.**   What am I wrong about?

23   **A.**   I had not gone and got any money from him yet.  It

24   was in his pocket, and I had not found any drugs.

25   **Q.**   But ultimately the drugs were on him at that point,

*15-20652; USA v. EUGENE FISHER, ET AL*

1   yes or no?

2      **A.**   At that point?

3      **Q.**   Yes.

4      **A.**   Yes.

5      **Q.**   Okay.  So you're saying that he had drugs on him.

6   He knew that he had drugs on him, and he said go and

7   search me further, right?  Why are you shaking your head

8   no?

9      **A.**   Your question is confusing.

10     **Q.**   What's confusing about it?

11     **A.**   Can you repeat it?

12     **Q.**   Sure.  I'm asking you, he knew, Mr. Bailey, that he

13  had drugs on him according to you at that time, and he

14  said go ahead and search me some more?

15     **A.**   I assume that he knew he had drugs.

16     **Q.**   But he said go ahead and search me some more?

17     **A.**   I asked him -- I asked him later if I could search

18  him further and he said yes, and I found what I believed

19  to be drugs.

20     **Q.**   Okay.  Which ultimately meant there were drugs,

21  right?

22     **A.**   Yes.

23     **Q.**   So you are telling the jury that Mr. Bailey, knowing

24  that he had drugs on him, said go ahead and search me.  I

25  consent to you searching me and find drugs that are on me.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      That's what you're saying?

2          A.  Yes.

3          Q.  So eventually, Mr. Bailey is taken down to the

4      station, right?

5          A.  Yes, sir.

6          Q.  And when get down there by this point you know who

7      he is, Corey Bailey, right?  You determined that?

8          A.  Yes.

9          Q.  You are trying to get a search warrant?

10         A.  Yes.

11         Q.  You were in the process of doing that?

12         A.  Correct.

13         Q.  And then Mr. Bailey voluntarily turns over the

14     pills?

15         A.  Correct.

16         Q.  All right.  Then you talk about transporting

17     Mr. Bailey for an arraignment?

18         A.  Yes.

19         Q.  Which meant that he was charged, right?

20         A.  Yes, sir.

21         Q.  And then you knew the case was dismissed, right?

22         A.  Yes, sir.  I believe I learned it in the last

23     hearing up here.

24              **MR. DALY:**  Nothing further.

25              **THE COURT:**  Thank you, Mr. Daly.


                *15-20652; USA v. EUGENE FISHER, ET AL*

1          Any redirect?

2                    **MR. BILKOVIC:**  Yes, your Honor.  Briefly.

3

4                         **REDIRECT EXAMINATION**

5    **BY MR. BILKOVIC:**

6

7      **Q.**  Mr. Daly asked your a series of questions about

8    where you received the information, and you indicated

9    first you did not think that you directly talked to a

10   confidential informant, correct?

11     **A.**  Correct.

12     **Q.**  And the question was asked of you at a previous

13   hearing was:  Let me stop you.  How did you have that

14   information, and you responded from a confidential

15   informant?

16     **A.**  Yes.

17     **Q.**  He did not ask you, did you talk to the confidential

18   informant, correct?

19     **A.**  Correct.

20     **Q.**  So who was the other officer relaying this

21   information?

22     **A.**  Detective Tagayun.

23     **Q.**  So if the CI talked to a detective, and that

24   detective relayed that information to you, you would have

25   then received the information from the detective and the

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    confidential informant, correct?

2        A.   Correct.

3        Q.   It doesn't mean you talked to the confidential

4    informant?

5        A.   Correct.

6        Q.   Let's talk about the information that you had about

7    two individuals staying there from Detroit.  Did that

8    pique your interest?

9        A.   Yes.

10       Q.   Had Detroit come up in any previous investigations

11   of yours?

12       A.   Numerous.

13       Q.   In what way?

14       A.   At that time until -- continuing up to now, we have

15   a huge problem with individuals from Detroit, Michigan

16   coming to West Virginia to sell pills, meth, heroin.

17   We've encountered dozens and dozens, if not hundreds and

18   arrested a lot of people from Detroit, Michigan selling

19   pills.  Any time we hear that there's individuals in West

20   Virginia involved in drug activity from Detroit, we're

21   immediately interested.  It's a major pipeline running

22   drugs back and forth and has been since I started in 2009

23   and continues today.

24       Q.   When you were dealing with Mr. Halstead that day --

25       A.   Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   -- he was not arrested?

2    **A.**   He was not.

3    **Q.**   Did Mr. Halstead give you a fake name like

4    Mr. Bailey?

5    **A.**   He did not.

6    **Q.**   Did Mr. Halstead have 54 Opana pills shoved up his

7    butt like Mr. Bailey?

8    **A.**   No.

9    **Q.**   Did Mr. Halstead attempt to resist you like

10   Mr. Bailey?

11   **A.**   No, sir, he did not.

12   **Q.**   When you were patting Mr. Bailey down and found the

13   money --

14   **A.**   Yes, sir.

15   **Q.**   -- and he told you that you could continue to pat

16   him down, correct?

17   **A.**   Yes, sir.

18   **Q.**   Do you know when he said that, that if he had

19   realized whether he had shoved the pills far enough up his

20   rectum, that you might not have felt them?  Is that's why

21   he gave you the go ahead?

22   **A.**   It's possible.

23   **Q.**   Because when you did feel them, what did he do?

24   **A.**   When I ran my hand up the crease of his buttocks, he

25   immediately clinched his butt cheeks up, and tried to pull

*15-20652; USA v. EUGENE FISHER, ET AL*

1      away from me, and tried to fight basically.

2          **Q.**  Now at some point he was handcuffed with his hands

3      behind his back?

4          **A.**  Yes, sir, but before he did that, he then shoved his

5      hand up into his buttock area, and attempted shove the

6      pills further up, and I could hear the bag crinkling, and

7      I grabbed him and handcuffed him, and then later we had to

8      handcuff up front because he continued to dig around his

9      butt.

10         **Q.**  In fact, the bag that was recovered, was there

11     anything on that bag?

12         **A.**  Yes, sir.

13         **Q.**  What was on the bag?

14         **A.**  Feces.

15         **Q.**  They weren't your feces or other officers' feces?

16         **A.**  No, sir, it wasn't.

17                **MR. BILKOVIC:**  Nothing further.

18                **MR. FEINBERG:**  Your Honor, I have a couple of

19     questions based on the redirect.

20                **THE COURT:**  Okay.  I'll give you a chance.  A

21     couple of questions mean two.

22

23                        **CROSS EXAMINATION**

24

25     BY MR. FEINBERG:


                      *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  Detective you indicated that Detroit -- the location

2      of Detroit came up in other investigations where hundreds

3      of people were arrested from Detroit and charged with drug

4      crimes, is that correct?

5      **A.**  Dozens upon dozens, if not hitting the level of a

6      hundred or more maybe.

7      **Q.**  A lot?

8      **A.**  A lot.

9      **Q.**  And you have been in the Metro Drug Unit from 2009

10     until -- are you still there?

11     **A.**  No, sir.  December 2017 I was promoted to sergeant

12     and moved back to the patrol division.

13                    **THE COURT:**  Did you want to ask another

14     question?

15                    **MR. FEINBERG:**  I'm sorry?

16                    **THE COURT:**  Did you want to ask another

17     question?

18

19     **BY MR. FEINBERG:**

20     **Q.**  Are you aware that Mr. Robert Brown, a defendant in

21     this case, has never been charged with a drug crime and

22     never convicted of drug crime in West Virginia?

23     **A.**  I'm not positive, but I believe Mr. Brown was

24     charged with a drug crime.  I don't know about the

25     conviction.  I believe so.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Is there any record of that that you have in front

2    of you?

3    **A.**  I've never encountered Mr. Brown.  I believe that

4    from hearing other officers.

5    **Q.**  Not knowing whether or not it's true?

6    **A.**  I believe it's true.  I was not personally involved

7    in it.  I would like to hold back a little as far as my

8    certainty.

9    **Q.**  You have no idea what happened to those alleged

10   arrests or drug crimes?

11   **A.**  I don't know, sir.

12            **THE COURT:**  Thanks, Mr. Feinberg.

13         Thank you, sir.  You may step down.

14            **MR. FEINBERG:**  Thank you, Judge.

15            **THE WITNESS:**  Thank you.

16

17               (Witness excused.)

18

19            **THE COURT:**  We'll take a break.

20

21            (Recess taken at 10:45 a.m.)

22

23         (Proceedings with jury at 11:17 a.m.)

24

25            **THE COURT:**  You can all take a seat, and

                    *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1      we'll continue with the next witness.

 2              MS. FINOCCHIARO:  The government will call

 3      Officer Smith.

 4

 5                      E R I C   S M I T H

 6

 7      being first duly sworn by the Court to tell the truth, was

 8      examined and testified upon his oath as follows:

 9

10              THE COURT:  We will have you begin by having

11      you state your name, and spelling your last name for us.

12              THE WITNESS:  Eric Smith.

13              THE COURT:  Okay.

14

15                      DIRECT EXAMINATION

16

17      BY MR. WECHSLER:

18

19      Q.  Good morning, Mr. Smith -- Officer Smith.  Who do

20      you work for currently?

21      A.  Currently for the University of Charleston a private

22      college.

23      Q.  What do you do there?

24      A.  Director of public safety.  Chief of security.

25      Q.  Move the  microphone closer to you.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   How's that?

2    **Q.**   Fine.  How many people do you oversee?

3    **A.**   I currently oversee nine.

4    **Q.**   Where did you work prior to becoming chief at the

5    University of Charleston?

6    **A.**   Charleston Police Department.

7    **Q.**   How long did you work there?

8    **A.**   Almost 21 years.

9    **Q.**   What were some of the units that you were assigned

10   to?

11   **A.**   I did a fair share of time on the patrol division.

12   I was assigned to a walking beat on the west side of

13   Charleston.  From there I was assigned as a detective in

14   the special enforcement, which was a street crime unit.

15   From there I was transferred out and went to patrol for a

16   little bit like everybody did, and I was assigned to the

17   criminal investigation division.

18   **Q.**   At one point you were on a walking beat?

19   **A.**   Yes, sir.

20   **Q.**   Let me ask you about January 16, 2009.  What unit

21   were you assigned to then?

22   **A.**   I was in the patrol division.  I was between our

23   street crime unit or special enforcement unit, and I was

24   transferred to the criminal investigation division.

25   **Q.**   So turning to that day, did you have reason to

*15-20652; USA v. EUGENE FISHER, ET AL*

1    respond to 601 Park Avenue, Apartment 1, Charleston, West

2    Virginia at approximately 3:45 a.m.?

3    **A.**  Yes.

4    **Q.**  Why did you go to that apartment?

5    **A.**  We were dispatched there as a disturbance call.

6    **Q.**  When you say "we", who is we?

7    **A.**  Metro communication dispatcher dispatched several

8    Charleston police units to that address.

9    **Q.**  Do you recall who responded with you?

10   **A.**  Steve Petty and Rick Edwards and an officer named do

11   Dotson.

12   **Q.**  Do you recall what the disturbance call was for?

13   **A.**  No, I remember it being a disturbance call.  I would

14   have to look at report.  I remember upon arrival you could

15   smell marijuana coming from the apartment.

16   **Q.**  So you smelled marijuana.  Where were you when you

17   smelled the marijuana?

18   **A.**  On the front porch standing at the front of the

19   door.

20   **Q.**  And if you could, describe what 601 Park Avenue is

21   like, if you remember?

22   **A.**  It's a square apartment building.  It's may have

23   been a house years ago.  It was divided into small

24   apartments around it.  Apartment 1 is on the ground floor.

25   **Q.**  Do you know approximately how many apartments are in

*15-20652; USA v. EUGENE FISHER, ET AL*

1    that building?

2        **A.**   I want to say at least five or six.

3        **Q.**   So you smelled marijuana at the front door.  What

4    did you do then?

5        **A.**   We knocked and announced.

6        **Q.**   That you were the police?

7        **A.**   Yes.  We knocked on the door.  We hear somebody

8    reply who is it.  I reply, it's the police.  Please open

9    the door.

10       **Q.**   What happened at that point?

11       **A.**   Once we announced, we could hear commotion going on

12   inside the apartment itself.  We hear people running

13   around, knocking things over.  To the side of the door is

14   a window.  Looking in the window between the blinds, you

15   can see people moving around.  An individual came, and I

16   could see him step up off the couch and asked who was it,

17   and that's when the reply was it's the police.  Please

18   open the door.  After that, a juvenile female opened the

19   door, and motioned for us to come into the apartment.

20       **Q.**   Let me ask you, you said that somebody came to the

21   door and first asked who you were.  Did that person open

22   door after you said it was the police?

23       **A.**   That person did not, but was later identified.

24       **Q.**   So that person who didn't open the door, did you see

25   where they went?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Towards the back of the apartment.

2    **Q.**  He or she?

3    **A.**  He.

4    **Q.**  He went to the back of the apartment.  Was there

5    anybody at the back of the apartment?  Any officers?

6    **A.**  There were officers outside and around.  It was a

7    common -- we responded to this apartment often, and as

8    soon as people started running, and this person going

9    towards the back, I yelled for officers in the back to

10   look out for anyone coming out the back door.

11   **Q.**  You said that you responded to the apartment often.

12   What do you mean by that?

13   **A.**  It's was a very familiar apartment building.  We

14   received calls there quite frequently for disturbances,

15   made many arrests out of this apartment building itself.

16   **Q.**  You say eventually someone opened the door?

17   **A.**  Yes, a juvenile female opened the door and allowed

18   us in.

19   **Q.**  Did you ask her to come in?

20   **A.**  She opened the door stepped back and motioned us in,

21   like inviting us.

22   **Q.**  What do you see when you stepped in the apartment?

23   **A.**  As soon as she opened the door and she stepped back,

24   we stepped in, and the marijuana smell became much greater

25   inside as soon as the door opened up.  What we did was, we

*15-20652; USA v. EUGENE FISHER, ET AL*

1    entered the apartment with the intent to secure it, secure

2    everybody in it, and then go and obtain a search warrant

3    from there.  So our intent was to secure it so no evidence

4    could be destroyed, but going in we could see cutoff

5    baggies, things that indicated that narcotic trafficking

6    was occurring.

7    **Q.**  Let's back up.  You said you went in to secure it.

8    What does it mean to secure a location?

9    **A.**  We want to remove the occupants, make sure it is

10   safe, nobody is armed.  We want to make sure that nobody

11   destroyed any evidence, drugs or anything like that.  What

12   we do, we remove everybody.  Make them stand outside.

13   We'll make sure that they are not armed or don't have any

14   weapons, and make sure nobody can destroy any evidence.

15   In this case, since we could smell marijuana, we didn't

16   want anybody basically flushing marijuana down the toilet.

17   So once we did that, we stepped out of the apartment, and

18   then I went to obtain a search warrant for apartment.

19   **Q.**  Is it fair to say you secured the occupants prior to

20   obtaining a search warrant?

21   **A.**  Yes.

22   **Q.**  So why did you need a search warrant at that point?

23   **A.**  Nobody in the apartment -- we couldn't establish any

24   residency of the apartment that would give us consent to

25   search the apartment.  There were numerous people in

*15-20652; USA v. EUGENE FISHER, ET AL*

1    there, but nobody was renting the apartment.  We were not

2    able to identify anybody that rented the apartment.  So

3    instead of taking it by chance, getting a consent that

4    might get overturned, it's easy to write a search warrant

5    based on the set of facts for the circumstance.

6        Q.  And you talked about securing the location.  Did you

7    go inside yourself and start looking for individuals

8    inside?

9        A.  Yes.  Several of us went in, and people were hiding

10   in the apartment.  We had to clear the apartment, and then

11   work our way back out and make sure we didn't leave

12   anybody behind to destroy the evidence.

13       Q.  Who did you secure from the apartment?

14       A.  Two that I distinctly remember was Arlandis Shy.  He

15   was hiding in a bathroom, and Kenyoda Holmes was hiding

16   behind a trash can next to the refrigerator.

17       Q.  You say Arlandis Shy was hiding in the bathroom.

18   When you say he was hiding, what do you mean?

19       A.  I have to look at the report, but I just remember

20   him hiding in the bathroom behind the door or behind the

21   shower curtain.  He was not using the facilities to

22   relieve himself or take a shower.

23       Q.  And Kenyoda, you said something about a trash can?

24       A.  He was behind a trash can next to the refrigerator

25   trying to hunker down.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  The trash can was not a large --

2    **A.**  No, a small kitchen trash can.

3    **Q.**  Were there other occupants in the apartment?

4    **A.**  There were.  Those I don't recall where they were

5    located at.  I remember that there were, but I don't

6    remember where those were.

7    **Q.**  Tell us about the apartment.  When you went in and

8    securing the individuals, what did the inside of the

9    apartment look like?

10   **A.**  It was a mess.  One of the things that stuck out to

11   me through my experience in street crimes was the cutoff

12   bags, which is an indication that they are using sandwich

13   bags to baggy up narcotics, illegal narcotics.  They will

14   use a portion of the bag, cut the corners off and tie them

15   up.  They will cut the corners off the bag.  That will be

16   the method of distribution.  There were cutoff bags

17   everywhere in the apartment, even some scales.

18   **Q.**  You say some cutoff bags.  Is it a large cutoff bag?

19   **A.**  It's a sandwich bag, and they will fill a corner of

20   the bag up.  In this case instance marijuana.  They would

21   twist if off, tie it up so they would have the amount that

22   they are going to sale prepackaged, say a gram of

23   marijuana at a time, or however much they determined they

24   were going to sale.  They would cut that corner off and

25   melt it.  You got marijuana sealed up in the corner of a

*15-20652; USA v. EUGENE FISHER, ET AL*

1    sandwich bag, and there are two corners.  The rest of the

2    bag is useless.  So they would cut the two corners off,

3    package the marijuana up, and the other bags are laying on

4    floor.

5    **Q.**  When you went in, do you recall if it was five

6    sandwich bags?  How many would there have been?  Do you

7    remember?

8    **A.**  I don't remember the number.  There were a few,

9    quite a few, but I don't remember.

10   **Q.**  Was there furniture?  Did it look like anybody lived

11   there?

12   **A.**  I think there was furniture in it.  I think

13   according to one of the statements or one of the

14   individuals, I think he claimed that he had a relative

15   that lived in it, but moved somewhere else, and they were

16   squatting in it.  I think there was used or broken

17   furniture.  I remember clothes scattered about.

18   **Q.**  Did you, in fact, get that search warrant?

19   **A.**  I did.

20   **Q.**  And so what did you do when you got it?

21   **A.**  Searched the apartment.  With that we observed

22   obviously the baggies.  We found scales, and recovered

23   13 grams of marijuana that was repackaged in eight bags.

24   **Q.**  You said you recovered scales.  What kind of scales

25   were these?  Were they big scales?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   No.   If I remember correctly, I believe it was the

2      small digital scales that you would buy in a tobacco

3      store.   They are commonly used for weighing out the

4      narcotics, whether it be marijuana, crack or heroin.   We

5      find them frequently in locations.   They are cheap and

6      inexpensive.

7      **Q.**   I think you said something that you recovered

8      marijuana as well?

9      **A.**   We did.

10     **Q.**   Tell us about that recovery.

11     **A.**   I think it was in the -- towards the back of the

12     apartment.   I think near where Holmes was located.   It was

13     eight bags, eight individuals bags for resale.   The total

14     weight was 13 grams.

15     **Q.**   What did do with the marijuana?

16     **A.**   We processed it, put it in sealed evidence bags, and

17     dropped it in our drug evidence locker.

18     **Q.**   I will show you what's been marked as Government

19     Exhibit 228 for identification.   Do you recognize this

20     item?

21     **A.**   Yes, sir, I do.

22     **Q.**   What do you recognize that to be?

23     **A.**   The evidence bag that the Charleston Police

24     Department uses for drug evidence.

25     **Q.**   And in that bag, is that the marijuana that was

*15-20652; USA v. EUGENE FISHER, ET AL*

1      taken from the apartment that day?

2          **A.**  Yes, sir.

3                  **MR. WECHSLER:**  Judge move to admit this as

4      Government Exhibit 228.

5                  **THE COURT:**  All right.  Any objection?

6                  **THE WITNESS:**  No objection.

7                  **THE COURT:**  The Court will receive it.  Thank

8      you.

9

10     **BY MR. WECHSLER:**

11         **Q.**  Let me ask you this, was anybody arrested as a

12     result of that marijuana?

13         **A.**  Yes, Holmes and Shy was arrested.

14         **Q.**  Holmes and Shy, were they searched?

15         **A.**  They were.

16         **Q.**  What, if anything, was recovered from them?

17         **A.**  Shy had $940 in U.S. currency, and Holmes had $704

18     in U.S. currency.

19         **Q.**  Do you recall the denomination of this money?

20         **A.**  I don't, but I believe I documented it in the report

21     what the bills were.

22         **Q.**  Would your report refresh your recollection as to

23     what the denominations were?

24         **A.**  It would.

25         **Q.**  Take a look and let us know if that refreshes your

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1   recollection.

2       **A.**   Yes, sir, it does.

3       **Q.**   So the denomination of bills that were recovered

4   from Holmes were what?

5       **A.**   100's, 50's, 20's, some 10's.

6       **Q.**   Do you recall how many 20's, and how many 10's?

7       **A.**   There were 12 20's and one 10, two 50's and two $100

8   bills.

9       **Q.**   And what about Shy?

10      **A.**   He had at least one $100 bill, two 50's, 31 20's,

11  five 10's, 12 5's and 18 ones.

12      **Q.**   Now Chief Smith, you've worked as a police officer

13  for a good amount of time.  During your time as a police

14  officer, have you investigated a lot of narcotic crimes?

15      **A.**   I have.

16      **Q.**   Does anything stand out about certain denominations

17  of bills?

18      **A.**   Yes.  The 20's are very typical.  We would see 20's

19  and 50's in narcotic trafficking.

20      **Q.**   Why would this be?

21      **A.**   It's easy to convert.  A lot of times, especially a

22  lot of the pricing of the narcotics hovers around 20

23  bucks.  When I was in street crimes, a lot of the crack

24  cocaine was $20 for a rock of cocaine.  So we see a lot of

25  20's.  The same for marijuana.  You're talking sometimes

*15-20652; USA v. EUGENE FISHER, ET AL*

1    10 and $20 for a bag of marijuana.

2        Q.  Did you ever learn whose apartment that was?

3        A.  I don't think I did.

4        Q.  Did you ever learn when Arlandis Shy arrived in West

5    Virginia?

6        A.  I believe earlier that day or the day before just

7    prior to the arrest.

8        Q.  How did you learn that?

9        A.  I believe he was speaking to him I think.

10                MR. WECHSLER:  No further questions.  Thank

11    you.

12                THE COURT:  Thank you.  Any cross

13    examination?

14                MR. MAGIDSON:  Yes, your Honor.

15                THE COURT:  All right.

16

17                        CROSS EXAMINATION

18

19   BY MR. MAGIDSON:

20

21        Q.  Detective Smith?

22        A.  I was at one time.  That's fine.  Yes, sir.

23        Q.  Okay.  What is your position now?

24        A.  I'm director of public safety for the University of

25    Charleston.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**   That's right.  All right.  So you no longer are with

2      the police department in Charleston?

3      **A.**   That's correct.

4      **Q.**   So you really don't have any independent

5      recollection of this event, but you're able to refer to

6      your report?

7      **A.**   That's correct.

8      **Q.**   And what you do recall is that you were called to

9      this apartment on Park Street?

10     **A.**   Yes.

11     **Q.**   And you how many other officers responded, five, 10?

12     **A.**   Four or five, and I remember the incident.  I've got

13     to look at the report for details of it, the substance.

14     **Q.**   So five officers responded?

15     **A.**   I believe so.

16     **Q.**   The complaint was for loud noise or --

17     **A.**   I think so.  I would have -- I remember it was a

18     disturbance, but I have to refer to the report.

19     **Q.**   You send five officers to respond to the loud music

20     complaint?

21     **A.**   Sure.

22     **Q.**   Are you armed?

23     **A.**   Yes, sir.

24     **Q.**   And when you got to the apartment, you hear this

25     chaos?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  I have to look to see if I mentioned that in the

2    report.

3    **Q.**  It doesn't stand out?

4    **A.**  It doesn't stand out, but even if we arrived on the

5    scene and didn't hear disturbance, we would knock on the

6    door.

7    **Q.**  So just to make sure that everything is okay?

8    **A.**  Yes, sir.

9    **Q.**  Safety inspection?

10   **A.**  I wouldn't call that a safety inspection, but due

11   diligence.  I was called to this location.

12   **Q.**  All right.  And so you knock on the door, and is

13   this a glass door that you can see inside?

14   **A.**  No, a wooden door.

15   **Q.**  Okay.  So but you knock on the door, and nobody

16   comes right a way?

17   **A.**  That's correct.

18   **Q.**  But you see people running.  Is that what you

19   testified to?

20   **A.**  Yes, the apartment itself --

21   **Q.**  Are you able to see people running?

22   **A.**  I want to explain how the apartment runs.  It goes

23   directly to how I could see into the apartment.  To the

24   side of the door is a window with some broken blinds.  So

25   when you knock on the door, you can look in the apartment.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1      Q.   This apartment is on the street level?

 2      A.   Yes.

 3      Q.   And so you see people running you said.  There's

 4    several people in there?

 5      A.   Yes, sir.

 6      Q.   Several.  I usually think of five to seven?

 7      A.   I don't know.  Probably three to five.  I wouldn't

 8    argue if there were that.  I remember three to five.  I

 9    have to look at the report for the exact number.

10      Q.   Okay.  So were these people scurrying?

11      A.   Correct.

12      Q.   You announce your presence police?

13      A.   Uh-huh.

14      Q.   When you do a knock and announce to investigate, did

15    you have search warrant at that time?

16      A.   No, sir, just knocked on the door.

17      Q.   All right.  So somebody at this point -- are you

18    able to detect the scent of marijuana?

19      A.   Yes, sir.

20      Q.   Is it burnt or fresh marijuana?

21      A.   I have to look at the report.  I don't know if I

22    indicated burnt or green marijuana, but I remember

23    specifically the smell of marijuana.  I didn't indicate

24    either way.

25      Q.   So you smell marijuana.  Do people in West Virginia
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    and Charleston, were they smoking marijuana back then?

2    **A.**  Yes, sir.

3    **Q.**  Fairly common?

4    **A.**  Yes, sir.  It's against the law even in West

5    Virginia.

6    **Q.**  They grow a lot of tobacco down there?

7    **A.**  What's that, sir?

8    **Q.**  Is it similar to tobacco?  They grow tobacco?

9    **A.**  I'm not sure.

10   **Q.**  Okay.  At any rate, it is common thing that people

11   smoke marijuana in Charleston at that time.  Would you

12   agree with that?

13   **A.**  I don't know if I would agree with that.  I don't

14   know what your definition of common would be.  I know that

15   even in 2009 in West Virginia, it was against the law to

16   smoke marijuana regardless whether some people's opinion

17   is that it is common or not common.  I'm not one of those.

18   I don't smoke marijuana, never have.  So not something

19   that I can elaborate to.

20   **Q.**  Did you ever smoke it but not inhale it?

21   **A.**  No, not even in Clinton's era.  To your point

22   marijuana arrests are fairly routine.

23   **Q.**  You eventually gain access to the apartment?

24   **A.**  Sure.

25   **Q.**  People scattered around.  Police come in.  People

*15-20652; USA v. EUGENE FISHER, ET AL*

1     are running around all over?

2        A.   Yes.

3        Q.   And these are basically young people?

4        A.   Yeah.

5        Q.   Eighteen, 19, 20 years old?

6        A.   Sure.  Yes, sir.

7        Q.   And playing loud music and smoking marijuana I'm

8     asking?

9        A.   Sure.

10       Q.   Okay.

11       A.   Well, my only issue is that we've gone down the road

12    characterizing disturbance as loud music, and referring

13    back to the report when looking for the strong odor of

14    marijuana, I didn't characterize it as loud music.  I

15    characterized it as a 911 call for disturbance at that

16    location.  I don't want to stray too far to it being just

17    a common, we're just having a little bit of a house party,

18    and the police show up and harass young kids.  That's not

19    the call that we ran that night.

20       Q.   You don't know what the disturbance was?

21       A.   No.

22       Q.   So there's a bunch of people, several people in the

23    apartment, correct?

24       A.   Sure.

25       Q.   And then you find all of these baggies in there?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yes, sir.

2    **Q.**   And then you go and get a search warrant?

3    **A.**   Yes, sir.

4    **Q.**   Anybody give you permission to come into that place?

5    **A.**   The girl that opened the door and stepped back and

6    motioned, inviting us in.  Based on the fact that

7    people -- we knocked and announced.  When an individual

8    asked who was it, I announced police.  Please open the

9    door, and that's when really all the commotion took place.

10   People started hiding.  We could smell the odor of

11   marijuana outside of the apartment.  When she opened the

12   door to the apartment, that odor of marijuana increased.

13   It was much more stronger inside the apartment, and in

14   plain view is the cutoff baggies.

15   **Q.**   Did you have your guns drawn?

16   **A.**   I don't remember whether the guns are drawn.  I

17   didn't ask them to consent because I didn't think anybody

18   there would give us consent.  So we secured the apartment

19   for a search warrant.

20   **Q.**   So you went into the apartment.  You didn't have a

21   warrant.  You didn't necessarily have consent?

22   **A.**   Yeah, I didn't have consent to search the apartment.

23   We were securing the apartment to obtain a search warrant,

24   which is legal in West Virginia.

25   **Q.**   Ultimately you got a search warrant?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Correct.

2    **Q.**  Did you detain people initially?

3    **A.**  Yes.

4    **Q.**  Did some people leave while you were getting a

5    search warrant?

6    **A.**  We detained everybody, and then I think Holmes and

7    Shy got released about the time we started either

8    searching or found the marijuana right at end of the

9    search, but they were released right before we were done.

10   **Q.**  Some people were released before you were finished

11   with the search?

12   **A.**  Yes, sir.

13   **Q.**  And then you found -- did you get the names of

14   everybody else that were in the apartment?

15   **A.**  You know, I'm not sure.  The copy of the report that

16   I have is not the complete copy that was given.  It was

17   somewhat redacted.  I have to look at the complete 15 page

18   report to see if we had the names.

19   **Q.**  Some of the people that were in that apartment were

20   local people?

21   **A.**  Yes.

22   **Q.**  So the people who got arrested were people from

23   Detroit?

24   **A.**  Correct.

25   **Q.**  Now you found  you said 13 baggies of marijuana?

*15-20652; USA v. EUGENE FISHER, ET AL*

1        **A.**  Eight baggies that weighed 13 grams.

2        **Q.**  Is that considered a large quantity of marijuana in

3    Charleston?

4        **A.**  Large quantity is kind of relative.  With the

5    individual baggies for resale, it qualifies for possession

6    with intent.

7        **Q.**  I understand.  Was that the biggest bust that year

8    in Charleston on marijuana?

9        **A.**  It wasn't mine, no.

10       **Q.**  Okay.  So you had a -- they were bagged in an ounce,

11   is that right?

12       **A.**  It was only 13 grams.  So a half ounce altogether.

13       **Q.**  Making it worst than what it is.

14       **A.**  Yes, sir.

15       **Q.**  All right.  So the marijuana that you found was not

16   on Mr. Shy's person?

17       **A.**  No.

18       **Q.**  The scale that you found in the apartment, did you

19   ever -- was this Mr. Shy's apartment?

20       **A.**  No.  He just came to Charleston.

21       **Q.**  Okay.  He was traveling?

22       **A.**  I assume.

23       **Q.**  Did you determine -- did you take fingerprints on

24   the scales, the bags?  What was the linkage of the

25   marijuana and the scale to Mr. Shy?

*15-20652; USA v. EUGENE FISHER, ET AL*

1       **A.**  I didn't take any fingerprints.

2       **Q.**  So the reason he was charged with that is because he

3    was in the apartment?

4       **A.**  He was in the apartment, and he had a criminal

5    history with narcotics.

6       **Q.**  The other people in the apartment, local people,

7    they were not charged?

8       **A.**  That's correct.

9       **Q.**  The people from outside Detroit, they were charged?

10      **A.**  That's correct.

11      **Q.**  Now you filed a -- these charges, is that correct?

12      **A.**  Yes.

13      **Q.**  And you agree with me that ultimately the case was

14   dismissed?

15      **A.**  I think so.  I'm not sure.

16              **MR. MAGIDSON:**  If I may have just one moment.

17              **THE COURT:**  Yes.

18              **MR. MAGIDSON:**  Nothing further, your Honor.

19              **THE COURT:**  All right.

20              **MR. WECHSLER:**  Very briefly.

21              **THE COURT:**  Okay.

22

23                      **REDIRECT EXAMINATION**

24

25   **BY MR. WECHSLER:**

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  Chief Smith, if you had recovered significant sums

2   of money in small denominations from other individuals in

3   the apartment, would you have noted that in your report?

4      **A.**  Yes, sir, I would have.

5      **Q.**  And how would that have affected who you actually

6   arrested?

7      **A.**  It probably would have -- another individual with a

8   large sum of money in small denominations probably would

9   have been arrested as well.

10      **Q.**  So is it fair to say it was not just because they

11   were from Detroit that he was arrested?

12      **A.**  It was a factor of issues there.  That's correct.

13              **MR. WECHSLER:**  Judge if I could, we have not

14   done it in this case yet, could we show this to the jury

15   so they can see?

16              **THE COURT:**  You may publish.

17              **MR. WECHSLER:**  No further questions.

18              **THE COURT:**  Any cross?  No recross?  I guess

19   not.

20              **MR. MAGIDSON:**  Nothing further.

21              **THE COURT:**  You may step down, sir.

22

23                    (Witness excused.)

24

25              **MS. FINOCCHIARO:**  At this time the government

                *15-20652; USA v. EUGENE FISHER, ET AL*

1  calls Officer Karseen.

2          **THE COURT:**  Okay.

3

4                **C O R Y   K A R S S E N**

5

6  being first duly sworn by the Court to tell the truth, was

7  examined and testified upon his oath as follows:

8

9          **THE COURT:**  We will have you begin by stating

10  your name and spelling your last name.

11          **THE WITNESS:**  Cory Karssen, K-a-r-s-s-e-n.

12          **THE COURT:**  Thank you.

13

14                **DIRECT EXAMINATION**

15

16  **BY MR. BILKOVIC:**

17

18    **Q.**  Make sure you're close enough to the mic.  Thank

19  you.

20          Can you tell the jury how you are employed?

21    **A.**  Sergeant with the Detroit Police Department.

22    **Q.**  How long have you been employed with the Detroit

23  Police Department?

24    **A.**  Twenty-three years.

25    **Q.**  And what do you do as a sergeant?

                *15-20652; USA v. EUGENE FISHER, ET AL*

127

1    **A.**  Currently work for the traffic enforcement unit.

2    **Q.**  Prior to working with the traffic enforcement unit,

3    what other things did you do with Detroit Police

4    Department?

5    **A.**  I worked narcotics for most of my career, and I

6    worked special operations in the Ninth Precinct.

7    **Q.**  The Ninth Precinct is located where?

8    **A.**  Gratiot and Gunston.

9    **Q.**  So would the Ninth Precinct -- so one of the areas

10   within the Ninth Precinct would be Seven to Eight Mile and

11   Gratiot to Hayes?

12   **A.**  Yes.

13   **Q.**  Taking your attention back to April 13, 2007, did

14   you have an opportunity on that day to go to a residence

15   at 14177 Collingham in the city of Detroit?

16   **A.**  Yes, sir.

17   **Q.**  And without getting into the specific nature of it,

18   what was the general reason to go to that location?

19   **A.**  Seeking out Mr. Corey Bailey.

20   **Q.**  Were you with anybody when you went there?

21   **A.**  Officer Gary Bickley and Carlos Chapman.

22   **Q.**  What did you do when you arrived at that location?

23   **A.**  Knocked on the front door.

24   **Q.**  Anybody answer the door?

25   **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Do you recall who answered the door?

2    **A.**  If I can refer to my report.

3    **Q.**  That's fine.

4    **A.**  It was Mrs. Keisha Bembry.

5    **Q.**  Keisha Bembry?

6    **A.**  Yes, sir.

7    **Q.**  When she answered the door, did you tell her what

8    you were there for?

9    **A.**  I identified myself as a police officer, and asked

10   are her if she lived there.

11   **Q.**  What did she say?

12   **A.**  She stated yes, and I asked her if Corey Bailey

13   lived there, and if he was home.

14   **Q.**  And she said?

15   **A.**  She said that he did, and she did not know if he was

16   home.

17   **Q.**  What happened at that point?

18   **A.**  Ms. Bembry had allowed us entry into the house, and

19   we asked if we could see if Mr. Bailey was there, and she

20   said yes.

21   **Q.**  So then all three officers come into the house?

22   **A.**  We were in the house.

23   **Q.**  What did you do?

24   **A.**  Began to go through house looking for Mr. Bailey.  I

25   could smell what I believed was marijuana coming from the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    basement, and I went to the basement and discovered a

2    bedroom down there where Mr. Bailey was.

3      **Q.** Was Mr. Bailey -- when talking about Mr. Bailey,

4    we're talking about Corey Bailey?

5      **A.** Yes.

6      **Q.** Was he down there with himself or with another

7    person?

8      **A.** Another young lady.

9      **Q.** Where was he at?

10     **A.** He was laying on the bed which was an air mattress.

11     **Q.** What did you do at that point?

12     **A.** Made entry in the room, and I walked to the opposite

13   side of the bed, and Officer Bickley was also in there

14   with me.

15     **Q.** And what did you do when you got into that room?

16     **A.** When I got around the side of the mattress, I

17   observed a small sawed-off shotgun on the floor.  Officer

18   Bickley -- we asked Mr. Bailey to come off the bed, which

19   he did, and Officer Bickley placed him in custody, and I

20   recovered the weapon.

21     **Q.** What did you do with the weapon?

22     **A.** Placed it on evidence.

23     **Q.** Did you make any other observations when you were

24   down in the basement area?

25     **A.** I did.  I observed on an entertainment center, just

*15-20652; USA v. EUGENE FISHER, ET AL*

1      in front of the bed, suspected crack cocaine and

2      marijuana, eight knotted zip locks and one ziplock of

3      marijuana.

4          Q.  You said that you saw suspected crack cocaine and

5      marijuana?

6          A.  Yes.

7          Q.  Where was that located?

8          A.  Just on the shelf on top of the entertainment

9      center.

10         Q.  The entertainment center was in the area that you

11     described as the bedroom?

12         A.  Yes.

13         Q.  Did you have use your flashlight or anything to see

14     that?

15         A.  It was in plain view.

16         Q.  Describe the suspected crack cocaine.

17         A.  Just eight knotted plastic wraps separately packaged

18     and one ziplock of marijuana.

19         Q.  Did you field test the crack cocaine?

20         A.  No, we don't field test at the scene, but it was

21     taken to the narcotic section where it was tested.

22         Q.  Okay.  So was the cocaine and marijuana preserved?

23         A.  Yes.

24         Q.  Sent to the lab for processing?

25         A.  That's correct.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  How far was the air mattress from the entertainment

2    center approximately?

3    **A.**  A foot right in front of it.

4    **Q.**  I have given you a box that's marked Government

5    Proposed Exhibit 169.  Do you recognize that?

6    **A.**  Not the box itself.

7    **Q.**  The contents of the box?

8    **A.**  Yes.

9    **Q.**  What's that?

10    **A.**  That's the shotgun that was on the floor.

11          **MR. BILKOVIC:**  Your Honor, move for admission

12    of Government Proposed Exhibit 169.

13          **THE COURT:**  Any objection?

14          **MR. DALY:**  No, sir.

15          **THE COURT:**  The Court will receive the item.

16

17    **BY MR. BILKOVIC:**

18    **Q.**  Would you step down with that, and hold the box up

19    so the jury can see it?

20    **A.**  Sure.

21    **Q.**  Step down and get a little closer and hold it up a

22    little more.  You can sit back down.

23          Now that box contains two pieces?

24    **A.**  Correct.

25    **Q.**  What are the two pieces?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   That's the barrel and the receiver.

2    **Q.**   And were those together as one when you found it?

3    **A.**   Yes, all in tact.

4    **Q.**   What was done with Mr. Bailey?

5    **A.**   He was arrested.

6         **MR. BILKOVIC:**  Nothing further.

7         **THE COURT:**  Thank you.  Mr. Daly?

8         **MR. DALY:**  Thank you.

9

10              **CROSS EXAMINATION**

11

12   **BY MR. DALY:**

13

14   **Q.**   Good afternoon.

15   **A.**   Good afternoon.

16   **Q.**   We're talking about an incident that happened in

17   2007, is that correct?

18   **A.**   Yes, sir.

19   **Q.**   And you have your report that you are using to

20   refresh your recollection about the details, correct?

21   **A.**   Correct.

22   **Q.**   You had information that Corey Bailey was living at

23   the 14177 Collingham address, correct?

24   **A.**   Correct.

25   **Q.**   And before you went to that address, did you have

                *15-20652; USA v. EUGENE FISHER, ET AL*

1     any information about a drug complaint related to that

2     address?

3         **A.**  No, sir.

4         **Q.**  Had you done any street surveillance of that address

5     for drug activity?

6         **A.**  No, sir.

7         **Q.**  And did you do any buy and busts at that address

8     before you went there on that date?

9         **A.**  No.

10        **Q.**  Did you have a search warrant to go look for drugs

11    at that address before you went there?

12        **A.**  No, sir.

13        **Q.**  So you and how many other officers arrived?

14        **A.**  Two.

15        **Q.**  And I assume that you're armed?

16        **A.**  Correct.

17        **Q.**  And once you get there, one of you, presumably you,

18    knock on the door, correct?

19        **A.**  Correct.

20        **Q.**  And you said a woman Keisha Bembry came to the door?

21        **A.**  Yes, sir.

22        **Q.**  And she was a young black female?

23        **A.**  Correct.

24        **Q.**  And you said to her, do you live here?  That was

25    your first question?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  And she said yes, right?

3    **A.**  Correct.

4    **Q.**  And then you said, does Corey Bailey live here,

5    correct?

6    **A.**  Correct.

7    **Q.**  And she said yes?

8    **A.**  Correct.

9    **Q.**  Which confirmed the information that you had

10   already?

11   **A.**  Yes.

12   **Q.**  And then did you tell her why you were there other

13   than looking for Mr. Bailey?

14   **A.**  No.

15   **Q.**  Okay.  And so did you ask her if you could come in

16   and look for Mr. Bailey?

17   **A.**  Yes.

18   **Q.**  According to you she said yes?

19   **A.**  That's correct.

20   **Q.**  And do you remember there were other females at that

21   house?

22   **A.**  I do recall the other young lady downstairs.

23   **Q.**  Do you recall that there was an older woman on the

24   first floor whose last name was Smith?

25   **A.**  I don't recall that.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  She could have been there, but right now you just
2      don't remember, is that a fair statement?
3      **A.**  Yes, it is.
4      **Q.**  So once you get inside, you smell marijuana -- or
5      what you believe to be marijuana smoke.  You smelled that
6      many, many times before?
7      **A.**  Correct.
8      **Q.**  You smelled the marijuana.  You believe it's coming
9      from the basement, and you go down there?
10     **A.**  Yes.
11     **Q.**  Did you have your flashlight with you at the time?
12     **A.**  Yes.
13     **Q.**  Can you tell the jury now going back to April 13,
14     2007, did you have any independent recollection whether or
15     not you were using the flashlight when going in the
16     basement?
17     **A.**  I do not.
18     **Q.**  So it is clearly possible it was dark down there,
19     and you needed your flashlight?  That's possible, isn't
20     it?
21     **A.**  It's possible for the first entry part of the
22     basement.  Yes, it is.
23     **Q.**  And then once you get down there, you see
24     Mr. Bailey, and he is lying down on a mattress, is that
25     right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  And there's a young lady that is sitting on the end

3    of the mattress, is that correct?

4    **A.**  Yes.

5    **Q.**  What was her name?

6    **A.**  I have to refer to the report.

7    **Q.**  Sure.  Monica Jones?

8    **A.**  Yes, I believe that's correct.

9    **Q.**  That's what's in your report?

10   **A.**  Yes.

11   **Q.**  So you see Mr. Bailey there, and you don't see a

12   weapon at the first initial point?

13   **A.**  Correct.

14   **Q.**  You state to Mr. Bailey stand up, right?

15   **A.**  Correct.

16   **Q.**  He stands up.  He does what you tell him to do?

17   **A.**  Yes.

18   **Q.**  And you immediately cuff him?

19   **A.**  Officer Bickley did.

20   **Q.**  In your presence?

21   **A.**  Correct.

22   **Q.**  And then once he is off the mattress and under

23   arrest handcuffed is when you see the weapon that we have

24   in court?

25   **A.**  Actually it was simultaneous.  I saw the weapon as

*15-20652; USA v. EUGENE FISHER, ET AL*

1    we were -- Mr. Bailey was getting off the mattress.

2    Q.  So did you retrieve of the weapon yourself?

3    A.  I did.

4    Q.  One of the first things that you want to do is

5    determine whether or not it is loaded?

6    A.  That's correct.

7    Q.  This weapon was not loaded?

8    A.  I believe not, sir.

9    Q.  Had it been loaded, you would have indicated that in

10   your report?

11   A.  Right.

12   Q.  And there's nothing in the report that indicates

13   that it was loaded, right?

14   A.  Right.

15   Q.  Did you ever test fire this weapon to see if it

16   worked?

17   A.  Not me personally, no.

18   Q.  Do you have any evidence that anybody else test

19   fired this weapon?

20   A.  I have no knowledge if the lab tested it or not.  I

21   don't know.

22   Q.  And it is sort of a raggedy old piece of firearm,

23   isn't it?

24   A.  It could kill you.

25   Q.  If it worked?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  You don't know if it works or not, do you?

3    **A.**  At this point looking at it, no, I don't.

4    **Q.**  It can't kill you if it's not loaded unless you try

5    to hit somebody with it?

6    **A.**  It was not loaded at the time.

7    **Q.**  Now did you seize any money from Mr. Bailey?

8    **A.**  I did not.

9    **Q.**  Did you seize any money in the immediate area?

10   **A.**  I did not.

11   **Q.**  Do you know what cut is?

12   **A.**  Cut.

13   **Q.**  Cut?

14   **A.**  Street word, yes.

15   **Q.**  What does the word "cut" mean?

16   **A.**  Used it to cut up narcotics.  Weaken it to make more

17   volume.

18   **Q.**  Is that common when you get a certain amount of

19   drugs, a drug dealer will cut it with power, whatever to

20   increase the volume?

21   **A.**  That's correct.

22   **Q.**  Make more money?

23   **A.**  Correct.

24   **Q.**  Did you find any cut?

25   **A.**  I didn't look for it.  I did not find any.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Any razors that might be used to mix cut with

2    cocaine?  Did you see of that?

3    **A.**  I did not.

4    **Q.**  Any ledgers?

5    **A.**  No, sir.

6    **Q.**  So the only male that was present was Mr. Bailey in

7    the house?

8    **A.**  That's correct.

9    **Q.**  And marijuana that you found was consistent with

10   personal use?

11   **A.**  One ziplock.  So it's possible, yes.

12   **Q.**  Consistent with personal use, one ziplock?

13   **A.**  Sure.

14   **Q.**  Also consistent with what you smelled, right?

15   **A.**  Correct.

16              **MR. DALY:**  Nothing further.

17              **THE COURT:**  Thank you, Mr. Daly.

18         Any redirect?

19              **MR. BILKOVIC:**  Just briefly.

20

21                      **REDIRECT EXAMINATION**

22

23   BY MR. BILKOVIC:

24

25      **Q.**  Did you recover a crack pipe near Mr. Bailey?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1       **A.**   No, sir.

2       **Q.**   Now Mr. Daly asked you questions about that you

3       weren't there investigating any type of drug case.   You

4       were there for a reason though?

5       **A.**   Yes.

6       **Q.**   What were you there for?

7       **A.**   To arrest Mr. Bailey.

8       **Q.**   For what?

9       **A.**   Originally for malicious destruction of a property

10      complaint.

11      **Q.**   Malicious destruction of what?

12      **A.**   Complaint.

13      **Q.**   Now there was also -- he asked you question about

14      that weapon being a raggedy weapon, and you said that it

15      could kill you assuming it is operable, correct?

16      **A.**   Correct.

17      **Q.**   You said the barrel was sawed-off.   It was a

18      sawed-off shotgun.   Are you familiar with sawed-off

19      shotguns?

20      **A.**   Yes, sir.

21      **Q.**   What is a sawed-off shotgun?

22      **A.**   Just what you see, a short barrel shotgun.

23      **Q.**   Does it come like that when you buy it?

24      **A.**   No, somebody cut it off.

25      **Q.**   What is the purpose that somebody would want to cut

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1     up the barrel of a shotgun?
2         A.   Conceivable.
3                  MR. BILKOVIC:  Nothing further.
4                  MR. DALY:  May I ask a question based on the
5     questions that were asked?
6                  THE COURT:  Yes.  Did I ask you how many
7     questions?
8                  MR. DALY:  You can.
9
10                    RECROSS EXAMINATION
11
12    BY MR. DALY:
13
14        Q.   When the government lawyer asked you about an
15    incident, you made reference to a malicious destruction of
16    property crime?
17        A.   Yes, sir.
18        Q.   So you were at the Ninth Precinct before you came to
19    the address?
20        A.   Correct.
21        Q.   And a woman came in and made a complaint at the
22    desk, right?
23        A.   Yes.
24        Q.   You were present, but you were not actually speaking
25    to the woman, right?
```

1      **A.**  Yes.

2      **Q.**  You overheard her say something including the name

3      Corey Bailey, right?

4      **A.**  Yes.

5      **Q.**  And she said something about her car being damaged,

6      right?

7      **A.**  Yes, sir.

8      **Q.**  And you didn't try to verify whether or not she was

9      telling the truth about that, did you?

10     **A.**  No, sir.

11     **Q.**  You didn't go out and look at the car to see if it

12     was damaged?

13     **A.**  No.

14     **Q.**  You didn't know how it was damaged, right?

15     **A.**  Just from what she said, just on her words.

16     **Q.**  Just on her words.  You didn't know if it was truth.

17     She could have come in and been lying?

18     **A.**  I mean, anything is possible, but I don't see why.

19     **Q.**  Are you saying that nobody ever comes in the

20     precinct to file a false police report?

21     **A.**  No, I'm not saying that.

22     **Q.**  That does happen, right?

23     **A.**  Sure.

24     **Q.**  People come in and make claims that are far from the

25     truth, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Yes.

2      **Q.**  And sometimes the police act on information that

3    ends up not being true.  People lie?

4      **A.**  Yes, sir.

5              **MR. DALY:**  Nothing further.

6              **THE COURT:**  Thank you.  You may step down.

7              **THE WITNESS:**  Thank you.

8

9                    (Witness excused.)

10

11            **MS. FINOCCHIARO:**  At this time the government

12    calls Officer Green.

13

14                **L A V A R   G R E E N**

15

16    being first duly sworn by the Court to tell the truth, was

17    examined and testified upon his oath as follows:

18

19            **THE COURT:**  We will have you begin by having

20    you state your name, and spell your last name.

21            **THE WITNESS:**  Lavar Green, G-r-e-e-n.

22

23                  **DIRECT EXAMINATION**

24

25    BY MS. FINOCCHIARO:

                *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**   Good afternoon, officer.

2      **A.**   Good afternoon.

3      **Q.**   Where do you work?

4      **A.**   Detroit Police Department.

5      **Q.**   How long have you worked for the Detroit Police

6    Department?

7      **A.**   Close to 16 years now.

8      **Q.**   What is your current assignment?

9      **A.**   Police officer training staff with Detroit Police

10   Academy.

11     **Q.**   You're a teacher there?

12     **A.**   Yes.

13     **Q.**   What to you teach?

14     **A.**   Physical training and physical tactics.

15     **Q.**   How long have you been teaching at the academy?

16     **A.**   Over a year.

17     **Q.**   Prior to teaching at the academy, what part of the

18   Detroit Police did you work?

19     **A.**   DEA task force.

20     **Q.**   How long were you at that task force?

21     **A.**   Over three years.

22     **Q.**   Can you describe to the jury what you did with the

23   task force?

24     **A.**   With the DEA task force we were going after guys,

25   enforcing drug laws and any narcotics traffickers.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  And prior to being with the DEA task force, what
2    other units were with at DPD?
3    **A.**  Narcotics and worked at special operations and gang
4    squad.
5    **Q.**  Starting with narcotics, what did you do with
6    narcotics?
7    **A.**  With narcotics, going after lower drug traffickers.
8    **Q.**  Lower level drug traffickers?
9    **A.**  Correct.
10   **Q.**  You said special operations.  What was that?
11   **A.**  Special operations was plain clothes unit at the
12   local precincts.
13   **Q.**  And the gang squad unit?
14   **A.**  That's correct.
15   **Q.**  What did you do with gang squad?
16   **A.**  Gang squad focused on guns, dope and organized
17   gangs.
18   **Q.**  So I want to talk to you about August 18, 2012.
19   What unit were you in at that time?
20   **A.**  Special operations, at the Ninth Precinct.
21   **Q.**  Where is the Ninth Precinct located in Michigan?
22   **A.**  Gratiot and Gunston in Detroit.
23   **Q.**  East side?
24   **A.**  Yes.
25   **Q.**  So did you have an encounter in the area of 14711

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Tacoma Street?

2        **A.**   Yes, I did.

3        **Q.**   What were you doing in that area?

4        **A.**   At that area that day we were actually on a -- just

5    a follow up investigation from complaints in the area as

6    far as narcotics being sold.

7        **Q.**   Complaints in the area for narcotics?

8        **A.**   Yes.

9        **Q.**   So when in that area, what are you patrolling?

10   What's happening?

11       **A.**   Actually I had my partners drop me off.  I

12   approached the rear of the location because as far as the

13   tips of drugs being sold towards the rear or front of that

14   location.

15       **Q.**   So at that location 14711 is where you were called

16   out to?

17       **A.**   Yes.

18       **Q.**   You said your partners dropped you off.  First were

19   you in a marked police or unmarked?

20       **A.**   Semi-marked black Crown Vic with lights in the

21   interior.

22       **Q.**   How many partners did you have with you that day?

23       **A.**   Two.

24       **Q.**   Who were they?

25       **A.**   Officer Morris and Officer Gaines.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  And sir, were in uniform like today?

2    **A.**  No.

3    **Q.**  What were you in?

4    **A.**  As far as like plain clothes, blue jeans, regular

5    shirt with my badge visible around my neck.

6    **Q.**  If you were approaching someone, they would notice

7    that you were a police officer?

8    **A.**  Yes.

9    **Q.**  They dropped you off.  Before we get into what

10   happened, can ask you describe that area of 14711 Tacoma?

11   **A.**  It's a residential street.

12   **Q.**  How about that specific location?

13   **A.**  Specific location was a vacated residence.

14   **Q.**  How could you tell it was vacant?

15   **A.**  The house itself, certain parts of it, the grass was

16   unkept, certain windows were broken out, certain parts of

17   the house had boards on it.

18   **Q.**  Were you familiar with that house and street?

19   **A.**  Yes.

20   **Q.**  Approximately what time of day was this that you

21   were out there?

22   **A.**  This was during the afternoon.

23   **Q.**  So you get out of the car, you approach the house.

24   What happened?

25   **A.**  Once I started to approach the house, I observed a

*15-20652; USA v. EUGENE FISHER, ET AL*

1    white male with money in his hand.  As I looked at the
2    male, he starts to walk towards the black male, and they
3    start to exchange.  At this time I recognized the person
4    as Corey Bailey.
5        Q.  You said there was a white male and a black male?
6        A.  Correct.
7        Q.  The black male was who?
8        A.  Corey Bailey.
9        Q.  What did you see what happened between the two
10   individuals?
11       A.  Exchanging.  I couldn't see what they were
12   exchanging.  The white guy had money in his hand, and
13   Corey Bailey was accepting the money, and ready to
14   exchange, and Mr. Bailey took off running.
15       Q.  Does this interaction have a particular name?
16       A.  A narcotic transaction was taking place.
17       Q.  Had you seen those type of transactions before on
18   your job?
19       A.  Yes.
20       Q.  Is that a common way for drugs to be sold in
21   Detroit?
22       A.  Yes, hand to hand transaction.
23       Q.  So you said the individual was Mr. Corey Bailey.
24   Did you know Mr. Bailey at the time that you saw him?
25       A.  Yes, I've investigated Mr. Bailey on other

*15-20652; USA v. EUGENE FISHER, ET AL*

1    occasions.

2    **Q.**   So what happened after you saw this interaction?

3    **A.**   Once I saw the interaction, Mr. Bailey took off

4    running from me.  I actually started to chase after

5    Mr. Bailey, and he actually took his hand and placed the

6    suspected narcotics on top of a garbage can on the

7    driveway.

8    **Q.**   So first off, where in the area of the house where

9    this transaction going on?

10   **A.**   I was in the rear, and he was towards the side of

11   the house.  So once he ran past the driveway towards the

12   front of the house, that's when he took his hand and

13   placed the narcotics on top of a garbage can.

14   **Q.**   As you approached, did you see if Mr. Bailey saw

15   you?

16   **A.**   Yes.

17   **Q.**   And you say that he took off running?

18   **A.**   That's correct.

19   **Q.**   And at a certain point he approached the side of the

20   house and dropped items where?

21   **A.**   On top of a garbage can.  It was full at the time.

22   So the garbage can was open.  It was a big city black

23   garbage can.  It was opened.  So when he placed it on top,

24   the garbage was full.  So it set right on top of the

25   garbage can.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.** Once you saw that occur, what did you do next?

2    **A.** I pursued Mr. Bailey on foot.  I detained him on the

3    next block on Manning Street.

4    **Q.** As you pursued him, did you radio for backup to try

5    to get other help?

6    **A.** Yes, I informed my partners, and at that time they

7    begin to bring the scout car around.

8    **Q.** You caught up with Mr. Bailey?

9    **A.** Yes.

10   **Q.** Where at?

11   **A.** On Manning Street.

12   **Q.** How far was that from the house where --

13   **A.** We went actually directly on the next street between

14   a couple of houses.  I would say between, like -- not so

15   many feet, but so many houses.  Three to four, maybe five

16   or six houses.

17   **Q.** So once you caught up with Mr. Bailey, what

18   happened?

19   **A.** I walked him back to the scout car, and placed

20   Mr. Bailey in the scout car.  I walked back to recover the

21   suspected narcotics.

22   **Q.** You arrested Mr. Bailey when you caught up with him?

23   **A.** Yes.

24   **Q.** At that time did you search him?  Do you recall?

25   **A.** Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**   Did you find anything on his person?

2      **A.**   No.

3      **Q.**   You said that you walked him back to the scout car.

4      Why did you do that?

5      **A.**   Walk him back to the scout car to turn him over to

6      my partners.

7      **Q.**   What was the next step that you took?

8      **A.**   Recovered the narcotics from the garbage can.

9      **Q.**   Is that the garbage can that you saw him throw the

10     item in?

11     **A.**   Yes.

12     **Q.**   You described it before that the garbage can was

13     full?

14     **A.**   That's correct.

15     **Q.**   Now the items that you recovered, you said they were

16     on top?

17     **A.**   Yes.

18     **Q.**   Was there anything on top of those items, debris,

19     anything like that?

20     **A.**   No.

21     **Q.**   What did you do once you recovered the two items

22     from the garbage can?

23     **A.**   Placed the items on evidence.

24     **Q.**   What were the two items that you recovered?

25     **A.**   It was heroin and cocaine.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  What happened with Mr. Bailey that day after you

2    recovered the items?

3    **A.**  Mr. Bailey was conveyed to the Ninth Precinct  for

4    processing, and he was also wanted for an outstanding

5    warrant for dangerous drugs.

6    **Q.**  You said there are two different types of drugs

7    recovered?

8    **A.**  That's correct.

9    **Q.**  I will show you what's been marked as Government

10   Exhibit 297 for identification.  Officer Green can you

11   describe to the jury what we have in Exhibit 297?

12   **A.**  Sixteen small plastic packets of crack cocaine.

13   Also 14 small packets of heroin.

14   **Q.**  Flip that over.  What's in this particular bag?

15   **A.**  In this one I have the small lotto packs of heroin.

16   **Q.**  This is what you recovered from the garbage can

17   after you saw Mr. Bailey throw it in there?

18   **A.**  Yes.

19                **MS. FINOCCHIARO:**  Move for admission of

20   Exhibit 297.

21                **THE COURT:**  Any objection?

22                **MR. DALY:**  No objection.

23                **THE COURT:**  Thank you.  The Court will

24   receive it.

25                **MS. FINOCCHIARO:**  Permission to publish to

*15-20652; USA v. EUGENE FISHER, ET AL*

1    the jury?

2              **THE COURT:**  Yes.

3

4    **BY MS. FINOCCHIARO:**

5        **Q.**  I will have step down and show the jury what it is

6    that you have in this bag.

7              Now you described it as lotto packs of heroin?

8    What do you mean by lotto packs?

9        **A.**  On the street the narcotics sales, what a lot of

10   guys do, once they play the lottery or they buy lottery

11   tickets, they break them off in small square pieces, and

12   place the heroin inside, power heroin, and then they fold

13   it up.

14       **Q.**  Look how this is packaged.  What does that indicate

15   to you?

16       **A.**  Narcotics sales.

17       **Q.**  Now showing you what's been marked as Exhibit 298

18   for identification.  What is that item?

19       **A.**  This is the 16 plastic bags of cocaine.

20       **Q.**  What kind of cocaine was it?

21       **A.**  Crack cocaine.

22       **Q.**  Is this what you recovered from the garbage can that

23   you saw Mr. Bailey throw it into?

24       **A.**  Yes.

25              **MS. FINOCCHIARO:**  Move for admission of

                    *15-20652; USA v. EUGENE FISHER, ET AL*

 1       Government Exhibit 298.

 2                    THE COURT:  Okay.  Any objection?

 3                    MR. DALY:  No.

 4                    THE COURT:  Thank you.  The Court will

 5       receive it.

 6                    MS. FINOCCHIARO:  Permission to publish to

 7       the jury?

 8                    THE COURT:  Yes.

 9

10   BY MS. FINOCCHIARO:

11       Q.  Officer Green, looking at Government Exhibit 298,

12       how is this packaged?

13       A.  Also for narcotics sales.

14                    MS. FINOCCHIARO:  No further questions, your

15       Honor.

16                    THE COURT:  Thank you, Ms. Finocchiaro.

17              Mr. Daly?

18                    MR. DALY:  Thank you.

19

20                    CROSS EXAMINATION

21

22   BY MR. DALY:

23

24       Q.  Officer Green, you went to the back of this

25       particular address to see what you could see, right?

                   15-20652; USA v. EUGENE FISHER, ET AL

1      **A.**   To see what I could see?

2      **Q.**   Yes.   To see if you could see if anything was going

3      on?

4      **A.**   That's correct.

5      **Q.**   And you went by yourself, right?

6      **A.**   That's correct.

7      **Q.**   When you go to the back of the house, you said you

8      could see Mr. Bailey inside of the house, right?

9      **A.**   No.

10     **Q.**   At the door?

11     **A.**   No.

12     **Q.**   I thought you that said that he was at the side door

13     leaning out?

14     **A.**   No.   Mr. Bailey was outside.   He was in the rear of

15     the location.

16     **Q.**   In the rear or at the rear?

17     **A.**   In the rear of the location.   Not inside of the

18     house.

19     **Q.**   So outside?

20     **A.**   Correct.

21     **Q.**   But at the back?

22     **A.**   That's correct.

23     **Q.**   And you're walking towards the back?

24     **A.**   Yes.

25     **Q.**   He's back there with another person, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  White male with money in his hand.

2    **Q.**  Tell the jury who the white male was.

3    **A.**  I don't know who white male was.

4    **Q.**  Never stopped?

5    **A.**  No.

6    **Q.**  Never detained?

7    **A.**  No.

8    **Q.**  Nobody ever checked to see if he had any money on

9    him?

10   **A.**  No.

11   **Q.**  Or had any drugs?

12   **A.**  No.

13   **Q.**  But I thought you said that you saw a drug

14   transaction with that person?

15   **A.**  That's correct.

16   **Q.**  But that was never confirmed, was it?

17   **A.**  No, your client took off running, no.

18   **Q.**  How many other officers are with you?

19   **A.**  No one was with me at the time.  The other officers

20   were on the other block.

21   **Q.**  Did you radio your other officers and say stop the

22   white male too?  Check him out?

23   **A.**  No.  They were in aid of safety of me.

24   **Q.**  I didn't ask you that.  Two people were involved in

25   this, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   Yes.

2     **Q.**   The other person was just let go?

3     **A.**   He was not let go.

4     **Q.**   He was not stopped?

5     **A.**   Correct.

6     **Q.**   Was not detained?

7     **A.**   Correct.

8     **Q.**   Was not arrested?

9     **A.**   Correct.

10    **Q.**   You never confirmed whether or not he was involved

11    in any transaction through an arrest of him, right?

12    **A.**   I could not follow up not chasing your client.

13    **Q.**   So you were walking to the back down the driveway,

14    right?

15    **A.**   That's correct.

16    **Q.**   And you say that he then runs to the front?

17    **A.**   Correct.

18    **Q.**   Right by you?

19    **A.**   No, not right by me.  Away from a me.

20    **Q.**   I thought you said you were going to the back?

21    **A.**   I coming up through the back of the location.  I was

22    coming through the alley of the location.  He's in the

23    rear.

24    **Q.**   You're in the alley?

25    **A.**   Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  He's running out the front?

2      **A.**  Yes.

3      **Q.**  As running out the front there's a garbage can

4      nearby?

5      **A.**  On the driveway, yes.

6      **Q.**  And you say that he then reaches into his pocket?

7      **A.**  No.

8      **Q.**  He then puts on the top of the lid of the garbage

9      can the suspected drugs?

10     **A.**  That's correct.

11     **Q.**  That you could see?

12     **A.**  That's correct.

13     **Q.**  He didn't throw them on the ground?

14     **A.**  No.

15     **Q.**  Or in the weeds?

16     **A.**  No.

17     **Q.**  Or run around the front of house where you could not

18     see him and toss them?

19     **A.**  No.

20     **Q.**  He did it so you could see it?

21     **A.**  Yes.

22     **Q.**  And presumably running away from you, the police, so

23     he is not caught?

24     **A.**  Yes.

25     **Q.**  But instead he leaves them out for you to get it?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   In the garbage can, yes.

2      **Q.**   In the garbage can or on top?

3      **A.**   On top.

4      **Q.**   Not in the garbage can?

5      **A.**   In the garbage can.   The garbage can is full.

6      **Q.**   All right.   Then you chase him down, and you catch

7   up to him?

8      **A.**   That's correct.

9      **Q.**   And you search him, and there are no weapons?

10     **A.**   No.

11     **Q.**   No drugs?

12     **A.**   No.

13     **Q.**   And then you go back to the garbage can lid to find

14   the drugs.   You do that?

15     **A.**   That's correct.

16              **MR. DALY:**   Nothing further.   Thank you.

17              **THE COURT:**   Thank you, Mr. Daly.   Any

18   redirect?

19              **MS. FINOCCHIARO:**   One moment, your Honor.

20

21                     **REDIRECT EXAMINATION**

22

23   BY MS. FINOCCHIARO:

24

25     **Q.**   Very briefly, just to clear up.   The garbage can

                  *15-20652; USA v. EUGENE FISHER, ET AL*

1     that Mr. Bailey threw the drugs into, did this have a lid

2     on it?

3        **A.**   It had a lid, but the lid was down.

4        **Q.**   What do you mean the lid was down?

5        **A.**   You have the black garage can, the lid is down

6     behind the garbage can.

7        **Q.**   The lid is attached, but not on top?

8        **A.**   Correct.

9        **Q.**   It was opened and you can see what was inside?

10       **A.**   Correct.

11                    **MS. FINOCCHIARO:**  Nothing furthers.

12                    **THE COURT:**  You may step down, sir.

13

14                        (Witness excused.)

15

16                    **MS. FINOCCHIARO:**  Your Honor, at this time

17     the government would call Officer Paul.

18

19                        **R Y A N   P A U L**

20

21     being first duly sworn by the Court to tell the truth, was

22     examined and testified upon his oath as follows:

23

24                    **THE COURT:**  We will have you begin by stating

25     your name, and spelling your last name.

                        *15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE WITNESS:**  Police Officer Ryan Paul,

2     P-a-u-l.

3          **THE COURT:**  Thank you.  You may proceed.

4

5                    **DIRECT EXAMINATION**

6     BY MR. WECHSLER:

7

8     **Q.**  Officer Paul, who do you work for?

9     **A.**  Detroit Police Department.

10    **Q.**  And what assignment do you currently have?

11    **A.**  Major violator section.

12    **Q.**  What does that mean?

13    **A.**  Primary focus is narcotics.

14    **Q.**  Primary focus is narcotics?

15    **A.**  Yes.

16    **Q.**  How long have you been in that position?

17    **A.**  Past three years.

18    **Q.**  Before that?

19    **A.**  Worked at the Ninth Precinct, special operations.

20    **Q.**  Ninth Precinct is on the east side of Detroit?

21    **A.**  Yes.

22    **Q.**  Special operations, I think we heard is a uniform

23    division?

24    **A.**  Yes.

25    **Q.**  And special operations, you always wear uniforms?

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  Were you -- what kind of uniform?  Is it full from

3    head to toe?

4    **A.**  It is green cargo pants, black polo shirt with

5    police on the front and back.

6    **Q.**  Not the typical officer in a hat and badge?

7    **A.**  Yes.

8    **Q.**  Okay.  Were you working on June 6, 2013?

9    **A.**  Yes.

10    **Q.**  I want to turn your attention to that day.  Were you

11    working in the vicinity of 15715 Coram in the city of

12    Detroit.

13    **A.**  Yes.

14    **Q.**  Were working on that day at approximately 9:00 p.m.?

15    **A.**  Yes.

16    **Q.**  What is the cross street of 15715 Coram?

17    **A.**  Rex.

18    **Q.**  Were you working by yourself or with somebody else?

19    **A.**  I was working with two other partners, Police

20    Officer Borshch and Officer Riccinto.

21    **Q.**  First one was Borshch?

22    **A.**  Yes.

23    **Q.**  And the second one?

24    **A.**  Police Officer Riccinto.

25    **Q.**  So how did you get to that location that day?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Just on patrol.

2    **Q.**   What kind of car were you in?

3    **A.**   A black semi-marked police vehicle.

4    **Q.**   Semi-marked vehicle.  What do you mean by

5    semi-marked?

6    **A.**   Just with lights on it.

7    **Q.**   Lights on the outside?

8    **A.**   Inside.

9    **Q.**   So would the average person know it was police

10   officer's vehicle?

11   **A.**   Yes.

12   **Q.**   Not fully marked.  It doesn't say Detroit Police on

13   the side?

14   **A.**   No.

15   **Q.**   You said this was about 9:00 p.m.  Was it light at

16   that time?

17   **A.**   Yes.

18   **Q.**   Around the same time of year as it is now?

19   **A.**   Yes.

20   **Q.**   What, if anything, happened at that time and

21   location?

22   **A.**   I observed a group of individuals standing on

23   sidewalk in the street, and I stopped to investigate that

24   group.

25   **Q.**   Why did you choose to stop and investigate that

*15-20652; USA v. EUGENE FISHER, ET AL*

1    group?

2        **A.**   They were drinking alcohol.

3        **Q.**   Drinking in public is at least a violation in the

4    city of Detroit?

5        **A.**   Yes.

6        **Q.**   So what happened?

7        **A.**   I exited the scout car.  When I did that, one of the

8    individuals from the group began acting suspicious.

9        **Q.**   When you say "suspicious" -- let me ask this, were

10   wearing the same outfit that you mentioned before?

11       **A.**   Yes.

12       **Q.**   When you say he was acting suspicious, what do you

13   mean by that?

14       **A.**   He began looking at me, the scout car, and kind of

15   back pedaling walking away as we approached.

16       **Q.**   He's back pedaling.  What happens after he did that?

17       **A.**   I told him to come here, and he took over running.

18       **Q.**   Why did you ask him to come to you?

19       **A.**   There was a group of individuals there consuming

20   alcohol in public.

21       **Q.**   He took off running?

22       **A.**   Yes.

23       **Q.**   A sprint?

24       **A.**   Yes.

25       **Q.**   Which direction did he go?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   North.

2    **Q.**   Did you later identify who this individual was?

3    **A.**   Yes.

4    **Q.**   His name?

5    **A.**   Mr. Arlandis Shy.

6    **Q.**   So he takes off -- Shy takes off running going north

7    in a sprint.  What did you do?

8    **A.**   I follow.

9    **Q.**   And you were in good shape back then?

10   **A.**   Yes.

11   **Q.**   You were able to keep up with him?

12   **A.**   No.  He eventually got over a fence.

13   **Q.**   Did you get over the fence?

14   **A.**   No, I did not.

15   **Q.**   Before he got over the fence, did you see him toss

16   anything or do anything?

17   **A.**   Yes.

18   **Q.**   What did he do?

19   **A.**   Threw a black pistol.

20   **Q.**   Do you know where he pulled it from?

21   **A.**   Hoodie.

22   **Q.**   How far away were you when he threw that pistol?

23   **A.**   Approximately 30 to 40 feet.

24   **Q.**   Maybe twice the distance that I am to you?

25   **A.**   Approximately.

                     *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  Podium to the witness stand.  So he goes over the

2      fence.  You didn't go over.  Were you working with your

3      partners that day?  Did you let them know what was

4      happening?

5      **A.**  Yes.

6      **Q.**  And did you later learn that he was apprehended?

7      **A.**  Yes.

8      **Q.**  How did you learn that?

9      **A.**  By partner Officer Borshch indicated over the radio

10     he had Mr. Shy detained.

11     **Q.**  Did he know that it was Mr. Shy?  Did he say Mr.

12     Shy, or I got an individual?  How did you know it was Mr.

13     Shy?

14     **A.**  He was the only one running from us.

15     **Q.**  Now after Shy is detained, did you get that firearm?

16     **A.**  Yes.

17     **Q.**  Do you recall where it was?

18     **A.**  In the rear of a house on Novara, which would be the

19     property directly north where we stopped.

20     **Q.**  Approximately how far was that from where you

21     initially stopped him?

22     **A.**  From the group?

23     **Q.**  Yes.

24     **A.**  Approximately 100 feet.

25     **Q.**  When you recovered that firearm was it loaded?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yes.

2    **Q.**   Do you recall how many rounds it had in it?

3    **A.**   Fourteen.

4    **Q.**   What did you do with that gun?

5    **A.**   Placed it in evidence.

6    **Q.**   Did you ever ask Arlandis Shy whether he had a

7    permit to carry the gun?

8    **A.**   Yes.

9    **Q.**   What did he say?

10   **A.**   Was not able to produce a license.

11   **Q.**   Did you ever check if he had a license?

12   **A.**   I didn't have a computer.

13   **Q.**   Did he indicate that he had one or didn't?

14   **A.**   Didn't have one.

15   **Q.**   I will show you Government Proposed Exhibit 524 for

16   identification.  Do you recognize this?

17   **A.**   Yep.

18   **Q.**   What do you recognize that to be?

19   **A.**   The pistol that I recovered after I placed it on

20   evidence.

21   **Q.**   How do you know that?

22   **A.**   Same serial number.

23            **MR. WECHSLER:**  At this time I would move to

24   admit into evidence Exhibit 524.

25            **THE COURT:**  Any objection?

*15-20652; USA v. EUGENE FISHER, ET AL*

1           **MR. MAGIDSON:**  No objection.

2           **THE COURT:**  Thank you.

3           **MR. WECHSLER:**  If I may publish it by showing

4    the jury.

5           **THE COURT:**  You may.

6

7    **BY MR. WECHSLER:**

8       **Q.**  Any additional item in the box?

9       **A.**  Yes, a magazine.

10      **Q.**  That would hold the 14 rounds?

11      **A.**  Yes.

12          **MR. WECHSLER:**  No further questions, Judge.

13          **THE COURT:**  Thank you.  Any cross

14   examination?

15          **MR. MAGIDSON:**  Briefly, your Honor.

16          **THE COURT:**  Okay.

17

18                    **CROSS EXAMINATION**

19

20   **BY MR. MAGIDSON:**

21

22      **Q.**  Good afternoon, sir.

23      **A.**  Good afternoon.

24      **Q.**  What's your title?

25      **A.**  Police officer.

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**   Sergeant or just --

2     **A.**   Police officer.

3     **Q.**   Okay.  At the time of the day in question, you were

4     riding with a partner?

5     **A.**   Yes.

6     **Q.**   How many of you were there?

7     **A.**   Three.

8     **Q.**   Total of three?

9     **A.**   Yes.

10    **Q.**   Were you driving or the passenger?

11    **A.**   I was the passenger.  I don't recall if I was in the

12    back seat or front seat.

13    **Q.**   And this is about 9:00 p.m.?

14    **A.**   Correct.

15    **Q.**   June 6th, getting dark, correct?

16    **A.**   I don't recall if it was getting dark or still light

17    or cloudy.  I don't recall.

18    **Q.**   You do recall seeing a group of young people on the

19    sidewalk?

20    **A.**   Yes.

21    **Q.**   And you were able to detect that they were drinking?

22    **A.**   Yes.

23    **Q.**   Did they have liquor bottles?

24    **A.**   Liquor bottles about the ground.

25    **Q.**   But you didn't see anybody drinking?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  I don't recall.

2      **Q.**  Okay.  But there was a group.  That in and of itself

3   look suspicious, a group of young African American men?

4      **A.**  I didn't say that.

5      **Q.**  I'm asking.

6      **A.**  No.

7      **Q.**  The group was not African American men?

8      **A.**  Yes.

9      **Q.**  At least seven to 10?

10     **A.**  I would estimates five to 10.

11     **Q.**  If your report said seven to 10, would you agree

12   with that?  Do you want to see your report to refresh your

13   recollection?

14     **A.**  Sure.  This is not my report.

15     **Q.**  Whose report is this?

16     **A.**  Officer Riccinto.

17     **Q.**  Was he with you that day?

18     **A.**  Yes.

19     **Q.**  Your name appears on the report?

20     **A.**  Yes, as assisted by.

21     **Q.**  Would you agree he said in his report seven to 10?

22     **A.**  Yes.

23     **Q.**  Okay.  Then you were going to ticket everybody for

24   drinking in public.  Was that your intent?

25     **A.**  No.

*15-20652; USA v. EUGENE FISHER, ET AL*

1       **Q.**  You stopped to investigate, correct?

2       **A.**  Yes.

3       **Q.**  And you saw people drinking in public, correct?

4       **A.**  Yes.

5       **Q.**  So were you going to chat about the neighborhood or

6       what were you going to talk about?

7       **A.**  That's a possibility.  I don't know what would have

8       happened.

9       **Q.**  But at any rate one person began to depart?

10      **A.**  Yes.

11      **Q.**  Was that illegal?

12      **A.**  No.

13      **Q.**  And he began to, as you said, he began to run?

14      **A.**  Yes, unprovoked.

15      **Q.**  Is that a crime, running away?

16      **A.**  No.

17      **Q.**  But in spite of the fact it wasn't a crime, you

18      pursued him?

19      **A.**  Yes.

20      **Q.**  Okay.  And then you're cutting through yards and

21      things like this, correct?

22      **A.**  No.

23      **Q.**  He's running through yards?

24      **A.**  Eventually, yes.

25      **Q.**  And during this process he stops and looks at you?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No.

2    **Q.**  You see him discard a weapon?

3    **A.**  Yes.

4    **Q.**  Okay.  But he does it in plain view so you're able

5    to see?

6    **A.**  Yes.

7    **Q.**  And ultimately he's -- although you don't catch

8    him -- somebody else detains him?

9    **A.**  Yes.

10   **Q.**  And then did you go back and retrieve what we now

11   know to be this exhibit?

12   **A.**  Correct.

13   **Q.**  Okay.  Now you said -- do you remember what he was

14   wearing?

15   **A.**  I don't recall.

16   **Q.**  If I showed you -- Officer Borshch is it?

17   **A.**  One of my partners.

18   **Q.**  Is that his report?

19   **A.**  I don't have one in front of me.

20   **Q.**  Let me show you.  Whose report is this?

21   **A.**  Officer Riccinto.

22   **Q.**  He was one of the officers?

23   **A.**  Yes.

24   **Q.**  Does it indicate on here -- have you looked at this

25   to see if it refreshes your recollection as to what he was

*15-20652; USA v. EUGENE FISHER, ET AL*

1    wearing.

2    **A.**   Gray hooded sweatshirt and blue jeans.

3    **Q.**   Gray hooded sweatshirt and blue jeans.  He didn't

4    have a red bandana?

5    **A.**   It's not in my report.

6    **Q.**   It was just Mr. Shy that was arrested for the CCW

7    violation of the carrying a concealed weapon?

8    **A.**   Yes.

9    **Q.**   Nobody else?

10   **A.**   No.

11   **Q.**   And this weapon, it had no markings that it belonged

12   to the Seven Mile Bloods or anything like that?  That's

13   not on this gun?

14   **A.**   That's not on the gun.

15   **Q.**   And nothing at least in your partner's report about

16   this gun being a Seven Mile Bloods gun, is that correct?

17   **A.**   I would have to look at the report.

18   **Q.**   Sure.  Take your time.

19   **A.**   Officer Riccinto's report does not indicate that the

20   firearm belonged to the Seven Mile Bloods.

21   **Q.**   This was a case of a young man being charged with

22   individually with a possession of a weapon, is that

23   correct?

24   **A.**   Yes.

25             **MR. MAGIDSON:**  Nothing further.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1                    THE COURT:  All right.

 2                    MR. MAGIDSON:  Judge, one moment if I may.

 3                    MR. SPIELFOGEL:

 4                    MR. H. SCHARG:  Can we approach for a minute?

 5                    THE COURT:  About what?

 6                    MR. MAGIDSON:  No further questions.

 7                    MR. WECHSLER:  One thing.

 8

 9                        REDIRECT EXAMINATION

10

11    BY MR. WECHSLER:

12

13       Q.  Did you see anybody else throw a gun that day?

14       A.  No, I did not.

15                    THE COURT:  All right.

16

17                   (Witness excused.)

18

19           (Sidebar conference held off the record.)

20

21                    THE COURT:  Do you want to try to get one

22    more witness in?

23                    MS. FINOCCHIARO:  Officer Atkins.

24                    THE COURT:  It may take us a few minutes past

25    one, but we have a gift for you.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1              W A L T E R   A T K I N S

 2

 3    being first duly sworn by the Court to tell the truth, was

 4    examined and testified upon his oath as follows:

 5

 6              THE COURT:  We will have you begin by stating

 7      your name, spelling your last name for us.

 8              THE WITNESS:  Waller Atkins, A-t-k-i-n-s.

 9              THE COURT:  You may proceed.

10

11                    DIRECT EXAMINATION

12

13    BY MS. FINOCCHIARO:

14

15      Q.  Good afternoon, officer.

16      A.  Good afternoon.

17      Q.  Officer, where do you work?

18      A.  Detroit Police Department, narcotic division.

19      Q.  How long have you worked for the Detroit Police

20    Department?

21      A.  Ten years this July.

22      Q.  And how long have you been with narcotics?

23      A.  Narcotics almost two years.

24      Q.  Prior to being with the narcotic unit, what unit

25    were you in?
```

1      **A.**  Before that I was at vice enforcement, and prior to

2      that I was at special operations in the Second Precinct.

3      **Q.**  What did you do in special operations with the

4      Second Precinct?

5      **A.**  We answer priority calls like robberies, shootings,

6      high priority calls.

7      **Q.**  And how about with the vice unit?  What did you do

8      with vice?

9      **A.**  Vice, we did human trafficking, drug trade.  That

10     involved a lot undercover operations with vice.

11     **Q.**  So special operations is more reactive and vice was

12     more proactive?

13     **A.**  Yes.

14     **Q.**  Currently with narcotics, what do you do with

15     narcotics?

16     **A.**  Right now I'm assigned to the conspiracy unit, and I

17     handle like major drugs and execute a lot of narcotic

18     search warrants.

19     **Q.**  Now I will take you back to 2013.  What was your

20     assignment back then?

21     **A.**  I was assigned to the Second Precinct special

22     operation unit.

23     **Q.**  Do you recall a stop you made on May 23, 2013 at Joy

24     and Livernois?

25     **A.**  I do.

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  Describe that area where you made the stop?

2     **A.**  Yes.  It is right there at the intersection of

3     Livernois and Joy Road.  There is a Valero gas station

4     that sits on the east side of the street, and you have a

5     club, like a lounge.  It's called the Penthouse Clubhouse

6     on the west side of the street.

7     **Q.**  Is it residential or commercial more?

8     **A.**  It's residential, but just on Livernois and Joy Road

9     at the intersection there are businesses.

10    **Q.**  What time of day were you called out?

11    **A.**  It was -- I believe it was like 1:00 in the morning.

12    1:00 a.m.

13    **Q.**  And why were you called out to that location?

14    **A.**  On a shooting that just happened at the Empire

15    Nightclub.

16    **Q.**  You were called out for a shooting?

17    **A.**  Yes.

18    **Q.**  Where is the Empire Nightclub?

19    **A.**  It is right on Livernois north of Tireman.  One

20    street north of Tireman.

21    **Q.**  When you get the call, where were you called to go

22    to?

23    **A.**  That call was routeing us to the club.

24    **Q.**  Okay.  So what happened as you went to the call?

25    **A.**  The radio dispatcher gave out a description of the

*15-20652; USA v. EUGENE FISHER, ET AL*

1   shooters, and said that the shooters were driving or were

2   inside of a white BMW limousine.

3       **Q.**   Did you see that limousine at any time?

4       **A.**   Yes.   I was stopped at the red light on Joy Road and

5   Livernois, and I looked to the left, and the limousine was

6   in the Valero gas station parking lot.

7       **Q.**   You are in the car at that point?

8       **A.**   Yes.

9       **Q.**   By yourself or with a partner?

10      **A.**   With my partner.

11      **Q.**   Who was that?

12      **A.**   Donald Covington.

13      **Q.**   Were you in a marked police car?

14      **A.**   I believe I was fully marked.

15      **Q.**   You spot the limo.   What did you and your partner do

16   next?

17      **A.**   We notified dispatch that the limousine -- that

18   we're going to affect a traffic stop with the limousine.

19      **Q.**   Did you affect a traffic stop?

20      **A.**   We did.

21      **Q.**   Describe that.

22      **A.**   The limousine was -- the way we approached the

23   limousine, I don't think is the normal way of approaching

24   it.   We pulled in the Valero gas station.   The limousine

25   was faced north in the parking lot.   We pulled on the side

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1      of the limo.  My partner and I exited the scout car and
 2      approached the limousine on the driver side, the rear
 3      driver side.
 4      Q.   Did you encounter the driver of the limousine?
 5      A.   We did.
 6      Q.   How did the limo driver seem to you?
 7      A.   He afraid.  He was frighten.  He looked like
 8      something just happened.
 9      Q.   So what did you do next?
10      A.   My partner then opened the rear driver side door,
11      and that's when I observed Mr. Thomas with a gun in his
12      hand.
13      Q.   You said Mr. Thomas with a gun in his hand.  Can you
14      describe what kind of gun it was?
15      A.   A Taurus handgun.  I believe it was a .45 caliber.
16      Q.   And was Mr. Thomas inside the limo?
17      A.   Yes, closest to the door.
18      Q.   Were there others in the limo as well?
19      A.   Yes.
20      Q.   When you first observed Mr. Thomas, did you see any
21      other guns besides the one that he had?
22      A.   Yes.
23      Q.   Do you recall how many other guns you saw?
24      A.   Six guns total.
25      Q.   So Mr. Thomas has a gun in his hand.  What happened
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    next?

2        A.   I ordered him to place the gun down, and he

3    complied.

4        Q.   What did you do at that point?

5        A.   I had each person keep their hands up, and have all

6    of them exit one at the time.

7        Q.   I know it's been a while, but do you recall how many

8    people were in the limo?

9        A.   I believe seven people were inside the limousine.

10       Q.   Do you recall who they were?

11       A.   If I could look at my report.

12       Q.   Yes.  Look at your report, and tell the jury who was

13   in the limo.

14       A.   We have a Diondre Fitzpatrick, Darius Curington,

15   Andrew Thomas.

16       Q.   Is that the Mr. Thomas that you were just

17   describing?

18       A.   Yes.

19       Q.   Who else?

20       A.   Joshua Coleman, Devon McClure, Charles Hodge, Marcus

21   Franklin.

22       Q.   So you had them exit the vehicle.  What did you do

23   after they exited the vehicle?

24       A.   I detained each one of them, my partner and I, and

25   at the time there were other cars that arrived that worked

*15-20652; USA v. EUGENE FISHER, ET AL*

1    with us in the special operations unit.

2        **Q.**  Other officers arrived?

3        **A.**  Yes.

4        **Q.**  And so other officers took the individuals from the

5    limo and placed them under arrest?

6        **A.**  Yes.

7        **Q.**  So what did you do with the handgun that you saw

8    with Mr. Thomas?

9        **A.**  I recovered it, and made it safe and placed it on

10   evidence when I got back to the precinct.

11       **Q.**  When you say make it safe, what do you mean by that?

12       **A.**  Unloaded it, and made sure there was no accidental

13   discharges.

14       **Q.**  And you said you placed it in evidence?

15       **A.**  Yes.

16       **Q.**  And did you get the serial number of the gun that

17   you recovered from Mr. Thomas?

18       **A.**  I did.

19       **Q.**  Do you know the serial number off the top of your

20   head?

21       **A.**  No.

22       **Q.**  Go ahead and look at the report.

23       **A.**  Okay.  The serial number is Nora David Paul O88O9.

24       **Q.**  You said you saw six guns recovered.  This was one

25   of six?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  Did you notice anything in particular that you

3    recovered from Mr. Thomas?  Was it loaded?

4    **A.**  Yes.

5    **Q.**  And the other five guns?

6    **A.**  The other ones were loaded, but one I believe -- I

7    believe it was only one that was empty, like the slide was

8    locked to the rear, meaning that it was freshly fired.

9    **Q.**  Did you notice anything about the other guns,

10   anything particular that caught your attention?

11   **A.**  No.

12   **Q.**  Did you smell or see anything about the guns?

13   **A.**  Yes, when we opened the door, we could immediately

14   smell like gun powder.  It was still imminent in the

15   vehicle.

16   **Q.**  After you shoot off a gun, there is the smell of gun

17   powder?

18   **A.**  Yes.

19   **Q.**  And that's what you smelled when you opened the limo

20   door?

21   **A.**  Yes.

22   **Q.**  I will show you what's been marked as Government

23   Exhibit 313 for identification.  Can you explain to the

24   jury what Exhibit 313 is?

25   **A.**  This is the gun that I recovered from Mr. Thomas,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    the Taurus .45 caliber handgun.

2        **Q.**   The gun has the same serial number that you

3    described as noted in your report?

4        **A.**   It does.

5        **Q.**   And take a second and step down for me.

6        **A.**   Okay.

7                **MS. FINOCCHIARO:**   Move for admission of

8    Government Exhibit 313.

9                **THE COURT:**   Any objection?

10               **MR. DALY:**   No, sir.

11               **THE COURT:**   The Court will receive it.

12               **MS. FINOCCHIARO:**   Permission to publish?

13               **THE COURT:**   You may.

14

15   **BY MS. FINOCCHIARO:**

16       **Q.**   What do you see with the gun?

17       **A.**   That's the magazine that goes inside the gun.

18       **Q.**   Just to clarify, you got the gun from Mr. Thomas,

19   Mr. Andrew Thomas?

20       **A.**   Yes.

21       **Q.**   Just to confirm the other individuals that were

22   there, Diondre Fitzpatrick, Darius Curington, Mr. Thomas,

23   Joshua Coleman, Charles Hodge, Devon McClure and Marcus

24   Franklin?

25       **A.**   Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1              MS. FINOCCHIARO:  Nothing further, your

2      Honor.

3              THE COURT:  Thank you.  Cross examination?

4              MR. DALY:  None your Honor.

5              THE COURT:  Okay.  Thank you.  You can step

6      down.

7              THE WITNESS:  Thank you.

8

9                   (Witness excused.)

10

11             THE COURT:  So we didn't run over much at

12     all.  Anybody else that you wanted to call?

13             MS. FINOCCHIARO:  No one at this time.

14             THE COURT:  Okay.  The Court was notified

15     that the government was running out of witnesses for

16     tomorrow's session, and while there are a few left, it

17     would consume less than an hour, and it would not make any

18     sense to bring you in for an hour's worth of testimony.

19          So your gift is we have tomorrow off and, of

20     course, then we have all of next week off as well.

21          So we will not see you again until a week from

22     Monday.  Enjoy your time off, and see you back then.

23

24          (Proceedings concluded at 1:02 p.m.)

25                     -   -   -


                   15-20652; USA v. EUGENE FISHER, ET AL

1              **C E R T I F I C A T I O N**

2            I, Ronald A. DiBartolomeo, official court

3     reporter for the United States District Court, Eastern

4     District of Michigan, Southern Division, appointed

5     pursuant to the provisions of Title 28, United States

6     Code, Section 753, do hereby certify that the foregoing is

7     a correct transcript of the proceedings in the

8     above-entitled cause on the date hereinbefore set forth.

9            I do further certify that the foregoing

10    transcript has been prepared by me or under my direction.

11

12    s/Ronald A. DiBartolomeo                 June 28, 2018
      Ronald A. DiBartolomeo, CSR                  Date
13    Official Court Reporter

14                            -    -    -

15

16

17

18

19

20

21

22

23

24

25

                 *15-20652; USA v. EUGENE FISHER, ET AL*