1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3

4    **UNITED STATES OF AMERICA,**

5                    Government,
                                          **HONORABLE GEORGE CARAM STEEH**
6          v.
                                          **No. 15-20652**
7    **D-3 EUGENE FISHER,**
     **D-4 COREY BAILEY,**
8    **D-6 ROBERT BROWN,**
     **D-13 ARLANDIS SHY,**
9    **D-19 KEITHON PORTER,**

10                  Defendants.
     _____/
11
                              **JURY TRIAL**
12
                     **Wednesday, July 18, 2018**
13
                           -   -   -
14
     APPEARANCES:
15
     For the Government:          JULIE FINOCCHIARO, ESQ.
16                                JUSTIN WECHSLER, ESQ.
                                  TARE WIGOD, ESQ.
17                                MARK BILKOVIC,ESQ.
                                  Assistant U.S. Attorneys
18

19   For the Defendants:         HENRY M. SCHARG, ESQ.
                                  On behalf of Eugene Fisher
20
                                  CRAIG DALY, ESQ.
21                                KEITH SPIELFOGEL, ESQ.
                                  On behalf of Corey Bailey
22
                                  JAMES FEINBERG, ESQ.
23                                On behalf of Robert Brown

24
                                  MARK MAGIDSON, ESQ.
25                                JOHN THEIS, ESQ.
                                  On behalf of Arlandis Shy

1
                                         STEVEN SCHARG, ESQ.
2                                        On behalf of Keithon Porter

3

4                          -    -    -

5

6            *To Obtain Certified Transcript, Contact:*
           *Ronald A. DiBartolomeo, Official Court Reporter*
7              *Theodore Levin United States Courthouse*
             *231 West Lafayette Boulevard, Room 1067*
8                     *Detroit, Michigan   48226*
                        *(313) 962-1234*

9           *Proceedings recorded by mechanical stenography.*
          *Transcript produced by computer-aided transcription.*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            I  N  D  E  X

2  _____  Page

3  **VINCENTE RUIZ**
   Direct examination cont. by Ms. Finocchiaro          10
4  Cross examination by Mr. H. Scharg                   44
   Cross examination by Mr. Daly                        47
5  Cross examination by Mr. Feinberg                    54
   Cross examination by Mr. Magidson                    57
6  Cross examination by Mr. S. Scharg                   59
   Redirect examination by Ms. Finocchiaro             73

7
   **JOSEPH JENSEN**
8  Direct examination by Mr. Wigod                      77
   Voir Dire examination by Mr. H. Scharg               89
9  Direct examination cont. by Mr. Wigod                97

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          E   X   H   B   I   T   S
 2    Identification_____Offered      Received
 3    Government Exhibit No. 40                15            15
 4    Government Exhibit No. 29                19            19
 5    Government Exhibit No. 30                26            26
 6    Government Exhibit No. 31                29            29
 7    Government Exhibit No. 38                31            31
 8    Government Exhibit Nos. 28, 28A          35            35
 9    Government Exhibit No. 32                36            36
10    Government Exhibit No. 37                37            37
11    Government Exhibit No. 27                39            39
12    Government Exhibit No. 466               39            40
13    Government Exhibit No. 36               101           101
14
15
16
17
18
19
20
21
22
23
24
25
```

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1                              Detroit, Michigan
 2                              Wednesday, July 18, 2018
 3                              At 8:42 a.m.
 4                          -    -    -
 5                    (Proceedings held without jury.)
 6
 7             THE COURT:  So the Court has had the
 8    opportunity to read the briefs submitted in relation to
 9    the recently decided case of Carpenter versus United
10    States, and based upon the Court's review of it, I had one
11    question.  Who will be arguing for the defendants?
12             MR. DALY:  Judge, I will.
13             THE COURT:  Mr. Daly?
14             MR. DALY:  Yes.
15             THE COURT:  So since the decision in
16    Carpenter, there's been quite a number of opinions, most
17    importantly in the Sixth Circuit we have Pembroke to deal
18    with.
19         Can you tell me why I ought not to be relying on
20    Pembroke, which appears to be -- which is a published
21    opinion by Sixth Circuit, and directs the Court to
22    consider the good faith exception?
23             MR. DALY:  Judge, the analysis that we make
24    is based on the decisions by the United States Supreme
25    Court, and let me start by saying that we both agree --
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    meaning both the government and the defense -- that
2    Carpenter does apply.  Our analysis is that it is a
3    question of retroactivity, not a good faith exception, and
4    so notwithstanding Pembroke, the United States Supreme
5    Court has never said that the good faith exception applies
6    to a discretionary decision by lawyers, right?
7         Leon says that the good faith exception comes as
8    an exception as to the rule that the police should get a
9    warrant, and if they get a warrant, and somebody else
10   makes a mistake, such as the judge in determining that
11   there is probable cause, they shouldn't be held
12   responsible.
13        Pembroke doesn't engage in that analysis.
14   Pembroke doesn't address the fact that in this case and in
15   Carpenter, it was the U.S. Attorney's Office that made a
16   discretionary decision.
17        So both the lawyers on both sides, the government
18   side and defense side, took an oath to uphold the
19   Constitution and to protect Mr. Bailey's Constitutional
20   Rights, and what they are seeking to do is something that
21   the United States Supreme Court has never done, which is
22   an extension of good faith to a decision that they made.
23   So they had the option to get a search warrant, and they
24   chose not to do that.  That was their decision, and so now
25   they need to pay the price for that decision.  They don't

1    get a pass because they made that decision.

2         That's different than Leon, and it's different

3    than Pembroke that doesn't make this analysis because here

4    the government is --

5              **THE COURT:**  Admittedly Pembroke has little

6    discussion of the issue, but the Sixth Circuit -- and

7    we're, of course, bound by Sixth Circuit opinions -- has

8    declared pretty flatly that the -- the suppression of the

9    evidence in this context would not deter others.  We are

10   dealing with the exclusionary rule, and the decision

11   whether the exclusionary rule applies or not is an

12   important part of this equation that even your well pled

13   motion doesn't really address the -- well, so my question

14   was, why are we not bound by the Sixth Circuit?  I have

15   not heard you address that yet.

16             **MR. DALY:**  And the distinction that I'm

17   making is the difference between the United States Supreme

18   Court that you're bound by, as oppose to the Sixth

19   Circuit.  So I'm asking you to look beyond Pembroke, look

20   to the United States Supreme Court, and whether or not the

21   United States Supreme Court has ever said that good faith

22   applies to discretionary decisions made by lawyers in the

23   United States Attorney's Office, and the answer to that is

24   that they haven't.  They've never extended it to it

25   because the underlying policy reasons for the good faith

*15-20652; USA v. EUGENE FISHER, ET AL*

1    exceptions, they don't apply to lawyer decisions.

2        So that's what I'm doing.  I'm stepping beyond

3    Pembroke.  I understand what you're saying, that Pembroke

4    is Sixth Circuit, and you feel bound by it.  I'm asking

5    you to step beyond Pembroke.

6        **THE COURT:**  How I feel about it doesn't

7    matter, but it is a precedential rule obviously.

8        **MR. DALY:**  Well, Pembroke, of course, cert

9    has been filed.  The petition has been filed.  There has

10   been no ruling yet on whether or not Pembroke is going to

11   be binding Sixth Circuit precedent.  So that is not the

12   final say so.  If the United States Supreme Court grants

13   cert, you know, it may very well that Pembroke is not the

14   law, and they could reverse just like they did in

15   Carpenter, and if you rule in favor of the government and

16   go forward and use the evidence, they will do it at their

17   own risk with the possibility that Pembroke will be

18   reversed.

19       **THE COURT:**  All right.  Thank you, Mr. Daly.

20       I think at this time the Court is constrained as

21   my questions have suggested by the decisions in the Sixth

22   Circuit.  In this instance while the exclusionary rule has

23   not been necessarily used exactly in this context, there

24   are cases where supression -- supression order is not in

25   order when the actors in this case, the police officers,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    are acting on the basis of well-settled statutory law, and

2    in addition in this case, of course, we have the Stored

3    Communications Act, which explicitly authorized the

4    officers' use of a subpoena as oppose to a search warrant,

5    and it would appear from a fairness standpoint that while

6    nobody questions the fact that protected privacy rights

7    are accorded by Carpenter to the defendants and have that

8    right invaded by the use of the mechanism set forth in the

9    Stored Communications Act, it is the epitome of good faith

10   exception of law that's represented here.

11        The officers -- I also understand defense

12   argument -- and I do have to say I think the defense

13   argument in its brief is cogent and real reasoned and

14   might serve for the basis for the Supreme Court to reverse

15   a ruling in this instance, but in the meantime, the Court

16   is bound by the Sixth Circuit decision in Pembroke.   In

17   Pembroke, there's a Footnote 14 that expressly disavows

18   Carpenter as the basis for its decision, and so the Court

19   is going to overrule the objections made by defendants to

20   the introduction of this evidence.

21        So I think we're ready for the jurors unless there

22   is something else.

23             **MS. FINOCCHIARO:**   If I may have one moment to

24   check with Agent Ruiz.  He is our first witness.

25

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1           THE COURT:  Sure.

2           MS. FINOCCHIARO:  We're ready, your Honor.

3           THE COURT:  Okay.

4

5           (Proceedings with jury at 8:51 a.m.)

6

7           THE COURT:  Okay.  You can take a seat.  Good

8    morning, everyone.

9           We will call on Ms. Finocchiaro.

10          MS. FINOCCHIARO:  Yes.  The government

11   recalls Special Agent Ruiz.

12          THE COURT:  Okay.  Agent Ruiz, you are still

13   under oath.

14

15                V I C E N T E   R U I Z

16

17                DIRECT EXAMINATION CONT.

18

19   BY MS. FINOCCHIARO:

20

21       Q.  Good morning, Special Agent.

22       A.  Good morning.

23       Q.  Today I just want to talk about addresses and phone

24   numbers.

25       A.  Okay.

                15-20652; USA v. EUGENE FISHER, ET AL

1      **Q.**  We heard about the May 1, 2015 shooting of Raphael

2      Carter.  Where did that occur?

3      **A.**  15OO7 Troester in Detroit, Michigan.

4      **Q.**  And what section of the city?

5      **A.**  Detroit's east side.  Specifically that house is on

6      the corner of Queen and Troester.

7      **Q.**  15OO7 Troester?

8      **A.**  That's correct.

9      **Q.**  We heard about the May 8, 2015 homicide of Devonte

10     Roberts and shooting as well?

11     **A.**  Yes.

12     **Q.**  What location was that to remind the jury?  Where

13     did that occur?

14     **A.**  In the intersection of Duchess and Craft in Detroit,

15     Michigan, east side.

16     **Q.**  East side?

17     **A.**  Yes.

18     **Q.**  Duchess and Craft you said?

19     **A.**  Yes.

20     **Q.**  And we heard about the May 10, 2015 of Darnell

21     Canady, Derrick Peterson and Gaskin?

22     **A.**  That's correct.

23     **Q.**  Where was that at?

24     **A.**  That occurred on the southwest corner of State Fair

25     and Hoover in Detroit, Michigan, also on the east side.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Again, the intersection of Hoover and East State

2    Fair?

3    **A.**  Yes.

4    **Q.**  And we heard about the shooting that occurred at a

5    baby shower at Athena Hall on June 7, 2015.  Do you know

6    the address of that?

7    **A.**  Yes, 25650 Gratiot Avenue in Roseville, Michigan.

8    **Q.**  25650 Gratiot?

9    **A.**  That's correct.

10    **Q.**  That was in Roseville and not Detroit?

11    **A.**  Yes.

12    **Q.**  What side of the city is Roseville on?

13    **A.**  Northeast.

14    **Q.**  Now during the course of your investigation, did you

15    come across an address for Eugene Fisher?

16    **A.**  Yes.

17    **Q.**  What's that address?

18    **A.**  18803 Lamont.  That's in Detroit, Michigan, also on

19    the east side.

20    **Q.**  18830 Lamont?

21    **A.**  Yes.

22    **Q.**  And how did you associate that address with him?

23    **A.**  A couple of different ways.  In September of 2015,

24    he made a police report that his meter -- electric meter

25    was stolen.  He provided 18803 Lamont as his residential

*15-20652; USA v. EUGENE FISHER, ET AL*

 1    address.

 2        **Q.**   Any other way?

 3        **A.**   We executed a search warrant on November 12, 2015 at

 4    that residence.   We encountered Eugene Fisher inside the

 5    residence at that time.   Part of the items that we seized

 6    on that --

 7              **MR. H. SCHARG:**   Can he talk about what he did

 8    and not what we did?

 9              **THE WITNESS:**   Okay.

10

11    **BY MS. FINOCCHIARO:**

12        **Q.**   What items?

13        **A.**   I was part of the raid team that executed a search

14    warrant.   I spoke to Mr. Eugene Fisher that day.   I seized

15    items of evidence to include proof of residency from that

16    location for Mr. Eugene Fisher.

17        **Q.**   Okay.   And how about for Mr. Keithon Porter?   Is

18    there an address that he's associated with?

19        **A.**   Yes, ma'am, 20304 Dresden in January of 2012.

20        **Q.**   20304 Dresden?

21        **A.**   Yes.

22        **Q.**   What city?

23        **A.**   Detroit, Michigan, east side.

24        **Q.**   And explain to the jury how you attached that

25    address to Mr. Porter?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1   **A.**   Yes.   In January of 2012, Mr. Porter used that

2   address to obtain a driver's license with the Secretary of

3   State of Michigan, and June 21th --

4   **Q.**   Let me stop you for a minute.  He used that address

5   for his driver's license with the Michigan Secretary of

6   State?

7   **A.**   Yes.

8   **Q.**   And how about Mr. Robert Brown?  Is there an address

9   associated with him?

10  **A.**   Yes.

11  **Q.**   What was that?

12  **A.**   7211 Meadow Avenue in Warren, Michigan.

13  **Q.**   7211 Meadow?

14  **A.**   Yes.

15  **Q.**   How was he attached to that address?

16  **A.**   The jury previously heard testimony that on

17  April 11, 2015, they saw a video of a fight that occurred

18  in the Eastland Mall.  As part of that video and

19  investigation, the license plate of the vehicle was

20  observed.  It was registered to Tanisha Mumford and came

21  back to 7211 Meadow.  Warren Police Department responded

22  to that address, as well as Eastpointe Police Officers and

23  encountered Mr. Brown at 7211 Meadow Avenue.

24  **Q.**   Now going back briefly to the 5-8-15  the Duchess

25  and Craft incident, have you had seen a map showing some

*15-20652; USA v. EUGENE FISHER, ET AL*

 1     addresses that we spoke about with regards to that date?

 2        A.   Yes.

 3        Q.   Showing you what's been marked as Government Exhibit

 4     44 for identification --

 5        A.   Okay.

 6        Q.   -- is this the map that has some of the addresses

 7     that we have been speaking about?

 8        A.   This map has 7211 Meadow, Warren, Michigan on it.

 9     It also has 20304 Dresden in Detroit, Michigan on it, and

10     it also has the intersection of Craft and Duchess, which

11     is in Detroit, Michigan also on it?

12              MS. FINOCCHIARO:   At this time I would like

13     to admit Government Exhibit 40.

14              THE COURT:   Any objection?

15              MR. MAGIDSON:   No objection.

16              THE COURT:   The Court will receive it.

17              MS. FINOCCHIARO:   And I will publish to the

18     jury using the Elmo.

19

20  BY MS. FINOCCHIARO:

21        Q.   Special Agent Ruiz, can you point out what we are

22     looking at here on this map?

23        A.   Certainly.   In the top left corner of the map, you

24     see the address for 7211 Meadow.   From left to right you

25     the see the address of 20304 Dresden, and in the bottom

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1  right corner you see a blue marker there at the

2  intersection of Craft and Duchess.

3    Q.  Can you tell based on this map the direction that we

4  are looking at north, south, east, west?

5    A.  North is up on this particular map.  This is the

6  east side of Detroit.  North of Eight Mile is Warren.

7    Q.  This is the location that we just discussed?

8    A.  Correct.

9    Q.  I would like to talk about some phone numbers.  Were

10 you able in the course of your investigation get a phone

11 number for Mr. Corey Bailey?

12   A.  Yes.

13   Q.  What was the phone number that you got?

14   A.  (313)784-6729.

15   Q.  How were you able -- what are some of the sources

16 you used to get that phone number from Mr. Bailey?

17   A.  On July 22, 2014, the jury heard that Corey Bailey

18 was arrested in front or near 15621 Novara when a fire

19 investigator observed him trying to conceal a pistol.

20 When he was arrested, his property was conveyed with him

21 to the Detroit Detention Center.  One of the FBI TFO

22 seized that cell phone from his property.

23   Q.  Is there other ways that you have seen that number

24 associated with Mr. Bailey?

25   A.  Yes.  That number was saved in a phone that was

*15-20652; USA v. EUGENE FISHER, ET AL*

1    ceased from Billy Arnold.  That number was saved in there
2    under the contact name Cocaine.
3        Q.  Let me stop you there.  Let me pull up Exhibit 21,
4    Page 5.
5        A.  109 -- I'm sorry.  It's 105.
6        Q.  It's at the top here.  You said this is Billy
7    Arnold's contact list?
8        A.  Correct.
9        Q.  What do we see here?
10       A.  We see he saved that particular phone number
11   (313)784-6729 as the name Cocaine.
12       Q.  We heard Cocaine referred to as Cocaine Sonny,
13   Mr. Bailey?
14       A.  Correct.
15       Q.  Any other contacts that you have seen that number
16   in?
17       A.  A phone was seized from Mr. Robert Brown.  This
18   phone number was saved in his contact list as well under
19   the name Sonny.
20       Q.  Pull up Exhibit 16, Page 18.  What do we see here?
21       A.  Yes.  That is what we are seeing, (313)784-6729,
22   stored as the contact name Sonny.
23       Q.  As part of your investigation for this number ending
24   in 6729, did you reach out to the phone company to get the
25   subscriber and cell tower records?

*15-20652; USA v. EUGENE FISHER, ET AL*

1       **A.**   Yes.

2       **Q.**   Explain to the jury how you did that.

3       **A.**   To obtain cell records with cell tower information,

4    a court order at the time of this was required, 2703(d)

5    court order.  We obtained a 2703 court order from a U.S.

6    Magistrate, served it upon the cell company, and they, in

7    fact, returned their business records for the time frame

8    specified and for the number that we asked them for.

9       **Q.**   Generally what is the information that they provide

10   in that return?

11      **A.**   They provide the subscriber information, which will

12   include a name of a person.  Sometimes -- oftentimes,

13   people will use aliases.  It may include the subscriber's

14   address, type of phone device that's used.  It can include

15   the time that the account originated.  If the account

16   number has been terminated, it will give you that date.

17   As part of the detail records, you get incoming and

18   outgoing calls, text messages -- not actual messages

19   themselves, but the mere fact that the event occurred at a

20   date and time, and the direction.  It also gives cell

21   tower information which you will probably hear more about

22   today.

23      **Q.**   I will show you what's been marked as Government

24   Exhibit 29.  Does this contain the information that you

25   just discussed for the phone number ending in Mr. Bailey's

*15-20652; USA v. EUGENE FISHER, ET AL*

number 6729?

**A.**  That's correct.

      **MS. FINOCCHIARO:**  I move for admission of Government Exhibit 29.

      **THE COURT:**  Any objection?

      **MR. DALY:**  The admissibility of that has been litigated.

      **THE COURT:**  Thank you.  The Court will receive the item.

      **MS. FINOCCHIARO:**  Thank you, your Honor.

**BY MS. FINOCCHIARO:**

**Q.**  During your investigation, have you gotten a phone number for Mr. Keithon Porter?

**A.**  Yes, I have.

**Q.**  Okay.  What is that number?

**A.**  (313)806-0837.

      **MR. S. SCHARG:**  I would place an objection on the record.  Can we approach the bench, or do you want me to do it in front of the jury regarding foundation, lack of foundation as to this?

      **THE COURT:**  Let's approach.

      (Sidebar on the record.)

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. S. SCHARG:**  My client wants me to object

2     as to the foundation for this number.  Is it being

3     recorded?

4          **THE COURT:**  Yes.

5          **MR. S. SCHARG:**  There are a number of

6     reasons.  One is Officer -- Agent Ruiz testified on

7     July 11th where he indicated that prior to the date of

8     November 2015, no phone was ever recovered from Mr.

9     Porter's person.  They did say that he was stopped by

10    Warren with that phone, but there has been no proof of

11    verification that that number was -- came back from any

12    phone, Verizon, none of them are saying that it belonged

13    to Mr. Porter.  In fact, there's documentation to show

14    that it belonged to somebody else.

15         There's also testimony from the first trial,

16    February 12, 2018, in front of you in the first trial,

17    where Officer Ruiz testified that the phone number

18    belonged to Eugene Fisher.

19         So for him now to say that this phone belongs to

20    my client, I think that's improper, or possibly lying

21    under oath because he testified under oath that the phone

22    belonged to Eugene Fisher in the first trial.  I have the

23    transcript.

24         **MS. FINOCCHIARO:**  I don't recall that off

25    hand.  I will have to look that up what Agent Ruiz

*15-20652; USA v. EUGENE FISHER, ET AL*

1    testified to.

2           In terms of foundation, that is a number that

3    appeared in contact lists both as K.P. for one of the

4    co-defendants, as well as lower case P, upper case K, and

5    we heard testimony that it was used by an undercover cover

6    where Mr. Porter showed up.  So there's sufficient

7    foundation for Agent Ruiz to connect that number to Mr.

8    Porter for purposes of his testimony.

9           **THE COURT:**  You will have the opportunity to

10   cross.

11          **MR. S. SCHARG:**  Can I, instead of keep

12   objecting, have a standing objection?

13          **THE COURT:**  Sure.  Okay.

14          **MR. S. SCHARG:**  Thank you.

15          **MR. H. SCHARG:**  I have no objection of Ruiz,

16   you know, testifying intermittently during to the trial,

17   and you agreed, but's there's an old saying, you give

18   somebody a shield, you can't use it as a sword.  Every

19   time he comes up, he goes back and reemphasizes the

20   testimony that he gave before.  He says, as the jury heard

21   before, reemphasizing.  That was not the purpose of this.

22          The purpose was that intermittently he was suppose

23   to come up and bring in additional evidence and not go

24   over and repeat.  Every time he comes up, he's repeating

25   his testimony and evidence.

*15-20652; USA v. EUGENE FISHER, ET AL*

1           That's unfair.  That's not was not the purpose of

2      him testifying intermittently, because if he was

3      testifying once, he would not be able to do that, and just

4      because they want to break up his testimony, that's

5      improper and not appropriate.

6           **MS. FINOCCHIARO:**  Agent Ruiz is the case

7      agent in this case, and I told defense in advance of today

8      that Joe Jensen is going to testify about phone numbers,

9      and I would create an exhibit which the Court has, defense

10     counsel has, that has the phone number with the

11     defendant's names and how it's associated with that

12     person.  He's not trying to reiterate what he has

13     testified to, but explain to the jury what this sheet

14     shows to explain how the number is connected to the person

15     for the purposes of the testimony Joe Jensen, as well as

16     connecting the dots.

17          **MR. H. SCHARG:**  Every time he gets up, he

18     reiterates back to his previous testimony, and he refers

19     to the fact that the jury has already heard this.  What

20     they want to have accomplished can be done properly

21     without repeating himself and without the coining the

22     phrase as the jury heard before.

23          **THE COURT:**  I haven't perceived it as

24     repeating at this point.  There is a mass of information

25     that the witness is tying together contextually, and that

1    is a -- I think not only an appropriate way of putting in

2    the evidence, but necessary for the jury to understand the

3    evidence that's offer.  So if I perceive it as undue

4    repetitiveness, I'll certainly reconsider it at that

5    point.

6                **MR. H. SCHARG:**  What about the witness

7    constantly -- and he has constantly referred -- testified

8    as the jury has heard before, as I have told the jury

9    before?  That's going beyond what the Court has allowed,

10   and what is appropriate.  That's the biggest problem that

11   I have.  I understand to lay a little foundation, but as I

12   told you before, as you learned before, that's

13   emphasizing.  That's not only reiterating, that's

14   emphasizing certain testimony.

15               **THE COURT:**  It is identifying the evidence

16   that he has connected to whatever the address or the

17   individual --

18               **MR. H. SCHARG:**  Why does he have to give a

19   preference as I told the jury?

20               **MR. WECHSLER:**  Isn't it worst if he doesn't

21   do that, because then he's just saying, on July 22nd,

22   Corey Bailey was arrested with gun.

23               **MR. H. SCHARG:**  I'm fine with that.  I don't

24   think he should be lecturing the jury and telling the jury

25   and emphasizing and telling them what they heard before.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1     It is up to them to determine what they heard.  It's not
2     for him to lecture and tell them what they hear.
3                 THE COURT:  All right.  Again, I haven't
4     perceive that.
5                 MR. H. SCHARG:  At least keep one of the
6     lights on.
7                 MR. S. SCHARG:  And my objection is noted
8     throughout?
9                 THE COURT:  Yes.
10                MS. FINOCCHIARO:  Thank you.
11
12                (Sidebar conference concluded.)
13
14                THE COURT:  You may continue.
15
16    BY MS. FINOCCHIARO:
17      Q.  I believe we were talking about the number ending in
18    0837?
19      A.  That's correct.
20      Q.  And you say that belonged to Mr. Keithon Porter?
21      A.  That's correct.
22      Q.  And where -- what sources did you have for that
23    information?
24      A.  Yesterday we heard from an officer in Warren who was
25    doing an undercover operation and purchased drugs from
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1   Keithon Porter, and was in communication with Keithon

2   Porter back on November 11th, the initial drug

3   transaction, and then November 17th was the second drug

4   transaction, in which Keithon Porter was arrested and

5   those phones were recovered.

6   **Q.**  A phone with that number?

7   **A.**  Correct.

8   **Q.**  Just to be clear, we don't have the phone itself

9   today?

10  **A.**  No, we do not.

11  **Q.**  Was there any other areas where that phone number

12  showed up in that it was connected to Mr. Porter?

13  **A.**  Yes.  He in the phone that was seized from Corey

14  Bailey's property.  In that contact list was this number

15  stored with the contact name KP.

16  **Q.**  If we can pull up Exhibit 11, Page 10.  What do we

17  see on 235 and 236?

18  **A.**  235 and 236?

19  **Q.**  Yes.

20  **A.**  You see the telephone number (313)806-0837.  Line

21  235 it says KP for the contact name, and Line 236 it also

22  says KP.

23  **Q.**  Is there another contact list that this number

24  showed up in?

25  **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Who was that?

2    **A.**  We seized the phone from 18803 Lamont that belonged

3    to Eugene Fisher.  In that contact list this same number

4    appears to be stored under the contact name of P.K.

5    **Q.**  Go to Exhibit 15, Page 8.  That is Line 251.

6    **A.**  Yes, telephone number (313)806-0837, contact name

7    P.K.

8    **Q.**  Lower case P and upper case K?

9    **A.**  Yes.

10   **Q.**  Like Mr. Bailey's phone number, did you do a court

11   order and get information from the phone company for this

12   number?

13   **A.**  Yes, I did.

14   **Q.**  I will show you what's been marked as Government

15   Exhibit 30 for identification.  Does this contain the

16   information that you got back from the phone company for

17   that number?

18   **A.**  Yes, it does.

19           **MS. FINOCCHIARO:**  Move for admission of

20   Government Exhibit 30.

21           **THE COURT:**  All right.  The Court will

22   receive the evidence.

23

24   **BY MS. FINOCCHIARO:**

25   **Q.**  Now during the course of your investigation, did you

*15-20652; USA v. EUGENE FISHER, ET AL*

1    come across a phone number for Robert Brown?

2       **A.**  Yes, I did.

3       **Q.**  What's that phone number?

4       **A.**  (313)320-3075.

5       **Q.**  Okay.  What's the source of connecting that number

6    to Mr. Brown?

7       **A.**  On March 1, 2016, a search warrant was executed at

8    1624 Lozier in Warren, Michigan.  At that time we arrested

9    Mr. Brown, and in possession -- in his possession were

10   several cell phones, to include a cell phone that had this

11   number.

12      **Q.**  Did this appear in the contact list?

13      **A.**  Yes, it did.

14      **Q.**  We have not discussed this yet, but on September 26,

15   2015, was Andrew Thomas or Chino arrested?

16      **A.**  Yes.

17      **Q.**  And a phone was recovered?

18      **A.**  Yes, it was.

19      **Q.**  Was that phone dumped?

20      **A.**  We did a cell phone extraction of his telephone.

21      **Q.**  Explain where Mr. Brown's number appears in context?

22      **A.**  In Andrew Thomas' cell phone that we did a cell

23   phone extraction on, this number appeared under the

24   contact name R.O.

25      **Q.**  Okay.  Is that the nickname for Mr. Brown?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   That's correct.

2      **Q.**   Go to Exhibit 466, Page 6, and what line does it

3    appears on?

4      **A.**   I think it is 132.

5      **Q.**   And explain to the jury --

6      **A.**   The phone number stored in there is 1(313)320-3075,

7    stored under the contact name R.O.

8      **Q.**   Were there other contact lists that it appeared

9    under?

10     **A.**   Yes, in the phone that was seized at the time of

11   Corey Bailey's arrest, that same number was stored in his

12   contact list as Big Rob.

13     **Q.**   Go to Exhibit 11, Page 5.

14     **A.**   Line 49, phone number (313)320-3075, contact name

15   Big Rob.

16     **Q.**   Big Rob is another nickname that Robert Brown went

17   by?

18     **A.**   Yes.

19     **Q.**   And was there any other contact list that this

20   number appeared on?

21     **A.**   Yes.  Devon Patterson also had his phone number

22   saved on this contact list as Big Rob.

23     **Q.**   Exhibit 13, Page 24.

24     **A.**   Line 363.

25     **Q.**   What do we see?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  (313)320-3075, contact name Big Rob.

2    **Q.**  And did you also reach out to the phone companies

3    for this number and get back the subscriber and cell tower

4    information?

5    **A.**  Yes.

6    **Q.**  I will show you what's been marked Government

7    Exhibit 31 for identification.  Government Exhibit 31 is

8    the return from the phone company for that number?

9    **A.**  Yes, it is.

10          **MS. FINOCCHIARO:**  Move for admission of

11   Government Exhibit 31.

12          **THE COURT:**  Any objection?  Hearing none, the

13   Court will receive the item.

14

15   **BY MS. FINOCCHIARO:**

16   **Q.**  Now through the investigation, did you get a number

17   for Mr. Arlandis Shy?

18   **A.**  Yes, I did.

19   **Q.**  And what is that number?

20   **A.**  (313)671-6022.

21   **Q.**  And can you describe the source where that number

22   came from?

23   **A.**  Sure.  On May 19, 2015, he provided that number

24   himself to the Michigan Department of Corrections.

25   **Q.**  Is there any place that this number appeared?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**  Yes, it's stored in a Samsung tablet that we

2   received at 18803 Lamont, Mr. Fisher.  It was stored as a

3   contact in that device as A-Grymee.

4     **Q.**  Exhibit 15A, Page 2.  What do we see?

5     **A.**  Mobile number 1 (313)672-6022, contact name

6   A-Grymee.

7     **Q.**  Now we heard that Grymee is in association with

8   Mr. Arlandis Shy?

9     **A.**  Yes.

10    **Q.**  And is there any other contact lists that this

11  appeared in?

12    **A.**  A cell phone was also seized at the time of the

13  search warrant execution belonging to Mr. Fisher, which

14  that number was saved in that device as well as A Grymee.

15    **Q.**  Exhibit 15, Page 2, and again, what do we see here?

16    **A.**  Phone number (313)672-6022, contact name A-Grymee.

17    **Q.**  Any other contact that this appeared in?

18    **A.**  Yes.  It also appeared in James Robinson's cell

19  phone, stored contact name Vill.

20    **Q.**  Vill?

21    **A.**  Yes.

22    **Q.**  Is that a nickname for Mr. Shy?

23    **A.**  Yes.

24    **Q.**  Exhibits 14, Page 24, and what line is that?

25    **A.**  Line 406, mobile number (313)672-6022, contact name

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Vill.

2        **Q.**   And did you have the opportunity to reach out to the

3    phone company and get the information subscriber and or

4    cell tower for this?

5        **A.**   Yes.

6        **Q.**   Showing you Government Exhibit 38, is this the

7    information that you received from the phone company for

8    the number 6022?

9        **A.**   Yes, it is.

10            **MS. FINOCCHIARO:**   At this time the government

11   moves for admission of Government Exhibit 38.

12            **THE COURT:**   Any objection?

13            **MR. MAGIDSON:**   No objection.

14            **THE COURT:**   The Court will receive it.

15

16   **BY MS. FINOCCHIARO:**

17       **Q.**   Special Agent, during the course of the

18   investigation, did you get a phone number for Mr. Eugene

19   Fisher?

20       **A.**   Yes.

21       **Q.**   What was that number?

22       **A.**   (313)728-0167.

23       **Q.**   What was the source of that number connecting it to

24   Mr. Fisher?

25       **A.**   The phone seized at the time of the search warrant

1      execution at 18803 Lamont had that number for that device.

2      I believe it was also used in his Facebook account that we

3      reviewed previously.  In addition to that, it was stored

4      in Devon Patterson's contact list as Eugene Fisher.

5      **Q.**   Go to Exhibit 13, Page 51, and what do we see here?

6      **A.**   Line 1227, we see the mobile number 1(313)728-0167,

7      contact name is a little cut off, but it says Eugene

8      Fisher.

9      **Q.**   That's what we were just looking at?

10     **A.**   Yes.

11     **Q.**   Okay.  Now were you able to get phone numbers for

12     Mr. Billy Arnold?

13     **A.**   Yes, three of them.

14     **Q.**   Let's start with the first one or one of the ones

15     that you got for him.  What is the number that you got for

16     Mr. Billy Arnold?

17     **A.**   One number that I got from Billy Arnold at the time

18     of his arrest on September 26, 2015 was (313)424-8378.

19     **Q.**   Does that number appear in contact lists?

20     **A.**   Yes, it does.

21     **Q.**   Can you explain where it appears?

22     **A.**   It was stored in Andrew Thomas' contact under the

23     name Killa.

24     **Q.**   Go to 466, Page 4.  What do we see here?

25     **A.**   The mobile number (313)424-8378, contact name Killa.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Is that a nickname for Mr. Arnold?

2    **A.**  Yes.

3    **Q.**  Does it appear on other contact lists?

4    **A.**  Yes, it does.

5    **Q.**  Explain that to the jury.

6    **A.**  It is in the Samsung tablet seized from Fisher's

7    home.  It was stored under the name B-Man.

8    **Q.**  Go to Exhibit 15A, Page 2.

9    **A.**  I think it is Line 21, mobile number (313)424-8378,

10   contact name B-Man.

11   **Q.**  Along with Killa, is B-Man a nickname for Mr.

12   Arnold?

13   **A.**  Yes.

14   **Q.**  Does it in other contact lists?

15   **A.**  Yes, it does.

16   **Q.**  Can you explain that?

17   **A.**  It's stored in Robert Brown's cell phone under the

18   contact name Killer.

19   **Q.**  Go to Exhibit 16, Page 11, Line 123.

20   **A.**  Mobile number (313)424-8378, name Killer.

21   **Q.**  Does it appear in any other contacts list?

22   **A.**  It appears on Devon Patterson's as Berenzo.

23   **Q.**  Exhibit 23, Page 23.  You see the line on here?

24   **A.**  I -- it is difficult to see.  There's several

25   numbers under the contact Berenzo, (313)424-8378 is one of

*15-20652; USA v. EUGENE FISHER, ET AL*

1    them.

2       **Q.**   Okay.  Are you -- you said there were three numbers

3    that you were going to talk about.  Do you see the other

4    two numbers?

5       **A.**   Yes.  The other two numbers that I have for Billy

6    Arnold are (212)470-3434, and (212)470-1934.

7       **Q.**   You said this is Devon Patterson's phone contact

8    list?

9       **A.**   Yes.

10      **Q.**   Along with B-Man, Killer, is Berenzo a nickname for

11   Billy Arnold?

12      **A.**   Yes.

13      **Q.**   Any other contact that has the 8378 number?

14      **A.**   Corey Bailey's cell phone has this phone number

15   saved in it under Berenzo.

16      **Q.**   Exhibit 11, Page 5.

17      **A.**   Line 46, mobile number (313)424-8378, contact name

18   Berenzo.

19      **Q.**   For the 8378 number, did you search out the phone

20   company for cell tower and subscriber information?

21      **A.**   Yes.

22      **Q.**   And so I will show you Government Exhibit 28 and

23   28A.

24            Exhibit 28, is there the subscriber information

25   that you received back?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, it is.

2    **Q.**  And 28A, what are we looking at here?

3    **A.**  Copy of phone records.

4              **MS. FINOCCHIARO:**  Move for admission of

5    Government Exhibits 28 and 28A.

6              **THE COURT:**  Any objection?  Hearing none, the

7    Court will receive both items.

8

9    **BY MS. FINOCCHIARO:**

10   **Q.**  I think you previously discussed in the last slide

11   the number 1934 for Billy Arnold?

12   **A.**  Yes.

13   **Q.**  What is the full number?

14   **A.**  (212)470-1934.

15   **Q.**  Does that number, other than Mr. Patterson's phone,

16   appear in any other contact list?

17   **A.**  This phone number was one of the devices that was

18   seized at the time of the arrest for Billy Arnold on

19   September 26, 2015.

20   **Q.**  Okay.

21   **A.**  Obviously, we saw it in Mr. Patterson's contact

22   list.  It was also stored as B-Man in Eugene Fisher's cell

23   phone.

24   **Q.**  Go to Exhibit 15, Page 3, Line 35.  What do we see

25   here?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Both of those mobile numbers, 1(212)470-3434 and

2      1(212)470-1934, stored as contact name B-Man.

3      **Q.**  For this number ending in 1934, did you reach out to

4      the telephone company in order to get the subscriber and

5      cell tower records?

6      **A.**  Yes, I did.

7      **Q.**  I will show you Government Exhibit 32.  Is this the

8      subscriber return for that number?

9      **A.**  Yes.

10                 **MS. FINOCCHIARO:**  Move for admission of

11     Government Exhibit 32.

12                 **THE COURT:**  Any objection?  Hearing none, the

13     Court will receive the item.

14

15     **BY MS. FINOCCHIARO:**

16     **Q.**  And that third number that you were talking about

17     for Billy Arnold that we saw, repeat that again for the

18     jury.

19     **A.**  (212)470-3434.

20     **Q.**  As we just saw, it was in Mr. Fisher's cell phone as

21     B-Man?

22     **A.**  Correct.

23     **Q.**  And in Mr. Patterson as Berenzo?

24     **A.**  Yes, and this was another cell phone that was seized

25     from Mr. Arnold when he was arrested on September 26,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    2015.

2        **Q.**  And did you get the subscriber and cell tower

3    information for this number?

4        **A.**  Yes.

5        **Q.**  Showing you Government Exhibit 37, does this contain

6    the information ending in 3434?

7        **A.**  It does.

8            **MS. FINOCCHIARO:**  Move for admission of

9    Government Exhibit 37.

10           **THE COURT:**  Any objection?  Hearing none, the

11   Court will receive the item.

12

13   **BY MS. FINOCCHIARO:**

14       **Q.**  As part of your investigation, did you come across a

15   number for James Robinson?

16       **A.**  Yes, I did.

17       **Q.**  What is the number for Mr. Robinson?

18       **A.**  (313)948-8079.

19       **Q.**  What was the source for that number?

20       **A.**  It was seized at the time of his arrest on July 13,

21   2016.

22       **Q.**  And does it appear on any contact list?

23       **A.**  It does.  It appears on Robert Brown's list under

24   the name Wick.

25       **Q.**  Go to Exhibit 16, Page 22.  At the top, what do we

*15-20652; USA v. EUGENE FISHER, ET AL*

1    see?

2    **A.**  Mobile number (313)948-8079, contact name Wick.

3    **Q.**  And Wick is a nickname for Mr. James Robinson?

4    **A.**  Yes, it is.

5    **Q.**  Other than Mr. Brown's phone, was it in any other

6    contact list?

7    **A.**  It also appeared in Corey Bailey's cell phone.

8    **Q.**  Go to Exhibit 11, Page 17.

9    **A.**  Mobile number (313)948-8079, contact name Wick.

10   **Q.**  For this number ending in 8079 for Mr. Robinson, did

11   you reach out to the phone company for the subscriber and

12   cell tower information?

13   **A.**  Yes.

14   **Q.**  I will show you Exhibit 33 for identification.  Is

15   this Government Exhibit 33 that what we talked about?

16   **A.**  Yes, it is.

17          **MS. FINOCCHIARO:**  Move for admission of

18   Government Exhibit 33.

19          **THE COURT:**  All right.  Any objection?

20   Hearing none, the Court will receive the item.

21

22   **BY MS. FINOCCHIARO:**

23   **Q.**  I believe I skipped over -- I want to return briefly

24   to Mr. Fisher's number ending in 0167.  Is there any other

25   way besides what we talked about that that number was

*15-20652; USA v. EUGENE FISHER, ET AL*

1  associated?

2      **A.**  Yes, I mentioned the police report in which he

3  reported his electric meter being stolen.  Not only did he

4  provide the address of 18803 Lamont as his residence, he

5  provided the cell phone number (313)728-0167 as a way to

6  contact him.

7      **Q.**  What was the date of that?

8      **A.**  September 8, 2015.

9          **MS. FINOCCHIARO:**  One moment, your Honor.

10          Your Honor, since Special Agent Ruiz has addressed

11  the phone number information, the government would move

12  for the admission of Government Exhibit 27, which was

13  previously provided to defense, and would like to provide

14  a copy to the jury.

15          **THE COURT:**  All right.  The Court will

16  receive the item.

17

18  **BY MS. FINOCCHIARO:**

19      **Q.**  Just to be clear, Government Exhibit 27 is the

20  information that we discussed about the phone numbers?

21      **A.**  Yes, it is.  That's correct.

22          **MS. FINOCCHIARO:**  No further questions at

23  this time.

24          **THE COURT:**  Okay.  You made reference to 466,

25  contact list from Andrew Thomas, and I don't believe

*15-20652; USA v. EUGENE FISHER, ET AL*

1      that's been received in evidence.  Are you asking that it

2      be?

3                     MS. FINOCCHIARO:  Yes, under 104

4      conditionally admitted.  There will be a later time when

5      that will be discussed in more detail.

6                     THE COURT:  All right.  The Court will

7      receive the item.

8                     DEFENDANT PORTER:  With all due respect --

9                     THE COURT:  No, sir.  Not at this point, sir.

10     If you would take a seat, we'll address it when --

11                    DEFENDANT PORTER:  I want the jury to hear

12     me.  Mr. Ruiz is not --

13                    MS. FINOCCHIARO:  Your Honor, if we could

14     take a break?

15                    THE COURT:  Yes.  Why don't you sit down for

16     a minute, and we'll take a short break.

17

18                    (Jurors excused at 9:40 a.m.)

19

20                    THE COURT:  You can take a seat.

21                    DEFENDANT PORTER:  Can I state my case

22     please?

23                    THE COURT:  Well, go ahead.

24                    DEFENDANT PORTER:  I didn't meet Mr. Corey

25     Bailey until I was incarcerated.  So it's no way possible

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    that he can ever have a number in his phone under my name,

2    under KP.  My alias is KP.  I'm Keithon Porter.  That's

3    for the record, and for the record, they never took a

4    phone from me.  I never had a 806 number in my name.  They

5    never took a 806 number from me.

6         The police officer that was here yesterday, he

7    couldn't even provide no type of evidence that link me to

8    a 806 number.  He didn't have no phone.  He didn't have no

9    text records.  They never had that phone from me.  I don't

10   know where that number comes from.  And Ruiz is here

11   saying that the 806 is my number.  They can't even prove

12   it.  I guaranty he cannot prove it nowhere throughout this

13   trial.  They cannot bring in a 806 phone.  He cannot bring

14   a 806 number or any text messages that says Keithon Porter

15   to that phone.

16        I don't know understand why the Court is allowing

17   them to use that phone against me when it is not my phone.

18   They showed no type of evidence or foundation to link me

19   to that phone.  I just want that on the record.

20             **THE COURT:**  All right, sir.  It is noted for

21   the record.  You should know at sidebar your attorney was

22   describing some of the evidence that he will be using to

23   challenge the testimony.  That's what this process is all

24   about.  There's evidence that the government has that I'm

25   sure others among the defendants also disagree with, and

*15-20652; USA v. EUGENE FISHER, ET AL*

1    that's why you have a lawyer.

2              DEFENDANT PORTER:  I have been incarcerated

3    for two years, and I haven't seen a piece of evidence that

4    could tie me to this phone yet.

5              THE COURT:  So that's why the defense

6    attorney is here, because he has a chance to challenge

7    and --

8              DEFENDANT PORTER:  I understand that, sir.

9              THE COURT:  -- and object to the evidence.

10   If the evidence that is produced through that cross

11   examination discredits the testimony, the jury will have

12   the opportunity, and the Court may have the opportunity to

13   weigh in.

14        But the basic problem of hearing these complaints

15   during the process is that, first of all, it is premature

16   because there's going to be other evidence that you're

17   using to discredit this information on cross examination,

18   and it disrupts the flow of the case.

19        So if in the future you have something that you

20   feel has to absolutely be noted for the record, I will

21   give you the opportunity when the jury is not here to do

22   that because that's the only way.  You will have a chance

23   to testify if you wish also.

24             DEFENDANT PORTER:  Yes, sir.  I just want it

25   on the record because to my knowledge I'm not aware what's

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    going on at sidebar.  I don't know what's going on over
2    there.  My lawyer can only speak to me so much.  He can't
3    speak what the prosecutor is saying.  He can't tell me
4    everything.  I'm not aware what's going on over there.
5    I'm only aware what's going on that I can hear right here,
6    and I just wanted that on the record.
7              **THE COURT:**  All right.
8              **DEFENDANT PORTER:**  Thank you.
9              **THE COURT:**  If you have another problem
10   during the course of this, it has to be voiced outside the
11   presence of the jury.
12             **DEFENDANT PORTER:**  I understand that.
13             **MR. H. SCHARG:**  Do I have to put on the
14   record that I have to use restroom?
15             **THE COURT:**  I guess we may as well take a --
16             **MR. H. SCHARG:**  We're going to ask to take a
17   break when Agent Jensen finishes his direct, a short
18   break.  Agent Jensen is the next witness, and we would ask
19   for 10 or 15 minutes at that time.
20             **THE COURT:**  Okay.  All right.  That's going
21   to happen when?
22             **MS. FINOCCHIARO:**  If there's no cross, right
23   now.
24             **MR. H. SCHARG:**  There's a little cross.
25             **MS. FINOCCHIARO:**  After cross.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE COURT:** Hurry up.

2

3          (Recess taken at 9:43 a.m.)

4

5          (Proceedings with jury at 9:47 a.m.)

6

7          **THE COURT:** You can take a seat.

8          All right. Ms. Finocchiaro?

9          **MS. FINOCCHIARO:** No further questions.

10          **THE COURT:** Any cross examination?

11          **MR. H. SCHARG:** Yes.

12

13                    **CROSS EXAMINATION**

14

15   BY MR. H. SCHARG:

16

17   **Q.** Good morning, Agent Ruiz.

18   **A.** Good morning, sir.

19   **Q.** You obtained phone records from the subscribers of

20   certain phones during this investigation, correct?

21   **A.** I obtained it from the actual cell phone companies,

22   not subscribers.

23   **Q.** Okay. From the providers?

24   **A.** That's correct.

25   **Q.** And it's fair to say there's two roads -- or two

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    ways in order to obtain those records from the providers,

2    one is by subpoena and one by search warrant, correct?

3    **A.**   That's not entirely correct.

4    **Q.**   Correct me.

5    **A.**   At the time that we were obtaining these cell phone

6    records, the 2703, the court order was the way to obtain

7    these records.   The subpoenas will not get you cell tower

8    information.

9    **Q.**   You can obtain the records by court order?

10   **A.**   Correct.

11   **Q.**   Or by search warrant?

12   **A.**   That was a not legal requirement.

13   **Q.**   There was one way to obtain these?

14   **A.**   Court order.

15   **Q.**   Which is a pretty simple avenue, is that correct?

16   **A.**   I believe the legal threshold is relevance.

17   **Q.**   Okay.   You obtained the records for (313)424-8378,

18   and those were the phone records of the subscriber Billy

19   Arnold?

20   **A.**   That's correct.

21   **Q.**   Do you recall when you submitted the order for these

22   records?

23   **A.**   Not off the top of my head.

24   **Q.**   Give us a guesstimate.   You're very sure and very

25   definitive regarding all your testimony.   Give us at least

*15-20652; USA v. EUGENE FISHER, ET AL*

1    an estimate as to when --

2        A.   My estimation would be after September 26, 2015 when

3    he was arrested with those cell phones in his possession.

4    I probably did the court order request shortly thereafter.

5    My guess would be in October of 2015.

6        Q.   And you identified Exhibit 28 this morning?

7        A.   I identified a lot of exhibits.  I don't know what

8    28 was.

9        Q.   Is that the detail call record of Billy Arnold?

10       A.   It may be.

11       Q.   You don't remember what you testified to 10 minutes

12   ago?

13       A.   I don't remember the number.  We went through a lot

14   of exhibits already.

15       Q.   I'm talking about within the last 10 minutes.

16       A.   I'm telling you we went through nine numbers, which

17   would have been nine different exhibits for those numbers

18   alone.  In addition to that, all of the cell phone contact

19   lists would have been their own exhibit number.  I don't

20   remember all of the exhibit numbers.

21       Q.   Do you recall identifying the call detail records of

22   Billy Arnold for the phone (313)423 --

23       A.   Yes, I do.  I don't recall the exhibit number.

24       Q.   Did you obtain a court order for (313)728-0167

25   during your investigation?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.  I do not recall exhibit number for that.

2    **Q.**  And there is a -- you were able to obtain the detail

3  call records for Eugene Fisher for (313)728-0167?

4    **A.**  That's correct.

5           **MR. H. SCHARG:**  No further questions.

6           **THE COURT:**  Thank you.  Mr. Daly?

7

8                    **CROSS EXAMINATION**

9

10  **BY MR. DALY:**

11

12    **Q.**  Agent Ruiz, good morning.

13    **A.**  Good morning.

14    **Q.**  Is that the correct pronunciation of your name?

15    **A.**  Ruiz.

16    **Q.**  Ruiz?

17    **A.**  Ruiz.

18    **Q.**  I'm close?

19    **A.**  Very close.

20    **Q.**  Okay.  You said that with regards to Corey Bailey,

21  there was a specific number that you associated him with,

22  is that correct?

23    **A.**  That's correct.

24    **Q.**  And one of the ways that you associated that number

25  with him was based on an arrest on July 22, 2014?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   That's correct.

2     **Q.**   And that was the arrest at the Novara address

3     involving the Detroit arson investigation that we heard

4     about, right?

5     **A.**   Yes, it is.

6     **Q.**   And in that incident, Mr. Bailey was seen with a .40

7     caliber, correct?

8     **A.**   Yes.

9     **Q.**   And Mr. Bailey was charged in federal court with

10    possession of that .40 caliber, correct?

11    **A.**   Yes, he was.

12    **Q.**   Now there was another weapon that was seized there,

13    and that was an assault weapon that was found in the white

14    van in the driveway, correct?

15    **A.**   That is also correct.

16    **Q.**   And Mr. Bailey was not charged with possessing that

17    weapon, correct?

18    **A.**   He was not.

19    **Q.**   Was not.   Okay.   Now since Mr. Bailey's arrest on

20    July 22nd of 2014, has he remained in custody up until

21    today?

22    **A.**   Yes.

23    **Q.**   He's never been released?

24    **A.**   No, he has not.

25    **Q.**   He is not free to roam around the country.   He is

*15-20652; USA v. EUGENE FISHER, ET AL*

1    always incarcerated?

2    **A.**   That's correct.

3    **Q.**   You talked a little bit about the records that you

4    obtained through court orders, the phone records, correct?

5    **A.**   Yes.

6    **Q.**   And we're going to have more testimony from another

7    agent in detail about this?

8    **A.**   Yes, you will.

9    **Q.**   One of the things that you referred to, you used the

10   abbreviation CDR?

11   **A.**   I may have.

12   **Q.**   Those are call detailed record?

13   **A.**   That's correct.

14   **Q.**   And then you mentioned on direct examination from

15   the government lawyers that that information included

16   dates, correct?

17   **A.**   Yes.

18   **Q.**   Incoming, outgoing calls, correct?

19   **A.**   Yes.

20   **Q.**   Times when calls were made?

21   **A.**   Yes.

22   **Q.**   When they started and ended, correct?

23   **A.**   Yes.

24   **Q.**   And those records do not indicate the content of the

25   call in any way, shape or form?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  They do not.

2    **Q.**  And those records don't indicate who is making the

3    call or receiving the call, correct?

4    **A.**  That is also correct.

5    **Q.**  You also mentioned text messages, that these records

6    show that a text message may have been sent or received,

7    correct?

8    **A.**  Yes, again with no content.

9    **Q.**  You mentioned that.  There's no content on these

10   records?

11   **A.**  Right.

12   **Q.**  All right.  Now also the government lawyers were

13   asking you questions, and they showed you some maps of

14   what could be called crime scenes for certain shootings,

15   is that correct or not?

16   **A.**  The map that was shown today?

17   **Q.**  Yes.

18   **A.**  Only one, Duchess and Craft.

19   **Q.**  One crime scene on that map, correct?

20   **A.**  Correct.

21   **Q.**  And you testified before about the July 14, 2014

22   shooting of Neff or Mr. Page?

23   **A.**  Yes.

24   **Q.**  One of the things that you told us is that you were

25   unable to determine a crime scene, that is, where the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    shooting actually happened, correct?

2        A.  That is also correct.

3        Q.  So the best that we can say at this point is that

4    the crime scene or the shooting occurred somewhere between

5    the parole office at 5300 Lawton and Grand River and

6    Oakman?

7        A.  Yes, where the vehicle came to rest.

8        Q.  Somewhere between there?

9        A.  Yes.

10       Q.  And we said that's short of 4 miles, ball park?

11       A.  Right.

12       Q.  Now as the agent in charge, you testified before the

13   grand jury in this case a number of times, correct?

14       A.  Yes.

15       Q.  Okay.  More than once, right?

16       A.  Many more times.

17       Q.  Many times.  Okay.  And just for background

18   information, the grand jury is a group of citizens,

19   correct?

20       A.  Yes.

21       Q.  And in the grand jury room, besides the grand jury

22   citizens, there are witnesses who are called to testify,

23   correct?

24       A.  Yes.

25       Q.  And before they testify there, they are sworn to

                   *15-20652; USA v. EUGENE FISHER, ET AL*

1    tell the truth, correct?

2    **A.**  Yes.

3    **Q.**  After they testify, they are always given an

4    opportunity to change their testimony if they want to?

5    That's general protocol, is that correct, at the end?

6    **A.**  I don't know.  I don't think I've ever changed.

7    **Q.**  I'm not asking if you did, but the normal course of

8    things, the witness testifies, and the U.S. Attorney will

9    say, is there anything that you want to change about what

10    you just testified.  That's normal course, or you don't

11    know?

12    **A.**  I don't know.  I'm not present when other witnesses

13    are in the grand jury.

14    **Q.**  You're not present.  There's no judge present?

15    **A.**  Correct.

16    **Q.**  No defense lawyers present?

17    **A.**  Correct.

18    **Q.**  Defense lawyers don't get to object or cross examine

19    witnesses at a grand jury, correct?

20    **A.**  That's correct.

21    **Q.**  Now because you testified a number of times, you

22    probably can't tell the jury every day that you appeared

23    before the grand jury?

24    **A.**  I certainly cannot.

25    **Q.**  If I told you December 16, 2015 was a day that you

*15-20652; USA v. EUGENE FISHER, ET AL*

1    appeared, does that sounds about right?

2       **A.**   It may be.

3              **MR. DALY:**   Your Honor, may I approach the

4    witness?

5              **THE COURT:**   Yes.

6    **BY MR. DALY:**

7       **Q.**   I will hand you a cover sheet of a grand jury

8    transcript.

9       **A.**   Okay.

10      **Q.**   It has your name on it, is that correct?

11      **A.**   It sure does, and says December 16, 2015.

12      **Q.**   And if you would turn to Page 28, and read to

13   yourself the question and answer on Lines 12 through 13.

14   Have you read that, sir?

15      **A.**   I'm reading it.  Yes.

16      **Q.**   So you told us before you testified that you were

17   sworn to tell the truth, correct?

18      **A.**   Yes.

19      **Q.**   And you did tell the truth, correct?

20      **A.**   Yes.

21      **Q.**   You never changed your testimony.  You also added

22   that, correct?

23      **A.**   Yes.

24      **Q.**   Were you asked this question, and did you give this

25   answer under oath in front of the grand jury:

                *15-20652; USA v. EUGENE FISHER, ET AL*

 1              Question:  What time is Djuan Page or Neff

 2      killed?

 3              Answer:  Let me take a quick look.  It was at

 4      1:15 p.m.

 5              Is that what you testified to before the grand

 6      jury?

 7      **A.**  That's what I testified to.

 8              **MR. DALY:**  Nothing further.

 9              **THE COURT:**  Thank you.

10              **THE WITNESS:**  May I clarify something, sir?

11

12                    **CROSS EXAMINATION**

13

14  BY MR. FEINBERG:

15

16      **Q.**  Relating to the testimony that you gave concerning

17      Mr. Brown's phone, did you get a court order for his

18      records?

19      **A.**  Yes, I did.

20      **Q.**  You didn't think to get a search warrant?

21      **A.**  I believe the legal requirement at the time to

22      getting call detailed records was the 2703(d) court order.

23      **Q.**  How do you know that?

24      **A.**  I have been doing this job for eight years, plus

25      that's been my training, and we go through the U.S.

1    Attorney's Office each time.  I just don't take it to the

2    court.  It is reviewed by the attorney, and reviewed by

3    magistrate, and it's either approved or denied, and served

4    upon the cell phone company.

5        Q.  Before you attempt to get a court order, you consult

6    with the U.S. Attorney's Office?

7        A.  Yes.

8        Q.  And then you go to the magistrate and get --

9        A.  Not me personally.

10       Q.  They do it?

11       A.  Yes.

12       Q.  Okay.  You testified concerning his contact list, do

13   you remember that?

14       A.  Yes.

15       Q.  And you testified based on your examination of the

16   court received records, court ordered records.  How many

17   contacts did you testify to that were on Mr. Brown's

18   phone?

19       A.  Today?

20       Q.  Yes.

21       A.  I think only three.

22       Q.  In reviewing all of his records, how many contacts

23   did he have total on his phone?

24       A.  I don't know that number off the top of my head.

25       Q.  Hundreds?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Maybe.

2    **Q.**  And these three were the only ones that you

3    testified to that were on his phone, Billy Arnold's and

4    Corey Bailey and Mr. Patterson?

5    **A.**  These three are relevant to the number that we are

6    discussing today.

7    **Q.**  People who you were investigating as to the Seven

8    Mile Bloods?

9    **A.**  That's correct.

10   **Q.**  Whose phones that you had seized?

11   **A.**  That's correct.  Not all of them, just the ones that

12   are relevant to today.  There are numerous other contacts

13   of Seven Mile Bloods members.

14   **Q.**  And non-Seven Mile Bloods members?

15   **A.**  Yes.

16   **Q.**  Friends, family?

17   **A.**  Yes.

18   **Q.**  Not all of his friends were people who were

19   connected to your investigation of the Seven Mile Bloods?

20   **A.**  That's true.

21   **Q.**  Other people that he grew up with?

22   **A.**  Quite possibly.

23   **Q.**  And according to your investigation, a lot of the

24   people that you investigated as to being members of Seven

25   Mile Bloods were friends that he grew up with, is that

*15-20652; USA v. EUGENE FISHER, ET AL*

1      correct?

2          **A.**   And he grew up with some of these guys.

3                   **MR. FEINBERG:**  No further questions.

4                   **THE COURT:**  Thank you, Mr. Feinberg.

5

6                        **CROSS EXAMINATION**

7

8  BY MR. MAGIDSON:

9

10         **Q.**   Good morning, Agent Ruiz.

11         **A.**   Good morning.

12         **Q.**   Hope I was able to pronounce your name correctly.

13         **A.**   Very close.

14         **Q.**   Okay.  So as it relates to Mr. Shy's phone, based on

15     your review of the records, he voluntarily turned over

16     that phone, isn't that correct?  He was asked when

17     arrested, turned himself in at the probation department,

18     and he was asked to give some phones, and he voluntarily

19     produced those?

20         **A.**   He produced a phone.

21         **Q.**   Okay.  And he voluntarily gave the phone number even

22     before that to his -- to Bonnie Phillips, his probation

23     officer, isn't that right?

24         **A.**   Are you referring to the cell phone that he

25     voluntarily gave to me?

                  *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.** I'm talking about the phone that's the subject to

2      this case.

3      **A.** Well, I don't want you to confuse anybody.  The

4      phone that he gave me did not have that telephone number.

5      **Q.** Right, but he was asked, either by you or another

6      person involved in the investigation, asked him to produce

7      phones, and he produced --

8      **A.** A phone.

9      **Q.** In fact, his grandmother brought a phone to the

10     probation office, isn't that right?

11     **A.** Not to the probation office, but to court.

12     **Q.** Anyhow, he asked family members to locate various

13     phones and bring them to either you or other people

14     involved in the investigation?

15     **A.** That's correct.

16     **Q.** And he also had given this number, this number

17     that's the subject of this case, to Bonnie Phillips, the

18     probation officer, isn't that right?

19     **A.** I don't know if it was Bonnie or another probation

20     agent, but yes, he provided it to the Michigan Department

21     of Corrections.

22     **Q.** He was not hiding it or anything like that?

23     **A.** Not at that time.

24     **Q.** Well, at any time?

25     **A.** No.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. MAGIDSON:**  I have nothing further.

2          **THE COURT:**  Thank you, Mr. Magidson.

3      Mr. Scharg?

4          **MR. S. SCHARG:**  Thank you, Judge.

5

6                    **CROSS EXAMINATION**

7

8  **BY MR. S. SCHARG:**

9

10     **Q.**  Good morning, Investigator Ruiz.

11     **A.**  Good morning.

12     **Q.**  As officer in charge of the case, you're only

13  gathering reports from different individuals in your

14  group?

15     **A.**  This was a very large case.  It was multiple people

16  working on it with me.  I was responsible for some things

17  as well as my partner.

18     **Q.**  Being the officer in charge, they have to report to

19  you?

20     **A.**  Most of it goes through me.

21     **Q.**  And they prepare reports, and you have the chance

22  review them before you submit them to the prosecutors?

23     **A.**  Usually, yes.

24     **Q.**  And in this case you told us this morning that you

25  had the address of 20304 Dresden assigned to Mr. Keithon

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1    Porter, correct?

2       **A.**   He is associated with that address.

3       **Q.**   When you say associated, you say he is associated

4    because the Secretary of State indicated that he applied

5    for a driver's license with that address on it?

6       **A.**   In January 2012.

7       **Q.**   And do you have a copy of that information with you

8    to indicate that?

9       **A.**   On my phone I have an email, but I don't have a

10   physical copy.

11      **Q.**   Has anything been presented to the prosecutor with

12   the driver's license with that address on it?

13      **A.**   Yes.

14      **Q.**   They have it in their possession?

15      **A.**   You have to ask them.

16      **Q.**   Officer Ruiz, are you referring to a Michigan State

17   Police profile and not Secretary of State, actually

18   driver's license.

19      **A.**   It says Secretary of State on there.

20          **MR. S. SCHARG:**   May I approach the witness,

21   your Honor?

22          **THE COURT:**   Yes.

23          **THE WITNESS:**   SOS file.

24

25   **BY MR. S. SCHARG:**

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  That stands for Secretary of State?

2    **A.**  Yes, sir.

3    **Q.**  Okay.  And through your investigation, it is also

4    fair to say that yesterday when Officer Villerot testified

5    from the City of Warren, undercover police officer, he had

6    some documents that you reviewed as well?

7    **A.**  That's correct.

8    **Q.**  And is it fair to say that the address that was

9    given or provided to the officers in Warren in the summer

10   of 2015 was Mr. Porter's address as 12500 Stringham Court

11   in Detroit?  Do you recall seeing that in the documents

12   that they provided to you for your review?

13   **A.**  I think that might have been the address.

14   **Q.**  May I show you this to see if it refreshes your

15   memory?

16   **A.**  Yes.

17            **MR. S. SCHARG:**  May I approach the witness?

18            **THE COURT:**  Yes.

19            **THE WITNESS:**  Yes, I see it, 12500 Stringham

20   Court, Detroit, Michigan.

21

22   **BY MR. S. SCHARG:**

23   **Q.**  That's the address that the Warren Police Officers

24   put on their documentation that Mr. Porter was residing at

25   that address?

*15-20652; USA v. EUGENE FISHER, ET AL*

1        **A.**   He must have provided that address.

2        **Q.**   And when you received that information that Mr.

3    Porter mentioned or some documents from the Secretary of

4    State that indicated that he was at 20304 Dresden, did you

5    ever go to that location during this investigation?

6        **A.**   Yes, I have.

7        **Q.**   And have you ever -- did you find any documents in

8    that house that indicated --

9        **A.**   As part of the search warrant or to review the

10   address and look at what the structure looks like?

11       **Q.**   So see what the structure looked like first?

12       **A.**   I had driven by.

13       **Q.**   Was it a vacant home or abandon home, or did it look

14   like people were living there?

15       **A.**   I've seen a lot of houses in Detroit.  I've seen

16   houses that look like they are vacant homes in which

17   people live in.  This looks like it could have been lived

18   in.

19       **Q.**   Did you see individuals -- I mean, when you first

20   went to that location, were you there preparing to do a

21   search warrant or surveillance?

22       **A.**   Just surveillance.

23       **Q.**   And did you see any individuals coming and going

24   from that location?

25       **A.**   I did not.

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Were there vehicles in the driveway when you were

2    there?

3    **A.**  I don't recall.

4    **Q.**  And at some point you did do a search warrant at

5    that location?

6    **A.**  No.

7    **Q.**  So at no point do you know with certainty whether

8    Mr. Porter lived at that address?

9    **A.**  I'm sorry?

10   **Q.**  Do you have any documents or any physical evidence

11   to show that he lived at that address?

12   **A.**  All I got are several police reports that was

13   associated with him at that address.

14   **Q.**  I know there might be some association.  Was there

15   proof of residency from that location, any documents to

16   show from Detroit Edison that he had electricity at that

17   location, whether he had any gas bills, anything of that

18   nature?

19   **A.**  None that I was able to obtain.

20   **Q.**  Okay.  After finding out that he was given an

21   address of 12500 Stringham Court in Detroit, did you ever

22   go to that location?

23   **A.**  No.

24   **Q.**  And so you had no idea to determine whether or not

25   he was actually living there?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No.

2    **Q.**  And did you know that he was living there for the

3    past 15 years?

4    **A.**  I guess the other things would have been false

5    information, right?

6    **Q.**  I'm just asking if you know.  Do you have any

7    knowledge if he was living there for the past 15 years?

8    **A.**  He was not living there when we executed a search

9    warrant on Charest.

10   **Q.**  But that address on Stringham Court, there was never

11   a search warrant executed at that location, correct?

12   **A.**  No.

13   **Q.**  So you have nothing to contradict the fact that if

14   he was living there for 15 years, you wouldn't have --

15   **A.**  The search warrant executed at 19940 Charest would

16   contradict that.

17   **Q.**  And whose residence was that?

18   **A.**  His mother's.

19   **Q.**  Anyone else residing at that location besides his

20   mother?

21   **A.**  Well, Keithon Porter, a female.  I don't recall if

22   it was a sister or girlfriend or what.  I think it was his

23   girlfriend that was there.

24   **Q.**  And did you do any search of the Stringham Court

25   address to see if there was such an address?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No.

2    **Q.**  You had no clue about that address at all?

3    **A.**  I don't.

4    **Q.**  During your investigation in this case, we saw on

5    the first couple days of trial numerous Facebook pages and

6    Instagrams, and I'm sure -- as I asked you the last time

7    you testified, you look at many others as well, correct?

8    **A.**  Correct.

9    **Q.**  And is it fair to say that in none of the pictures

10   that you observed, you indicated today that Corey Bailey

11   had a contact name of KP in his phone list?

12   **A.**  He did.

13   **Q.**  And after all the hours and time you put into these

14   Facebooks and Instagrams, not one did you ever see Corey

15   Bailey with Keithon Porter, did you?

16   **A.**  No, I don't believe so.

17   **Q.**  And in fact, you don't even have reference to

18   believe -- or you have no knowledge to believe to indicate

19   that, that they didn't know each other until the time they

20   were arrested in the case?

21   **A.**  You mean Keithon Porter?

22   **Q.**  Keithon Porter and Mr. Bailey?

23   **A.**  Okay.

24   **Q.**  Isn't that fair to say that you have no knowledge --

25   or you can't -- there's no evidence to show -- to even

*15-20652; USA v. EUGENE FISHER, ET AL*

1    show that they had any relationship at all up until the

2    time they were indicted in this case?

3        **A.**  I wouldn't be able to say that.

4        **Q.**  Have you ever checked the Secretary of State within

5    the last five years to see whether Mr. Porter's I.D.

6    matched the Stringham Court address?

7        **A.**  I've seen other addresses, and yes, they've been

8    within the last five years.

9        **Q.**  For the Stringham Court?

10       **A.**  I don't remember the exact address.

11       **Q.**  And we heard testimony today that Mr. Bailey has

12   been locked up since 2014, correct?

13       **A.**  Yes, he last.

14       **Q.**  And do you have any explanation from all of your

15   investigation work how Mr. Porter's phone number was -- or

16   that number that you said was 806-8037 happened to be in

17   Mr. Bailey's phone?

18       **A.**  Do I have an explanation?

19       **Q.**  Yes, is there any explanation for that?

20       **A.**  I assume he put it in there.

21       **Q.**  That's the only explanation that you have for that?

22       **A.**  Yes.

23       **Q.**  Now on July 11th, Special Agent Ruiz, when you

24   testified the last time, I asked you on cross examination

25   whether or not a phone was ever recovered from Keithon

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Porter with the number 806-0837 prior to November 2015,

2    and your response was no, correct, off his person?  Did

3    you ever recover a phone with that number from him?

4        **A.**   I never recovered a phone with that number.

5        **Q.**   Is it fair to say that the first time that number

6    ever came up that's associated to Mr. Porter is when the

7    Warren Police Department recovered four phones at the time

8    of his arrest in Warren?

9        **A.**   No.

10       **Q.**   When was the other time they would have had a phone

11   with that number recovered from Mr. Porter?

12       **A.**   That number was made known to me when there was a

13   carjacking incident at 20304 Dresden, in which the victim

14   Aaron Moon was shot.  The female that was there with Aaron

15   Moon at the time provided that as a contact number for

16   Keithon Porter.  She also provided that as a residence for

17   Keithon Porter, and she identified a photo of Keithon

18   Porter.

19       **Q.**   Is she one of the witnesses on your witness list?

20       **A.**   She's deceased.

21       **Q.**   So there's no way to contradict or contest what

22   you're saying?

23       **A.**   That's correct.

24       **Q.**   And, in fact, when you testified -- before we get

25   into that, at no time is there any phone in your custody,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    government's custody, that had 806-8037, is that correct?

2    **A.**  As the actual phone number for the device?

3    **Q.**  Yes.

4    **A.**  No.  As a contact saved in other cellular devices,

5    yes.

6    **Q.**  And it's fair to say that you did send away for

7    phone records pertaining to that phone as to who the

8    ownership or subscriber was?

9    **A.**  Yes.

10   **Q.**  And it's fair to say that you did get a response

11   back as who the subscriber was?

12   **A.**  Yes, I did.

13   **Q.**  Do you know who this person's name was?

14   **A.**  Not off the top of my head, but it's a female's name

15   if I remember correctly.

16   **Q.**  Does the name Biljohna Sevetski (sp) sound familiar?

17   **A.**  Not at all.

18   **Q.**  If the government provided me that information,

19   would you disagree with that?

20   **A.**  No, I would not.

21   **Q.**  Obviously, it's your position that information has

22   to be incorrect because you're saying that number belongs

23   to Keithon Porter, correct?

24   **A.**  In previous testimony, we showed that Jeffrey Adams'

25   cell phone had the subscriber name Sammy Bull.  So it's

*15-20652; USA v. EUGENE FISHER, ET AL*

1    not uncommon for people to use aliases when getting

2    telephones.

3       Q.  Do you know whether or not Sprint has certain

4    requirements?  That's a Sprint line, correct?

5       A.  I don't recall if it was Sprint.

6       Q.  And you do know that you recovered a phone with the

7    phone number (313)476-5312 belonging to Mr. Porter?

8       A.  Yes.

9       Q.  And have you done a research into that phone at all?

10      A.  Yes.

11      Q.  And was he the subscriber of that line?

12      A.  I don't recall off the top of my head.  He provided

13   that number to the Detroit homicide investigators himself.

14      Q.  And it's fair to say that --

15      A.  It may or may not have his name as the subscriber on

16   it.

17      Q.  Now you testified in another hearing this year

18   before Judge Steeh, correct?

19      A.  Yes, I have.

20      Q.  And you testified in this hearing under oath like

21   you're doing today?

22      A.  Yes.

23      Q.  And you were asked a number of questions like you

24   are being asked today, correct?

25      A.  I'm sure, yes.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1  **Q.** Do you recall somebody, the U.S. Attorney by the
2  name Chris Graveline asking you questions at that hearing?
3  **A.** Yes, he asked many question.
4  **Q.** Do you recall him asking you the question of: Who
5  the number -- who is the authorized person of
6  (313)806-0837 for that phone?
7  **A.** I don't remember that question specifically, but if
8  you have the testimony it may refresh my memory.
9  **Q.** Sure. Mr. Graveline on Page 95 from the
10 February 12th hearing day of this year, 2018, before Judge
11 Steeh.
12 **A.** Okay.
13 **Q.** He started asking you questions regarding peoples'
14 phone numbers?
15 **A.** Yes.
16 **Q.** Question, Line 3: Did you see who was listed there
17 as Cocaine in Mr. Arnold's cell phone?
18             Answer: I do.
19             What is the number there?
20             Answer was: (313)784-6729.
21 **A.** Okay.
22 **Q.** Is that correct?
23 **A.** Yes.
24 **Q.** And based upon your investigation, have you heard
25 the nickname Cocaine associated with anyone?

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1              Answer:  Yes, Corey Bailey?

2      A.   Yes.

3      Q.   Next question:  Did you reach out to Metro PCS and

4    T-Mobile to get Mr. Bailey's phone number and have those

5    marked as a government exhibit?

6              And your answer was:  Yes, I did, and I believe

7    they are.

8      A.   Okay.

9      Q.   So Mr. Graveline moved for admission of those

10   exhibits.

11     A.   Okay.

12     Q.   Going on to Page 96, Mr. Graveline asked you:  Do

13   you see the phone number listed there (313)806-0837?

14             Your response was:  I do.

15             That's true?

16     A.   Yes.

17     Q.   Question was asked by Mr. Graveline, the U.S.

18   Attorney:  Based upon your investigation, did you identify

19   that phone number as being associated with someone?

20             Your answer was:  Yes.

21     A.   Yes.

22     Q.   That's true?

23     A.   Yes.

24     Q.   Question:  And who did you associate that with?

25             Answer:  I believe this is Eugene Fisher's cell
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    phone number.

2              Did you reach out to Sprint and get their

3    records for (313) 806-8037?

4              Answer was:  Yes.

5    **A.**   I remember that specifically now.

6    **Q.**   Those were your answers?

7    **A.**   It was.  I was mistaken on that day.

8    **Q.**   You were mistaken?

9    **A.**   Yes.

10   **Q.**   Did you tell Mr. Graveline that you were mistaken?

11   **A.**   He reminded --

12   **Q.**   I didn't finish my question.

13   **A.**   I'm sorry.

14   **Q.**   Did you inform Mr. Graveline on the date of that

15   testimony that before you got off the witness stand that

16   you were mistaken?

17   **A.**   I did not.

18              **MR. S. SCHARG:**  Judge, may I have one moment,

19   please?

20              **THE COURT:**  Yes.

21              **MR. S. SCHARG:**  I have nothing further, your

22   Honor.

23              **THE COURT:**  Thank you, Mr. Scharg.

24         Any redirect?

25              **MS. FINOCCHIARO:**  Yes, your Honor.

*15-20652; USA v. EUGENE FISHER, ET AL*

1                        **REDIRECT EXAMINATION**

2

3    **BY MS. FINOCCHIARO:**

4

5       **Q.**   Special Agent, I want to clarify some things.

6             When talking about subscriber information, names

7    given to a phone company, can you explain to the jury, do

8    you need a driver's license necessarily to subscribe to a

9    phone number?

10      **A.**   Not necessarily.  Like I mentioned, people can use

11   aliases.  I've seen aliases that doesn't make any sense,

12   like Mickey Mouse.  We saw Sammy Bull previously when I

13   testified, and there are those that may get a friend or

14   family member to go to those providers that require

15   identification to get a phone for them.

16      **Q.**   We have talked a lot on cross about 2703(d) orders.

17   I want to be clear.  With a 2703(d) order, this is an

18   order of the court, right?

19      **A.**   That is correct.

20      **Q.**   And the judge signs it?

21      **A.**   Yes, they do.

22      **Q.**   And so the judge determines whether the law has been

23   met before signing the order to get the records?

24      **A.**   That is correct.

25      **Q.**   And you talked with Mr. Shy's counsel about phones

*15-20652; USA v. EUGENE FISHER, ET AL*

1      that he voluntarily gave up.

2                To be clear to the jury, the phone that was

3      brought into court here, was that the one with the 6022

4      number?

5      **A.**   I don't think it was.

6      **Q.**   But the 6022 number was provided in May of 2015 to

7      probation?

8      **A.**   Yes, it was.

9      **Q.**   And you heard about your former hearing where you

10     were asked the question about the 8037 number.  You were

11     mistaken.  Please explain that.

12     **A.**   At the time of that testimony, I didn't have my

13     reference sheet like I do today.  There's a lot of

14     telephone numbers as way discussed that's associated with

15     this case.  When Mr. Graveline asked me that question, I

16     thought I recognized that number.  After that day's

17     testimony, he reminded me that I was mistaken, and he

18     informed me that we would clear that record up at another

19     date.

20     **Q.**   Just to be clear, that number, 0837, what's your

21     investigation associated that number with?

22     **A.**   With Keithon Porter, not Eugene Fisher.

23     **Q.**   And there were some questions from defense counsel

24     about July 14, 2014 --

25     **A.**   Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      Q.  -- and previous testimony that you gave for the

2    grand jury.  To be clear for the jury, when you testify

3    for the grand jury, are you always testifying from your

4    personal knowledge or are you using other sources of

5    information?

6      A.  You use many sources of information, police reports,

7    interviews, information like court records that we might

8    receive, witness and cooperator information, other police

9    officers' knowledge and information that they share with

10   us.

11     Q.  When you gave the 1:15 number, was that from a

12   source that you were looking at?

13     A.  It must have been.  I must have looked at something

14   that said let me take a quick look, but the thing that I

15   wanted to clarify --

16          MR. H. SCHARG:  Objection.  Narrative.

17

18   BY MS. FINOCCHIARO:

19     Q.  For the 1:15, can you explain where you got that

20   time from that you gave to the grand jury for the Djuan

21   Page shooting?

22     A.  I must have looked at an exhibit of some sort.

23     Q.  Why do you believe that?

24     A.  Because I say in my testimony, let me take a quick

25   look.

                     *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  You were reading off of something?

2      **A.**  Yes.

3      **Q.**  Now in this stage of the case and investigation, do

4      you know 1:15 to be the time of the shooting, or are you

5      aware of the time that Djuan Page was sent to the

6      hospital?

7      **A.**  If memory serves me right --

8      **Q.**  If you don't recall, that's fine.

9      **A.**  I thought it was 12:15, but he was not killed on

10     that day.

11     **Q.**  He was shot on that day, but died later?

12     **A.**  Correct.

13     **Q.**  Would it make sense that around 12:17 he arrived at

14     hospital?

15     **A.**  12:17 is what we heard during the trial.

16          **MS. FINOCCHIARO:**  One moment, your Honor.

17     Nothing further.

18          **THE COURT:**  All right.  Thank you.

19          Thank you.  You may step down.

20

21          (Witness excused.)

22

23          **MS. FINOCCHIARO:**  Our next witnesses is

24     Special Agent Jensen.  It's my understanding from my

25     co-counsel that his testimony will take some time.  If we

*15-20652; USA v. EUGENE FISHER, ET AL*

1    could take a short break at this time to go through his

2    testimony, because I believe that defense counsel would

3    like a break once direct is over.

4              **THE COURT:**  Well everybody all right?

5              **MS. FINOCCHIARO:**  At this time the government

6    calls Special Agent Joe Jensen.

7

8                    **J O S E P H   J E N S E N**

9

10   being first duly sworn by the Court to tell the truth, was

11   examined and testified upon his oath as follows:

12

13             **THE COURT:**  We will have you begin by having

14   you state your name, and spell your last name.

15             **THE WITNESS:**  Joseph Richard Jensen,

16   J-e-n-s-e-n.

17             **THE COURT:**  You may proceed, Mr. Wigod.

18             **MR. WIGOD:**  Thank you, your Honor.

19

20                    **DIRECT EXAMINATION**

21

22   **BY MR. WIGOD:**

23

24     **Q.**  Special Agent Jensen, you're here to talk to us a

25   bit about your review and certain opinions of cell tower

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    and cell phone numbers that you reviewed?

2        A.   Yes.

3        Q.   I want to talk to you about your background and your

4    training.

5        A.   Yes, sir.

6        Q.   Can you tell the jury what it is that you currently

7    do for a living?

8        A.   I'm currently employed as a supervisor special agent

9    with the public corruption unit at FBI headquarters.

10       Q.   What's does that entail?

11       A.   I am a program manager over a particular region of

12   public corruption squads, and assist them with funding and

13   policy, and then I also work on several initiatives with

14   public corruption units.

15       Q.   You work out of D.C.?

16       A.   I work in D.C.

17       Q.   How long have you had that assignment?

18       A.   Since January of this year.

19       Q.   And your assignment before your public corruption

20   manager?

21       A.   I was assigned to the Detroit field office of the

22   FBI.

23       Q.   What did you do with the Detroit field office of the

24   FBI?

25       A.   My last job was a member of the technical service

*15-20652; USA v. EUGENE FISHER, ET AL*

1    squad, and I provided cellular analysis support to the

2    Detroit field office and state and local partners.

3        Q.   All right.  We will come back to that in a second.

4             Before you were on the technical service squad,

5    what did you do?

6        A.   I was an investigator special agent on the public

7    corruption squad.

8        Q.   How long did you do that?

9        A.   Approximately four years.

10       Q.   What did this entail?

11       A.   Public corruption investigations of federal, state

12   and local officials, as well as some other international

13   human rights and human trafficking violations.

14       Q.   And did you start your FBI career there?

15       A.   No.

16       Q.   Where did you start before that?

17       A.   I was originally assigned out of the academy to the

18   organized crime squad, and I did that for approximately

19   two years, and I investigated La Costra Nostra

20   investigations, Middle Eastern criminal enterprise

21   investigations, cargo theft, major theft.

22       Q.   What did you do before joining the FBI?

23       A.   I was a full-time Illinois National Guard field

24   artillery officer.

25       Q.   How long did you did that for?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  I've been in the guard reserve for 14 years now.

2    **Q.**  I want to turn back now to your time with the

3    technical services squad.

4    **A.**  Yes.

5    **Q.**  What was your duties with that squad?

6    **A.**  I was assigned to the technical services squad

7    because of my CAST and my cellular analysis survey team

8    certification, and I was basically the point in contact

9    for all the cellular analysis that was conducted in the

10    Detroit area and other parts of Michigan, other parts of

11    Ohio, and I did case consultations with special agents

12    conducting investigations.  I helped training.  I did out

13    reach, things of that nature.  I was basically the primary

14    point of contact.

15    **Q.**  You mentioned CAST, and that stands for what again?

16    **A.**  The cellular analysis survey team.

17    **Q.**  What does that team do?

18    **A.**  It's a team that's based out of FBI headquarters.

19    There are field assets and national assets through the FBI

20    in the United States, and they deal predominately with the

21    historical analysis of call detail records, phone records.

22    And CAST also reacts to terrorist events, terrorist

23    attacks, and fugitives, and missing children, missing

24    persons.

25    **Q.**  You mentioned -- I believe you mentioned a

*15-20652; USA v. EUGENE FISHER, ET AL*

1    certification with CAST?

2    **A.**  Yes.

3    **Q.**  Are you certified with CAST?

4    **A.**  Okay.

5    **Q.**  You are certified to do what?

6    **A.**  I am certified by the CAST unit in the FBI to

7    testify on behalf of the FBI for these call detail

8    analysis records.

9    **Q.**  And can you explain to the jury what the process

10    is -- or what the educational process is in order to

11    obtain your CAST certification?

12    **A.**  Sure.  There are three phases -- there's basically

13    four phases.  So there's three sets of training, and then

14    there's the on the job training.

15          So the first one is the basic CAST course.  It's

16    about a three or four day course, and it deals with the

17    basics that you need know as an investigator, any

18    investigator, to conduct these types this types of

19    investigations, these types of analysis for your cases.

20    It goes through things like what's called -- excuse me --

21    call detail records are, where they come from, what kind

22    of relevant they can provide, and it gives a general

23    overview from the telephone provider, the cell phone

24    provider themselves as to how their networks are set up.

25          After that, there's -- you want to be actively

*15-20652; USA v. EUGENE FISHER, ET AL*

1    engaged doing this type of analysis either in your cases

2    or cases for colleagues, and then you go to an advance

3    course, which is a week, and it goes into greater detail

4    of cellular theory, more detail about the particular phone

5    companies and the services they provide, and the way their

6    records are maintained, and then you go to do more on the

7    job training, and then there's the certification portion,

8    which is a month long classroom instruction, and it goes

9    into greater depth of all of these things that you've

10   learned about engineering theory and greater detail about

11   radio frequencies, what the cell phones are doing, how the

12   cell phone networks are used, and you are told by the

13   companies themselves.  They come and discuss with you all

14   the things that you need to know about their networks to

15   conduct this analysis.

16      Q.  When you say the companies, you are referring to

17   what?

18      A.  The cell phone providers, Sprint, Verizon, AT&T,

19   Metro PCS once upon a time, T-Mobile, U.S. Cellular.

20      Q.  You went through this process?

21      A.  Yes.

22      Q.  How long of a process is it that basically?

23      A.  About 300 hours of training.  I want to say it took

24   me -- I went through the basic course -- I have to look at

25   my C.V. -- but I think it was 2012, and I was certified in

*15-20652; USA v. EUGENE FISHER, ET AL*

1    2016.

2        **Q.**  Everybody who goes through the class is certified?

3        **A.**  Everybody who goes through the process can be

4    certified if they pass the process.

5        **Q.**  Not everybody passes?

6        **A.**  That's correct.

7        **Q.**  You did?

8        **A.**  I did.

9        **Q.**  And then so you're basically a -- with technical

10   services working for CAST out of Detroit?

11       **A.**  That's what I was doing.

12       **Q.**  What services did you provide to other agents in

13   Detroit as a CAST certified individual?

14       **A.**  So there's basic analysis, somebody would approach

15   me and say I have phone records.  How does this help?  Can

16   you help me interpret these, and sometimes they would, a

17   case agent, would ask me which phone records help my case,

18   how they help my case, what do I do with them, how do

19   obtain them, things like this.  I was just a single point

20   of contact for this type of program.

21       **Q.**  Have you been an instructor on this topic?

22       **A.**  Yes.

23       **Q.**  In what situation?

24       **A.**  So I have helped with a number of basic courses.  As

25   the point of contact in Michigan, I was able to provide

*15-20652; USA v. EUGENE FISHER, ET AL*

1    seven courses in the state of Michigan last year, and just

2    teaching state and local officials that don't have the

3    same resources as the FBI as to conduct this analysis

4    their investigations.

5    **Q.**   Now you mentioned a couple of times CDR.

6    **A.**   Yes, sir.

7    **Q.**   What does that stand for?

8    **A.**   CDR is a call detailed record.

9    **Q.**   Can you explain for jury what a call detailed record

10   is?

11   **A.**   Sure.  A call detailed record is basically an

12   enhanced billing record.  Actually I haven't seen one for

13   my phone, but we use to get billing records, and it would

14   tell you the date of the call, the phone number that you

15   called or one that called you.  It would have all of that

16   information, how many minutes you used of your minutes,

17   how much data you used.  That's a billing record.

18           A call detailed record is kind of an industry

19   term for that billing record with cell tower information

20   attached to it.  So it's kept over the normal course of

21   business by cell phone providers because they use it to

22   optimize their network, and through legal process, we are

23   able to obtain those records, and that's what I analyze,

24   the cellular provider's call detailed record.  That's the

25   Excel spreadsheet that I look at.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   You mentioned cell data tower data is on there.

2    What do you mean by that?

3    **A.**   So the cell tower -- the cell phone company have a

4    network.  You can think of it like a sprinkler system in

5    your yard, and they set up towers in various places and

6    they try to optimize it as best they can.  Well, when

7    everybody is walking around making phone calls, they want

8    to make sure they are providing the best service where it

9    needs to go the most.  So they track what cell tower that

10   you use or I use when I make those phone calls, and they

11   are kept by them to help optimize the record.  So the

12   phone call that you made, just like the billing record,

13   who you called, time and date, amount of time that you

14   spent on the phone, and the tower it is connected to is

15   the call detailed record.

16   **Q.**   So included in the call detailed record is the

17   information concerning which tower the phone is connected

18   to, is that correct?

19   **A.**   Correct.

20   **Q.**   Now you mentioned these records are kept in the

21   ordinary course of business for the phone company to

22   optimize their network.  This is not something that the

23   phone company is making for law enforcement?

24   **A.**   They are producing records for law enforcement, but

25   all of this information is engineering information that

*15-20652; USA v. EUGENE FISHER, ET AL*

1    they would create it any way.

2        Q.   You are using their records for a different purpose?

3        A.   Yes.

4        Q.   Have you testified in court regarding as a CAST

5    member before?

6        A.   Yes.

7        Q.   Approximately how many times?

8        A.   Approximately a dozen times.

9        Q.   Have you testified in federal court?

10       A.   Yes.

11       Q.   State court as well?

12       A.   Yes.

13       Q.   Now you're here obviously in a criminal trial.  Have

14   you seen other uses, or have you used these called detail

15   record in context outside of criminal prosecution?

16       A.   Like what?

17       Q.   Like --

18       A.   Outside of criminal prosecution, such as during an

19   investigation or do you mean civilly?

20       Q.   For example, a missing child, missing person?

21       A.   Yes, I have used call detailed record analysis for

22   cases that have not ended in criminal prosecution, and I

23   have also used it in exigent circumstances.  So if there

24   is a missing child or a missing person, I would get called

25   out and provide expertise for this particular topic, not

*15-20652; USA v. EUGENE FISHER, ET AL*

1   really overly concerned about a courtroom setting.  You

2   look at the records and try to find somebody.

3       **Q.**  That's been successful in the past?

4       **A.**  Yes, sir.

5       **Q.**  Have you used call detailed records to exclude

6   suspects for a crime?

7       **A.**  Yes.

8       **Q.**  Basically this person was not at that location or --

9       **A.**  Right.  So I mean, not every investigator knows

10  necessarily what they are looking for.  So after they give

11  me call detailed records, they will say, here's the dates

12  and times of a particular crime.  Can you check these

13  records?  I think it is this the phone associated with

14  somebody that might be involved, and I have told him or

15  her, the phone doesn't give me any connection that this

16  person was in the area, or this phone was somewhere else.

17      **Q.**  Can you explain for purposes of your analysis the

18  kind of the interaction or relationship between the

19  handset cell phone and the cell tower and further the

20  network?

21              **MR. H. SCHARG:**  Right now, he's getting into

22  expert testimony.  He has not moved to qualify him as an

23  expert yet.  Are you at some point going to move to

24  qualify him as an expert?

25              **MR. WIGOD:**  May we approach?

*15-20652; USA v. EUGENE FISHER, ET AL*

1              (Sidebar conference on the record.)

2

3              **MR. WIGOD:**  The proper procedure is to

4    continue with the questioning.  If you have an objection

5    as to his qualification, it is to be made at sidebar.

6    Case law says this court should not say that a witness is

7    an expert in front of the jury.

8              **MR. H. SCHARG:**  I'm sorry.  Qualified to give

9    opinion testimony.

10             **MR. BILKOVIC:**  Yeah, but the jury is not

11   suppose to know that.  The Court is not suppose to put any

12   emphasis on his expertise.  It is reversible error.

13             **MR. WIGOD:**  You should not declare him as an

14   expert because otherwise --

15             **MR. H. SCHARG:**  I misspoke, and he's just

16   going to be giving opinion testimony.

17             **THE COURT:**  So you will withdraw?

18             **MR. H. SCHARG:**  I will withdraw the

19   objection, but I still have some questions before he gives

20   testimony.

21             **MR. DALY:**  If Henry wants to do some

22   questioning on his qualifications, that's fine, but the

23   government is right.  You're not to indicate that he is an

24   expert.

25             **MR. H. SCHARG:**  It was opinion testimony.

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1    I'm sorry.  It's opinion testimony.  I will withdraw.

2                    **THE COURT:**  You're asking to do some voir

3    dire?

4                    **MR. H. SCHARG:**  Yes.

5

6                    (Sidebar conference concluded.)

7

8                    **THE COURT:**  The objection is withdrawn, and

9    you will Mr. Scharg conduct some voir dire?

10                   **MR. H. SCHARG:**  Yes.

11

12                    **VOIR DIRE EXAMINATION**

13

14   **BY MR. H. SCHARG:**

15

16     **Q.**  Good morning, Agent Jensen.

17     **A.**  Good morning.

18     **Q.**  Let me go back through some of the process testimony

19   that you gave in terms of your curriculum vitae.

20             You graduated from college from Albany, New York

21   with a Liberal Arts degree in 2008?

22     **A.**  Liberal studies, yes.

23     **Q.**  In terms of your background, did you have any major

24   or minor training in the area of science, engineering or

25   mathematics?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No, sir.

2    **Q.**  You have a masters degree?

3    **A.**  Yes, sir.

4    **Q.**  In what field?

5    **A.**  A masters in management in organizational

6    leadership.

7    **Q.**  Those have no bearing on the fields of science,

8    engineering or mathematics either?

9    **A.**  Yes, sir.

10   **Q.**  Now you also testified that you have given previous

11   courtroom testimony in the field of cellular phone

12   analysis in different courts?

13   **A.**  Yes, sir, that's correct.

14   **Q.**  And you listed the 38th District Court in Monroe,

15   Michigan?

16   **A.**  Yes, sir.

17   **Q.**  The 3rd Judicial Circuit in Detroit, Michigan?

18   **A.**  Yes.

19   **Q.**  The Macomb -- 16th Circuit Court in Macomb?

20   **A.**  Yes.

21   **Q.**  And the U.S. District Court for the Eastern District

22   of Michigan?

23   **A.**  Yes, sir.

24   **Q.**  You testified that you've given this opinion

25   testimony on approximately 12 occasions?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.  I don't know if you have an updated C.V.,

2    but I would also add Fulton County, Ohio.  I don't know if

3    you have that on there.

4    **Q.**  Was that recently?

5    **A.**  Probably this year.

6    **Q.**  How many times have you provided testimony in this

7    field in the Eastern District of Michigan of the 12 or 13

8    times?

9    **A.**  I would have to look at the sheet.  I would say

10   about five or six.  Just about half, sir.

11   **Q.**  And have you written any publications, papers in

12   this area in this field?  Other than lecturing to

13   co-agents in other law enforcement, have you ever written

14   any articles that have been published?

15   **A.**  If you do not count the exhibits, then no.

16   **Q.**  You got your certification in 2016?

17   **A.**  Yes, sir.

18   **Q.**  And you were transferred or promoted to a position

19   in Washington D.C. in early 2018?

20   **A.**  January 2018.

21   **Q.**  All of your testimony and all of your consultation

22   have been in a period of a year and a half?

23   **A.**  As a CAST certified person.  I was doing

24   consultation before that, just not as certified.

25   **Q.**  And is it fair to say you usually work with case

*15-20652; USA v. EUGENE FISHER, ET AL*

1    agents in consultation?

2        A.   Case agents more broadly, state and local

3    investigators as well.

4        Q.   Besides this case, have you ever worked with Agent

5    Ruiz before?

6        A.   With call detailed record analysis?

7        Q.   Yes.

8        A.   Yes.

9        Q.   And on how many occasions?

10       A.   I'm not really sure how many call detailed records I

11   have reviewed for him.  If I can speak more broadly to

12   that, he's on a -- he was on a squad where violence crimes

13   and criminal activity of that nature was more of a

14   customer I would say for this sort of analysis than say

15   public corruption or counterespionage.  So I know that for

16   Special Agent Ruiz -- or Supervisor Special Agent Ruiz

17   I've worked fugitive cases and things of that nature as

18   well.

19       Q.   Do you know what the question was?

20       A.   Can you say it again, sir?

21       Q.   The question is -- the question was, have you ever

22   worked with Agent Ruiz before?

23       A.   Yes.

24       Q.   You testified that there's four phases to this

25   certification, meaning you have to do the certification.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    There is also on the job training, correct?

2        A.   The on the job training leads up to the

3    certification.

4        Q.   Did you work under the mentorship of another agent

5    at any point in time?

6        A.   There were my instructors from the CAST

7    certification process, and there was also a CAST agent in

8    Detroit that assisted me, yes, sir.

9        Q.   And was there an agent that reviewed your findings

10   on the reports that you analyzed, signed off?  Has anyone

11   signed off on this case?  Anyone review your mapping and

12   your results and signed off on this?

13       A.   Yes.

14       Q.   Who was that?

15       A.   So the original submission of this was certified by

16   Bastian Freud out of St. Louis, and the additional part

17   for this separate trial was peer reviewed by S.A. Matt

18   Wilder out of Baltimore.

19       Q.   You're talking about organizations.  Was there an

20   agent out of this field office or another field office

21   that signed off on your -- reviewed your work and did peer

22   review?

23       A.   Yes, Special Agent Bastian Freud from St. Louis.

24   Those are both CAST certified individuals.

25       Q.   In regards to the work that you have done in terms

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1    of mapping, is it fair to say that you have to rely on the

2    agents that you worked with to give you the information

3    regarding -- facts regarding an offense, correct?

4    **A.**  Yes.

5    **Q.**  Regarding dates and times?

6    **A.**  Yes, sir.

7    **Q.**  Locations?

8    **A.**  Yes.

9    **Q.**  And cell phone records, is that correct?

10   **A.**  Yes.

11   **Q.**  Okay.  And you take the information and you download

12   or uploaded it into a special system that kicks out the

13   results?

14   **A.**  That's one of the steps, yes, sir.

15   **Q.**  And there's a reference to a software called

16   Penlink?

17   **A.**  No.

18   **Q.**  There's not a software called Penlink?

19   **A.**  Yes, sir.

20   **Q.**  And is that the software that you use in your field?

21   **A.**  No.

22   **Q.**  What software do you use?

23   **A.**  It's called ISPA.

24   **Q.**  Pardon me?

25   **A.**  ISPA, and it's created by a company named Gladiator.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    There's also another piece of software called CASTvis.

2    That's kind of a FBI internal product.  You can also use

3    Microsoft Streets and Trips, and you can do a lot of this

4    analysis through Excel.

5    **Q.**  Before you had the software, how was the mapping

6    done?

7    **A.**  Good old days.  So you looked at the detailed

8    spreadsheets, and you would open like Streets and Trips,

9    and draw the sectors by hand and do the analysis.

10   **Q.**  With rulers and all of those mechanical pencils?

11   **A.**  I mean, when I started it was still electronic.

12   **Q.**  Have you ever gone to old school to map -- to do the

13   mapping to corroborate or verify results of software that

14   you used?

15   **A.**  Can you describe old school?

16   **Q.**  The old school was the system before you had the

17   software mapping, as you said, going through the detail

18   call records and mapping it out by hand.

19   **A.**  Well, I can't remember too many instances of drawing

20   something out by hand.  You can draw by hand

21   electronically.  So I have done it old school if that's

22   what you consider old school.

23   **Q.**  Finally, you talked about situations where you were

24   able to exclude suspects?

25   **A.**  Yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**   And, in fact, sometimes Case Agent Ruiz would come

2      to you with the information for the mapping, correct?

3      **A.**   Yes.

4      **Q.**   And he would give you again the detail call record?

5      **A.**   Yes, sir.

6      **Q.**   It gives you the place, date and time, and he would

7      ask you to map it out?

8      **A.**   Yes.

9      **Q.**   And is there a time where you went to Agent Ruiz and

10     said, well we have to exclude this individual because he

11     was not in that sector or that place -- excuse me -- not

12     him, but the phone was not in that place or sector at that

13     time?

14     **A.**   You mean him specifically?

15     **Q.**   Yes.

16     **A.**   I don't remember if I said that.

17     **Q.**   You don't recall giving him that type of information

18     regarding exclusion?

19     **A.**   I don't think so.  I might have.

20     **Q.**   And, in fact, just finally, when you do your

21     mapping, you're not mapping where a person is.  You're

22     trying to map where a phone is, is that correct?

23     **A.**   That's correct.

24     **Q.**   It doesn't tell you who was using the phone?

25     **A.**   Correct.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  And it doesn't tell you because these are historical

2    records, correct?  They can't tell you exactly and

3    pinpoint where a phone was, correct?  It can only put it

4    in a sector?

5    **A.**  In a sector.

6    **Q.**  And sometimes that information is not reliable

7    either, correct?

8    **A.**  I wouldn't say that.

9    **Q.**  Only because sometimes because of the -- if the --

10   if there's a lot of traffic on the phones, a phone could

11   be kicked from one sector to another, correct?

12   **A.**  It can, but that's not what's in the call detailed

13   record.

14        **MR. H. SCHARG:**  No further questions.

15        **THE COURT:**  We're going to take a break at

16   this point.

17

18        (Recess taken at 11:02 a.m.)

19

20        (Back on the record at 11:28 a.m.)

21

22        (Jury in at 11:28 a.m.)

23

24        **THE COURT:**  All right, folks, you can take a

25   seat.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1              Mr. Wigod, you may continue.
2                   MR. WIGOD:  Thank you, Your Honor.
3    BY MR. WIGOD:
4       Q.   Special Agent Jensen, I think we left off where you
5    were going to discuss the operation or the relationship or
6    interaction between the handset/cell phone, the cell tower
7    and the network.
8       A.   Okay, sir.
9       Q.   Can you please do that for us.
10      A.   Sure.  When your phone is on in your pocket and, you
11   know, you are not engaged in a phone call or sending a
12   text message, that phone is in your pocket constantly
13   searching for the best, clearest signal that it can get on
14   the particular provider.  So it's scanning all the
15   different cell towers in that -- I'll keep using the
16   analogy the sprinkler system -- to look for the best one.
17   You know, if you have a Verizon phone, Verizon wants that
18   to happen so that you have the best service, so you don't
19   have dropped calls, and things like that.
20              So it creates a list.  We call it racking and
21   stacking.  And whenever you take that phone out to
22   activate it and call home or check in or something like
23   that, the phone picks the tower on the top of that list,
24   connects with it, and you have your phone call or text
25   message or things like that.  So that's what your phone is
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    constantly doing all the time.

2        Q.   And the connection between the phone and the tower

3    is reflected in the call detail record?

4        A.   Right.   That event goes to your billing records.

5    It's the thing that when it's -- excuse me, let me back

6    up.   When the phone is scanning, that's not, you are not

7    using the Verizon service except to have it available if

8    you need it, right?   So when you make that phone call,

9    that's when Verizon wants to start billing you for the

10   minutes that you're using and the space you are taking up

11   on their tower.   So it's reflected in the billing records,

12   and again, the call detail records also includes the tower

13   information so ...

14       Q.   It doesn't include the scanning information?

15       A.   Correct.

16       Q.   And I just want to make sure we're all on the same

17   page.   It's not as if we have records of constant 24/7

18   tracking of where the phone is.   It's only when the phone

19   connects to the tower?

20       A.   The call detail records are only, yeah, they are

21   only when the phone picks a tower and has an event.

22       Q.   Okay.   And, based on your experience, the best,

23   clearest signal is in the vicinity of a tower?

24       A.   Could you explain "vicinity of a tower," what do you

25   mean by that?

                  *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  In proximity to the tower.

2    **A.**  Well, the best, clearest -- the phone is looking for

3    the best, clearest signal, and so it could, kind of

4    irrespective of distance, it could just pick -- it picks

5    the one that it sees the clearest.

6    **Q.**  The best, the clearest signal, the phone picks that?

7    **A.**  Correct.  The phone picks the first dance partner,

8    yes.

9    **Q.**  All right.  Now, you spoke with Agent Ruiz on this

10   case?

11   **A.**  Yes.

12   **Q.**  And he asked you to basically take a look at some

13   call detail records that he had obtained in the course of

14   his investigation?

15   **A.**  That's correct.

16   **Q.**  And you did that for him?

17   **A.**  Yes, sir.

18   **Q.**  Okay.  And did you prepare a report outlining your

19   findings?

20   **A.**  I did.

21   **Q.**  And that's basically a visualization of certain

22   phone numbers and their relationship with the cell towers?

23   **A.**  Correct.

24   **Q.**  Showing you what's been marked as Government's

25   Proposed Exhibit Number 36, can you just take a look at

*15-20652; USA v. EUGENE FISHER, ET AL*

1    that and tell us what that is, please.

2        **A.**  So this is my Cast report.

3        **Q.**  And this is a report that you prepared for this

4    case?

5        **A.**  Yes, sir.

6                **MR. WIGOD:**  Your Honor, at this time I would

7    move for admission of Government's Proposed Exhibit

8    Number 36.

9                **THE COURT:**  Any objection?

10            Hearing none, the Court will receive the item.

11                **MR. WIGOD:**  Can we publish 36, please.  Next

12    page.

13   **BY MR. WIGOD:**

14       **Q.**  Now, Special Agent Jensen, up on the screen is

15   Page 3 of the exhibit, 36.  Are these the phone records

16   that you had an opportunity -- or are these the phone

17   numbers that you had an opportunity to review records for?

18       **A.**  I reviewed a lot of phone numbers.  These are the

19   ones that are in the exhibit.

20       **Q.**  Okay, all right.  So there is further, further

21   diagrams as it pertains to these numbers that are

22   reflected on the screen here?

23       **A.**  Yes, sir.

24       **Q.**  I believe there are eight numbers up there, if my

25   math is right?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes.

2    **Q.**  Okay.  And we have previously heard testimony as far

3    as -- you personally have no idea whose phone numbers

4    these are associated with?

5    **A.**  I may know some just from talking with the case

6    agents but ...

7    **Q.**  Firsthand knowledge, I'm talking about.

8    **A.**  Correct.

9    **Q.**  Now, some of the phone numbers you have the provider

10   or all of them you have the provider next to them; is that

11   right?

12   **A.**  Yes.

13   **Q.**  Some of them you have multiple providers?

14   **A.**  Correct.

15   **Q.**  The top one, Metro PCS and T-Mobile, why would there

16   be two providers for that number?

17   **A.**  There could be a couple of reasons.  Metro PCS

18   merged with T-Mobile in 2013 so depending on -- 2015.  So

19   depending on when the records were available, like if

20   somebody, if a case agent gets one batch of records for

21   let's just say 2011 and the investigation goes on and they

22   get another bunch of records for 2016, it may have never

23   been ported, but in 2011 they were Metro PCS records and

24   then in 2016 the formatting is a T-Mobile record.

25   **Q.**  Because of the merger?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   That's one of the possible reasons, because of the

2    merger.

3    **Q.**   And you mentioned porting as well?

4    **A.**   Porting.  So if you take your number and you find

5    that ATT was going to provide you a better price and

6    better service, you can bring your cell phone number with

7    you.  And so where you had Verizon, for example, you may

8    now have ATT and so your old records would be Verizon

9    records, in their format, because they are owned by

10   Verizon and the ATT records would be in a different

11   format.

12   **Q.**   Okay.  You mentioned that this, part of the process

13   of creating this report is a peer review process?

14   **A.**   Yes.

15   **Q.**   Basically somebody else who is Cast certified looks

16   at your findings to make sure they are accurate.  Is

17   that --

18   **A.**   Correct.

19   **Q.**   Okay.  We have mentioned a bunch of times now "cell

20   tower" and I think defense counsel at times mentioned

21   "sectors."  Can you explain what we're looking at in this

22   slide?

23   **A.**   Sure.  The left picture is a traditional cell phone

24   tower.  You can see the antennas on it, and that's where

25   the radio frequency or the energy comes from.

*15-20652; USA v. EUGENE FISHER, ET AL*

1              And then, as defense counsel was stating,
2       sectors.  So typically, though not always, a cell phone
3       tower is broken into three sectors, sometimes six,
4       sometimes just one.  But this is -- the picture on the
5       left is depicting a three-sector tower.  You can see how
6       they are labeled one, two, three, and there's a little
7       arrow in the middle, a little one in the middle of each,
8       and if you can see it, it says zero on top --
9       **Q.**  Actually I can zoom in on that for you?
10      **A.**  See how it says 0 on top and then 120 and 240.
11      That's in a 360-degree circle, and that is the direction
12      that the energy is going off of the antenna.  So when we
13      say "sector," there is an azimuth and it's generally
14      120 degrees of energy going in a particular direction.
15             And so most phone companies will give you the
16      tower, which is the group of antennae, and then the
17      sector, which is one of the three sides that the energy
18      is -- that's where the phone connected so ...
19      **Q.**  So just to make sure we are all on the same page and
20      we understand, so you get information as far as which
21      tower, like, for example, the thing we see on the left
22      here, which tower the phone connects to?
23      **A.**  Correct.
24      **Q.**  And then you also have information in the same
25      records from the phone company as to which sector within

*15-20652; USA v. EUGENE FISHER, ET AL*

1    the tower the phone is connecting to?

2        **A.**   That's correct.

3        **Q.**   Okay.  And along with that information you have

4    basically the date and time that that event occurs, the

5    connection to the tower?

6        **A.**   Yes, sir.

7        **Q.**   Okay.  Now, you had an opportunity to review several

8    different events and the phone numbers associated with

9    those events; is that fair to say?

10       **A.**   Yes, sir.

11       **Q.**   Okay.  Just describe generally -- we'll go through

12   it in more detail -- what we're looking at on Page 5 of

13   this exhibit.

14       **A.**   Okay.  Do you mind if I use the pointer and --

15       **Q.**   Not at all.

16               **THE WITNESS:**  Sir, do you mind?

17               **THE COURT:**  Yes.  Yes, you may.

18               **THE WITNESS:**  The rest of the exhibits look a

19   little bit like this.

20           Just to orient you to what everything is.  So we

21   have the phone number that was analyzed, the particular

22   date and times of this particular analysis.

23   **BY MR. WIGOD:**

24       **Q.**   I'm going to highlight portions as we go through.

25   So this is the phone number that you analyzed?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  And when we say "analyzed," meaning you looked at

3    the call detail records for this phone number for a

4    certain time range?

5    **A.**  Yes, sir.

6    **Q.**  Okay.

7    **A.**  And so these are -- this is essentially a picture of

8    an Excel spreadsheet.  So this address was given to me by

9    the investigators as something of importance to them for

10   their investigation, and these are the results.

11          So you can see the pink kind of triangle-looking

12   thing there.  That's one of the sectors.  So that's

13   depicting the energy coming off of the antenna and the

14   phone using the energy from that sector.  You can see

15   one more down here and one more down here.

16          Up top in this blue box here, CID is cell

17   identifier.  It's the name of the tower, and I'm given

18   that name by the cell phone providers.  And then some of

19   them, this is the sector.

20          And then down here is the date, July 14th, 2014,

21   and these are all the events that we talked about.  These

22   are all the events that would show up on your billing

23   records that occurred on this tower at these times.

24   **Q.**  Okay.

25   **A.**  And then one other thing that I'll just point you

*15-20652; USA v. EUGENE FISHER, ET AL*

1    to, they change color throughout the report depending upon

2    the provider, but these red dots here are all the cell

3    towers of this particular provider, in this case it is

4    Verizon, so ...

5    **Q.**  Okay.  You can sit down.  Can you see the screen

6    from there if I ask you some questions on follow-up?

7    **A.**  I can, yes, sir.

8    **Q.**  All right.  So let's back up.  These red dots all

9    over the screen are towers?

10   **A.**  Yes, sir.

11   **Q.**  Okay.  And these are not all the towers in the city

12   of Detroit, they are only the towers for the provider for

13   this phone number?

14   **A.**  Right, and on July 14th, 2014.

15   **Q.**  So the provider -- so these are towers on this date

16   and time from Verizon?

17   **A.**  Yes.

18   **Q.**  Sprint may have towers in different locations,

19   T-Mobile may have towers in different locations?

20   **A.**  That's correct.

21   **Q.**  And you get the location of the tower from where?

22   **A.**  From the tower lists that the providers give us.

23   **Q.**  Okay.  So Verizon tells you where the tower is?

24   **A.**  Yes.

25   **Q.**  And let's go back for a minute to what you have

*15-20652; USA v. EUGENE FISHER, ET AL*

1    here.  You know, let me back up even more.  So you have
2    three boxes on this screen, one, two, three?
3         A.   Yes.
4         Q.   Those boxes relate to the pink angles, so this
5    one goes with this one, this one with goes with this one,
6    and this one goes with this one?
7         A.   Yes, sir.  Those are the sectors.
8         Q.   Okay.  So it goes with a tower and a sector.  So
9    this box goes with this tower and this sector, this box
10   goes with this tower and this sector, this box goes with
11   this tower and this sector?
12        A.   Yes, sir.
13        Q.   Okay.  And the towers have names?
14        A.   They do, yes, sir.
15        Q.   And those names are provided by the phone company?
16        A.   Yes, sir.
17        Q.   So what we're looking at here, the name of the tower
18   in this case is what?
19        A.   210.
20        Q.   And the sector?
21        A.   3.
22        Q.   Okay.  And then the same for -- this tower would be
23   tower?
24        A.   572.
25        Q.   Sector?

*15-20652; USA v. EUGENE FISHER, ET AL*

1        **A.**   1.

2        **Q.**   And unfortunately they don't make this terribly

3    simple for us, but different companies have different

4    naming configurations for their towers?

5        **A.**   They do, yes.

6        **Q.**   Okay.  Can you explain for -- so obviously this is

7    downtown Detroit, you see?

8        **A.**   Yes, sir.

9        **Q.**   And there seems to be more red dots in the downtown

10   area than there does as you get further away from

11   downtown?

12       **A.**   Yes, sir.

13       **Q.**   Can you explain that for us?

14       **A.**   Sure.  To use the analogy again, if you, if you look

15   at this slide like a sprinkler system, you build sprinkler

16   systems based on logical use of water to get the best

17   coverage, right?  So you wouldn't just put one tower, or,

18   excuse me, one sprinkler in the middle of your yard and

19   hope that it gets all of your grass and your bushes and in

20   the back and things like that.  You build the system so

21   that if there's more flowers over here it gets more water;

22   if there's less over here, maybe a big grass spot, it gets

23   maybe a little bit less water.

24            So in urban areas there are more people and

25   there are more obstructions, in some cases there are more

*15-20652; USA v. EUGENE FISHER, ET AL*

1    obstructions, so they need to build more cell phone towers

2    so you don't lose coverage.  Cell phone towers are about

3    $250,000 each to build so the cell phone providers want to

4    be very logical about who and where -- or not who, but

5    where they put them to provide coverage.  They don't want

6    to just stack five towers in one area that doesn't need

7    five towers.  So what you see is generally less coverage

8    in, say, the countryside and more coverage in a city where

9    there are more people and it's -- they do it pretty

10   logically so that they make the most money.

11   **Q.**   They don't want to spend money they don't have to?

12   **A.**   That's right.

13   **Q.**   So basically more people downtown, more towers or

14   antennas?

15   **A.**   That's right, sir.

16   **Q.**   Okay.  Now, going back to these boxes for a minute,

17   these are all -- all these numbers on the left -- the

18   numbers on the left are what?  Let me back up.  When I say

19   the left, the far left, the 313-424-8378.

20   **A.**   Right.  So that's the phone number being depicted

21   here.

22   **Q.**   Okay.  And then next to the phone number is what?

23   **A.**   The time.

24   **Q.**   The time of what?

25   **A.**   Of the event that occurred.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   Now, so at least what's depicted on your slides is
2    nothing about what number -- what the specific event is,
3    meaning an outgoing call, an incoming call, a text
4    message, things of that nature?
5    **A.**   That's correct.
6    **Q.**   Okay.  So these are basically all some sort of
7    billable event, which would be incoming, outgoing, text
8    message for this phone number at these times?
9    **A.**   Yes, sir.
10   **Q.**   Okay.  And that's true of basically all of your
11   boxes here?
12   **A.**   Correct.
13   **Q.**   This is all the number that you looked at and then
14   the times with the tower, and the same on the bottom here?
15   **A.**   Correct.
16   **Q.**   If we look at the -- there's three towers.  This is
17   the -- 5300 Lawton is a location that Agent Ruiz gave you
18   that was of significance to the investigation?
19   **A.**   Yes.
20   **Q.**   That's why you have that?
21   **A.**   Correct.
22   **Q.**   Okay.  And this tower is in proximity to the 5300
23   Lawton address?
24   **A.**   Yes.
25   **Q.**   So between 9:59 a.m. -- this is a.m.?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   Yes.

2      **Q.**   Okay.  Let me back up for a minute.  There are some

3    things called military time?

4      **A.**   Yes.

5      **Q.**   And the records and the slides go sometimes back and

6    forth between standard time and military time?

7      **A.**   In this report are you asking?

8      **Q.**   Yes.

9      **A.**   Yes.

10     **Q.**   Okay.  Military time is what?

11     **A.**   It goes from 0 to 24.

12     **Q.**   All right.  So these times are a.m. that we're

13   looking at here?

14     **A.**   Correct.

15     **Q.**   Okay, all right.  So between -- so at 9:59:50 there

16   is an event for this number at this tower?

17     **A.**   Correct.

18     **Q.**   And then the same at 10:17?

19     **A.**   Yes.

20     **Q.**   I'll skip the seconds.  10:22 and so on?

21     **A.**   Correct.

22     **Q.**   Okay.  So the between 9:59 and the last one being

23   11:59 at this tower next to this location, which is in the

24   vicinity of the 5300?

25     **A.**   Well, and including the other two towers.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  We'll get to that.  That's the next one.

2    **A.**  But those are all of the events on this tower.

3    **Q.**  Okay.  Now, there are events on towers that seem to

4    be nearby within that time range?

5    **A.**  Yes.

6    **Q.**  Okay.  So 10:05, 10:05 and 10:44 on this tower 572?

7    **A.**  Yes.

8    **Q.**  Okay.  And then a handful on this tower 328?

9    **A.**  Correct.

10   **Q.**  Backing up for a second, as far as the

11   representations of the angles or the pink areas, what does

12   that represent?

13   **A.**  You mean the sector?

14   **Q.**  The lines, the sector.

15   **A.**  It's a general picture that shows this is where the

16   cell phone company says its sector is.  This is 120

17   degrees of energy being pushed out of this particular

18   antenna.  It's just a depiction.  Radio frequencies are

19   not, they are not straight lines.  It's not pretty like

20   this.  RF energy is kind of just shot out of the antennas.

21   So it mixes with other nearby radio frequency and they

22   overlap each other a little bit.

23           Similar to the sprinkler system, if you don't

24   have a little bit of overlap with your sprinklers, the

25   grass in the middle dies, right?  And so that grass in the

*15-20652; USA v. EUGENE FISHER, ET AL*

1   middle in the cell phone world is dropped calls.  It's

2   when you're driving down the road and you are talking on

3   the phone and you lose that call.  Very quickly you go

4   find another cell phone provider.  So they, the cell phone

5   companies, like to provide a little bit of overlap to keep

6   your phone going, and that is what this yellow sector

7   depicts.  It's just a general depiction of the direction

8   that the energy is being pushed.

9       **Q.**  The pink section?  You said yellow.

10      **A.**  Did I say yellow?  I apologize.  The pink sector.

11      **Q.**  So this is the general direction of the RF signal

12  going out?

13      **A.**  The general direction, yes, sir.

14      **Q.**  The RF signal is not linear like the lines.  This is

15  basically the simplest way to depict the RF signal?

16      **A.**  Yes, sir.

17      **Q.**  Okay.  It doesn't -- the lines stop at some point in

18  time.  The RF signal doesn't necessarily stop there.  This

19  is just a simple depiction of the direction of the RF

20  signal?

21      **A.**  Yes, sir.

22      **Q.**  Okay.  So as it relates to this phone -- I'll just

23  refer to the last four digits, the 8378 -- this phone

24  utilized three towers that are in the vicinity of 5300

25  Lawton Street?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  And the time frames between that is -- we'll just

3    call it 9:59 and then 10:59; is that correct?

4    **A.**  9:59 and 11:59, yes, sir.

5    **Q.**  I'm sorry, thank you.  9:59 and 11:59, thank you.

6    So 10:00 to 12:00 basically?

7    **A.**  Basically.

8    **Q.**  All right.  Special Agent Jensen, can you tell us

9    what we're looking at in this instance?  And I'm just

10   going to highlight the top portion for us.

11   **A.**  So this is the next slide.  It is the analysis of a

12   different number ending in 6729 on the same day from

13   9:59 a.m. to 11:43 a.m., and below this highlighted

14   portion is the graphical depiction of the towers that were

15   utilized.

16   **Q.**  Okay.  So we're talking about now the same day and

17   the same general time frame, 9:59 to 11:43?

18   **A.**  Yes, sir.

19   **Q.**  Again, just so -- because this is new to the jury --

20   these dots throughout the map would be what?

21   **A.**  Those are all the cell towers.

22   **Q.**  All right.  Now, is this a same or different network

23   provider than the previous slide?

24   **A.**  6729.  If you could go to Page 3 -- could I see

25   that?  Thank you, sir.  It would be Metro PCS.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Okay.  And the other one was Verizon?

2    **A.**  Yes.

3    **Q.**  So we have 5300 Lawton down kind of in the left-hand

4    corner of the slide?

5    **A.**  Yes.

6    **Q.**  Can you tell sort of in this slide the general

7    direction of travel of the phone?

8    **A.**  Yes.

9    **Q.**  Okay.  And how do you do that?

10   **A.**  You have to look at basically the totality of the

11   slide.  If you look at all the different towers throughout

12   this area, you can see that they are spread out, things

13   like that.  When phones use towers that are in proximity

14   to each other, like three different towers, it doesn't

15   necessarily mean movement.  Remember, that phone is always

16   looking for the best, clear signal.  So it could just be

17   it picks one tower over the other.

18            But generally when I conduct analysis and you

19   can see movement --

20            **THE WITNESS:**  Sir, would you mind if I stand

21   up?

22            **THE COURT:**  Sure.

23            **THE WITNESS:**  Generally when you see -- you

24   know, this is the 959 tower for this particular phone.

25

*15-20652; USA v. EUGENE FISHER, ET AL*

1    BY MR. WIGOD:

2        Q.   Is this what you're talking about here, 959?

3        A.   Yes, sir.

4        Q.   And this is connecting with a tower that's basically

5    north of Saint Clair Shores?

6        A.   Yes, sir.

7        Q.   Okay.

8        A.   And then if you go down, this is the 1143 tower down

9    here, and I don't know how many miles that is.

10       Q.   You mean between here and here?

11       A.   Right, if you look at the totality, but there are

12   many towers in between the 959 and the 1143 tower.  And

13   just based on the nature of cell phone networks, if the

14   phone is up here, it's not going to connect to a tower

15   down there, so to me it indicates movement of some sort.

16       Q.   And these, these tower connections are basically

17   nsequential in time, chronological; is that correct?  And

18   we can break it down a bit, but --

19            So say, for example, the tower at the top north

20   of St. Clair Shores, there's a 9:59, 11:29, and then tower

21   2632 is 10:48; is that right?

22       A.   Correct.

23       Q.   And then going south 11:10?

24       A.   Correct.

25       Q.   11:19.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  And then it's --

2    **Q.**  196?

3    **A.**  Correct.

4    **Q.**  And then 186 is 11:21, 11:22?

5    **A.**  Correct.

6    **Q.**  And then actually it would have been this tower,

7    then this one, 11:11, then down here 11:30.  So we are

8    basically moving southward direction as time goes by?

9    **A.**  Correct.

10   **Q.**  And then as you get closer that just continues;

11   11:30 on tower 401, 11:35 tower 461, and then down in the

12   proximity of Lawton.  Is that fair to say?

13   **A.**  Well, and then tower 491, yes, sir.

14   **Q.**  Yes, thank you.  So let's talk about tower 491 for a

15   minute.  The red square is the Lawton address?

16   **A.**  Yes, sir.

17   **Q.**  And then there's a tower that's, if not closest, in

18   the vicinity of that address that's 491?

19   **A.**  Are you asking me if it's the closest tower?

20   **Q.**  Yeah or at least --

21   **A.**  It's in the area, yeah.

22   **Q.**  Okay.  And there's connections with this phone at

23   tower 491 at 11:39 and 11:43?

24   **A.**  Correct.

25   **Q.**  So this would be consistent with travel from up in

*15-20652; USA v. EUGENE FISHER, ET AL*

1    the upper right-hand corner to down toward Lawton; is that

2    fair to say?

3       A.   Yes.

4              MR. WIGOD:   If we could go back to Page 5 for

5    a second.

6    BY MR. WIGOD:

7       Q.   The 8378 number, now going back to the 8378 number,

8    at 11:39, so this event here, the phone is connecting with

9    which tower?

10      A.   210.

11      Q.   Okay.   So the tower that's basically just to the

12   right of Lawton?

13      A.   Yes.

14      Q.   Just to the east of Lawton?

15      A.   East of Lawton, yes, sir.

16      Q.   And that same is true for 11:42 and 11:44?

17      A.   Yes, sir.

18      Q.   All right.   Now, I just want to juxtapose that with

19   the 6729 number.   Thank you.

20              So at those times or near the same times as we

21   were talking about before, so at 11:39 the 6729 number

22   connects to a tower that's in the vicinity of Lawton?

23      A.   It's in the vicinity, yes, sir.

24      Q.   Okay.   And then the same at 11:43?

25      A.   Yes.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  So if we put those two slides together, basically as

2      it relates to those times, 11:39 and 11:43 or so, those

3      two phones are in the same vicinity?

4      **A.**  I would say they are in the same area, yes, sir.

5      **Q.**  Okay.  And they are in the same area at the same

6      time; is that correct?

7      **A.**  Yes, sir.

8      **Q.**  That time being basically 11:39 to 11:43?

9      **A.**  Yes, sir.

10     **Q.**  And that vicinity that both of those phones are in

11     at the same time is 5300 Lawton?

12     **A.**  I would say that 5300 Lawton is also in the vicinity

13     of that area.

14     **Q.**  So basically we have three things in the vicinity,

15     all in the same vicinity, the Lawton address and the

16     two cell phones?

17     **A.**  Yes, sir.

18     **Q.**  Okay.

19          **MR. WIGOD:**  If we could go to Page 7, please.

20     BY MR. WIGOD:

21     **Q.**  Just very quickly, the red dots are various cell

22     towers?

23     **A.**  Yes.

24     **Q.**  And the boxes with the information are connections

25     with 8378 with the towers?

*15-20652; USA v. EUGENE FISHER, ET AL*

1   **A.**   Yes.

2   **Q.**   Okay.  And can you explain what we're looking at in

3   this slide, please.

4   **A.**   So, similar to the other two, this is 8378, and the

5   bottom left-hand corner has events at 12:01 and 12:02, and

6   you can see -- just kind of reorient yourself -- you can

7   see 5300 Lawton down in that bottom left-hand corner, and

8   then there are events if you -- in the middle it's

9   12:05 and 12:07 and then up at the top there.

10  **Q.**   So is this slide -- so these times are also

11  sequential, 12:01, 12:02, 12:05, 12:07, and so on, as we

12  get to the northeast?

13  **A.**   Yeah.  There's a 12:12 at the top and then 12:16,

14  and the remaining are in that area there.

15  **Q.**   Would this be consistent with this phone traveling

16  basically from the lower left-hand area to the upper

17  right-hand area?

18  **A.**   Yes.

19  **Q.**   And just so -- this upper right-hand area basically,

20  this is Eight Mile, the numbers 102?

21  **A.**   Yes.

22  **Q.**   And then this freeway is 94?

23  **A.**   Yes, sir.

24          **MR. WIGOD:**   Okay.  If we could go to Page 8

25  please.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    BY MR. WIGOD:

2        Q.  Now, we're kind of flipping back and forth between

3    two phone numbers, the two phone number being the 8378,

4    which we talked about, and then the 6729.  And we talked

5    about 6729 basically traveling from the northeast down to

6    toward the 5300 Lawton.  That was one of the previous

7    slides.

8            This is now a bit later in time; is that fair to

9    say?

10       A.  Yes, sir.

11       Q.  Okay.  So the last activity that the 6729 phone had

12   on Slide 6 --

13           MR. WIGOD:  Actually, could you go to

14   Slide 6, please.

15   BY MR. WIGOD:

16       Q.  So this activity here, the last in time is 11:43 at

17   this tower?

18       A.  Yes, sir.

19       Q.  Okay.  And then the next activity that the phone

20   had --

21           MR. WIGOD:  Page 8, please.

22   BY MR. WIGOD:

23       Q.  The next activity that the phone had is where?

24       A.  It's 12:17 up at Harper Woods and Eastpointe.

25       Q.  Okay.  So this is, again, Eight Mile and 94?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Correct.

2    **Q.**   So just as far as mapping, you're not picking and

3    choosing within this time range which connections to map

4    and which connections not to map?

5    **A.**   That's correct, and you can tell from my title.  So

6    you can see 6729.  I have to leave myself clues so I can

7    remember a year later what I have done.  "Activity on

8    July 14th, 2014 between 12:17 and 1:53 p.m."  So I would

9    not make that -- I wouldn't put between 12:17 and 1:53 if

10   I was picking which specific ones.  It's all activity

11   between that time period.

12   **Q.**   Okay.  But as far as the time frame between -- the

13   previous slide for 6729 had activity between 9:29 and

14   11:43?

15                 **MR. WIGOD:**   Can we go to Page 6 for a second.

16   BY MR. WIGOD:

17   **Q.**   9:59 and 11:43?

18   **A.**   Yes.

19   **Q.**   And then the next jump is to 12:17 on Page 8.

20   12:17.  So is there activity between those time periods

21   for this phone that would register on the towers?

22   **A.**   So I would have to look at the records, but given,

23   given what I have discussed with Agent Ruiz, I'm going to

24   say no.

25   **Q.**   Okay.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yeah.

2    **Q.**  So staying on this slide for a minute, this

3    number 6729 is connecting with cell towers up at basically

4    Eight Mile and 94 between 12:17 and -- now, we talked

5    about military time.  I just want to make sure for those

6    individuals who aren't familiar with military time.  We

7    see the hour is 13.  What time would 13 be?

8    **A.**  It's 1:53 p.m.

9    **Q.**  P.M.  So it's basically subtract 12 for P.M.s?

10   **A.**  Correct.

11   **Q.**  Okay.  So this is 12, and then 13 is one o'clock.

12   So 13:53 would be 1:53 p.m.?

13   **A.**  Yes.

14   **Q.**  It's connecting with towers at Eight Mile and 94 at

15   these time periods?

16   **A.**  Yes.  I would say closer to Eight Mile, but in that

17   vicinity.

18   **Q.**  All right.  If you could go back to Page 7 for a

19   second.

20        So the other phone, 8378, also connects with

21   towers near Eight Mile; is that fair to say?

22   **A.**  Yes.

23   **Q.**  All right.  And what are the time periods that the

24   8378 number connects with towers near or in the vicinity

25   of Eight Mile?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   It would be, it looks like, 12:12 p.m. to 1:55 p.m.

2    **Q.**   And so, again, these two phones, 8378 and 6729, are

3    in the same general vicinity at the same general time?

4    **A.**   Yes.

5    **Q.**   And that vicinity being basically Eight Mile near

6    94?

7    **A.**   Eight Mile west of 94, yes, sir.

8    **Q.**   And all of these four slides -- we have been

9    flipping between four slides.  All of those slides are

10   from July 14, 2014?

11   **A.**   Yes.

12   **Q.**   And if you need to flip, you have the exhibit.

13   **A.**   Can I do that?  Okay.

14        Yes.

15   **Q.**   This was not the only day -- July 14th was not the

16   only day that you reviewed call detail records for?

17   **A.**   Correct.

18   **Q.**   If we could go to Page 9, please.  You looked at

19   numbers for May 1st of 2015?

20   **A.**   Yes.

21   **Q.**   Okay.  And the two numbers in this instance are

22   what?

23   **A.**   8378 and 0837.

24   **Q.**   So the 8378 number is the same as from July 14th,

25   but now we have a new number, 0837?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Correct.

2    **Q.**   Okay.  And so this is activity for May 1st, 2015

3    between 6:37 p.m. and 8:29 p.m.?

4    **A.**   Yes.

5    **Q.**   So these dots are cell towers?

6    **A.**   Correct.  There's two providers depicted.

7    **Q.**   Okay.  That's what I'm getting at.  Go ahead.

8    **A.**   The green is T-Mobile, and the black towers are

9    Sprint.

10   **Q.**   Okay.  So unlike the previous slides we have been

11   looking at, before we had separate phones on separate

12   slides?

13   **A.**   Yes.

14   **Q.**   And each of those phones had different providers?

15   **A.**   Correct.

16   **Q.**   This now, we are kind of overlaying two phones that

17   have two providers?

18   **A.**   Yes.

19   **Q.**   Hence, the different-colored dots?

20   **A.**   Correct.

21   **Q.**   Okay.  Now, this slide has a lot of information in

22   it so I think we should break it down a bit, but let's

23   start for a second, you received information from Special

24   Agent Ruiz as far as a particular location and time that

25   was of significance?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yes.

2    **Q.**   And that in this instance was what?

3    **A.**   It was 15007 Troester, Detroit, and the time of

4    interest was approximately 7:07 p.m.

5    **Q.**   Okay.  So we're talking about this location

6    represented by the red square?

7    **A.**   Correct.

8    **Q.**   And we'll come back to the tower in a minute, but as

9    far as the time frames on this exhibit, they are

10   sequential as well so starting -- let's start on kind of

11   the bottom right.  Tell us what we're looking at here.

12            **THE WITNESS:**  Your Honor, do you mind?

13            **THE COURT:**  Yes.

14            **THE WITNESS:**  Do you want me to keep asking,

15   bugging you?

16            Okay.  Just like the previous slides, this shows

17   sectors of usage for particular cell phones, but it's got

18   two now and so it can be a little bit crowded.  The pink

19   is 8378, and the black is 0837.  And so it's showing both

20   the Sprint usage in the black sectors and the T-Mobile --

21   now it's T-Mobile.  It was Verizon usage in the 8378.

22            So in this area here, just from the highlighted,

23   from about 6:41, it's 18:41 p.m., I'm sorry, 18:41 is

24   6:41 p.m. through approximately 7:02 p.m. there was usage

25   from both phones in this general area.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    BY MR. WIGOD:

2        Q.   So the times on this blowup here were basically

3    between 6:44 and 7:02, combining those phones?

4        A.   6:41 and 7:02.

5        Q.   Thank you.   6:41.

6        A.   Yes, sir.

7        Q.   Now, at some point in time it looks like both of the

8    phones are connecting with the same tower.   Is that -- we

9    have tower CID 2390-3 and then 4213-3?

10       A.   Right.   It's not the same tower.   So if you think

11   of -- when I talk about cell phone towers, I'm talking

12   about the antennas, the energy, the actual cell phone

13   usage, but sometimes the actual cell tower is on a

14   building or, you know, in the first picture there is just

15   the pole with the antennas around it.   So different

16   providers sometimes use the same structure.   In this case

17   Sprint and T-Mobile may use the same pole, and there will

18   be Sprint antennas and then T-Mobile antennas above it.

19            So if you look at the top one here, there are

20   those three events and it looks like they are sharing the

21   same black Sprint tower.   It's really a Sprint and a

22   T-Mobile tower.   This is kind of difficult to visualize,

23   but the top two events were from the Sprint number 0837 at

24   those two times, and then you can see the bottom event is

25   from 8378 and it's at 7:02.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Okay.  You touched on something that I wanted to

2    make clear and make sure we're on the same page.  In the

3    slides we were talking about before, for each individual

4    box we only had -- we were only dealing with one number?

5    **A.**  I'm sorry, say that again.

6    **Q.**  In the prior slides that we had --

7    **A.**  The prior slides.

8    **Q.**  -- in each box we only had one number?

9    **A.**  Yes, sir.

10   **Q.**  Now, since we have multiple phones with different

11   providers on the same slide, we have multiple numbers in

12   the same box?

13   **A.**  Yes.  It's very busy.  I apologize for that.

14   **Q.**  No.  As long as we walk through it and we get it,

15   we'll be fine.  So the top two are 0837 and then the

16   bottom one is 8378?

17   **A.**  Yes.

18   **Q.**  And those two numbers are connecting with a tower

19   right here?

20   **A.**  Correct, with their individual provider's towers,

21   yes, sir.

22   **Q.**  All right.  And they are doing so generally rather

23   close in time; is that fair to say?  18:59 and then 19:02?

24   **A.**  Those are close in time, yes, sir.

25   **Q.**  All right.  Less than three minutes?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      A.  Yes, sir.

2      Q.  Okay.  So from at least this blowup is it fair to

3   say at that point in time these two phones are in the same

4   general area at the same general time?

5      A.  Given the usage of the -- there's basically

6   three towers per phone.  I think the general area would be

7   broader in this sense, but yes, same area.

8      Q.  Okay.  Now, you have red arrows here and then here.

9   What are those?

10      A.  Right.  So I recognize that these slides are very

11   busy and there's a lot of information, and just like in

12   the other examples where there's one phone and it looks

13   like you could see movement basically from Eastpointe down

14   to Detroit and so on and so forth, I just wanted to make

15   sure that I depicted just very generally -- these arrows

16   aren't pointing to anything specifically -- but very

17   generally the overall movement of this particular slide.

18      Q.  So the movement is from the lower right-hand corner

19   up to the top middle and then to the left of the screen?

20      A.  To the west, yes, sir.

21      Q.  Okay, to the west.  All right.  Now let's move to

22   the -- these times were basically around seven o'clock and

23   just before -- 20 minutes or so before seven o'clock?

24      A.  Right.  6:41 to 7:02?

25      Q.  We're going to come back to the crime scene in a

*15-20652; USA v. EUGENE FISHER, ET AL*

1    minute, but then there's activity for both of these two

2    phones up near -- this is Eight Mile here, the yellow?

3    **A.**   Yes.

4    **Q.**   Okay.  So what are we looking at here?

5    **A.**   Again, it's cell phone activity for each phone.

6    0837 is on the left and 8378 is on the right.  It looks

7    like it's the same tower again.  This is the same general

8    concept of two different providers using the same tower,

9    but I would, I would note that the, the initial slide with

10   the little arrows indicating the energy it was going,

11   those sectors, they are not absolute.  So sector one is

12   not always pointing straight north and things like that.

13          And you can see that example here.  The Sprint

14   sector is pointing in a little bit different direction

15   than the T-Mobile sector.

16   **Q.**   Okay.  And so these two phone numbers are connecting

17   with the tower that's next to this house depiction?

18   **A.**   Yes.

19   **Q.**   Okay.  And the times for 0837 are between 7:12 and

20   8:06?

21   **A.**   Yes.

22   **Q.**   And then the times for the 8378 number are between

23   7:17 and 7:25?

24   **A.**   Yes.

25   **Q.**   Okay.  These connections -- these phones connecting

*15-20652; USA v. EUGENE FISHER, ET AL*

1    with this tower at these times are later in time than the

2    ones we saw in the lower right-hand corner?

3        A.  Yes, correct.

4        Q.  So the times in the lower right-hand corner were

5    6:41 to 7:02.  Now we're talking about 7:12 at the

6    earliest?

7        A.  Yes.

8        Q.  And they are hitting off this tower that you have

9    depicted here.  The same, same tower, it looks like?

10       A.  The same structure.  Different, different towers,

11   yes, sir.

12       Q.  Okay.  During the same general time period?

13       A.  Yes, sir.

14       Q.  Okay.  And that's consistent with these two phones

15   being in the same general vicinity during the same general

16   time?

17       A.  Yes.

18       Q.  Okay.  So so far we have same general vicinity and

19   same general time down here, same general vicinity and

20   same general time up here for these two phones?

21       A.  Yes, sir.

22       Q.  Okay.  And just back up a second.  This house, this

23   was an address given to you by Special Agent Ruiz that had

24   some significance in the case?

25       A.  Yes, sir.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Okay.  And this tower is close to that Dresden

2    address?

3    **A.**  Yes.

4    **Q.**  All right.  Moving now, kind of following along with

5    your arrow to the left here, we'll do the address, so this

6    address is 18803 Lamont here?

7    **A.**  Yes, sir.

8    **Q.**  Okay.  Now, these times are later in time than the

9    first set and then the second set that we have been

10   looking at; is that fair to say?  Well, for some, but not

11   all.

12   **A.**  For some, correct.

13   **Q.**  Okay.  Overall later in time?

14   **A.**  Well, it is -- if you take each number individually,

15   it is later in time for each number individually.

16   **Q.**  All right.  Thank you.  That's a better way than I

17   would have ever said it.

18           So again we have two boxes.  The top is for the

19   pink and the bottom is for the black.

20   **A.**  Yes, sir.

21   **Q.**  Okay.  And these two phones are connecting with

22   towers that are in the vicinity of 18803 Lamont at these

23   particular times?

24   **A.**  In the general vicinity, yes, sir.

25   **Q.**  So we have basically a time sequence, this one area

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    they are together down here, two area they are together up

2    here, and then three area they are together over near

3    Lamont, in the same general vicinity?

4    **A.**   Right.  I want to --

5    **Q.**   Thank you.

6    **A.**   General vicinity.

7    **Q.**   These two phones are in the same general vicinity

8    during these times, these two phones are in the same

9    general vicinity during these times, and these two phones

10   are in the same general vicinity during this time?

11   **A.**   Yes, sir.

12   **Q.**   And that's sequential, meaning one, two and

13   generally three?

14   **A.**   Yes.

15   **Q.**   Okay.  Now let's go back to the crime scene itself.

16   So the red square is the address that was given to you by

17   Special Agent Ruiz?

18   **A.**   Yes.

19   **Q.**   And so what are we looking at in this blowup?

20                **THE WITNESS:**  Your Honor, may I?  Thank you.

21                **THE COURT:**  Yes.

22                **THE WITNESS:**  So this is just one tower,

23   one physical tower, two sectors, and there's two events

24   for phone 8378 in this area here.

25

                        *15-20652; USA v. EUGENE FISHER, ET AL*

1    **BY MR. WIGOD:**

2        **Q.**   Okay.  And so for that number -- and that's the 8378

3    number that's connecting with this tower at these

4    two times?

5        **A.**   Yes.

6        **Q.**   And those two times are less than two minutes before

7    the time that was given to you by Agent Ruiz, the 7:07?

8    Less than two minutes before 7:07?

9        **A.**   Less than two minutes before 7:07, yes, sir.

10       **Q.**   And that's a tower in general proximity of the

11   Troester address?

12       **A.**   Yes.

13       **Q.**   And in this time frame, 7:07, that the 8378 phone

14   connects with this tower here just south of the Troester

15   address, that time frame is in between this time frame and

16   this time frame?

17       **A.**   You are asking if 7:07 and is in between there?

18       **Q.**   I'm sorry, no, 7:05.  The time that 8378 connects

19   with this tower is in between these times and these times?

20       **A.**   Correct.

21       **Q.**   So, just backing up and clarifying a little bit,

22   these events that we see described here in each of these

23   boxes are actually some billable event, meaning there is

24   an outgoing phone call, an incoming phone call, a text

25   message or something of that nature?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Yes.

2      **Q.**  These are not instances where the phone is searching

3      for the best, clearest tower, these are specific events?

4      **A.**  Correct.

5      **Q.**  And, in order to have a record populate as far as a

6      connection to a tower, there has to be some event for you

7      to see it in the call detail record?

8      **A.**  Yes.

9      **Q.**  Okay.  So when we talk about there's no -- the 0837

10     number with the towers in proximity to the crime scene,

11     unlike 8378, there's no connection to towers there?

12     **A.**  In the general vicinity of the crime scene?

13     **Q.**  Correct.

14     **A.**  Correct.

15     **Q.**  All right.  Does that mean that the phone wasn't

16     there?

17     **A.**  Well, it means I don't know where the phone was.

18     **Q.**  Okay, okay.  So in order for a -- one of these

19     events -- there has to be an event for a connection to a

20     tower?

21     **A.**  Yes.

22     **Q.**  Okay.  So the phone was south of 94 shortly before

23     7:07; is that fair to say?

24     **A.**  The 0837?

25     **Q.**  Right.

*15-20652; USA v. EUGENE FISHER, ET AL*

137

1      **A.**  Yes, sir.

2      **Q.**  Okay.  And then it was near Eight Mile at -- again

3   0837, north of the crime scene and just south of

4   Eight Mile after the event at 7:07?

5      **A.**  Correct.

6      **Q.**  Okay.  So just kind of before we move on to the next

7   slide, the same general vicinity for two numbers down

8   here, the same general vicinity for the two numbers here,

9   the same general vicinity for two numbers here, and then

10  here there's activity for the 8378 in proximity to

11  Troester, but there's just no activity for 0837?

12     **A.**  Correct.

13     **Q.**  Okay.  So you can't say where the phone was during

14  that time period of 7:07 --

15     **A.**  Correct.

16     **Q.**  -- for the 0837?

17     **A.**  That's correct.

18          **MR. WIGOD:**  Okay.  If we could go to Page 10.

19  **BY MR. WIGOD:**

20     **Q.**  Special Agent Jensen, this is now a different event

21  that you analyzed, a different day?

22     **A.**  Yes.

23     **Q.**  Okay.  Can you tell us what we're looking at on this

24  slide, please.

25     **A.**  Again, two numbers, 8378 and 6022, and there was --

*15-20652; USA v. EUGENE FISHER, ET AL*

1      this is May 8th, 2015 between 4:03 p.m. and 6:06 p.m., and

2      then there's an address, 7211 Meadow in Warren, Michigan.

3      Q.  So as far as the numbers, we have again the 8378

4      number that we have looked at on previous slides and then

5      now a new number, 6022?

6      A.  Yes, sir.

7      Q.  And can you just walk us through what we're looking

8      at on this slide?

9      A.  So this is -- it looks like it's two towers each for

10     each phone and they are different providers.  Pardon me.

11     6022 is Sprint, which is the black cell towers, and 8378

12     is T-Mobile with the green cell towers, and this is their

13     activity respectively for each of them.

14             And, I'm sorry, there is an error on this slide.

15     It's actually 4:00 p.m., not 4:03 p.m.  So it was from

16     4:00 p.m. to 6:06 p.m.  I apologize for that.

17     Q.  You are referring to, down here, the earliest is

18     4:00 p.m.?

19     A.  Right.  I put 4:03 in the title.  It's 4:00.

20     Q.  Okay.  I want to just clarify something as far as

21     the lines coming out from the tower that you have

22     depicted, the sectors?

23     A.  Yes, sir.

24     Q.  All right.  And are these like definitive lines,

25     meaning you explained earlier about the RF signal and this

15-20652; USA v. EUGENE FISHER, ET AL

1    is just a general direction of the RF signal?

2        A.  Yes, sir.

3        Q.  All right.  So you could, in theory, be on other

4    sides of the lines and still connect with this sector?

5        A.  Other sides of the lines?  So the lines are not

6    definitive limits of, of a very messy type of frequency.

7    So it's just a visual depiction.  It's the general area.

8    It just gets the conversation started.

9        Q.  Okay.  So these two phones between 4:00 and

10   6:06 connect with towers that are in the vicinity of 7211

11   Meadow?

12       A.  Yes.

13       Q.  And the time periods that we're talking about here

14   that they connect, these two phones connect with towers in

15   the vicinity of 7211 Meadow, between the two phones, do

16   they overlap?

17       A.  The time for each phone?

18       Q.  Yes.

19       A.  Yes, sir, they do.

20       Q.  Okay.  So the two phones are in the vicinity of

21   7211 Meadow during the same general time frame?

22       A.  Yes, sir.  They are in the vicinity of that address,

23   yes, sir.

24       Q.  And it's at the same general time.  I just want to

25   make sure we're not saying one phone is there at 12:00,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    one phone is there at 8:00?

2        **A.**  Correct.  Same general area, same general time.

3        **Q.**  And the last time event we have here is 6:06?

4        **A.**  Yes, sir.

5             **MR. WIGOD:**  Okay.  If we could go to

6    Slide 11, please.

7    **BY MR. WIGOD:**

8        **Q.**  And what are we looking at on this slide?

9        **A.**  So this is activity for three phones now, 8378,

10   6022, and 0837, on May 8th, 2015 between 6:14 and

11   6:20 p.m.

12       **Q.**  Okay.  The same day as the previous slide?

13       **A.**  Yes, sir.

14       **Q.**  But a little further in time?  The last event was

15   6:06.  This is now first event 6:14?

16       **A.**  Yes, sir.

17       **Q.**  So this is between 6:14 and 6:20?

18       **A.**  Yes, sir.

19       **Q.**  And now on this slide you said we have

20   three separate phones?

21       **A.**  Yes.

22       **Q.**  One being represented by the pink?

23       **A.**  Correct.

24       **Q.**  And then we have purple and black?

25       **A.**  Yes.

                *15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  Where is the purple and black on this one?

2                   **THE WITNESS:**  Your Honor, can I --

3                   **THE COURT:**  Yes.

4                   **THE WITNESS:**  So, again, this slide is a

5      little busy, I apologize, but 6022 and 0837 are the same

6      provider, Sprint, so they are using the same sector and

7      it's noted here in this particular box.  So you will see

8      the first two events are 0837, and then the third event is

9      a separate number, same tower and sector.

10     **BY MR. WIGOD:**

11     **Q.**  So on this slide the three phones, are they

12     three phones in the same general vicinity of 20304 Dresden

13     between 6:14 p.m. and 6:20 p.m.?

14     **A.**  Yes.

15                  **MR. WIGOD:**  If we could go to Slide 12

16     please.

17     **BY MR. WIGOD:**

18     **Q.**  And can you tell us what we're looking at on this

19     slide?

20     **A.**  One phone, 6022, May 8th, 2015, and it's an event at

21     6:32 p.m.

22     **Q.**  Okay.  So this is approximately the same day as the

23     prior two slides?

24     **A.**  Yes.

25     **Q.**  And approximately 12 minutes after the last event

*15-20652; USA v. EUGENE FISHER, ET AL*

1    from the prior slide?

2         A.   Correct.

3         Q.   And tell us what we are looking at on this slide.

4         A.   It is -- so it's utilizing, this phone is utilizing

5    a cell tower, 2400 Sector 3, and just to orient you, based

6    on an address that I was given by Agent Ruiz, I just

7    depicted it there.  So it's east of, east of that address.

8         Q.   Okay.  So at 6:32 p.m. 6022 is connecting with a

9    tower that's east of the Dresden address?

10        A.   Correct.

11             **MR. WIGOD:**  Can we go to 13, please.

12   **BY MR. WIGOD:**

13        Q.   And can you tell us what we're looking at on this

14   slide, please?

15        A.   Two phones, 8378 and 0837, May 8th, 2015 between

16   6:41 p.m. and 6:46 p.m.

17        Q.   Okay.  So, again, the same day, May 8th, 2015, as

18   the prior three slides?

19        A.   Is it three?  One, two, three.  Yes, sir.

20        Q.   Later in time there's a part of three slides?

21        A.   Yes, sir.

22        Q.   So this is now 6:41 and 6:46?

23        A.   Yes, correct.

24        Q.   Now, on this slide you have kind of two separate

25   maps that look to be in a similar area.  Can you explain

*15-20652; USA v. EUGENE FISHER, ET AL*

1    what's going on here?

2       **A.**   Right.  So I'm just depicting the two different

3    providers, T-Mobile on the left, Sprint on the right, and

4    the events for 8378 on the left and the events for 0837 on

5    the right.  And, pardon me, and then the crime scene and

6    an approximate time given to me by Agent Ruiz.

7       **Q.**   The time given to you, the time and location of the

8    crime scene given to you by Agent Ruiz is what?

9       **A.**   It's approximately 6:46 p.m., and it's at the

10   intersection of Craft and Duchess in Detroit, Michigan.

11      **Q.**   Let's deal with the 8378 number first.  So the 8378

12   is connecting with this tower here that's --

13      **A.**   Correct.

14      **Q.**   And that's essentially -- it's close to the Craft

15   and Duchess crime scene?

16      **A.**   The structure is close, yes, sir.

17      **Q.**   And in relation to between the 6:46 time and the

18   time that this phone connected with this tower is what?

19      **A.**   You said 6:46?

20      **Q.**   Yes, sir.

21      **A.**   Are we talking about 8378?  So 6:41 and 42.

22      **Q.**   So this is essentially four or five minutes before

23   the --

24      **A.**   Oh, I'm sorry, yes.  Before the other phone, yes,

25   four minutes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  So at this point I'm talking about this phone and

2    the crime scene time.

3    **A.**  Yes.

4    **Q.**  It's connecting with a tower that's close to the

5    crime scene within a few minutes of the event?

6    **A.**  Yes, I misunderstood.

7    **Q.**  I don't ask very good questions often so let me know

8    if I'm not making sense.

9            All right.  Now, moving to the 0837 number,

10   these two maps on the left and right depict the same

11   general area?

12   **A.**  Yes, sir.

13   **Q.**  Okay.  Then we have the crime scene in the red at

14   6:46 p.m.?

15   **A.**  Approximately, yes, sir.

16   **Q.**  And the 0837 number is connecting with this tower in

17   relation to the Craft and Duchess location?

18   **A.**  Yes, sir.

19   **Q.**  And at what times?

20   **A.**  6:42 p.m. and 6:46 p.m.

21   **Q.**  So one time essentially at the approximate time of

22   the crime scene?

23   **A.**  Yes, sir.

24   **Q.**  And one about four minutes before the crime scene?

25   **A.**  Yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Okay.  As it relates to those two phones, if we kind

2    of-overlap the two maps, what would we be seeing?

3    **A.**  Well, so even though they are two separate sprinkler

4    systems these phones are both in the vicinity of the crime

5    scene around the time of -- the approximate time of the

6    crime.

7    **Q.**  So both phones if you overlap the maps would be in

8    the same general vicinity of the crime scene at the same

9    general time?

10   **A.**  Yes, sir.

11         **MR. WIGOD:**  Okay.  Could we go to Slide 14,

12   please.

13   **BY MR. WIGOD:**

14   **Q.**  Can you tell us what we're looking at on Slide 14,

15   please.

16   **A.**  Three phones, 8378, 6022, and 0837, and this is

17   highlighted activity on May 8th between 7:42 p.m. and

18   8:35 p.m.

19   **Q.**  So the same date as the few prior slides we have

20   been talking about?

21   **A.**  Correct.

22   **Q.**  Later in time though?

23   **A.**  Correct.

24   **Q.**  And what are we looking at in this slide?

25   **A.**  So this slide is I believe, based on my discussion

*15-20652; USA v. EUGENE FISHER, ET AL*

1    with Special Agent Ruiz, this slide depicts activity as it

2    pertains to a particular address.  And I know that because

3    of the title.  It says "highlighted activity."  So this is

4    not every phone call between this time period, but it is

5    the ones in proximity to this particular address.  And so

6    from 7:42 to 8:35 p.m. three phones utilized these cell

7    towers.

8                    **THE WITNESS:**  Excuse me, Judge.

9            Again, two of the phones are the same provider so

10    this one has two, excuse me, two phone numbers.

11   **BY MR. WIGOD:**

12       **Q.**  So the 6022 and the 0837?

13       **A.**  Yes, sir.

14       **Q.**  So we have three phones connecting with towers in

15    the general vicinity of 7211 Meadow?

16       **A.**  Yes.  And also, make a correction, that title should

17    have said 8:40 p.m. instead of 8:35.  That's the second

18    one.

19       **Q.**  That's here?

20       **A.**  Yes, sir.

21       **Q.**  And they are connecting with the same -- the towers

22    in the general vicinity of 7211 Meadow, during the same

23    general time frame?

24       **A.**  Correct.

25       **Q.**  Okay.  Now, we have had multiple slides about the

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    May 8th event with multiple locations.  I just want to

2    kind of orientate everyone.  Can you see the exhibit?

3    **A.**  I can.

4    **Q.**  So the 7211 Meadow, as those slides progressed, was

5    up in this area in the upper left-hand corner?

6    **A.**  Is this from my report?

7    **Q.**  No, I'm sorry.  This is Exhibit 40.

8    **A.**  Okay.

9    **Q.**  It's not from your report.

10   **A.**  Okay.  Surprising me.

11           So, yeah, top left corner.

12   **Q.**  Top left, yes, sir.

13   **A.**  Yes, sir.

14   **Q.**  And that's from Page 10 of your report, essentially

15   the location?  We're not talking about cell towers.

16   **A.**  Right, yes.

17   **Q.**  And then if you go to Page 11 of your report, we're

18   talking about the towers in relation to the Dresden

19   address?

20   **A.**  Correct.

21   **Q.**  Okay.  And then we saw a slide, and we'll go back to

22   this, where there was a phone, the 6022 on Page 12, which

23   connects kind of near Kelly Road and Eight Mile over in

24   this area?

25   **A.**  Kelly Road, yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  Yes.  And then Page 12 of your -- excuse me, Page 13

2  of your report talks about the crime scene in the lower

3  right-hand corner?

4      **A.**  Yes, sir.

5      **Q.**  And then Page 14 talks about the phones hitting back

6  at 7211 Meadow after the crime scene?

7      **A.**  Yes.

8      **Q.**  All right.  We're going to jump back so we can all

9  see that a little better.

10            **MR. WIGOD:**  Can we go to Page 10, please.

11  **BY MR. WIGOD:**

12      **Q.**  So on this slide this is a few hours before the

13  6:46 crime scene event?

14      **A.**  It starts a few hours, yes.

15      **Q.**  Yes, thank you.  And this is, the pertinent address

16  here is on 7211 Meadow?

17      **A.**  Yes.

18      **Q.**  And that was the address that we saw on the last

19  exhibit that was kind of in the upper left-hand corner?

20      **A.**  Top left, yes, sir.

21      **Q.**  And then after 606 -- if you could go to the next

22  page -- it kind of traveled down Eight Mile to the east,

23  is that fair to say, to the Dresden address?

24      **A.**  Yes, sir.

25      **Q.**  Okay.  So basically -- if we go back to 10 -- Meadow

*15-20652; USA v. EUGENE FISHER, ET AL*

1    is west of Dresden down Eight Mile a bit?

2        A.  Yes.

3        Q.  And then so this would be later, later in time.  Not

4    this one, but Page 11.

5        A.  Yes, sir, and I'll just point out that there is an

6    additional phone on Page 11 than on Page 10.

7        Q.  Okay.  At the new address on Dresden there is now an

8    additional phone that is connected with towers in the

9    vicinity of the Dresden address?

10       A.  Yes.

11       Q.  Okay.  So just sequentially time wise it goes from

12   Meadow from the upper left-hand corner on the map on here,

13   and then to Dresden, which is depicted here?

14       A.  Yes,sir.

15       Q.  And that's down Eight Mile a bit basically to the

16   right?

17       A.  Yes, sir.

18             MR. WIGOD:  Okay.  Next slide, please.

19   BY MR. WIGOD:

20       Q.  And then we talked about the corner of -- here is

21   Dresden.  This is now one of the phones hitting away from

22   Dresden near Kelly and Eight Mile?

23       A.  It's east.

24       Q.  Thank you.  And then progressing time wise, Page 13,

25   this is now at the crime scene between 6:31 and 6:46 tower

                    15-20652; USA v. EUGENE FISHER, ET AL

1    hits?

2       **A.**   Yes, sir, in proximity to the crime scene.

3       **Q.**   Thank you.   The crime scene being 6:46 and the tower

4    hits in proximity to the crime scene being at 6:41, 6:42

5    and 6:46 for the two phones?

6       **A.**   Correct.

7       **Q.**   Now, these two phones are different from the phone

8    that we saw in the previous slide, Slide 12?

9       **A.**   Yes.

10      **Q.**   Okay.   And then after the crime scene at 6:46 --

11   Slide 14 -- we are now back at Meadow about an hour or so

12   after the 6:46 event?

13      **A.**   Some of the phones, yes.

14      **Q.**   Yes.   Actually at Meadow after there's three phones

15   depicted there?

16      **A.**   There's three phones, yes.   But as it pertains to

17   particular times, some are there at 8:11, some are there

18   at 7:42 and some at 7:51.

19      **Q.**   Within an hour?

20      **A.**   Yes, sir.

21      **Q.**   So just as far as sequence of locations, we go from

22   7211 Meadow to Dresden, there is one phone hitting off of

23   the area of Kelly and Eight Mile, then the crime scene,

24   and then back at Meadow just as far as time wise,

25   forgetting which phones are there?

                  *15-20652; USA v. EUGENE FISHER, ET AL*

1       **A.**   And also I want to be clear it's not, I'm not

2    indicating any particular address.  I'm indicating a

3    vicinity of particular addresses.

4       **Q.**   Correct.  And I don't -- taking away the tower, just

5    as far as what's depicted sequentially on the addresses --

6       **A.**   Oh, yes, sir.

7       **Q.**   -- we're talking Meadow, Dresden, Kelly and Eight

8    Mile, crime scene, then back to Meadow?

9       **A.**   Yes, sir.

10      **Q.**   That was just the sequence of the slides.

11      **A.**   Correct, yes, sir.

12      **Q.**   Just so we have a chronology of the slides.

13              **MR. THEIS:**   Your Honor, I object to the form

14   of the question.  He is combining all of the phones as if

15   they are one phone, and they are not all doing the same

16   thing at the same time, they are in totally different

17   locations, so I would object to the form of that question.

18              **THE COURT:**   Mr. Wigod?

19              **MR. WIGOD:**   That was my next set of questions

20   as far as which phones are in which areas during that

21   sequence.

22              **THE COURT:**   Okay.

23   BY MR. WIGOD:

24      **Q.**   So we have Meadow, Dresden, Eight Mile and Kelly,

25   crime scene, back to Meadow as far as the sequence of the

*15-20652; USA v. EUGENE FISHER, ET AL*

152

1    slides?

2       **A.**  Yes, sir.

3       **Q.**  As far as which phones are at those sets of the

4    locations --

5                **MR. WIGOD:**  Can we go to Page 10, please.

6    BY MR. WIGOD:

7       **Q.**  Here we have the 8378 and the 6022 number in the

8    vicinity of Meadow?

9       **A.**  In the vicinity of Meadow, yes.

10               **MR. WIGOD:**  The next slide, 11, please.

11   BY MR. WIGOD:

12      **Q.**  Now we pick up a phone here.  Now we have 8378,

13   6022, and pick up 0837 in the vicinity of Dresden?

14      **A.**  Yes.

15      **Q.**  And this would have been after Meadow?

16      **A.**  Yes.

17      **Q.**  And then the next slide, Slide 12, we have 6022 east

18   of Dresden?

19      **A.**  Yes.

20      **Q.**  And then we have, Page 13, 8378 and 0837 in the

21   vicinity of the crime scene?

22      **A.**  Yes.

23      **Q.**  And then, Page 14, we have 8378, 6022 and 0837 back

24   in the vicinity of Meadow?

25      **A.**  Well, when you say back in the vicinity, that would

*15-20652; USA v. EUGENE FISHER, ET AL*

1   be 8378 and 6022.  And also, in addition to that, 0837 is

2   now in the vicinity of Meadow because it wasn't on the

3   original.

4   **Q.**  Correct.  Thank you, thank you.  So we have -- it's

5   back in the vicinity of Meadow for 8378 and 6022, and now

6   it's new in the vicinity of Meadow for 0837?

7   **A.**  Yes, sir.

8   **Q.**  You had an opportunity to analyze some records from

9   May 10th of 2015 --

10  **A.**  Yes, sir.

11  **Q.**  -- for certain cell phone numbers.

12          **MR. WIGOD:**  Can you go to Page 15, please.

13        Your Honor, I think this next slide is going to

14  take more than five minutes.  I think some defense counsel

15  can't stay later than 1:00 so this may be a good time to

16  break.

17          **THE COURT:**  All right.  We will break, and

18  we'll reconvene tomorrow morning.

19          **THE CLERK:**  Please rise.

20          (Jury out at 12:54 p.m.)

21          (Proceedings adjourned at 12:54 p.m.)

22                      -   -   -

23              C E R T I F I C A T I O N

24        We, Ronald DiBartolomeo and Sheri Ward, official

25  court reporters for the United States District Court,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Eastern District of Michigan, Southern Division, appointed

2    pursuant to the provisions of Title 28, United States

3    Code, Section 753, do hereby certify that the foregoing is

4    a correct transcript of the proceedings in the

5    above-entitled cause on the date hereinbefore set forth.

6

7    s/ Ronald DiBartolomeo          07/18/2018
      Ronald DiBartolomeo             Date

8    Official Court Reporter

9

10    s/ Sheri K. Ward              07/18/2018
      Sheri K. Ward                Date

11    Official Court Reporter

12                  -   -   -

13

14

15

16

17

18

19

20

21

22

23

24

25

*15-20652; USA v. EUGENE FISHER, ET AL*