1
2
3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

4   **UNITED STATES OF AMERICA,**

5                    Government,

**HONORABLE GEORGE CARAM STEEH**

6        v.

**No. 15-20652**

7   **D-3 EUGENE FISHER,**
    **D-4 COREY BAILEY,**
8   **D-6 ROBERT BROWN,**
    **D-13 ARLANDIS SHY,**
9   **D-19 KEITHON PORTER,**

10                   Defendants.
    _____/

11

                        **JURY TRIAL**
12
                **Thursday, July 26, 2018**
13
                       -   -   -
14

APPEARANCES:
15

16  For the Government:        JULIE FINOCCHIARO, ESQ.
                               JUSTIN WECHSLER, ESQ.
17                             TARE WIGOD, ESQ.
                               MARK BILKOVIC,ESQ.
                               Assistant U.S. Attorneys
18

19  For the Defendants:        HENRY M. SCHARG, ESQ.
                               On behalf of Eugene Fisher
20
                               CRAIG DALY, ESQ.
21                             KEITH SPIELFOGEL, ESQ.
                               On behalf of Corey Bailey
22
                               JAMES FEINBERG, ESQ.
23                             On behalf of Robert Brown

24
                               MARK MAGIDSON, ESQ.
25                             JOHN THEIS, ESQ.
                               On behalf of Arlandis Shy

1

                              STEVEN SCHARG, ESQ.
2                             On behalf of Keithon Porter

3

4                              -   -   -

5

              *To Obtain Certified Transcript, Contact:*
6        *Ronald A. DiBartolomeo, Official Court Reporter*
            *Theodore Levin United States Courthouse*
7        *231 West Lafayette Boulevard, Room 1067*
                *Detroit, Michigan  48226*
8                   *(313) 962-1234*

9        *Proceedings recorded by mechanical stenography.*
       *Transcript produced by computer-aided transcription.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I  N  D  E  X**

2                                                                    <u>Page</u>

3     <u>**DERRICK KENNEDY**</u>
Cross examination by Mr. Magidson cont.                 5
4     Cross examination by Mr. Feinberg                      20
      Cross examination by Mr. H. Scharg                    106
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        E  X  H  B  I  T  S

 2    Identification_____  Offered    Received

 3    Defense Exhibit No. ?                     11          11

 4    Defense Exhibit No. 24                    91          91

 5    Defense Exhibit No. 19                   112         112

 6    Defense Exhibit No. 20                   117         117

 7    Defense Exhibit No. 21                   122         122

 8    Defense Exhibit No. 22                   124         124

 9    Government Exhibit No. 64                132         132

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1                              Detroit, Michigan

2                              Thursday, July 26, 2018

3                              At 8:37 a.m.

4                         -    -    -

5            (Proceedings with jury at 8:37 a.m.)

6

7               **THE COURT:**  Okay, folks.  You can take a

8      seat.

9               **MR. BILKOVIC:**  If the Court wants to begin,

10     we can continue.

11              **THE COURT:**  All right.  Mr. Magidson?

12              **MR. MAGIDSON:**  Thank you, your Honor.

13

14                    **CROSS EXAMINATION CONT.**

15

16     **BY MR. MAGIDSON:**

17

18        **Q.**  Good morning, Mr. Kennedy.

19        **A.**  Good morning, sir.

20        **Q.**  When we broke yesterday, we were talking about

21     during the time that you were selling the drugs in West

22     Virginia.  You were kind of bringing in a fair amount of

23     cash, is that correct?

24        **A.**  Yes, sir.

25        **Q.**  We discussed a range of 130 to $200,000 or more that

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    you would have at any given time, is that about right?

2        **A.**  No, sir.  That was the most that I had all at once.

3        **Q.**  And so some of the cash you would distribute at

4    various clubs, is that correct?

5        **A.**  Yes, sir.

6        **Q.**  And there's at least a couple of videos -- or one or

7    two videos that have you distributing cash to the various

8    participants at the clubs, is that right?

9        **A.**  Can you repeat that?

10       **Q.**  There are videos that were played of you doing this

11   distributing, the money to the young ladies?

12       **A.**  Yes, sir.

13       **Q.**  All right.  One of them is called something like --

14   I may have it wrong, and you can correct me -- Dip's

15   Despair.  Are you familiar with that one?

16       **A.**  Yes, sir.

17       **Q.**  And did you commission that or somebody tell you

18   that this was going to be made?

19       **A.**  Yes, sir.

20       **Q.**  Okay.  And you've seen it before, is that correct?

21       **A.**  Yes.

22              **MR. MAGIDSON:**  So if we could at this point

23   move to play that video, your Honor?

24              **THE COURT:**  All right.

25                      (Video played.)

*15-20652; USA v. EUGENE FISHER, ET AL*

**BY MR. MAGIDSON:**

**Q.** Mr. Kennedy, for clarification, is that you?

**A.** Yes.

**Q.** And you had a duffel bag?

**A.** Yes, sir.

**Q.** And that was cash in there?

**A.** Yes, sir.

**Q.** Do you remember how much approximately there was?

**A.** Like 8,000.

**Q.** And this was a party at a strip club?

**A.** Yes.

**Q.** Do you remember which club?

**A.** It was Gold Diggers.

**Q.** Is that the one on Livernois?

**A.** Yes, sir.

**Q.** And is that an extended -- we saw an extended white limo?

**A.** Yes, sir.

**Q.** Is that a car that you rented or was that something different?

**A.** That was a car that I rented.

**Q.** That you rented?

**A.** Yes.

**Q.** You came in a different car?

**A.** Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1 **Q.** The car that you came in was that -- it looked like

2 a BMW?

3 **A.** Porsche.

4 **Q.** A Porsche?

5 **A.** Yes.

6 **Q.** Was that your car?

7 **A.** No, sir.

8 **Q.** You borrowed that car?

9 **A.** Yes, sir.

10 **Q.** Leased it?

11 **A.** No, that was Dada's car.

12 **Q.** Whose?

13 **A.** Dada, Jerome Gooch's car.

14   **THE COURT:** Hold on.  Before you start again,

15 I believe I misunderstood you.  You were asking to publish

16 an item already received.

17   **MR. MAGIDSON:** I'm sorry.  I move to have it

18 admitted into evidence.

19   **THE COURT:** Any objection?

20   **MR. WECHSLER:** No, Judge.

21   **THE COURT:** All right.

22   **MR. MAGIDSON:** Thank you.

23

24 **BY MR. MAGIDSON:**

25 **Q.** Let's play the video.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1                          (Video played.)

 2                  Mr. Kennedy?

 3       A.  Yes, sir.

 4       Q.  So we're looking at what appears to be a watch?

 5       A.  Yes, sir.

 6       Q.  Is that your watch?

 7       A.  Yes.

 8       Q.  What type of watch?

 9       A.  A Breitling.

10       Q.  And how much is that?

11       A.  10,000.

12       Q.  Okay.  You can play it.

13                  (Video played.)

14                  Mr. Kennedy?

15       A.  Yes, sir.

16       Q.  Do you know who that individual is?

17       A.  I don't know.  I never hung with him or nothing.

18              MR. FEINBERG:  I can't understand.

19

20  BY MR. MAGIDSON:

21       Q.  Can you repeat that?

22       A.  I know of him.  I never hung with him.

23       Q.  But was this somebody from the Six Mile, east side

24   area?

25       A.  No, sir.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1   **Q.**   It wasn't from the Team Eastside or something like
2   that?
3   **A.**   No, sir.
4   **Q.**   East Warren area?
5   **A.**   Yes.
6   **Q.**   East Warren, east side, right?
7   **A.**   Yes, sir.
8   **Q.**   He's affiliated with another organization, is that
9   correct?
10  **A.**   Yes, sir.
11  **Q.**   Okay.  Did you cosponsor this event, this party?
12  **A.**   Yeah,  me and him went half.
13  **Q.**   You and somebody from East Warren went in together
14  on this party?
15  **A.**   We didn't go in.  The club double booked.  So I got
16  half my money back, and he gave him half his money back.
17  It never happened like that.  We never got together and
18  said we would do a party together.
19  **Q.**   But you wound up doing a party together?
20  **A.**   Yes.
21  **Q.**   All right.
22         (Video played.)
23         So did you distribute all of the $8,000 that
24  night?
25  **A.**   No.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  You had some left over?

2    **A.**  Yes, sir.

3    **Q.**  You got rid of most of it?

4    **A.**  Yes, sir.

5    **Q.**  Yesterday you were talking about -- you have -- was

6    it six or seven kids?

7    **A.**  Yes, sir.

8    **Q.**  How many?

9    **A.**  Six.

10   **Q.**  And you were behind as it relates to the Friend of

11   the Court.  You were behind on child support?

12   **A.**  Yes, sir.

13   **Q.**  There's at least one individual, a mother of your

14   children that you owe $35,000 to?

15   **A.**  Yes, sir.  About 30, yes, sir.

16   **Q.**  And there's a warrant for your arrest for failure to

17   pay child support?

18   **A.**  Yes, sir.

19   **Q.**  But you claim that you pay these -- the mothers of

20   your children directly?

21   **A.**  Yes, sir, I have.

22   **Q.**  But the fact is, you really don't give them that

23   much, and you only, if somebody is getting evicted or

24   something like that, that's the only time when you give

25   them money?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  No, that's not true.

2      **Q.**  The -- so I will refer you back, do you recall

3      testifying at a hearing prior to this time?

4      **A.**  Yes, sir.

5      **Q.**  And you were under oath at that time?

6      **A.**  Yes, sir.

7      **Q.**  And looking at Page 128 of your transcript, you were

8      asked:  How much money were you giving the mothers of your

9      children at this time, meaning while you were under court

10     order?

11            Answer:  Every time they was about to get put

12     out, every time they was calling, doing anything.

13            Question:  So you would wait until they were

14     going to get evicted?

15            Answer:  I mean, if she had a man living in her

16     house, she shouldn't have to ask me for no money for

17     nothing, but my kids.

18            Question:  But you let your kids go out on

19     streets because she's got another man in the house?

20            Answer:  I never let them go out in the streets.

21     That's why I pay.

22            So if they are about to be evicted or something

23     like this, you come up with the rent money?

24     **A.**  That's the only time I would do something for their

25     mothers.  I ain't take care of no woman that has a man.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    I'm taking care of my kids.

2        Q.  Right.

3        A.  She shouldn't be laying there with no man that he

4    can't help you with your bills.  That's what I meant.

5        Q.  Okay.  But nevertheless, at least for one woman, you

6    owed over $35,000.  You had other cases as well, correct?

7    That's not the only one?

8        A.  Yes, sir, because when I was selling drugs, I was

9    not getting a paycheck.  I was not going down to the court

10   to give them money, no.

11       Q.  You could have taken that money -- could have gotten

12   a money order and gone to the Friend of the Court, here's

13   100?

14       A.  Yes, I could have.

15       Q.  But you never did that?

16       A.  No, sir.

17       Q.  Now you indicated that you were friends with Billy

18   Arnold, also known as Killa?

19       A.  Yes, sir.

20       Q.  I think you testified that things were relatively

21   calm and peaceful at least between the different

22   organizations, groups of people until -- but when he got

23   out of the prison in 2013, things changed.  Did you

24   testify to something like that?

25       A.  Can you repeat that?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  Well, so prior to around 2012-2013, things between,

2     you know, guys in the Six Mile area, Seven Mile area,

3     there was really no beefs or hostilities.  Things were

4     relatively cool?

5     **A.**  Yes.

6     **Q.**  In fact, you hung out with Mr. Page, right?

7     **A.**  Yes, sir.

8     **Q.**  Neff?

9     **A.**  Yes, sir.

10     **Q.**  In fact, you know Jeffaun Adams?

11     **A.**  Yes, sir.

12     **Q.**  Were you aware that he and Mr. Page were arrested

13     together?  They were driving and were pulled over and

14     arrested on a case together.  Were you aware of that one?

15     **A.**  No.

16     **Q.**  But it wouldn't surprise you that somebody from

17     Seven Mile, such as yourself, were hanging with people

18     from Six Mile?

19     **A.**  No, it wouldn't surprise me.

20     **Q.**  Okay.  So Billy gets out, and he's got some beefs

21     with the people, the Davis brothers, the Twins, is that

22     right?

23     **A.**  I don't know the last name, but the Twins.

24     **Q.**  He thinks that they set him up.  It's because of

25     their testimony or something to that effect, he winds up

*15-20652; USA v. EUGENE FISHER, ET AL*

1   in prison for several years, correct?

2       **A.**  Yes, sir.

3       **Q.**  And he wants revenge on other people, right, like a

4   personal thing?

5       **A.**  Yes, sir.

6       **Q.**  And he -- he's kind of a hothead.  Would you agree

7   with that?

8       **A.**  Yes.

9       **Q.**  He's your friend, right?

10      **A.**  Yes, sir.

11      **Q.**  But he's kind of a crazy guy, right?

12      **A.**  That's not what you said at first.  You asked me two

13  different questions.

14      **Q.**  He's your friend, right?

15      **A.**  Yes, sir.

16      **Q.**  And he's still your friend, but he's kind of a crazy

17  guy?

18      **A.**  You said hothead at first.

19      **Q.**  I said what?

20      **A.**  You said hothead at first.

21      **Q.**  But I'm asking you, he's still kind of a crazy guy?

22      **A.**  Yes, sir.

23      **Q.**  And he would do crazy things that you wouldn't

24  necessarily agree with or approve of, right?

25      **A.**  Yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1   **Q.**  But at the end of the day, you've been together --
2   you've known him a long time.  He's still your friend?
3   **A.**  I haven't known him a long time.
4   **Q.**  But he's still your friend on a personal level?
5   **A.**  Yes, sir.
6   **Q.**  He's out there raising hell at Somerset.  Cool it.
7   Cool it.  You can't do that stuff here, but he's still
8   your friend?
9   **A.**  Yes.
10  **Q.**  He goes out shooting, doing things that you didn't
11  authorize?
12  **A.**  No, sir.
13  **Q.**  You didn't tell him, let's take a vote.  You go out
14  there, I endorse this.  You didn't tell him to do that,
15  right?
16  **A.**  No, sir.
17  **Q.**  But he did it, right?  He did things?
18  **A.**  Yes, sir.
19  **Q.**  He did things that you didn't approve of?
20  **A.**  Yes.
21  **Q.**  Things that you didn't endorse?
22  **A.**  Yes, sir.
23  **Q.**  But you know, Billy is Billy, right?
24  **A.**  Yes, sir.
25  **Q.**  If he came to you -- not saying that he would -- and

*15-20652; USA v. EUGENE FISHER, ET AL*

1    you had the money, because let's say you were able to

2    start a legitimate business, and you had maybe $100,000,

3    and he says, Dip.  I'm in this federal case.  I need to

4    hire a lawyer.  Can you stake me $20,000, even today,

5    because of your loyalty to him and your friendship, you

6    probably give it to him?

7    **A.**  I don't know about that.  It depends on the

8    circumstances, but I would try to help him.

9    **Q.**  You would try to help him.  It has nothing to do

10   whether he is Seven Mile Bloods or anything else, but the

11   relationship that you have with him, correct?

12   **A.**  No, I wouldn't say that just because -- this is

13   probably because of me.

14   **Q.**  Because of you?

15   **A.**  Yes.

16   **Q.**  And you have that loyalty, that friendship that you

17   had developed with Billy over the years, right?  You've

18   been through a lot together?

19   **A.**  I wouldn't say that.  We have now.

20   **Q.**  So it's the same with a lot of these people that you

21   grew up over there on the east side.  When you were coming

22   up over to Coram Street and all the other streets over

23   there, it was a neighborhood, right?

24   **A.**  Yes, sir.

25   **Q.**  Kids were out on the streets.  You got to know them,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    right?

2         A.   Yes, sir.

3         Q.   And as you got older, you guys hung together, and it

4    was not always about selling drugs or whatever you were

5    doing.  You guys would play basketball?

6         A.   Yes.

7         Q.   Probably go restaurants or whatever, do things

8    together, right?

9         A.   We went out to eat before, yes, sir.

10        Q.   Looking for young ladies?

11        A.   Yes, sir.

12        Q.   In the beginning, you probably would go to each

13   other's birthday parties and things like that?

14        A.   Yes, sir.

15        Q.   As you got older, you did things together.  You

16   would have parties together.  It was not always about

17   selling drugs or doing things that were in violation of

18   the law, right?

19        A.   Right.

20        Q.   And just finally, I want to touch upon a couple of

21   things.  You already testified that there was really not

22   an elected leader of anything called the Seven Mile

23   Bloods.  You would agree with that?

24        A.   Yes, sir.

25        Q.   It was not something that you paid dues to, not

*15-20652; USA v. EUGENE FISHER, ET AL*

1    something where you had mandatory meetings, correct?

2    **A.**   Correct.

3    **Q.**   You started off and continued as a bunch of -- like

4    a social organization, social group of kids in the

5    neighborhood, neighborhood kids hanging together?

6    **A.**   Can you repeat that?

7    **Q.**   You were neighborhood kids hanging out together.

8    That's how it started?

9    **A.**   That's how it started?  How what started?

10   **Q.**   You were on Coram Street.  How old were you when you

11   moved over there?

12   **A.**   Eleven, 12.

13   **Q.**   Right.

14   **A.**   No.  I was 9-10.  I was in fourth grade.

15   **Q.**   You were not Seven Mile Bloods in the fourth grade?

16   **A.**   No.

17   **Q.**   You would meet other people and start hanging out

18   together, is that right?

19   **A.**   Yes, sir.

20          **MR. MAGIDSON:**  If I may have a moment, your

21   Honor.

22       Mr. Kennedy, I don't have any further questions.

23          **THE COURT:**  All right.  Thank you.

24       Mr. Feinberg?

25

*15-20652; USA v. EUGENE FISHER, ET AL*

1                          **CROSS EXAMINATION**

2

3    **BY MR. FEINBERG:**

4

5        Q.   Mr. Kennedy, you got arrested in West Virginia?

6        A.   Yes, sir.

7        Q.   And were you charged with a crime in West Virginia?

8        A.   Yes, sir.

9        Q.   Whatever happened to that criminal case in West

10   Virginia?

11       A.   It's on here.

12       Q.   So you never went to court in West Virginia?

13       A.   Yes, I did.

14       Q.   It was dismissed?

15       A.   No, it was dropped in the state level.  The feds

16   picked it up.

17       Q.   That's what I'm saying.  The state case in West

18   Virginia that you were arrested for was dismissed because

19   the feds took it over, correct?

20       A.   Yes, sir.

21       Q.   Okay.  And what you did in West Virginia was part of

22   the indictment here in Michigan, is that correct?

23       A.   It is.  Yes, sir.

24       Q.   Okay.  So you were extradited from West Virginia to

25   Michigan, correct?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  You were brought here on what's commonly known as

3    ConAir.  They flew you to Oklahoma City and from Oklahoma

4    City to Michigan?

5    **A.**  Yes, sir.

6    **Q.**  And as soon as you got to Michigan, you were taken

7    to court, correct?

8    **A.**  Yes, sir.

9    **Q.**  And you were arraigned in court?

10   **A.**  Yes, sir.

11   **Q.**  Okay.  When did you get your attorney, that day or

12   sometime after that?

13   **A.**  I got my attorney when I was still in West Virginia.

14   **Q.**  Mr. Morris?

15   **A.**  Yes, sir.

16   **Q.**  Was he hired or was he appointed?

17   **A.**  He was hired.

18   **Q.**  Hired by your family or by you?

19   **A.**  By me.

20   **Q.**  I'm sorry?

21   **A.**  By me.

22   **Q.**  How did you -- was he on a retainer for you, so that

23   even before you got arrested in West Virginia, if you got

24   in trouble, he was there for you?

25   **A.**  No, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   How did you hire him if you were in West Virginia?

2    **A.**   I hired him through people that I knew, people that

3    suggested him for me.

4    **Q.**   And who paid him?

5    **A.**   I paid him.

6    **Q.**   How much did you pay him?

7    **A.**   9,000.

8    **Q.**   To start?

9    **A.**   To start.

10   **Q.**   Okay.  How did he get paid?  How did he get the

11   money?

12   **A.**   Cash, and the mother of my child dropped it off to

13   him.

14   **Q.**   She was holding your money for you?

15   **A.**   Yes, sir.

16   **Q.**   Let me ask you a question.  How many -- you have six

17   children, right?

18   **A.**   Yes, sir.

19   **Q.**   How many different women have birthed your children?

20   **A.**   Four.

21   **Q.**   Four women?

22   **A.**   Yes, sir.

23   **Q.**   How much was your baby's mama that was holding the

24   money, how much was she holding for you at that time?

25   This was 2016, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yes.

2    **Q.**   How much was she holding for you?

3    **A.**   Maybe like 15,000.

4    **Q.**   Where was the rest of your money?

5    **A.**   Gone.

6    **Q.**   I'm sorry?

7    **A.**   It was gone.

8    **Q.**   What happened to the assets that you had bought

9    during your drug dealings?  You know what assets mean?

10   **A.**   Yes, sir.

11   **Q.**   Okay.  Watches.  How many watches did you have?

12   **A.**   I had one watch.

13   **Q.**   How many?

14   **A.**   One.

15   **Q.**   Was that the Breitling?

16   **A.**   No.  I lost the Breitling.

17   **Q.**   How did you lose it?

18   **A.**   I lost it.  How do you lose stuff?

19   **Q.**   I don't know.  I never lost a $10,000 Breitling.

20   **A.**   I was robbed for it.

21   **Q.**   You were robbed?

22   **A.**   Yes, sir.

23   **Q.**   Okay.  Now did the watch that you showed on the

24   video, it had diamonds?

25   **A.**   Yes, sir.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  And it was platinum, correct?

2    **A.**  No, sir.

3    **Q.**  White gold?

4    **A.**  No, sir.

5    **Q.**  What was it tin?

6    **A.**  Silver.

7    **Q.**  You're telling me that Breitling sells a silver

8    sterling, a silver watch with diamonds?

9    **A.**  Rolex do.

10   **Q.**  I'm sorry?

11   **A.**  Rolex do.  Everybody sell silver watches.  Silver is

12   not -- you can put diamonds in silver.

13   **Q.**  Where did you get it?

14   **A.**  Got it from the jewelry store.

15   **Q.**  Which one?

16   **A.**  Mike's.

17   **Q.**  Where?

18   **A.**  Mike's.

19   **Q.**  Mike's?

20   **A.**  Yes, sir.

21   **Q.**  What other kind of watch did you have when you got

22   arrested?

23   **A.**  I didn't have no watch when I was arrested.

24   **Q.**  You didn't have any kind of watch?

25   **A.**  No, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  How did you tell time?

2    **A.**  I had -- that's crazy.  Do you have a watch?

3    Phones, clocks, cars.

4    **Q.**  Did you have someone around to tell you the time?

5    **A.**  You not making sense.  What you trying to do because

6    that don't make sense?  Everybody don't own a watch and

7    can still tell time.  Everything has time on it, clocks --

8    **Q.**  Okay.  I understand.

9    **A.**  -- cell phones, cars.

10   **Q.**  How about cars?

11   **A.**  What do you mean cars?  I had no cars.

12   **Q.**  How many cars had you purchased during the -- your

13   hay day of making money?

14   **A.**  Probably purchased a truck.  I financed a lot of

15   cars.

16   **Q.**  For you?

17   **A.**  Yes, sir.

18   **Q.**  Tell me all the cars that you bought.

19   **A.**  Never bought a car.

20   **Q.**  You said that you financed them?

21   **A.**  Financed and bought is something different.

22   **Q.**  Well, who did you finance the cars through?

23   **A.**  Car lots.

24   **Q.**  Okay.  So you gave them -- you got the car in your

25   name, and gave them money and financed it?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No, sir.  I financed cars through car lots, brokers

2    where you don't need no name.  Just give them the money,

3    and they go get you the car.

4    **Q.**  Were they your cars?

5    **A.**  Technically they were my cars.

6    **Q.**  Technically.  Technically, tell me all the cars you

7    had in your hay day?

8    **A.**  A 750.

9    **Q.**  750 BMW?

10   **A.**  Yes, sir.

11   **Q.**  Okay.

12   **A.**  I had a Range Rover.  I had Yukon, 2007 Yukon.  I

13   had a 2007 Range Rover, and 2007 -- I believe it was a 07

14   Yukon Denali.

15   **Q.**  Only three cars?

16   **A.**  Yes, sir.

17   **Q.**  What happened to them?

18   **A.**  I lost them.  I gave them back.  The Yukon Denali

19   got stole.  The Range Rover was somebody's else.  So when

20   I got him the money, he basically had the tow truck man

21   come back and get it.

22   **Q.**  So when you --

23   **A.**  Like a broker deal.

24   **Q.**  So when you were arrested in 2016, you had no assets

25   other than $15,000?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  And the money and the drugs that I got caught with
2    when I was arrested.
3         **Q.**  But that was taken away from you?
4         **A.**  Yes.
5         **Q.**  Other than the money that was taken away from you
6    when you got arrested, the only money that you had over
7    all of these years was $15,000 that one of your baby's
8    mama had for you, is that correct?
9         **A.**  Yes, sir.
10        **Q.**  Okay.  And that's 100 percent the truth, right?
11        **A.**  You said as of 2016?
12        **Q.**  Yes.
13        **A.**  When I got locked up?
14        **Q.**  When you were locked up in West Virginia and
15   extradited to Michigan?
16        **A.**  That's 100 percent the truth.
17        **Q.**  Okay.  And this is what you told the government?
18        **A.**  I don't believe I told -- no.  I had a girl owed me.
19   A girl owed me like $8,000.
20        **Q.**  Did you ever get that back?
21        **A.**  Yes, sir.
22        **Q.**  Okay.  So 23,000?
23        **A.**  Yes, sir.
24        **Q.**  And 9,000 went to your attorney, right?
25        **A.**  Yes, sir.  At first, yes.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  I'm sorry?

2      **A.**  At first, yes, sir.

3      **Q.**  Did you tell the government that you had this money

4      when you first met them?

5      **A.**  Yes, sir.

6      **Q.**  You told them that you had money hidden away and

7      money that was owed to you?

8      **A.**  Yes, sir.

9      **Q.**  Well, one of the agreements that you signed was

10     forfeiture.  You had to give up all of your assets,

11     correct?

12     **A.**  Right.

13     **Q.**  How much did you give the government?

14     **A.**  No.  You asked me --

15     **Q.**  Did you give the government any money based on your

16     requirement for forfeiture?

17     **A.**  You asked me a double question.

18     **Q.**  I'm asking you this question.  How much money did

19     you give the government?

20     **A.**  When the government called me, I had no money to

21     give them.  When I retained my lawyer, by the time they

22     got me -- you asked me how much did I give my lawyer to

23     retain him.

24     **Q.**  Right.

25     **A.**  Then you never asked me how much that I end up

*15-20652; USA v. EUGENE FISHER, ET AL*

1     giving him altogether before I got out of jail.

2        Q.   Okay.

3        A.   By the time I got out of jail I had nothing.

4        Q.   How much money did you give him totally?

5        A.   I was locked up for four months from August to

6     December 10th.  By that time I gave him 15,000, and

7     Christmas, my kids and stuff, that money was gone.  That

8     money was not there.

9        Q.   Okay.  So how are you living now?

10       A.   I'm -- can you repeat that?

11       Q.   Is that a tough question?

12       A.   Yes.

13       Q.   You don't remember the question?

14       A.   You said how am I living now.

15       Q.   Yes.  Why do you need me to repeat it if you

16    remember the question?

17       A.   Because --

18       Q.   You need time to think about that --

19       A.   No, I don't.

20       Q.   -- answer?

21       A.   No, I can answer it.

22       Q.   Okay.

23       A.   Somebody sent somebody to kill me when I was out,

24    since I've been out on bond.

25       Q.   I'm asking you, how are you supporting yourself?

                *15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  I'm trying to tell you.

2      **Q.**  Okay.  Tell me.

3      **A.**  When since I've been out on bond, I was working at

4      my house on Coram.  Somebody tried to come and kill me,

5      and the government gave me money to move.

6      **Q.**  How much money did they give you?

7      **A.**  27,000, 26, 5.  Something like that.

8      **Q.**  Okay.  That was to move, right?

9      **A.**  Yes, and to live.

10     **Q.**  That's two years ago?

11     **A.**  No, not two years ago.

12     **Q.**  When was it?

13     **A.**  Not even six months.  Maybe 4-5 months ago.

14     **Q.**  After you got out of jail in December of 2016,

15     right?

16     **A.**  Right.

17     **Q.**  How did you live financially?

18     **A.**  I lived in the basement.  I had a job.

19     **Q.**  Where were you working?

20     **A.**  Precision, Inc.

21     **Q.**  Where?

22     **A.**  Precision, Inc.

23     **Q.**  What's that?

24     **A.**  It's like a place that make parts for Tesla cars.

25     **Q.**  And from that money I assume you're paying child

*15-20652; USA v. EUGENE FISHER, ET AL*

1    support?

2        **A.**   I took care of my kids.

3        **Q.**   I understand.   Right now how many warrants do you

4    have for felony non-support in Wayne County?

5        **A.**   I don't have nothing from Wayne County.

6        **Q.**   Where are your children?

7        **A.**   In Wayne County.

8                **MR. WECHSLER:**   Your Honor, could we have a

9    brief sidebar?

10               **THE COURT:**   All right.

11               **MR. FEINBERG:**   I'm not asking for a specific

12   address.

13               **MR. WECHSLER:**   Can we have a brief sidebar?

14

15       (Sidebar conference held on the record.)

16

17               **MR. WECHSLER:**   He's getting really close to

18   where he's living.   I want to make sure that he stays away

19   from that, where the kids are living.   He moved for a

20   reason, and he's starting to ask where he works, and

21   things like that.   That's way too many clues.

22               **MR. FEINBERG:**   Okay.   I won't ask where he

23   works or lives.

24               **MR. WECHSLER:**   Where the kids are.   Not just

25   he works.   I mean, what he does is fine.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. FEINBERG:**  I'll stay away from that.  I

2     apologize if that causes you some problems.

3          **THE COURT:**  Right.

4          **MR. WECHSLER:**  Thank you.

5

6          (Sidebar conference concluded.)

7

8          **THE COURT:**  You may continue.

9          **MR. FEINBERG:**  Thank you.

10

11   BY MR. FEINBERG:

12    **Q.**  You testified that you had a felony non-support

13    warrant.  Where was that out of?

14    **A.**  Macomb County.

15    **Q.**  Is that case still pending?

16    **A.**  Yes, sir.

17    **Q.**  What's the status?

18    **A.**  You ask me if it was still pending, and then you ask

19    me what's the status.

20    **Q.**  Do you have court dates?

21    **A.**  No, sir.

22    **Q.**  How much do you owe them?

23    **A.**  I don't know specifically.

24    **Q.**  Did they order you to make payments?

25    **A.**  No, they never order me to make payments.  She had a

*15-20652; USA v. EUGENE FISHER, ET AL*

1    warrant.  So she didn't want to go to down there.  I asked

2    her asked her to go down there the last time to let them

3    know that I've been giving her money.  She agreed to go

4    down there, but she told me that she had a warrant.  The

5    last time she went down there, they locked her up.

6        **Q.**  That's for how many children?

7        **A.**  That's for one child.

8        **Q.**  What about your other five?

9        **A.**  I take care of my kids all the time.

10       **Q.**  There's no Friend of the Court process on any of

11   those other children?

12       **A.**  Probably is.  If you get aid, it is Friend of the

13   Court.

14       **Q.**  Are they getting aid?

15       **A.**  That's not my business.

16       **Q.**  I'm sorry?

17       **A.**  That's not my business if they getting aid.  That's

18   not something that you talk to with the mother of your

19   child.  You make sure the child is all right.  Her getting

20   aid for her stuff, how is that my business?  How does that

21   make sense?  What do these questions have to do with this?

22       **Q.**  Does the mothers ask you for money to help support

23   the children?

24       **A.**  And I give it to them if I have it.  If I can get

25   it.  I haven't had no money to give.  When I have money, I

*15-20652; USA v. EUGENE FISHER, ET AL*

1    give it.  You can only do what you can do.

2        **Q.**  The money that you're making now, are you using that

3    money to pay any of the Friend of the Court in Macomb

4    County or the mothers?

5        **A.**  I try to set up a court date with the Friend of the

6    Court.  It is difficult.  It's something that I can't

7    express in the courtroom.  I'm pretty sure you know that.

8    I don't know if you trying to figure out where I live, if

9    your clients know where I live.  I don't understand what

10   you trying to do.

11       **Q.**  I don't care where you live.  I'm asking you --

12       **A.**  I haven't been in town.

13       **Q.**  Mr. Kennedy.  I'm asking, the money that you're

14   making --

15       **A.**  Yes, I take care of my kids.

16       **Q.**  -- are you making payments to the Friend of the

17   Court?

18       **A.**  No, I'm not.

19       **Q.**  When you -- how long did it take from the time that

20   you were arrested in West Virginia to get to Michigan?

21       **A.**  Three and a half months.

22       **Q.**  So the very first time you went to court on this

23   case was when, November, December?

24       **A.**  November.

25       **Q.**  I'm sorry?

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   November.

2      **Q.**   You went to court, and no bond was given to you,

3      right?  You were remanded to jail?

4      **A.**   Yes, sir.

5      **Q.**   Okay.  You got a copy of the indictment at the time

6      that you were arraigned, correct?

7      **A.**   Yes, sir.

8      **Q.**   And they told you what the penalties were for all of

9      the crimes that you were charged with, correct?

10     **A.**   Yes, sir.

11     **Q.**   How many different counts -- how many different

12     charges in the indictment were you charged with?

13     **A.**   Two.

14     **Q.**   The first one was racketeering, RICO?

15     **A.**   The RICO.

16     **Q.**   And the second one, what was the second charge?

17     **A.**   Felon in possession of a firearm in commission of

18     furtherance of violence, something like that.  Conspiracy.

19     **Q.**   And the RICO charge, how much time did that carry?

20     **A.**   Life.

21     **Q.**   And the felon in possession of a firearm during a

22     crime of violence, how much time did that carry?

23     **A.**   I believe it was life too.  I don't recall that.

24     Was it life?

25     **Q.**   So when did you first start talking to your attorney

*15-20652; USA v. EUGENE FISHER, ET AL*

1    about cooperating?

2        **A.**   When he came to talk to me.

3        **Q.**   First time?

4        **A.**   Face-to-face, yes, sir.

5        **Q.**   The very first time that you spoke with Mr. Morris,

6    you were discussing you're desire to cooperate?

7        **A.**   Yes, sir.

8        **Q.**   Okay.  And that was in order for you to help

9    yourself not to do life, correct?

10       **A.**   Yes, sir.

11       **Q.**   Okay.  So I assume you directed Mr. Morris to

12   contact the federal authorities that it was your desire to

13   cooperate?

14       **A.**   Yes, sir.

15       **Q.**   Okay.  At that particular time you didn't have any

16   of the discovery, the reports, the investigation that the

17   government had against you, is that correct?

18       **A.**   Correct.

19       **Q.**   Wasn't it -- weren't you curious to see whether or

20   not they had enough evidence to convict you before you

21   decided to cooperate?

22       **A.**   Right.

23       **Q.**   I'm sorry?

24       **A.**   I was just scared.

25       **Q.**   When you first met with the government and you

*15-20652; USA v. EUGENE FISHER, ET AL*

1   signed the agreement, you read the agreement, correct?

2   A.   Yes, sir.

3   Q.   This is before you gave any -- made any statements,

4   right?

5   A.   When I read the letter.

6   Q.   First, you read the letter, talked it over with your

7   attorney, signed it, and then made your first statement,

8   correct?

9   A.   Correct.

10  Q.   When you sat down with them, the government -- what

11  was the very first thing anyone said to anybody else after

12  you signed the agreement, and before you made the

13  statement?  What was the first thing said?

14  A.   After I signed the agreement, I just talked.

15  Q.   Well, did they say just talk, or did they say Mr.

16  Kennedy, tell us everything that you know?

17  A.   What's been going on out there.  They didn't ask me

18  specifically about them.  They asked me what's been going

19  on out there, like in the neighborhood and streets.

20  Q.   Okay.  So how they prompted you to make the first

21  statement was Mr. Kennedy, tell us what's going on out

22  there, correct?

23  A.   No, what do you know.

24  Q.   What do you know about what?

25  A.   What's going on out there.  It was something -- I

*15-20652; USA v. EUGENE FISHER, ET AL*

1    can't give you word for word what they said, like

2    specifically word for word, because then if I quote

3    something wrong or something wrong, they say I'm lying,

4    but basically what do you know about what's going on out

5    there.

6        **Q.**  Among whom?

7        **A.**  I mean --

8        **Q.**  Did they say what's going on with the Tigers, Lions,

9    or did they say what's going on with the Seven Mile

10   Bloods?

11       **A.**  They didn't say that.  They say what's been going on

12   with all the shootings and killings going on out there.

13       **Q.**  Do you know what they wanted?

14       **A.**  Yeah, I knew what they wanted.

15       **Q.**  What did they want it?

16       **A.**  They wanted to know what's going on.

17       **Q.**  Among who?

18       **A.**  With the beefs and all the killings.

19       **Q.**  Among whom?  I mean, there's a lot of beefing and

20   killings throughout the city of Detroit, right, that had

21   nothing to do with your indictment, correct?

22       **A.**  If I am on the case --

23       **Q.**  Mr. Kennedy how --

24       **A.**  You won't let me answer the question.

25       **Q.**  How do you know they wanted you to talk about the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Seven Mile Bloods?

2        **A.**  Because I know they don't want me to talk about

3    somebody that I can't tell them about nobody else because

4    I don't hang with those people.

5        **Q.**  Did you or your lawyer talk about what they wanted

6    from you --

7        **A.**  No.

8        **Q.**  -- before you gave your first statement?

9        **A.**  No.

10       **Q.**  Okay.

11       **A.**  Obviously, we didn't.  He told me that I want you to

12   tell the truth.  He told me don't lie, and whatever you

13   say, make sure it's the truth.

14       **Q.**  Did he know that you have lied before, all of the

15   lies that you testified about yesterday, giving phony

16   names, things like that?

17       **A.**  Probably not.  I don't know.  I don't know what he

18   know.

19       **Q.**  You never told him that?

20       **A.**  No, sir.

21       **Q.**  Okay.  So it was your understanding that they wanted

22   you to tell them what was going on out there.  Did you

23   know the organization in which they wanted to know what's

24   going on out there?  Just yes or no.

25       **A.**  I can't answer that yes or no.  It's not yes or no.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    You trying to trap me in the question, and I'm not going

2    to let you do that because it's not a yes or no question.

3        Q.   You think that I would try to trap you?

4        A.   That's your job.

5        Q.   Why?

6        A.   It is not a yes or no question.

7        Q.   Okay.

8        A.   It's a trick question, because if I say yeah, then

9    you say they never said that.  They said they wanted to

10   know about any killing, any murder, anything illegal that

11   happened, they wanted to know about it, period.  I told

12   them all my life doing this since 2002-2003.  We talked

13   for hours.

14       Q.   Okay.  The very first time you spoke for hours?

15       A.   Hours.  They didn't ask a question.

16       Q.   So the very first time you spoke to them was on

17   December 5, 2016, is that correct?

18       A.   I don't think so, no.

19       Q.   Was it before that?

20       A.   You said December 5th.

21       Q.   December 5th.

22       A.   Everybody else saying November.

23       Q.   December 5, 2016?

24       A.   Everybody else keep saying November 29th.  When the

25   other lawyers asked me when I first talked to them, they

*15-20652; USA v. EUGENE FISHER, ET AL*

1    said it was November 29th.  I don't know the date.  The

2    end of November, beginning of December.

3        **Q.**  Okay.  So based on your recollection, the first time

4    you spoke to them was when, November 29th?

5        **A.**  That's the date that everybody is saying.

6        **Q.**  I'm not asking what everyone else said.  How soon

7    after you were arraigned did you speak to the agents?

8        **A.**  Maybe a week or two.

9        **Q.**  I'm sorry?

10       **A.**  Maybe a week.  Maybe two.

11       **Q.**  Okay.  And that was the very first time that you

12   spoke to them, you said that you spoke for hours?

13       **A.**  About three hours.

14       **Q.**  Have you had an opportunity to read the report that

15   the government made for your first meeting?

16       **A.**  Yes, sir.

17       **Q.**  And how long was the report?

18       **A.**  I don't recall.

19       **Q.**  Okay.  And who was taking notes during that first

20   meeting?  Who was taking notes?

21       **A.**  The agent.

22       **Q.**  How did it start?  What was the very first thing you

23   told them about what was going on out there?

24       **A.**  I don't know.  I don't recall that.  I can't tell

25   you that, because if I said this was the first thing and

*15-20652; USA v. EUGENE FISHER, ET AL*

1     it wasn't, then you say I'm a liar.  I can't tell you the

2     first thing that I said.

3        **Q.**  You told him about --

4        **A.**  I don't recall the very first thing that I said.

5        **Q.**  You told them about when the first time you started

6     selling drugs, right?

7        **A.**  I don't recall the first thing that I said.

8        **Q.**  No, at any time during the first meeting?

9        **A.**  Yes, sir.

10       **Q.**  And you told them about all the people that you

11    associated with, is that correct?

12       **A.**  You asking me did I tell them about what?

13       **Q.**  Tell them about all the people that you ever

14    associated with out on the street from the time you

15    started selling drugs?

16       **A.**  Probably -- no, I probably didn't tell them about

17    everybody.

18       **Q.**  How did you know what to tell them as far as people?

19       **A.**  I don't understand your question.

20       **Q.**  You told them about people.  How did you know that

21    they wanted to know about people that were in any group or

22    organization or association?

23       **A.**  I assume because the case that I'm on.  They wanted

24    to know about people that I hung with at the time.

25       **Q.**  They never asked you about any specific person?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   Yeah.  At times they did, yes.

2    **Q.**   When did that happen?

3    **A.**   During the conversation they stop me and ask me

4    about something that I said or something like that.

5    **Q.**   And each time that you were interviewed, did they

6    say, okay.  Tell us more.  Is that what -- how they got

7    that next -- all the meetings started?

8    **A.**   No.

9    **Q.**   How did it start?

10   **A.**   Sometimes I remember stuff, and just call them and

11   tell them stuff, or they asked me about certain people and

12   ask me if I knew something.

13   **Q.**   They specifically asked you about some people,

14   certain people, right?

15   **A.**   I don't understand your question.

16   **Q.**   Okay.  Did they give you names that they wanted you

17   to tell them about?

18   **A.**   No, it didn't go like that.  When I told them about

19   some people, they would follow with questions about the

20   situation, or how did I know about the situation, or how

21   did the situation take place.

22   **Q.**   Did they ask you about certain events that they were

23   interested in?

24   **A.**   No, I don't recall that.

25   **Q.**   They didn't ask you about any shootings?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  They asked me about the shootings that I knew about.

2    **Q.**  So they said, tell us about the shootings that you

3    know about.  Is that how that was brought out?

4    **A.**  No, it's not.

5    **Q.**  So how did that happen?

6    **A.**  When I was talking, and if I brought up a shooting

7    or something that happened, then they would ask me about

8    it.

9    **Q.**  So you would -- things that you heard, you would

10   tell them about, is that right?

11   **A.**  Things that I heard, saw, witnessed I would tell

12   them about.

13   **Q.**  You testified once before today, correct?

14   **A.**  Yes, sir.

15   **Q.**  Okay.  And how many more times do you expect to

16   testify?

17   **A.**  I don't know.

18   **Q.**  At least two or three more times, different trials?

19   **A.**  That's something that I know.  They never told me.

20   **Q.**  Okay.  You testified that you first heard about

21   something called the Seven Mile Bloods when you were

22   either in the sixth or eighth grade, is that correct?

23   **A.**  Yes, sir.

24   **Q.**  And how old were you in the sixth, seventh, eighth

25   grade?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Eleven, 12, 13.

2    **Q.**  Were you selling drugs on the street by then?

3    **A.**  No, sir.

4    **Q.**  When did you start?

5    **A.**  Probably when I dropped out of high school, about

6    tenth grade.  Ninth, tenth grade.

7    **Q.**  So when you first heard of a group called Seven Mile

8    Bloods, did you associate with any of them?  Were you

9    friends with any of them?

10   **A.**  I went to school with some of them.  We played on

11   the same basketball team.

12   **Q.**  At the age 13?

13   **A.**  In the seventh grade.  They was in eighth.  I was in

14   the seventh.

15   **Q.**  So people that were a year older than you, eighth

16   grade, they were in the Seven Mile Bloods?

17   **A.**  I wouldn't say that.  I would say after I was in the

18   eighth grade.

19   **Q.**  I understand that.

20   **A.**  You asked me did I know them before there was Seven

21   Mile Bloods.  I knew them, but you asked me did I know

22   them.

23   **Q.**  Yes.

24   **A.**  And how did I know them?

25   **Q.**  And you grew up with them?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**  Right, and before there was Seven Mile Bloods I knew

2     them.  I'm not saying when we was in the sixth, seventh,

3     eighth grade they was walking around saying Seven Mile

4     Bloods.  When I was in the eighth grade, they was probably

5     at the end of high school, most of them.

6     **Q.**  When did you hear --

7     **A.**  Eighth grade.  Seventh, eighth grade.

8     **Q.**  Let me ask the question.  When did you hear that any

9     of your friends were associated with the Seven Mile

10    Bloods?

11    **A.**  Seventh, eighth grade.

12    **Q.**  Okay.  So if you were in the eighth grade and they

13    were older, they would have been in the tenth grade?

14    **A.**  Tenth, eleventh, yes, sir.

15    **Q.**  That's when the Seven Mile Bloods started, according

16    to your knowledge, when your friends were maybe 15-16?

17    **A.**  I can't answer to when they started.

18    **Q.**  You have no idea where -- when it started or how it

19    started?

20    **A.**  No, sir.

21    **Q.**  Okay.  The felon in possession of a firearm during

22    the crime of violence that has been since dismissed,

23    correct?

24    **A.**  Yes, sir.

25    **Q.**  The RICO charge that you were facing life, according

*15-20652; USA v. EUGENE FISHER, ET AL*

1    to the plea agreement now says 20 year max, is that

2    correct?

3        **A.**  Yes, sir.

4        **Q.**  Okay.  Do you know how the amount of time was

5    determined as far as what your guidelines are?

6        **A.**  Came about from the pills that people say they saw

7    me with, or seen them on text messages that people talking

8    about.

9        **Q.**  The amount of drugs that --

10       **A.**  That can account for, and the text messages where

11   people said they seen or saw me in that order, stuff like

12   that.

13       **Q.**  None of the drugs that you were selling on Woodward

14   and Seward are part of the computation, right?

15       **A.**  No, sir.

16       **Q.**  None of the drugs that you were selling on Coram

17   were part of the computation, correct?

18       **A.**  I was selling pills on Coram.  So I would think some

19   of the drugs that I was selling on Coram accounted for it.

20       **Q.**  Okay.  And what about when you move to another

21   location, not Coram?  Any of those drugs taken into

22   account?

23       **A.**  Yes, sir.

24       **Q.**  Okay.  And what about all of the drugs that you were

25   selling in West Virginia?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No, sir.

2    **Q.**  I'm sorry?

3    **A.**  The drugs that I got caught with was taken into

4    account.  The drugs that people say they seen at the house

5    while I was in West Virginia was taken into account.  The

6    drugs that I texted was taken into account.

7    **Q.**  During your lifetime of selling drugs, how much

8    money did you make?

9    **A.**  I don't know.

10   **Q.**  Over a million?

11   **A.**  Yes, sir.

12   **Q.**  Two million?

13   **A.**  No, I can't -- I don't know.  I've never seen it all

14   at once.

15   **Q.**  What is the total amount that you yourself sold, not

16   sharing with anyone because you didn't share with anybody?

17   How much money did you personally make selling drugs?

18   **A.**  I can't answer that.  I don't know.

19   **Q.**  But you said at least over one million?

20   **A.**  I don't recall.  I can't answer.  That's guessing.

21   That's speculation.  I can't guess to that.  That's

22   guessing.  I'm not going to answer that.  I can't answer

23   that.

24   **Q.**  Based on your best guess?

25   **A.**  I can't.  I don't have a best guess.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Your best estimate?

2    **A.**  I don't have one.  I'm sorry.  I can't answer.

3    **Q.**  It was with a lot though?

4    **A.**  I can't answer that.

5    **Q.**  Did you ever give an estimate to the government how

6    much money you made over the lifetime of your drug

7    dealing?

8    **A.**  I don't recall that.  No, I don't think so.

9    **Q.**  You were also selling drugs up in St. Clair County,

10   correct?

11   **A.**  Yes, sir.

12   **Q.**  Okay.  And how much were you selling up there?

13   **A.**  Probably like 8 balls and stuff like that.  I don't

14   know.  It was little.

15   **Q.**  Little stuff?

16   **A.**  Yeah.  It wasn't nothing.

17   **Q.**  How much, a 1,000 a week, 2,000 a week?

18   **A.**  I wasn't there a month.

19   **Q.**  So a 1,000, 2,000, 3,000?

20   **A.**  Probably about -- you asking me to guess.  I can't

21   guess that.

22   **Q.**  When were you arrested in St. Clair County?

23   **A.**  August -- August of 2009.  August of 2009 or 10.

24   **Q.**  You got probation?

25   **A.**  No.  No, I didn't.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  You got time?

2      **A.**  Ten months.

3      **Q.**  Prison or jail time?

4      **A.**  Jail time.

5      **Q.**  You were not put on probation?

6      **A.**  I was put on probation after I came home and did

7      county time.

8      **Q.**  How long was your probation?

9      **A.**  Three or four years.

10     **Q.**  I'm sorry?

11     **A.**  Three or four years.

12     **Q.**  And how many violations or probation warrants were

13     issued against you out of the St. Clair County case?

14     **A.**  One.

15     **Q.**  What was that for?

16     **A.**  Failure to --

17     **Q.**  I'm sorry?

18     **A.**  Missing two consecutive reports I believe.  I missed

19     two in a row.  When you miss two in a row, it is

20     automatic.

21     **Q.**  What happened to you?

22     **A.**  No transportation.

23     **Q.**  What happened to you on the violations, or are they

24     still pending?

25     **A.**  No, I did it.  They gave me 65 days -- 60 some days,

*15-20652; USA v. EUGENE FISHER, ET AL*

1      took off 30 days if I pay $1000, and I went from the end

2      of March of 2015 to beginning of April, first week of

3      April 2015 -- May.  Beginning of May 2015.

4         Q.  Had you ever been in prison?  Not jail, but prison?

5         A.  No, sir.

6         Q.  And you certainly want to do anything and everything

7      you can not to go to prison?

8         A.  No, I wouldn't do anything or everything.

9         Q.  Well, you were facing up to life, correct?

10        A.  Up to life.  So you make it seem like -- correct,

11     sir.

12        Q.  Were you facing up to life, correct?

13        A.  But --

14        Q.  Yes or no.

15        A.  No, I wasn't.

16        Q.  The maximum --

17        A.  It's the guidelines.

18        Q.  I understand.  But the maximum penalty for the

19     crimes in which you were indicted for carried up to life?

20        A.  I was facing 14 and a half years.  I was not facing

21     life.

22        Q.  What about for the crime of violence, what were the

23     guidelines for that?

24        A.  They didn't give me no guideline for that.

25        Q.  Because you copped out before you could figure out

*15-20652; USA v. EUGENE FISHER, ET AL*

1    how much time you would have to serve?

2       **A.**   Yes, sir.

3       **Q.**   But up to life at the time?

4       **A.**   Fourteen and a half years is what they told me.

5       **Q.**   Who told you that, the feds?

6       **A.**   The paper.  The paper that they gave me said 140 to

7    17O some months.

8       **Q.**   That's the papers that the federal government gave

9    you?

10      **A.**   Yes.

11      **Q.**   Before that when you were arraigned, did it say that

12   you were facing up to life on both of the charges?

13      **A.**   It could be up to life.

14      **Q.**   Okay.  And you say that you would not do anything

15   and everything in order not to do life?

16      **A.**   When you say everything and anything --

17      **Q.**   Yeah, like lie.

18      **A.**   I would -- honestly sir, if I could, I would.  I

19   would.  I would lie not to do life, but I'm not lying.

20      **Q.**   I understand.  You would lie if you could, right?

21      **A.**   But I'm not lying.

22      **Q.**   Yes or no.  That's what you just said?

23      **A.**   To --

24      **Q.**   Yes or no.

25      **A.**   Yes, I said that.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Okay.  And one of the ways -- well, it is your

2    understanding that it's the government who was going to

3    decide whether or not they think you're telling the truth

4    in order for you to get what you pled guilty to, and the

5    cooperation agreement, correct?

6    **A.**  No, sir.

7    **Q.**  It's up to them?

8    **A.**  No, sir, through the investigation.  They know if

9    I'm lying or not.

10   **Q.**  Mr. Kennedy --

11   **A.**  You keep asking me a rhetorical question, a question

12   that's got two meanings.  They know if I am lying.  They

13   know.  They know everything.  You think we all sitting

14   here for no reason, or they just picked them -- us?

15   **Q.**  Who makes the decision to make the recommendation

16   for reduction in sentence?

17   **A.**  Who makes the recommendation?

18   **Q.**  Yes.

19   **A.**  The prosecutors.

20   **Q.**  Okay.  So they make the recommendation if they think

21   you're telling the truth, correct?  Yes or no.

22   **A.**  Yes, sir.

23   **Q.**  Okay.  And one of the ways that they can help

24   determine whether or not you're telling the truth about --

25   not just everything, but maybe some specific things, is to

*15-20652; USA v. EUGENE FISHER, ET AL*

1    polygraph you.  You know what a polygraph is?

2    **A.**  Yes, sir.

3    **Q.**  A lie detector test?

4    **A.**  Yes, sir.

5    **Q.**  At no point in time, from the time that you decided

6    to cooperate up until now, has anybody said to you we want

7    to polygraph you on a specific question?

8    **A.**  I offered to take that polygraph.  I take one for

9    you if you want me to.  I'm not lying.

10    **Q.**  Nobody has asked you to take a polygraph?

11    **A.**  No.

12    **Q.**  Okay.  Did you ever tell the government that you

13    would lie if you could?

14    **A.**  No, it is a question that you asked.  You asked

15    me -- you said would I do anything not to go to jail for

16    life.  Who wouldn't do anything not to go to jail for

17    life?  That's just a question.  But would I lie to the

18    federal government not to go to jail to do life, and they

19    find out I'm lying, and they give me even more time would

20    be the dumbest thing to do ever.  I don't want to lie on

21    these guys.  I don't even want to do this.  I do what I

22    have to do to safe myself and my family.  I'm not proud

23    for what I'm doing.  I feel bad, but I'm not going to lie

24    on them.  I never lied on them.  I'm not lying on them.

25    Nothing that I said is a lie.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Would you do anything in order to not do life to

2    protect you --

3        **A.**  I'm being honest.  I'm being honest.  In the

4    position that I was put in and as a criminal, yes, if I

5    could lie to get away from the police about my name, yes,

6    I have lied to get away from the police.  That's what I

7    was doing.  I was doing criminal activities, but I'm not

8    going to sit up and lie to the federal government, and

9    then they find out I'm lying.  Then I just -- now I'm a

10   snitch and I go to jail for the rest of my life.

11       **Q.**  Of course, you would never do anything like that --

12       **A.**  No, that's dumb.

13       **Q.**  -- not to protect you and your family?

14       **A.**  I wouldn't make up a story on them.

15       **Q.**  Okay.  When did you first meet R.O.?

16       **A.**  2004-5, sir.

17       **Q.**  Where was that?

18       **A.**  In the neighborhood, just being in the neighborhood.

19       **Q.**  Which neighborhood?

20       **A.**  Red Zone, Coram and Manning.

21       **Q.**  How was it that you met him?

22       **A.**  Just being around.  Just seeing him in the

23   neighborhood being around.

24       **Q.**  How old were you?

25       **A.**  Probably fifth, sixth grade.  Fourth, fifth, sixth

*15-20652; USA v. EUGENE FISHER, ET AL*

1   grade.  I think I met him at a park or carnival the first

2   time I ever saw him.

3       **Q.**  Well, just hanging out having fun, right?

4       **A.**  Yeah.

5       **Q.**  Not beating up anyone, shooting anybody, selling

6   drugs, anything like that?

7       **A.**  No, sir.

8       **Q.**  Okay.  Did you know where he lived at that time?

9       **A.**  Yes, sir.

10      **Q.**  Where?

11      **A.**  On Manning.

12      **Q.**  During one of your statements, you made a statement

13  saying that you would see Mr. Brown on Manning street, is

14  that correct?

15      **A.**  Yes, sir.

16      **Q.**  Of course, he lived on Manning.  You would expect

17  him to be on Manning, the street that he lived on?

18      **A.**  Yes, sir.

19      **Q.**  Okay.  Where were you living at the time?

20      **A.**  I was living on Coram.

21      **Q.**  How far is Coram from Manning?

22      **A.**  It's three blocks south, six, seven blocks west --

23  five, six blocks west.

24      **Q.**  Were you on Manning to sell drugs?

25      **A.**  No, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.** Ever sell drugs on Manning?

2    **A.** No, sir.

3    **Q.** Was he older than you?

4    **A.** Yes, sir.

5    **Q.** How much older?

6    **A.** I don't know, sir.

7    **Q.** Were you just acquaintances, say hello, or were you

8    friends?

9    **A.** We was acquaintance.  He was older.  He was probably

10   16-17, and I was probably 12-11.  He would not hang with

11   11-12 year old when 16-17.  I would not say that we were

12   hanging.

13   **Q.** Just to say hello, right?

14   **A.** Yes, sir.

15   **Q.** And did you ever become friends with him?

16   **A.** At a point.

17   **Q.** Not acquaintances?

18   **A.** I said at a point, yes, sir.

19   **Q.** How was it that you became friends with Mr. Brown?

20   **A.** Through being in the same neighborhood.  Seeing him

21   a lot, being around him.

22   **Q.** Again, playing ball, going to the parks, going to

23   carnivals, things like that, correct?

24   **A.** Yes, sir.

25   **Q.** When did you become associated with Seven Mile

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Bloods?

2        A.   When I actually started hanging with them every

3    single -- like more times than not was in 2011-12.

4        Q.   Did you become a member or just hung out?

5        A.   Hung out.

6        Q.   Did you ever become a member?

7        A.   No, sir.

8        Q.   Ever become a member of the groups associated with

9    Seven Mile Bloods, 55?

10       A.   Yes, sir.

11       Q.   And how did you become a member of 55?

12       A.   It just something that we sat around and made up one

13   day.

14       Q.   Who?

15       A.   Everybody.

16       Q.   Who's everybody?

17       A.   Me, Block, Chino, Grymee.  It was a few of us.  I

18   don't recall everybody that was there.

19       Q.   Not Mr. Brown?

20       A.   No, sir.

21       Q.   Okay.  The people that you just mentioned, they were

22   Seven Mile Bloods, and then they later decided to become

23   55?

24       A.   Yes, sir.

25       Q.   Okay.  And they asked you or you asked them to

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    become part of their group?

2        A.   It wasn't like nobody asked nobody.  It was all

3    agreed upon, and then the longer -- the more it became

4    popular from videos like you just saw, and doing certain

5    stuff, everybody wanted to be in it.

6        Q.   And those were the people that you really started

7    hanging around with, correct?

8        A.   Those were the people?  Who are those people?

9        Q.   People that you mentioned that became 55's?

10       A.   Uh-huh.

11       Q.   Those were the people?

12       A.   I hung with everybody.  Because -- just because you

13   wasn't 55 don't mean I won't hang.

14       Q.   You hung out with them more than anybody else, is

15   that correct?

16       A.   No, I wouldn't say that.

17       Q.   Okay.  So some of the people that you hung around

18   with were not affiliated with any SMB or 55's or Hobsquad

19   or any of those groups?

20       A.   Some of the people that I hung around with, no.

21       Q.   They were just neighborhood friends?

22       A.   Or new friend.

23       Q.   New friends, right.  You didn't not want to be with

24   people who were not part of 55's, right?  You didn't say,

25   if you're not a 55, I can't be my friend?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.** No, I didn't say that.

2                 **THE COURT:** Okay. Let's take a break.

3

4                 (Jury excused at 10:12 a.m.)

5

6                 **THE COURT:** Do any defendants need to use the

7      facilities? Any of the defendants need to use the

8      facilities? All right. We'll make it a longer break.

9

10                (Recess taken at 10:13 a.m.)

11

12                (Proceedings held with jury at 10:40 a.m.)

13

14                **THE COURT:** You can take a seat, and you may

15     continue, Mr. Feinberg.

16

17     **BY MR. FEINBERG:**

18     **Q.** Just to sidetrack a little bit, the testimony that

19     you gave concerning the party that was shown to you on the

20     video, Mr. Brown wasn't there, was he?

21     **A.** Yes, he was.

22     **Q.** He didn't show up on the screen?

23     **A.** He worked the door that night.

24     **Q.** I'm sorry?

25     **A.** He worked the door that night.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

**Q.**  At the club?

**A.**  I paid him, yes, to receive the money at the door that night.  He was there.

**Q.**  You paid him to be at the door?

**A.**  Yes, sir.

**Q.**  How much did you pay him?

**A.**  We never got the money because the fight ensued, including Mr. Brown and Jig and a bunch of other people.

**Q.**  I'm talking about the one that was on the video.

**A.**  The one on the video, he was there.  He was working the door.

**Q.**  Yeah.

**A.**  He was working the door.  That's why you didn't see him in the club.  He was working the door.  He was there.

**Q.**  Did you tell the government that he was at the club working the door?

**A.**  They never asked me about it.  I really forgot about that video.

**Q.**  So he is not on the video, but you have a distinct memory that he was there?

**A.**  I dropped him off first earlier that day, about 9:30 when the club first opened.  He asked me if he would make money for working the door, and I paid him to work the door.

**Q.**  But you never paid him?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No, I never paid him.

2    **Q.**  Even after, the day after?

3    **A.**  I never got paid.  Nobody got paid.

4    **Q.**  You had a bag of money?

5    **A.**  Right.

6    **Q.**  You didn't give the doorman any money from the bag,

7    these big stacks of money?

8    **A.**  No, sir.

9    **Q.**  Okay.  So you became a member of 55 in 2012-2013?

10   **A.**  Yes, sir.

11   **Q.**  How old were you then?

12   **A.**  Twenty-six.

13   **Q.**  I'm sorry?

14   **A.**  Twenty-six.

15   **Q.**  Up until then you would just socialize with various

16   people in the organizations, but you weren't the member,

17   correct?

18   **A.**  Correct.  Correct, sir.  Yes, sir.

19   **Q.**  Did you ever associate -- were you ever -- when did

20   you become, if you ever did become, friends with Mr.

21   Brown?

22   **A.**  He use to always stop at my house, come over to my

23   house.

24   **Q.**  I'm sorry?

25   **A.**  He always use to stop at my mother's house.  I go to

*15-20652; USA v. EUGENE FISHER, ET AL*

1   his house.  I mean, go in the neighborhood, I see him all

2   the time.  We all from the same neighborhood.  I guess we

3   been friends.

4       Q.  He was at your house on Coram?

5       A.  Yes, sir.  He stop there at times when I was not

6   even there.

7       Q.  And you went to his house?

8       A.  I wouldn't say his house, but I went to the block

9   that he stayed on.

10      Q.  Never go to his house?

11      A.  Yes, I been to his house before.

12      Q.  On Manning?

13      A.  I don't know if -- no, I don't recall going to his

14  house on Manning.  No, sir.

15      Q.  What house do you remember?

16      A.  The one in Warren.  He use to have another one on

17  the west side somewhere.  I been there a couple of times.

18      Q.  Were you invited or you just showed up?

19      A.  I was invited.  I didn't know where he live at if I

20  wasn't invited.

21      Q.  Did you watch TV, watch ballgames?

22      A.  Play games, the video games.

23      Q.  Do you remember what year this was?

24      A.  2015.

25      Q.  Prior to 2015, you weren't that close of a friend?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  2013-2014 I been to his house when he stayed on the

2      west side.

3      **Q.**  So 2013, you say you became friends with him?

4      **A.**  You see, you keep putting your questions together.

5      You ask me one question, and then you add on another

6      question at the end, and you ask me when I go to his

7      house, and you ask me, is that when you became friends.

8      No, that's not when he became friends.  That's not what I

9      meant.  I been knowing R.O. since 2005-2006.

10     **Q.**  I understand.  You already testified to that.  I'm

11     talking about --

12     **A.**  But you keep asking me --

13     **Q.**  -- the type of friends that you would go and hang

14     out and watch TV, and play games?

15     **A.**  That's some of the stuff that we did.

16     **Q.**  2013, 2014, 2015?

17     **A.**  2007, 2008, 2009, sometimes I would see them.  Yes,

18     we did stuff like that.  We did normal stuff.  It wasn't

19     always --

20     **Q.**  Normal stuff.  2007.  What kind of normal stuff?

21     **A.**  Just normal stuff.

22     **Q.**  Like what?

23     **A.**  Just like normal stuff, watch TV, play -- chill

24     outside, smoke, have a drink, chill.

25     **Q.**  You went to West Virginia the first time around

*15-20652; USA v. EUGENE FISHER, ET AL*

1    2OO8-2009?

2        **A.**  No, sir.

3        **Q.**  When did you go to West Virginia?

4        **A.**  2012.

5        **Q.**  So if you said 2008-2009 that was a mistake?

6        **A.**  I never said 2008-2009.  That's you saying that.  I

7    never said that.  The transcripts.  Check them.

8        **Q.**  So the first time you went to West Virginia was

9    2012?

10       **A.**  West Virginia, yes.

11       **Q.**  You got a place in West Virginia, your own place

12   around March 2013?

13       **A.**  Yes, sir.

14       **Q.**  Okay.  Mr. Brown never had a place in West Virginia,

15   did he?

16       **A.**  Not that I know of.

17       **Q.**  And, of course, you know everything?  If you don't

18   know it, then he must not ever have had it?

19       **A.**  I don't know everything.

20       **Q.**  Other than the watch that you had, you had other

21   jewelry, right?

22       **A.**  Yes, sir.

23       **Q.**  When you first -- after you made your first

24   cooperation statement, you were released out on bond?

25       **A.**  After December 5th?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  December 2016?

2    **A.**  Yes, sir.

3    **Q.**  So you only spent probably less than a month in

4    Detroit after you came back from West Virginia before you

5    got out on bond, right?

6    **A.**  Correct.

7    **Q.**  Okay.  And when you first got out, you were on a

8    tether?

9    **A.**  Yes, sir.

10   **Q.**  Yes?

11   **A.**  Yes, I was on a tether.

12   **Q.**  It was a personal bond.  You didn't have to come up

13   with any money, right?

14   **A.**  Right.

15   **Q.**  The night that you testified to that Block and Sonny

16   was in -- that was in a strip club?

17   **A.**  Yes.

18   **Q.**  To the best of your knowledge?

19   **A.**  Yes.

20   **Q.**  That wasn't the strip club that the video was in,

21   was it?

22   **A.**  No, sir.

23   **Q.**  Okay.  That was a different -- a different club?

24   **A.**  Yes, sir.  You just asked me that.

25   **Q.**  You said that there was a fight at the club that the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    video was shot at?

2       **A.**  Yes, sir.

3       **Q.**  You were called to go to the strip club where the --

4    where Block was hit in the head.  Do you remember that?

5       **A.**  I wasn't called to go nowhere.  I was informed that

6    Block and Sonny up there fighting, yes, sir, and I

7    proceeded up there.

8       **Q.**  And you were told that he was hit in the head with a

9    bottle?

10      **A.**  I don't believe that I was told that at that time

11   that he was hit in the head with a bottle.  I was told

12   that he was up there.  I was not told the specifics.

13      **Q.**  And you went there to help?

14      **A.**  Yes, sir.

15      **Q.**  In any way that you could help?

16      **A.**  Yes.

17      **Q.**  Fight?

18      **A.**  Yes, sir.

19      **Q.**  Hurt someone, kill someone, whatever needed to be

20   done?

21      **A.**  I didn't go up with a gun.

22      **Q.**  You didn't?

23      **A.**  If I did have a gun -- and I said a million times I

24   had a gun in the courtroom -- if I had a gun there, I

25   would say that I had a gun there.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Mr. Kennedy, you can kill someone without a gun,

2    can't you?

3    **A.**  Yes.

4    **Q.**  You can a break a bottle, cut their neck?

5    **A.**  Yes.

6    **Q.**  And you would have done anything, including hurting

7    or killing someone to help Sonny or Block if, in fact, you

8    needed to, right?

9    **A.**  Yes, sir.

10    **Q.**  Okay.  You also testified that were you in West

11    Virginia, and you came back a week later because you had a

12    probation violation case in St. Clair County, correct?

13    **A.**  Yes, I had a court date to go in front of the judge

14    for probation violation.

15    **Q.**  And that was for a violation?

16    **A.**  Yes.

17    **Q.**  Because you didn't show up when you were suppose to.

18    You missed appointments, right?

19    **A.**  Yes.  Yes, I missed.

20    **Q.**  So there was a warrant out for your arrest?

21    **A.**  Yes, sir -- no, it was not a warrant out for my

22    arrest.  I was out on bond.

23    **Q.**  Right.  And because there was a probation violation,

24    there was a warrant out for you?

25    **A.**  Because there was a probation violation it was a

*15-20652; USA v. EUGENE FISHER, ET AL*

1   warrant out are for my arrest.  Then I went --

2   **Q.**  I understand.  I said there was a warrant out for

3   you, is that correct, for probation violation?

4   **A.**  Yes, it was a warrant out for me.

5   **Q.**  Okay.

6   **A.**  That was --

7   **Q.**  That's the only question that I asked.  There was a

8   warrant out for you?

9   **A.**  Yes, sir.

10  **Q.**  Are you getting frustrated because I'm asking you

11  questions --

12  **A.**  Because you're asking me double questions.

13  **Q.**  -- and I want your answers without repeating the

14  questions that I'm asking you?

15  **A.**  No, because you ask me a question, and then you

16  throw another question in there just to make it seem like

17  I'm answering that question.  I'm answering one question

18  at the time.  You asking me double questions every time.

19         It was a warrant.  Then I went to jail, and I

20  bonded out.  So when I was going to court, I was out on

21  bond.  I was not going for a warrant.  I was just to go to

22  court.

23  **Q.**  Out of the goodness of your heart because you were

24  an honest citizen?

25  **A.**  I had to deal with the situation, but it was no

*15-20652; USA v. EUGENE FISHER, ET AL*

1    warrant.

2       **Q.**  And you know how to deal with situations, right?

3    You know how to deal with legal situations?

4       **A.**  I don't understand that.  You being funny.

5       **Q.**  Every time you have a legal problem, you know how to

6    deal with it, either lie to the police --

7       **A.**  Evidently, I don't because I always got legal

8    problems.  I don't have legal problems for a long time.  I

9    wouldn't say that I know how who deal with it.

10      **Q.**  2016 was a long time ago that you had a legal

11   problem, right?

12      **A.**  2016?

13      **Q.**  Yes, when you got arrested in West Virginia?

14      **A.**  Yes, sir.

15      **Q.**  Okay.  So when you came back, you heard that Smoke

16   had been shot?

17      **A.**  I heard Smoke was shot when I was in West Virginia.

18      **Q.**  Right.  When you came back, not only did you go to

19   St. Clair County to get that straighten out, you went

20   looking for people who shot Smoke, right?

21      **A.**  Yes, sir.

22      **Q.**  Okay.  And there were two different cars of people,

23   correct?

24      **A.**  Yes, sir.

25      **Q.**  Okay.  And what you did was, you were going hunting,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    correct?

2         **A.**   Yes, sir.

3         **Q.**   And some of the people that were in your car and

4    other cars had guns?

5         **A.**   Yes, sir.

6         **Q.**   And you were going to assist them if you found the

7    person that shot Smoke in killing that person, correct?

8         **A.**   Yes, sir.

9         **Q.**   You were going to aid and abet those people with

10   killing the person who shot Smoke, right?

11        **A.**   Yes, sir.

12        **Q.**   After Block was killed -- do you remember when that

13   was?

14        **A.**   It was April.

15        **Q.**   What year?

16        **A.**   2015.

17        **Q.**   You were in jail?

18        **A.**   Yes, sir.

19        **Q.**   Okay.  You came out of jail, and you went to the

20   viewing or the memorial, correct?

21        **A.**   The viewing, yes, sir.

22        **Q.**   That was to pay tribute to your friend Block, right?

23        **A.**   Yes, sir.

24        **Q.**   And then a bunch of his friends went to -- you say

25   R.O.'s house, is that right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  That was 2015.  What was your relationship with R.O.

3    in 2015 around April, May 2015?

4    **A.**  We was cool.

5    **Q.**  What does that mean?

6    **A.**  It was cool.  We was friends.

7    **Q.**  In what way were you friends?  Would you go out to

8    dinner, go out with women?

9    **A.**  We never double dated or went out to dinner and

10   stuff.  That's just not something that grown men do all

11   the time go out to dinner together.

12   **Q.**  You think that's something that's not masculine?

13   **A.**  You said go out dinner.  Everything you keep saying,

14   go to dinner.  You're not going to go out to dinner with

15   your friend, no man all the time.

16   **Q.**  I didn't say all the time.

17   **A.**  That's what you keep saying.

18   **Q.**  Did you ever go out to dinner with him?

19   **A.**  It is what you're saying.

20   **Q.**  I'm sorry?

21   **A.**  It is what you're saying.  Check it.  Every time you

22   say something, out to dinner, play games, watch TV.

23   That's just not nothing me and dudes -- we don't go in the

24   house and oh, let's watch TV.  Let's watch soap operas.

25   Let's go out to dinner and get something to eat.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**   What's your favorite soap opera?

2      **A.**   I don't watch soap operas, sir.

3      **Q.**   When you watch TV with your friends, what do you

4      watch?

5      **A.**   The TV might be on playing when we talking.  It just

6      not sitdown and watch TV.

7      **Q.**   It's not something that you do?

8      **A.**   I mean, if the TV on and it's a good show on, we

9      look up, glance at it, watch it, start talking when the

10     commercials come on, stuff like that, but not just sitting

11     there and watching a movie, eating popcorn and chilling.

12     **Q.**   So when you say you went to R.O.'s house after the

13     viewing, you weren't the only one there.  There were a

14     number of Block's friends who were there, correct?

15     **A.**   Correct, sir.

16     **Q.**   How many of Block's friends were at R.O.'s house,

17     15, 20?

18     **A.**   Maybe eight to ten, 12.

19     **Q.**   Would you say that it was like reminiscing about

20     Block?  People would go there and talk about him, say how

21     sad they were, that type of thing?

22     **A.**   Yes, sir.

23     **Q.**   It was like a memorial?

24     **A.**   Yes.

25     **Q.**   A tribute to Block by his friends?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   Yes, sir.

2     **Q.**   Okay.   You're saying that when you got to the house,

3     Billy Arnold motioned you to come downstairs, correct?

4     **A.**   Yes, sir.

5     **Q.**   And at first you said it was only Billy Arnold and

6     R.O. that was in the basement, right?

7     **A.**   No, I think at first I said it was Teisha, me,

8     R.O --

9     **Q.**   That was on cross examination.   On direct

10    examination you first said it was you, R.O. and Billy

11    Arnold?

12    **A.**   Right.   I said -- you said the first time I ever

13    spoke about it, I said it was -- I said no.   I think on

14    paper the first time I ever spoke about it -- the first

15    time I ever spoke about it, I said Teisha, R.O., Bill -- I

16    mean, Bo and Killa.

17    **Q.**   Who's Bo?

18    **A.**   R.O.'s cousin.

19    **Q.**   I'm sorry?

20    **A.**   R.O.'s cousin.

21    **Q.**   You don't know his name?

22    **A.**   No, sir.

23    **Q.**   Was he Seven Mile Bloods or 55 or anything like

24    that?

25    **A.**   He was associated.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  When you say "associated", you just found out?

2    **A.**  He was around.

3    **Q.**  Occasionally?

4    **A.**  Occasionally.

5    **Q.**  Not an awful lot?

6    **A.**  No.

7    **Q.**  Not someone that you would particular would confide

8    really serious stuff that you ever done to him, correct?

9    **A.**  Yeah, I talk to Bo a couple of times, but no.  Bo

10   kind of --

11   **Q.**  Not those kind of things?

12   **A.**  No.  Me and Bo was not close.  Teisha --

13   **Q.**  What about Teisha?  What about her?  Was she someone

14   that hung around?

15   **A.**  Teisha been around forever.

16   **Q.**  Was she the kind of person that you would tell -- or

17   the other people would tell real, real dark illegal

18   things?

19   **A.**  Yes, she was.

20   **Q.**  Why?

21   **A.**  She was because -- she was that type.  She was a

22   person that been around forever, before me.

23   **Q.**  Did you ever tell her all the criminal activities

24   that you participated in?

25   **A.**  No.

1    **Q.**  Okay.  Did you ever see other people or hear other

2    people in your presence tell her real serious criminal

3    activities that they participated in?

4    **A.**  I told you we was talking.  It wasn't like Teisha

5    and Bo was standing there listening.  They was passing

6    through.  We was blocking the stairs.

7    **Q.**  Mr. Kennedy, I asked you the question.

8    **A.**  You won't let me answer.

9    **Q.**  Other than this alleged incident, did you ever see

10   or --

11   **A.**  No.

12   **Q.**  -- anyone tell Teisha any real, real important

13   things that they may have done criminally?

14   **A.**  She been around when we talk about criminal stuff.

15   She always been around.

16           **MR. WECHSLER:**  Your Honor, can I just say one

17   thing?  Mr. Feinberg seems to be asking one question, and

18   then he does change it to a second question.  Mr. Kennedy

19   wants to answer the first question, that's fine, but then

20   Mr. Feinberg says he's not answering that question, and

21   repeats a different question.

22           So I understand that Mr. Feinberg can ask whatever

23   he wants he, but I would ask the Court to instruct him to

24   allow the witness to answer one question at the time

25   before he changing it.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. FEINBERG:**  If he's answering the question

2     that I ask him, I have no problem with that.  The only

3     time I have a problem with it is if I ask him a question,

4     and he's answering something else, but I will try.

5          **THE COURT:**  The problem for Mr. DiBartolomeo

6     is that you're stepping on the witness' words, and you're

7     not allow him to finish, and he can't -- I can only

8     imagine what the record looks like.

9          **MR. H. SCHARG:**  We see it everyday.

10          **THE COURT:**  All right.  Go ahead.

11

12   **BY MR. FEINBERG:**

13     **Q.**  What's Teisha's real name?

14     **A.**  I don't know her real name.

15     **Q.**  Did you give her name to the authorities?

16     **A.**  Like I said Teisha.

17     **Q.**  Did you at one time give her full name?

18     **A.**  I think -- I don't recall giving her full name.  I

19   don't recall it.

20     **Q.**  So what you're saying is Billy Arnold and R.O. are

21   in front of Teisha, Bo, and you were talking about real,

22   real serious criminal activity that they had participated

23   in, correct?

24     **A.**  I'm saying they were passing through.  We was

25   blocking the steps.  They stopped, listen for a second.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    They was passing through.  We was blocking the basement

2    steps.  There was rooms in the basement I guess.  They was

3    passing through getting stuff, going back and forth

4    outside while we was talking.

5        Q.  They were not talking to you specifically about

6    that?

7        A.  Teisha and Bo was not talking to me, period.  Killa

8    and R.O., we was down there together.

9        Q.  The three of you?

10       A.  We were in the conversation.  They kept passing

11   through getting stuff.

12       Q.  I understand.  What I'm asking you, Billy Arnold and

13   R.O. specifically told you --

14       A.  R.O. didn't say nothing.

15       Q.  -- bad things that they had allegedly done?

16       A.  R.O. doesn't say nothing at the time -- at the time

17   we was in the basement.

18       Q.  That's when you say that you heard them say certain

19   things when in the basement?

20       A.  That is not what I said.  I said that Billy Arnold

21   told me come in the basement.  He said come here, and then

22   he proceeded to talk.  R.O. didn't say nothing in the

23   basement.

24       Q.  So Billy Arnold told you after he asked you to come

25   down the basement, some real serious criminal activity

1 that he participated in?

2 **A.** Yes, sir.

3 **Q.** Just to make sure that you knew what was going on?

4 **A.** Yes, sir.

5 **Q.** Because you were a very close confidant of Billy

6 Arnold?

7 **A.** No, he was mad because I was not answering my phone.

8 **Q.** So he was so mad at you, I'm going to get back at

9 you.  I'm going to tell that you I killed someone?

10 **A.** No, he was talking out of anger and doing a whole

11 bunch of other stuff.  He was bragging.  He was bragging.

12 That's what they do, brag.  He was bragging about the

13 murders.  So what you trying to say?  They was bragging

14 about it.  He was happy that he got revenge for one of his

15 friends.

16 **Q.** Okay.  March 2015, you say that you were with R.O.

17 watching TV, correct?

18 **A.** End of February, beginning of March, yes, sir.

19 **Q.** Well, you said March 2015?

20 **A.** Yes, early March.

21 **Q.** 2015?

22 **A.** Yes, sir.

23 **Q.** And watching the TV?

24 **A.** Yes, sir.

25 **Q.** Where?

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1        A.   At R.O. house.

2        Q.   Which house?

3        A.   In Warren.

4        Q.   Anybody else there?

5        A.   Me, him, the mother of my child.  I don't recall who

6    else there was.

7        Q.   Who is the mother of your child?

8        A.   Mother of my child.

9        Q.   I'm sorry?

10       A.   The mother of my child.

11       Q.   Who was this?  What's her name?

12       A.   Tiara.  Why do I have to answer that?

13       Q.   Because I asked you the question?

14       A.   Because people trying to kill me.  I don't know if

15   your client is the one sending them or who.

16            MR. FEINBERG:  Your Honor, would you direct

17   the witness to answer my question?  I asked him who is the

18   mother of the child that was at R.O.'s house allegedly

19   watching TV in March of 2015.

20            THE WITNESS:  That's a personal question.

21   People are trying kill me, making threats and everything

22   about this case, and I don't want to expose my family to

23   this.  No, I don't.  When they sitting right there and get

24   on the phone and tell people in court, and people in court

25   know where my family stay, no, I do not want to answer
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    that question.

2              **MR. WECHSLER:**  Perhaps initials.  Maybe the

3    first initial.  I know the first name came out, but maybe

4    that could be the end of the questioning.

5              **THE COURT:**  All right.

6

7    **BY MR. FEINBERG:**

8      **Q.**  Did you tell the agents that on that particular

9    occasion that the mother of your child was with you?

10     **A.**  I don't recall telling them that.  I know she the

11   one that took me over to R.O. house.

12     **Q.**  Okay.  So here it is March 2015, and you're watching

13   TV at R.O.'s house.  Why do you keep looking at the

14   defendants?

15     **A.**  The defendants is sitting here staring at me, and

16   trying to intimidate me.  You don't see that, but you see

17   everything that I do.  What you trying to do be funny?

18     **Q.**  Try to look at me, if you can, if you want to.

19             **MR. WECHSLER:**  Can we talk briefly at

20   sidebar?

21

22        (Sidebar conference held on the record.)

23

24             **MR. WECHSLER:**  So I do want to make a record.

25   They are laughing the whole time during his testimony.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Fisher has been staring at him since he walked in the

2    room.  R.O. keeps shaking his head.

3              **MR. H. SCHARG:**  I told him he could look at

4    him, yes, if that's what confrontation is.  He's not --

5    there's no threatening.  Looking at a witness is not

6    threatening.  Do you want him not to look at him?  I'll

7    instruct him, but there's no threat.

8              **THE COURT:**  There's looking at him and

9    staring, and I think it is crossing the line.

10             **MR. H. SCHARG:**  Okay.

11             **THE COURT:**  It wasn't a blink of the eye, and

12   there's other things going on in the courtroom.  All

13   right.  So --

14             **MR. WECHSLER:**  Just for the record, the other

15   guys are doing the same thing.  I don't know if doing the

16   same extent as Fisher.  I mean, R.O. is scuffing at every

17   one of these answers.  I hear Shy laughing the whole time.

18   I mean, they can do whatever they want.  It is their

19   trial, but it is intimidating.

20             **THE COURT:**  The jury is watching all of this

21   too.  In terms of the cross examination, you got -- how

22   can I put this?  I think, again, you're doing some harm --

23   well, when your questions -- there is a problem with

24   identifying family members who may be the object of some

25   retaliation, and so if you have something that has a great

*15-20652; USA v. EUGENE FISHER, ET AL*

1      deal of significance, I think use of initials --

2                  **MR. WECHSLER:**  The first initial perhaps.

3                  **THE COURT:**  But you're inviting the responses

4      that --

5                  **MR. FEINBERG:**  I don't think so, and I can

6      live with it.

7                  **MR. THEIS:**  Your Honor, I would like to

8      address that, because this witness has now on probably

9      four or five or more occasions, made reference to threats

10     that have been made.  This was not in response to any

11     questions that we've asked.  I think we were careful in

12     our examination -- in our cross examination.

13          I understand some of this is a problem with

14     multiple defendants on trial, and we have to live with

15     some of that, but we did make made a motion for severance

16     in this case at this time.

17          I mean, these threats that he's talking about, and

18     suggesting that even the lawyers are then going to pass on

19     information about the whereabouts of family members -- of

20     his whereabouts or family members whereabouts, I think

21     this has a detrimental affect on our client, not in

22     response to anything that we have done.  We made a motion

23     for severance, and we would renew it at this time.

24                 **MR. FEINBERG:**  I think my opinion is this

25     witness has an agenda, that he wants to tell the jury his

1    story and what he wants to say, regardless of any

2    questions that I'm asking him.

3              MR. WECHSLER:  But that's the point of cross

4    examination.

5              MR. FEINBERG:  He tries to get that in any

6    time he can.

7              MR. WECHSLER:  Well, the point is -- at least

8    from my perspective -- is what he's feeling sitting on

9    that bench.  If he believes the point of his question is

10   to pass this information, that's his belief.

11             I have to say I think some of the questions you're

12   asking him are confusing to him, because -- you know, I'm

13   not how to do your job -- but there's one question, then

14   he tries to answer that question, and the question

15   changes, and it has happened numerous times.  So he gets

16   frustrated, and you got the defendants staring at him the

17   entire time, and then the personal question about the

18   mother of his child comes out.

19             So he may -- I'm not going to speak to his agenda.

20   My belief is that he's telling the truth -- but to say

21   that he has an agenda, yeah, his agenda is to protect

22   himself, and we're going to get onto redirect instances

23   where he did feel threaten specifically.

24             MR. S. SCHARG:  I would state that Mr. Porter

25   has been looking at my computer the whole time, and is not

*15-20652; USA v. EUGENE FISHER, ET AL*

1    staring at this witness.

2             MR. THEIS:   And Judge, by the way, I would

3    like a ruling on my motion, but I'm not going to renew it

4    again after Mr. -- after the government gets up and goes

5    through some other stuff that we did not open the door to.

6    That's to me, based on his representation, that would be

7    an additional reason why we are entitled to a severance.

8             MR. DALY:   I would also like an offer of

9    proof from the government before they start getting into

10   specific about threats.

11            MR. WECHSLER:   The only thing that I'm going

12   to get into -- I don't know who asked the question -- but

13   about his house getting shot up.   I am going to get into

14   the time when this took place.   I'm not going to get into

15   specifically who did it, but I want to get into the timing

16   of it, was it before or after the cooperation.

17            MR. DALY:   Do you have any idea who was

18   involved?

19            MR. WECHSLER:   I don't, but I think Agent

20   Ruiz does, but I think part of that is the witness' belief

21   about his own intimidation, which goes into his

22   credibility and his testimony, and he can say -- I think

23   it would be fair for the Court to say, you don't know --

24   I'll even ask, you don't know who actually did this.   You

25   don't know if it was SMB or an associate, and the jury can

*15-20652; USA v. EUGENE FISHER, ET AL*

1   decide whether or not to believe it that he felt

2   threatened based upon his own cooperation if that's what

3   happened as a result.  I think it goes to his credibility.

4           MS. FINOCCHIARO:  Part of the indictment is

5   witness intimidation.

6           MR. H. SCHARG:  And the question itself, was

7   it SMB or and associate, or could have been anybody else.

8   It doesn't have to be someone associated with SMB, 55.

9   You know, him being a drug dealer, it could have been

10  anybody.

11          MR. WECHSLER:  Do you have any idea who it

12  was?  If he says yes, then there's the answer to that.  If

13  he says no -- well, if he says yes, he has an idea who it

14  was, then he says it's Jane Doe who did it, that helps

15  him.  If he says it was Corey Bailey, for example -- I'm

16  not saying he's going to -- if he says it was Corey

17  Bailey, then that unfortunately is the answer that he

18  gives.

19          MR. H. SCHARG:  What is he going to say?

20          MR. WECHSLER:  I don't know.  That's the

21  point of cross examination.  Do you know who did this.  If

22  he doesn't know, he'll say no, and if he does do --

23          MR. H. SCHARG:  Direct examination, you know

24  everything that he is going to say.

25          MR. WECHSLER:  No, it is not.  Absolutely

*15-20652; USA v. EUGENE FISHER, ET AL*

 1    not.

 2              **MR. DALY:**  We have right to know what the

 3    answer is going to be.

 4              **MR. H. SCHARG:**  Outside the presence of the

 5    jury.

 6              **MR. WECHSLER:**  After he started cooperating,

 7    his house was shot up.  That goes to his belief of what's

 8    happening.

 9              **THE COURT:**  Did you have any questions along

10    these lines that you will be asking?

11              **MR. FEINBERG:**  A couple, like, did he tell

12    the agents that his baby's mama was in the room when my

13    client allegedly made a comment about him and Jonathan

14    Murphy.

15              **MR. WECHSLER:**  I'm sorry?

16              **THE COURT:**  My question was with respect to

17    having his house shot up.

18              **MR. FEINBERG:**  Of course not.

19              **THE COURT:**  So let's get through this

20    testimony, and I think outside presence of the jury it may

21    be appropriate.

22              **MR. FEINBERG:**  I'm not going to bring that

23    up.

24              **THE COURT:**  How much do you have left?

25              **MR. FEINBERG:**  Fifteen, 20 minutes.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      **THE COURT:**  Okay.

2      **MR. DALY:**  I don't know if you'll get to me

3    today.  I'm tired.  I don't know about you.  I've been

4    sitting here.

5      **THE COURT:**  You're going -- you're starting

6    today?

7      **MR. DALY:**  Let see how it goes.  Henry is

8    next.  I don't want to start and not finish.

9      **THE COURT:**  Okay.

10

11      (Sidebar concluded.)

12    **BY MR. FEINBERG:**

13    **Q.**  Mr. Kennedy?

14    **A.**  Yes, sir.

15    **Q.**  Did you tell the agents in March of 2015 when you

16    were allegedly at Ro's house that the mother of one of

17    your children was also there?

18    **A.**  I don't recall if I did or I didn't say.

19    **Q.**  Was she watching TV with you?

20    **A.**  She was tired.  She had got up early to go to court

21    with me and then she bonded me out.  So she came in and

22    she was laying across the couch.

23    **Q.**  Okay.  She was in the same room?

24    **A.**  She was -- no.  She was -- you know how a dining

25    room and a living room connect?  She was in the living

*15-20652; USA v. EUGENE FISHER, ET AL*

1    room on the couch.  He had a chair and a couch.  She was

2    laying on the couch.  We was in the dining room.  He had a

3    TV in the dining room.

4        Q.  I see, okay.  The TV is in the dining room.  And you

5    said that the news came on that someone was getting out of

6    jail who supposedly had been convicted of shooting

7    someone, correct?

8        A.  Yes, sir.

9        Q.  And this is -- the TV showed the person leaving the

10   jail?

11       A.  No.

12       Q.  Getting out because he was being released?

13       A.  No, sir.

14       Q.  What was it?

15       A.  They was saying that the guy was trying -- the TV

16   forecasters, his family and people was just talking about

17   it saying how he was trying to get a new trial in light of

18   the new evidence.  They did not show him walking out of

19   jail and getting out of jail, no.

20       Q.  Okay.  So the TV commentator was saying that this

21   person was trying to get a new trial?

22       A.  Yes, sir.

23       Q.  And trying to get out of jail?

24       A.  Yes, sir.

25       Q.  And that was March of 2015?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   The end of February, beginning of March, yes, sir.

2      **Q.**   Okay.  And you're saying, you're saying that Ro told

3   you that Marbury was the snitch involved in that case,

4   correct?

5      **A.**   Yes, sir.

6      **Q.**   And that Marbury had driven Ro to the location where

7   the shooting occurred?

8      **A.**   Yes, sir.

9      **Q.**   Is that correct?

10      **A.**   Yes, sir.

11      **Q.**   Did you know Jonathan Murphy?

12      **A.**   Bleek.

13      **Q.**   Did you know Bleek?

14      **A.**   I went to school with him.

15      **Q.**   Okay.  So you were pretty good friends with him?

16      **A.**   Yeah, I hadn't seen him in years.

17      **Q.**   Okay.  But you were pretty good friends?

18      **A.**   I hadn't seen him since middle school/high school.

19      **Q.**   He was Seven Mile Blood?

20      **A.**   Yes, he was associated.

21      **Q.**   And you were associated?

22      **A.**   Yes, sir.

23      **Q.**   Didn't you ever see him periodically --

24      **A.**   The last time I seen Bleek was in 2008 or '9.

25      **Q.**   Okay.  So let me ask you this.  Were you --

*15-20652; USA v. EUGENE FISHER, ET AL*

1        **MR. FEINBERG:**  Your Honor, I would like to

2    offer a Register of Action concerning a Roy Lucky Jones

3    into evidence as Defense Exhibit 24.

4        **MR. WECHSLER:**  No objection, Judge.

5        **THE COURT:**  All right.  The Court will

6    receive the item.

7    **BY MR. FEINBERG:**

8    **Q.**  And you are sure of the time period because this was

9    when you had just gotten out of jail?

10   **A.**  I had just got bond from Roseville.

11   **Q.**  Okay.  What were you on bond in Roseville for?

12   **A.**  The domestic violence.

13   **Q.**  Okay.  Mr. Kennedy, what's been marked into evidence

14   is a Register of Action for an Elroy Lucky Jones.  Do you

15   know who that is?

16   **A.**  No, sir.

17   **Q.**  Okay.  The government has agreed to this exhibit and

18   shows that Elroy Lucky Jones -- that there was a motion

19   for a new trial for Elroy lucky Jones, that he was a

20   person who killed someone back in 2006.  Okay?  Do you

21   follow that?  Do you understand what I just said?

22   **A.**  I understand it.

23   **Q.**  Okay.  I'm just asking if you understand that.

24   **A.**  Yes, sir.

25   **Q.**  You are following me.  And that in March of 2014 the

1   case against Elroy Lucky Jones was dismissed and he was

2   released, no bond.  Do you follow that?

3       **A.**  Yes, sir.

4       **Q.**  What you testified to in March, concerning March of

5   2015, that you were watching TV with Ro?

6       **A.**  Yes, sir.

7       **Q.**  And that the TV was showing that this particular

8   person was filing a motion for new trial and tried to get

9   out of jail, prison?

10      **A.**  Yes, sir.

11      **Q.**  Okay.  Were you not aware that a year before you say

12  you saw this on TV a motion for new trial and the case was

13  dismissed against the person who Ro is saying, according

14  to your testimony, that he was involved in that person's

15  murder, correct?

16      **A.**  Correct.

17      **Q.**  Okay.  So a year before -- a year after all of this

18  had already played out you are saying that you saw it on

19  TV March of 2015?

20      **A.**  Yes, sir.

21      **Q.**  Okay.  And you also indicated that Bleek was a

22  witness against him, right?

23      **A.**  That statement by the -- the statement by the --

24      **Q.**  Ro.

25      **A.**  No, you never let me answer the question, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**   Statement by whom?

2      **A.**   The statement given by the broadcaster or whoever

3      was talking at the time indicated that the FBI had found a

4      new witness in the case.  They say he was the one that

5      drove the person who killed the guy to do it.  That's what

6      it was about, too.  That's what was said in the newscast.

7      **Q.**   And from that you got the impression that Ro had

8      committed that murder?

9      **A.**   Not from that.  That's not where I got the

10     impression from.

11     **Q.**   From what Ro told you, that Bleek was the person who

12     drove him?

13     **A.**   Yes, sir.

14     **Q.**   All right.  Are you aware that Bleek testified in a

15     trial before this one?

16     **A.**   Yes, sir.

17     **Q.**   And that he testified about --

18              **MR. WECHSLER:**  Objection, Judge.  This is

19     clear hearsay.  He's bringing in someone else's testimony

20     who is not here.

21              **THE COURT:**  Mr. Feinberg.

22              **MR. FEINBERG:**  I'm just asking whether or not

23     he was aware of what was testified to.

24              **MR. WECHSLER:**  But there was a bit of a

25     follow-up that I think was going to lead down the road of

*15-20652; USA v. EUGENE FISHER, ET AL*

1    are you aware of what he said or specifically what he did

2    say.  So the question of whether he was aware if he

3    testified I think should be enough at this point.

4              **MR. FEINBERG:**  Your Honor, Jonathan Murphy,

5    Bleek, is listed as a potential witness for the

6    government.  In my opening statement I made certain

7    allegations about Jonathan Murphy's testimony at the first

8    trial.  I think I'm allowed to bring that in.  It's up to

9    the government whether or not to bring in Mr. Murphy.  For

10    whatever reason they don't want to bring him in, but I can

11    certainly go into the fact that he did testify.

12              **THE COURT:**  The objection was hearsay, and I

13    haven't heard whether you have an exception to the hearsay

14    rule or whether you agree that you are seeking hearsay.

15              **MR. WECHSLER:**  Judge, perhaps we can step to

16    the side and have a more candid conversation.

17              **THE COURT:**  Come on up.

18              (The following sidebar conference was

19              held:)

20              **THE COURT:**  Is Jonathan Murphy on the witness

21    list?

22              **MR. WECHSLER:**  No, Your Honor.  So anything

23    he's getting into from the prior trial regardless of what

24    he said in his opening is clear hearsay.

25              **MR. FEINBERG:**  He testified he got caught

1    lying on the stand concerning this incident and that's why

2    the government isn't calling him.

3                **MR. WECHSLER:**  So what?  What does that have

4    to do with this trial?

5                **MR. FEINBERG:**  It has to do a lot with this

6    trial.  You are not calling a witness because he was

7    caught lying about the incident with Mr. Brown.

8                **MR. WECHSLER:**  So why don't you call him as a

9    witness?  He's valuable to you as well.

10               **MR. FEINBERG:**  I'm using his prior testimony.

11               **MR. WECHSLER:**  Which is clear hearsay.

12               **MR. FEINBERG:**  It's not hearsay.  It was in

13   court on the record under oath subject to direct and

14   cross-examination.

15               **MR. WECHSLER:**  But not in this court.  The

16   hearsay is out of court, the court being the court we are

17   sitting in.  You can't use someone else's testimony from a

18   different courtroom and bring it in.  That's clearly the

19   definition of hearsay.  I can bring you 20 cases tomorrow

20   that say the exact same thing, that it's this court we're

21   talking about on that witness stand.

22               **MR. FEINBERG:**  I think it's fair game.

23               **THE COURT:**  So you, I mean, you really want

24   evidence that the government has responsibly decided not

25   to use a witness whom they suspect to be lying?

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **MR. FEINBERG:**  That would help, that would

2     help the defendant.

3          **THE COURT:**  That would help the defendant?

4          **MR. FEINBERG:**  Absolutely it would help the

5     defendant.

6          **MR. WECHSLER:**  But that's an issue -- he can

7     state that on summation, just like his opening was not

8     evidence, on summation say we didn't hear from Bleek.

9          **THE COURT:**  But his last question was were

10    you aware -- what's the question?

11         **MR. FEINBERG:**  That he had testified that on

12    the day of this alleged incident he was holding

13    Mr. Brown's child and that's why he remembers the

14    incident, and it was brought out at the first trial, that

15    Mr. Brown's child was born two months after this alleged

16    incident.

17         **MR. WECHSLER:**  Which is straight hearsay.

18         **THE COURT:**  I'm going to sustain the

19    objection.

20         **MR. FEINBERG:**  Okay.

21         (End of discussion at sidebar.)

22         **THE COURT:**  The objection has been sustained.

23    You may continue.

24 **BY MR. FEINBERG:**

25    **Q.**  In determining the sentencing guidelines, you are

*15-20652; USA v. EUGENE FISHER, ET AL*

1    not being held responsible for all the drugs throughout

2    the years and the over million dollars that you made for

3    purposes of sentencing guidelines; is that correct?

4    **A.**  No, that's not true.

5    **Q.**  Only the amount from West Virginia?

6    **A.**  No, I'm being held responsible for all the drugs

7    that everybody else told on me about.

8    **Q.**  So you believe that you are being held responsible

9    for all the drugs that you ever sold in your drug-dealing

10   lifetime?

11   **A.**  No, I don't believe that, but I don't believe it's

12   just for guidelines.  You are saying like they bent the

13   rules to help me, and that's not true when it clearly

14   state whatever I told them cannot be used against me.

15   That's why they couldn't charge me with nothing but what

16   everybody else charged me with.  They still charge me with

17   almost 7,000 pills that everybody else told on me about.

18   They can't charge me with something that they didn't know

19   about.  So I don't want to guess, estimate stuff.

20   **Q.**  The approximate million dollars that you made during

21   your drug-selling lifetime, none of it exists anymore,

22   right?

23   **A.**  No, sir.

24   **Q.**  You spent it on women, right?

25   **A.**  Yes, sir.

1     **Q.**  You spent it on drugs.  Were you using drugs at the
2     time?
3     **A.**  No, sir.  I drank alcohol, smoke weed.
4     **Q.**  Okay.  Clothes?
5     **A.**  Yes, sir.
6     **Q.**  Jewelry, cars?
7     **A.**  Yes, sir.
8     **Q.**  Okay.  And you're saying that over all this period
9     of time you spent over a million dollars?
10    **A.**  You asked me to estimate and guess something.  I
11    don't know how much it was, sir.
12    **Q.**  It was close to a million?
13    **A.**  How do you know that?
14    **Q.**  Based on what I asked you and you said yes.
15    **A.**  Because you guys asked me to estimate.  I don't know
16    if it was a million, over a million, under a million,
17    10 million, 100 million.  I don't know.
18    **Q.**  So the 100 million --
19    **A.**  I can't guess that.  I'm not going to answer that.
20    **Q.**  So 100 million you say could have been --
21    **A.**  So now it's 100 million.
22    **Q.**  -- all gone.  When was the last time you had a
23    safety deposit box?
24    **A.**  2011.
25    **Q.**  Where at?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   I don't know what bank it was.

2    **Q.**   Have you still got the key?

3    **A.**   I don't have the account.  I don't -- it was not an

4    account.  I never -- it was never -- no, no.

5    **Q.**   Did you tell the government where it was?

6    **A.**   It did not exist.  It was not -- it don't have

7    nothing to do with this case.  That was when -- you've got

8    your timelines mixed up.  I told you before West Virginia

9    I was going to Virginia.  The only time I had a safe

10   deposit box was when I was going to Virginia.  When I was

11   going to West Virginia, I did not have a safe deposit box

12   so I didn't think it was relevant.  I don't have no safe

13   deposit box, and I'm pretty sure they looked through every

14   financial piece of anything that I had and seen that.

15   **Q.**   The question that I asked you, did you tell the

16   government that you ever had safety deposit boxes?

17   **A.**   I don't recall.  I probably did.  I don't recall.

18   **Q.**   Did they ask you where they were if you did tell

19   them?

20   **A.**   I don't recall telling them.

21   **Q.**   Okay.

22   **A.**   You guys, you ask me a question to something.  If I

23   say I don't recall something, then you ask me another

24   question associated with something that I told you that I

25   don't recall.  How can I answer that, too?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.** Did you ever give the names of the people that you

2    were buying the oxies from?

3    **A.** I gave names of some people, but like I told you, it

4    was hundreds, it was a lot of people that I was buying

5    pills from.  You cannot just get pills from anybody, sir.

6    You can't just get 1,000 pills from somebody.

7    **Q.** I understand.

8    **A.** It was not no one specific person.

9    **Q.** But you had a group of people that you knew would

10   get prescriptions for the oxies, and every time they

11   filled the prescriptions you would get -- you would buy

12   those from them, right?

13   **A.** I had different people, yes, sir.

14   **Q.** All right.  And did you give the agents all their

15   names?

16   **A.** I gave them names.

17   **Q.** Or did you seem to think that the agents weren't

18   real concerned about that?

19   **A.** No, they asked me a lot of times about it, but it

20   was old people.  I don't want to bring old people,

21   grandmothers and old people that get them kind of

22   prescriptions, I didn't probably want to bring them into

23   this.  That's not what I wanted to do.

24   **Q.** You wanted to protect the old people?

25   **A.** No, it's not that.  It's just that they didn't have

*15-20652; USA v. EUGENE FISHER, ET AL*

1    nothing to do with this so I didn't feel like it was no

2    big deal to give them the names of 80-year-old people that

3    give pills, 60-, 70-year-old people that send me their

4    pills.

5        Q.   The fight that occurred at the club where the video

6    was made?

7        A.   Yes.

8        Q.   Did the police ever come out there?

9        A.   Yes, sir.

10       Q.   And you had rented a white limo?

11       A.   Yes, sir.

12       Q.   And did the police look inside the white limo?

13       A.   I was told they did, yes, sir.  I never, as you see,

14   I was never in the limo ever.  I pulled up in -- I drove a

15   friend truck so ...

16       Q.   You rented the limo though?

17       A.   Yes, I rented it.

18       Q.   And how much money and how many guns were in the

19   limo?

20       A.   I don't know.  I gave somebody -- when the fight was

21   pursuing, I gave somebody my book bag and I guess they

22   took it to the limo.  But they found my book bag of money

23   in there and they found guns in the limo.  Yes, sir.

24       Q.   And what about how many guns?

25       A.   I honestly don't know.

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  I'm sorry?

2     **A.**  I honestly don't know.  About five or six guns.

3     Four or five guns.

4     **Q.**  How many would be yours?

5     **A.**  Two or three of them.

6     **Q.**  Did Mr. Brown ever ask you for money?

7     **A.**  Not really.

8     **Q.**  I'm sorry?

9     **A.**  Not really.  At times sometimes being an asshole,

10    but not really.

11    **Q.**  Not $1,000 to start up some kind of drug business?

12    **A.**  No, sir.

13    **Q.**  Okay.  Ever see Mr. Brown sell drugs?

14    **A.**  Yes, sir.

15    **Q.**  Where?

16    **A.**  I bought pills.  He get prescription pills.  I

17    bought pills from him.

18    **Q.**  When?

19    **A.**  Numerous occasions when he had them.  He only get

20    them once a month.  Sometimes he'll sell them to me.

21    Sometimes he'll sell them to other people, I guess.

22    **Q.**  Okay.  And how much were you paying for those pills?

23    **A.**  At that time it was like 16, 17 dollars a pill.

24    **Q.**  Did you tell the government this?

25    **A.**  I don't recall it, no.  I don't recall it.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.** Did you ever have any sitdown conversations with

2    Mr. Brown about anything?

3    **A.** We had conversations. I don't know if it was

4    sitdowns like roundtable meetings.

5    **Q.** And what were some of the conversations about?

6    **A.** Rapping.

7    **Q.** I'm sorry?

8    **A.** It was conversations about rapping, drugs, killing

9    people, normal stuff. We had numerous conversations about

10   different things.

11   **Q.** Just normal stuff?

12   **A.** Not just normal stuff, but we had conversations

13   about normal stuff, too.

14   **Q.** Would you consider him at the time a friend that you

15   would tell really close, important stuff that was

16   sensitive, maybe serious criminal stuff?

17   **A.** I think we would have conversations about a lot of

18   different stuff.

19   **Q.** You telling him. I'm not asking about what he

20   supposedly told you.

21   **A.** I don't recall. Yeah, I probably told him about how

22   the drugs go out of town. I probably told him about a lot

23   of stuff.

24   **Q.** I'm not asking what you probably did. Do you

25   remember anything specific?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  No.  No, sir.

2    **Q.**  I'm sorry?

3    **A.**  No, sir.

4    **Q.**  Okay.

5            **MR. FEINBERG:**  Just one second, Your Honor.

6        I have no further questions at this time,

7    Your Honor.

8            **THE COURT:**  All right.  Thank you,

9    Mr. Feinberg.

10           **MR. H. SCHARG:**  I need five minutes.

11           **THE COURT:**  Excuse me?

12           **MR. H. SCHARG:**  I need five minutes to use

13   the men's room or the women's room, whichever one is

14   available.

15           **THE COURT:**  All right.  We'll take a short

16   break.

17           **MR. H. SCHARG:**  Thank you.

18           **THE COURT:**  I thought you needed five minutes

19   for the examination.  I was very happy.

20               (Jury out at 11:47 a.m.)

21           **MR. H. SCHARG:**  You and Mr. Feinberg must go

22   to the same hearing-impaired guy.

23               (Recess from 11:47 a.m. to 11:53 a.m.)

24           **MR. THEIS:**  Judge, could I briefly before

25   they come in.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1              THE COURT:  Yes.
 2              MR. THEIS:  Judge, just for the record I
 3    wanted to renew the motion for mistrial and severance.  I
 4    don't think the judge actually ruled on it before.  It's a
 5    renewal of the motion for severance and a motion for
 6    mistrial based on the evidence that was elicited and what
 7    I anticipate the government is going to do on redirect
 8    based on the representation of the government.
 9              MR. H. SCHARG:  On behalf Mr. Fisher, I join
10    in it.  As the Court knows, I made that motion several
11    times, a motion for severance, prior to the commencement
12    of this trial.
13              MR. SPIELFOGEL:  Your Honor, on behalf of Mr.
14    Bailey we would also join in that motion.
15              THE COURT:  All right.  The Court is going to
16    deny the motions.  I recognize the complaints that counsel
17    has about the testimony.  I don't believe it would support
18    a mistrial at this point so I'll deny it.
19              MR. THEIS:  Thank you.
20              THE CLERK:  Please rise for the jury.
21              (Jury in at 11:55 a.m.)
22              THE COURT:  All right, folks, you can take a
23    seat.
24         All right.  Mr. Scharg.
25              MR. H. SCHARG:  Thank you.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1                          -   -   -

2                                              (11:56 a.m.)

3                          CROSS-EXAMINATION

4    BY MR. H. SCHARG:

5        Q.   Good evening.

6        A.   Good evening.

7        Q.   Only because it seems like we have been here for

8    hours and hours, but looking at the clock, it's still

9    morning.  Unbelievable, but it is, and I'll move forward

10   with you, Mr. Kennedy.

11              Mr. Kennedy, first and foremost, my name is

12   Henry Scharg.  I'm an attorney, and I represent

13   Eugene Fisher.

14       A.   Yes, sir.

15       Q.   Fes, Fester, okay?

16       A.   Yes, sir.

17       Q.   I don't represent anybody else, okay?

18       A.   Yes, sir.

19       Q.   And the questions that I ask you are going to be

20   dealing with Mr. Fisher and his case.

21       A.   Yes, sir.

22       Q.   Okay.  Mr. Kennedy, you are about, what, 31 years

23   old?

24       A.   Yes, sir.

25       Q.   And you have been a drug dealer for most of your

                   *15-20652; USA v. EUGENE FISHER, ET AL*

1    life, haven't you?

2        **A.**  Yes, sir.

3        **Q.**  You started out, you said, in about 2004?

4        **A.**  I said '3 or '4, yes, sir.

5        **Q.**  Pardon me?

6        **A.**  I said '3 or '4, yes, sir.

7        **Q.**  Okay.  And you were selling drugs up until the time

8    you were arrested in West Virginia on August 15th, 2016?

9        **A.**  I was not -- yes, sir.

10        **Q.**  Okay.  And so from -- that's about 15 years,

11    correct?

12        **A.**  Yes, sir.

13        **Q.**  All right.  And that's all you did was sell drugs up

14    until August 15th of 2016, right?

15        **A.**  I don't want to say that's all I did.

16        **Q.**  Well, that's how you made your money?

17        **A.**  I had a job.

18        **Q.**  Well, tell me --

19        **A.**  But yes, most of my life that's what I did.

20        **Q.**  Pardon me?

21        **A.**  I said I had jobs before, but most of my life --

22        **Q.**  Did you have any jobs after 2012?

23        **A.**  No, sir.

24        **Q.**  Okay.  And is it fair to say that besides selling

25    drugs, which was marijuana, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  Crack cocaine?

3    **A.**  Yes, sir.

4    **Q.**  Powder cocaine?

5    **A.**  Yes, sir.

6    **Q.**  And then you moved on to, to prescription drugs,

7    right?

8    **A.**  Yes, sir.

9    **Q.**  And that's where the money was, wasn't it?

10   **A.**  Yes, sir.

11   **Q.**  You were rolling in on money with the, with the

12   prescription drugs that you were taking down to

13   West Virginia, Virginia and West Virginia, right?

14   **A.**  Yes, sir.

15   **Q.**  And you were making about 10,000 or more a week,

16   weren't you?

17   **A.**  Yes, sir.

18   **Q.**  Yeah.

19   **A.**  I want to say a week -- every --

20   **Q.**  Yeah, you were going down there maybe two,

21   three times a week -- two or three times a month?

22   **A.**  Maybe, yes, sir.

23   **Q.**  And every time you went down there you would flip

24   about $10,000, wouldn't you?

25           Well, that's not what I'm asking you.  That's

*15-20652; USA v. EUGENE FISHER, ET AL*

1   what you told the government when they interviewed you.

2      **A.**   Right, what you said, but you are saying it a

3   different way.  I went and flip 10,000.  I probably made

4   that profit.  I see what you're saying.  Yes, sir.

5      **Q.**   You are putting $10,000 in your pocket maybe

6   three times a month?

7      **A.**   Could be, yes, sir.

8      **Q.**   My calculations, between 2012 when you started going

9   down to West Virginia and the time that you got arrested

10  in 2016, that's close to three, four hundred thousand

11  dollars a year that you are putting in your pocket?

12     **A.**   It was not always like that.  Sometimes it will be

13  slow.  Sometimes it will be faster than that.  It just

14  depends.

15     **Q.**   Okay.  Not only were you dealing drugs your whole

16  life, but during that whole time, at least up to

17  August 15th of 2016, you had no respect for the law, did

18  you?

19     **A.**   I don't want to say I didn't respect the law.  I was

20  trying to be slick.  Yes, sir.

21     **Q.**   No respect for the law was every time you got

22  arrested you would go back out and sell drugs again,

23  correct?

24     **A.**   Yes, sir.

25     **Q.**   Every time you -- not every time, but you would be

*15-20652; USA v. EUGENE FISHER, ET AL*

1    stopped by the police and you would give names of

2    different people, right?

3        **A.**   Not every time but a lot of times.

4        **Q.**   Well, not every time.

5        **A.**   Yes, sir.  A lot of times.

6        **Q.**   A lot of times you would give your brother's name or

7    someone else's name to avoid being detected, correct?

8        **A.**   Yes, sir.

9        **Q.**   Hey, there was even a time when you were an adult

10   and you gave the name of a juvenile so you could avoid

11   going to jail, correct?

12       **A.**   I was still in the juvenile system, too, sir.

13       **Q.**   You had no respect for the law, did you?

14       **A.**   I had respect for the law.  I was just trying to be

15   slick.  Yes, sir.

16       **Q.**   Okay.  Now, we can agree based upon your testimony

17   that at just one time, at one minute of one hour of

18   one day you had approximately $200,000 on you, on your

19   person or in your crib, in your house, correct?

20       **A.**   Can you repeat that?

21       **Q.**   Well, you testified it seems like years ago, but I

22   think it was yesterday or the day before that at one time

23   you had 180 to 230 thousand dollars in your possession?

24       **A.**   Yes, sir.

25       **Q.**   At one time?

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  All at once.

2    **Q.**  Over a period of four years that you were running

3    back and forth to West Virginia?

4    **A.**  This was right at the beginning of it when I was --

5    **Q.**  In the beginning?

6    **A.**  Yes.  It was --

7    **Q.**  And it got better as time went on, didn't it?

8    **A.**  No, it didn't.  It got worse.

9    **Q.**  It got worse.

10           Now, during the time that you were rolling

11   from -- when you had that 180 to 200 thousand dollars in

12   your control, what year was that?

13   **A.**  That was 2015.

14   **Q.**  2015?

15   **A.**  No, sir, I'm sorry, it was 2013.

16   **Q.**  Are you sure it wasn't '15?

17   **A.**  No, it wasn't '15.

18   **Q.**  It was 2013?

19   **A.**  Yeah, it was 2013.

20   **Q.**  Okay, okay.  And during that period of time you were

21   able to buy fine jewelry?

22   **A.**  Yes, sir.

23   **Q.**  Clothes?

24   **A.**  Yes, sir.

25   **Q.**  Cars?

1    **A.**   I never bought a car.

2              **MR. H. SCHARG:**  Well, we'll go into that in a

3    minute with the cars, but why don't we move for admission

4    of Defense Exhibit 19.

5    **BY MR. H. SCHARG:**

6    **Q.**  I'm going to show you Proposed Exhibit --

7              **MR. WECHSLER:**  Could we see what it is?  We

8    don't know what he's talking about.

9              **MR. H. SCHARG:**  I provided you with --

10             **MR. WECHSLER:**  Okay.

11             **MR. H. SCHARG:**  May I approach?

12             **THE COURT:**  Yes.

13   **BY MR. H. SCHARG:**

14   **Q.**  I'm going to show you Proposed Exhibit 19.  Did you

15   ever see that picture before?

16   **A.**  I took it.

17   **Q.**  You took it?

18   **A.**  Yes, sir.

19   **Q.**  Okay.  And that's a screen shot of you?

20   **A.**  A screen shot?  Yes, it was off of --

21             **MR. H. SCHARG:**  Move for admission.

22             **MR. WECHSLER:**  No objection.

23             **MR. H. SCHARG:**  19.

24             **THE COURT:**  The Court will receive the item.

25             **MR. H. SCHARG:**  Okay.  We're going to put

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    that on the overhead.

2    **BY MR. H. SCHARG:**

3        **Q.**  That's a picture of you, correct?

4        **A.**  Yes, sir.

5        **Q.**  With your bling?  Yes?

6        **A.**  Yes.

7        **Q.**  Did you ever hear the word "bling"?

8        **A.**  Yes, sir.

9        **Q.**  What is that?

10       **A.**  Like jewelry.

11       **Q.**  I'll ask you, is that your bling?

12       **A.**  Yes, sir.

13       **Q.**  And you took a screen shot.  Did you put it over the

14   internet or Facebook or Instagram or anything?

15       **A.**  I never had a Facebook, but I did, I took the

16   picture and I put it on Instagram.  Somebody made a fake

17   Facebook for me.

18       **Q.**  You wanted to show everyone in the world how much

19   money you had, how successful you were, how powerful you

20   were, right?

21       **A.**  No, that's not true.

22       **Q.**  All right.

23       **A.**  Successful, yeah.

24       **Q.**  What kind of watch have you got?  You were

25   successful.  You were rolling in it.  You were rolling in

*15-20652; USA v. EUGENE FISHER, ET AL*

1   the money back then in 2013, 2014, 2015, weren't you?

2   **A.**  You say what years?

3   **Q.**  You went down to Virginia and West Virginia in 2012?

4   **A.**  Yes, sir.

5   **Q.**  You were going down there in 2013?

6   **A.**  Yes, sir.

7   **Q.**  2014?

8   **A.**  Yes, sir.

9   **Q.**  2015?

10  **A.**  Yes, sir.

11  **Q.**  And 2016, up until August 15th of 2016?

12  **A.**  Yes, sir.

13  **Q.**  What type of watch is that?

14  **A.**  A Rolex.

15  **Q.**  A Rolex.  Diamond Rolex?

16  **A.**  It's not Rolex diamonds, but yes, it's a Rolex with

17  diamonds in it.

18  **Q.**  $50,000 watch?

19  **A.**  No, sir.

20  **Q.**  How much?

21  **A.**  About 25, 26.

22  **Q.**  Okay.  Excuse me.  It's only half of $50,000.  It

23  was $25,000, right?

24  **A.**  Yes, sir.

25  **Q.**  And that was only one of your watches that you had?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   It's the only watch I had.

2      **Q.**   Well, didn't you say you had another watch?

3      **A.**   That was back before I even started going out to --

4      that watch was from 2010.

5      **Q.**   All right.  That was your 2010 watch?

6      **A.**   Yeah.

7      **Q.**   What was that, a $5,000 watch, right?

8      **A.**   10,000.

9      **Q.**   10,000.  So you had that $10,000 watch before you

10     started going to Virginia, before you were making all of

11     this doe, all of this cash, right?

12     **A.**   No, sir.

13     **Q.**   Now that you are going to Virginia, you are able to

14     afford a $25,000 watch, right?

15     **A.**   No, sir.  It wasn't Virginia.  It was West Virginia,

16     sir.

17     **Q.**   West Virginia.

18     **A.**   Yes, sir.

19     **Q.**   Virginia, West Virginia.  West Virginia you were

20     able to buy -- afford this $25,000 watch, right?

21     **A.**   Yes, sir.

22     **Q.**   What about the necklace?

23     **A.**   The necklace.

24     **Q.**   The gold necklace.

25     **A.**   It's a kilo.

*15-20652; USA v. EUGENE FISHER, ET AL*

1       **Q.**   How many pounds was that?

2       **A.**   It was a kilo.  A kilo is 1000 grams.

3       **Q.**   How much did that weigh?

4       **A.**   1,000 grams.  Both the chains together.  One was a

5       700 and one was a 350.  It was like 1050.

6       **Q.**   10,000.

7       **A.**   1,000.  1,000 grams.  It was $19 a gram.

8               **MR. WECHSLER:**  Judge, could we let the

9       witness answer before we move to the next question?

10              **THE COURT:**  Yes.

11          Go ahead.

12              **THE WITNESS:**  It was $19 a gram, $19 a gram,

13      and the chain came up to a little over 20,000 for both

14      chains.

15  **BY MR. H. SCHARG:**

16      **Q.**   $20,000?

17      **A.**   For both chains.

18      **Q.**   So in just that picture of you alone, there's 45 to

19      50 thousand dollars worth of jewelry?

20      **A.**   45.

21      **Q.**   Okay.

22              **MR. H. SCHARG:**  Exhibit 20.  May I approach?

23              **THE COURT:**  Yes.

24  **BY MR. H. SCHARG:**

25      **Q.**   Showing you Exhibit 20, have you ever seen that

1    before?

2        **A.**   Yes, sir.

3        **Q.**   Okay.  And is that another screen shot?

4        **A.**   Yes, sir.

5        **Q.**   You took or someone else took?

6        **A.**   I took the picture, but I don't know who

7    screenshotted it.

8        **Q.**   All right.  You took the picture.

9        **A.**   I didn't take the picture, but this is me.  It's not

10   no Photoshopped picture.  It's an actual picture, yes,

11   sir.

12               **MR. H. SCHARG:**  Okay.  Move for admission of

13   20.

14               **MR. WECHSLER:**  No objection.

15               **THE COURT:**  All right.  The Court will

16   receive it.

17               **MR. H. SCHARG:**  Can we publish it.

18   **BY MR. H. SCHARG:**

19       **Q.**   That is you?

20       **A.**   Yes, sir.

21       **Q.**   In front of your "beamer"?

22       **A.**   BMW, yes, sir.

23       **Q.**   Okay.  Well, you call it a BMW or "beamer"?

24       **A.**   I don't know, is a "beamer" a Benz or BMW?

25       **Q.**   I thought a BMW.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  All right.

2    **Q.**  Okay.  That's your car?

3    **A.**  Yes, sir.

4    **Q.**  Okay.  And let's go to the sunglasses.

5    **A.**  Yes, sir.

6    **Q.**  Those are designer glasses?

7    **A.**  Yes, sir.

8    **Q.**  $5,000?

9    **A.**  No, sir.

10   **Q.**  How much?

11   **A.**  About 16, 18 hundred.

12   **Q.**  About 16, 18 hundred?

13   **A.**  Yes, sir.

14   **Q.**  Okay.  Shoes?

15   **A.**  The shoes was regular tennis shoes.  $150.

16   **Q.**  Okay.  How did you pay for that "beamer," excuse me,

17   that BMW?

18   **A.**  It was not paid for.  I put 9,000 down on it, and I

19   had a note.  The note was 700 a month.

20   **Q.**  And was that at a car lot?

21   **A.**  It's the BMW car lot right there.

22   **Q.**  Okay.  Did you go to a dealership?

23   **A.**  Yes, I got it from a dealership.

24   **Q.**  Okay.  And you put down how much?

25   **A.**  Like nine, a little over nine.

*15-20652; USA v. EUGENE FISHER, ET AL*

1   **Q.**  Nine grand, 9,000?

2   **A.**  9,700, yes, sir.

3   **Q.**  In cash?

4   **A.**  Yes, sir.

5   **Q.**  And you paid monthly?

6   **A.**  Car note, yes, sir.

7   **Q.**  You didn't lease that car, did you?

8   **A.**  It was a lease with an option to buy, I think.  It

9   was a finance.  It was a finance.

10   **Q.**  You didn't lease it in your name, did you?

11   **A.**  No, sir.

12   **Q.**  Whose name did you lease it in?  I won't go there.

13   I'll just say you leased it in somebody else's name,

14   right?

15   **A.**  Yes.

16   **Q.**  Because you couldn't show income, correct?

17   **A.**  Correct.

18   **Q.**  And you had to get someone who probably had some

19   credit; is that right?

20   **A.**  Correct.

21   **Q.**  To put down the money for you?

22   **A.**  Yes, sir.

23   **Q.**  The car was in their name?

24   **A.**  Yes, sir.

25   **Q.**  And you paid the insurance for them?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  But it was your car?

3    **A.**  Yes, sir.

4    **Q.**  Okay.  Now, whatever happened to that car?

5    **A.**  When I got indicted, I gave it -- when I got

6    indicted -- the car was in my mother's name.  So when I

7    got indicted I gave it, I gave it to her so she could have

8    it.  She couldn't afford it so they repossessed it.

9    **Q.**  So when did you go ahead and buy this car, what

10   year?

11   **A.**  I didn't never go ahead and buy it.

12   **Q.**  Well, you put the money down.

13   **A.**  Because buying it --

14   **Q.**  Financing.

15   **A.**  Owning and financing is two different things.  I

16   never went to the car lot and gave them 80, 70 thousand

17   dollars for the car.  I gave them $9,000.  I financed it.

18   Then when I got indicted I couldn't afford it.  I couldn't

19   afford it.  So I gave it to my mother.  My mother couldn't

20   afford it so she let them come back and get it.  The car

21   is in repossession.

22   **Q.**  All right.  When did you finance it, what year?

23   **A.**  2013.

24   **Q.**  And you got indicted in 2016?

25   **A.**  Yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **Q.**  So you had the car for four years?

2      **A.**  Yes, sir.  No, three, three years.

3      **Q.**  Three years.  You paid -- you were paying the note

4      on it monthly, correct?

5      **A.**  Yes, sir.  Yes, sir.

6      **Q.**  How much a month?

7      **A.**  700.

8              **MR. H. SCHARG:**  Defense Exhibit 21.  May I

9      approach?

10             **THE COURT:**  Yes.

11     **BY MR. H. SCHARG:**

12     **Q.**  Here you go.  Look at that picture.  Have you seen

13     that before?

14     **A.**  Yes, sir.

15     **Q.**  Is that a screen shot?

16     **A.**  Yes, sir.

17     **Q.**  Okay.  And did you take it?

18     **A.**  I took the picture, yes, sir.  I didn't take it, but

19     yes, that's an actual picture.  That's a real picture of

20     me.

21     **Q.**  You put it on Facebook?

22     **A.**  I never had a Facebook.

23     **Q.**  You put it on some type of Instagram?

24     **A.**  Yes, sir.

25     **Q.**  Okay.

*15-20652; USA v. EUGENE FISHER, ET AL*

1            **MR. H. SCHARG:**  Move for admission of Defense

2    Exhibit 21.

3            **MR. WECHSLER:**  It's already on the screen,

4    but no objection.

5            **THE COURT:**  The Court will receive it.

6    BY MR. H. SCHARG:

7        **Q.**  Is that you?

8        **A.**  Yes, sir.

9        **Q.**  With the designer glasses?

10       **A.**  Yes, sir.

11       **Q.**  What watch are you wearing there?

12       **A.**  The same watch.  It's just -- the same watch,

13    different picture.

14       **Q.**  What about the belt?

15       **A.**  It was a Giuseppe belt.

16       **Q.**  Pardon me?

17       **A.**  A Giuseppe belt.

18       **Q.**  I can't hear you.

19       **A.**  It was a Giuseppe belt.

20       **Q.**  How much does that belt cost?

21       **A.**  About $1,300.

22       **Q.**  Just for the belt?

23       **A.**  Just for the belt.

24       **Q.**  What about those shoes?

25       **A.**  The shoes was 1400.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   1400?

2    **A.**   Yes, sir.

3    **Q.**   So for shoes and the belt, that's 2500?

4    **A.**   Yes, sir.

5    **Q.**   When was that picture taken?

6    **A.**   That was my birthday.  So August 12th, 2000 -- 2014.

7    **Q.**   All right.  So in 2014 you were still making -- did

8    you buy that for yourself or did someone give that to you

9    as a gift?

10   **A.**   I bought that.

11   **Q.**   Okay.  So at least you had enough money that you

12   could buy 25 -- spend 2500 on a belt and shoes in 2014,

13   right?

14   **A.**   Yes, sir.

15            **MR. H. SCHARG:**   Okay.  And now Defense

16   Exhibit 22.

17   **BY MR. H. SCHARG:**

18   **Q.**   I'll show you Defense Exhibit 22.  Do you recognize

19   that?

20   **A.**   Yes, sir.

21   **Q.**   What is it?

22   **A.**   A box.

23   **Q.**   For purposes of --

24   **A.**   It's a box with some shoes in it.

25   **Q.**   Yeah, what type of shoes?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  Christian Louboutin's.

2              **MR. H. SCHARG:**  Did I move for admission?  If

3      I didn't, I am at this time.

4              **THE COURT:**  Any objection?

5              **MR. WECHSLER:**  No objection.

6              **THE COURT:**  All right.  The Court will

7      receive the item.

8              Is it marked as an exhibit?

9              **MR. H. SCHARG:**  Yes.

10     **BY MR. H. SCHARG:**

11     **Q.**  What type of shoe box is that?

12     **A.**  A Christian Louboutin box.

13     **Q.**  Are those the ones with the red bottoms?

14     **A.**  Yes, sir.

15     **Q.**  You took a picture of a box of shoes that you had?

16     **A.**  Yes, sir.

17     **Q.**  How many thousands of dollars did those shoes cost?

18     **A.**  That was 1200.

19     **Q.**  Huh?

20     **A.**  1200.

21     **Q.**  1200, okay.  When did you purchase those?

22     **A.**  I purchased those, that was for my birthday in 2015.

23     **Q.**  2015?

24     **A.**  Uh-huh.

25     **Q.**  So you are still doing okay in the drug business

*15-20652; USA v. EUGENE FISHER, ET AL*

1    buying $1,200 shoes, right?

2    **A.**  Yes, sir.

3    **Q.**  And you took a picture of the shoe box.  Why?

4    **A.**  To show it off.

5    **Q.**  Now, I see that you like fancy clothing, right?

6    **A.**  Yes, sir.

7    **Q.**  Fancy shoes?

8    **A.**  Yes, sir.

9    **Q.**  Fancy watches, chains?

10   **A.**  Yes, sir.

11   **Q.**  Is that what you wore to court today?

12   **A.**  No, sir.

13   **Q.**  What did you wear to court today?

14   **A.**  Normal stuff.

15   **Q.**  Huh?

16   **A.**  Normal stuff.

17   **Q.**  What do you mean "normal"?  This is normal stuff for

18   you.  I'm asking what did you wear.

19   **A.**  Just pants, a shirt that the agents had to give me,

20   and some regular shoes.

21   **Q.**  Okay.  You wore -- what did you wear?

22   **A.**  It's not name brand.  It's just regular.

23   **Q.**  And then you came to court, and then the agents had

24   you change into that shirt and tie, right?

25   **A.**  That's because I don't have no money.  What do you

*15-20652; USA v. EUGENE FISHER, ET AL*

1    want me to do?

2       **Q.**  After all of this you can't afford to buy your own

3    shirt and slacks?

4       **A.**  No, sir.

5       **Q.**  Okay.  Now, let me ask you to look at Defense

6    Exhibit 18.

7              **MR. H. SCHARG:**  May I approach?

8              **THE COURT:**  Yes.

9    **BY MR. H. SCHARG:**

10      **Q.**  Do you recognize that picture?

11      **A.**  Yes, sir.

12      **Q.**  What is that?

13      **A.**  That's a picture of a friend named Meech.

14      **Q.**  Pardon me?

15      **A.**  A picture of a friend named Meech.

16      **Q.**  Okay.  And behind your friend there is a vehicle?

17      **A.**  Correct.

18      **Q.**  Is that a Range Rover, Land Rover?

19      **A.**  Range Rover.

20      **Q.**  And whose car -- whose truck is that?

21      **A.**  That's not my truck.

22      **Q.**  That's not your truck?

23      **A.**  I had one like it.  I had one like it.  The motor

24   went out.  That's not my truck.  They did a bad job of

25   investigating because that's not my truck.  That's his

*15-20652; USA v. EUGENE FISHER, ET AL*

1    truck.  I ain't going to lie.  I admitted to everything

2    else.

3        **Q.**  Where is your Range Rover?

4        **A.**  It's in the shop.

5        **Q.**  Is it a Range Rover or a Land Rover?

6        **A.**  It's a Range Rover, and it's not an expensive Range

7    Rover, it's a cheap Range Rover, and the motor went out.

8    It's in the shop.

9            And the agents was well aware.  It was in my

10   name.  I didn't try to hide it.  The agents was well aware

11   I got it.  They was with me when I got it basically.

12       **Q.**  They were with you when you bought it?

13       **A.**  Not with me when I bought it, but when I was moving

14   my stuff, they knew I had it.  It was a truck for the

15   kids --

16       **Q.**  What year is the Range Rover?

17       **A.**  A '14.

18       **Q.**  2014?

19       **A.**  Yes.

20            But it's not the Range Rover you are trying to

21   make it seem like to the jury.

22       **Q.**  I'm not saying what it is, sir.

23       **A.**  Yes, sir.  That's not my truck.

24       **Q.**  Okay.  The Range Rover that you have?

25       **A.**  Uh-huh.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**   I apologize.  It's not your truck.  You have a

2     different Range Rover, I understand.

3     **A.**   Yes.  Mine's older.

4     **Q.**   You bought a 2014 Range Rover?

5     **A.**   I did not buy it.  I took out a loan for it.  When

6     they gave me my money, I had to get a car to leave town.

7     **Q.**   How much money did you put down?

8     **A.**   Like 5800.

9     **Q.**   Okay.  And are you making payments on it?

10    **A.**   Yes, sir.

11    **Q.**   It's in your name?

12    **A.**   Yes, sir.

13    **Q.**   Okay.  And do you remember when you bought it?

14    **A.**   It was -- like I had to get my license put together

15    so it was like November/December of 2017.

16    **Q.**   Okay.  And when did it break down?

17    **A.**   It broke down about a week ago.  Friday or Saturday.

18    **Q.**   Didn't you tell us earlier that you don't have a

19    driver's license?

20    **A.**   Yes, sir.

21    **Q.**   So you've been driving this Range Rover around town?

22    **A.**   No, sir.

23    **Q.**   Hold on.  You've been driving this Range Rover

24    around town up until a couple of weeks ago when it broke

25    down?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**   No, sir.

2     **Q.**   When did you stop driving it?

3     **A.**   I never drove it.  It was for my wife and my kids.

4     **Q.**   All right.  So you have never driven this vehicle?

5     **A.**   I drove it before, but not around town like I'm just

6     around partying and having fun, no.

7     **Q.**   Okay.  You have been driving it without a license?

8     **A.**   I drove it -- yes, sir.  I drove it without a

9     license before.

10    **Q.**   It's a simple question.

11    **A.**   Yes, sir.

12    **Q.**   And the government knows that you are driving it

13    without a license?

14    **A.**   They don't know what I do -- I don't believe they

15    know what I do every day.

16    **Q.**   That means you could be selling drugs every day and

17    they don't know about it, right?

18    **A.**   I ain't selling no drugs, sir.

19    **Q.**   I didn't ask you.  I said they don't know when

20    you're driving without a license, they wouldn't know if

21    you are selling drugs when they are not around, correct?

22    **A.**   I'm pretty sure they know something.  They know more

23    than what you think you know.

24    **Q.**   I know more than what you think I know, also.

25    **A.**   You can't because you thought this was my car and

*15-20652; USA v. EUGENE FISHER, ET AL*

1    it's not.

2        **Q.**  When you had all of this money, you were also

3    throwing it around, weren't you?  Throwing money at these

4    strip clubs; is that correct?

5        **A.**  Yes, sir.

6        **Q.**  We saw one video this morning where you were at a

7    strip club and throwing dollar bills all around, raining

8    dollar bills, right?

9        **A.**  Yes, sir.

10        **Q.**  Took a bag full of dollar bills?

11        **A.**  Yes, sir.

12        **Q.**  You testified today that somewhere between five and

13    ten thousand dollars in dollar bills?

14        **A.**  I said eight.

15        **Q.**  8,000 in dollar bills?

16        **A.**  Yes, sir.

17        **Q.**  Where did you get those dollar bills from?

18        **A.**  From just running around putting it together.

19    Liquor stores, stores.

20        **Q.**  You went around collecting dollar bills at liquor

21    stores?

22        **A.**  Stores.

23        **Q.**  $8,000?

24        **A.**  You make it seem like it's hard.  It's a liquor

25    store.  Liquor store got hundreds of thousands of dollars

*15-20652; USA v. EUGENE FISHER, ET AL*

1   in there.  If you go in there and you say give me 1,000

2   ones, you go to eight stores, you are done.

3       Q.  Wait a second.  You wouldn't just go into a liquor

4   store and ask them for $1,000 in dollar bills, you had to

5   give them money, right?

6       A.  Yes, sir.

7       Q.  So what did you give them, $100 bills?

8       A.  20s, 50s 100s, 10s, 5s, however I had it.

9       Q.  Okay.  So you would go around to eight different

10  liquor stores?

11      A.  Liquor stores, grocery stores, banks.

12      Q.  How many parties did you sponsor or throw between

13  2012 and 2016 where you would throw all of this money

14  around?

15      A.  I don't recall.  I threw a bunch of parties.

16      Q.  Okay.  And --

17      A.  About five or six, ten.

18      Q.  Okay.  Can we agree that each time that you would

19  get at least 5,000 or $10,000 in singles and throw around?

20      A.  Not every time, but most of the time at least three,

21  four thousand.

22      Q.  Or more?

23      A.  Or more.

24      Q.  Sometimes up to 25 or 50 thousand dollars?

25      A.  Never.

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  All right.  Well, I'm going to ask you if there was

2     a party at the Sting Nightclub that you attended.

3     **A.**  Yes, sir.

4     **Q.**  And you have seen the video?

5     **A.**  Yes, sir.

6     **Q.**  And what year was that?

7     **A.**  It was 2000 -- that might have been 2014.  It might

8     have been 2000 -- it was 2014.

9     **Q.**  2014, maybe 2015?

10    **A.**  It was 2014.

11    **Q.**  Okay.  That's --

12              **MR. H. SCHARG:**  Move for the admission of

13    Exhibit 64.  It's actually Government's Exhibit 64.

14              **MR. WECHSLER:**  One moment.  Let me check the

15    number.

16          No objection, Judge.

17              **THE COURT:**  All right.  The Court will

18    receive it.

19    **BY MR. H. SCHARG:**

20    **Q.**  Before you -- I'm not going to play the whole video

21    for you, but I'm going to, I'm going to -- we'll start it

22    and we'll go from there, okay?

23    **A.**  Yes, sir.

24              (Video started.)

25              **MR. H. SCHARG:**  Stop.  Last time he didn't

*15-20652; USA v. EUGENE FISHER, ET AL*

1    hear us.  I think I woke everybody up, but that was my

2    ulterior motive.

3  **BY MR. H. SCHARG:**

4      **Q.**  Do you see this limo?

5      **A.**  Yes, sir.

6      **Q.**  Is that another limo that you rented?

7      **A.**  Yes, sir.

8      **Q.**  And what type of limo is that?

9      **A.**  A Maserati limo.

10     **Q.**  A Maserati limo.

11     **A.**  Yes, sir.

12     **Q.**  And how much does that go for an hour?

13     **A.**  It wasn't much.  It was -- I had it for four hours.

14   It was like $400.

15     **Q.**  An hour?

16     **A.**  No.

17     **Q.**  $100 an hour?

18     **A.**  It's a limo.  It's not a real Maserati.

19     **Q.**  How often do you rent these limos?  Did you get a

20   deal on them?

21     **A.**  I don't get a good deal.  You get a base rate.

22   Anything over four hours is going to be $100 an hour.  I

23   don't care if it was a Cadillac.

24     **Q.**  Did you ride in it that night or did you ride in

25   another vehicle?

*15-20652; USA v. EUGENE FISHER, ET AL*

 1                It doesn't matter.  Let's go on.

 2                    (Video playing.)

 3   BY MR. H. SCHARG:

 4       Q.  Is that you?

 5       A.  Yes, sir.

 6       Q.  Okay.  Wearing your designer glasses?

 7       A.  Yes, sir.

 8       Q.  You've got your $25,000 watch on at the time?

 9       A.  No, sir.

10       Q.  Did you have another watch on?

11       A.  No, sir.

12       Q.  Okay.  And that's at the club?

13       A.  Yes, that's the Sting Club.  Everybody there.  Your

14   client threw money, too.  Their clients, too.  Watch it.

15       Q.  Was he throwing your money?

16       A.  No, throwing his own money.

17              MR. H. SCHARG:  Okay.  Keep on going.

18                    (Video played.)

19              MR. H. SCHARG:  I think everybody will agree

20   we have had enough entertainment for the morning.

21   BY MR. H. SCHARG:

22       Q.  That's you throwing that money, right?

23       A.  Yes, sir.

24       Q.  Raining money in that club?

25       A.  Yes, sir.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   How many thousands and thousands of dollars did you

2    go through that day?

3    **A.**   About nine.

4    **Q.**   You think nine?

5    **A.**   Eight or nine.

6    **Q.**   Okay.  There was so much money that you threw out

7    that day that these girls, these dancers, had to get a

8    money counter, didn't they?

9    **A.**   Yes, sir.  It wasn't just money I threw though.  It

10   was everybody was throwing money.  That's why you stopped

11   it because you didn't want to see everybody else throwing

12   money.

13            **MR. H. SCHARG:**  Go ahead.  We'll play the

14   rest of it.

15                 (Video played.)

16            **MR. H. SCHARG:**  All right.  We can stop it.

17   **BY MR. H. SCHARG:**

18   **Q.**   All right.  So far we really just see you throwing

19   money in there?

20   **A.**   I'm pretty sure the jury see it, but ...

21            **MR. H. SCHARG:**  All right.  Let's move to the

22   other.

23   **BY MR. H. SCHARG:**

24   **Q.**   So after the party that you throw and all of the

25   money that you threw?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**   Uh-huh.

2      **Q.**   All of these dancers go in back with a money counter

3      and count the money, right?

4      **A.**   Uh-huh.

5      **Q.**   And that's all money for them?

6      **A.**   Yes.

7      **Q.**   It's not money for your baby's mama?

8      **A.**   Right.

9      **Q.**   For your kids, for the mothers of your children?

10     That doesn't go for child support.  That goes to these

11     dancers for that night; is that correct?

12     **A.**   Right.  My kids never --

13     **Q.**   I'm asking you a certain question.  The money that

14     you threw out that night, that didn't go to your kids,

15     that didn't go to their mothers, that didn't go to child

16     support, that went to these dancers that you didn't even

17     know, right?

18     **A.**   Right.

19     **Q.**   And there was so much money that they needed

20     counters, money counters like the banks do?

21     **A.**   Yes, sir.

22              **MR. H. SCHARG:**   Okay.  Please show that.

23              (Video played.)

24   **BY MR. H. SCHARG:**

25     **Q.**   Do you see that money in the background?  Do you see

*15-20652; USA v. EUGENE FISHER, ET AL*

1    all of that money in the background?

2        **A.**   Yes, sir.

3        **Q.**   Behind that girl?

4        **A.**   Yes, sir.

5        **Q.**   You think that's $5,000?

6        **A.**   I'm not the only person -- you asked me how much

7    money I spent that night.  I spent eight, nine thousand.

8    Everybody else spent three, four, five thousand dollars.

9    It was a lot of people in there throwing money.  I wasn't

10   the only one throwing money, sir.

11           **MR. H. SCHARG:**  All right.  Go ahead.

12   **BY MR. H. SCHARG:**

13       **Q.**   "The greatest show on earth brought to you by

14   55dubb."  Who is that?

15       **A.**   Quincy Graham.

16       **Q.**   Okay.  "55_g_field."

17       **A.**   Yes.

18       **Q.**   That's you?

19       **A.**   Yes, sir.

20       **Q.**   You are the ones that threw the party?

21       **A.**   Yes.

22       **Q.**   You are the ones that made the video?

23       **A.**   Yes.  No, we're not the ones that made the video.

24       **Q.**   But you are the ones that threw the money?

25       **A.**   No.  That don't mean because it's our party that we

                *15-20652; USA v. EUGENE FISHER, ET AL*

 1    are the only ones who threw money.  That's like if it's

 2    somebody else's party and you are not going to drink

 3    because it's somebody else's occasion.  You are still

 4    going to have a drink, right?  That don't make sense.

 5    Everybody threw money.

 6      Q.  Here is what makes sense, sir.  You say that you

 7    threw out nine grand that night, 9,000?

 8      A.  Eight or nine thousand, yes.

 9      Q.  Eight or nine thousand.  And we know that you owed

10    $30,000 in child support, right?

11      A.  Not at that time, no, I did not.  My kids' mother

12    never paid for nothing since my kids been born.  Stop

13    disrespecting my kids because I don't owe nobody for my

14    kids, sir.

15      Q.  Sir, I'm not disrespecting your kids.

16      A.  You are.  You disrespecting my kids.

17      Q.  You are disrespecting your kids, aren't you?

18      A.  No, I'm not.  Just because I didn't pay child

19    support doesn't mean I didn't take care of my kids, sir.

20    I didn't get legitimate checks to where they could take

21    the money out.  I paid them cash.  They got their money.

22    They never paid for a birthday party.  They never paid for

23    nothing.  They barely paid rent sometimes.  I paid for

24    everything for my kids, and I could have every mother of

25    my child come and sit on this stand and they will tell you

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1     I'm a great father.  You can make the jury think what you

2     want them to think, but I'm not going to let them think

3     that about me.  I'm not a bad father.  I take care of

4     every last one of my kids.  Other people kids, too.

5     **Q.**  All right.  When you had to go into court for child

6     support, right, you had to go in, it was like a revolving

7     door --

8     **A.**  I did not find out about the child support until I

9     had to come to court.  The mother of my child is the one

10    that called me and told me I had a warrant.  I didn't even

11    know I had a warrant.  She called me and told me.  She

12    told me she would go down there with me, which is Quincy's

13    sister.  She said she will take it off me knowing what I'm

14    doing.  She -- and still they took it off me for $1200.

15    **Q.**  Okay.  Now, you were indicted on February 17th,

16    2016, right?

17    **A.**  We didn't know about the indictments until March

18    1st, I believe.

19    **Q.**  Pardon me?

20    **A.**  The indictment probably -- it was --

21    **Q.**  First question.  Were you indicted -- did you learn

22    that you had been indicted on February 17th, 2016?

23    **A.**  I did not know it was -- I did not know that.

24    **Q.**  When did you learn that you had been indicted?

25    **A.**  March.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**   Okay.  But -- so after you learned that you were

2    indicted in March you still kept on going back down to

3    West Virginia to sell drugs.

4    **A.**   Yes, sir.

5    **Q.**   Right?

6    **A.**   Yes, sir.

7    **Q.**   You knew that the government agents were actively

8    searching for you, correct?

9    **A.**   Yes, sir.

10   **Q.**   In fact, there was some type of court proceeding for

11   child support that you didn't go to because you didn't

12   want to get arrested?

13   **A.**   That's not true.  It could be true, but I didn't

14   know about the -- but I wouldn't have went knowing that I

15   had a warrant for the FBI if I did know about the court

16   proceeding, you are right.

17   **Q.**   Right, so --

18   **A.**   But that's not why I didn't go.

19   **Q.**   So the fact is that there is an open federal

20   indictment issued against you in February of 2016, you

21   learn about it in March of 2016, but you continue to go

22   down to West Virginia to sell these pills until you are

23   arrested in August of 2016, correct?

24   **A.**   Can you repeat that?

25   **Q.**   Okay.  When you learned that there was an indictment

*15-20652; USA v. EUGENE FISHER, ET AL*

1    against you that had been issued in February of 2016, you

2    learned about it in March of 2016, you continued to go

3    down to West Virginia from Detroit to sell drugs, to sell

4    pills, to sell Oxycontin until you were arrested on

5    August 15th of 2016, correct?

6        **A.**  Yes, sir.

7        **Q.**  And you remember that you were arrested in

8    West Virginia on August 15th, 2016, right?

9        **A.**  Yes, sir.

10       **Q.**  And during that time, between March and August, you

11   were coming back and forth to Detroit knowing that the

12   feds were looking for you, right?

13       **A.**  Yes, sir.

14       **Q.**  And the reason you were coming back was to get more

15   pills so that you could go back down to West Virginia to

16   sell, right?

17       **A.**  Yes, sir.

18       **Q.**  Knowing that there was this federal indictment

19   against you and that the Marshal's Service was looking for

20   you, right?

21       **A.**  Yes, sir.

22       **Q.**  And when you were arrested by West Virginia police

23   on August 15th of 2016, you gave another name again, you

24   gave a false name --

25       **A.**  Yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    Q.  -- again?

2    A.  Yes, sir.

3    Q.  You gave the name of Drew Kennedy?

4    A.  Yes, sir.

5    Q.  Who is that?

6    A.  My little brother.

7    Q.  So you get busted for pills and money in August of

8    2016, right?

9    A.  Yes, sir.

10   Q.  You had over 200 pills on you at the time?

11   A.  Yes, sir.

12   Q.  And you had cash?

13   A.  Yes, sir.

14   Q.  Were you driving a car?

15   A.  No, sir.

16   Q.  Were you riding with someone else?

17   A.  Yes, sir.

18   Q.  And, and you knew that the feds were looking for

19   you, correct?

20   A.  Yes, sir.

21   Q.  So you gave your brother's name?

22   A.  Yes, sir.

23   Q.  You sat down there in jail in West Virginia from

24   August until November of 2016 when you were extradited

25   back to Michigan, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  Yes, sir.

2    **Q.**  You had a detention hearing before a federal

3    magistrate on November 14th, 2016, right?

4    **A.**  In West Virginia?

5    **Q.**  No, here.  You were brought back to Michigan?

6    **A.**  Uh-huh.

7    **Q.**  You appeared before a judge at a detention hearing,

8    right, a bond hearing?

9    **A.**  Yes, sir.

10   **Q.**  Because the government wanted to lock you up, wanted

11   you to stay locked up, right?

12   **A.**  Yes, sir.

13   **Q.**  You got yourself a good lawyer, right?

14   **A.**  Yes, sir.

15   **Q.**  Someone that was referred to you by your other drug

16   dealer friends, right?

17   **A.**  No, sir.

18   **Q.**  Who referred Mr. Morris to you?

19   **A.**  Somebody had a lawyer already, and I wanted him on

20   this case.

21   **Q.**  He was a drug lawyer, wasn't he?

22   **A.**  I don't know --

23   **Q.**  Drug cases?

24            **MR. WECHSLER:**  Objection to "a drug lawyer."

25   I don't know what "a drug lawyer" is.  I mean, what kind

*15-20652; USA v. EUGENE FISHER, ET AL*

1    of lawyer is --

2              **MR. H. SCHARG:**  You never had a drug lawyer?

3              **MR. WECHSLER:**  No, and I don't know what "a

4    drug lawyer" is.  I know what a lawyer is.

5              **MR. H. SCHARG:**  A lawyer that represents

6    people on drug cases.  Right?  I'll move on.

7    **BY MR. H. SCHARG:**

8      **Q.**  You got Mr. Morris to represent you, right?

9      **A.**  Yes, sir.

10     **Q.**  And he appeared at a hearing with you on

11   November 14th, 2016, right?

12     **A.**  Yes, sir.

13     **Q.**  And there was a hearing on it because you wanted to

14   get out that day?

15     **A.**  Yes, sir.

16     **Q.**  Right?

17     **A.**  Yes, sir.

18     **Q.**  You were already in for like three or four months?

19     **A.**  Yes, sir.

20     **Q.**  And you knew you were in major problems, you knew

21   that you had major problems, didn't you?

22     **A.**  Yes, sir.

23     **Q.**  You knew that, although you had did a little time

24   here or there or everywhere that now you were facing years

25   in the federal system, didn't you?

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **A.**  Yes, sir.

2     **Q.**  And you wanted to get out?  You wanted to get out of

3     jail at that time?

4     **A.**  Yes, sir.

5     **Q.**  So you had the bond hearing, and through your lawyer

6     you informed the magistrate that you were not a gang

7     member, right?

8     **A.**  Yes, sir.

9     **Q.**  Okay.  That was a lie?

10    **A.**  When?  How is that a lie?

11    **Q.**  It was a lie on November 14th of 2016 when you came

12    into this building with a lawyer and you told your lawyer

13    to argue that you were not a gang member.

14    **A.**  I'm not a gang member.

15    **Q.**  Well, you are a 55, aren't you?

16    **A.**  That don't mean that -- I didn't look at it, I

17    didn't look at it like it's a gang.  I'm affiliated, yes,

18    sir, but I don't consider myself as a gang member.  It's

19    not nothing that -- it was not a gang that been out for

20    years and years and years.  It was some members we put

21    together.  This was a group of people that claimed it.  It

22    didn't look like that to me, no.

23    **Q.**  Did you consider yourself on November 14th of 2016 a

24    55?

25    **A.**  Yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  And are you telling this jury today that 55 is not

2    reference, does not refer to a gang?

3    **A.**  I did not look at it as like -- no, at the time I

4    did not look at it -- I still really don't look at it as a

5    gang.  It's a group of -- it's not like bloods and crypts,

6    gangs that have been around for years.  55 just been out

7    here for years and we just got beat up.  We had to get

8    beat into a gang.  Trying to make y'all think that, oh,

9    I'm lying because of my beliefs.  If I'm saying I'm

10   affiliated with somebody, yes, I'm affiliated with them.

11   I hung with them.  I'm affiliated.  Just like the judge is

12   affiliated with the prosecutors.

13   **Q.**  I've got it, I've got it.

14   **A.**  You making up stuff.

15   **Q.**  I'm making up stuff?

16   **A.**  Yes.

17   **Q.**  Didn't you testify yesterday or the day before --

18   **A.**  Trying to switch my words around.

19   **Q.**  -- you were a 55?

20   **A.**  I am.

21   **Q.**  And the 55 is a gang, isn't it?  Didn't you say

22   that?

23   **A.**  It's like a gang because it's a group of people, but

24   at the time I didn't look at it as a gang.  I wouldn't

25   say, oh, I'm a gang member.  I wasn't walking around

*15-20652; USA v. EUGENE FISHER, ET AL*

1    saying I'm a gang member.  I'm like, oh, gang, yeah.  I

2    never said that.  It was never like that.

3        **Q.**  Let's cut it, okay?

4        **A.**  Because you keep -- you, you -- all right.  Yes,

5    sir.

6        **Q.**  November 14th of 2016 did you know that the 55s --

7    that the federal government had indicted certain people

8    for being members of a gang known as 55?

9        **A.**  SMB.

10       **Q.**  Pardon me?

11       **A.**  SMB or affiliated.

12       **Q.**  And 55.

13       **A.**  It was SMB or affiliated.

14       **Q.**  Okay.  Did you also tell your lawyer to argue that

15   you never used any firearms?

16       **A.**  I never used a firearm in my life.  I never shot

17   nobody.

18       **Q.**  Did you tell your lawyer to argue that you never

19   possessed any firearms?

20       **A.**  I don't recall that.  No, I didn't.  I don't recall

21   that.

22       **Q.**  Okay.

23       **A.**  You arguing that your client is not guilty of

24   something that you know he is.

25                **THE COURT:**  That's not a question.  You wait

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1      for a question.

2  **BY MR. H. SCHARG:**

3      **Q.**   You also had your lawyer argue that you had strong

4      ties to the community, right?

5      **A.**   I have been staying over there all my life.

6      **Q.**   Okay.  And that you had children in the

7      jurisdiction?

8      **A.**   I do.

9      **Q.**   Okay.  And you told us yesterday, the day before --

10      or yesterday and today that you have six children?

11      **A.**   Yes, six children.

12      **Q.**   Okay.  And that you provide for them?

13      **A.**   Yes.  When I can, yes, sir.

14      **Q.**   All right.  And you've told us that repeatedly

15      yesterday and today, right?

16      **A.**   Yes, sir.

17      **Q.**   Okay.  Why did you tell the magistrate at this

18      detention hearing that you had seven children?

19      **A.**   Because I'm going through legal battles with one of

20      them.  This little boy named Jeremiah that I'm going

21      through legal battles with, I claim him, but the mother

22      won't let me see him.  I told them last time when I

23      testified that I had seven children.

24      **Q.**   I understand.  You testified last time that you had

25      seven children?

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**   In court.

2    **Q.**   That was four months ago, right?

3    **A.**   It was in February -- March.

4    **Q.**   Okay.  And now you are testifying that you have

5    six children.  Which is it, sir?  Which is it?  Do you

6    have seven children?

7    **A.**   She won't let me --

8    **Q.**   Let me finish the question.  Is it that you under

9    oath when you testified that you had seven children at a

10   prior proceeding in February or March or is it

11   six children that you are testifying here today?

12   **A.**   Can I answer it?

13   **Q.**   Now you can.

14   **A.**   She won't let me take the blood test for the child.

15   She from Mack where Neff and them from so it's a big

16   misunderstanding going on.  Mack is the guy -- I mean Neff

17   is the guy that they have been talking about.  It's a big

18   misunderstanding going on so she won't let me take the

19   blood test because she knew Neff, a person that one of my

20   friends supposed to hurt.  I'm talking to the jury.  So

21   she won't let me take the blood test --

22   **Q.**   No, you've got to talk to me.  You've got to talk to

23   me.

24         **MR. WECHSLER:**  Judge, he's in the middle of

25   answering his question.  It's getting very contentious --

*15-20652; USA v. EUGENE FISHER, ET AL*

 1          **MR. H. SCHARG:**  No, he's not answering the

 2    question.

 3          **MR. WECHSLER:**  Because Mr. Scharg is not

 4    letting him answer.  He's in the middle of an answer, and

 5    Mr. Scharg is interrupting him this time.

 6          **THE COURT:**  I'm not sure if that is an

 7    objection, but the Court will permit the question to be

 8    answered.

 9          Go ahead.

10          **THE WITNESS:**  She won't let me see the baby

11    or let me take the blood test because the guy that died is

12    her -- felt like a close friend or family member to her.

13    So she won't let me take the blood test.  So I did claim

14    him, but now I just know I still love him, I do want to be

15    in his life, but she won't let me see him because of all

16    of this.

17  BY MR. H. SCHARG:

18    **Q.**  How long has this dispute been going on?

19    **A.**  Since he died, 2014, '15.

20    **Q.**  Okay.  So this dispute that we're talking about

21    occurred in 2014 or 2015?

22    **A.**  Yes, sir.

23    **Q.**  So it was ongoing when you testified four months ago

24    about the number of children you have?

25    **A.**  Yes, sir.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.** Correct?

2    **A.** Yes, sir.

3    **Q.** And at that time you testified that you had

4    seven children?

5    **A.** Yes, sir.

6    **Q.** You testified yesterday and today that you had

7    six children, correct?

8    **A.** Yes, sir.

9    **Q.** And the same dispute that you talked about

10   four months ago when you gave sworn testimony --

11   **A.** We never talked about it.

12   **Q.** -- is still the same dispute that you are talking

13   about?

14   **A.** We never talked about the dispute before, sir.

15   **Q.** Why did you testify that you had seven children at

16   the prior court proceeding four months ago and now you

17   change it to six?

18   **A.** Because I'm trying to be in his life. She won't let

19   me. That's what I keep trying to tell you.

20   **Q.** Now, based upon information that was provided at the

21   detention hearing, the judge denied you bond, correct?

22   **A.** Correct.

23   **Q.** And your lawyer explained to you that because of

24   your lengthy history of failing to appear, your violation

25   of conditions of supervised release, the active warrants

*15-20652; USA v. EUGENE FISHER, ET AL*

1    and the hundreds of pills that you had in your possession

2    at the time of your arrest, your prior convictions for

3    assaulting police officers, giving a false name that he

4    wasn't going to let you out on the streets, correct?

5    **A.**   The judge?

6    **Q.**   Yes.

7    **A.**   Yes, sir.

8    **Q.**   Okay.  So after you were denied bond you had a

9    conversation with your lawyer, Mr. Morris, correct?

10   **A.**   Yes, sir.

11   **Q.**   And you were telling him I've got to get out of

12   here, I've got to get out of here, right?

13   **A.**   No, that's not --

14   **Q.**   I've got to get out on bond?

15   **A.**   No, that's not what I'm telling him.  He informed me

16   that if I did cooperate that doesn't mean I was going to

17   get a bond.  He told me that.  He told me it don't mean

18   you are going to get a bond because you cooperate.

19   **Q.**   Well, this conversation that you had with your

20   lawyer about cooperating, that occurred after the judge

21   denied bond?

22   **A.**   No, it did not.  I was in West Virginia when I -- I

23   was still in West Virginia when I -- it was -- I was still

24   in West Virginia or it was Oklahoma or West Virginia when

25   I talked about cooperating.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  Yeah.  So you talked about cooperating, you

2    considered cooperation, but you went in for your detention

3    hearing and you lied to your lawyer and you lied to the

4    Court?

5    **A.**  I never lied, sir.  I never spoke at the detention

6    hearing.  How can I lie?

7    **Q.**  You lied to your lawyer.  You told him -- didn't you

8    tell your lawyer that you were not a gang member?

9            **MR. WECHSLER:**  Objection, Judge.  He's

10   getting into conversations with him and his lawyer.

11           **THE COURT:**  The question has been withdrawn.

12           **MR. H. SCHARG:**  Well, it's not because a

13   lawyer made those --

14   **BY MR. H. SCHARG:**

15   **Q.**  The conversations you had with your lawyer, your

16   lawyer argued those facts to the Court, didn't he?

17           **MR. WECHSLER:**  Objection, Judge.  He's

18   getting into conversations with his lawyer.  If he wants

19   to argue what's on the record, that's fine, but anything

20   he talks about with his lawyer is privileged.

21           **MR. H. SCHARG:**  Fine.  I'll withdraw the

22   question and move on.

23   **BY MR. H. SCHARG:**

24   **Q.**  You heard your lawyer argue that you were not a gang

25   member, right?

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **A.**  I don't recall what he argued.

2      **Q.**  You recall, don't you, that your lawyer said that

3  you did not possess firearms?

4      **A.**  He probably argued it.

5      **Q.**  Did you hear your lawyer argue that you had strong

6  ties to this area because you had seven children?

7      **A.**  I remember him arguing a bunch of stuff, sir.

8      **Q.**  Did you hear your lawyer argue that you had not been

9  aware of the indictment when you were arrested?

10     **A.**  I wasn't aware of the indictment in February.  I was

11  aware of it in March.  I knew.

12     **Q.**  I'm talking about the detention hearing

13  November 14th of 2016.  You said you became aware of the

14  indictment in March of 2016, right?

15     **A.**  Yeah, I was aware of the indictment since March.

16     **Q.**  Well, I'm talking about November 14th, 2016.  Were

17  you present when your lawyer argued that you should be

18  released on bond because you were not aware of the

19  indictment when you were arrested in August of 2016?

20     **A.**  I don't recall him saying that.

21     **Q.**  Well, after, after this detention hearing where you

22  were denied bond, your lawyer set up a proffer or a

23  meeting with you and the government two weeks later,

24  November 29, 2016, right?

25     **A.**  Yes, sir.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **Q.**  And you said you sat down there for three hours,

2    four hours with the government?

3    **A.**  Yes, sir.

4    **Q.**  Who was present at that meeting?

5    **A.**  Me, my lawyer and the government.

6    **Q.**  Okay.  The government.  We have got a big

7    government.  Who in the government sat down at that

8    meeting?

9    **A.**  Two agents and the attorney.  Two agents and an

10   attorney.

11   **Q.**  Got you.  We're narrowing it down now.

12   **A.**  Yes.

13   **Q.**  Who are the two agents?

14   **A.**  One of the agent sitting behind you, and the other

15   agent is -- I don't remember his name, last name.

16   **Q.**  What about the government attorney?

17   **A.**  It was the -- it was USA -- I forgot his name.

18   **Q.**  Okay.  And before you sat down for this meeting

19   there were some ground rules, weren't there?

20   **A.**  Yes, sir.

21   **Q.**  That you had to be 100 percent honest?

22   **A.**  Yes, sir.

23   **Q.**  Which was nothing that you were known for, correct?

24            **MR. WECHSLER:**  Objection.

25

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1    BY MR. H. SCHARG:

 2        Q.  You didn't have a reputation for honesty before

 3    that, did you?

 4                MR. WECHSLER:  Objection.

 5    BY MR. H. SCHARG:

 6        Q.  You had to be 100 percent honest?

 7        A.  Yes, sir.

 8        Q.  Okay.  You had to volunteer information?

 9        A.  Yes, sir.

10        Q.  You had to answer all the questions?

11        A.  To the best of my ability.  Do the best I can.

12        Q.  You had to provide all of the information that was

13    asked of you, correct?

14        A.  No, that's not true.  That didn't -- it was not --

15    you making it seem like they made me say stuff.  It was

16    not like that.

17        Q.  All right.  You sat down for at least three hours,

18    right?

19        A.  At least two or three hours, yes, sir.  Two

20    and-a-half, three hours.

21        Q.  And during that time the name of Eugene Fisher came

22    up, correct?  Yes?

23        A.  Did the name of Eugene Fisher come up?  What do you

24    mean by the name, like what is you saying?

25        Q.  November 29th, the first proffer, the first time you
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1     met with the government for these three hours did you talk

2     about Eugene Fisher?

3         **A.**  I don't recall.  If it's in the paper, I did.

4         **Q.**  Well, would it refresh your memory if I showed you

5     the paper?

6         **A.**  Yes, sir.

7         **Q.**  Okay.  I'll show you the paper.  I'm going to ask

8     you to look at -- you can look at as much as you want, but

9     I'm specifically going to be asking you about the

10    highlighted sections of Pages 1 and 2.

11        **A.**  Uh-huh.

12        **Q.**  And this is the FBI 302 report dated -- date of

13    entry 2-10 of '17, okay?

14        **A.**  Uh-huh.

15            All right.

16        **Q.**  Okay.  Do you see there where you discuss Fes?

17        **A.**  Uh-huh.

18        **Q.**  Said that you went to school with Fes?

19        **A.**  I never said I went to school with Fes.

20        **Q.**  Okay.  Well, you lived in the neighborhood with Fes,

21    didn't you?

22        **A.**  Why you keep -- it don't even say I went to school

23    with Fes.

24        **Q.**  Well, does it reference Wick and Fes?  Who is Wick?

25        **A.**  Wick is James.

*15-20652; USA v. EUGENE FISHER, ET AL*

1     **Q.**  And Fes is Eugene Fisher?

2     **A.**  Yes, sir.

3     **Q.**  Did you tell the agents that you sat down with and

4     the government lawyer that Wick and Fes were not about

5     gang stuff?

6     **A.**  I never -- I don't know.  I never said it.

7              **MR. H. SCHARG:**  May I approach?

8              **THE COURT:**  Yes.

9     **BY MR. H. SCHARG:**

10    **Q.**  I'm directing your attention to the bottom of Page 2

11    of 10 pages.  Do you see that highlighted area?

12    **A.**  Yes.

13    **Q.**  Will you read it to yourself?

14    **A.**  Yes, sir.

15    **Q.**  And is that what you -- did you tell that to the

16    agents?

17    **A.**  I did if it's written down, but I don't think they

18    wrote it down right.  I don't know.

19    **Q.**  All right.  Well, you read what was written down.

20    **A.**  It say, "Smoke --

21    **Q.**  In your playground voice, please.

22    **A.**  Huh?

23    **Q.**  Read it in your playground voice.

24    **A.**  What you mean by "playground voice"?

25    **Q.**  Like if you are in a strip club.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    **A.**  I'm not mumbling.  I'm reading the paper.

2    **Q.**  Can you read it out loud?

3            **MR. WECHSLER:**  Judge, he can't read it out

4    loud.  It's hearsay.  He can use it to refresh his

5    recollection if he doesn't know it, then he can answer the

6    question posed to him.

7    **BY MR. H. SCHARG:**

8    **Q.**  Let me ask you this.  By the way, Agent Ruiz, he was

9    in the room at the time you were interviewed, correct?

10   **A.**  Yes, sir.

11   **Q.**  Okay.  And did you tell Agent Ruiz that Wick and Fes

12   were not about gang stuff?

13   **A.**  I told him, I told him Smoke was not about gang

14   stuff.  I don't know why they wrote Wick and Fes.  Wick

15   and Fes been in gangs all their life.

16           **THE COURT:**  All right.  I think we're going

17   to break for the day, and I'll see you tomorrow morning.

18               (Jury out at 12:57 p.m.)

19               (Proceedings adjourned at 12:57 p.m.)

20                     **-   -   -**

21             **C E R T I F I C A T I O N**

22       We, Ronald DiBartolomeo and Sheri Ward, official

23   court reporters for the United States District Court,

24   Eastern District of Michigan, Southern Division, appointed

25   pursuant to the provisions of Title 28, United States

*15-20652; USA v. EUGENE FISHER, ET AL*

1   Code, Section 753, do hereby certify that the foregoing is

2   a correct transcript of the proceedings in the

3   above-entitled cause on the date hereinbefore set forth.

4

5   s/ Ronald DiBartolomeo                    07/26/2018
    Ronald DiBartolomeo                       Date
6   Official Court Reporter

7

8   s/ Sheri K. Ward                          07/26/2018
    Sheri K. Ward                             Date
9   Official Court Reporter

10                          -    -    -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                  *15-20652; USA v. EUGENE FISHER, ET AL*