UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

*vs*.

        Case No. 15-cr-20652
        Hon. George Caram Steeh

COREY BAILEY (D-4),
ROBERT BROWN, II (D-6),
ARLANDIS SHY, II (D-13),
KEITHON PORTER (D-19),

        Defendant.

_____

## DEFENDANTS' MOTION FOR A NEW TRIAL
## BASED ON NEWLY DISCOVERED EVIDENCE
## AND REQUEST FOR AN EVIDENTIARY HEARING

The Defendants move this Honorable Court for a new trial under Fed. R.

Crim. P. 33(b)(1), and the Sixth Amendment to the U.S. Constitution, based on

newly discovered evidence of juror bias, impartiality, and extraneous prejudicial

information tainting the deliberations.

The Defendants alternatively move for an evidentiary hearing under *Remmer*

*v. United States*, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954).

**BRIEF IN SUPPORT OF**
**DEFENDANTS' MOTION FOR A NEW TRIAL**
**BASED ON NEWLY DISCOVERED EVIDENCE**
**AND REQUEST FOR AN EVIDENTIARY HEARING**


**FACTS**

The Defendants named in this Motion were charged in the Sixth Superseding Indictment (Doc. 812) with multiple counts. After trial, the jury returned its verdict on August 27, 2018, finding the Defendants guilty of multiple counts.

Here, based on newly discovered evidence, the defense is arguing that one of the jurors, "Juror V," [1] deliberately omitted truthful answers to voir dire questions about her bias against gang members, her personal knowledge of facts in the case, her reliance of facts not in evidence, and her exposure to media reporting about the Seven Mile Bloods. In her answer to the jury voir dire questionnaire, Juror V stated that she did not know anyone who ever had a dispute with any member of a gang, and she stated that she did not have any views or opinions or any other reason why she could not be objective and impartial in this particular case. (Juror V Sealed Questionnaire, Doc. 1-16, Pg ID 3274).

---

[1] The jurors are referred to by random letters to preserve anonymity, and the attached juror Affidavits have been redacted to remove identifying information. The unredacted originals are in the possession of Defense Counsel.

Juror V was part of the initial jury panel bought in on June 5, 2018, that heard all of the void dire opening comments of counsel, the questioning of other potential jurors, and the comments and questions posed by this Court. (Voir Dire Trans., Doc. 1302, Pg ID 17175). Nevertheless, Juror 391 failed to reveal her biases when called to the jury box and questioned by the Court. (Voir Dire Trans, Doc. 1303, 17236-238).

After trial and the verdict was entered, a juror, "Juror F," contacted a defense attorney in this trial group because she believed that inappropriate and misleading influences occurred during deliberations. (Exhibit A - Affidavit of Juror F). Juror F states that she wrote a letter to this Court, but when she did not receive a response, she contacted Defense Counsel Craig Daly to notify him about Juror V's statements during deliberations. *Id*.

According to Juror F, Juror V told the jury that she lived adjacent to the "red zone," described at trial, and that she was very familiar with that area. *Id*. Juror V stated that she had seen Seven Mile Bloods graffiti painted on buildings either in her neighborhood or in the adjacent neighborhoods. *Id*. Juror V repeatedly stated that although she did not know the Defendants personally, "it was guys like them that were ruining the neighborhood." *Id*.

As an influence on the jury deliberations, Juror V accused other "suburban" jurors as being naive and uninformed because they did not understand what really

went on in the Detroit neighborhoods such as the red zone neighborhood or her neighborhood, as she did. *Id.* When it was pointed out to Juror V that the jury was obligated to judge the case based on the facts and evidence introduced at trial, she responded that these guys (Defendants) need to burn because of what gangs are doing to the city. *Id.* Juror V had strong opinions regarding gangs, and she was not interested in discussing how the facts applied to the law, such as whether the Seven Mile Bloods were even an enterprise. *Id.*

There was one incident during deliberations where the location of a strip club came up, and Juror V stated that she knew of the club, that it was at a certain location based on her knowledge of the neighborhood. *Id.* However, it was never stated in the trial where the club was, but Juror V used that outside information to try to influence the jury. *Id.* Juror V had strong feelings about the case and made it clear that the Defendants "had to go down" because of their gang activity. *Id.*

At one point in the deliberations, the voices got loud, and Juror F even pounded on the table. *Id.* A Marshal came into the jury room and told them they could be heard in the courtroom and to quiet down. *Id.* The Marshal was white, somewhat tall with some facial hair. *Id.* While Juror F felt it was somewhat embarrassing to be told to quiet down, the Marshal's intrusion did not affect Juror F, but it may have had an impact on some of the other jurors. *Id.*

It appeared that Juror V and another Juror, "C," read the Detroit News article about the Seven Mile Bloods because in jury deliberations they were stating facts about the Seven Mile Bloods that were not presented in evidence, and after the trial, Juror F read the article, confirming how Jurors V and C obtained those "facts." Juror V was able to assert disproportionate influence over the other jurors because she claimed to know things first hand. *Id*. Only an evidentiary hearing would determine whether they, in fact, read the Detroit News article.

After Defense Counsel spoke with Juror F, another juror, "Juror L," was contacted.

Juror L corroborated Juror F's accusations about the jury deliberations being inappropriate or defective. (Exhibit B - Affidavit of Juror L). When the jury was hung, Juror L stated that the jury was told by the Court that the jury had to go back to deliberate and reach an unanimous verdict, either guilty or not guilty. *Id*. The jury was left with the impression that staying "hung" was not an option. *Id*. After a few more days of deliberations, none of the jurors changed their mind so the jurors who were in favor of not guilty changed their votes to guilty believing that there was no other way. *Id*.

Juror L also confirmed that Juror V said she lived adjacent to the red zone and was familiar with that area. *Id*. Juror V spoke from personal experience about how those types of guys, meaning the Defendants, were ruining the neighborhood.

*Id*. When the jury told Juror V that the jury was supposed to decide the case based on the evidence that was presented, Juror V reminded everybody that she lived in the area as opposed to the suburbanites who did not understand Detroit neighborhoods. *Id*.

In one instance, the jury was discussing the evidence and the 007 strip club came up. *Id*. Juror V stated that she knew for a "fact" where it was located, and Juror L thought she was wrong. *Id*. Juror L did not believe it was ever presented in evidence where the strip club was located. *Id*.

It seemed to Juror L that Juror V had a personal interest in this case because she lived in a nearby neighborhood and had seen Seven Mile Blood graffiti on buildings around her neighborhood. *Id*. Juror V was able to influence the other jurors regarding facts or information that was not put into evidence. *Id*.

Juror V confirmed that, without a juror asking for assistance, a Marshal came into the jury room during heated deliberations. *Id*. Juror L stated that he was not influenced by the Marshal's entry, but he could not say how much it affected other jurors since the next day the jury was quieter. *Id*.

## ARGUMENT

Under Rule 33 of the Federal Rules of Criminal Procedure "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(1).

The fair trial right secured by the Sixth Amendment guarantees that an accused is entitled to "trial[] by an impartial jury." U.S. Const. amend. VI. The Supreme Court has held the right to jury trial in criminal cases "fundamental to our system of justice." *Duncan v. Louisiana*, 391 U.S. 145, 153-54, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968). The right to a jury trial presupposes "an absolute right to a fair and impartial jury." *Id.*

The United States Supreme Court has held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias. *Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 945 (1982).

A district court also "has an obligation to investigate a colorable claim of external influence on the jury to determine whether any external influence occurred and, if so, whether it was prejudicial." *United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017)(citing *Remmer v. United States*, 347 U.S. 227, 229-30, 74 S. Ct. 450, 98 L. Ed. 654, 1954-1 C.B. 146 (1954)).

In this case, the Defendants argue that Juror V was impartial and biased against him, and that she deliberately answered the voir dire questions in a way to hide and omit her bias and impartiality.

For a juror's nondisclosure of bias during voir dire to warrant a new trial, a defendant must show that (1) the juror "failed to answer honestly a material question on voir dire," and (2) "a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 78 L. Ed. 2d 663 (1984).

Where the juror's omission was unintentional, a defendant must show "actual bias," but where the omission was intentional, bias may be inferred. *Zerka v. Green*, 49 F.3d 1181, 1186 (6th Cir. 1995) (quoting *United States v. Patrick*, 965 F.2d 1390, 1399 (6th Cir. 1992)).

Here, the defense presents the affidavits and testimony of two jurors, Juror F and Juror L, to show not only that Juror V was biased and intentionally omitted her unfair impartiality during voir dire, but that she injected her alleged personal knowledge of facts, facts not in evidence, and apparently relied on a Detroit News article about the Seven Mile Bloods during deliberations (which another juror, Juror "C," did as well).

A juror may testify about whether extraneous prejudicial information was improperly brought to the jury's attention, or whether an outside influence was improperly brought to bear on any juror. Fed. R. Evid. 606(b)(2).

Information "derive[d] from a source external to the jury" is generally "deemed extraneous" and therefore falls within Rule 606(b)'s exceptions. *Warger v. Shauers*, 135 S. Ct. 521, 529, 190 L. Ed. 2d 422 (2014)(internal quotation marks omitted). Examples of extraneous influence include a jury's consideration of facts not introduced in evidence, or newspaper articles and media attention. *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998)(citing *United States v. Thomas*, 463 F.2d 1061 (7th Cir. 1972)). See also *United States v. Swinton*, 75 F.3d 374, 381 (8th Cir. 1996) (jury's discussion of the defendant's prior conviction, evidence of which had not been introduced at trial, was "extraneous prejudicial information"); *Hard v. Burlington N. R.R.*, 812 F.2d 482, 485-86 (9th Cir. 1987) (juror's knowledge of a party's settlement practices was extraneous), abrogated on other grounds by *Warger*, 135 S. Ct. 521, 190 L. Ed. 2d 422; *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 214-15 (6th Cir. 1982) (testimony that a juror conducted improper experimentation was admissible under Rule 606(b) and required reversal).

In *English v. Berghuis*, 900 F.3d 804 (6th Cir. 2018), the United States Sixth Circuit decided a habeas case originating from a Michigan state conviction. The

petitioner was convicted of third-degree criminal sexual conduct after a jury trial and sentenced to prison. *Id*. at 807. After the verdict was entered, a member of the jury, Juror A," revealed at a hearing that her father had sexually abused her at age eight; however, she had not disclosed that information during voir dire. *Id*. at 807, 815.

At voir dire, the trial court told the jury venire that a defendant has the right to a trial by an impartial jury who "must be free as humanly possible, from bias, prejudice, or sympathy for either side." *Id*. During voir dire, Juror A had heard other venire members report that they had suffered sexual abuse; she saw that those jurors took part in a conference with the court outside the presence of the other jurors; and, she understood that those jurors were subsequently excused for cause. *Id*. at 808, 813-814.

The trial court's statements to the venire included a question about being a "victim or accused of a crime," and another question underscoring that the case was about criminal sexual conduct. *Id*. at 814. In addition, the prosecutor asked if "anyone just because of the type of case it is, is going to have trouble sitting on this case?". *Id*. The court also asked about experiences that might affect impartiality:

> [W]e need to find out if you have any opinions or personal experiences that might influence you for or against the prosecution, the defendant, or any witnesses. One or more of these things could cause you to be excused, in this particular case, even though you may otherwise be qualified as a juror. The questions may probe deeply into your attitudes, beliefs, and experiences. They are not meant to be an unreasonable prying into your private life. The

law requires that we get this information so that an impartial jury can be chosen.  [*English*, 900 F.3d at 814.]

The Sixth Circuit Court of Appeals held that the juror had deliberately omitted material information during voir dire, and that a finding of bias could be inferred. *Id*. at 817. That is, the petitioner had met the U.S. Supreme Court's test in *McDonough*, showing not only that there was a material omission, but "that a correct response would have provided a valid basis for" a for-cause challenge. *Id*. (citing *McDonough*, 464 U.S. at 556).

This case involves the same facts relevant to the decision in *English*. The introduction to the juror's questionnaires put the prospective jurors on notice that "[t]he purpose of these questions is to determine whether prospective jurors can impartially decide this case based upon the evidence presented at trial and the instructions on the law given by the presiding judge," and "[y]ou are sworn to give true and complete answers." (Juror V Sealed Questionnaire, Doc. 1-16, Pg ID 3261). "Please answer each question as fully and completely as possible. Your complete candor and honesty is necessary so that both the prosecution and the defense will have a meaningful opportunity to select an impartial jury." *Id*. at 3261-62. "The jury in this case will be asked to listen to the evidence presented in court and make their decision based ONLY on the evidence they hear in court." *Id*.

at 3263. "You must answer truthfully and honestly and will be asked to affirm that you did so at the end of the questionnaire under penalty of perjury." *Id*.

Some of Juror V's answers to the questionnaire violated the spirit of full and complete disclosure that was required. Juror V stated that she did not know anyone who was a member of the Seven Mile Bloods or that she did not know anyone who had a dispute with any gang member; however, she failed to disclose that she knew of the Seven Mile Bloods and gangs like them, and that she knew how gangs had ruined her neighborhood. *Id*. at 3274 (# 40, 42).

Juror V denied that she or anyone she knew had an experience with a gang, and she denied that she had "any views or opinions or any other reason why [she] could not be objective and impartial in this particular case" due to gangs and the charged distribution of drugs. *Id*. at 3274-75 (# 43, 48).

Juror V denied that she had heard anything about this case or the people involved, and whether or not she had made up her mind about the Defendants' guilt. *Id*. at 3275-76 (# 50A, C, D). And Juror V stated that she would not do any research on the internet concerning the case. *Id*. at 3278 (# 59).

In court, the jury panel was immediately notified about the reasons for voir dire and their individual obligations to disclose material information about themselves:

THE COURT.  The questions asked during this process are meant to find out if you know anything about the case. Also, we need to find out if you have any opinions or personal experiences that might influence you for or against the prosecution, the defendant or any of the witnesses in the case. [Voir Dire, Doc 1301, Pg ID # 16819.]

\* \* \*

The case that brings you here today is a criminal case which involves allegations of a racketeering enterprise, alleging that the Seven Mile Bloods and -- as a racketeering enterprise, has engaged in certain racketeering activity . . . . All six of the defendants who are here today are charged with being members or associates of the Seven Mile Bloods . . . . [*Id.* at 16821-822.]

Juror V also heard the defense attorneys question a number of jurors about their strong, negative opinions about gangs and rap music—that the jurors associated gangs with violence, drugs, and have an overall bad image keeping those jurors from being impartial. (Voir Dire, Doc 1301, Pg ID # 16896-897; 16922; 16937-938; 16954-955). Those jurors who had a bias against gang members were excused for cause. *Id*. at 16956, 16960 (Jurors 23, 148, and 184); and Voir Dire, Doc. 1302, Pg ID # 17018 (Juror 171)).

One defense attorney told the panel that "I looked at some of your questionnaires, and we all -- a lot of you come from different areas around the state, and I have some real concerns as to whether you have biases that could spillover to you not being able to look at this evidence without being affected by your biases. Can you render a fair and impartial verdict? (Voir Dire, Doc. 1301, Pg ID # 16915-916).

Because of the defense's concern about impartiality toward gang members, one defense attorney repeated the request for revealing any biases: "After all of the questions that the government asked and we all asked, does anybody now have a reason or opinion that they could not sit and be impartial in this case? *Id*. at 16954.

Later, the Court questioned jurors about being exposed to any news coverage of this case, noting that "That's, again, information outside the confines of the courtroom." (Voir Dire, Doc. 1302, Pg ID # 17027). Initially, the parties agreed to excuse for cause any juror who had been exposed to the media coverage. *Id*. at 17026-029. Three jurors were excused, but then brought back to the panel to assess their media exposure if any of those jurors happened to be called to the jury box. *Id*. at 17029, 17032-033, 17038. One of those jurors initially excused, Juror 307, was later excused for cause because of her exposure to the media story. (Voir Dire, Doc. 1303, Pg ID # 17137-143.

A juror who had a family member murdered from gang activity was also excused for cause. (Voir Dire, Doc. 1302, Pg ID # 17055-056).

Juror V was called to the jury box at the end of the second day of void dire, but she was not questioned until the following day. *Id*. at 17175. Before being questioned by the Court, Juror V again heard other jurors questioned about gang related bias. *Id*. at 17096, 17170. One juror saw gang related "scenes" while living in Chicago, and another had a nephew convicted for violent crimes who lived on

the East side of Detroit and was familiar with the Seven Mile Bloods name. *Id*. at

17170. The second juror who knew the name of the Seven Mile Bloods was

excused for cause. *Id*. at 17171.

When Juror V was called to the box, the Court engaged in the following voir

dire questioning:

> THE COURT:  And you heard the other questions asked of the perspective jurors?
> JUROR NO. 16:  Yes.
> THE COURT:  And based on those questions, is there any information that you feel should be brought to our attention?
> JUROR NO. 16:  No.  [Voir Dire, Doc. 1303, Pg ID # 17326.]

*   *   *

> THE COURT:  Okay. Anything about the nature of the case that raises concerns for you?
> JUROR NO. 16:  No.   [*Id*. at 17237.]

As soon as the Court was finished with its questions, a defense attorney

immediately questioned another juror about being exposed to any outside

information about the case, giving Juror V a final notice that her bias and media

exposure were material:

> MR. H. SCHARG:  In reference to this case, you indicated that you had some reference to serious allegations in this case. Have you read anything about this case?
> JUROR NO. [**]:  No, I haven't.
> MR. H. SCHARG:  Have you heard anything other than what you heard in the court about this case?
> JUROR NO. [**]:  No, I haven't.   [*Id*. at 17239.]

Just as in *Ewing v Berghuis, supra*, it was made clear to Juror V that her biases, personal knowledge, and exposure to the media article were material and she had an obligation to disclose them.

Here, Juror V lived near the red zone and personally knew about its significance to the case a relation to gang violence. (Ex. A)(Ex. B). She had witnessed what she considered to be the destructive effects of gang activity in her neighborhood, including the Seven Mile Bloods' graffiti, and she believed that people like the Defendants in this case were ruining the neighborhood, they needed to burn and "had to go down." *Id*. Juror V also openly refused to decide the case based on the evidence presented, excusing herself from that obligation in front of the other jurors, because she had personal knowledge of the area, gangs, and Detroit neighborhoods, and the other suburbanite jurors did not. *Id*.

Juror V claimed personal knowledge about the location of the 007 strip club, openly relying on and referring to her personal knowledge during deliberations. *Id*.

Finally, Juror V and another juror, "Juror C," apparently read a Detroit News article about the Seven Mile Bloods during deliberations, and they apparently referred to those News article facts that were not presented at trial. *Id*.

Juror F and L's Affidavits demonstrate an external influence (Juror V's personal knowledge, and Juror V and Juror C's consideration of the Detroit News

article). Their Affidavits also demonstrate juror impartiality (Juror V's bias against the Seven Mile Bloods and gangs).

Juror V's bias can be favorably compared with the facts and decision in *United States v. Perkins*, 748 F.2d 1519 (11th Cir. 1984). In *Perkins*, after a hung jury and an *Allen* instruction (*Allen v. United States*, 164 U.S. 492, 501, 17 S. Ct. 154, 157 (1896), the jury returned a guilty verdict. *Id*. at 1529. Later two jurors contacted the defense attorney and indicated that the guilty verdict was not theirs, that they had been pressured by other jurors to convict, and that they succumbed to the pressure because they were physically and mentally exhausted. *Id*. One of those jurors also stated that a fellow juror who had been "especially committed to return a 'guilty' verdict" had said that he knew the defendant and had served on "some committee" with him, and failed to disclose prior civil and criminal litigation. *Id*. at 1530-31. That juror who knew the defendant also claimed that he knew where a particular person (a Dr. Scanks) lived, which was a material fact at trial. *Id*. at 1522, 1530.

The district court in *Perkins* conducted a hearing and interviewed the jurors. *Id*. at 1530. After the hearing, the district court denied the defendant's motion for a new trial. *Id*. at 1531. On appeal, the Eleventh Circuit reversed and remanded, finding that the juror's omissions during voir dire warranted a presumption of actual bias. *Id*. at 1533.

As for the external influence, the Court found that the juror had stated during deliberations that he knew the defendant or that he had served on a committee with him, and that the juror had disputed the defendant's testimony as to where Dr. Scanks lived. *Id*. The *Perkins* Court stated that

> [e]xtrinsic evidence, evidence that has not been subject to the procedural safeguards of a fair trial, threatens such constitutional safeguards as the defendant's right of confrontation, of cross-examination, and of counsel. In addition, since such evidence has not been subject to the rules of evidence, it may confuse the jurors.
>
> When jurors consider extrinsic evidence, a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant. Prejudice from extrinsic evidence is assumed in the form of a rebuttable presumption and the government bears the burden of demonstrating that the consideration of the evidence was harmless.  [*Perkins*, 748 F.2d at 1533 (citations omitted).]

The Eleventh Circuit determined that the extraneous information might have influenced the verdict and remanded the case for a new trial. *Id*. at 1534. The juror's comments were made to a jury that was deadlocked for many hours and "made by a juror who was outspoken in his belief that Perkins should be convicted." *Id*. at 1534.

Here, the jury was similarly deadlocked, and Juror V and Juror C relied on a Detroit News article during deliberations. In *Thomas,* 463 F.2d at 1063, the Seventh Circuit found that "the district court, when presented with evidence indicating that a prejudicial news article was actually present in the jury room and,

more importantly, that it was in fact used by some jurors to persuade others, was at the very minimum required to investigate further."

Not only was the deadlocked jury apparently exposed to facts from the Detroit News article, but Juror V outspokenly maintained that her personal knowledge about gangs, Detroit neighborhoods, the red zone, and the destructive effects occurring in those neighborhoods should be relied on to support a guilty verdict. Although Juror V did not personally know the Defendants as the juror had in *Perkins*, Juror V's external personal knowledge is just as prejudicial because it was extrinsic evidence that had not been subject to the procedural safeguards of a fair trial, and threatened the Defendants' rights of confrontation, cross-

examination, and to counsel. In addition, since such evidence had not been subject to the rules of evidence, it confused the jurors, who thought that they had to vote either guilty or not guilty, and Juror V's personal knowledge evidence was a basis

for their verdict.

Juror V also deliberately omitted to tell this Court and the Defense Attorneys about her bias and impartiality against the Seven Mile Bloods based on her personal knowledge from living in or near the red zone neighborhood and seeing Seven Mile Blood graffiti, and the ruinous effects of gangs on Detroit neighborhoods. Juror V deliberately hid her bias because she had a strong motive

to convict: the Defendants "had to go down" because "it was guys like them that were ruining the neighborhood." (Ex. A).

If Juror V had been open and honest during voir dire, she would have been dismissed for cause. "At stake is [Petitioner's] right guaranteed by the Sixth Amendment to an impartial jury; the principal way this right is implemented is through the system of challenges exercised during the voir dire of prospective jurors." *Hughes v. United States*, 258 F.3d 453, 457-58 (6th Cir. 2001)(citations omitted).

A defendant may obtain a new trial if an impaneled juror's honest responses to questions on voir dire would have given rise to a valid challenge for cause. *McDonough*, 464 U.S. at 556. Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias." *Hughes*, 258 F.3d at 457-58 (6th Cir. 2001)(citing *Virgin Islands v. Felix*, 569 F.2d 1274, 1277 n.5 (3d. Cir. 1978)).

Pursuant to the Sixth Amendment, for a finding of juror impartiality when a juror is challenged for cause, the relevant question is "did the juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed." *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984).

Here, Juror V's bias was not challenged by the Court or the Defense Attorneys because they did not know about it. Juror V did not protest her impartiality against the defense's questioning, which would have definitely occurred had the defense known about Juror V's biases.

Should Juror V's impartiality be presumed or believed?  No.  Any claim that she was impartial should not be believed because she could not set aside her opinion that the Defendants "had to go down" because "it was guys like them that were ruining the neighborhood." (Ex. B). She was personally affected by the Seven Mile Bloods, and her bias and impartiality denied the Defendants a fair trial.

The facts and legal argument in *Ewing v. Horton*, No. 17-2485, 2019 U.S. App. LEXIS 3528 (6th Cir. Feb. 5, 2019)(see attached unpublished opinion), a very recent Sixth Circuit Court of Appeals decision, support the requirement of holding a *Remmer* hearing in this case. In *Ewing*, the defendant was convicted in the Michigan state courts for murder and other charges arising from a gang-related shooting. *Id*. at 2. The victim and two other passengers were members of a gang known as the Knock Out Boys, and the defendant allegedly belonged to the rival Hustle Boys. *Id*. at 2-3. The prosecution's theory was that the shooting was part of a feud between the gangs. *Id*. at 3. On the second day of deliberations, the jury was deadlocked, but the court charged them to continue deliberations. On the fourth day the jury found the defendant guilty. *Id*.

Two months later, a juror filed an affidavit accusing two other jurors of

conducting internet research about the case and discussing their findings during

deliberations. *Id*. at 1. That juror swore the following in her affidavit:

> 5. [Juror #13] discussed Facebook look up information during deliberations.
> [Juror #13] brought up information regarding Mr. Ewing's and Mr. Searcy's
> past. [Juror #13] said she saw on Facebook a picture of Mr. Ewing and a girl
> with the caption "Mr. and Mrs. Nasty" and had brought to the juror's
> attention that she had read an [sic] eulogy online for J.B. Watson.

> 6. [Juror #5] brought up during juror deliberations that she had googled gang
> information and knew about gang codes and that gang activity involved
> killing people.

> 7. [Juror #5] also said during deliberations that gangs have a pecking order
> according to information she googled at home. She went on to say that
> Darrell Ewing was at the top of the pecking order. That would put Tyree
> Washington at the bottom and the gang decided to sacrifice Tyree
> Washington by setting him up as the fall guy for the murder. According to
> [Juror #5], the above information was based on what she had read on line
> [sic] regarding the history of gangs on the goggle web site [sic].  [*Ewing*,
> 2019 U.S. App. LEXIS 3528 at 4.]

The defendant in *Ewing* exhausted his state appeals and filed a timely

petition for writ of habeas corpus claiming he was denied his constitutional rights

to a fair trial and an impartial jury because of the jury's consideration of extraneous

facts. *Id*. at 6. The district court found that the defendant had "shown that the

internet information may have tainted the jury," but that the actual effect of the

extraneous information was unknowable without an evidentiary hearing. *Id*. at 6-7.

The district court granted the defendant's petition and ordered the State to afford a new trial. *Id*. at 7.

The Sixth Circuit and the parties in *Ewing* agreed that the defendant had been "unconstitutionally denied an opportunity to prove that he was actually prejudiced by the use of outside internet research." *Id*. 7-8. The Sixth Circuit Court stated that

> the Byrnes affidavit states that the jury learned of and discussed outside information about the defendant, the murder victim, and the activities and internal power-dynamics of gangs. **Such information had a clear potential for tainting the jury**. The State has accordingly made the reasonable concession on this appeal that it was contrary to established law for the state court to deny Ewing an opportunity to show the actual effect that the information had on the jury. (Emphasis added.) [*Ewing*, 2019 U.S. App. LEXIS 3528 at 7-8.]

The same circumstances requiring an evidentiary hearing exist in this case. Juror F and L's Affidavits show that Juror V injected an extraneous influence and bias in the deliberations, that is, Juror V's bias and personal knowledge of gangs in the red zone, the crimes and harm that they cause, and her personal knowledge obtained from media articles. Under *Ewing, supra*, the Defendants are entitled to an evidentiary hearing.

WHEREFORE, the Defendants move this Honorable Court for a new trial; or, alternatively, for a *Remmer* evidentiary hearing with the deliberating jurors subpoenaed by the Court for testimony.

Dated: February 11, 2019


Respectfully submitted by:

*/s/Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Arlandis Shy
615 Griswold, Suite 810
Detroit, MI 48226
(313) 963-4311
mmag100@aol.com

*/s/John T. Theis*
JOHN T. THEIS
Co-Counsel for Arlandis Shy
190 South La Salle Street, Suite 520
Chicago, IL 60603
(312) 782-1121
Theislaw@aol.com


*/s/Craig A. Daly, P.C.*
CRAIG A. DALY, P.C. (P27539)
Attorney for Corey Bailey
615 Griswold, Suite 820
Detroit, Michigan 48226
(313) 963-1455
4bestdefense@sbcglobal.net

*/s/Keith A. Spielfogel*
KEITH A. SPIELFOGEL
Co-Counsel for Corey Bailey
190 S. LaSalle St., Suite 520
Chicago, Illinois 60603
(312) 236-6021
spielfogel@sbcglobal.net


*/s/James L. Feinberg*
JAMES L. FEINBERG (P13341)
Attorney for Robert Brown II
28411 Northwestern Hwy., Suite 875
Southfield, MI 48034
(248) 353-0600
jlfdefense@mindspring.com

*/s/Steven E. Scharg*
STEVEN E. SCHARG
Attorney for Keithon Porter
615 Griswold, Ste. 1125
Detroit, MI 48226
313-962-4090
scharg1924@gmail.com

**Certificate Regarding Concurrence**

I certify and affirm, in compliance with E.D. Mich. LR 7.1(a)(2)(A), that there was a conference between the attorneys of record in which the movant explained the nature of the motion or request and its legal basis and requested but did not obtain concurrence in the relief sought.

By: s/*Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Defendant Shy (D-13)

**CERTIFICATE OF SERVICE**

I certify that on February 11, 2019, I electronically filed the above *Motion*, with the Clerk of the Court using the CM/ECF system.

By: s/*Mark H. Magidson*
MARK H. MAGIDSON (P25581)
Attorney for Defendant Shy (D-13)