```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3   UNITED STATES OF AMERICA,

 4            Plaintiff,
                                          HON. GEORGE CARAM STEEH
 5
       v.                                 No. 15-20652
 6
     BILLY DARRELL ARNOLD, ET AL.,
 7
              Defendants.
 8   _____/

 9
                          STATUS CONFERENCE
10
                       Thursday, May 5, 2016
11
                          10:28 a.m.
12

13   APPEARANCES:

14     For the Plaintiff:        CHRISTOPHER GRAVELINE
                                  MICHAEL C. MARTIN
15                                RAJESH PRASAD

16     For Defendant Arnold:     ERIC K. KOSELKE
                                  MARIA P. MANNARINO
17
       For Defendant Arthur:     JOHN M. MCMANUS
18
       For Defendant Fisher:     HENRY M. SCHARG
19
       For Defendant Bailey:     KEITH A. SPIELFOGEL
20                                JOHN R. MINOCK

21     For Defendant Graham:     MICHAEL A. RATAJ

22
       (Appearances continued)
23

24           To Obtain Certified Transcript, Contact:
           Leann S. Lizza, CSR-3746, RPR, CRR, RMR, CRC
25                         (313) 234-2608
```

```
 1   APPEARANCES (Continued):

 2      For Defendant Brown:        JAMES L. FEINBERG

 3      For Defendant Gooch:        CHRISTOPHER M. SEIKALY

 4      For Defendant Rogers:       DAVID I. LEE

 5      For Defendant Patterson:    BERTRAM L. JOHNSON

 6      For Defendant Owens:        JAMES W. AMBERG

 7      For Defendant Adams:        RYAN MACHASIC

 8      For Defendant Shy:          CARL JORDAN

 9      For Defendant Lovejoy:      VINCENT J. TOUSSAINT

10      For Defendant Fitzpatrick:  HENRY M. SCHARG (standing in
                                     for Patrick M. Cleary)
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**TABLE OF CONTENTS**

                                                                Page

  Status conference                                             4


Exhibits:                                                   Received

  (None offered.)

4

**STATUS CONFERENCE**

```
 1                              May 5, 2016
 2                              Detroit, Michigan
 3                      -   -   -
 4      (Call to order of the Court, 10:28 a.m.)
 5      (Court and Counsel present.)
 6          THE COURT:  Good morning.  So from the government's --
 7          MR. GRAVELINE:  Yes, Your Honor.  Good morning.  Chris
 8   Graveline, Michael Martin and Raj Prasad appearing on behalf of
 9   the United States.
10          THE COURT:  Okay.  Welcome.
11          MS. MANNARINO:  Would you like us in order?
12          THE COURT:  Yeah, I suppose so, huh?
13          MS. MANNARINO:  All right.  Good morning.  Maria
14   Mannarino appearing on behalf of Billy Arnold, defendant number
15   one.  Also with me is learned counsel.
16          MR. KOSELKE:  Eric Koselke.
17          THE COURT:  Okay.
18          MR. MCMANUS:  Good morning, Your Honor.  John McManus
19   on behalf of Steve Rumeal Arthur, D2.
20          MR. SCHARG:  Your Honor, Henry Scharg appearing on
21   behalf of Eugene Fisher and standing in for panel attorney
22   Patrick Mc -- Cleary appearing on behalf of Diondre
23   Fitzpatrick, number 15.
24          MR. MINOCK:  Good morning.  If it please the Court,
25   John Minock appearing on behalf of Cory Bailey.
```

**USA v. ARNOLD, ET AL., 15-20652**

STATUS CONFERENCE

1          MR. SPIELFOGEL:  Also, Keith Spielfogel appearing on

2    behalf of Mr. Bailey.  Good morning, Your Honor.

3          THE COURT:  Welcome.

4          MR. RATAJ:  Good morning, Your Honor.  Mike Rataj

5    appearing on behalf of defendant number 5, Quincy Graham.

6          MR. FEINBERG:  James L. Feinberg, attorney for

7    number 6, Robert Brown, II.

8          MR. JOHNSON:  Good morning, Your Honor.  May it please

9    the Court, Bertram Johnson appearing on behalf of Devon

10   Patterson, defendant number 10.

11         MR. SEIKALY:  Good morning, Your Honor.  Christopher

12   Seikaly.  I represent Jerome Gooch, defendant number 7.

13         MR. AMBERG:  Good morning, from way back here, Your

14   Honor.  It's good to see you.  Jim Amberg on behalf of

15   defendant 11, Christopher Owens.

16         MR. LEE:  Good morning, Your Honor.  David Lee

17   appearing on behalf of Michael Rogers, who is defendant

18   number 8 who you know is not present here in court today.

19         THE COURT:  Right.

20         MR. MACHASIC:  Good morning, Your Honor.  Ryan

21   Machasic on behalf of defendant 12, Jeffery Adams.

22         MR. JORDAN:  Good morning, Your Honor.  Carl Jordan

23   appearing on behalf of defendant number 13, Arlandis Shy,

24   seeking to substitute in.  The current attorney is Kimberly

25   Lewis.

USA v. ARNOLD, ET AL., 15-20652

STATUS CONFERENCE

```
1              THE COURT:  I see.  Okay.  Has a substitution been --
2              MR. JORDAN:  I was going to do that this morning.
3              THE COURT:  All right.  Fine.  There are a couple
4   missing.  Is that --
5              MR. GRAVELINE:  Yes.  I believe it's Mr. Toussaint is
6   missing for defendant number 14, Anthony Lovejoy, Your Honor.
7              THE COURT:  All right.  And have we heard from
8   Mr. Toussaint?
9              MR. PRASAD:  Yes.  Raj Prasad, Your Honor.  I just
10  spoke with him a couple of minutes ago.  He's on his way.  He's
11  about five minutes away.
12             THE COURT:  Okay.
13             MR. SCHARG:  I don't know if Mr. Graveline wants to
14  inform the Court, there's also defendant number 9 Derrick
15  Kennedy, who is not in custody yet.
16             MR. GRAVELINE:  That's correct.  He has yet to make an
17  initial appearance on the indictment.  We wanted to set the
18  status conference since we have all but one of the defendants
19  who have made their initial appearance.  And so even though the
20  speedy trial clock hasn't started running because of the
21  absence of Mr. Kennedy, who we're still looking for, I thought
22  it would be a good idea to get everybody together to talk about
23  the way forward on the case, some general timelines.
24             One of the things, and I think we're all in agreement
25  on this, is that this case should be designated as a complex
```

```
 1  case under 18 U.S.C. 3161 subdivision (h)(7)(B)(ii).  And that
 2  essentially helps us with the Speedy Trial Act, allows us to
 3  push it off by several months as people begin to review the
 4  discovery in this case.  If it's agreeable to everyone -- I
 5  haven't had a chance to talk to everyone in the case about
 6  that -- I'll prepare the motion and proposed order for the
 7  Court to sign as to designated and complex case.  I think that
 8  also helps in setting budget for the Sixth Circuit with those
 9  people who are appointed.  So absent any objection --
10          THE COURT:  Is there anyone who thinks this is
11  inappropriate?
12          MR. RATAJ:  No, Your Honor.
13          MR. LEE:  No.
14          THE COURT:  All right --
15          MR. GRAVELINE:  So I'll prepare that motion.  I'll
16  circulate that to all counsel either this afternoon or first
17  thing tomorrow and we'll have that filed by the end of the week
18  here, Your Honor.
19          THE COURT:  Okay.
20          MR. GRAVELINE:  The second thing I wanted to talk
21  about a little bit was discovery.  Myself and Mr. Scharg have
22  had preliminary conversations about I believe the defense is
23  interested in having a discovery coordinator appointed as part
24  of the case as well.  Just to give the Court a general idea
25  about how much discovery we're talking about in this case, I
```

1   think my best estimate right now is going to be between 30 and

2   40,000 pages of discovery.  The reason for that, in large part,

3   is just the amount of digital discovery we have.  For example,

4   I believe there were at least 12 if not about 15 cell phones

5   seized during the initial arrest warrants done in this case.

6   When you do the physical -- or dump of those phones, which

7   we've applied for search warrants and received search warrants

8   for those phones, generally speaking those reports can be

9   anywhere from 800 to 1,500 pages long.  So I mean right there

10  is a bulk of discovery.

11         We've also applied for Facebook warrants on a number

12  of the defendants in this case.  It's been my experience in

13  prior cases that depending on how active someone is on

14  Facebook, that can stretch from less than a thousand pages up

15  to 8 or 9,000 pages in a return.  So that's why there's going

16  to be a voluminous amount of discovery in this case.

17         As you can also tell from the indictment, the

18  allegations also stretch back approximately a decade, and

19  there's a number of arrest reports, police reports, forensics

20  reports that I think are going to probably total in the

21  ballpark of a thousand to 2,000 pages just on that type of

22  information.  And that's before we get to any FBI 302s or

23  DEA 6s or anything along those lines.  So it's going to be

24  quite a bit of discovery in this case, Your Honor.  We've

25  already distributed approximately about 2,200 pages of

1    discovery to date, and we're doing it on a rolling basis but I

2    think that's one of the reasons they wanted to have a discovery

3    coordinator.

4            MR. SCHARG:  Can I interject for one second, Judge?

5            THE COURT:  Yes.

6            MR. SCHARG:  As you know, Mr. Graveline and I were

7    before the Court on my client on a separate indictment

8    arraignment on an indictment about a month ago, and we spoke

9    about the discovery coordinator.  I -- you're familiar with

10   Chris Anton who is my coordinator in the Herman Johnson murder

11   case.  And he's been involved in a number of other

12   multi-defendant prosecutions in different courts, and I took it

13   upon myself.  I am going to be filing a motion for budget on

14   behalf of all CJA panel attorneys with the exception of the

15   death-eligible group of Mr. Arnold and Mr. Bailey, and so then

16   we can get things started.  I anticipated his approval as the

17   discovery coordinator.  So he has already started coord -- you

18   know, the process with the discovery coordinator for the

19   government.  And, in fact, we have put on the cloud all the

20   discovery to date and have made that accessible to all the

21   lawyers in this case.  And I believe it's more than a couple

22   thousand.  In terms of Mr. Fisher himself, there's almost 5,000

23   pages of social media in addition to the several thousand pages

24   that we have received to date.  But what will happen, so when

25   the Court gets the motion, is that the discovery coordinator,

STATUS CONFERENCE

10

```
 1    Chris Anton, will be working directly with the government and

 2    every time there's any dissemination of any material, put it on

 3    the cloud for everyone.  There will be two files in the cloud;

 4    one file for each defendant, which will be the group discovery

 5    that's to be shared, and a separate file in the cloud

 6    exclusively for that defendant.

 7            And at this point in time, until we hear otherwise,

 8    everyone in this case, meaning the death-eligible attorneys,

 9    the general pack of CJA, you know, attorneys for the RICO

10    charges and retained counsel will be able to share in that

11    discovery which will be efficient for the court.  And it really

12    doesn't -- it does not involve any additional man hours for us

13    to put on the cloud for retained counsel and I think it just

14    will allow everything to run more efficiently for both the

15    government, for us and for the court.

16       (Mr. Toussaint entered the courtroom.)

17            THE COURT:  Okay.  A couple of questions, when the --

18            MR. GRAVELINE:  Your Honor, I don't mean to interrupt

19    your train of thought, but I just want to put on the record

20    that Mr. Toussaint has entered the courtroom on behalf of --

21            THE COURT:  Good morning, Mr. Toussaint.

22            MR. TOUSSAINT:  Good morning, Your Honor.  May it

23    please this most honorable Court, Vincent Toussaint on behalf

24    of Anthony Lovejoy.  Thank you, Your Honor.

25            THE COURT:  Glad you made it.
```

STATUS CONFERENCE                                                    11

1              MR. GRAVELINE:  I apologize for that, Your Honor.

2              MR. TOUSSAINT:  And I apologize, Your Honor.

3              THE COURT:  All right.  So when this discovery is

4     essentially posted and made accessible, is it anticipated that

5     it will be reviewed on the computer?  I suppose it is

6     printable, right?  It can be printed out as well?

7              MR. GRAVELINE:  Yes, Your Honor.  And so the way that

8     we've been delivering the discovery has been on a compact disk.

9     And then I believe what we've been doing is delivering it to

10    all the defense counsel.  To date we've been doing a disk for

11    each defense counsel.  But I think what -- and correct me if

12    I'm wrong, Mr. Scharg.  What we're talking about is now we can

13    deliver that CD to Mr. Anton and he will be taking

14    responsibility of posting it to a shared cloud that all the

15    defense counsel then can access for the general discovery, the

16    things that are not client specific.  Is that correct?

17             MR. SCHARG:  Right.  And the ones that are client

18    specific he'll put on a separate file of the cloud that can

19    only be opened by that respective defense counsel.  And then

20    it's up to the defense counsel to share with their client in

21    hard copy what they want.

22             What we've done on other cases that Mr. Graveline and

23    I have is where you have people in custody, and because of the

24    voluminous nature of the discovery material, we've had

25    purchased computers, inexpensive laptops, cost about $200,

STATUS CONFERENCE

12

```
 1   Mr. Anton has put discovery material for that individual
 2   defendant.  And we have been able, with all the facilities,
 3   Midland, you know, Sanilac, St. Clair, to provide the computer
 4   to that facility and they make arrangements for the inmate or
 5   client -- slash, client to be able to view the discovery.  The
 6   only thing that we've changed is some of the social media
 7   materials cannot be put on that discovery because they involve
 8   pornographic or other objectionable material.  So in that
 9   regard, that social media stuff is going to the attorneys, you
10   know, and not on the portable, and it's up to the lawyer to
11   make arrangements to view the social media separately.
12            THE COURT:  Okay.  So are there potential benefits or
13   are there implications for billing advantages here?  I mean, do
14   you have a way of tracking the time that you're spending?
15            MR. SCHARG:  Well, I'm going to put it on my budget.
16   So no one else will have to put the discovery coordinator on
17   their budget.  He will be on my budget but everybody will have
18   access.  You know, with our budget approval, he'll just, you
19   know, everything will be billed on my budget but everyone will
20   have the same access.  And the main thing is so we don't
21   duplicate our resources.  And that's what the Sixth Circuit
22   wants, not to have everybody have individual discovery
23   coordinators.  And it's a lot of time, resources, confusion by
24   doing it any other way other than the one that we're
25   suggesting.
```

STATUS CONFERENCE                                                    13

```
 1            And I informed attorneys for Mr. Arnold and Mr. Bailey
 2    that they can, you know, share with us as much as they want,
 3    and if they're at a time where they feel that's appropriate to
 4    get their own discovery coordinator and their own budgets, they
 5    can do that but at this point in time, as of right now,
 6    everyone, every defendant, every defense counsel in this case
 7    is up-to-date with the discovery and they have it available to
 8    them on the cloud.
 9            THE COURT:  Okay.  I was thinking in terms of
10    advantages, that is there a way that this can assist the
11    lawyers in tracking time that they're spending reviewing the
12    materials --
13            MR. SCHARG:  Well, it does.  What it does is -- it is
14    because one of the things that the defense -- the coordinator
15    does is he does the OCR scanning which is the character
16    recognition.  So with the materials that I get, the 10,000
17    pages of materials, he formats it so that I can just put in,
18    you know, searchable, my client's name or an address or a date,
19    you know, parallel to the indictment and you can just go to
20    those areas instead of going to the 10, 20,000 pages.
21            So yes, it absolutely saves time for everybody.
22    Instead of going through every page of every document of
23    discovery, that way you can just key in on names, dates or
24    events that affect your client based upon the indictment or
25    other information that you have.
```

**STATUS CONFERENCE**

1          So in terms of efficiency, it's unbelievable how

2    efficient it will be.  In fact, when we get our information on

3    the cloud, when it's given to a discovery coordinator, before

4    he puts it on a cloud he will scan it so it's searchable.  So

5    if my client is involved in one count on one date, I can search

6    his name or the date or a co- -- you know, or, you know, with

7    co-defendants and that way it saves me probably -- literally

8    hundreds of hours of going through all the discovery.  So I

9    think, I wonder does that answer your question?

10          THE COURT:  Yeah, partially.

11          MR. SCHARG:  Is there something that -- the other

12   partial?

13          THE COURT:  Mr. Lee?

14          MR. LEE:  Just one thing, Mr. Graveline and I talked.

15   I just wanted to get it straight on the record.  Does that mean

16   that you're no longer going to send disks now?  Everything will

17   be placed on the cloud?  Because right now, for the record, we

18   have two disks that have been sent to defense counsel by

19   government, by the government.  Are you going to continue to

20   send disks or is eventually everything -- I'm just a little

21   confused.  I want to straighten that out.

22          MR. SCHARG:  It can send disks to everybody anyways.

23   Everybody can get their separate disks but he will put the

24   disks on the cloud.

25          MR. GRAVELINE:  Well, I mean, I don't want to

1    duplicate effort, though, either.  What I'm hearing, though, is

2    from this point forward what we're going to do is get the

3    general discovery to Chris Anton and he will post it up on the

4    cloud and that's how you will receive it.

5         MR. LEE:  So after disk two there will be no more

6    individual disks?

7         MR. GRAVELINE:  Directly to you, yes.

8         MR. LEE:  Now, if we can take up the secondary issue

9    about clients --

10        MR. GRAVELINE:  Sure.

11        MR. LEE:  -- and how the defendants are supposed to

12   get their discovery.  Each facility, as you probably know by

13   now, Your Honor, since these cases have been around these last

14   couple years, has their own distinct policies.  And I think

15   we're all just going to have to work with the Court and the

16   staff needing separate orders at separate times to get

17   discovery into the various county jails which, as you know,

18   house most of the defendants, I believe.  Some people are at

19   Milan, correct?  Mr. Rataj's client.  I don't know who else,

20   but I know there are several.  Mr. Rogers and several others

21   are in Sanilac and, I believe, Midland?  Gentlemen?

22        MR. AMBERG:  Sanilac.

23        MS. MANNARINO:  St. Clair.

24        MR. LEE:  We're going to need to be in some contact

25   with the Court.  So we can facilitate our clients to be able to

**STATUS CONFERENCE**

1   view discovery.

2          Finally, I ask Mr. Graveline, and this has happened in

3   several cases, if somehow the government can provide -- I guess

4   we can do that with Mr. An -- I'm just asking now.  Would

5   Mr. Anton then put -- maybe Mr. Scharg knows.  Would Mr. Anton

6   then put it on a separate computer for the defendants to view?

7   Would that be part of his role?  I'm asking --

8          MR. SCHARG:  Well, that's what we've done on other

9   cases, Judge.

10          MR. LEE:  Very well, Judge.  I just wanted to point

11   out that based on several other cases I've had, this stuff is

12   going to happen.

13          MR. SCHARG:  There's been other cases similar in terms

14   of the discovery outreach, and what happens is that computers

15   are provided to the discovery coordinator.  He puts on the

16   discovery for the individual defendant.  Each facility has

17   their own policy and procedure on how to provide the --

18          MR. LEE:  Right.

19          MR. SCHARG:  -- prisoner with that information.

20   Either by -- you know, there's a standard order that some of

21   the facilities want.  Others have different procedures, but

22   it's really -- it's not that complicated.  The only thing that

23   I'd like to say and step back is that some lawyers, especially

24   I think the ones on the death-eligible cases, do not want their

25   individual discovery on the cloud, so anyone who doesn't want

STATUS CONFERENCE

1    to go along with this program can, you know, you should be able

2    to opt out and have -- not the general information but the

3    individual, separate discovery material sent directly to them

4    and they can deal with it in that way separate if they wish to.

5         MR. GRAVELINE:  We have no objection to that, Your

6    Honor.  As long as they let us know that they want it directly,

7    then we can do that.

8         And the general way, when we're talking about --

9         THE COURT:  When you say it, you're talking about --

10        MR. GRAVELINE:  Client-specific discovery.

11        THE COURT:  Discovery.

12        MR. GRAVELINE:  And so just so the Court's aware, so

13   when we're talking about client-specific discovery, this has

14   been my general practice in discovery especially with these

15   cell phones and Facebooks, people have a lot on their cell

16   phones to include pictures of a whole bunch of stuff.  And so

17   what I do when I -- when we have a dump of someone's cell

18   phone, I give that specifically to that person's attorney and

19   no one else until I identify within that phone text messages or

20   other items that might be used as evidence in our case in chief

21   and then I provide that evidence to everyone at a later date in

22   a general discovery batch.

23        So when we talk about client-specific discovery, we're

24   talking about their own Facebook accounts, their own cell

25   phones that we've taken off of them.  If there is something

1   that -- if they've given statements to the police before.  That

2   stuff's going to go only to the defendant not to everybody.

3   And so that's the material that we talk about, client specific.

4              THE COURT:  Okay.

5              MR. SCHARG:  Just one more thing on that, is regarding

6   the cloud, the way it's set up now, if I'm on the cloud,

7   there's two files.  There's one file that's general and then

8   there's a second file that's defendant specific to Mr. Fisher.

9   I'm the only one that can open up the Fisher file.  No one else

10  can.  Everybody can open up a general file but the specific

11  part of the cloud is only available to myself.

12             THE COURT:  Okay.

13             MR. MINOCK:  Judge, on behalf of Mr. Bailey, we would

14  prefer that the discovery that is specific to our client not be

15  placed on the cloud and simply be sent directly to us.

16             THE COURT:  Okay.  Is Mr. Bailey one of the two death-

17  eligible --

18             MR. MINOCK:  That's correct.

19             THE COURT:  -- defendants?

20             So, yes, Ms. Mannarino?

21             MS. MANNARINO:  I'm sorry.  On behalf of Mr. Billy

22  Arnold, who is also the other death-eligible defendant, we'd

23  make that same request.

24             MR. GRAVELINE:  All right.

25             THE COURT:  All right.

STATUS CONFERENCE

19

```
 1          MR. GRAVELINE:  Anyone else?  No?  Okay.
 2          Then we'll do that, Your Honor.
 3          THE COURT:  Okay.
 4          MR. GRAVELINE:  The other issue I wanted to address
 5   today is the death-eligible count and the death-eligible
 6   defendants, and so that is Mr. Arnold and Mr. Bailey at this
 7   point.  And I say at this point because we are still
 8   investigating and I don't think I've made it any secret to
 9   anybody that we're still investigating approximately five or
10   six other murders involved in this case.
11          But this is the government's plan in terms of the
12   death-eligible defendants.  It is our plan for the
13   U.S. Attorney's recommendation to go to the capital case
14   section at Main Justice by no later than October 31st of this
15   year.  So that's approximately six to seven months out from the
16   date of the indictment.  If people want additional time, if
17   either one of the defense want additional time, we're
18   definitely willing to listen to that request, but I think six
19   or seven months might be enough time and I also think it would
20   behoove everyone since it's an election year, change of
21   administration, to get this resolved before the end of the year
22   while this administration is still in place just because once
23   you have the changeover, once you have a new inauguration, who
24   knows when the new Attorney General is going to be sworn in.
25   And then we just enter into a limbo state after January, 2017.
```

USA v. ARNOLD, ET AL., 15-20652

STATUS CONFERENCE

```
 1   So I think it's in everybody's best interest to try to resolve
 2   that before we enter that limbo state of January, 2017.  And so
 3   that's why we're picking that time frame.  And like I said,
 4   we're willing to listen to, you know, if people want additional
 5   time, but that's our thinking at least from the outset here.
 6        THE COURT:  All right.  How does that strike, again,
 7   the two death penalty-eligible --
 8        MR. SPIELFOGEL:  Your Honor, as to Mr. Bailey, I
 9   totally agree with the second part of what the U.S. Attorney
10   said.  It would be in our interest most likely to have this
11   determined during the current administration for several
12   reasons and also not to put it in limbo for whatever period it
13   would be.
14        The problem is that six or seven months would be
15   cramming it.  It generally takes longer than that.
16        THE COURT:  You're assembling litigation evidence?
17        MR. SPIELFOGEL:  You're exactly right, Judge.  You're
18   interviewing, getting numerous witnesses, getting numerous
19   records, and I would say in the cases I've been involved in
20   we've never actually gotten it done in six or seven months.  We
21   will put a special emphasis on this and attempt to meet that
22   timeline, but I wouldn't be surprised if we have difficulty in
23   doing that.
24        THE COURT:  Okay.
25        MR. SPIELFOGEL:  Okay.
```

STATUS CONFERENCE

```
 1            THE COURT:  All right.  I assume that applies to both?
 2            MR. KOSELKE:  Yes.  On behalf of Mr. Arnold, Your
 3     Honor, I've never had a case that we were able to complete that
 4     quickly, but I would concur with Mr. Spielfogel.
 5            THE COURT:  It's worth a try?
 6            MR. KOSELKE:  We would place a special emphasis.  I
 7     concur with other prior statements.  It would be best, in
 8     everybody's interest, to get this before the current
 9     administration --
10            THE COURT:  All right.  Yeah, because otherwise it's
11     going to kick over a considerable period, I agree --
12            MR. GRAVELINE:  And just from the government's point
13     of view, and I've had discussions with several defense counsel,
14     and just in terms of the severability of the death-eligible
15     defendants and whatnot, at least from the government's
16     perspective, especially with racketeering charge, RICO
17     co-conspiracy, the murders that we're talking about already and
18     are already charged are going to be presented during -- doesn't
19     matter which defendant goes to trial, doesn't necessarily have
20     to be Mr. Bailey, Mr. Arnold, we believe those murders are
21     going to be relevant.  So I think it's premature to talk about
22     severance, you know, just because they are death-eligible
23     defendants because I think that -- the evidence of those
24     murders is going to be coming in during any type of trial here
25     and that's why we're also trying to move as quickly as possible
```

USA v. ARNOLD, ET AL., 15-20652

STATUS CONFERENCE

1   understanding that we're dealing with the timelines of 15

2   defendants not just two defendants.

3           THE COURT:  Okay.  All right.

4           MR. GRAVELINE:  Other than that, I think that's all

5   that the government had in terms of this status conference,

6   Your Honor.  We'll prepare the motion and order on the complex

7   case.  If anyone else has anything?

8           THE COURT:  Anyone?

9           MR. GRAVELINE:  And then part of the motion, I'll

10  propose to the Court and to counsel is we'll pick a date, maybe

11  about four months out, that maybe we'll meet again and maybe at

12  that point also insure that all the defendants are here and

13  then we'll talk about speedy trial and speedy trial waivers at

14  that point.

15          THE COURT:  Okay.  Counsel?

16          MR. JOHNSON:  Yeah, Judge.  With respect to the

17  discovery and the dissemination of discovery, it's come to my

18  attention with respect to my client, Devon Patterson, who is

19  currently being housed at Livingston County, it also came to my

20  attention that in another mega case there's another prisoner

21  that is being housed at the Livingston jail and they have been

22  kept under maximum security since they've been there.  It's my

23  understanding that they've been given almost a couple hours out

24  of the day and their access to the computer has been limited,

25  if any, to the library or the computer.  I know I could take

23

```
 1    that up with the marshal, but I don't want to call the marshals
 2    and be -- and ask for them to assist me.  If we're here in
 3    court, I think there may be a problem, and I thought since
 4    we're here I might address that because it might only be with
 5    respect to my client, but that particular facility with the
 6    voluminous amount of discovery coming in, I think that may have
 7    to be addressed and I'm asking for the assistance of the Court
 8    as well as the government in dealing with that.
 9              THE COURT:  Well, any ideas of your own on how that
10    might be dealt with?  So you have a computer-literate client at
11    least?
12              MR. JOHNSON:  Yes, yes.  That's no problem.  It's just
13    having access.
14              THE COURT:  Access.
15              MR. JOHNSON:  And in some instances, if they were here
16    and a marshal was here, the Court could have words with the
17    marshal in chambers and sometimes they'll address that, but
18    since no marshals are here today, I'm open for suggestions and
19    I will follow up too.
20              THE COURT:  Okay.
21              MR. LEE:  Your Honor, in my experience, I think
22    getting an order from this Court is usually what does the
23    trick.
24              THE COURT:  Yeah.
25              MR. LEE:  And once you get the order, the marshals and
```

STATUS CONFERENCE

1   everybody is bound to listen to you.  And I will say that most

2   of our clients based on discovery are highly literate when it

3   comes to computer use.

4           THE COURT:  Really?

5           MR. LEE:  Based on discovery.  I don't know that for a

6   fact.

7           MR. SCHARG:  I'll send Mr. Bertram a standard order to

8   allow computers in and he can work with Mr. Anton on how to

9   best do it.

10          Is his client in federal custody or --

11          MR. JOHNSON:  Yeah, federal, Livingston.

12          MR. SCHARG:  Yeah.  Once you get the order, it's

13  really not going to be a problem.

14          THE COURT:  I see.  It may be helpful to have orders

15  for all 15?

16          MR. SCHARG:  Well, once we get the computer -- you

17  know, the first thing is for a lawyer to get the computer, if

18  that's how they want to do it, and then he can put all the

19  information on and with the order you send it to the facility.

20  It's happened so many times it's really -- is not going to

21  be -- it shouldn't be an issue for anybody at any of the

22  facilities.

23          THE COURT:  I see.

24          MR. LEE:  Judge, as I mentioned before, some of the

25  institutions have slightly different requirements.

STATUS CONFERENCE

```
 1              MR. SCHARG:  Right.
 2              MR. LEE:  And that's really the only difference, but I
 3    got a feeling any order you give them they're going to comply
 4    with.  I've never seen them not in the several cases like this
 5    that we've done.
 6              THE COURT:  So is it a shared sentiment among the
 7    lawyers that we really don't have to worry about whether these
 8    individual defendants are going to be able to navigate the
 9    computer to review this material?
10              MR. SCHARG:  It's pretty simple.  All you have to do,
11    Judge, the way it's formatted, is the computer will only have
12    the discovery material.  All you got to do is touch a button
13    and I don't know of anyone who's had any difficulty in getting
14    it done.  Really is -- I think we're --
15              THE COURT:  Okay.
16              MR. SCHARG:  -- worrying about things that don't
17    exist.  The only question I have is right now we really -- when
18    are we going to get -- are we going to get any substantive
19    materials within the next four months?
20              MR. GRAVELINE:  We're working on it.
21              MR. SCHARG:  Okay.
22              MR. GRAVELINE:  And then the -- that just reminded me.
23    At present there's no protective order on the discovery, on the
24    general discovery that we've given out.  If we believe that
25    there is some material that is going to be subject to a
```

STATUS CONFERENCE

1   protective order that we don't want disseminated to anyone's

2   client but only for attorney review, first we'll coordinate

3   with defense counsel and also minimally seek their concurrence

4   and then come with a motion, but at this point there's no

5   protective order and I don't think there's -- needs to be one

6   right now for the general discovery.

7           THE COURT:  Okay.  Well, I know that Mr. Scharg, you

8   asked for the opportunity to talk about budget for -- among the

9   defense counsel.  Obviously not with --

10          MR. GRAVELINE:  We can leave.

11          THE COURT:  -- the government.  But if there's --

12          MR. SCHARG:  We're going to present the order to the

13  Court under seal and if the Court has any questions, then we

14  can meet at that time.

15          THE COURT:  I see.  Okay.  All right.

16          MR. SCHARG:  I think you know enough of the case now

17  that we don't have to sit down and tell you that it's

18  complex -- you know, since we got the stipulation.  We're going

19  to present a group order.  I'm going to file a motion with all

20  the CJA attorneys, you know, so it will be one motion under

21  seal and then if you have any questions, we can sit down with

22  you.  Otherwise, we'll hope you sign it and get the ball

23  rolling so we can do what we have to do to represent our

24  clients.

25          THE COURT:  All right.  Anything else anyone thinks

1   should be addressed today?

2            MR. GRAVELINE:  Nothing from the government, Your

3   Honor.

4            THE COURT:  Thank you very much.  Waiting for the

5   order to come in.

6            MR. LEE:  Thank you, Your Honor.

7            MR. SCHARG:  Thank you.

8            THE COURT CLERK:  Please rise.  Court's in recess.

9       (Proceedings concluded, 11:00 a.m.)

10                          -   -   -

11                 CERTIFICATION OF REPORTER

12

13      I, Leann S. Lizza, do hereby certify that the above-entitled

14   matter was taken before me at the time and place hereinbefore

15   set forth; that the proceedings were duly recorded by me

16   stenographically and reduced to computer transcription; that

17   this is a true, full and correct transcript of my stenographic

18   notes so taken; and that I am not related to, nor of counsel to

19   either party, nor interested in the event of this cause.

20

21

22   S/Leann S. Lizza                                4-15-2019

23   Leann S. Lizza, CSR-3746, RPR, CRR, RMR          Date

24

25