1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3

4    **UNITED STATES OF AMERICA,**

5                    Government,
                                        **HONORABLE GEORGE CARAM STEEH**
6          v.
                                        **No. 15-20652**
7    **D-3 EUGENE FISHER,**
     **D-4 COREY BAILEY,**
8    **D-6 ROBERT BROWN,**
     **D-10 DEVON PATTERSON,**
9    **D-13 ARLANDIS SHY,**
     **D-19 KEITHON PORTER,**
10
                    Defendants.
11   _____/

12                        **MOTION HEARING**

13                   **Monday, June 18, 2018**

14                      -    -    -

15   APPEARANCES:

16   For the Government:          JULIE FINOCCHIARO, ESQ.
                                  MARGARET SMITH, ESQ.
17                                WILLIAM SLOAN, ESQ.
                                  MARK BILKOVIC, ESQ.
18                                Assistant U.S. Attorneys

19
     For the Defendants:         HENRY M. SCHARG, ESQ.
20                               On behalf of Eugene Fisher

21                               CRAIG DALY, ESQ.
                                 KEITH SPIELFOGEL, ESQ.
22                               On behalf of Corey Bailey

23                               JAMES FEINBERG, ESQ.
                                 On behalf of Robert Brown
24
                                 BERTRAM JOHNSON, ESQ.
25                               On behalf of Devon Patterson

```
 1                                    MARK MAGIDSON, ESQ.
                                      JOHN THEIS, ESQ.
 2                                    On behalf of Arlandis Shy

 3                                    STEVEN SCHARG, ESQ.
                                      On behalf of Keithon Porter
 4

 5                              -    -    -

 6

 7             To Obtain Certified Transcript, Contact:
           Ronald A. DiBartolomeo, Official Court Reporter
 8            Theodore Levin United States Courthouse
             231 West Lafayette Boulevard, Room 1067
 9                  Detroit, Michigan  48226
                        (313) 962-1234
10

11         Proceedings recorded by mechanical stenography.
          Transcript produced by computer-aided transcription.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I  N  D  E  X

2  _____ Page

3  Motion hearing                                              4

14                       E  X  H  B  I  T  S

15  Identification_____Offered    Received

16

17                      N      O      N      E

18

19

20

21

22

23

24

25

                  15-20652; USA v. EUGENE FISHER, ET AL

1               Detroit, Michigan

2               Monday, June 18, 2018

3

4                 -   -   -

5          **THE CLERK:**  Case Number 15-20652 United

6     States versus Billy Arnold et al.

7          **THE COURT:**  Good morning.  Okay.  So we had a

8     couple of developments that needs to be addressed, and how

9     would you like to proceed?

10         **MR. H. SCHARG:**  Should we put appearances on

11    the record?

12         **THE COURT:**  Yes.

13         **MR. H. SCHARG:**  Henry Scharg on behalf of

14    Eugene Fisher.  Well, women first.

15         **MS. SMITH:**  Thank you, your Honor.  Good

16    morning.  Maggie Smith, Julie Finocchiaro, Billy Sloan and

17    Mark Bilkovic for the United States.

18         **THE COURT:**  Good morning.

19         **MR. H. SCHARG:**  Government first, right?

20         **MS. SMITH:**  Either way.

21         **MR. H. SCHARG:**  Henry Scharg on behalf of

22    Eugene Fisher.

23         **MR. JOHNSON:**  Good morning, your Honor.  If

24    it please the Court, Bertram Johnson on behalf of Devon

25    Patterson.

*15-20652; USA v. EUGENE FISHER, ET AL*

1              **THE COURT:**  Good morning.

2              **MR. DALY:**  Good morning.  Craig Daly on

3    behalf of Corey Bailey.

4              **THE COURT:**  Welcome.

5              **MR. SPIELFOGEL:**  Also Keith Spielfogel for

6    Mr. Bailey.

7              **THE COURT:**  Welcome.

8              **MR. FEINBERG:**  James L. Feinberg, attorney

9    for Robert Brown, II.

10             **THE COURT:**  Good morning.

11             **MR. THEIS:**  Good morning, your Honor.  John

12   Theis, one of the attorneys for Arlandis Shy.

13             **MR. MAGIDSON:**  Good morning, your Honor.

14   Mark Magidson on behalf of Arlandis Shy.

15             **MR. S. SCHARG:**  Good morning.  Steven Scharg

16   on behalf of Mr. Porter.

17             **THE COURT:**  Welcome.

18             **MR. H. SCHARG:**  Can I say something before we

19   start?

20             **THE COURT:**  Yes.

21             **MR. H. SCHARG:**  Thank you.  We had a pretrial

22   last week, pretrial motions, and I made a motion for

23   severance, and I have -- I respect the Court's ruling, but

24   what's been festering me all week was that the Court made

25   a reference to an in camera or in chambers discussion that

                *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1    we had --
 2                 THE COURT:  Right.
 3                 MR. H. SCHARG:   -- where the Court said that
 4    Mr. Scharg was given the opportunity to ask for a
 5    severance, and that I denied or rejected that, and it kind
 6    of put us in opposition in terms of your recollection of
 7    the meeting the conference and what I told the Court, and
 8    inferred that maybe I was misleading the Court or I was
 9    dishonest with the Court, but I just want to clarify one
10    thing.
11            It wasn't me that was directed to.  It was Mr.
12    Feinberg who was asked whether he wanted a severance,
13    because if the Court remembers, Mr. Feinberg's learned
14    counsel had to step down because of health reasons, and
15    the Court asked Mr. Feinberg whether Mr. Feinberg wanted
16    want a severance.  Never, ever did I tell the Court that I
17    didn't want one.
18            I don't think it has any impact and it didn't have
19    an impact on the Court's decision, but it had an impact on
20    my credibility with this Court, and I just wanted to
21    clarify that because it didn't happen that way the Court
22    recollected.  Obviously, it has no impact on the Court's
23    decision to deny my motion, but I didn't want the Court to
24    believe in any way that I would at any point in time say
25    something to the Court to mislead the Court or be not
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1   true.

2               **THE COURT:**  I never thought you did.  So I

3   accept your version, in fact, of the conversation, and

4   it's quite possible that I was thinking you when I

5   addressed a question to Mr. Feinberg.

6               **MR. H. SCHARG:**  I understand how you can get

7   Mr. Feinberg and I confused.  We definitely look alike.

8               **THE COURT:**  I think the major point was that

9   I was inviting people to ask if they were interested in

10  severance, and the only one that I heard from was Mr.

11  Swor.

12              **MR. H. SCHARG:**  And again, my recollection at

13  that point in time, I also did not directly demand, but I

14  have made my position known, but the issue was whether I

15  specifically said I didn't want a severance, and that was

16  Mr. Feinberg and not myself.

17              **THE COURT:**  Right.  Thank you.

18              **MR. JOHNSON:**  Judge, if I may quickly with

19  respect to that status conference?

20          For the record I would like to indicate that this

21  Court did ask a number of us.  You, in fact, asked me, and

22  I responded in the waiver of my client being present in

23  the status conference, and me moving forward with that

24  answer I said no, I could not accept it, and I just want

25  to make that for the record.  Even if I felt that

*15-20652; USA v. EUGENE FISHER, ET AL*

1   severance might have been a reasonable position to take

2   legally, my client informed me that he would not want to

3   put that trial date back.

4           Again, I want to also address the renewal of

5   myself severance motions with the motions that have come

6   into being over the last few days, motion in limine.

7           Again, for the record, I may believe that my

8   client should be severed from this group for reasons

9   stated that you will hear, but again, for the record,

10  since we're talking about severance, I want to make it

11  clear that my client, again, has instructed me under no

12  reason -- under no certain terms that does he want to have

13  his date moved.

14          **THE COURT:**  Okay.  Thank you, Mr. Johnson.

15          All right.  So which of the new issues do we wish

16  to address first, and who's going to --

17          **MS. SMITH:**  Well, your Honor, I believe they

18  are defense motions.  So as I understand it, what's up

19  today has to do with the motion regarding the lineup.  I

20  think it's Robert Brown's motion, Number 1061, and then

21  the other motion is Number 1063, which is defendant Shy's

22  motion in limine to preclude Corey Bailey's video recorded

23  statements.  So whatever one the Court wants to hear

24  first, it is the defense motion.

25          **THE COURT:**  Why don't we do the lineup

*15-20652; USA v. EUGENE FISHER, ET AL*

1   question first.  Who will be addressing that?  Mr.

2   Feinberg?

3                    **MR. FEINBERG:**  Good morning, your Honor.

4                    **THE COURT:**  Good morning.

5                    **MR. FEINBERG:**  Last week I received a

6   notification, a telephonic notification that a new witness

7   against Mr. Brown was going to be offered.  The following

8   day I received a report that is attached to the

9   government's response.  I then filed the motion to

10  suppress the photographic lineup identification by Jesse

11  Gaskin, or in the alternative conduct an evidentiary

12  hearing.  I submitted the motion in brief, cited facts and

13  law, but what I want to highlight is the various court's

14  rulings as to identification and photo.

15           In 2006, Mr. Gaskin's name was in a police report

16  taken at the time of the shooting.  His name has been in

17  the report for 12 years.

18           On the 13th of June of this year is when the

19  investigators in this case decided to reinterview some of

20  the names that were in the report.  One witness was

21  interviewed in May.  Mr. Gaskin was interviewed in June.

22  Mr. Brown was in custody.  The government wanted to show a

23  photographic array to Mr. Brown.

24           First and foremost, because Mr. Brown was in

25  custody and he had counsel, the proper procedure would

*15-20652; USA v. EUGENE FISHER, ET AL*

1    have been to have a live lineup with his attorney present.

2    That was not done.  That was the choice of the government.

3    The government chose to interview Mr. Gaskin and show him

4    six photos.

5         Now Mr. Gaskin 12 years prior, again, was not

6    interviewed, and gave no identification because he was not

7    questioned.  We don't know from the report --

8         **THE COURT:**  So how do we know from that --

9    from that report is that he was present --

10        **MR. FEINBERG:**  Correct.

11        **THE COURT:**  -- at the time of the incident?

12        **MR. FEINBERG:**  Correct.

13        **THE COURT:**  No details were elicited at that

14   time?

15        **MR. FEINBERG:**  None.  So last week the

16   identification that Mr. Gaskin gave of the shooter was --

17   that the decease was dark skin, black man, and that the

18   shooter was a lighter skin black man, clean cut, gave some

19   kind of description of the clothing.

20        **THE COURT:**  Specific description, right?  I

21   mean, white T-shirt, black pants or --

22        **MR. DALY:**  Right, but he indicated in the

23   report that he was not 100 percent sure of the clothing

24   because of the amount of time that went by.

25        The proper procedure of a photographic array is to

*15-20652; USA v. EUGENE FISHER, ET AL*

1     have a blind photo array.  That means the people

2     presenting the array did not know who the suspect was, and

3     this is for obvious reasons, because the Court has ruled

4     that it's possible to inadvertence that the agents who

5     knew who the defendant was and who was the target, could

6     have indicated some kind of idea to the witness who the

7     person was that they were targeting.  That's why the blind

8     array is done.  Blind, meaning that the person or persons

9     who are presenting the photo array have no idea who the

10    suspect is.

11           Further, even though it was done sequentially,

12    meaning that it wasn't all six photos in one piece of

13    paper, each photo was shown separately, but the proper

14    procedure is not to have one photo array, but to have

15    multiple photo arrays where the first group, second group,

16    third group all have different photos, and that the

17    suspect is not in two of the three, but is in only one.

18    That was not done in this particular case.

19           Also, because of modern technology, witnesses are

20    often, if not preferred, to be videoed interview, so that

21    we know -- and also the photo array is videoed -- we know

22    whether or not there is any impropriety either

23    intentionally or unintentional.

24           We don't know whether or not that was done because

25    the government who has vast technology at their fingertips

                   15-20652; USA v. EUGENE FISHER, ET AL

1    chose not to videotape the interview and photo array.  We

2    know that in 2014 they had video technology because the

3    next motion involves an interview of one of the defendants

4    that was videoed for almost four hours.  That's the proper

5    way to interview witnesses.

6          One of the items that the courts look upon is the

7    confidence level of the identification.

8               THE COURT:  Right.

9               MR. FEINBERG:  Also the time period.  We know

10   the time period was 12 years.  The confidence level in

11   this particular case is supposedly, we don't know exactly

12   the wording, but that Mr. Gaskin, upon looking at the

13   photos, saw Mr. Brown's photo and said that's him.  Later

14   his confidence level was --

15               THE COURT:  Favors.

16               MR. FEINBERG:  -- favors him.

17               THE COURT:  Right.

18               MR. FEINBERG:  Then he says it's been a long

19   time, and he wanted to be sure it was the right guy, and

20   he says it favors.  That's not a confidence level of a

21   positive identification.

22               THE COURT:  Right.

23               MR. FEINBERG:  The government says that can

24   be gone into on cross examination.  We argue that it

25   shouldn't even go that far, that Mr. Gaskin's testimony is

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    potentially so unreliable.  The government violated many

2    areas of the law in conducting the interview and the photo

3    array, that under no circumstances should Mr. Gaskin's

4    testimony be allowed.

5            In the alternative, we need to have an evidentiary

6    hearing, not necessarily as to whether or not Mr. Gaskin

7    is 100 percent positive in the identification, but an

8    evidentiary hearing as to the entire conduct of the lack

9    of Mr. Gaskin being interviewed 12 years ago, how it was

10   that he was interviewed on the 13th after the trial had

11   already started by picking a jury, three days before

12   testimony was to suppose to be taken, and whether or not

13   this Court is going to consider, based on the evidentiary

14   hearing, if the Court needs it to exclude Mr. Gaskin's

15   testimony.  The evidentiary hearing would require all of

16   the agents who participated in the interview, as well as

17   Mr. Gaskin.

18           So first we ask the Court to, based on the motion

19   and the law that the Court has that's been provided by the

20   government and the defense, and the report of Mr. Gaskin's

21   interview, to suppress Mr. Gaskin's testimony, and to

22   exclude him from testifying.

23           **THE COURT:**  Thank you, Mr. Feinberg.

24       For the government?

25           **MR. SLOAN:**  Good morning, your Honor.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    William Sloan on behalf of the United States.

2              THE COURT:   Good morning, Mr. Sloan.

3              MR. SLOAN:   Your Honor, I would just like to

4    begin by handing up a color photo of the lineup which was

5    referred to in the government's response brief.

6              THE COURT:   Okay.

7              MR. SLOAN:   And your Honor, Mr. Feinberg does

8    have a copy of that.

9              MR. FEINBERG:   I received it this morning,

10   your Honor.

11             THE COURT:   As I understand it, Photos 4 and

12   5 were not shown because the witness identified the person

13   depicted Number 3, is that right?

14             MR. SLOAN:   That's actually incorrect, your

15   Honor, and I think it is an important factual point.  The

16   way this photo array played out was that -- in keeping

17   with current best practice -- the agents showed what's

18   referred to a six pack photo array, six photos, one of

19   which was of the defendant, five were filler photographs

20   of individuals of similar ethnicity and age and

21   appearance.

22        The way the agents did this was they presented for

23   each photo, they instructed the witness to look at each

24   photo, and tell us if you recognize this person.  That's

25   it.  The witness did not Photo Number 1, not Number 2.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    When Number 3 came up, which was Mr. Brown, the witness

2    said that's him.  The agents then asked a few follow up

3    questions as to how do you recognize that person.

4         Once that happened, the agents proceeded with

5    showing 4, 5 and 6, which is an important factor to show

6    that the agents were not emphasizing Photo 3, or indeed,

7    giving any feedback to the witness that he may or may not

8    picked out who the suspect was, and it is standard

9    procedure in these arrays to go through all the photos,

10   and give no feedback as whether that was the right person

11   or not so to speak.

12        Your Honor, if I may start out with a couple of

13   highlight points.

14        The defendant's motion cites two basis for

15   supression, one just to get out of the way, Sixth

16   Amendment right to counsel.  The case law is clear.

17   Whatever state practice may be, federal law is very clear

18   that while there may be a Sixth Amendment right to counsel

19   for an in person show up by the defendant or lineup, there

20   is no such similar Sixth Amendment right to counsel

21   present for a photo array, and the government referred to

22   that at the end of its brief, but I just want to point the

23   Court to the case we did not cite, which is clearly on

24   point, the Supreme Court case, United States versus Ash,

25   413 U.S. 300, which holds that in an opposed indictment,

15-20652; USA v. EUGENE FISHER, ET AL

1    photographic display, there is no Sixth Amendment right to

2    counsel present.

3            So turning to the heart of the defendant's motion,

4    which is the due process claim, as we stated in our brief,

5    your Honor, the government doesn't think we get past step

6    one here, which is that the defendant has to make an

7    initial showing, carry an initial burdensome that there

8    was some improper law enforcement conduct that was

9    impermissibly suggestive to the witness, and only then

10   does the Court need to do a further inquiry into the

11   specific facts to see if the identification was

12   nevertheless reliable.

13           And as we set forth in our brief describing the

14   procedure, the agents used almost to a "T", photo array

15   practices here, and the defense simply pointed to nothing

16   that would suggest impermissible suggestiveness by the

17   agents.

18           The only thing that Mr. Feinberg raised is the

19   fact that the agents were not, quote-unquote, blind

20   administrators, and while I think Mr. Feinberg referred to

21   what he quoted, said were what the law requires, what I

22   think he actually was referring to was what a DOJ guidance

23   manual suggests would be idea circumstances for preferred

24   procedures.  And that manual itself on the one hand does

25   suggest a blind procedure as preferable, it expressly

*15-20652; USA v. EUGENE FISHER, ET AL*

1      acknowledges that that's not always possible given

2      practical realities, time constraints, people constraints,

3      and I think that's what happened here, your Honor.

4            This witness was identified to be reinterviewed.

5      The agents involved in the trial are doing a lot of

6      witness prep and trial prep.  They went to talk to this

7      agent (sic).  They brought a photo array with them in case

8      the interview was successful, and if he remembered

9      anything.  Based on their initial start of the interview

10     that he did recall this incident, they then proceeded to

11     show him a photo array in line with customary FBI

12     practice.

13           So this simply was not a case of the government

14     intentionally avoiding doing a lineup or involving

15     counsel.  It was a practical exigency of interviewing this

16     witness this trial and the run up to trial.

17           So, your Honor, I think based on how this

18     procedure was done and the report the government attached,

19     as well as photos themselves, there's nothing the defense

20     can point to in case law that suggests anything about this

21     procedure was impermissible or suggestive to get to the

22     factor analysis under Neil v Biggers.

23           So the government would suggest that no

24     evidentiary hearing is necessary here, and in fact,

25     defense counsel can use cross examination at trial for

1    this witness, or request certain jury instructions to

2    answer his concerns.

3              THE COURT:  All right.  Thank you, Mr. Sloan.

4         Mr. Feinberg?

5              MR. FEINBERG:  May I address it from here?

6              THE COURT:  No, I think you're better off at

7    the podium.

8              MR. FEINBERG:  It's interesting the

9    government would say that the DOJ preference of having a

10   blind array wasn't done because it wasn't -- it was not

11   always possible.  Time constraints.

12        Well, all they have to do was one day later.  I

13   mean, we're not talking about it was an emergency.  All

14   they have to do is bring in agents who had nothing do with

15   the case to conduct the photo array.  That's totally

16   disingenuous on the government's part.  They caused the

17   time constraint that they're arguing that they are under.

18   Not the defense.

19        Further, what were the circumstances that

20   prevented the government from conducting a blind array?

21   They indicated no circumstances that caused them not to be

22   able to comply with the DOJ preference of conducting a

23   blind array.

24        Lastly, they never even addressed the fact that it

25   wasn't done video.  Video lineups are done all the time.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      Video interviews are done all the time.  They had the

2      equipment present like they have every minute of every

3      day.  It is totally disingenuous to say that they did what

4      they did because of the delay of their own investigation.

5      We would argue that absolutely it should be suppressed, or

6      in the alternative conduct a thorough evidentiary hearing.

7              **THE COURT:**  So how do you respond to the

8      government's argument that the Court never reaches the

9      Biggers factors if a wrongdoing is not first established?

10             **MR. FEINBERG:**  The case law that I cited,

11     your Honor, indicates that there is a suspicion of

12     impropriety if it's not done properly.  Case law indicates

13     that there is a likelihood of impropriety if it's not done

14     the proper way.

15             It wasn't done the proper way.  Therefore, there

16     is a possibility of impropriety which has to go in favor

17     of the defense since the defense did not cause the

18     impropriety.

19             Also, under the trilogy, the Wade, Gilbert,

20     Stovall back in the late 60's, indicates that where the

21     defendant is available, a live show up should be

22     conducted.  Not just state, but those were United States

23     Supreme Court cases, which is, I guess, the prosecution

24     doesn't go that far back into the late 60's to see what

25     the language of the Wade case.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1              They didn't also respond as far as why it wasn't

2       videotaped, and why they didn't have multiple arrays which

3       is always the preference.

4                   **THE COURT:**  All right.  Mr. Sloan?

5                   **MR. SLOAN:**  Your Honor, just briefly --

6                   **THE COURT:**  Tell me about, again, the

7       threshold finding that you believe needs to occur before

8       the Biggers factors are considered.

9                   **MR. SLOAN:**  The defense has to make some

10      showing that there was impermissible suggestiveness by law

11      enforcement agents, and the defense's only argument is

12      that this procedure was not done under perfect ideal world

13      scenarios laid out in the DOJ guidance manual, but that's

14      not what the law says.

15             The government laid out in its brief, the examples

16      and case law precedent that show where examples of

17      impermissible suggestiveness are much more dramatic than

18      anything that occurred here.

19             For example, in a photo array making the

20      defendant's or suspect's photograph the only color

21      photograph, and all of the others are black and white

22      calls out that photograph.

23             For instance, agents telling the witness in

24      advance the suspect is in this array, or conversely, when

25      a witness picks out a photo confirming or giving feedback

*15-20652; USA v. EUGENE FISHER, ET AL*

1          to that witness that that's the right person.

2                Those are examples of impermissible suggestiveness

3          on behalf of agents, but in the defendant's motion, he's

4          alleged no facts whatsoever of impermissible

5          suggestiveness.  All he's alleged is that in a perfect

6          world this could have been videoed and have blind

7          administrators, but that's not what the law requires.

8                **THE COURT:**  So you agree that the

9          identification here was -- let's assume for the moment

10         that we're going to address the totality of the

11         circumstances analysis, and the factors include his level

12         of certainty.  Mr. Feinberg points out that while he

13         declared his certainty initially, his last references were

14         to -- the photograph favors, and when asked to explain

15         what that means, he said looks like the person I saw.

16               **MR. SLOAN:**  Yes, your Honor.  So one point

17         that the government made in its brief, his initial

18         recognition of the photograph seems to indicate greater

19         certainty, and he certainly hedged afterwards, and there's

20         some indication case law and social science research that

21         indicates that the initial reaction should carry great

22         weight.  I believe the Manson v Brathwaite, Supreme Court

23         case, refers to that, and that fall under the -- let me

24         turn to the other factors just briefly, your Honor.

25               I think the first two factors in terms of the

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    witness' opportunity to view the suspect back in 2006 and

2    his degree of attention both weigh in favor of reliability

3    here.  The witness' explanation was he was taken a lunch

4    break in the vicinity of where --

5              MR. FEINBERG:  Objection.  We don't know.

6    That's not in the report.

7              MR. SLOAN:  Your Honor, that is in --

8              MR. FEINBERG:  The report never -- the

9    witness was never asked how long you had to look.  Were

10   you doing anything else in the meantime?  That's why,

11   number one, it should be excluded, or an evidentiary

12   hearing.  The prosecutor can't indicate what the person

13   said that was not recorded, and what you and I don't have.

14             THE COURT:  All right.  It would assist the

15   Court to have some proffer as Mr. Sloan was beginning --

16             MR. FEINBERG:  The prosecutor was not

17   present.  How can he make a proffer?

18             THE COURT:  I recognize that.

19             MR. FEINBERG:  He didn't talk to the witness.

20             THE COURT:  This is -- this maybe pertinent

21   to the Court's decision about whether to have a

22   evidentiary hearing or not.  I'm not going to be relying

23   on representations that are not in the record somewhere.

24   Go ahead.

25             MR. SLOAN:  Your Honor, so I think what's

                  *15-20652; USA v. EUGENE FISHER, ET AL*

1    captured in the report, which is what I'll limit the

2    proffer to -- and that again is attached to the

3    government's response brief -- is that this witness was on

4    a lunch break in the vicinity of where the initial fight

5    broke out between Defendant Brown and the victim, and from

6    the report it indicates the witness observed not only the

7    initial fight, from which he describes Mr. Brown's

8    appearance relative to the other person that he was

9    fighting, the ultimate victim, he then describes the

10   suspect leaving the area.  The witness was still there

11   minutes later when Mr. Brown came back with a rifle.  The

12   witness observed him go into an apartment complex, heard

13   shots, and witness was still there when Mr. Brown exited

14   the apartment complex and fled the area.

15        So while it's true the report doesn't indicate a

16   specific time amount, what is clear from the report is

17   that the witness had at least a several minute period to

18   view the suspect on several different occasions.

19        In terms of the second factor, the attention,

20   certainly observing a fight, and then watching somebody

21   come back with rifle and hearing shots is a dramatic event

22   that would draw someone's attention to these facts.

23        Mr. Feinberg's motion seems to indicate that the

24   observer had to be some type of trained observer.  That's

25   simply not the case, otherwise we couldn't have any

*15-20652; USA v. EUGENE FISHER, ET AL*

1    eyewitnesses who weren't police officers.  So I think

2    those two factors cut in favor of reliability.

3              Certainly the government can see there was quite a

4    time lapse between the 2006 shooting and the 12 year later

5    identification.  So we would not contest the fact that

6    that factor probably cuts against reliability.

7              In terms of --

8              THE COURT:  May I ask, if again, there is a

9    hearing to take place, do you have a description from --

10   there's a second witness who's been known for sometime,

11   apparently, and that person was interviewed.  Is there any

12   similarity or dissimilarity between the physical

13   descriptions of those two witnesses?

14             MR. SLOAN:  With the Court's indulgence?

15             THE COURT:  Sure.  Mr. Sloan?

16             MR. SLOAN:  I don't want to risk misspeaking.

17   I don't recall exactly if the specific physical

18   description of the suspect has similarities with the other

19   witness.  However, what I can proffer to the Court is that

20   the other witness' general description of the sequence of

21   events in terms of the fight, the return with the rifle,

22   and suspect fleeing align with this witness' account.

23             THE COURT:  Okay.  You agree that the

24   Court -- again, if we're addressing these factors, if the

25   Court is to consider the length of time between the crime

*15-20652; USA v. EUGENE FISHER, ET AL*

1 and the time of the confrontation, I guess you would have

2 to concede that, that would disfavor permitting eyewitness

3 identification?

4     **MR. SLOAN:**  Yes, your Honor.

5     **MR. DALY:**  Could you your Honor speak into

6 the microphone?

7     **THE COURT:**  Yes, I'm sorry.

8   So the Court inquired whether the government

9 agrees that the time between the crime and the

10 confrontation here is -- couldn't get much worst from the

11 standpoint of admissibility.

12     **MR. SLOAN:**  Your Honor, the government

13 concedes that this factor weighs against reliability.

14 This was a 12 year time span between the events and the

15 I.D.

16   But again, your Honor, I would point the Court

17 to -- I've already covered the first two factors -- but as

18 to Number 3 and 4, the accuracy of the description and the

19 level of certainty, I believe the report indicates that

20 the witness actually had a pretty specific description of

21 the defendant in terms of complexion relative to the

22 person whom he was fighting, clean cut.  He seems to

23 recall specific clothing, but he wasn't sure given the

24 lapse in time.

25   And again, just turning to the fourth factor,

*15-20652; USA v. EUGENE FISHER, ET AL*

1    level of certainty, the agents indicate in their report

2    that when he turned to Photo 3 in the array, he

3    immediately said that's him, and as the agents are trained

4    to do, they ask further questions to gauge the level of

5    certainty.  They document that in their report, and that's

6    certainly fair game for cross examination for counsel at

7    the trial to say, why did you back off of it, but the fact

8    remains his initial identification was immediate that

9    Photo 3 was the suspect.

10           So, your Honor, the government does think if we

11   get to the next step, Step 2, the factors would

12   nevertheless weigh in favor of reliability.

13           **THE COURT:**  And if the Court concluded that

14   the identification evidence is inadmissible, you -- that

15   doesn't go as far as Mr. Feinberg was asking the Court to

16   consider denying the witness' testimony, not permitting

17   the witness to testify at all in the case if I understood

18   his argument, and you agree that would be the appropriate

19   remedy?

20           **MR. SLOAN:**  Your Honor, I do think if the

21   Court does find there was impermissible suggestiveness,

22   and then the Court makes a further finding under the

23   Biggers factors, the statement was not reliable, then

24   that, the Court's finding, would taint the witness'

25   testimony for in court testimony.

*15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE COURT:**  On any subject?

2          **MR. SLOAN:**  Just as to the identification,

3    your Honor, and the pretrial identification photo array.

4          **THE COURT:**  All right.

5          **MR. SLOAN:**  So I don't think it is really as

6    broad as could not testify to anything, and the government

7    would consider what the scope of that would be, but as to

8    the specific photo array identification of Robert Brown, I

9    think if the Court makes a finding that it was not

10   reliable, that would taint the government attempting to

11   elicit an in court I.D. from that witness, but I can

12   proffer to the Court I don't believe the government would

13   be seeking to do that any way.

14         **THE COURT:**  So as it relates to the third

15   factor, you don't really, other than complexion and clean

16   cut, you don't have any prior description of the

17   individual from the --

18         **MR. SLOAN:**  Your Honor, if you're asking a

19   specific height or weight, no, we do not.

20         **THE COURT:**  Okay.

21         **MR. SLOAN:**  Court's indulgence?

22         **THE COURT:**  Yep.

23         **MR. SLOAN:**  Just a brief point of

24   clarification, I was conferring with one of the agents,

25   Agent Nasser who was present for the interview, what he

*15-20652; USA v. EUGENE FISHER, ET AL*

1    related to me in terms of height, the witness referred to

2    the other agent present, Agent Horvath, and indicated that

3    the suspect was about the height of that agent, and I

4    believe that agent is a little under 5-10.

5          **THE COURT:**  Okay.  Mr. Brown is how tall?

6          **MR. FEINBERG:**  My client indicates, and my

7    information is he's 6 feet 2 inches.

8          **THE COURT:**  Okay.

9          **MR. SLOAN:**  So your Honor, that's all the

10   proffer that I can tell you.  Agent Nasser is here if the

11   Court wants to hear further about the conduct or the

12   procedure.

13         **THE COURT:**  Well, I think that would probably

14   need to occur under oath in a hearing that I don't know if

15   Mr. Feinberg --

16         **MR. FEINBERG:**  Well, I would request all the

17   agents that participated in the interview, and the alleged

18   identification, as well as Mr. Gaskin.

19         **THE COURT:**  So we have Agent Horvath and we

20   have --

21         **MR. SLOAN:**  Agent Nasser.

22         **THE COURT:**  The only two?

23         **MR. SLOAN:**  Yes, sir.

24         **THE COURT:**  And had Nasser been on this

25   investigation from --

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1                    MR. SLOAN:  Yes.
 2                    THE COURT:  Okay.
 3                    MR. SLOAN:  I can get a specific answer if
 4      the Court wants, but both agents are involved in the
 5      investigation of the gang.
 6                    THE COURT:  All right.  Well --
 7                    MR. FEINBERG:   I think it is also interesting
 8      that Agents Horvath and Nasser are in the courtroom, but
 9      it certainly concerns me that they were present during my
10      argument, the government's argument and your questioning
11      of the Assistant U.S. Attorney, and they have been court.
12      So they know the areas in which my concerns are, and I
13      think that's improper for them to have been present,
14      understanding I didn't know -- I don't know who they are,
15      and that the government would not have sequestered them.
16                    THE COURT:  Okay.
17                    MR. SLOAN:  Your Honor?
18                    THE COURT:  Yes.
19                    MR. SLOAN:  Well, Agent Horvath is not here.
20      So if the Court has concerns about Agent Nasser having
21      been here for some of the factual proffer, which again,
22      was based on his report, he has not been in the courtroom.
23                    THE COURT:  All right.  Thank you.
24                    MR. SLOAN:  Thank you, your Honor.
25                    THE COURT:   If the Court gets to the totality
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    of circumstances analysis, and the consideration of the
2    five factors that are set forth in the Biggers case, the
3    weighing of those factors I think in general would lead
4    the Court to deny the admissibility of the identification
5    testimony.  That would not affect testimony from the
6    witness about his observations of the incident, but it
7    sounds as if the accuracy of the witness' prior
8    description of the criminal is -- the criminal defendant
9    in this case -- it's not that it is inaccurate, but it is
10   fairly limited in its value; that the witness' degree of
11   attention we don't really know about from the information
12   submitted so far.
13        The opportunity for the witness to view the
14   criminal at the time of the crime is -- would I think
15   slightly favor the government's claim, but again, all of
16   these factors should be considered by the Court in an
17   evidentiary hearing I think before making a final
18   assessment.
19        The level of certainty demonstrated by the witness
20   at the confrontation I think has been described here, and
21   it is -- and it starts out with a declaration of certainty
22   and ends up with something more equivocal.  The length of
23   the time between the crime and the confrontation is, of
24   course, as I indicated, is a difficult factor for the
25   government to overcome in terms of the reliability of the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    identification testimony.

2         And so at this point I'm unable to rule with

3    finality on the question of identification, but I would

4    have to say that likelihood of its being found by the

5    Court to be permissible is not so great.

6         I will, however, in order to give the government

7    fair opportunity to be heard on the subject, be willing to

8    conduct an evidentiary hearing, which may benefit the

9    Court in further consideration of these factors, or may

10   persuade the Court that there is -- I'm still not certain

11   that the totality of circumstances are only considered if

12   the Court finds that the -- there's reason to believe that

13   the process was impermissibly suggestive, because that

14   showing I think is problematic under the -- what we know

15   so far.

16        So I need to look at that aspect of the

17   government's argument to be certain as well.

18        So I guess you're not getting a final ruling

19   today, and I would leave to the government the opportunity

20   to have an evidentiary hearing if they choose to do that,

21   but I'll give you a chance to talk about that among

22   yourselves.

23        **MR. SLOAN:**  Thank you, your Honor.

24        **THE COURT:**  Okay.  All right.  So then the

25   second issue to address is the defendant Shy's motion in

1    limine to preclude Mr. Bailey's video recorded statements,

2    and so I'll hear from Mr. Magidson.

3            **MR. MAGIDSON:**  Good morning, your Honor.

4         So over the weekend we did file a motion in limine

5    to preclude co-defendant Bailey's recorded statements, and

6    or to sever him from this trial, and he can have his own

7    trial later on, or join other people, but he should not be

8    part of this case, or the statements themselves should not

9    be included as it relates to Mr. Shy.

10        So just to back up a little bit, on -- we did have

11    an opportunity late -- or one point last week to view the

12    evidence of the -- that the government was intending to

13    introduce in this matter, and I went there.  There's a lot

14    of evidence, but not 344A, which was these video clips.

15        Then later on Friday, I guess we were here on

16    motions at some point -- on Thursday -- and it was

17    revealed that there was something going on.  We didn't

18    know what because other defense counsel didn't know.

19    Ultimately, it was revealed that there is these video

20    clips, and that ultimately we would receive them later

21    that day or Friday -- I forgot which -- but nevertheless,

22    it took awhile -- a little bit to review these clips, and

23    what we received were six individual clips of purported

24    statements.  They vary in length.  They are short.  Some

25    are a minute, maybe some are 2-3 minutes, but relatively

*15-20652; USA v. EUGENE FISHER, ET AL*

1   short.

2        But at least in my view, these clips are damaging

3   and hurt Mr. Shy, and in those videos Bailey confirms that

4   the Seven Mile Bloods, you know, is as a matter of fact,

5   an organization.  He states that there's about six core

6   group members when you filter it down, not the wannabes or

7   the druggies or anything like that, but when you get right

8   down to it, there's a core of six or seven, and

9   coincidently that's who's on trial here.

10        The number being tried in Group 2 states that

11   there was a beef or a dispute with Hustle Boys, the Gutta

12   Gang, and things like that.  He names individuals who he

13   specifically thinks are enemies and who coincidentally are

14   now dead.

15        So this corroborates in many respects what the

16   government is alleging here, that these are some overt

17   acts, that these are corroborated.

18        Now we have available -- the Court has not seen

19   this obviously -- we have available, if the Court believes

20   that it would be helpful, we can play that for the Court.

21   As I said the six clips might be about eight to 10

22   minutes.  So it may be worthwhile for the Court to view

23   that.  So you will have to take my word for it.

24            **THE COURT:**  I have actually seen the clips

25   that are at issue.

15-20652; USA v. EUGENE FISHER, ET AL

1          **MR. MAGIDSON:**  Okay.  So then --

2          **THE COURT:**  I heard all the pertinent clips.

3          **MR. MAGIDSON:**  Okay.  So then as long as you

4     seen and heard that, then there's no need to rehash that.

5          So basically what we're suggesting here is that

6     this statement is not a statement made by a co-conspirator

7     or in furtherance of the conspiracy; that is, it is not an

8     exception under 801(d)(2)(E).

9          To show that it was such a statement, the

10    government has to show, number one, that the conspiracy

11    existed, the defendant was a member of the conspiracy, and

12    that the co-conspirator statements were made in

13    furtherance, but here at the time of the statement -- when

14    the statements were made, they were made not in

15    furtherance of the conspiracy, but they were made as some

16    sort of proffer to the government while he was in custody,

17    and so a person's role in the conspiracy ends with his

18    arrest, and we've cited case law to that effect.

19         Now so what we're left with then are statements

20    made by a co-defendant, a co-conspirator that's not in

21    furtherance, but yet, we have no ability to cross examine

22    that statement, and so then we have to look to Crawford v

23    Washington, and the cases cited there that provides that

24    the admission of testimonial hearsay against the defendant

25    is prohibited unless the declarant is unable to testify at

*15-20652; USA v. EUGENE FISHER, ET AL*

1     trial, and the defendant had a prior opportunity to cross

2     examine him, and so we have no opportunity to cross

3     examine him.  He is unavailable at trial because we do not

4     anticipate him testifying.

5            Further, we cited Bruton as well, which the Court

6     is familiar with.  In Bruton, we have a co-defendant whose

7     statement is being offered.  It implicates the defendant.

8     That can't -- that can't come in.

9            Now there's been some suggestion that a curvative

10    jury instruction only with regard against Mr. Bailey would

11    suffice.  We're saying that's not right.  It's not -- we

12    can't use that.  It's our position that even when the jury

13    is instructed to consider the confession only against the

14    defendant, the court in Bruton determined that the danger

15    of misuse of the confession by the jury is too great to be

16    constitutionally permissible, and we cited that as well.

17           Mr. Bailey's out of court statements support the

18    allegations that there was an organization.  It had

19    structure and purpose.  He talks about shootings of named

20    victims in the indictment.  He talks about the core group

21    of Seven Mile Bloods.  He talks about the fact that

22    they're having -- this gang is having beefs with other

23    gangs, and named names, and those people are actually

24    victims in this case, and finally, because he was in

25    custody, these were not made in furtherance.

                      *15-20652; USA v. EUGENE FISHER, ET AL*

1          So we believe that the admission of Bailey's

2     statements violates the holdings in Crawford and Bruton.

3     There is no prior opportunity to cross examine, and we

4     also believe that Bruton is instructive.  Regardless of

5     what instructions the jury might be receiving, it's going

6     to cause confusion.  It's going to cause problems, and I

7     think the only remedy as I've outlined here is number one,

8     it cannot be used against Mr. Shy in this case, and that

9     the proper remedy then is to either prohibit them, or if

10    the government -- nor if the Court is not so inclined,

11    then Mr. Bailey has to be severed from this group because

12    otherwise the -- those statements are going to be used

13    against Mr. Shy in a way that would be improper, and we

14    have no ability to cross examine Mr. Bailey on this.

15          **THE COURT:**  All right.  I guess I'll hear

16    from the other defendants.

17          **MR. H. SCHARG:**  Henry Scharg on behalf of

18    Eugene Fisher.

19          This information was disclosed to me.  I filed a

20    submission letter with the Court raising my objections.

21    When Mr. Shy's attorney filed the motion in limine, I

22    joined in on that, and I appreciate the opportunity to --

23    to add to the arguments of Mr. Shy's counsel.

24          **THE COURT:**  For purposes of your argument, we

25    can assume that the testimony is -- clearly it is

*15-20652; USA v. EUGENE FISHER, ET AL*

1      testimony, and the question ultimately for co-defendants

2      is coming down to whether they are ineluctably, whether

3      inescapable, that somehow the co-defendants individually

4      have been --

5              MR. H. SCHARG:  Prejudiced?  Judge, this

6      statement was made in 2014.  This statement has been

7      hanging out there for four years.  The first time we find

8      about this -- Mr. Fisher and I find out about this is last

9      Friday.  It's important --

10             THE COURT:  When you say find out about this,

11     you mean find out about the government's intention to use

12     the testimony?

13             MR. H. SCHARG:  No, we didn't even know about

14     the statement.  We didn't even know about the interview

15     until last Friday.  This is a pattern of trial by ambush,

16     and I would say if this was an isolated incident, it could

17     be -- it wouldn't be excusable, but it could be more

18     understanding.

19          What we have is a pattern in terms of Mr. Brown

20     with the surfacing of this identification 12 years later,

21     the dumping of Facebook materials right before the trial,

22     and then this last move by the government believing

23     that -- they are going uncheck in their power and their

24     position in this case.

25          The problem is if we look at -- I would like to

                 15-20652; USA v. EUGENE FISHER, ET AL

1    play this because it has the impact, Clip Number 2,

2    whereas during this interview -- and I can't talk about

3    the interview because we still don't have this three hour

4    proffer by Mr. Bailey.  All we were able to -- when I say

5    "we", Mr. Fisher and what I have been able to obtain are

6    these seven snippets.  The government and Mr. Bailey's

7    counsel have denied the request for us to -- for

8    Mr. Fisher and I to see the entire three hour interview.

9    So I can only speak from the seven snippets, but the

10   second snippet is the most damaging and prejudicial.

11           Please play it, Mr. Anton.

12

13                  (Video clip played.)

14

15           **MR. H. SCHARG:**  So the evidence is that the

16   government is preparing -- or requesting to present to

17   this jury by a co-defendant who acknowledges that he was a

18   member of the Seven Mile Bloods, was that there is a

19   number of peons, but the core is seven or five members.

20           This jury is going to be watching that and looking

21   at that table, and what do they see?  They see five to

22   seven defendants that are alleged to be members of the

23   core group of the Seven Mile Bloods, and I have to sit

24   there and cannot defend my client in terms of any type of

25   cross examination of that statement.

                *15-20652; USA v. EUGENE FISHER, ET AL*

1          And furthermore, I don't even know what else is in

2     that interview.  I don't know whether if during that three

3     hours plus, whether my client was ever mentioned as being

4     one of those cores, being one of the peons, whatever.

5          What I do know was that by the government sitting

6     back on this until Friday, trying this case by ambush,

7     that when this jury panel was seated, when we going

8     through the jury voir dire process, that my opportunity to

9     question the jury panel as to whether they could be fair

10    and objective, and whether they would have any bias

11    regarding this type of evidence, that ship has sailed.

12         So there has been an impact and a prejudice to my

13    client because we were not informed of this exhibit that

14    has been known to the government for four years, that they

15    sat on it for four years, and surfaces it intentionally

16    and by designed after the jury selection process.

17         I know what I think.  I know what my client

18    thinks.  I probably know what this jury will think when

19    they hear -- if they hear that clip, and you don't have to

20    be an accountant or a rocket scientist to count up to

21    five, six or seven, and during that we just sit there, and

22    we continue to sit there, and we don't get a chance to

23    challenge that in any way.

24         The government in their brief says, the Court is

25    not required to do so unless the evidence will cause

*15-20652; USA v. EUGENE FISHER, ET AL*

1    compelling specific and actual prejudice.  If that's not

2    actual prejudice, then I haven't seen it in the courtroom.

3    The fact is that my client is and will be prejudiced by

4    that snippet indicting him for being one of five, six or

5    seven core members of the Seven Mile Bloods, when the

6    government knows that he is not even a member of the Seven

7    Mile Bloods.

8              THE COURT:  Tell me how, Mr. Scharg, that

9    this sets forth ineluctably an identification of your

10   client as a member when they are going to hear the names

11   of probably all 22 defendants at one point or another

12   during the course of the trial, and why would they be led

13   inescapably to the conclusion that your client is one of

14   the members when there are 22 others to choose from?

15             MR. H. SCHARG:  Well, first of all, there

16   were 22 that were indicted.

17             THE COURT:  They were speculating.  So of

18   course, they would be instructed that they may not -- that

19   they are -- it is evidence for limited purposes to be

20   considered only for that limited purpose, and multiple

21   other instructions; that if they listen to the

22   instructions and follow the instructions, it would

23   preclude any inescapable conclusions that your client is a

24   member of the SMB.

25             MR. H. SCHARG:  First of all, not only is

                    15-20652; USA v. EUGENE FISHER, ET AL

1    there 22 indicted individuals related to the Seven Mile

2    Bloods, but there were a number of other individuals that

3    were members of SMB, who associated with SMB, and have

4    about been buried as former members of SMB.

5          The problem is is the optics, Judge.  We could

6    assume that the jury will follow the law, but what we do

7    is we have these optics.  We have these optics that the

8    jury is going to hear about six or seven core members, and

9    there's six defendants and Billy Arnold, which makes seven

10   at this table, and the reason we're at this point is

11   because the government sat back.  They hid in the woods.

12   They are conducting trial by ambush, because if they would

13   have disclosed this to us sometimes during the last four

14   years, when we picked a jury, this was probably numero uno

15   in terms of the areas we would have explored to see if

16   whether it would have any impact on the jury.

17         So instead of assuming that the Court -- that the

18   jury will follow the Court's instructions, we could have

19   had -- actually had a dialogue and questioned the jurors

20   like on other issues as to whether it would have any

21   impact upon them, and that's the whole purpose of the

22   government coming forward with this type of information

23   and evidence and exhibits, so that we can question the

24   jury in advance, and they shouldn't be rewarded for this

25   for laying back and holding back, this sitting back and

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    disclosing that after we pick the jury.

2          The horse has left the barn.  There's no way now

3    to question this jury as to any impact that would have,

4    and I suggest to the Court I don't think it should be

5    minimized that this jury is going to disregard the optic

6    of a co-defendant in this case sitting at the table with

7    this jury watching him, watching the screen, and watching

8    the defendants at this table, and this could have been

9    avoidable.  This could have been avoidable if four years

10   after the fact, but prior to the jury selection this could

11   have been disclosed to Mr. Fisher and myself.

12         I believe that the Court has two choices, you can

13   either deny the government's -- deny the government the

14   opportunity to show these clips, or sever Mr. Bailey from

15   this trial.  Thank you.

16              **THE COURT:**  Thanks.

17              **MR. FEINBERG:**  On behalf of Mr. Brown, we

18   would were able to file an inclusion to the motion, but we

19   do ask to be included in the motion, and adopt Mr.

20   Magidson's and Mr. Scharg's argument.

21              **THE COURT:**  All right.  Thank you.

22              **MR. JOHNSON:**  Same for Devon Patterson,

23   Judge.

24              **THE COURT:**  Okay.  Thank you, Mr. Johnson.

25              **MR. S. SCHARG:**  Your Honor, Steven Scharg on

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    behalf of Mr. Porter.  I filed notice of joiner with Mr.

2    Shy's attorney on this issue, and we feel it would be

3    prejudicial to allow -- for the statement to be allowed.

4              **THE COURT:**  All right.  Thank you, sir.

5         Okay.  From the government, Ms. Smith?

6              **MS. SMITH:**  Thank you, your Honor.

7         Rule 16, as you know, does not require our

8    disclosure of co-defendant statements to other defendants

9    in this trial group, but if Mr. Scharg had checked his

10   discovery, he would have seen on May 31st, three weeks

11   before -- or weeks before he started picking a jury, a 302

12   was disclosed to him that detailed the interview between

13   Bailey and law enforcement.  The 302 corresponds with the

14   video, one of the clips that you saw this morning.

15        And so he had the information in his possession

16   when we picked the jury, and I was not here for jury

17   selection, but I'm confident that these defense attorneys

18   took the time to voir dire potential jurors on their

19   ability to parse out evidence specific to their client, as

20   well as specific to other clients.

21        And so I think that issue, to the extent that he

22   complains that he didn't have an opportunity, I'm sure he

23   did take an opportunity in a general sense, but he also

24   had that specific interview in his possession by the time

25   the jury selection started.

                *15-20652; USA v. EUGENE FISHER, ET AL*

1          So I'll cut to the chase.  There's three issues

2    here, the Crawford issue, the Bruton issue and the

3    severance issue, and as we noted, we don't intend on

4    introducing defendant Bailey's against anybody except for

5    defendant Bailey, and because of that, Crawford is not an

6    issue.  It's not implicated, and we don't need to continue

7    on in the discussion.

8          If we were seeking to introduce those statements

9    as against the other defendants, then we would have

10   another problem, but we don't because we're not going to.

11         So that brings us to the next issue, which is even

12   where the defendant admits to being part of a group, as

13   what happened here, and even if those statements could be

14   helpful for us to prove a conspiracy against the remaining

15   defendants, there's still no Crawford issue, and I noted

16   cases in my brief that included specific RICO cases, and

17   that is Vasilakos, V-a-s-i-l-a-k-o-s, the Driver case, the

18   Espinoza case and the Norwood case, N-o-r-w-o-o-d, and I

19   call the Court's attention to the Norwood case because

20   that -- those facts are similarly aligned with the facts

21   that are occurring here.  So we have no Crawford issue.

22         The next question is do we have a Bruton problem?

23   We only have a Bruton problem if defendant Bailey's

24   statements implicate one of the other individual

25   defendants at the table, and that's not the case here.

*15-20652; USA v. EUGENE FISHER, ET AL*

1    The defendant does not name any particular individuals in

2    those clips, no nicknames, no characteristics, and no

3    specific identifiers that would implicate unfairly any of

4    these defendants sitting at the table.

5           Now Mr. Scharg made reference to the fact that the

6    defendant said -- talked about this core group of Seven

7    Mile Bloods being somewhere between five and seven, and I

8    would note as the Court has recognized, the Seven Mile

9    Bloods consisted of more than five to seven people, and in

10   fact, as the case progresses, we're not even alleging that

11   defendants Fisher or Porter were part of that core group.

12          We are alleging an enterprise of which all of

13   these defendants were a part of, but not just them.  There

14   are 22 individuals on the indictment, and there will be

15   dozens of names that will come up as alleged SMB members

16   during the trial.

17          So even that statement doesn't even come close to

18   being a Bruton problem, and again the cases that we cited

19   in our brief support that.

20          So because there's no Crawford issue and because

21   there's no Bruton issue, there's no basis for severance

22   here.  I don't think that there's a basis for individual

23   defendants to kick a different defendant out of a trial

24   group.  I think they can only ask for their own severance,

25   but nevertheless, the Vasilakos case talks about the

                    15-20652; USA v. EUGENE FISHER, ET AL

1    limiting instructions that are appropriate in cases like

2    this.  The jury is presumed to understand what they are

3    being instructed heeds to do, and they are presumed to

4    follow those instructions, and there's been no indication

5    that this jury is any different than any other juries.

6         So your Honor, for all of those reasons, the

7    defendants' motion should be denied.

8              **THE COURT:**  Thank you, Ms. Smith.

9         **MR. H. SCHARG:**  One point, your Honor.

10             **THE COURT:**  Yes.

11        **MR. H. SCHARG:**  And I'm trying to look at it

12   right now to verify any recollection.  We received the

13   exhibit list after it was due, but the original witness

14   list we received was on May 31, 2018.

15        My recollection and the recollection of others at

16   the table was that that exhibit regarding the 3O2

17   narrative was not on that witness list.  It was on the

18   supplemental witness list that we received last Wednesday,

19   June 12th, after the jury selection, and unless the

20   government can prove me wrong, and they have the original

21   witness list, and they point to the fact that that was

22   disclosed before jury selection, I welcome them to correct

23   me, and to support their allegations, which I think are

24   false.

25             **MS. SMITH:**  Your Honor, he's correct about

*15-20652; USA v. EUGENE FISHER, ET AL*

1    the witness list.  What he's incorrect about is he

2    received a copy of the 302, which was the report

3    indicating that this defendant had been interviewed by law

4    enforcement.  He had that information on May 31st.  We are

5    not required to select and give them copies of every

6    single exhibit that we intend to use at trial a month

7    before the jury is selected.  He had the information in

8    his hand.

9            MR. H. SCHARG:  We didn't have the exhibit

10   list.  On the original exhibit list that she referred to

11   on May 31st, we did not have the exhibit regarding

12   Mr. Bailey's 302 or any reference to the videos.  So for

13   her to make that argument to the Court that we had before

14   the jury selection is blatantly false.  We did not receive

15   that until last week after the jury was selected.

16        So that argument -- that argument, that narrative,

17   is false, and that is the most important --

18            THE COURT:  I'm trying to understand.  You

19   do -- you dispute that you got the 302 which describes the

20   statement?

21            MR. H. SCHARG:  On the exhibit list of May

22   31th.

23            MR. SPIELFOGEL:  Not only the exhibit list, a

24   witness list.  There's a witness list that was given, and

25   after that there was an exhibit list, and on the first

*15-20652; USA v. EUGENE FISHER, ET AL*

1    exhibit list that we got, it wasn't -- there was not

2    anything about Corey Bailey clips, and it wasn't until

3    after they met with the government -- and I was not able

4    to be at that because I was not here -- that's when it

5    came out, and I believe that was after the jury --

6              **MR. H. SCHARG:**  June 12th.

7              **MR. SPIELFOGEL:**  June the 12th.  So when you

8    get an exhibit list, even if you got 302's and they say

9    they are not going to use it, what is there to talk about?

10   It isn't until after the jury is picked on June 12th.

11   That's when it was first listed.

12             **MS. SMITH:**  Your Honor, defense counsel's

13   argument was that he couldn't properly voir dire the jury

14   panel because he didn't know of this interview's

15   existence.  He knew of the interview's existence.  That we

16   had not selected particular clips is of no moment.  His

17   argument that he did not know this interview existed is

18   belied by the fact that he received a 302 on May 31st.

19             **MR. SPIELFOGEL:**  Why would you get up and

20   question jurors about something that isn't on an exhibit

21   list that you don't think is going to be introduced at

22   trial?  It would be ridiculous.  You may hear testimony

23   about a clip from one of the defendants when it's not even

24   on a list.  They don't even know that there is clips.

25             **THE COURT:**  All right.  Well --

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1              **MR. MAGIDSON:**  Judge?

2              **THE COURT:**  Mr. Magidson?

3              **MR. MAGIDSON:**  So to say this evidence is not

4    going to be used against Mr. Shy is ludicrous.  The fact

5    is it is, and so --

6              **THE COURT:**  How so, Mr. Magidson?

7              **MR. MAGIDSON:**  Well, okay.  So first of all,

8    let's go to what we were talking about, this core group.

9    What I would want to be asking Mr. Bailey, sir, are you

10   referring to Mr. Shy?  Is he in the core group?  What

11   makes him a core group just because you say so?

12        I'm going to be hammering him on those issues, and

13   I'm going to be hammering him on the other issues about --

14   he talks about -- he defines the Red Zone.  He talks about

15   the real zone.  He defines the fact that 48205 is not the

16   Red Zone because that's a broader area.  He goes into very

17   specifics.  He goes into much more detail defining this.

18        That's going to be used against Mr. Shy because

19   it's alleged a RICO conspiracy, and this is proving those

20   elements, and so if I can't attack the witness who's

21   making these statements against my client, then we suffer

22   prejudice, and that prejudice was recognized in Bruton,

23   your Honor.  It talks about the introduction of evidence

24   confession.  Whether you call it a confession or whether

25   you call it whatever you call it, it's being used against

*15-20652; USA v. EUGENE FISHER, ET AL*

1   my client.  Otherwise, the government would not be

2   introducing this.

3        What the Court in Bruton said this poses a

4   substantial threat of the right to confront witnesses

5   against him, and this is a hazard that we cannot ignore.

6   Despite the concededly clear instructions to the jury to

7   disregard evidence of inadmissible hearsay evidence

8   inculpating petitioner in this context of a joint trial,

9   we cannot accept limiting instructions as an adequate

10  substitute for the petitioner's Constitutional Right of

11  cross examination.  The affect is the same as if there had

12  been no instruction at all.

13       So the government says, you know, we can give

14  these cautionary instructions, but that -- once that bell

15  rings, that bell keeps ringing, and the jury is going to

16  hear this, and it's totally unfair.

17       Now the fact is that I can't cross examine an

18  empty chair, and this is -- as counsel said, we're just

19  going to have to sit there and take it, punch after punch

20  without punching back.  That's unfair.

21           **THE COURT:**  All right.  Thank you, Mr.

22  Magidson.

23       The Court basically tracks the argument on this

24  question to come down to the ultimate issue of whether

25  the -- whether there's a Bruton problem, because the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    testimony will inescapably result in the jurors

2    identifying the co-defendants in this case as members of

3    the SMB when the names aren't mentioned, when there's

4    virtually nothing more than the argument, which I

5    acknowledge have some force in this case made by the

6    defendants that there are six of them sitting here who

7    could be -- the jury could speculate were members of the

8    SMB.

9         Well, indeed, as it relates to each of the

10   defendants, there's going to be plenty of evidence

11   introduce to address that issue, and nothing that from

12   Mr. Bailey's testimony would lead inescapably to the

13   conclusion that the other co-defendants were members, and

14   that's the standards under Bruton.

15        There's not a Crawford issue for the same issues

16   that were argued here, and there's not a Bruton issue.

17   It's just as simple as that.

18        And as it relates to the late notice of the

19   interview and the clips that are going to be used by the

20   defendants in the interview, there's a lot that's gone on

21   late in this case, not all attributable to the

22   prosecution.  Indeed, the unexpected resignation of Mr.

23   Graveline has led to a lot more in the way of scrambling

24   on the part of plaintiff's counsel to be ready for this

25   trial.  There were multiple reasons to consider delaying

*15-20652; USA v. EUGENE FISHER, ET AL*

1     the onset of the trial.  Understandably, the defendants in

2     this case wanted to have their trial.  They did not want

3     to have any delays that might have addressed questions

4     like this along the way, but everybody committed to the

5     process on both sides, and I don't find any wrongdoing on

6     the part of plaintiff's counsel in the identification of

7     this evidence, and the designation of it for presentation

8     during the trial.

9             And as to limiting instructions, I don't -- the

10    jurors were questioned at great length about their ability

11    to follow the Court's instructions on the law, and that

12    was the subject of a lot of the questioning by defense

13    counsel as well as the Court, and I think the -- there's

14    no reason to believe that a jury could not fairly judge

15    the culpability on an individualized basis in this case,

16    and there's nothing more than that is at stake here than

17    the general reasons that the Court groups defendants

18    together for trial, which has nothing to do, again, with

19    the clips as the Court has read the transcripts of those

20    clips in connection with those motion.

21            So the Court is going to deny the motion.

22            **MR. H. SCHARG:**  Judge, you know, Mr.

23    Graveline's abrupt departure from the government team two

24    weeks before trial should not be an excuse for the

25    government, and they have no explanation as to why they

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1      waited four years to disclose the fact that they were

2      going to present this evidence at trial, knowing that this

3      is a matter that should have been resolved prior to the

4      commencement of this trial, and they have given no

5      rational explanation as to what happened in the last two

6      weeks which would cause them to make this monumental

7      change in their strategy to bring this forth after the

8      jury selection process.

9              Saying that, the other issue here is will the

10     Court allow us -- me and my client to have access to that

11     complete three hour video, because there is a possibility

12     that there may be something favorable to me, that although

13     I cannot question Mr. Bailey, I can question the agents

14     who conducted the interview, and it is premature to

15     resolve those issues, and it would have to be done at a

16     later time.

17             But I think it is fundamentally unfair for the

18     government to present these snippets, which is about eight

19     minutes of a three hour interview, where a co-defendant is

20     offering cooperation with the government, and that I don't

21     have the opportunity to see that three hour tape.  The

22     government has denied that request.  Mr. Bailey's

23     attorneys, rightfully so though, have denied us that

24     access.  So I have to rely on the Court to order the

25     government to provide me with that interview.  I can't see

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1   of any other alternative, and I believe at this time since

2   that horse is out of the barn, we have a right to se the

3   entire interview, and not rely on these snippets which

4   don't put the exhibits in its proper context.

5           **THE COURT:** Okay.  Thank you, Mr. Scharg.

6           **MR. FEINBERG:** Judge, I have another issue

7   that I would like to address the Court.

8           **THE COURT:** On some other issue?

9           **MR. FEINBERG:** A similar issue, your Honor.

10          This Court in its decision indicated that you

11  would ask the defense attorneys and the defendants whether

12  or not they wanted to prolong the trial -- the beginning

13  of the trial as a result of the government's problem with

14  Mr. Graveline retiring.  We all indicated no.

15          However, we, as defense attorneys, advising our

16  clients to indicate we need additional time in order to

17  review discovery that we don't know exists, meaning

18  Mr. Bailey's statement.  Had we known, maybe when you

19  asked the defense attorneys and the defendants whether or

20  not they wanted to prolong the beginning of the trial, had

21  we known the existence of the interview, and had an

22  opportunity to review the entire interview, not just the

23  snippets, maybe there would have been something different,

24  but how were we suppose to constitutionally represent our

25  clients in good faith, and say we want the trial to start

*15-20652; USA v. EUGENE FISHER, ET AL*

1     instantaneous when we don't know that something that is

2     very, very crucial and potentially very, very harmful even

3     existed.

4          So I ask the Court to reconsider its ruling based

5     on the fact that the government didn't indicate, oh, by

6     the way, your Honor.  We have some information that we are

7     going provide after the jury is selected that may cause

8     them some concern.

9               **THE COURT:**  All right.  Well, for the

10    government Mr. Bilkovic?

11              **MR. BILKOVIC:**  Your Honor, just briefly.

12    Mark Bilkovic for the United States.  I just want to

13    respond to Mr. Scharg's request because that's something

14    that I have been tasked with handling.

15         The Court has the entire interview.  I would ask

16    that if the Court is going to consider Mr. Scharg's

17    request, the Court review that interview in its entirety,

18    and the Court make an in camera determination whether or

19    not that interview needs to be turned over.

20         I don't see any possible way it would be

21    admissible.  It's not being used against their clients.

22    They can't bring in portions of it because it is not

23    statements of their client.  It's' not -- it's basically

24    an admission against Mr. Bailey which allows us to bring

25    it in.  It doesn't allow them to bring it in.

*15-20652; USA v. EUGENE FISHER, ET AL*

1              So I would ask the Court to consider watching the

2       entire video, and then make a determination as to whether

3       the Court feels the need to have us turn it over.

4              With respect to Mr. Feinberg, it's the same thing,

5       Judge.  We're not arguing -- we're not admitting this

6       against his client, and again, all of the defendants, they

7       didn't have the clips, all of the defendants, all of their

8       attorneys had the 3O2 on May 31st before we picked a jury.

9       They had a witness list where one of the officers that

10      took the interview was present on the witness list.  So

11      even if we didn't have the clips, nothing would have

12      stopped us from calling the witness that interviewed

13      Mr. Bailey, and tendering portions of his statement to

14      this jury, and the defendants were all aware of that prior

15      to picking a jury.

16              THE COURT:  All right.  Well, I'm persuaded

17      that the snippets will be allowed as evidence.  I'll look

18      at the three and a half hours of video that represent the

19      entire interview.  The balance has or has not been

20      transcribed?

21              MR. BILKOVIC:  It has not, your Honor.

22              THE COURT:  And I'll look at it with an eye

23      on what has been suggested as the value of the interview

24      from the defendant's perspective, and I can rule -- I can

25      set forth in an order the denial of the motion in limine,

                  *15-20652; USA v. EUGENE FISHER, ET AL*

1    and will go from there in terms of whether the plaintiffs

2    will be required to disclose the entire three and a half

3    hours.

4            **MR. H. SCHARG:**  How can I argue what I don't

5    know?  How can they be allowed to cherrypick evidence and

6    just provide to us what they want, what the government

7    wants us to see?

8            If the Court will not release the three and a half

9    hour video interview of Mr. Bailey, at least at a minimum

10   I should have the opportunity to view that in its

11   entirety; that is, if the Court wants to make that

12   compromise, I have no objection to it if it doesn't want,

13   for whatever reason, doesn't want to disseminate the

14   entire interview, but at a minimum, I should be entitled

15   to at least view it in the government's office, in the

16   Court's chambers, but have the opportunity to see that

17   interview in which parts of it are used as exhibits in

18   this trial and have some consequences -- has some

19   consequences against my client.

20           **THE COURT:**  All right.  I'll render an

21   opinion again on that issue, not recognizing that it

22   wasn't issue before I sat down here this morning.  So I'll

23   take a look at the general argument, and decide whether

24   the entire three and a half hours should be released.

25           Anything else that we need to address before

                *15-20652; USA v. EUGENE FISHER, ET AL*

1    tomorrow?

2              **MS. SMITH:**  Not from the United States.

3              **MR. FEINBERG:**  The question that I have is

4    will we know before opening statement whether -- whether

5    or not the government will conduct an evidentiary hearing

6    on the photo I.D., and whether that will be before we make

7    our oral -- my opening statement so that I can know what

8    evidence I can or cannot discuss with the jury?

9              **THE COURT:**  Yes, I think we should get an

10   answer to that question.

11             **MS. SMITH:**  Well, your Honor, we've been here

12   all morning.  So we have not had a chance to talk, but we

13   don't intend to use that in opening statement, if that

14   helps, but we'll expeditiously discuss what our options

15   are at this point.

16             **MR. FEINBERG:**  I'm not concerned whether or

17   not they are going to use it in their opening.  I'm

18   concerned whether I can address it, pro or con.  I mean,

19   if they're not going to agree to the evidentiary hearing

20   and follow the Court's initial response that it was going

21   to deny the testimony of the photo -- the identification

22   of the photo lineup, that's one thing.  If, in fact, at

23   some point in time they are going to say yes, we want to

24   do the evidentiary hearing, that has to be done before I

25   give my opening.

                *15-20652; USA v. EUGENE FISHER, ET AL*

1          **MS. SMITH:**  Your Honor, if I may, it looks

2     like we are going to request that evidentiary hearing.  So

3     with that in mind, I don't know when the Court wants to

4     hold it.

5          **THE COURT:**  Well, if your witnesses are

6     available this afternoon --

7          **MS. SMITH:**  We're looking for one of the

8     witnesses as we speak.

9          The agents I think are available.  I will call the

10    Court when we find out the location of that witness.

11         **THE COURT:**  All right.  Let's tentatively

12    plan to conduct that hearing this afternoon at --

13         **MS. SMITH:**  We can certainly start with the

14    agents.  In the interest of time, we can start with the

15    agents.  I don't know how long it's going to take to find

16    the civilian witness, but it can't be -- well, I don't

17    know.  If the Court wants to schedule it this afternoon,

18    we have the agents ready.

19         **THE COURT:**  I will have to figure out whether

20    I can do that this afternoon or not.  So we'll let you

21    know before noon.  Do we have your cell phone?

22         **MR. FEINBERG:**  I will give you my cell phone

23    number.

24         **DEFENDANT BAILEY:**  Excuse me.  May I say

25    something?  Your Honor, Judge Steeh, y'all said it is not

*15-20652; USA v. EUGENE FISHER, ET AL*

1    crime to be a Seven Mile Blood, correct?  Clearly that's
2    what we're being charged with, being a Seven Mile Blood.
3    Okay.  I'm that.  So what?  I'm from the Red Zone.  So
4    what?  That's not an enterprise.  So these snippets they
5    using to charge again, saying enterprise because I'm the
6    leader of the Seven Mile Bloods gang, that ain't got
7    nothing to do with what's going on with these charges of
8    RICO conspiracy.  First trial proved that it's not RICO
9    conspiracy.  We ain't no enterprise.  They still want to
10   insist that use the admissibility and bring me against my
11   co-defendants, and I never even mentioned them because he
12   not no Seven Mile Blood, he not no Seven Mile Blood, but
13   at the same time, the jury is going take us to Seven Mile
14   Bloods.  I'm okay being a Seven Mile Blood because that's
15   not a crime, but still y'all still charging me with being
16   Seven Mile Bloods.
17        No, you know I didn't kill Djuan Page.  The
18   evidence shows that at trial in the first trial.  Still
19   y'all trying to frame me and make me be guilty of killing
20   Djuan Page.
21        This Court been bias the whole time period.  I got
22   acquitted of a homicide in the state.  It's okay for them
23   to bring that up, but it's not okay for the jury to know
24   that I was acquitted, like come on.  My brother got
25   acquitted of a fabricated RICO case, but it's not okay for

*15-20652; USA v. EUGENE FISHER, ET AL*

1    him to be on record to the jury that he was acquitted of

2    it.  If one individual was acquitted of it, of conspiracy

3    RICO, we all would have been acquitted of the RICO

4    conspiracy, and you seen this.  They know this case.  It's

5    not what it is.  If y'all want to pursue me in trial, come

6    on.  I'm ready.

7              **THE COURT:**  Okay.  We'll continue.

8

9                   (Proceedings concluded.)

10                    -   -   -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                 *15-20652; USA v. EUGENE FISHER, ET AL*

```
1                    C E R T I F I C A T I O N
2            I, Ronald A. DiBartolomeo, official court
3     reporter for the United States District Court, Eastern
4     District of Michigan, Southern Division, appointed
5     pursuant to the provisions of Title 28, United States
6     Code, Section 753, do hereby certify that the foregoing is
7     a correct transcript of the proceedings in the
8     above-entitled cause on the date hereinbefore set forth.
9            I do further certify that the foregoing
10    transcript has been prepared by me or under my direction.
11
12    s/Ronald A. DiBartolomeo              ___May 9, 2019_
      Ronald A. DiBartolomeo, CSR                 Date
13    Official Court Reporter
14                            -    -    -
15
16
17
18
19
20
21
22
23
24
25
```

*15-20652; USA v. EUGENE FISHER, ET AL*