UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

Vs.                         Case No. 15-cr-20652

                                   HON. GEORGE CARAM STEEH

(D-13) ARLANDIS SHY, II,

        Defendant.

_____

**DEFENDANT ARLANDIS SHY, II SENTENCING MEMORANDUM**

**I. BACKGROUND**

Arlandis Shy, II was charged in the Sixth Superseding Indictment with the following counts:

- Count 1 – racketeering conspiracy, 18 U.S.C. § 1962(d);

- Count 16 – murder in aid of racketeering, 18 USC 1959(a)(1); as a principal or aider and abettor ,18 USC 2;

- Count 17 – use of a firearm in furtherance of a crime of violence causing death, 18 USC 924(c); and 924(j); as a principal or aider and abettor, 18 USC 2;

- Counts 18 (victim MW), 19 (victim DR2), and 20 (victim JR)  –  attempted murder in aid of racketeering, 18 USC 1959(a)(5);as a principal or aider and abettor, 18 USC 2;

- Counts 21 (victim MW), 22 (victim DR2), and 23 (victim JR)  –  assault with a dangerous weapon in aid of racketeering, 18 USC 1959(a)(3);as a principal or aider and abettor, 18 USC 2;

- Count 24 – use and carry of a firearm during, and in relation to, a crime of violence, 18 USC 924(c);as a principal or aider and abettor, 18 USC 2; and,

- Count 32 – possession of a firearm in furtherance of a crime of violence, 18 USC 924(c);as a principal or aider and abettor, 18 USC 2.

Following a several week jury trial, the jury found Shy not guilty of the following counts:

Count 16, the of murder of Dvante Roberts in aid of racketeering, an a principal or aider and abettor on or about May 8, 2015;

Count 17, the use of a firearm during and in relation to a crime of violence causing death, namely the May 8, 2015, murder of Dvante Roberts in aid of racketeering in Count Sixteen;

Count 18, the murder of Marquis Wicker in aid of racketeering on or about May 8, 2015;

Count 19, the attempted murder of Darrio Roberts in aid of racketeering on or about May 8, 2015;

Count 20, the attempted murder of Jesse Ritchie in aid of racketeering on or about May 8, 2015; and,

Count 24, the use and carrying of a firearm during and in relation to a crime of violence, namely the May 8, 2015, attempted murder of Marquis Wicker, Darrio Roberts, or Jesse Ritchie in aid of racketeering in Counts Eighteen, Nineteen, or Twenty.  [Verdict Form, Doc. 1168, Pg ID # 15269-15272.]

The jury found Mr. Shy guilty of  Count I, racketeering conspiracy, 18 U.S.C. § 1962(d) and Count 32 – possession of a firearm in furtherance of a crime of violence, 18

USC 924(c); as a principal or aider and abettor, 18 USC 2. However, Count 32 was vacated by this Court following the filing of a post-judgment motion by Mr. Shy.

The Indictment is complex, alleging Mr. Shy engaged in a racketeering conspiracy to sell/distribute drugs in 2009 at the directions of or in conspiracy with the Seven Mile Bloods, a street gang that existed in the "Redzone" in Detroit's eastside. Years later in 2015, it was alleged in the Sixth superseding Indictment that he conspired to and actually committed murder in the aid of racketeering

Mr. Shy is seeking to appeal his conviction and sentence and therefore respectfully disagrees with that portion of the jury's verdict that found him guilty on the above two counts. Nevertheless, for the reasons set forth herein Mr. Shy is seeking a sentence below the advisory guidelines. The Probation Department has scored him level 43 in the Offense Level category, resulting in a recommended sentence of life. To reach this conclusion, Probation counted as relevant conduct the overt acts of murder and assault with intent to murder. The Probation Department concludes in paragraph 26 of the presentence report, "Explanation of the Total Offense Level Computation", that Shy was "held accountable for the overt acts he personally engaged in and for conduct that was reasonably foreseeable for the defendant to have knowledge of. According to Probation, since the offenses were jointly undertaken criminal activities, Shy is responsible for the actions of his co-conspirators and ultimately, the injuries sustained by the victims." This conclusion, however, is not supported with evidence or facts or law.

The offense conduct in the paragraphs 18 through 25, is a paraphrased version of the Sixth Superseding Indictment. The Probation Department made no effort to go

beyond the Government's allegations contained in the Indictment and indeed ignored testimony and facts produced at trial. The offense level computation, paragraphs 31 through 51, simply repeats the "overt acts" listed in the Sixth Superseding Indictment. The presentence report does not provide the court with any information to support the use of the murders and attempted murders as the basis for calculating the base offense level. It does indicate why or how the murder and attempted murders were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity. The Report prepared by the Probation Department is void of the specific rationale for its conclusion as to why Shy should be held accountable for the murder and attempted murders that occurred May 8, 2015. In order to be used in sentencing, the court must make the specific findings on this issue.

## II. FACTORS TO BE CONSIDERED UNDER 18 U.S.C. § 3553(a)

(a) Factors to be considered in imposing a sentence.--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed--
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
 (3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) oftitle 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

1.  **The nature and circumstances of the offense and the history and characteristics of the defendant**

    a)  **The nature and circumstances of the offense**

    There is no dispute that the remaining one count for which the jury found him guilty is a very serious crime. The Jury found him guilty of Count I, racketeering conspiracy, 18 U.S.C. § 1962(d). Since he was not found guilty of any specific crime of violence such as the murder or attempted murder, the jury presumably found him guilty as an aider and abettor. Mr. Shy is appealing those convictions on several theories including whether there was sufficient evidence to establish that the SMB was an

enterprise within the meaning of that term under RICO. Nevertheless, for purposes of sentencing Defendant urges the Court not to consider the acquitted conduct of the murder and attempted murders and instead sentence him on the conduct where there is evidence of guilt. Since there is no evidence to attribute even the relevant conduct to him, the appropriate guideline level for this conspiracy conviction in this circumstance is 19, with a criminal history level III, yielding an advisory guideline range of 37-46 months.

Although this is a serious conviction, the jury acquitted him of the most serious charges. The verdict by the jury can be interpreted that while Mr. Shy was a SMB member, he was more of a Facebook associate, choosing to be on the sidelines via social media rather than being a direct participant. There is little doubt that he participated in mourning his neighborhood friends or old school friends who died and there is no dispute that he sold drugs, individually. However, there was no evidence that the narcotics that he sold were for the benefit of the SMB. In fact the cooperating witnesses for the Government corroborated that they all sold for their individual gain, not to benefit a larger cause or organization. Nearly all of the drug distribution activity that occurred in West Virginia occurred ten years ago, when Mr. Shy was 18. His most recent conviction in 2015 for submitting a false prescription for penicillin and cough syrup with codeine was to supply his own habit of drinking "lean" a drink  mixture of syrup with codeine and a soda. The effects of this drink combination causes the user to become lethargic and languid.  He was regularly using this drug and smoking marijuana daily at the time of his arrest. Mr. Shy would benefit from drug treatment while he is serving his sentence.

In short, Mr. Shy was found guilty of being in a racketeering conspiracy. The crime is serious. However, this court has a duty to individualize sentences in accordance to the culpability of the defendant. Here, Mr. Shy was acquitted of the most serious and egregious of the charges.  Contrary to the probation officer's position, there was insufficient evidence to hold him accountable for the acquitted VICAR counts.

**b. Characteristics of the Defendant**

1. A sanguine environment disrupted

Arlandis Shy told the probation officer that he was raised primarily by his mother and grandparents and that they provided him with a "great childhood" and that they "spoiled him." (Par. 78). In his early years that was true. He had no relationship with his father and that bothered him, but since his father was never a part of his life, he did not know what he was missing. He was provided a safe and loving family and had all the material items a young boy could want. His grandfather was retired from the military and a man of the church. He operated an auto repair shop and once he retired, he still worked on cars out of his garage, well into his 70's.  His mother worked and he was watched during the day by his grandmother who made sure  he stayed close to home and did not wander the streets. In his early years, his grandparents sent him to private Catholic schools since they were safer and provided a better education. Arlandis was respectful and introspective as a child. He went to church every Sunday with his grandfather and his grandmother cooked wonderful meals for the family, especially on Sundays after church.

When his grandparents purchased the home on Rosemary it was a safe and quiet neighborhood. Just southeast of the area known as the "redzone," Mr. and Mrs. Stevens

7

watched helplessly as their neighborhood declined. They were determined not to expose Arlandis to the "streets" and kept him near home or at church or in school.  They knew how toxic the nearby neighborhoods had become.

When he was 10, his mother met a wonderful man, Virgil Taylor, who had a son nearly the same age as Arlandis, Maurice Taylor. He and his mother moved from his grandparents' home and shared a home with Virgil Taylor and Maurice. He and Maurice shared a room and they became brothers. Virgil Taylor became the father Arlandis never had. For Arlandis, having this family meant more to him than he could have ever have imagined. He and Maurice  developed a special relationship and he learned from Virgil that being a strong man also meant you could be kind and warm and loving.

He and Maurice talked late into the nights, about sports, about music and their futures. They were going to be rappers and be famous one day. They were going to buy their parents a new house and new cars. Life was perfect, until one day, five years later, his mother announced that she and Virgil were separating. They were going to  leave Virgil's house. To him, his mother was taking this perfect life away from him. In his view, she did not understand how important this family environment had become to him. When they moved back to Rosemary Street to his grandparents' home, Arlandis was resentful and angry. As most 15 year olds, he was narcissistic and self-absorbed. He did not see or understand his mother's feelings; all he knew was that the security and love that he experienced with Virgil and Maurice was taken away and he wanted to rebel. He was resentful. Arlandis pushed back; he was mad at his mother so he explored the streets and at 15, he did not have to search far to find the SMB.

The feelings and emotions experienced by Arlandis are not uncommon and have been researched. In an article published in a psychological journal, the authors compare the impact of divorcing parents on young children verses adolescents. There the researchers concluded:

> The more independent-minded adolescent tends to deal more aggressively to divorce, often reacting in a mad, rebellious way, more resolved to disregard family discipline and take care of himself since parents have failed to keep commitments to family that were originally made.
>
> Where the child may have tried to get parents back, the adolescent may try to get back at parents. Where the child felt grief, the adolescent has a grievance. "If they can't be trusted to stay together and take care of the family, then I need to start relying more on myself." "If they can break their marriage and put themselves first, then I can put myself first too." "If they don't mind hurting me, then I can I don't mind hurting them."
>
> Now the adolescent can act aggressively to take control of his life by behaving even more distantly and defiantly, more determined to live his life his way, more dedicated to his self-interest than before. He feels increasingly autonomous in a family situation that feels disconnected. He now feels more impelled and entitled to act on his own.[1]

_____

[1] The Impact of Divorce on Young Children and Adolescents ...
https://www.psychologytoday.com

Other studies have come to similar conclusions. [2] Further it has been shown that in adolescent boys, parental divorce contributes to what some researchers term "externalizing behaviors," which include weapon carrying, fighting, substance abuse, and binge drinking. Young women (teenagers) are also affected by parental separation in that among adolescent girls, there is a strong correlation between family structure and delinquency, hostile behavior, drug use, larceny, skipping school, and alcohol abuse.[3]

Mr. Shy is now a man. He is no longer "blaming" his mother for anything, because he now understands life's complications. This information has been provided to answer the question as to why this young man, who seemingly "had it all", who was raised in an otherwise good environment, could be attracted to a gang affiliation. It

_____

[2] Children in intact families have lower rates of delinquency than children in non-intact families. Robert Sampson (then professor of sociology at the University of Chicago) reported, after studying 171 cities in the United States with populations over 100,000, that the divorce rate predicted the robbery rate of any given area, regardless of its economic and racial composition. In these communities, he found that lower divorce rates indicated higher formal and informal social controls (such as the supervision of children) and lower crime rates.

In 1994, it was reported in Wisconsin that the incarceration rate of juvenile delinquents was 12 times higher among children of divorced parents than among children of married parents. A 2004 study showed that children from stepparent and single mother families also have significantly higher incarceration rates than children in intact families. In a British longitudinal study of males aged eight to 32, David P. Farrington, professor of criminology at Cambridge University, found experiencing parental divorce before age 10 to be a major predictor of adolescent delinquency and adult criminality. Another study found that boys who go through family transitions at the age of 14 or 15 are more likely to be delinquent when they are 16 or 17. Adolescents from divorced families (particularly those in divorced single-father families) display more antisocial and violent behavior than adolescents in biologically intact families. An Australian parliamentary review of the literature found that divorce increases the likelihood that children will feel hostility and rejection.[30])

Children of divorced parents are significantly more likely than children of intact married families to be delinquent by age 15, regardless of when the divorce took place.

Effects of Divorce on Children's Behavior [Marripedia]
marripedia.org/effects.of.divorce.on.children.s.behavior

[3] Id.

explains why he rebelled against his mother and grandparents and why he chose a different path. To be clear, Mr. Shy is not making excuses for himself or contending that he is not acting with free will. Nevertheless, his life circumstances correlate to the published research regarding family breakups involving adolescents.

The good news is that Mr. Shy was imbued and instilled with good values, and since being detained these past years, he has become an avid reader. He is no longer an "angry young man" but has become reflective and philosophical. His reading list could be found on college psychology and philosophy classes. For instance, he has read "Man's Search for Meaning" a book by Viktor Frankl chronicling his experiences as a prisoner in Nazi concentration camps during World War II, and describing his psychotherapeutic method, which involved identifying a purpose in life to feel positively about, and then imagining that outcome.

He has read the Master Key System by Charles Haarel. *The Master Key System* is a personal development book by Charles F. Haanel(1866–1949.). The philosophy and message of this book which Mr. Shy has adopted is that everything one wants or needs can be satisfied by believing in an outcome, repeatedly thinking about it, and maintaining positive emotional states to "attract" the desired outcome. The combination of this book and Frankel's book has enabled Mr. Shy to transcend negative environments and surroundings and imagine a peaceful and better life, one not dominated by impulsive behavior but one managed by refection and thought.

These books resonate with Mr. Shy giving him a new and broader perspective, beyond what exists on Detroit's eastside. More importantly he has gained much wisdom

and strength from these books.  The self-control and learning to develop the ability to manage and influence his environment has not gone unnoticed by his peers and others in the institution. He is calm and insightful; when faced with difficulties and obstacles of institutional life, which there are numerous, he is able to "rise above it" based upon his readings and teachings contained in these and other books. He continues to read and learn and hopes one day he can write a book for those young men who come into prison without experience, angry at the world.

2.  **A young Man in Two Worlds**

It would be disingenuous to state that Mr. Shy was not associated with the SMB. His Facebook account is replete of references to the group and there are numerous references to other young men who had been killed on the streets of Detroit. However, as Billy Arnold complained, many of the people who associated with the SMB were Facebook members only, preferring to be a "virtual" member of the group rather than a real or actual member. As Mr. Arnold complained, these Facebook and social media affiliates posted "RIP's" for lost brothers and voiced support for the SMB, but they did nothing real. [4] Arlandis was one of those associates or affiliates of  the SMB who preferred to write lyrics or poetry and create art forms about gang life from the confines of his bedroom with his phone and computer. He was torn between two worlds, one virtual and one real. In the real world, Mr. Shy was struggling financially. He did not own a car and had few material things. However, what he had was something more

---

[4] Video of Billy Arnold making a "pubic announcement" chastising the internet gangsters for "hiding in their" rooms rather than doing anything.

**20150707_113308.mp4**

important: that being a father to his former girlfriend's daughter, Isabella, who he called his daughter and who called him "daddy." He remembered how Virgil Taylor became his de facto father and how important it was to him. He wanted nothing less for his daughter, Isabella.

When he was arrested in this case, Mr. Shy was on probation to Macomb County for submitting a false prescription so he could get codeine cough medicine that he would then use to make "lean" a drink that would cause drowsiness. He was sentenced to probation and was being supervised by the Macomb County Probation Department.

Mr. Shy was back, residing primarily with his grandparents at 12351 Rosemary, Detroit, Michigan. This is the home he had lived in all of his life. He was helping his grandparents around the house and assisting his grandfather with some of the heavy repairs to motor vehicles that he would still do even after his retirement. However, he did seek work and at that time the opportunities for employment on Detroit's Eastside were sparse, particularly for a young African American male with a felony record. However, he did locate work through a temporary placement agency. He went to where the jobs were, small factories making auto parts. His aunt lived in Clinton Township so during the week, he stayed with her to be closer to where the work was.

Nikki DeLamielure is a Senior Staffing Consultant at Express Employment Professionals. She confirms that Mr. Shy was employed through her agency from September 2014 through December 2015, working at various assignments as a "temp" employee doing assembly and quality work. (See Exhibit A, letter from Nikki DeLamiellure). She noted that "Arlandis was very dependable and hardworking associate

." She further volunteered that she received "nothing but positive feedback from his team leader and Arlandis was one of the very few people that I could rely on for past minute needs." The fact that he was a standout in her mind speaks volumes for him when she employs well over 100 people per month.

Because his aunt and mother lived in Macomb County nearer the employment opportunities, he moved into his aunt's apartment in Clinton Township. Mr. Shy notified the Macomb County Probation Department and advised that he would be staying with his mother and aunt at his aunt's apartment when he worked. Since there was limited space he brought very little possessions and slept on the couch. When he did not work, he stayed with his grandparent's home on Rosemary to assist them around the home and to assist his grandfather in his auto repair work.

In a report dated October 13, 2015, the probation officer made an unannounced visit to 15505 Lake Village Dr, Apartment 305, Clinton Township. According to the Probation Officer's report, Bonnie Phillips, "P" (Probationer) answered the door, and stated that the he sleeps on the couch. The Officer observed that there were pillow and blankets in the living room. (See Exhibit B, attached hereto)

Chiequita L. Roach is Mr. Shy's maternal aunt. It was her apartment that was raided by the Government agents looking for Mr. Shy. She confirms his good character and confirms they are a very close-knit family. She marvels how he has committed himself to raising "another man's baby" for the past five years. (See Exhibit C, letter for Ms. Chiequita Roach.)

Mr. Shy's mother, Felicia Roach confirms Mr. Shy's strong relationship with a child, Isabella, who only knows him as "daddy." She confirms his being on the Usher Board of the Freedom Missionary Baptist Church  and being helpful to his grandparents and giving them security in a deteriorating neighborhood. She confirmed that her son was respectful to not only her, but his grandparents and became the surrogate father to his then girlfriend's little girl. (See letter from Felicia Roach, Shy's mother. Exhibit D)

Several years ago, Mr. Shy began dating Kenisha Thomas, a single mother with an eight-month old child, Isabella. She describes how Mr. Shy quickly became a big part of Isabella's life; she loves him as if he were her "daddy." She notes than when she needed a "break" Arlandis would care for her full time; he would take care of her when she worked. She reminded us that "it takes a village to raise one child" and by that she meant Arlandis and his family. For Isabella, she does not know Arlandis is not her "blood,"  but she does know who loves her and that she misses him very much. They have not been together for two years, but that did not interfere wit his relationship with Isabella. She also confirms that she knows that Mr. Shy is not violent or a threat. (See Exhibit E, letter from Kenisha Thomas),Virgil Taylor has known Mr. Shy since he was two years old. Perhaps Arlandis modeled his behavior from Mr. Taylor, since years ago "because I loved his mother, I felt the right thing was to try to love her son." Mr. Taylor describes Mr. Shy as being a good listener, not a mouthy kid and respectful to all his elders.   After he and his mother separated, he maintained a close relationship with Arlandis, watching U of M football and other sports. He further confirmed that he was very close to his grandparents, mother, and aunt, spending most of his time with family. He knows Arlandis to be of

good character and not a threat to society. (See Exhibit F, attached hereto, Letter from Virgil Taylor.)

Aretha Adams is a friend of the family and has known Mr. Shy all his life. She knows him to be a kind, not threatening young man. Ms. Adams' mother has dementia and Arlandis was always very kind to her and helps the mother around her house, bringing moments of joy to a woman with few bright spots. She confirmed that Arlandis always seemed to have a job when jobs were scarce. Her own children love Arlandis and she verifies that Isabella misses him very much. (See Exhibit G, attached hereto ,letter from Aretha Adams).

Carolyn Stevens is Mr. Shy's grandmother who lives at 12351 Rosemary in Detroit who confirms that her grandson Arlandis lived with them all his life, except for the time he was living closer to work , which was in Macomb County. When he did not work, he came back to her house, to help out. He has his own room in her home, but when he was on Probation and working in Macomb Count he lived with her daughter. She describes that he does chores around the house such as taking her to the grocery store, taking out the garbage, taking laundry up and down the basement stairs and many other similar chores. She never had any problems with her grandson. She too confirms that they all love and care for Isabella and if allowed, would be welcome in her home. (See Exhibit H, attached hereto, Affidavit of Carolyn Stephens)

Samuel Stephens is Mr. Shy's grandfather. He retired from the United States Air Force as a mechanic and still does mechanic work for friends and neighbors at his home garage. Mr. Stephens who is 80 needs help for some of the jobs because they are "two

man" jobs. His grandson would help him if he (Arlandis) were not working at his temp jobs. Arlandis accompanies him to church once a month and is very respectful of elders and church members. (see Exhibit I, Affidavit of Samuel Stephens.)

These are the people who know him best, the side of Mr. Shy that this Court has not seen. These testimonials show that he is capable of being a respectful and reflective young man. Since being detained over the past years has made him thoughtful and insightful. He is not a threat or danger to the community. He was not convicted of any prior violent felonies. While he was convicted of a drug case while on probation, the "drug conviction" was when he tried use a false prescription to get cold medicine. His character comes through from all the people that know him, including the probation officer in Macomb County who had been supervising him for the past two years.

2. **The need for the sentence imposed--**
   **(A)** to reflect the seriousness of the offense, to promote respect for the law, and  to provide just punishment for the offense

Mr. Shy and his co-defendants  were charged with serious offenses. He was found guilty of Count 1 – racketeering conspiracy, 18 U.S.C. § 1962(d). While these are certainly serious felonies, he was found not guilty of the murders and assault with intent to murder. As a youth, he because associated with the SMB; these were the young men in his neighborhood and admits to his association of this group. He does not believe that the SMB was an Enterprise and therefore he will be appealing his sentence.

Many of the overt acts charged in the Indictment occurred over 10 years ago when Mr. Shy was a teenager. Since being detained in this case, the change in Mr. Shy has been palpable and profound. Through his readings and meditation he understands that he can

be the master of his own destiny and he can control his future. Gone is the anger. Gone is the depression and feelings of hopelessness and feelings of inadequacy. What has replaced those emotions is confidence and strength that he can shape his own destiny and that he can accomplish success through hard work. Overcoming self-doubt and inadequacy opens many doors of opportunity for Mr. Shy. He is looking forward to not only opening those doors, but walk through and accomplish great things. The first is to continue his education.

However, a sentence at the low end of the guidelines or below the guidelines regarding the conspiracy conviction would still nevertheless reflect the seriousness of this crime because the advisory guideline sentence is high due to his decision to take this case to trial and not be awarded a downward departure for acceptance of responsibility. He should not be punished for exercising his right to proceed to trial. Mr. Shy does expect to receive a prison sentence regarding the conspiracy conviction, but the court should keep in mind that the Mr. Shy appearing before the court at sentencing is not the Mr. Shy described in the Indictment and is no longer the Mr. Shy portrayed in his Facebook account.

Therefore, a sentence at the low end of the guidelines or below the guidelines would more than adequately address the seriousness of this crime. Imposing a punitive sentence does not automatically equate to "respect for the law"; a just sentence does that. In fact a "harsh" sentence can have the opposite effect, by promoting disrespect for the law. Lengthy sentences have mainly resulted in putting the United States number one in

the incarceration rates in the world.[5] I n this case, a fair sentence that would be

proportional to the seriousness of the offense.

T**he need for the sentence imposed**—

**(B) to afford adequate deterrence to criminal conduct**

 Researchers have assessed the effect of longer prison sentences by conducting

aggregate-level studies of general deterrence. Michael Weinrarh of the University of

Winnipeg studied the sentences of 514 convictions for drunk driving and found that short

sentences had little deterrence value, but that sentences that exceeded six months also

had little deterrence value.[6]  What he determined was that a "slap on the wrist" did not

deter drunk drivers but that punitive sentences also did not deter. In other words, there is

an optimum range where sentencing is effective.

 Mr. Shy would submit that a sentence on the low end of the advisory guidelines or

below the Guidelines would constitute a sentence sufficient, but not greater than

necessary, to deter others from engaging in similar conduct**.** Putting Mr. Shy in prison for

a lengthy term of years would will not deter kids from joining street gangs and engaging

––––––––––––––––––––

[5] The United States has now surpassed Russia to become the world's leader in incarceration rate. In comparison, the European Union, with a combined population of 370 million people, had a prison population in 1998 of approximately 300,000.1 The total bill for incarcerating these prisoners at the state and federal level was
estimated to be $41 billion for the year 2000, and approximately $26billion was spent incarcerating the nation's 1.3 million non-violent offenders. The increase in incarceration has been labeled "a societal commitment to imprisonment on a scale that would have been unthinkable a quarter of a century ago." Harry W. Fenton, *Drug War Battle Fatigue*, A.B.A. J., Dec. 1999, at 112; Dita Smith, *What on Earth?: Behind Bars*, WASH. POST June 3, 2000, at A9, 2000 WL 19612398 (stating that Russia and the United States are now in a virtual tie).

[6] Specific Deterrence and Sentence Length, **Michael Weinrarh,** *Journal of Contemporary Criminal Justice*, Vol. 17, No. 2, 105-122 (2001)

in illegal conduct; the elimination of street gangs is much more complex than locking up young men and "throwing away the key."

**The need for the sentence imposed—**
**(C) to protect the public from further crimes of the defendant**

One of the most difficult things for the court is to be assured or convinced that a Defendant will not engage in further illegal conduct upon his return to society. It would be safe to say that there has never been a Defendant who came before this Court and stated the he intended to return to the life of crime as soon as he gets out of jail. Yet in many cases that happens. In fact, Mr. Shy has prior convictions, albeit he has never served any prison time.

So how can this Court be assured that Mr. Shy is going to remain crime free no matter what the sentence? There are no guarantees but here is what is different: Mr. Shy cares what his family and friends think of him. Particularly since being at Milan, he has been reunited with his daughter, Isabella. She is no longer a toddler but has grown into a little girl who expresses her love for Mr. Shy. He wants to be there for her for important milestones. He wants to be able to make amends to his mother, aunt and grandparents who have shown him love and support throughout this entire episode. He does have a close-knit and supportive family. They are not enablers, excusing his behavior, but they are willing to work with him and help him.  Having strong family support can make a difference to a person convicted of a felony and in Shy's case, supporting him in reaching his goals. But most importantly, he has gained great insight into what makes a

man. It is wisdom and control of the mind; it is setting goals and following through. It is being able to listen, yet make independent and rational thoughts. Impulsive and rash behavior are things of the past. He is ready to prove that he can accomplish both short and along term goals.

**T**he **need for the sentence imposed—**

**D. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**

Mr. Shy never graduated high school and was a couple classes short of completing his GED when he was being supervised by the Macomb County Probation Department. The first goal he has set for himself is to finish that program. Based on the books that he has been reading while in pre/post trial detention, getting his GED will pose no problem for him.

He then plans to study classes in economics and finance; first in a community college, later in the university. His long-term goal is to trade stocks on the New York exchanges and elsewhere. Does this seem unrealistic or delusional? Maybe to the jaded or cynical of us, but Mr. Shy's transformation in 24 months can make a believer in even the greatest of skeptics.   Mr. Shy would benefit greatly in being sent to an institution that provides educational opportunities.

**(3) <u>The kinds of sentences available</u> and (4)<u>the kinds of sentence and the sentencing range established</u>**

Mr. Shy understands that a prison sentence will be imposed. He is only asking that the sentence be individualized and proportional to the crime for which he was convicted, not the crimes for which he was acquitted. In a separate filing, Mr. Shy has filed objections to the scoring of the sentencing guidelines. The Court will have to determine his guidelines and sentence him similarly to persons who were found or pled guilty to only count I, Conspiracy.

**RELIEF REQUESTED**

Wherefore for the foregoing reasons, Defendant respectfully requests that this Court determine that the appropriate guideline range and thereafter, applying the factors contained in 18 U.S.C. §3553, and looking at the circumstances surrounding his involvement in this crime and the circumstances surrounding Mr. Shy, sentence him to a sentence sufficient but not greater than necessary to comply with the purposes that Congress has set forth for sentencing in  18 U.S.C. §3553(a).

Date: October  17, 2019                                    Respectfully submitted,

| By: s/*Mark H. Magidson*<br>MARK H. MAGIDSON (P25581)<br>Attorney for Defendant Shy (D-13)<br>815 Griswold, Suite 810<br>Detroit, MI 48226<br>313-963-4311; 313-995-9146 fax<br>mmag100@aol.com | By: s/*John T. Theis*<br>JOHN T. THEIS<br>Attorney for Defendant Shy (D-13)<br>190 South LaSalle St., Suite 520<br>Chicago, IL 60603<br>(312) 782-1121 |
|---|---|