1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF MICHIGAN
2               SOUTHERN DIVISION

3

4   **UNITED STATES OF AMERICA,**

5                Government,

                                    **HONORABLE GEORGE CARAM STEEH**
6        v.
                                    **No. 15-20652**
7   **ARLANDIS SHY,II,**

8                Defendant.
    _____/

9

                        **DETENTION HEARING**
10
                  **Thursday, December 8, 2016**
11
                        -    -    -
12

    APPEARANCES:
13
    For the Government:            RAJESH PRASAD, ESQ.
14                                 Assistant U.S. Attorney

15
    For the Defendant:            MARK MAGIDSON, ESQ.
16
                        -    -    -
17

18          *To Obtain Certified Transcript, Contact:*
            *Ronald A. DiBartolomeo, Official Court Reporter*
19            *Theodore Levin United States Courthouse*
             *231 West Lafayette Boulevard, Room 1067*
20               *Detroit, Michigan  48226*
                    *(313) 962-1234*
21
          *Proceedings recorded by mechanical stenography.*
22      *Transcript produced by computer-aided transcription.*

23

24

25

1                       **I  N  D  E  X**

2 _____Page

3 Detention Hearing                                    3

4

5

6

7

8

9

10

11

12

13

14                    **E  X  H  B  I  T  S**

15 Identification_____Offered    Received

16

17                  N       O       N       E

18

19

20

21

22

23

24

25

*15-20652; USA v. ARLANDIS SHY*

```
 1                              Detroit, Michigan

 2                              Thursday, December 8, 2016

 3

 4                      -    -    -

 5           THE CLERK:  Case Number 15-20652, United

 6   States versus Arlandis Shy.

 7           MR. PRASAD:  Good afternoon, your Honor.  Raj

 8   Prasad for the United States.

 9           THE COURT:  Welcome.

10           MR. MAGIDSON:  Good afternoon, your Honor.

11   Mark Magidson on behalf of Mr. Shy who is seated here at

12   counsel table.

13           THE COURT:  Welcome.  This is your motion,

14   right?

15           MR. MAGIDSON:  Yes, your Honor.  I would like

16   to begin, I subpoenaed a witness, a probation officer from

17   Macomb County, who if the Court would indulge me maybe

18   five minutes, I could give the Court insight as to his

19   adjustment to probation while she was supervising him just

20   before his arrest.

21           THE COURT:  I see.  Okay.  Any objection Mr.

22   Prasad?

23           MR. PRASAD:  No.

24           THE COURT:  All right.  Call your witness up.

25           MR. MAGIDSON:  I would like to call Bonnie
```

*15-20652; USA v. ARLANDIS SHY*

1    Phillips to the stand.

2

3                    B O N N I E   P H I L L I P S

4

5    being first duly sworn by the Court to tell the truth, was

6    examined and testified upon her oath as follows:

7

8                    THE COURT:  Again, please state your name and

9    spell your last name.

10                   THE WITNESS:  Bonnie Phillips,

11   P-h-i-l-l-i-p-s.

12                   THE COURT:  All right.  You may proceed.

13

14                   DIRECT EXAMINATION

15

16   BY MR. MAGIDSON:

17

18        Q.  Ma'am, are you currently employed?

19        A.  I am.

20        Q.  With whom?

21        A.  Department of Corrections.

22        Q.  And in what capacity?

23        A.  Probation Officer, 16th Circuit.

24        Q.  As part of those duties, did you come in contact

25   with the defendant in this case, Mr. Arlandis Shy?

*15-20652; USA v. ARLANDIS SHY*

1       **A.**  I did.

2       **Q.**  Were you supervising him?

3       **A.**  I was.

4       **Q.**  Okay.  And for what period of time?

5       **A.**  From August 2015 until he was arrested, I think in

6    February or March of 20 -- wait.  From August 2015 until I

7    think, February or March of 2016.

8       **Q.**  All right.  And let me just ask you a couple of

9    things.

10              First of all, during the time that you were

11    supervising him, was there for a controlled substance case

12    in Macomb County?

13       **A.**  I think so.  You know, that's one note I didn't look

14    at.  I think it was.

15       **Q.**  And he was --

16       **A.**  Yeah, it was a prescription -- possession.  Yes, I

17    do recall.

18       **Q.**  And he was given a probationary sentence at that

19    time?

20       **A.**  Yes, two years.

21       **Q.**  During the period of time that you supervised him,

22    did you notice any change in his behavior or progression?

23       **A.**  Very much so.  A lot of progress.

24       **Q.**  Can you tell the Judge exactly what you observed?

25       **A.**  Well, we didn't start out on a very good foot.  He

*15-20652; USA v. ARLANDIS SHY*

1    had a little bit of an attitude.  The first day I met him

2    I had to give him a jail sanction.  It was over some

3    miscommunication between Corrections.  We had a little

4    talk.  He did his three days, and every time I saw him,

5    his attitude just got better and better.  It was more

6    positive.  So everything -- everything he ever did was

7    very accountable, very truthful about, and he took his

8    punishment.

9      Q.  Let me ask you this, were you aware whether or

10   not -- was one of his conditions of his probation that he

11   either had to be in school or working or both?

12     A.  Usually it's either they got to be in school.  I

13   know that the judge wanted him to get his GED.

14     Q.  And to your knowledge was he working on that?

15     A.  He was.  He just passed social studies, and he was

16   just waiting on the math portion.  He had taken it, and he

17   was off by six points.  He was looking forward to retaking

18   it.

19     Q.  You were supervising that GED progress?

20     A.  Yes, I was supervising all of his progress work.

21     Q.  All right.  And when he passed, how did he seem to

22   appear when he passed the first part?

23     A.  Even when he failed, he was very proud of himself.

24     Q.  Do you know during this time whether he was working?

25     A.  He was working for a temp agency.  I know one

*15-20652; USA v. ARLANDIS SHY*

1    assignment he stopped because it was too many nights, and

2    it was getting in the way.  He always worked.

3        **Q.**  Do you know whether he worked in Detroit or Macomb

4    County?

5        **A.**  I don't recall.

6        **Q.**  Were you aware of a time that he indicated that he

7    wanted to move to Macomb County?

8        **A.**  He was already in Macomb County when I was

9    supervising him.

10       **Q.**  Did you pay a visit at his Macomb County place?

11       **A.**  I did on two different occasions.

12       **Q.**  And you found him there?

13       **A.**  The first one I got verification from someone else

14   in the complex, and second time yes, he was actually

15   there.

16       **Q.**  You were satisfied that he was in place so to speak?

17       **A.**  Yes.

18       **Q.**  Did you know -- did you have any knowledge or

19   information that he had grandparents living in Detroit?

20       **A.**  Yes.

21       **Q.**  Did you ever meet them?

22       **A.**  I did.

23       **Q.**  Did you get to meet his mother?

24       **A.**  I did.

25       **Q.**  Did you meet his aunt?

*15-20652; USA v. ARLANDIS SHY*

1    **A.**  I had spoken to her.

2    **Q.**  How would you describe his relationship with his

3    family?

4    **A.**  Very supportive.

5    **Q.**  Did you make any determination from your own

6    observations whether he was involved in any type of gang

7    activity?

8    **A.**  No, I was aware there were friends that were.  I

9    know that he was at a party with some known members, and

10   he did have to pay for that.  He got violated, and we had

11   a long discussion about it, and he was very honest.

12   **Q.**  When you say that he got violated, what was he

13   violated for?

14   **A.**  He in a car with someone who had thrown a gun out

15   the window.  He ended up with no charges against him, but

16   he got violated through our court for the association.

17   **Q.**  Association with somebody with a felony record?

18   **A.**  Yes.

19   **Q.**  But he was not charged with a gun or anything of

20   that nature?

21   **A.**  No, the person in the car who had the gun actually

22   confessed to it.

23   **Q.**  Okay.  If he were released on bond or some

24   conditional bond, is he still on probation to you?

25   **A.**  Yes.

*15-20652; USA v. ARLANDIS SHY*

1    **Q.**  He would report to you?

2    **A.**  Twice a month.

3    **Q.**  So he's not off the hook?

4    **A.**  No.

5    **Q.**  Does he still owe you the six points on the math

6    test?

7    **A.**  He does.

8            **MR. MAGIDSON:**  I don't have anything further.

9            **THE COURT:**  Thank you, counsel.

10

11                    **CROSS EXAMINATION**

12

13   **BY MR. PRASAD:**

14

15   **Q.**  Ms. Phillips, he actually began probation with

16   Macomb County prior to your supervision, correct?

17   **A.**  Correct.

18   **Q.**  Initially when on probation with Macomb County, he

19   had an urinalysis violation in July?

20   **A.**  He had one violation due to them asking him to do a

21   BPT, and he refused.  We discussed it.  He did his

22   sanction, and that was it.

23   **Q.**  He didn't mention that he had multiple sanctions or

24   multiple punishments that he had to account for while on

25   probation with you?

                    *15-20652; USA v. ARLANDIS SHY*

1     **A.**  He had a couple of minor --

2     **Q.**  Correct?

3     **A.**  Uh-huh.

4     **Q.**  And there was also that violation that we're talking

5     about when he went to the party in September?

6     **A.**  Yes, that was the only violation.  The sanction for

7     the refusal of the BPT was not considered a violation.

8     **Q.**  Ms. Phillips, you indicated that the person who had

9     the gun confessed to it?

10    **A.**  Yes, they admitted to it.  So Mr. Shy was never

11    charged with it.

12    **Q.**  Okay.  I hate to quibble with you, the other person

13    pled guilty at court.  They never confessed to it.

14    **A.**  I'm sorry.  You're correct.  Pled guilty.

15    **Q.**  You understand the difference?

16    **A.**  I do.

17    **Q.**  Okay.  And you indicated that in your experience

18    there wasn't any real -- you didn't notice any gang

19    activity or gang connection, correct?

20    **A.**  I didn't notice any gang activity.

21    **Q.**  You were supervising Mr. Shy for approximately six

22    months?

23    **A.**  From August, yes.

24    **Q.**  And you met with him multiple times?

25    **A.**  I did.

                    *15-20652; USA v. ARLANDIS SHY*

1    **Q.**  Are you aware of the tattoos that he has?

2    **A.**  Just in paperwork, yes -- well, actually no.  I

3    don't know about his tattoos.

4    **Q.**  You're not familiar with the one that he has on his

5    forearm?

6    **A.**  No.

7    **Q.**  Do you know the name of the gang that we're talking

8    about here?

9    **A.**  I heard.

10   **Q.**  Sure.  What have you heard?

11   **A.**  Seven Mile Bloods.

12   **Q.**  Okay.  And you're not familiar whether or not he has

13   Seven Mile on his forearm?

14   **A.**  I don't recall.

15   **Q.**  Okay.  When you actually -- when this case in Macomb

16   County actually started, at that time he was -- when he

17   was arrested on the Macomb County case, he was on

18   probation in Wayne County in Third Circuit, wasn't he?

19   **A.**  I don't recall.

20

21              **MR. PRASAD:**  Okay.  No further questions.

22              **THE COURT:**  Okay.  Thank you, ma'am.  You can

23   step down.

24

25                      (Witness excused.)


                    *15-20652; USA v. ARLANDIS SHY*

1              **MR. MAGIDSON:**  Nothing further, your Honor.

2              **THE COURT:**  Thank you.

3              **MR. MAGIDSON:**  Judge, I would first

4    acknowledge that there are family members here in court.

5    My client's mother, Felicia Roach, his aunt -- I believe

6    her name is Chiquita Roach -- and Ms. Stevens his

7    grandmother.

8              I say that because he has very, very strong family

9    ties, and he gave me -- and I have not looked through

10   these -- they send him correspondences.  He's been locked

11   up for eight months.  He gets a letter or card almost

12   once -- he's up in Sanilac, and the family cannot get up

13   to see him because of the distance, but they send him

14   letters and cards constantly.

15             He has very strong family ties.  He has lived in

16   the Eastern District all of his life.  He was raised on

17   the east side of Detroit on Rosemary Street where he met a

18   lot of people who are the co-defendants in this case.

19             And I think part of the confusion, because I had

20   the opportunity to go through the transcript, and I raised

21   it in the motion as well, during this time -- when I say

22   during this time -- just prior to his arrest while he was

23   on probation in Macomb County, he was working with a temp

24   agency in Macomb County, and as this Court is aware,

25   there's a lot small parts, plants, along that Schoenherr

*15-20652; USA v. ARLANDIS SHY*

1    corridor in the Clinton Township area, and he was assigned

2    there, different places, and it was a lot when he --

3    easier, closer to where he worked if he stayed with his

4    aunt.  His mother actually moved up there as well, and

5    that's where he was, and I think Ms. Phillips verified

6    that.

7         Now he didn't work every day because he didn't get

8    called every day, and his aunt worked.  He didn't have a

9    car, and so the days that he didn't work, his grandmother

10   or grandfather would come and get him, and he would be

11   down there on Rosemary in Detroit, and he would help his

12   grandparents out.  His grandfather will be 79 tomorrow.

13   He's still working as a master mechanic, and he thinks he

14   can do everything, but he can't.  You know, he lifts a

15   tire or do whatever.  Arlandis helps him out, and he helps

16   his grandmother, and they like having him around.

17        So that's where he was when the police within

18   looking for him, the agents within looking for him.  On

19   that day they searched his aunt's house in Clinton

20   Township.  He wasn't there.  Therefore, he's missing.

21        Now he didn't keep a lot of clothes there because

22   he didn't have a bedroom there.  He slept on the couch,

23   and that was verified in one of the papers.  His mother

24   was staying there.  He aunt was staying there.  It was a

25   single bedroom apartment, and the aunt had a daughter, his

*15-20652; USA v. ARLANDIS SHY*

1    cousin that was staying there.  So he slept on the couch.

2    He had a couple of work clothes, and most of his things

3    stayed in Detroit.

4         But the point is, the day that he -- that the

5    agents went looking for him in Clinton Township, his aunt

6    called him and said, look.  They are looking for you.  He

7    immediately self-surrendered -- and I forgot to ask her to

8    verify -- but he turned himself to Ms. Phillips in the

9    Macomb County Probation Department immediately, and his

10   mother took him right there.  He called his mother and

11   that was it.  So there's that level of cooperation and so

12   forth.

13        So the issue that we have here, what is the danger

14   to society, because that's one of the things that the

15   Court has to look to.  He's charged with very serious

16   charges.  We're not claiming that, but as this Court knows

17   some of the defendants are death penalty eligible.

18   There's murders claimed and so forth.  That's not Mr. Shy.

19   He doesn't fit into that situation.  He's charged on a

20   RICO conspiracy claim where he's looking at 20 or 25 years

21   I believe, and using a firearm in furtherance of this type

22   of felony.  He's charged with a mandatory five year

23   conceivably to life sentence.

24        So the charges are serious.  I'm not minimizing

25   that, but if we look at this man's history, he's got three

*15-20652; USA v. ARLANDIS SHY*

1    prior felonies, one from 2007, a drug conviction that was

2    ultimately dismissed under HYTA.  He was between 17 and 21

3    at the time.  He then he had another case, attempted CCW

4    out of Wayne County Circuit Court, and then this final

5    case in Macomb County where he used an altered

6    prescription to try to get some penicillin or something

7    like that, and that was an attempt case there.  All three

8    cases he received probationary sentences.  He didn't --

9    he's never served time in prison.  He's never been

10   sentenced to jail.  I think he got three days for not

11   taking -- for violating -- or not complying with the

12   probation's request to take a portable breath test.

13        So according to Ms. Phillips, he was making

14   substantial progress.  He was getting his GED.  He's

15   working.  He was doing all the right things just prior to

16   this arrest.

17        The government in their indictment talks about

18   things that he's done in 2007, nine years ago.  He was

19   arrested twice in West Virginia.  He was not convicted.

20   One time he had marijuana.  Another time it was alleged

21   that he had oxycontin.  Both of those charges were

22   dismissed.  They are old.  There are other allegations

23   that he was part of a crew or something, but nothing ever

24   developed from that.

25        All I can tell you this, Judge, is that there are

*15-20652; USA v. ARLANDIS SHY*

1    conditions that this Court can impose to show that -- to

2    assure the community's safety, and to assure his

3    appearance.  There's never been a history of capias

4    whatsoever.  As soon as he found out that he was wanted by

5    the government, he self-surrendered.

6            I've attached to my papers a series of letters,

7    lot of them are from family members.  Some of whom are

8    here, and -- but two of the letters out of the multiple

9    letters that I've attached to me demonstrate this young

10   man's character, and the one letter is from the employer.

11           I sent my investigator out to the staffing place.

12   I said just get a verification that he worked there, and

13   she said Arlandis Shy?  I know him, and she volunteered a

14   letter on her own, which the Court has and has an

15   opportunity to read.  This went on and said that this guy

16   was one of the most dependable people.  She relied upon

17   him.  He was a good character, and he was a person that

18   when he said he'd show up for work, he showed up for work

19   and did what he was told to do.  She said in her view that

20   speaks volumes because she deals with hundreds of people a

21   month or a week -- I forgot what she said -- and he stood

22   out as a positive, and that to me says who he is.

23           The second thing, the other letter that I found

24   remarkable is a letter from Kinesha Thomas.  This is a

25   former girlfriend, and when they first met years ago, she

*15-20652; USA v. ARLANDIS SHY*

1     had year or two year old daughter.  It was not his.  It

2     was from another relationship.  Her name is Isabella.

3     Isabella's father had abandoned her.  This young lady

4     started going out with Mr. Shy, and Mr. Shy fell in love

5     with this little girl, and he adopted her, not legally.

6     He didn't go through the court, but emotionally, and he

7     brought her into his heart and family, and his whole

8     family then had to adopt her, and welcomed her, and they

9     treated her as if it was his own biological daughter.

10          But then -- and I know the Court is familiar with

11    family law based on prior experience -- usually in cases

12    like this, people try -- they're fighting over kids and

13    things like this, using kids against each other -- he

14    breaks up with -- they break up.  It happens after two,

15    three years.  He breaks up with Ms. Thomas, but he doesn't

16    abandon this child, because there's only one person that

17    this little girl calls daddy, and that's Mr. Shy.

18          And so they break up, and he still not only sees

19    her, this girl stays with him for days, weeks at the end

20    with the family, and to this day this girl -- they were

21    extremely close -- are extremely close, and she misses her

22    dad very, very much.

23          So the issue then becomes, is he a danger to

24    society?  Is he something that we have to keep locked up

25    to protect society, and the short answer is no.  There's

*15-20652; USA v. ARLANDIS SHY*

nothing here in this person's character or in this person's demeanor.  Everything that we've heard or what's been said about him is positive from the probation officer who has supervised for not a long time, but certainly long enough, longer than -- she got to know him more than any of us.  All of these other letters that know him, that have had contact with him, only positive things, and they go beyond positive things.

Yes, he has prior felonies, but I would submit to the Court they are nonviolent felonies.  The court -- the state court has deemed that he is probationable, he was on probation, and he was doing well on probation in Macomb County because he was almost completed his GED, and was working, and was doing the right thing.

And so will he return to court?  We only have -- there's been no history of capiases on any of his cases, and the only other record that we have is when the police -- when he found out that the police was looking for him, what did he do?  He didn't try run or hide.  He immediately self-surrendered.  So that's the record that we have of Mr. Shy.

THE COURT:  All right.

MR. MAGIDSON:  So my request is this, he's been locked up for eight months.  He's got no problems where he's been locked up in terms of where he's gotten in

*15-20652; USA v. ARLANDIS SHY*

1    fights.  I'm saying to the Court you can let him out.  You

2    can put him on a tether.  He's got a place to stay.  He's

3    got family here.  I would say that he would stay with

4    his -- back at his grandparents home.  He would stay

5    wherever the Court orders, but he has people that will be

6    there and vouch for him.  If you put him on a tether, he

7    can call in once a day, supervise him, and he's got

8    another supervisor, Ms. Phillips, where he will be doubly

9    supervised.

10                  **THE COURT:**  Okay.

11                  **MR. MAGIDSON:**  Thank you.  Unless you have

12   any questions?

13                  **THE COURT:**  Thank you.  Mr. Prasad?

14                  **MR. PRASAD:**  Your Honor, I can appreciate Mr.

15   Magidson wanting to focus on Mr. Shy's more recent

16   behavior on probation for the last six months of probation

17   in Macomb County.  I can also appreciate the fact that Mr.

18   Shy perhaps was doing better for the first time on

19   probation for the last six months in Macomb County, but

20   this indictment is not limited to the last year.  This

21   indictment goes back to 2004, and Mr. Shy's criminal

22   history is not limited to the last year.  It starts back

23   in 2007.

24         And I think the fundamental difference between Mr.

25   Magidson's argument and my argument that I indicated in my

*15-20652; USA v. ARLANDIS SHY*

1    response to the Court was in listing out the criminal

2    history of this defendant, because as the Court reviews

3    the criminal history of this defendant, and as I tried to

4    lay it out in a clear format -- these are Pages 4 and 5 of

5    my reply, starting with Page I.D. 1779 -- is that this

6    defendant consistently from 2007 onwards has been on

7    probation and in violation of his probations.

8         Starting in 2007 with the 2007 offense, he was

9    originally given Holmes Youthful Trainee Act, but here is

10   where I disagree with defense counsel.  He was violated,

11   and he was revoked on Holmes Youthful Trainee Act for that

12   case in 2009, August 2009.  What happened in the interim

13   while he is on probation from the 2007 offense, from 2008

14   through August 2009, he's arrested twice in West Virginia.

15        So counsel is correct that there's been no capias

16   history perhaps, no specific capias order in this case,

17   but while on probation out of the Third Circuit of

18   Michigan, he's being arrested for narcotic offenses in

19   West Virginia on two different occasions.

20        Counsel tries to argue that the Court should not

21   look at either the 2007 offense because he completed

22   Holmes Youthful Trainee, which he did not, he was revoked

23   on that, or the Court should not look at the 2009 arrest

24   in West Virginia because the state chose not to charge him

25   there.  Those 2009 offenses, your Honor, are specific

*15-20652; USA v. ARLANDIS SHY*

1    overt acts in our case, in our RICO conspiracy case, in

2    which Count 1 the defendant is charged.  There is

3    specifically Overt Acts 77 and 82.  He is going -- there

4    is going to be evidence clear to those offenses, and those

5    offenses go straight in line with the activities of the

6    Seven Mile Bloods in this time period, especially in the

7    middle time period of 2008 onwards to present where much

8    of the finances of the Seven Mile Bloods and how they were

9    financing their organization was through interstate travel

10   and the interstate trafficking oxycontin pills and other

11   types of opiate pills purchased in Detroit, transported

12   through the Greyhound bus system, and sold in West

13   Virginia, both occasions where the defendant was arrested

14   in 2009 in West Virginia when he was transporting himself

15   down on Greyhound buses, where he was found in one

16   location in Charleston, West Virginia, hiding in a

17   bathroom of a house that had drugs and money in it.

18           On the other occasion, he was found in a vehicle

19   driven by a female, and he did not know after he was

20   picked up from the bus station, and 300 oxycontin pills

21   were found in the back floor board behind the front seats.

22           Your Honor, so this defendant's actions from 2007

23   to 2009 show a pattern of violating probation.

24           Then we go to 2013 when he is arrested with a gun

25   in the Red Zone in Detroit.  In that situation, police

*15-20652; USA v. ARLANDIS SHY*

1    come.  He flees from the police, jumps over a series of

2    fences before he's finally caught with the 9-millimeter

3    loaded firearm.  He pled guilty to attempt CCW in that

4    case.  He's placed on probation in that case in 2013.  He

5    violates his probation in 2014.  His probation is

6    extended -- continued to be extended.  His probation was

7    closed in April 2015 only after he had been arrested in

8    Macomb County on the charges for which he was placed on

9    probation for in Macomb County.

10          Continuing this pattern as Judge Stafford called

11   it at the original detention hearing from the point of

12   being placed on probation in 2013 to a continuous

13   violation of probation, whether 2014 for technical

14   violations or 2015 for committing new criminal offenses.

15          He pleads guilty to those offenses in Macomb

16   County, and then placed on probation.  What happens when

17   placed on probation?  Well, September 2015 they have the

18   Block party in honor of Devon McClure, one of the deceased

19   founders of the Seven Mile Bloods.  This defendant goes

20   there -- and this is a quick aside -- he, like many

21   members of any of the long standing members of the Seven

22   Mile Bloods, has a Seven Mile tattoo on his forearm like

23   other members in this indictment.

24          This defendant goes to the Block party that is at

25   the strip club -- I tried to put this in kind terms.  It

*15-20652; USA v. ARLANDIS SHY*

1       was not some sort of peaceful honorary for Mr. McClure.

2       It wasn't a candlelight vigil.  This was an actual party

3       at a strip club where Seven Mile Blood members attended,

4       some coming from out of state.  The FBI was, in fact,

5       watching that party.  Different people left in different

6       groups, including this defendant driving three other Seven

7       Mile Blood members in his vehicle.  The law enforcement

8       stopped different vehicles.  Different vehicles were

9       stopped with firearms.

10              This defendant's vehicle that he was, in fact,

11      driving, as law enforcement pulls in behind him, the front

12      seat passenger Andrew Thomas tosses out a gun out of the

13      front seat passenger window in a residential window.

14              It's not that Mr. Shy stops right then and there.

15      It was that Mr. Shy continues to drive through the

16      residential neighborhoods, down several more blocks before

17      he's finally distancing himself away from where the gun

18      was thrown out, and that's where he stops for law

19      enforcement to come and effect the stop and arrest

20      Mr. Thomas.

21              As indicated earlier by both defense counsel and

22      myself with the questioning, Mr. Thomas later subsequently

23      in an unrelated case pleads guilty to felon in possession

24      of a firearm.

25              My ultimate argument in this case with regards to

*15-20652; USA v. ARLANDIS SHY*

1   Mr. Shy is that I strongly disagree with Mr. Magidson's

2   review of Mr. Shy's criminal record.  In this time period

3   of this racketeering indictment, in the four different

4   overt acts that this defendant is charged with, we have a

5   clear pattern that Mr. Shy is an active member of the

6   Seven Mile Bloods, engaged in both the narcotics aspect of

7   the Seven Mile Bloods, and also possessing firearms in

8   2013 as to fit in with the rest of the activities of the

9   Seven Mile Bloods.

10          I'm arguing, your Honor, both that he is a flight

11  risk as shown by his ability to go to West Virginia in

12  2009 while on probation out of the Third Circuit in

13  Michigan, and also that he is a danger to the community by

14  his continuous failure to comply with probation.  Even

15  when in Macomb County as his current probation officer

16  believes he is doing well, he's still in violation by

17  driving around with Seven Mile Blood fellow members while

18  one of them tosses out a gun.  That is why your Honor I

19  believe the Court should maintain the detention in this

20  case.

21          **THE COURT:**  Thank you.  Do we have anybody

22  from Pretrial Service?

23          **PRETRIAL SERVICE OFFICER:**  Yes, your Honor.

24  Tom Nugent.

25          **THE COURT:**  Is it accurate to say you're

*15-20652; USA v. ARLANDIS SHY*

 1    recommending to continue detention?

 2              **PRETRIAL SERVICE OFFICER:**  Yes, your Honor.

 3    We're not changing our recommendation.

 4              **THE COURT:**  Okay.  Do you see any changes in

 5    the situation since this decision was last made?

 6              **PRETRIAL SERVICE OFFICER:**  No, your Honor.

 7              **THE COURT:**  Okay.  All right.  Well, I can

 8    appreciate the defense counsel concerns.  Eight months is

 9    a long time to be held on pretrial conditions.  At some

10    juncture -- I don't know what the advisory guideline range

11    is in the event of a conviction in this case -- but I'm

12    sure at some point we going to be up against the low end

13    of advisory range that might affect the Court's continuing

14    the detention order.

15         At this point the Court is satisfied that the

16    detention order should continue for the reasons that were

17    earlier stated by Magistrate Judge Stafford in review of

18    this defendant's position.  Time does have a way of

19    changing things, but at this point the Court is not

20    satisfied to safely release, and not be flight risk.

21         So the Court will continue detention order.

22

23              (Proceedings concluded.)

24                   -    -    -

25

*15-20652; USA v. ARLANDIS SHY*

1                    **C E R T I F I C A T I O N**

2          I, Ronald A. DiBartolomeo, official court

3    reporter for the United States District Court, Eastern

4    District of Michigan, Southern Division, appointed

5    pursuant to the provisions of Title 28, United States

6    Code, Section 753, do hereby certify that the foregoing is

7    a correct transcript of the proceedings in the

8    above-entitled cause on the date hereinbefore set forth.

9          I do further certify that the foregoing

10   transcript has been prepared by me or under my direction.

11

12   s/Ronald A. DiBartolomeo                    December 3, 2019
                                             _____
13   Ronald A. DiBartolomeo, CSR                      Date
     Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

*15-20652; USA v. ARLANDIS SHY*