1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3

4    **UNITED STATES OF AMERICA,**

5                    Government,
                                         **HONORABLE GEORGE CARAM STEEH**
6         v.
                                         **No. 15-20652**
7    **D-3 EUGENE FISHER,**
     **D-4 COREY BAILEY,**
8    **D-6 ROBERT BROWN,**
     **D-10 DEVON PATTERSON,**
9    **D-13 ARLANDIS SHY,**
     **D-16 JAMES ROBINSON,**
10   **D-19 KEITHON PORTER,**

11                  Defendants.
     _____/
12
                          **STATUS CONFERENCE HEARING**
13
                        **Monday, April 30, 2018**
14
                              -    -    -
15

16   APPEARANCES:

17   For the Government:           CHRISTOPHER GRAVELINE, ESQ.
                                   Assistant U.S. Attorney
18
     For the Defendants:          HENRY M. SCHARG, ESQ.
19                                On behalf of Eugene Fisher

20                                JAMES FEINBERG, ESQ.
                                  On behalf of Robert Brown
21
                                  BERTRAM JOHNSON, ESQ.
22                                On behalf of Devon Patterson

23                                MARK MAGIDSON, ESQ.
                                  On behalf of Arlandis Shy
24

25                                WILLIAM SWOR, ESQ.
                                  On behalf of James Robinson

1                                              STEVEN SCHARG, ESQ.
                                               On behalf of Keithon Porter
2

3    Also appearing:
                                               MICHAEL RATAJ, ESQ.
4                                              On behalf of Quincy Graham

5                                              JEFFREY EDISON, ESQ.
                                               On behalf of Martez Hicks
6

7                              -    -    -

8
              *To Obtain Certified Transcript, Contact:*
9          *Ronald A. DiBartolomeo, Official Court Reporter*
             *Theodore Levin United States Courthouse*
10          *231 West Lafayette Boulevard, Room 238*
                  *Detroit, Michigan  48226*
11                   *(313) 962-1234*

12         *Proceedings recorded by mechanical stenography.*
        *Transcript produced by computer-aided transcription.*
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **I N D E X**

2  _____ Page

3  Status Conference Hearing                          4

4

5

6

7

8

9

10

11

12

13                  **E X H I B I T S**

14  Identification_____ Offered    Received

15

16                  N        O        N        E

17

18

19

20

21

22

23

24

25

                  *15-20652; USA v. EUGENE FISHER, ET AL*

1

2                                    Detroit, Michigan

3                                    Monday, April 30, 2018

4

5                              -    -    -

6              THE CLERK:  Case Number 15-20652, Trial Group

7     2, Eugene Fisher Corey Bailey, Robert Brown, Devon

8     Patterson, Arlandis Shy, James Robinson and Keithon

9     Porter, and we have Jim Feinberg on the telephone.

10             THE COURT:  Okay.

11             MR. GRAVELINE:  Good afternoon, your Honor.

12    Chris Graveline for the United States.

13             THE COURT:  Welcome.

14             MR. SWOR:  William Swor on behalf of James

15    Robinson.

16             MR. H. SCHARG:  Henry Scharg on behalf of

17    Eugene Fisher.

18             MR. S. SCHARG:  Steven Scharg on behalf of

19    Keithon Porter.

20             MR. MAGIDSON:  Mark Magidson on behalf of

21    Arlandis Shy.

22             MR. JOHNSON:  Bertram Johnson on behalf of

23    Devon Patterson.

24             THE COURT:  Okay.  So we're missing --

25             THE CLERK:  Craig Daly.


                    *15-20652; USA v. EUGENE FISHER, ET AL*

1          **THE COURT:**  All right.  Do you want to go

2     ahead?

3          **THE CLERK:**  And Mr. Feinberg is on the phone.

4          **MR. FEINBERG:**  Yes, I am.

5          **THE COURT:**  This is set up as a status

6     conference.  Mr. Swor?

7          **MR. SWOR:**  Your Honor, this will be a little

8     choppy because I was busy writing about it.  I was going

9     to do this in a formal fashion, but we have some major

10    concerns in light of the series of articles that ran in

11    the Detroit News last week.

12         You know, there was evidence there.  There was not

13    evidence there.  There were essentially confessions or

14    what the government is going to argue is confessions,

15    certainly statements against interest, and there was also

16    a lot of material in the articles that were rank hearsay,

17    gossip, speculation, government theory, whether proven or

18    otherwise, accusations of conduct that is not charged in

19    the indictment, and on behalf of Mr. James Robinson, I

20    have been absolutely horrified, and as the series went all

21    week, it was, you know, just one thing after another.

22         I think it terribly prejudices the defendants.  It

23    certainly prejudices Mr. Robinson, and at a minimum, I

24    would want to be severed from the -- obviously the death

25    defendants are not going to consent to an adjournment nor

*15-20652; USA v. EUGENE FISHER, ET AL*

1    should they, but I want Mr. Robinson severed.  I mean, if
2    nothing else, the passage of time may help us, but
3    certainly immediately in three weeks is immediate as far
4    as I am concerned, and this thing is on -- not only in the
5    paper on the Detroit News website, but I'm told that it's
6    been on Facebook, on Instagram, on Snap Chat.  So we don't
7    know yet the scope, but it's horrid.

8         People are talking about it.  People in church are
9    talking about it, and they didn't even know that I was on
10   the case.  So the risk to Mr. Robinson is very real, and
11   pictures are worth a thousand words.  We saw so many
12   pictures.  There were graphics.  The government says it
13   did not provide the graphics that were used in the story.
14   Well, they are there just the same, and -- and if the
15   government did -- did not provide them, then the idea that
16   the jury will be tainted by information that is not
17   evidence or the jury pool, and it just really reinforces
18   all the ugly stereotypes and prejudices.

19        I spoke with Mr. Graveline early in the week, and
20   he assured me that the government had nothing to do with
21   the creation of it, and I take him at his word, but that's
22   not the issue here.  I'm not asking -- at this point I'm
23   not asking for a dismissal.  If I find out otherwise, I
24   may come back and change that position, but we can't go to
25   trial -- I can't go to trial June 5th in the face of all

*15-20652; USA v. EUGENE FISHER, ET AL*

1          of this.

2                  In addition to that, after our last pretrial here,

3          Mr. Robinson who has been housed at Milan, was kept at

4          Dickerson for awhile, and then inexplicitly shipped up to

5          Sanilac.  I didn't -- I didn't realize that he was sent to

6          Sanilac.  He was sent to Sanilac, and all of his material,

7          his trial preparation material, his notes, his discovery

8          stayed at Milan, because when I checked with the -- once I

9          found out he was at Sanilac, I called the marshals and

10         said what's going on?  No.  I found out that he was gone

11         from Dickerson.  They told me he was going to -- he had

12         gone to Sanilac, and then I said, well how do I get the

13         stuff, his stuff to get it over to him, and they said, we

14         suggest you don't do anything, because this is only

15         temporary.  He may be getting moved.

16                 He's still at Sanilac, and so I had to print out

17         almost another complete set of discovery and get it up to

18         Sanilac, except that he is still short of his notes.  Our

19         trial preparation has been significantly hampered, but

20         that's just the disaster that happens in cases like this,

21         although it is a disaster.

22                 You've read the articles.

23                      **THE COURT:**  Actually, I haven't.

24                      **MR. SWOR:**  Well, I'm glad you haven't the

25         articles.

                        *15-20652; USA v. EUGENE FISHER, ET AL*

1     **THE COURT:**  I've been busy.

2     **MR. SWOR:**  I had airplane time.  So the

3   articles go well beyond discovery, go well beyond

4   evidence.  The taint for the jury pool is unacceptable,

5   given that the -- and the manner, the graphic manner in

6   which it paints the four death defendants, death eligible

7   defendants and the Seven Mile Bloods, and they found a

8   catchy heading for each story, Death by Instagram, is not

9   something jurors are likely to forget.

10     **THE COURT:**  I don't know what your experience

11   has been, but mine is I'm always amazed how little the

12   jurors know about coverage.

13     **MR. SWOR:**  If it were just -- if it were back

14   in the good old days of print media, but we got here the

15   web.  We got Facebook.  We got, like I said, Instagram,

16   Snap Chat.

17     Your Honor, on behalf of Mr. Robinson, I'm asking

18   the Court to sever us, and I will be filing a motion for

19   bond, and quite frankly, you know, this is not something

20   that should be held against Mr. Robinson, and I'll deal

21   with that in the bond motion, but I suppose the Court can

22   find because of the circumstances that this clock should

23   stop, that should not be -- the speedy trial clock should

24   not be a reason to deny us severance, and it doesn't

25   require the defendant's consent.  There's nothing in the

1    Speedy Trial Act that -- and I don't know where that habit

2    has come from, but I don't want to do this, getting into

3    an argument with the government.

4         This is not about, you know, how the paper got

5    ahold of these things, because that's not productive right

6    now.  That may be productive for another hearing, but for

7    the immediacy, my client can't go to trial on June 5th in

8    this environment, and he shouldn't go to trial with people

9    that were really in different situations.  The evidence is

10   totally different, and if I filed a written motion, I

11   would have done this a little more intelligibly, although

12   we know there's always danger with me about understanding

13   what I'm talking about it, but it should not go forward.

14             **THE COURT:**  Okay.

15             **MR. H. SCHARG:**  Your Honor, on behalf of

16   Mr. Fisher, I understand exactly what Mr. Swor said, and I

17   concur with him because Mr. Fisher is in the same

18   situation.  Mr. Fisher simply put, is being charged as

19   warehousing weapons.  He wasn't involved in any of the

20   shootings or in any of the other violent crimes.  The

21   government charges that he, in fact, warehoused weapons at

22   his house that were used in different offenses, but never

23   put him directly participating in any of those crimes, and

24   for the same reasons that Mr. Swor detailed, these are

25   articles that have been extremely prejudicial to him and

*15-20652; USA v. EUGENE FISHER, ET AL*

1    his ability to be tried at this time.

2         The Court does have a remedy though.  Even if the

3    Court grants a severance to those defendants that are not

4    death eligible, it's not creating another trial because

5    you already have a third group trial scheduled for after

6    the second group.  So it's not creating a new trial.  It's

7    just placing those defendants that are -- were not death

8    eligible into the third category, which would resolve all

9    of the issues that I think we have in this case.

10        **THE COURT:**  There's another element here, and

11   that is for death eligible defendants, there has not been

12   any indication from Justice whether they are going seek

13   the death penalty or not.  It has occurred to me that we

14   may not hear from them given the state of affairs for

15   D.C., and my expectation was that if we get to the trial

16   and we have had not a response, then there's no death

17   penalty for those defendants because will be --

18        **MR. H. SCHARG:**  Right.  But what I'm saying

19   is in terms of death eligible that's because they are

20   charged with more serious crimes than Mr. Swor's client

21   and my client.  I'm referring to them as death eligible at

22   this time because they are charged -- even if they are not

23   authorized, they are charged with violent crimes.  They

24   are charged with murders.  They are charged with shooting

25   an individual in front of his children, and he's going to

*15-20652; USA v. EUGENE FISHER, ET AL*

1    come in in a wheelchair.  They are charged with these

2    shootings at a parole office, at a baby shower.  They are

3    in a different class than my client and Mr. Swor's I

4    believe, and the fact that my client is not being charged

5    as being directly involved in any of these shootings or

6    violent acts, put them in the separate category.

7         The news articles did what the government wouldn't

8    be able to do at trial, which was to put them altogether

9    in the minds of the jury.

10        Again, the death eligible defendants have a whole

11   different agenda, and there is a remedy for this to put us

12   in the last grouping, Group Number 3, which the Court has

13   not -- I don't believe the Court has scheduled a trial

14   dated for the third group.

15             **THE CLERK:**  January 8th.

16             **MR. H. SCHARG:**  January 8th.

17             **THE COURT:**  Your argument is to keep the

18   death eligibles in this group?

19             **MR. H. SCHARG:**  Yes, in Group 2, and move the

20   non-death eligible into the third grouping for the reasons

21   that I've stated, and Mr. Swor stated.

22             **THE COURT:**  Okay.  At some point I'm going to

23   want to hear from Mr. Graveline.  Do you have reaction?

24             **MR. GRAVELINE:**  Just doing the math, your

25   Honor, I believe we have seven defendants in Trial Group

*15-20652; USA v. EUGENE FISHER, ET AL*

1    3.

2              **THE COURT:** Right.

3              **MR. GRAVELINE:** If we move people back, we're

4    creating a trial group of potentially nine, if not 10

5    people, which then necessitates yet another trial. So to

6    say it's not going to create another trial, I think it

7    would. We can all hope that we work out some pleas and

8    things start working out, but that's the trial group that

9    we would be creating for January.

10             In terms of the death penalty, I know it's been

11   forwarded on out of the capital case unit up to the deputy

12   attorney general, and they know of the May 10th plea

13   cutoff, and so I'm hoping to have answers no later than

14   May 10th.

15             **THE COURT:** Okay.

16             **MR. GRAVELINE:** That's the status of the four

17   individuals who still face death eligible charges.

18             **THE COURT:** So from the deputy to the

19   attorney general to --

20             **MR. GRAVELINE:** Those are the only two who

21   review. So normally in this review process it goes to the

22   capital case section. They review it. Once their review

23   is done, it is forwarded to the deputy attorney general,

24   and then from the deputy attorney general to the attorney

25   general. So it's at the top levels right now, and that

*15-20652; USA v. EUGENE FISHER, ET AL*

 1    was to have been accomplished by last Thursday.

 2              **THE COURT:**  All right.  Thanks.  Mr.

 3    Magidson?

 4              **MR. MAGIDSON:**  Thank you, Judge.

 5         Well, I don't want to be redundant here.  I echo

 6    the concerns of brother counsel.  Mr. Shy is death

 7    eligible, and I spoke with him today just to get his

 8    input.  They were -- obviously, he's detained, and he's

 9    aware of some of the news articles.  He was not aware of

10    the details.  So I shared it with him.  I brought him a

11    copy of the headlines, and it's beyond headlines.  It goes

12    on to various jump pages of a lot of details, details

13    which I questioned -- or he questioned as to whether or

14    not this reporter, who is apparently an investigative

15    reporter -- at least investigates one side -- was able to

16    glean certain facts that went beyond the indictment and

17    some of pleadings that were found, particularly since a

18    lot of information in the first trial didn't come up much

19    about some of the other defendants.

20         So the paper outlines like the key figures.  So it

21    tells us who the key figures are with pictures, and then

22    it goes through Mr. Shy's -- what they call a rap sheet.

23    Not rap song, but rap sheet -- and it talks about multiple

24    arrests and multiple convictions in Michigan, West

25    Virginia, and it leads somebody to think that this guy

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1    must be the worst person around when, in fact, he was

2    never sentenced as part of any of conviction to a day in

3    jail or let alone prison.  So it distorts everything.

4         So we find the timing unusual, this news breaking

5    story about a case that's been pending for years, falling

6    on the eve of trial after the government's -- you know,

7    maybe I don't want to say less successful, but I'm sure

8    the government was not pleased with the outcome of the

9    first case, acquittal and hung jury, and on the eve of

10   trial where people are death penalty eligible this.

11        So frankly, my client has been locked up so long,

12   and I'm sure the Court is aware of his position in term of

13   adjournments and things, he doesn't want an adjournment,

14   but it's his position that the government has at least, if

15   not sponsored this or encouraged this reporter from the

16   Detroit News to publish this article, to gain a tactical

17   advantage at the expense of Mr. Shy, and I don't know the

18   remedy.  I don't have a remedy short of having some sort

19   of evidentiary hearing to see whether or not the

20   government actually intended to do this, and to establish

21   prosectorial misconduct, in which case the remedy would be

22   dismissal of the indictment.

23        But short of that, I can't get a retraction.  It's

24   on the worldwide web in a million different ways, and

25   Henry mentioned or Bill mentioned something about they

*15-20652; USA v. EUGENE FISHER, ET AL*

1      were talking about it in church.  I just ran into

2      people -- I'm in the Ford Building, and some of the

3      people, just the workers in the building, talking about

4      it, and just didn't know that I was involved in the case,

5      and I heard them talking about it.

6           So it resinated at least with a number of people.

7      Like the Court says, you're always surprise how little

8      jurors are aware of what's going on, but for some reason

9      this article with these salacious, if you will, facts

10     involving detailed incidents, much of which are disputed,

11     people have, I think, have adopted this and have

12     internalized this.

13          So short of what I have suggested, I don't have a

14     remedy.  I do know that the people who are death eligible

15     are certainly facing a more difficult challenge now than

16     they did before.

17               **THE COURT:**  All right.  Thank you.

18               **MR. S. SCHARG:**  Good afternoon, your Honor.

19     Steven Scharg on behalf of Mr. Keithon Porter.

20          Your Honor, after reviewing the internet and the

21     Detroit News section, my client was quite, quite upset

22     because they have in this article, they mentioned that he

23     was involved in the two shootings on May 1st and May 8th,

24     and they made him look like he was a hitman in this

25     conspiracy, and it's his position that -- both of our

*15-20652; USA v. EUGENE FISHER, ET AL*

1    positions is that we don't believe he would get a fair

2    trial, and I don't know what the -- he does not want an

3    adjournment of this trial date, but he's indicating to me

4    based on this article, it's -- how could he get a fair

5    jury?  We don't know what the jurors actually really know,

6    how they are feelings are regarding this situation, but it

7    puts Mr. Porter in a horrible limelight as a result of the

8    accusations and allegations that were made in these

9    reports.

10         They had in the article about his prior

11    convictions, about his brother, family member.  They went

12    into depth regarding Mr. Porter's participation with Billy

13    Arnold, and we believe at this time there is no way that

14    he can get a fair trial on June 5th.

15              **THE COURT:**  Okay.  Well -- yes.

16              **MR. SWOR:**  The other problem is simply

17    because of the graphical nature of the images, the

18    stories, it will be harder for people who have seen to

19    unremember.  It will be -- it is possible that jurors will

20    not recall the story until some of the graphics go up on

21    the screen, and may not consciously remember, but

22    subconsciously remember.

23         And the other problem that I simply have is that

24    my client -- I mean, it is a real problem for us.  First

25    of all, he's an hour and half now at Sanilac.  He's an

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1    hour and a half away, and my schedule has not exactly been
 2    cleared for me to run back and forth.
 3              THE COURT:  When was he moved?
 4              MR. SWOR:  Roughly 10 days after our last
 5    status conference.  So he's been up there almost a month,
 6    and I've been up to see him, and but I can't spend -- I
 7    got four clients up there.  I mean, we're deprived of
 8    preparation material.
 9              THE COURT:  We have to get that cured
10    obviously.
11              MR. SWOR:  Obviously.  The marshals have been
12    trying.  You haven't heard me yell about the marshals, and
13    you know that I do.
14              THE COURT:  Well, I'll certainly make inquiry
15    after this hearing to see if we can get him moved to
16    Milan.
17              MR. SWOR:  He was at Milan, and that's where
18    his stuff is.  My concern is now that he's been gone long
19    enough, that Milan will administratively pack everything
20    up and mail it, and then we're in a whole different
21    situation.
22              THE COURT:  Okay.
23              MR. SWOR:  Because then getting it back in
24    will be a problem, but this is an absolute disaster.
25              THE COURT:  Well --
```

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1              MR. SWOR:  The timing is certainly horrible.
2              THE COURT:  Yeah.  All right.  Well, my take
3     on this is that people in general are -- I was looking
4     at -- I was looking at the one print copy that I had,
5     which was on Sunday, maybe last Sunday in the Detroit
6     News, and this is -- with the number of defendants, and
7     the complexity of the case, it seems to me that someone
8     could read that three times, to carefully read it three
9     times, and after the passage of couple of days, couldn't
10    name a person or attribute specific behaviors to an
11    induvial.
12         We have had a lot of high publicly cases in the
13    district, and if you get a jury, a satisfactory jury in
14    Kwame Kilpatrick's prosecution, I guess you can do it with
15    just about any, and I never -- I didn't hear of any
16    complaints about the jurors who were selected, and we have
17    means to deal with the -- to deal with the publicity.  We
18    should undoubtedly ask questions in the juror
19    questionnaire.  We should caution them at the time that
20    the questionnaires are received in the mail, not to do any
21    investigation or access social media about the case, and
22    people as a whole I think are pretty conscientious in
23    following instructions that they get.
24         I mean, you might be absolutely right in that this
25    has received so much attention that the timing of the
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    trial has to be alter, but I think we only find that out

2    when we get started with the selection process, and we

3    find out what people have seen or heard or remember of the

4    coverage even if they read it.  They are not going to be

5    able -- I'm pretty confident that we could fairly sort out

6    the people who really have been impacted.  I have had

7    people discuss it in my presence as well.  So I do agree

8    with you that this got a lot of attention when it came

9    out, but --

10             **MR. SWOR:**  But your Honor, if you go to the

11   website now, and I would invite the Court -- and excuse me

12   for interrupting -- but I would invite the Court to look

13   at it online as oppose to just looking at the print page,

14   and looking at the segmented articles and the video that

15   jumps -- I mean, this was -- there are television

16   productions that would envy this, because as you go over

17   them, the images flash and move, and we all studied how

18   those experiments work, and it remains on the Detroit News

19   website's main page.  It is there, right there in a big

20   bold black box.  So it's not something that fades in time.

21   It's there all the time.

22             **THE COURT:**  Right, if people are accessing it

23   and watching it.  I mean, if we're instructing them at the

24   time these questionnaires go out not to --

25             **MR. SWOR:**  Damage has already been done

                    *15-20652; USA v. EUGENE FISHER, ET AL*

1   because it paints with such a broadbrush, and condemns

2   anyone associated with the group.  That's the problem.  It

3   pernicious.

4           THE COURT:  Have you talked to your client

5   about asking for a severance?

6           MR. SWOR:  I spoke with his aunt who speaks

7   to him everyday.  I actually -- we already had a

8   discussion about going forward in light of what happened

9   here in the courtroom the last time and my concerns about

10  that and --

11          THE COURT:  You mean, just the client's

12  expression of their determination to get the case tried?

13          MR. SWOR:  It was little more than just a

14  simple expression of determination.  As you recall all,

15  with all due respect to the client, this was a rowdy

16  bunch, and they were disrespectful.

17          THE COURT:  Right.

18          MR. SWOR:  And when you get backed into a

19  corner -- and so yes.  The answer is yes, I have discussed

20  severance with my client even before this came out, and he

21  understands why it may be necessary, and as I said, the

22  Speedy Trial Act does not require a client's consent.  It

23  requires a determination by the Court, and I think that

24  given the options available -- and I really don't think

25  there are seven defendants going to trial in January, and

*15-20652; USA v. EUGENE FISHER, ET AL*

neither does the government, nobody does -- and given the
option that the Court has of taking a risk, we're taking a
much smaller risk, I think the Court should err on the
side of a smaller risk.

    **MR. H. SCHARG:** I also spoke with my client
directly, and he, Mr. Fisher, was one who took the
initiative and requested that I file a motion for
severance, and that was before the news articles, based
upon the outburst and circus like atmosphere that occurred
at the last pretrial.

    As you recall, Mr. Fisher is on bond, and he sat
at the defense table, and he had a front row seat of what
was going on there, and at that time he voiced his fears
to me about going to trial with the others who are death
eligible and were sitting in the jury box, and that
actually even before the articles came out, I conferred
with Mr. Swor because I found out that he had voiced
similar concerns.

    So my client not only agrees, but he requests that
there be a severance, and he be put in the third category.

    One more thing, I agree with the Court
wholeheartedly that when it comes to trial, that whoever
read the articles won't remember names.  They won't
remember events, but they will remember Seven Mile Bloods
being some really bad, dangerous dudes, the most

*15-20652; USA v. EUGENE FISHER, ET AL*

1   dangerous, and, you know, the Red Zone.

2        So they won't remember names.  They won't remember

3   events, but when you connect Red Zone and the baddest

4   dudes, the worst violent gang in Detroit, and the fact

5   that they -- that their names won't be published because

6   of the court order, they put two and two together, and

7   what they won't remember is almost more dangerous than

8   what they do.

9        **THE COURT:**  So we finished a trial recently,

10  and I have the benefit of having talked to the jurors

11  after that trial, and it was obviously they knew from the

12  outset what they were dealing with.  They had a general

13  understanding of -- well, there were a couple of people on

14  that jury that had a criminal justice background.  So they

15  undoubtedly educated the others, but they had it figured

16  out.  The skirting around the tables was used, but if

17  anybody has any level of sophistication, they understand

18  the -- they understood what the case was about.  They

19  had -- they were -- still they acquitted one of the

20  defendants, and they were hung on other charges relating

21  to the other defendants.

22       But I think we underestimate the jurors' capacity

23  to be fair and to avoid -- I mean, we live in a period now

24  where nobody agrees.  Nobody agrees with anybody else.

25  There's a lot of -- lots of leaders and few followers, I

*15-20652; USA v. EUGENE FISHER, ET AL*

1    think, these days, and I think that's reflected in the

2    jury, the jurors that we end up to hear these cases.

3          So I just don't know what else we can do but to

4    try to get a fair jury, and to be liberal in excusing

5    those who have been exposed in a serious way, and probe

6    with probing questions, I think we can assess your

7    concerns with the jurors' background without adjourning

8    and having them to sit in custody for another year or two

9    before case is tried.

10         So I hope we don't have seven going to trial

11   because I think it's going cumbersome, and I haven't asked

12   for an estimation of the time required.

13         **MR. GRAVELINE:**  Just in response to Trial

14   Group 3, we know there's three for sure going, and that's

15   the three who were just had a hung jury.  I can tell the

16   Court, I've had no conversation with Mr. Martez Hicks'

17   attorney.  Jeffaun Adams, who is the brother of Jeffrey

18   Adams, I think is heading to trial.  So there's five for

19   sure in Trial Group 3, and so I am concerned about the

20   numbers in terms of the two trial groups.

21         Yes, depending on the outcome of this case, that

22   might change, but if there's a similar result or

23   acquittal, then guess what?  I would imagine that we will

24   have a full seven or eight people come January as well.

25         So to sit here and say well, depending on what the

*15-20652; USA v. EUGENE FISHER, ET AL*

1    result is, we don't know what the result will be, and so

2    that's the difficulty the government finds itself in right

3    now just in terms of -- from the government's viewpoint, I

4    think the Court is correct.  We don't know the impact that

5    any of these stories have had until we get actual jurors

6    in here, we see what they put on their questionnaire, we

7    talk to them in voir dire, and then we're actually able to

8    assess what impact whatsoever these articles have had.

9         And just for complete understanding as well, I

10   mean, the series wrapped up with Michael Rogers being

11   acquitted, and if you go online, there's an interview of

12   Michael Rogers as he walks out the courthouse.  So it's

13   not as if this article is all one-sided as well, and so it

14   lays out what the defendants' arguments were.  It includes

15   the fact that Mr. Rogers was acquitted.  We just don't

16   know.

17        So I think what we have to do is go through the

18   voir dire process, and we'll be in a much better position

19   to judge what, if any, impact it had, and what any remedy

20   would be because of that impact.

21            **THE COURT:**  What's your estimation of the

22   time required for trial if all of these defendants now

23   scheduled?

24            **MR. GRAVELINE:**  I'm planning on two and a

25   half months, your Honor.  So approximately 10 weeks.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **MR. RATAJ:**  Your Honor, may I be heard

2  briefly?  I was not officially invited to the party, and

3  it has to do with the trial date in January with Group 3.

4  I mean, I've heard Mr. Graveline say that.  I mean, is

5  that a sure thing that we are in the third group?

6      **THE COURT:**  We haven't picked a date.

7      **MR. GRAVELINE:**  The only reason I say that is

8  that that's next, Trial Group 3, and I have a month and a

9  half, two month long trial in front of Judge Michelson

10  starting October 5th.  So between the time that Trial

11  Group 2 is done here in August, I have a six to eight week

12  long trial in front of Judge Michelson starting

13  October 5th.

14      **MR. RATAJ:**  I guess my question is that -- I

15  mean, is Mr. Graveline correct, your Honor, that myself,

16  Mr. Machasic and Mr. Arnone, are we with Trial Group 3

17  now?

18      **THE COURT:**  I have not made that decision.

19      **MR. RATAJ:**  I didn't think you did.  That's

20  why I asked.  I think I got the answer, the Court has not

21  made that decision.

22      **THE COURT:**  No, I haven't.  I haven't decided

23  whether I'm going to be around for January and February

24  and March again for this trial.  I'm getting too old for

25  this.

*15-20652; USA v. EUGENE FISHER, ET AL*

 1                    **MR. RATAJ:**  Sounds like you're a little under

 2      the weather.

 3                    **THE COURT:**  I am.

 4                    **MR. SWOR:**  Point of information, I already

 5      advised your staff, but that week that I alerted the Court

 6      about my family, it is now become compulsory because I'm

 7      hosting a wedding that week.  I didn't get to vote on it.

 8                    **THE COURT:**  This is when?

 9                    **MR. SWOR:**  This is going to take 10 weeks.

10                    **THE COURT:**  Okay.  Mr. Machasic?

11                    **MR. MACHASIC:**  If I may be heard?

12                    **THE COURT:**  Sure.

13                    **MR. MACHASIC:**  I am fairly confident that

14      whatever group we end up in, will follow the same

15      procedure as Group 2.

16            Given the Court's ruling, the Court has not placed

17      an order for a semi-anonymous jury, and in that we are

18      prevented from looking at social media postings of

19      potential jurors.

20            Given this series of articles -- and I

21      wholeheartedly disagree with the government that this was

22      some evenhanded treatment -- this was -- I mean, you want

23      to talk about a hit piece, this was a hit piece that did,

24      you know, cursory lip service to fairness in covering both

25      sides, but that was only cursory.

                       *15-20652; USA v. EUGENE FISHER, ET AL*

1        I would like the Court to -- actually, I move that

2    the Court amend the order impaneling a semi-anonymous

3    jury, to provide the names to defense counsel of the

4    potential jurors -- and there can be a protected order

5    that goes along with that regarding further disclosure --

6    but at this point I think we would be entitled to look at

7    social media for potential jurors to see if they have

8    commented about this case, posted about it.  I understand

9    that you can link.  So you can link and further distribute

10    these articles.  All of these sites work together so that

11    you can pull from one or another.  You can take the

12    article from the Detroit News website, and post it to

13    your -- I know it does it for Facebook.  I'm not sure it

14    does it for some of the other social media sites.  You can

15    Twitter it.

16        But certainly at this point under these

17    circumstances, given the fact that the Court has decided

18    that we should move forward and see if we can actually get

19    a fair and impartial jury, this is a necessary step in

20    order to guaranty that we have the best shot at a fair and

21    impartial jury, and so on behalf Mr. Adams, I would move

22    that the Court amend that order to then provide the names

23    under protection to defense counsel only, to allow us to

24    then go and find out if people have linked, post or

25    commented about these articles.

*15-20652; USA v. EUGENE FISHER, ET AL*

1      **THE COURT:**  Okay.  Mr. Graveline?

2      **MR. GRAVELINE:**  I would just ask the Court, I

3  would like to take a look what Judge Edmunds did in the

4  Kwame Kilpatrick case to see what they fashioned in terms

5  of the semi-anonymous jury.

6      I think the Court kind of hit the nail on the head

7  before when you talked about that we have had high profile

8  cases in this district before, the underwear bomber, Kwame

9  Kilpatrick.  If that's something that Judge Edmunds and

10  the parties agreed to, I think that would be instructive.

11  I also think how other courts within the building have

12  done that same thing.  I would just ask for a day or two

13  to see what protections were in place during that jury

14  selection as well.  It doesn't strike me as out there.

15  It's just I would like to take a look how that's been

16  treated before.

17      **THE COURT:**  Okay.

18      **MR. RATAJ:**  I was in that case, Judge.  We

19  fought for that option, but I believe we were denied.  So,

20  you know -- but I think, you know, that was like 4-5 years

21  ago, and I can tell you that -- I can told you that this

22  article even appears as an advertisement on Instagram,

23  where if you're on Instagram, it pops up Death by

24  Instagram, and you can go to the link, and go to the

25  series of stories.  It is popping up as an ad.  So it's

*15-20652; USA v. EUGENE FISHER, ET AL*

1    all over the place.  I was working out at a gym yesterday,

2    and there's not many bright people in this gym, and they

3    even read the article and commented on it.

4         **MR. EDISON:**  Good afternoon, your Honor.

5    Jeffrey Edison on behalf of Martez Hicks, who is in the

6    third group, and I, after learning of this issue that

7    brother counsel was bringing to this Court's attention, I

8    felt that it was necessary to at least appear, and given

9    how fast and quickly technology is evolving as we speak

10   today in April, it may certainly be different by December,

11   and so I would join brother counsel's request for a

12   semi-autonomous jury, and I know that you have to go

13   through another trial in June.  So just in anticipation of

14   our trial in January, we would join in that request.

15        **THE COURT:**  Okay.  Thank you.  All right.  I

16   do think for the reasons that I discussed earlier that --

17   and recognizing that we got another couple of -- do we

18   have a couple of months or a month?

19        **MR. GRAVELINE:**  Approximately five weeks from

20   tomorrow.

21        **THE COURT:**  I would encourage you to focus on

22   the jury questionnaire, and how we approach the problem in

23   connection with the voir dire to fare out people who may

24   have -- and I suspect there will be some who will, if for

25   no other reason, to get out of jury service, indicate that

*15-20652; USA v. EUGENE FISHER, ET AL*

1     they have been affected by the coverage.  But I think we

2     got a lot of skillful people in this room, not including

3     me, and you'll have an opportunity for free rein of

4     questioning in connection with this publicity, and I think

5     it can be dealt with, and if it can't be, then we --

6     there's nothing to say that we have to continue with voir

7     dire if we're running into a lot of people who acknowledge

8     reading the material or discussing the material, but as I

9     also said, I think the jurors have evidence that of pretty

10    great capacity for in most cases following instructions

11    from the court, and -- go ahead Mr. Swor.

12            **MR. SWOR:**  I'm just -- you know me I can't

13    sit still.  Obviously, my client, death eligible, the cost

14    of being wrong is almost irreparable, because for the four

15    death eligibles, if you -- if we start, and then we

16    suddenly can't find a jury, then all of sudden the

17    government has got another shot at making not only death

18    eligible, but death defendants, and that's a prejudice

19    that I think that we have all have to be aware of, the

20    cost of delay.

21            You know, my client -- I was going to say the cost

22    of delay to him, give him bond.  He's not sitting in jail

23    another year, and he's not accused of any of the

24    murders -- and we'll get into that at the bond hearing --

25    but I don't think -- well, you made your ruling, but I

*15-20652; USA v. EUGENE FISHER, ET AL*

1    just want to point that out that I think we have to be

2    careful.

3              **THE COURT:**  I think we do too, and so have

4    you collaborated at all on the jury questionnaire?

5              **MR. GRAVELINE:**  We have, your Honor.  I think

6    it is down to one question.  Now that was before any of

7    this popped up.  So I think it's been Mr. Daly who's

8    taking the lead on that in conversations with me.  We're

9    down to one question that quite frankly, the government is

10   objecting to the inclusion of that question.  We tabled

11   that for a couple of weeks since we knew we had a little

12   bit of time before the jurors were coming in in mid-March

13   (sic).  So that was on the to do list this week, at least

14   for me to reach out to Mr. Daly and talk about what were

15   we going to do with that question, and maybe also what, if

16   anything, anyone wants to have included about this.

17        It strikes me that touching upon how much people

18   have viewed this particular article probably should be an

19   in person thing rather than a juror questionnaire thing,

20   but I will also leave that up to defense counsel.  If we

21   can craft some questions, I'm open to discussion.  It just

22   strikes me -- that's my initial thought on it, probably

23   better for in person voir dire than on the jury

24   questionnaire.  The jury questionnaire asks what newspaper

25   do you get your information from in a pretty benign way.

*15-20652; USA v. EUGENE FISHER, ET AL*

1 So we'll probably know who reads or does not read the

2 Detroit News.  That will be helpful to us, but like I

3 said, I'll be open to the suggestion of what's included.

4   **THE COURT:**  That could be helpful, although

5 if what I'm hearing correctly, it's coming from a lot of

6 different sources that repeat the same material.

7   **MR. GRAVELINE:**  That's right, and I think we

8 can only fare that out once we start understanding who

9 might or may.  For example, the example that Mr. Rataj

10 gave in terms of Instagram.  I'm not sure if Instagram is

11 running that because it's name is listed in it or because

12 you clicked on it before.

13   So sometimes in Facebook, they monitor what

14 articles you put down before, and the running screen on

15 the right hand side will suggest other articles that you

16 may or may not be interested in.  So it might depend on,

17 you know, is this something that Instagram pushed out to

18 all of its users or is it suggesting the article because

19 you read one of the previous eight articles.

20   And so that's why I'm saying is I think at least

21 my initial reaction is, I think that's an in person voir

22 dire as oppose to -- I don't know how we craft enough

23 questions to ask about this or that.  I think the initial

24 juror questionnaire as crafted right now will give us

25 clues, someone gets their news from the Detroit News,

1     somebody gets their news from social media, at least

2     enough then to know that we need to be prompted that this

3     is somebody we might need to dig in a little bit more on

4     in terms of our questioning.

5           **THE COURT:**  Right.  I don't have a problem

6     with dealing with in the courtroom with voir dire, but

7     the -- but if we have the opportunity to head off jurors

8     researching in preparation in anticipation of their big

9     day in court, we should probably include a warning to

10    them.

11          **MR. GRAVELINE:**  Absolutely.  If I understand

12    the process of the court, they are called in, and they are

13    told to fill out the questionnaire in person here.  So I

14    think if the Judge wants to be there, if defense counsel

15    wants to be there, but if the Court instructs them, you

16    know, please understand -- you know, we don't have to

17    mention this particular article.  So just say, please

18    understand, you're now a juror in this case.  You should

19    not do any internet research on a case.  You should not do

20    any of this.  Not particularly flagging that, I think

21    that's a good and proper instruction that they should

22    receive, the entire jury pool when they come in to fill

23    out the jury questionnaire, and we can work on crafting a

24    statement for the Court to read to that effect as well.

25         So I'm open to all of those possibilities, and I

*15-20652; USA v. EUGENE FISHER, ET AL*

1    think it would be wise to do that.

2            MR. MAGIDSON:  The jury, when they come in as

3    a pool, are they informed of the case?

4            MR. GRAVELINE:  Yes.  So the jury

5    questionnaire, like Page 2 says, this is a racketeering

6    case involving the Seven Mile Bloods, particularly these

7    seven defendants with these type of crimes.

8            MR. MAGIDSON:  I think as long as they are

9    going to be informed of the case, then there should be a

10   general question, has anybody heard of this case without

11   being specific as to where or what because there are so

12   many sources, so at least we can flag that right away.

13           MR. GRAVELINE:  I think there is a question

14   that goes to that, have you heard of the Seven Mile Bloods

15   before?  Have you had problems with the Seven Mile Bloods?

16        So without taking up too much more of the Court's

17   time, maybe we all should take a look at the juror

18   questionnaire, and then we'll come back to the Court.

19           MR. H. SCHARG:  But Chris and I and Bill were

20   on the Atari case in front of Judge Roberts, and I believe

21   that we were all summoned to be here when the jury filled

22   out their questionnaires.  We were in the courtroom, and

23   they had monitors -- television monitors while Judge

24   Roberts went in the jury room and admonished them about

25   not to do any pretrial research, et cetera, et cetera.

                    *15-20652; USA v. EUGENE FISHER, ET AL*

```
 1              THE COURT:  This was at the time they are
 2    filling out the questionnaire?
 3              MR. H. SCHARG:  Judge Roberts went in there
 4    before they filled out -- you know, as an introduction
 5    before they started to fill out their questionnaires, and
 6    defense counsel and the government were in the courtroom
 7    watching on monitors as Judge Roberts admonished them
 8    about any type, such as, pretrial research, et cetera, et
 9    cetera, and then left the room.
10              THE COURT:  This was all on the record?
11              MR. H. SCHARG:  Pardon me?
12              THE COURT:  Was that all on the record?
13              MR. H. SCHARG:  Yes.  Judge Roberts left
14    before they initiated going through the questionnaires,
15    and the perspective jurors were free to leave when they
16    completed their questionnaires.
17              THE COURT:  Okay.  That sounds like a pretty
18    good way of approaching it.
19              MR. JOHNSON:  Judge, I would just like to add
20    that I concur with all of the arguments of counsel, but I
21    had conversation with Mr. Graveline at the outset, and one
22    thing we did agree on, I believe that there should be some
23    type of remedy.  I don't know what that is, but I think we
24    should work together to fashion some sort of process in
25    the selection of this jury that may come down to some
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1    individual voir dire after we fare out where that may be

2    useful.

3       I think the trial that you heard has demonstrated

4    that there is a thin line between some of the guilt or

5    innocence of some of these parties.  Particularly I'm

6    arguing for Devon Patterson, who I consider with respect

7    to sitting next to death eligible defendants, that he may

8    be a smaller guy when you start talking about that thin

9    line, but the spillover from this prejudice is so great,

10   that I think that it could determine the guilt or

11   innocence of some of these non-death eligible defendants.

12      So I would ask for some sort of consideration or

13   some degree of individualized voir dire if, in fact, we

14   could work that in and if, in fact, the government, like

15   me and Mr. Graveline, spoke about would agree on some sort

16   of process.

17       **MR. RATAJ:**  If I may just finish this up,

18   Judge, because I was in the Atari case too, and my

19   colleagues and Mr. Graveline can refresh my memory, but I

20   believe the voir dire was conducted individually.

21       **MR. SWOR:**  We had individual --

22       **MR. RATAJ:**  We had individual voir dire.

23   That maybe something that the Court may want to consider

24   as well.

25       **THE COURT:**  Right.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1                    MR. SWOR:  I assume --
 2                    MR. RATAJ:  So as a pool, the rest of the
 3     people don't get poisoned if somebody goes off the rail.
 4                    MR. SWOR:  In other words, when you're saying
 5     "individual," we brought them in individually.
 6                    MR. JOHNSON:  That's what I was speaking
 7     about.
 8                    THE COURT:  Right.  How long did that take?
 9                    MR. S. SCHARG:  It took us three days.
10                    THE COURT:  I would be willing to do that.
11     That probably makes sense.
12                    MR. RATAJ:  Actually Judge Roberts put a
13     table right in front of the box, sat there, and we were
14     all sitting around, and the person was like in front of
15     them.
16                    THE COURT:  Okay.  I don't know that I'll do
17     that.  In Macomb County we had Judge Chrzanowski, who
18     didn't want to be on that bench at all.  She would be out
19     mingling with the people.  Very nice lady.
20                    I'm going to be at the Sixth Circuit Conference
21     during the period when they are filling out their
22     questionnaires, and --
23                    MR. GRAVELINE:  I think we could have Judge
24     Hood do it.  I mean, she is the chief judge.  That gives
25     another veneer of hey, this is pretty common type of court
```

*15-20652; USA v. EUGENE FISHER, ET AL*

1   practice.  I'm the chief judge.  I'm here welcoming you

2   here.  Please know that you need to take your

3   responsibilities seriously.  Don't do any research.  I

4   think if the defense doesn't have any objection, I think

5   Chief Judge Hood --

6               THE CLERK:  She's probably going to be there.

7               THE COURT:  We usually have a couple that

8   don't attend.

9               MR. GRAVELINE:  So we'll see who's available.

10              MR. H. SCHARG:  There's always the magistrate

11  judge.

12              THE COURT:  Okay.  All right.  Sounds good.

13  All right.  So nothing new about the death authorization

14  other than it's at the assistant AG?

15              MR. GRAVELINE:  That's correct.  I hope --

16  and they know of the deadline before the plea cutoff.  So

17  I hope to have an answer.

18              THE COURT:  Okay.  So if you don't hear by

19  the time the trial is to start, do you agree that we

20  proceed without the death penalty, right?

21              MR. GRAVELINE:  I never heard of that.  I've

22  never done any research on that.  I would imagine -- I

23  would get myself in trouble saying these things -- I

24  imagine that would constitute some sort of waiver on the

25  Department of Justice.

*15-20652; USA v. EUGENE FISHER, ET AL*

 1              MR. SWOR:  Jeopardy attaches.

 2              MR. GRAVELINE:  Right.  It would strike me,

 3     if you're not saying it that you're affirmatively doing

 4     it, then that would be some type of waiver.  I say all of

 5     that, I've never heard of that happening, and I don't

 6     know, but I'm going to just stop right there, but we will

 7     have an answer before this start starts one way or the

 8     other.

 9              THE COURT:  All right.

10              MR. GRAVELINE:  I mean, when I say that, they

11     know of the plea cutoff.  They know when the plea cutoff

12     is in this case.

13              MR. MAGIDSON:  Will it be a waiver then if we

14     don't have it by the plea cutoff?

15              THE COURT:  I would like to set an earlier

16     date.

17              MR. GRAVELINE:  That's why -- I'm going to

18     back up.  I'm going to back up everything that I just

19     said.  I didn't know the operative facts on that.  I've

20     never heard of that happening.  I understand the

21     ramifications of everybody.  I've informed them of the

22     plea cutoff.

23              MR. MAGIDSON:  Perhaps the Court can set that

24     date.

25              MR. GRAVELINE:  I believe that's the plea

                 *15-20652; USA v. EUGENE FISHER, ET AL*

1   cutoff, and so all I'm saying, I will inform them.  They

2   know what the dates are, and it would strike me that --

3   let's say for example, that we don't hear anything by May

4   10th, but they come back on May 17th and say we are going

5   to authorize on a particular defendant, it would strike me

6   then that person would be able to sever.  We would sever

7   them out and figure out what we're doing with them like

8   Billy Arnold.  If they came back on May 17th and said

9   we're not seeking the death penalty on this person, it

10  would strike me at that point that if this person is still

11  interested in some type of plea negotiation with the

12  government, and wants to enter into some dialogue about a

13  number of years, a charged plea at that point, that we

14  would still be open to it if the Court is still open to

15  it.

16          And so without doing any research, not knowing --

17  I've never heard of the Department of Justice beginning a

18  trial and not saying yea or nay.  That's why I don't want

19  to speculate about some type of waiver, but they

20  understand what May 10th is.  They understand that it is

21  the plea cutoff, and they understand that's the timeline

22  that we're operating under.  They have moved expeditiously

23  in Washington D.C. upon receipt of everyone's materials,

24  and I anticipate we will have an answer one way or the

25  other before May 10th.

*15-20652; USA v. EUGENE FISHER, ET AL*

 1          **MR. H. SCHARG:**  One more wrinkle for Bill and

 2     I, the possibility of Washington authorizing the death

 3     penalty on one of the four defendants right before our

 4     trial, and that hits the news.  That's why I wish the

 5     Court would consider moving us to the third trial group to

 6     avoid further harm and prejudice.

 7          **MR. GRAVELINE:**  But we don't know that yet.

 8     We'll cross the bridges as we cross the bridges I think.

 9          The problem that -- I understand what Mr. Scharg

10     and Mr. Swor are arguing in terms of their defendants,

11     although I tend to disagree -- they are involved in

12     violent acts.  I mean, Mr. Robinson is charged during the

13     shooting of Mr. Canady and Anthony Bowen at the baby

14     shower.  Mr. Fisher is charged as aiding and abetting the

15     shooting on May 10th, and storing the weapon that was used

16     on May 1st, May 8 and May 10th.

17          So the problem is we have a pretty full Trial

18     Group 3, even assuming that the other three are not in

19     Trial Group 3.  I think we have to just keep moving

20     systematically, and then just take it as it comes.  And so

21     we'll see what the next week and a half brings, and I

22     think the Court will be in a better position to make the

23     decisions as necessary.

24          **THE COURT:**  When the Justice Department did

25     respond by directing the U.S. Attorney to pursue the death

*15-20652; USA v. EUGENE FISHER, ET AL*

1   penalty of the first guy, I don't think there was a line

2   written about it.

3               **MR. SWOR:**  Oh, yes there was.  Maybe you were

4   in different town that day or something.

5               **MR. GRAVELINE:**  Well, I think that's also

6   illustrative of -- the people in this room, the 12 of us

7   lawyers, we know every word that's written about our

8   cases.  I'm not sure until we get a jury in here, that

9   they will be as oh, yeah.  I would imagine if we brought

10  in 100 people, if you ask if you know about the Justice

11  Department seeking the death penalty against anyone, I bet

12  we would get a lot of shrugged shoulders that they don't

13  know.  I think we need to continue to consistently move

14  through it, and we'll find out where we end up here.

15              **THE COURT:**  All right.  We'll do our best.

16         What else do we've got pending?  Mr. Graveline

17  asked to us consider going 9 to 1:30 instead of nine to

18  one like the first time.  We also have the option of -- if

19  it makes it easier for jurors to -- I think we had planned

20  a week off in August if it goes that long.

21              **MR. GRAVELINE:**  We definitely had the week of

22  the July 4th off.  I haven't heard about a week in August.

23              **THE CLERK:**  The week of August 6th, if it

24  goes that far.

25              **MR. GRAVELINE:**  Maybe what we could consider

*15-20652; USA v. EUGENE FISHER, ET AL*

1     is, depending on Mr. Swor's schedule, the end of --

2          **THE CLERK:**  What are your dates?

3          **MR. SWOR:**  I'll be gone the last week of

4     July.

5          **MR. GRAVELINE:**  Well, before we get to

6     schedules and we have a final pretrial with that, and I

7     think we will have all of the defendants here, but in

8     terms of speaking with Jill before the hearing, I think

9     there's two pending motions for bond, Mr. Graham and

10    Mr. Jeffaun Adams.  I ask to have until Friday to respond

11    to those, if that's fine, this Friday, May 5th.

12         I believe there's a motion pending, concerning

13    precluding the government from recall of certain

14    witnesses, i.e., Agent Ruiz multiple times throughout the

15    trial.  I would ask the Court if you would consider giving

16    us at least until next Wednesday to respond to that

17    motion, and I think that's all of the pending motions

18    right now, and then have our final pretrial on May 10th.

19         The only other item that I want to bring the

20    Court's attention, I know the discussion right now is to

21    use Judge Tarnow's courtroom, and I know there's not a

22    whole bench of very good options on this.  If we go with

23    seven defendants, I think that courtroom could be pretty

24    tight, especially where the witness box is seated, and I'm

25    not sure if this something where we need the marshals --

*15-20652; USA v. EUGENE FISHER, ET AL*

1   as I remember Judge Tarnow's courtroom, it's very similar

2   to yours, but shorter, and the witness box is right

3   against the defense table.  If we have all seven

4   defendants, I would minimally ask the Court to consider

5   moving the witness box to the other side of the room or up

6   against the court's -- I have concerns about witnesses

7   testifying six inches away from some of the people they

8   might be testifying against.  That's an issue.

9           I don't think they are available.  I just point

10  out that, for example, Judge Borman and Judge Lawson, I

11  know we've done multi-defendants cases up there, and the

12  jury box -- or the witness box is on the opposite side.

13  Like I said, I don't think they are available, but it is

14  just something to put out there that I think we need to

15  consider about placement of the witness box, how much room

16  needs to be done if it is Judge Tarnow's courtroom that we

17  will be using.

18          **THE COURT:**  We're going to have a lot of

19  difficulties with that, given the -- you know, all of the

20  judges on this floor are going to be evicted and will be

21  scrounging around for courtrooms.

22          **THE CLERK:**  Judge Lawson's is not available.

23  We asked.

24          **THE COURT:**  So who is the other one?

25          **MR. GRAVELINE:**  Judge Borman.

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1              THE CLERK:  They are pairings us up with
 2   different judges, and it is not hi-tech either.
 3              THE COURT:  We can explore the possibility.
 4              MR. GRAVELINE:  I know we're still five weeks
 5   out from trial, but that's concern when I heard it was
 6   Judge Tarnow's.  That's a tight courtroom where the
 7   witness box located.
 8              THE COURT:  Okay.  All right.  So deadlines
 9   for responding to the two motions is reasonable, and we'll
10   address the issues --
11              MR. GRAVELINE:  So I mean, we have a final
12   pretrial -- the plea cutoff is May 10th, and so I figured
13   that was the final pretrial.
14         In terms of Mr. Rataj's client Mr. Graham and the
15   bond, I think we have a status conference set for May
16   22nd.  Maybe that would be a good time by the time we
17   respond, if he wanted to file a reply, we can do it on May
18   22nd, the bond hearing.
19              THE COURT:  Mr. Rataj?
20              MR. RATAJ:  Whatever your Honor sets.
21              THE COURT:  Okay.  We'll do it that way.
22              MR. GRAVELINE:  Then with Jeffaun Adams I'm
23   not sure.
24              THE COURT:  Okay.  All right.  If we hear in
25   the meantime from DOJ --
```

*15-20652; USA v. EUGENE FISHER, ET AL*

```
 1              MR. GRAVELINE:  As soon as I hear, everyone
 2    will hear.
 3              THE COURT:  Should we reconvene again?
 4              MR. GRAVELINE:  Sure, if it changes the
 5    dynamics at all.
 6              THE COURT:  All right.  During jury
 7    selection, we'll be doing that all day until we get a jury
 8    selected, and as it relates to nine to 1:30 or nine to
 9    one, do you have a preference?
10              MR. H. SCHARG:  Is the option 8:30 to one?
11              MR. GRAVELINE:  The only concern with 8:30 is
12    usually jurors and child drop off to school, especially if
13    we get somebody from St. Clair County or Washtenaw County.
14              THE CLERK:  It's summer.
15              THE COURT:  Daycare would be the only --
16              MR. GRAVELINE:  We can be flexible, a five
17    and a half trial day, and then leave it up to what works
18    best for the Court, jurors and everyone.
19              THE COURT:  The other option that I've never
20    tried, but I've been told by other judges where it seems
21    to work well with them, is to go Monday through Thursday
22    and take Friday off okay each week.  I'm happy to go
23    whatever you all agree on, and so we'll do the shorten
24    trial day, and just have to figure the preplanned vacation
25    problems.
```

*15-20652; USA v. EUGENE FISHER, ET AL*

```
1              All right.  Anything else?

2                   MR. GRAVELINE:  Nothing from the government,

3      your Honor.

4                   MR. SWOR:  No.

5                   MR. H. SCHARG:  No.

6                   THE COURT:  All right.

7

8                   (Proceedings concluded.)

9                        -    -    -

10                  C E R T I F I C A T I O N

11             I, Ronald A. DiBartolomeo, official court

12      reporter for the United States District Court, Eastern

13      District of Michigan, Southern Division, appointed

14      pursuant to the provisions of Title 28, United States

15      Code, Section 753, do hereby certify that the foregoing is

16      a correct transcript of the proceedings in the

17      above-entitled cause on the date hereinbefore set forth.

18             I do further certify that the foregoing

19      transcript has been prepared by me or under my direction.

20

21      s/Ronald A. DiBartolomeo              _May 23, 2018_
         Ronald A. DiBartolomeo, CSR                  Date
22      Official Court Reporter

23                       -    -    -

24

25


                 15-20652; USA v. EUGENE FISHER, ET AL
```