# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  July 05, 2022

Mr. Corey Bailey
U.S.P. Pollock
P.O. Box 2099
Pollock, LA 71467

Mr. Craig Alvin Daly
Law Office
P.O. Box 720
Royal Oak, MI 48068

Mr. Kort W. Gatterdam
Carpenter, Lipps & Leland
280 N. High Street, Suite 1300
Columbus, OH 43215

Mr. Daniel R. Hurley
Office of the U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226

Mr. Mark Henry Magidson
Law Office
1 Park Avenue, Suite 1207
Detroit, MI 48226

Ms. Karen Oakley
Law Office
P.O. Box 541111
Cincinnati, OH 45454

Re:  Case Nos. 19-2280/19-2281/19-2354/20-1235, *USA v. Bailey, et al.*
Originating Case No. : 2:15-cr-20652-4

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Laurie A Weitendorf
Opinions Deputy

cc: Ms. Kinikia D. Essix

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0265n.06

Case Nos. 19-2280/2281/2354/20-1235

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

FILED

Jul 05, 2022

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| COREY BAILEY (19-2280); ARLANDIS | ) | MICHIGAN |
| SHY, II (19-2281); ROBERT BROWN, II | ) | |
| (19-2354); KEITHON PORTER (20-1235), | ) | OPINION |
| Defendants-Appellants. | ) | |
| | ) | |

Before: BOGGS, THAPAR, and BUSH, Circuit Judges.

THAPAR, Circuit Judge. For over a decade, the Seven Mile Bloods used a combination of threats and violence to control a swath of territory in east Detroit. The defendants were convicted for their roles in these efforts. And they now bring a host of challenges to those convictions and their sentences. But we find no error and affirm.

I.

In this appeal, several members and associates of a Detroit street gang known as the Seven Mile Bloods (SMB)—Corey Bailey, Arlandis Shy, Robert Brown, and Keithon Porter—challenge their convictions for conspiracy under the Racketeer Influenced and Corrupt Organizations Act (RICO) and related offenses. SMB was founded in 2005. Before then, drug dealers from across the city would sell drugs between Seven Mile Road and Eight Mile Road in Detroit. But once SMB staked its claim to this area, nobody else was allowed to sell drugs there. If anyone tried to,

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

SMB would "[s]teal their customers" and "fight with them." R. 1123, Pg. ID 11003. The area developed such a bloody reputation that it was soon termed the "Red Zone."

Over time, law enforcement began to crack down on the Red Zone. This made dealing drugs there more dangerous and less profitable. So when Jason Gill, an SMB member, learned that money could be made more easily in West Virginia, he and other SMB members and associates began traveling there to sell drugs—mostly prescription pain killers. They would travel together, stay together, and ferry drugs and money for each other.

During this period, several SMB members were arrested in West Virginia. Shy had several encounters with the West Virginia police; one time he was caught ferrying 300 Oxycontin pills for Anthony Lovejoy, an SMB associate. And on another occasion, Bailey was found with 54 Oxymorphone pills stuffed up his buttocks. Brown, too, had interactions with the police in West Virginia.

In the summer of 2014, Billy Arnold (a senior SMB member) was released from prison. Arnold believed the Hustle Boys, a rival gang, had set him up on the charges. So when he saw members of the Hustle Boys (twins named Martez and Michael Davis) at his parole office later that year, he decided to act. Arnold called Bailey, who drove down to the parole office to join him. When the Davis twins left their meeting, they got into a car with Djuan Page and Corey Crawford. Arnold and Bailey then drove past the Hustle Boys, and Arnold opened fire, wounding one twin and fatally shooting Page in the eye. SMB members later bragged about the attack, even creating a rap video about shooting someone in the "e-y-e." R. 1126, Pg. ID 11488. And they posted a brochure from Page's memorial service on Instagram to mock the Hustle Boys.

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

The gang violence only escalated from there. On May 1, 2015, rival gang members shot and killed Devon McClure, a founding member of SMB. SMB retaliated that same day, gunning down Raphael Carter. A week later, on May 8, 2015, Arnold, Shy, and Porter shot up another car full of rival gang members, killing Dvante Roberts and wounding at least two others. And just two days after that, on May 10, 2015, SMB members attacked another group of rival gang members. Brown and Arnold opened fire on the rival gang's car, wounding Derrick Peterson. Then SMB members struck again. Darnell Canady was attending a baby shower when Arnold drove up and fired. Canady was hit. And so was a 15-year-old bystander.

Federal agents eventually charged twenty-one SMB members and associates. The trial here began in June 2018 and lasted over two months. The jury convicted all four defendants at issue (Bailey, Shy, Brown, and Porter) of RICO conspiracy. Bailey, Brown, and Porter were also convicted of related offenses, and Shy was acquitted of all other charges. The defendants appealed, bringing dozens of claims.

II.

Bailey, Brown, and Porter argue that their convictions are not supported by sufficient evidence. "A defendant challenging the sufficiency of the evidence bears a very heavy burden." *United States v. Warshak*, 631 F.3d 266, 308 (6th Cir. 2010) (citation omitted). We must uphold their convictions if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The government may carry its burden with "circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995).

- 3 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

### A.

Start with Bailey. He was convicted on five counts: (1) one count of RICO conspiracy in violation of 18 U.S.C. § 1962(d); (2) one count of murder in aid of racketeering in violation of 18 U.S.C. § 1959; and (3) three counts of attempted murder in aid of racketeering in violation of section 1959. First, we address Bailey's conspiracy conviction. And then we address his convictions for murder in aid of racketeering and attempted murder in aid of racketeering.

### 1.

RICO makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO also makes it "unlawful for any person to conspire to violate" that provision. *Id.* § 1962(d). Bailey argues that his conviction is invalid for two reasons: (1) there was no RICO "enterprise"; and (2) the government did not prove he agreed to participate in any enterprise.

We start with his contention that there was no RICO "enterprise." RICO defines an "enterprise" to include "any union or group of individuals associated in fact." *Id.* § 1961(4). This is a broad definition that encompasses any entity which shares three features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Put differently, any group that associates for a common purpose qualifies. *Id.* And this group need not have a formal structure. *Id.* at 948. Nor do group members need to have fixed roles. *See id.* Indeed, the group need not even have "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.*

- 4 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

According to Bailey, SMB was simply a group of individuals who did not associate for a common purpose but instead engaged in isolated criminal behavior for their own benefit. But construing the evidence in the light most favorable to the government, as we must, a rational factfinder could conclude that a RICO enterprise existed.

To begin, the record is full of evidence that SMB was a "distinct, identifiable group." *United States v. Brown*, 973 F.3d 667, 683 (7th Cir. 2020). Indeed, many witnesses testified that SMB was a gang, including Matleah Scott (partner of McClure, an SMB leader killed in the violence). Scott also described an SMB meeting where McClure chastised other members for not "taking being in the gang as serious as he was" because "he was the only one who was willing to put his life on the line for it." R. 1128, Pg. ID 11808. What's more, SMB members often sported tattoos proclaiming their affiliation with the gang. And they developed symbols and hand gestures to promote their group identity. *See Brown*, 973 F.3d at 684 ("The [gang members] also showed their unity through tattoos and hand signs."). They then advertised that identity by, for example, producing a series of rap videos to intimidate rival gangs and brag about their criminal exploits.

SMB members and associates also worked together to maximize their profits and protect their "exclusive territory"—the Red Zone. *Id.* at 683; *cf. United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir. 1999) (noting that "the existence of a drug conspiracy based on monopolistic conduct is not novel"). Indeed, before SMB was founded, competitors would sell in the Red Zone. But once SMB was started, they would "not let that happen." R. 1123, Pg. ID 11003 (cleaned up). If anyone else tried to sell drugs in the Red Zone, SMB members and associates would "[s]teal their customers" and "fight with them." *Id.*

On top of that, SMB members also worked together to traffic drugs in West Virginia. When Lovejoy was selling pills in West Virginia, SMB members resupplied him with 300 pills every

- 5 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

day. According to Lovejoy, SMB only trusted members and close associates to ferry the pills to West Virginia.

SMB members also "protected each other and retaliated on behalf of one another." *Brown*, 973 F.3d at 683. If someone attacked an SMB member, other members would violently retaliate. When another gang killed McClure, for example, SMB members started a months-long war with rival gangs. They shot Raphael Carter that same day. And they attacked another group a week later. Indeed, SMB members went "hunting" for rival gang members for months after McClure's murder. R. 1128, Pg. ID 11834. Thus, viewed in the light most favorable to the government, SMB was a "group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (citation omitted).

So we move to Bailey's second argument: that there is insufficient evidence he agreed to participate in the conspiracy. To convict Bailey of RICO conspiracy, the government needed to prove that he intended to "further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense," and "it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997); *accord United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008). In other words, it must "prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *United States v. White*, 7 F.4th 90, 99 (2d Cir. 2021) (citation omitted).[1] This agreement may be inferred from the defendant's acts. *See United States v. Gardiner*, 463 F.3d 445, 457 (6th Cir. 2006).

---

[1] At one point, Bailey contends that he didn't participate in the "affairs and operation of the criminal enterprise." Bailey Br. 30 (citation omitted). Although the government would need to prove that to establish a substantive RICO offense, *see Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), that is not an element of RICO conspiracy, *see United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011).

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

Here, the record is full of evidence that Bailey agreed to participate in the conspiracy. Bailey was an SMB member—in fact, Lovejoy named Bailey as one of the individuals who started SMB. He even had a "tattoo indicating his affiliation with the" gang. *Gibbs*, 182 F.3d at 422. And Bailey took that affiliation seriously. Indeed, he joined other SMB members to retaliate against rival gangs. According to Derrick Kennedy (an SMB member and cooperating witness), Bailey once helped Arnold shoot up a car of rival gang members, even waving a red bandana—SMB's color—out of the window as they drove away. Bailey also participated in the gang's drug-trafficking efforts in West Virginia. He traveled there to sell drugs and stayed with SMB members while doing so. Given Bailey's association with SMB and participation in gang activities, a rational factfinder could conclude that Bailey adopted "the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65.

### 2.

Bailey also contends that there is insufficient evidence to support his section 1959 convictions for murder in aid of racketeering and attempted murder in aid of racketeering. Section 1959 prohibits any person from committing certain violent crimes (including state-law crimes like murder and attempted murder) for the purpose of "maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a); *see, e.g.*, *United States v. Donovan*, 539 F. App'x 648, 655 (6th Cir. 2013) (looking at state-law crimes under section 1959). And the government need not prove that the defendant's sole or primary purpose was gang related. *See United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014). It is sufficient if maintaining or increasing position in the gang was "an animating purpose." *Id.* (cleaned up).

Taking the evidence in the light most favorable to the government, a rational factfinder could conclude that Bailey violated section 1959. Under the relevant law—here, Michigan law—

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

a defendant is guilty regardless of whether he committed the crimes himself or aided and abetted their commission. *See People v. Mass*, 628 N.W.2d 540, 548 (Mich. 2001) (citing Mich. Comp. Laws § 767.39). Thus, a defendant is guilty of murder and attempted murder if: "(1) the crime charged was committed by the defendant or some other person, (2) the defendant performed the acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended it when the defendant gave aid or encouragement." *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006); *see People v. Favorite*, No. 290380, 2010 WL 2507026, at *4 (Mich. Ct. App. June 22, 2010).

There is sufficient evidence that Bailey aided and abetted the murder of Dvante Roberts and attempted murder of three others. While visiting his parole office, Arnold spotted two members of the Hustle Boys (the Davis twins). Arnold immediately summoned Bailey. They then stalked the Davis twins as they left their meeting, drove by them, and Arnold opened fire. Michael Davis was hurt, and Page was fatally shot in the eye. While Arnold and Bailey sped off, Bailey waved a red bandana out of the window so that the victims would know who shot them. SMB members later bragged about the attack and created a rap video about shooting someone in the "e-y-e." R. 1126, Pg. ID 11488. Given this context, a jury could rationally conclude that Bailey knowingly assisted the commission of these crimes. *See Brown*, 441 F.3d at 351.

A jury could also conclude that Bailey committed these crimes to maintain or increase his position in SMB. *See* 18 U.S.C. § 1959(a). Bailey's cellphone record shows that he traveled a significant distance to Detroit right before the shooting and that his phone was near Arnold's around the time of the shooting. This attack on the Hustle Boys "fit the mold of the gang's typical missions against rival dealers and gangs," which often entailed drive-by shootings of rival gangs. *United States v. Ledbetter*, 929 F.3d 338, 358–59 (6th Cir. 2019). Because this shooting resembled

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

typical gang-related activity, and based on the lengths Bailey went to participate in it, the jury could infer that an "animating purpose" of his participation was a desire to maintain or increase his standing within SMB. *Hackett*, 762 F.3d at 500 (citation omitted); *see United States v. Tisdale*, 980 F.3d 1089, 1095–96 (6th Cir. 2020) (concluding that a defendant sought to "maintain" status when he did what the gang "expected" him to do). Thus, a rational factfinder could conclude that Bailey aided Arnold during the shooting in violation of section 1959.

B.

Brown was convicted on three counts: (1) one count of RICO conspiracy in violation of section 1962(d); (2) one count of attempted murder in aid of racketeering in violation of section 1959; and (3) one count of using and carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c). Like Bailey, he challenges the sufficiency of the evidence for each count.

1.

Brown contests his RICO conspiracy conviction on two grounds. First, he contends that there was no RICO enterprise. But as discussed above, a rational factfinder could conclude that a RICO enterprise existed. So this argument fails.

Second, Brown argues that the government didn't prove that he agreed to participate in the conspiracy. But as with Bailey, the record is full of evidence that Brown adopted "the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65; *see Fowler*, 535 F.3d at 421. Like Bailey, Lovejoy described Brown as "one of the founders of SMB." R. 1122, Pg. ID 10808. And Brown was an enthusiastic member. He starred in intimidating and threatening rap videos for the group. And he participated in the gang's criminal acivities. Lovejoy testified that Brown was one of the SMB members who ferried pills to West Virginia for him to sell, noting that

- 9 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

Brown was there "[a]lmost everyday." *Id.* at 10827–28. And Brown also joined other SMB members to shoot up rival gang members on May 10, 2015. From these facts, a rational factfinder could conclude that Brown agreed to participate in SMB's conspiracy.

2.

Brown also challenges his conviction for attempted murder in aid of racketeering under section 1959 and his related firearm conviction. These convictions relate to the May 10, 2015, shooting of rival gang members. Brown and Arnold opened fire on the rival gang's car, wounding Derrick Peterson. After the shooting, Brown and Arnold told Kennedy that they participated in it. They even debated whether they had hit the rival gang members, with Brown proclaiming that he had "seen their bodies drop" and he "look[ed] them in the face. They dead." R. 1139, Pg. ID 13454–55. Brown's cellphone record confirms that Brown was in the area of the shooting. Based on these facts, a rational factfinder could find Brown guilty of attempted murder and using a firearm in relation to that attempted murder. *See, e.g.*, *Brown*, 441 F.3d at 351 (noting that a defendant is guilty when he "performed [the] acts" and "intended the commission of the crime").

A rational factfinder could also find that Brown participated in this shooting to maintain or increase his standing in SMB. Indeed, the shooting was retribution for the murder of Devon McClure, an important SMB member. And shortly after that shooting, Brown disparaged another SMB member who failed to stand with Arnold when he was shot at by rival gang members. That is enough evidence to support the jury's finding. As we have previously explained, when the evidence suggests that a gang "expect[s] its members to retaliate violently" to an attack and a defendant complies, the jury may find that the defendant's actions were done to "perserve standing in the gang." *Ledbetter*, 929 F.3d at 359 (citation omitted); *Tisdale*, 980 F.3d at 1095–96

- 10 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

(concluding that gang member committed a criminal act to maintain his position because he did what the gang "expected" him to do).  In sum, sufficient evidence supports Brown's convictions.

## C.

Porter was convicted on seven counts:  (1) one count of RICO conspiracy in violation of section 1962(d); (2) one count of murder in aid of racketeering in violation of section 1959; (3) one count of using and carrying a firearm in relation to that murder in violation of section 924(c) and (j); (4) three counts of attempted murder in aid of racketeering in violation of section 1959; and (5) one count of using and carrying a firearm in relation to the attempted murder in aid of racketeering charges in violation of section 924(c).  He challenges the sufficiency of the evidence for each count.

The evidence supports Porter's convictions.  First, his RICO conspiracy conviction.  Porter contends there is insufficient evidence that he "joined in any common purpose" of SMB.  Porter Br. 82.  He points out that he was not a formal SMB member.  And that's true.  But Kennedy testified that Porter was affiliated with SMB and would often "hang out" with SMB members and associates.  R. 1138, Pg. ID 13344; *see United States v. Graham*, 622 F.3d 445, 449–50 (6th Cir. 2010) (noting that "a close relationship between alleged conspirators" can support finding that a defendant participated in a conspiracy).

Kennedy also testified that Porter associated with SMB for protection and actively participated in their wars with rival gangs.  On May 8, 2015—following McClure's murder—Arnold, Shy, and Porter shot up a car full of rival gang members, killing Dvante Roberts and wounding at least two others.  The evidence shows they shot at the car with at least three firearms (two long guns and a handgun).  And Porter's cellphone record confirms that his movements paralleled Arnold's on the day of the shooting.  Moreover, after the shooting, Arnold and Porter

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

were seen carrying firearms in the basement of Brown's house. And Porter later told Kennedy that he participated in the shooting. He explained how he had been "following" the victims, pulled up beside them, and "upped the AR and start[ed] shooting across his girlfriend's face." R. 1139, Pg. ID 13447. Porter even bragged about it later, claiming to have done all the damage before Arnold began firing. Thus, there is sufficient evidence that Porter adopted "the goal of furthering or facilitating the criminal endeavor." *Salinas*, 522 U.S. at 65; *see Fowler*, 535 F.3d at 421. So his RICO conspiracy conviction stands.

Porter's other convictions all directly relate to the May 8, 2015, shooting described above. Given the evidence—including Kennedy's testimony, the forensic evidence, and the cellphone records—the record is sufficient for a reasonable jury to conclude that Porter was guilty of murder and attempted murder in aid of racketeering (as well as using a firearm in relation to both). *See Brown*, 441 F.3d at 351. And Porter's boastful statements and attempts to claim credit for the shooting mean that a rational factfinder could conclude that an "animating purpose" behind Porter's actions was a desire to maintain or increase his standing with the group. *Hackett*, 762 F.3d at 500; *see Ledbetter*, 929 F.3d at 358–59. Thus, sufficient evidence supports Porter's convictions.

### III.

Shy, Brown, and Bailey challenge various aspects of the jury instructions. We review for an abuse of discretion and ask whether the instructions informed the jury of the relevant considerations and provided a legal basis for reaching a decision. *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010). We generally reverse only if the instructions "clearly misstated the law." *United States v. Ashrafkhan*, 964 F.3d 574, 577 (6th Cir. 2020).

- 12 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

## A.

First, Shy and Brown challenge the jury instructions and verdict form for their RICO sentence enhancement. RICO increases the maximum penalty for a violation of its conspiracy provision from twenty years to life "if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). Here, the jury found that both Shy's and Brown's conspiracy violations were based on racketeering acts "for which the maximum penalty includes life imprisonment." *Id.* But they argue that the district court erred because there "was no requirement in the instructions or verdict form that the jury identify *exactly* what acts supported the RICO conviction." Shy Br. 78 (emphasis added). They say that the district court violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000), by increasing their penalties based on facts not found by the jury. And they contend that their convictions must therefore be vacated.

We disagree. Even assuming the jury should have identified the exact acts supporting the conviction, any error is harmless. Start with Shy. Shy was sentenced to 220 months—less than twenty years. "Because the district court did not sentence [Shy] to a term of more than twenty years on the RICO counts, *Apprendi* is not triggered." *United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000); *see also United States v. Osborne*, 673 F.3d 508, 512 (6th Cir. 2012) ("*Apprendi* is not triggered where the defendant receives a term of imprisonment within the statutory maximum that would have applied even without the enhancing factor." (citation omitted)). And any error was harmless for Brown as well. The jury found that his RICO conspiracy conviction was based on three racketeering acts that would trigger a penalty of life. Thus, there were three independent bases for increasing Brown's statutory-maximum sentence to life: (1) conspiracy to assault rival gang members with intent to murder; (2) first-degree murder; and (3) attempted murder in connection with the May 10, 2015, shooting. And he challenges the

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

instructions for only the first of those findings here.  So we reject the defendants' sentence-enhancement arguments.

B.

Second, Bailey and Brown contend that the jury instructions included incorrect statements of law.  To convict a defendant under the RICO conspiracy provision, the government needs to prove that a defendant "intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO criminal offense and it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  *Fowler*, 535 F.3d at 421 (cleaned up).  In other words, the government need not establish that the defendant committed or agreed to commit any racketeering acts (e.g., murder) on behalf of the RICO enterprise.  *See id.*; *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005).  It's sufficient if the defendant agreed to further an endeavor in which a co-conspirator would commit the necessary racketeering acts.  *See Salinas*, 522 U.S. at 63.

The instructions here tracked those requirements.  They outlined the elements for a RICO conspiracy conviction.  And they told the jury that, to convict a defendant for RICO conspiracy, it must find that each "defendant and at least one other conspirator agreed that the defendant or a conspirator would engage in a pattern of racketeering, that is, commit at least two acts of racketeering."  R. 1159, Pg. ID 15047–48; *see id.* at 15053.  The instructions then defined those racketeering acts.  For example, they explained that the government established one racketeering act (assault with intent to murder) if:  (1) "the defendant or a conspirator tried to physically injure another person"; (2) "when the defendant or a conspirator committed the assault, he had the ability to cause an injury or at least believed that he had the ability to do so"; and (3) "the defendant or a conspirator intended to kill the person he assaulted."  *Id.* at 15057–58.

- 14 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

According to the defendants, the jury instructions incorrectly defined the racketeering acts. For example, the defendants argue that by describing the elements of attempted murder as applying when "the defendant or a conspirator" committed the act, the instructions say that a defendant could be found guilty of the offense based on only the conduct of another person. But the defendants are mistaken. Read in context, the instructions simply clarify that the jury could convict the defendant if the defendant agreed to further an enterprise in which either he *or a conspirator* would commit the racketeering acts. *See Saadey*, 393 F.3d at 676. Indeed, the instructions correctly explain that to convict a defendant of RICO conspiracy, the evidence must show "that the defendant under consideration agreed that he or one of the conspirators who were associated with the Seven Mile Bloods enterprise, would engage in a pattern of racketeering, that is, intentionally commit, or cause, or help the commission of two or more racketeering acts." R. 1159, Pg. ID 15053. And when listing the alleged racketeering acts, the instructions explain that an act qualifies if, for instance, "the defendant or a conspirator caused the death of another person." *Id.* at 15056. Thus, the instructions make clear that the defendant must agree that either the defendant or a conspirator would commit the substantive offense. As the district court put it, eliminating the "or a conspirator" phrase "would mislead the jury to believe they are required to tie the acts . . . to the main defendant involved." R. 1416, Pg. ID 18669. The district court was correct, and we find no error.

IV.

Shy, Brown, and Bailey argue that the district court abused its discretion by denying their request for an evidentiary hearing. They make several arguments. First, they say that one of the jurors was biased against them and injected an extraneous influence into the jury's deliberations. Second, they contend that two of the jurors may have exposed the jury to extraneous prejudicial

- 15 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

information. And finally, they say that the court's marshals constituted an outside influence warranting a hearing.

The Constitution guarantees criminal defendants the right to be tried by an "impartial jury." U.S. Const. amend. VI. In practice, that means a jury must base its verdict "upon the evidence developed at trial" and not other considerations. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). And if a trial court is presented with evidence of things like juror bias, it must hold a "hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 230 (1954); *see Smith v. Phillips*, 455 U.S. 209, 215 (1982). Citing *Remmer*, Shy, Brown, and Bailey argue that the district court erred by denying their motion to hold an evidentiary hearing based on alleged juror bias and extraneous influence. We review the district court's ruling for an abuse of discretion. *See United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017).

To warrant a *Remmer* hearing, a defendant "must do more than simply raise the possibility of bias." *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005). Instead, he must make a "colorable claim of extraneous influence" that has a "likelihood of affecting the verdict." *Lanier*, 870 F.3d at 549–50; *see United States v. Britton*, 811 F. App'x 312, 316 (6th Cir. 2020). For example, it must involve "claims of intentional improper contacts or contacts that had the obvious potential for improperly influencing the jury." *Lanier*, 870 F.3d at 549–50 (cleaned up).

What's more, a party's request for a *Remmer* hearing must be supported by credible evidence. *See, e.g.*, *Lang v. Bobby*, 889 F.3d 803, 811 (6th Cir. 2018) ("[W]hen there is evidence of possible juror bias, a defendant is entitled to a hearing with all interested parties present."); *see also United States v. Brown*, 934 F.3d 1278, 1303 (11th Cir. 2019). And not all evidence is admissible for this purpose. *See Smith v. Nagy*, 962 F.3d 192, 200 (6th Cir. 2020). Historically, jurors "were forbidden to impeach their verdict, either by affidavit or live testimony." *Peña-*

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

*Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017); *see Tanner v. United States*, 483 U.S. 107, 117 (1987) (describing the "near-universal and firmly established common-law rule" that "flatly prohibited the admission of juror testimony to impeach a jury verdict"). Moreover, the Federal Rules of Evidence codify this no-impeachment rule. *Peña-Rodriguez*, 137 S. Ct. at 864. Under Rule 606(b), a juror cannot "testify about any statement made or incident that occurred during the deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). In fact, a district court cannot even "*receive* a juror's affidavit or evidence of a juror's statement on these matters." *Id.* (emphasis added). This rule protects "verdict finality" and assures "jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Peña-Rodriguez*, 137 S. Ct. at 861.

Although Rule 606(b) codified a "broad no-impeachment rule," it also contains several narrow exceptions. *Id.* at 864. Two are relevant here. The first concerns information: A juror may testify about whether "extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A). The Rules don't define "extraneous prejudicial information." But the Supreme Court tells us that it includes "publicity and information related specifically to the case the jurors are meant to decide." *Warger v. Shauers*, 574 U.S. 40, 51 (2014); *see United States v. Herndon*, 156 F.3d 629, 636 (6th Cir. 1998) (explaining that an extraneous influence is "one derived from specific knowledge about or a relationship with either the parties or their witnesses"). Thus, news coverage of the case at hand may constitute extraneous prejudicial information. *See Thompson v. Parker*, 867 F.3d 641, 648 (6th Cir. 2017). So too may relevant information that is "physically brought to the jury room or disseminated to the jury." *Id.*

- 17 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

Of course, this exception doesn't prohibit jurors from considering all extra-record information. After all, Rule 606(b) doesn't require that "each juror's mind be a tabula rasa." *Id.* (citation omitted). Jurors necessarily bring with them to the jury room a "general body of experiences." *Warger*, 574 U.S. at 51. And they may consult those experiences when evaluating the evidence. *See Thompson*, 867 F.3d at 648 (citation omitted). Consider the Supreme Court's decision in *Warger v. Shauers*. There, a juror's daughter was in a car accident much like the one at issue in the *Warger* trial. But the Court held that this was not extraneous prejudicial information because it "did not provide either her or the rest of the jury with any specific knowledge regarding [the defendant's] collision with [the plaintiff]." *Warger*, 574 U.S. at 52. Similarly, we have said that a juror's "general knowledge about recidivism, even if it includes recollections of unrelated news coverage of other crimes, is fair game for discussion." *Thompson*, 867 F.3d at 648.

The second relevant exception concerns influences. A juror may testify about whether "an outside influence was improperly brought to bear on any juror." Fed. R. Evid. 606(b)(2)(B). The term "outside influence" refers to external influences on the jury rather than internal ones. An outside influence may occur when a juror's family member is threatened, *see Tanner*, 483 U.S. at 123, or a bailiff tells the jurors that the defendant is "wicked" and "guilty," *Parker v. Gladden*, 385 U.S. 363, 363 (1966). An internal influence, by contrast, comes from the jurors themselves. For example, claims that a juror "pressured" and "berated" other jurors to reach a guilty verdict concern matters internal to the jury. *United States v. Brooks*, 987 F.3d 593, 604 (6th Cir. 2021). Similarly, a juror's "own subjective fear" that he may run into the defendant's family after trial is also an internal influence. *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007). Unlike external ("outside") influences, which jurors may disclose, Rule 606(b) bars jurors from testifying about internal matters.

- 18 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

With these principles in mind, we turn to the defendants' arguments. First, they contend that they were entitled to a *Remmer* hearing because one of the jurors, Juror V, "injected an extraneous influence and bias in the deliberations." Shy Br. 50. To support this argument, the defendants rely only on two affidavits submitted by other members of the jury. In the affidavits, the jurors describe several remarks that Juror V supposedly made during deliberations. They say that Juror V lived near and was familiar with the neighborhood "described as the red zone at trial," knew the location of a strip club mentioned at trial, and recognized SMB graffiti. R. 1311-1, Pg. ID 17450–52. And although Juror V "repeatedly stated" that she didn't know the defendants personally, she explained that "guys like them . . . were ruining the neighborhood" and accused other jurors of being "naïve and uninformed." *Id.*

The problem? None of these statements are admissible under Rule 606(b). Juror V's general familiarity with the neighborhoods discussed at trial is an internal influence and did not give her any "specific knowledge" about the defendants' conspiracy or criminal conduct. *Warger*, 574 U.S. at 52; *see* 27 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6075 (2d ed.) (noting that relying on "general background facts or data having nothing specifically to do with the case" is permissible). In fact, the affidavits confirm that Juror V said she didn't know the defendants. Moreover, Juror V's dislike of gangs and the condition of local areas do not allege an outside influence. Nor do they constitute extraneous prejudicial information. After all, this information is part of "the general body of experiences that jurors are understood to bring with them to the jury room." *Warger*, 574 U.S. at 51; *see Thompson*, 867 F.3d at 647–48 (explaining that jurors are expected to rely on their "own wisdom, experience, and common sense" (citation omitted)). And even if these remarks reveal bias, "statements calling into question a juror's objectivity" are internal. *Brown*, 934 F.3d at 1303 (citation omitted); *see Smith*, 962 F.3d

- 19 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

at 201 (noting that "alleged bias based on a juror's own personal experiences" is an internal influence). And because the defendants offered no other evidence to support their claim that Juror V was biased or lied during voir dire, the district court did not abuse its discretion by denying their request for a *Remmer* hearing. *See Smith*, 962 F.3d at 201.[2]

Next, the juror affidavits say that Juror V and another juror may have read a "Detroit News article about the Seven Mile Bloods" because of some unidentified facts that the jurors stated during jury deliberations. R. 1311-1, Pg. ID 17452. And they assert that this is admissible under Rule 606(b). But even if these statements were admissible, they do not make a "colorable claim of extraneous influence"—they only speculate. *Lanier*, 870 F.3d at 549 (citation omitted); *see Britton*, 811 F. App'x at 316. The affidavits do not allege that the two jurors brought an article into the jury room. Nor do they allege that the two jurors discussed having read the article or even mentioned the article's existence. And without more than mere speculation, there is no "credible allegation of extraneous influence." *United States v. Harris*, 881 F.3d 945, 953 (6th Cir. 2018) (citation omitted); *Brown*, 934 F.3d at 1303. The district court therefore reasonably declined to interrogate the jurors on this basis.

Lastly, the defendants argue that the marshals presented an outside influence requiring a *Remmer* hearing. They offer three reasons: (1) a marshal asked the jurors to lower their volume;

---

[2] To the extent the defendants argue that the district court abused its discretion in denying their motion for a new trial on this basis, we hold that it did not. Because their juror-bias claim is "based solely on juror testimony" that is inadmissible under Rule 606(b), it was not an abuse of discretion for the district court to deny their motion. *Harden v. Hillman*, 993 F.3d 465, 478 (6th Cir. 2021); *see also Warger*, 574 U.S. at 44 (holding that Rule 606(b) applies when "a party seeks to secure a new trial on the ground that a juror lied during *voir dire*").

Additionally, our decision in *Cunningham v. Shoop* doesn't require the district court to hold a *Remmer* hearing on this claim. 23 F.4th 636 (6th Cir. 2022). In *Cunningham*, a state habeas prisoner sought a hearing under 28 U.S.C. § 2254(e)(2) for a juror-bias claim after diligently pursuing that claim in state court but being denied the opportunity develop more evidence. *See id.* at 661–62 (citing *Williams v. Taylor*, 529 U.S. 420, 442–43 (2000)). We treated the failure to hold a section 2254(e)(2) hearing in those circumstances as "distinct" from "a trial court's failure to hold a *Remmer* hearing." *Id.* at 660–61.

- 20 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

(2) a marshal gave the jurors his cellphone number "in case they were late, had car troubles, received threats, etc."; and (3) a marshal discreetly asked a juror to clarify a remark he or she made about other jurors.  The juror had referenced a "conspiracy" in the group and, when asked what that meant, reported that he or she was frustrated with some jurors who were slowing the pace of deliberations.

None of these allegations requires a *Remmer* hearing.  Under our precedents, a *Remmer* hearing is required "only when the alleged contact presents a likelihood of affecting the verdict." *Lanier*, 870 F.3d at 549–50 (cleaned up); *see also Ewing v. Horton*, 914 F.3d 1027, 1030 (6th Cir. 2019).  Simply asking the jury to lower its volume does not present a "likelihood of affecting the verdict." *Lanier*, 870 F.3d at 549–50.  Nor does a marshal providing his cellphone number for the jury to inform him of any problems they encounter.  And finally, on its own, discreetly asking a juror to clarify an ultimately harmless statement made about the jury does not present a likelihood of affecting the verdict either.  *See, e.g.*, *United States v. Robinson*, 872 F.3d 760, 772 (6th Cir. 2017) (affirming denial of a *Remmer* hearing when "the evidence was weak that the unauthorized contact affected the verdict").  Thus, the district court did not abuse its discretion in denying the defendants' motion for a *Remmer* hearing.

V.

Next, Bailey and Brown argue that the government failed to produce information as required under *Brady v. Maryland*, 373 U.S. 83 (1963).  In their words, "the government concealed from the defense exculpatory and impeachment evidence involving a multitude of text messages between the case agent and the two [cooperating] witnesses"—Lovejoy and Kennedy—"as well as information about their bond and changes in the conditions of their bonds that allowed them to be released pending the case and their testimony."  Bailey Br. 59.

- 21 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

In *Brady*, the Supreme Court held that "a criminal defendant's due process rights are violated if the prosecution suppresses exculpatory evidence that is material to the defendant's guilt or punishment." *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011) (en banc).  And in *United States v. Bagley*, the Supreme Court extended *Brady* to impeachment evidence as well. 473 U.S. 667, 676 (1985).  To establish a *Brady* violation, the evidence at issue (1) "must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The third prong, prejudice, poses a "difficult test."  *Montgomery*, 654 F.3d at 678 (quotation omitted).  To establish prejudice, "the nondisclosure must be so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* (cleaned up).  Although the reasonable-probability standard is not a more-probable-than-not standard, the difference between the two is "slight and matters only in the rarest case[s]." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quotation marks omitted).[3]

When making this determination, we look at the evidence "collectively."  *Montgomery*, 654 F.3d at 679 (citation omitted).  If the undisclosed evidence is "merely cumulative to evidence presented at trial," then it is immaterial under *Brady* and therefore not prejudicial.  *Id.* (citation omitted).  Similarly, if the undisclosed evidence just provides "an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *Id.* at 681 (citation omitted).

---

[3] *Harrington* is an ineffective-assistance case under *Strickland*.  But "*Strickland* and *Brady* claims use the same 'reasonable probability' standard to assess prejudice."  *Moreland v. Robinson*, 813 F.3d 315, 330 (6th Cir. 2016).

Bailey and Brown identify two pieces of evidence. First, they point to Lovejoy's and Kennedy's bond conditions. Although the defendants were "aware that both Lovejoy and Kennedy were released on bond," they were unaware of the terms of their release or that their bond conditions were modified with the government's consent. Bailey Br. 65. They say that the modifications could be construed as a "reward" for "continued cooperation." *Id.* And they emphasize that the changes in bond conditions "would be fertile grounds for cross-examination." *Id.* Second, Bailey and Brown contend that the government unlawfully suppressed text-message exchanges between the case agent and Lovejoy and Kennedy. According to the defendants, the texts show that "Kennedy was actively assisting the government to set up a number of other persons unrelated to this case" and the "jury needed to hear that Kennedy believed he needed to help the government with more than just testifying to his historical information of the SMB." *Id.* at 67. Likewise, the defendants say that the texts show that Lovejoy was actively working with the government.

Taken together, there is not a "reasonable probability" that the undisclosed evidence "would have produced a different verdict." *Montgomery*, 654 F.3d at 678 (cleaned up). Lovejoy's and Kennedy's credibility was "effectively impeached at trial." *Id.* at 682 n.6 (citation omitted). And the undisclosed evidence—both the bond information and the text messages—is simply additional evidence of Kennedy's and Lovejoy's cooperation. As the government explains, during cross-examination Kennedy "was forced to admit that he faced life in prison if he did not cooperate, that he was willing to lie to avoid this fate, and that his deal with the government might net him a sentence as low as 4–5 years." Appellee's Br. 64 (citing R. 1139, Pg. ID 13483; R. 1150, Pg. ID 13898–903). He was "also forced to admit that he had lied repeatedly to the police over the years, had engaged in numerous criminal offenses, and had made roughly a million dollars

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

selling drugs but had squandered the money on things like 'making it rain' at strip clubs and expensive watches, jewelry and clothing." *Id.* (citing R. 1139, Pg. ID 13595–96; R. 1140, Pg. ID 13611–35, 13702–03, 13719–36).

And Lovejoy testified similarly. On cross-examination, he admitted that he continued committing crimes "every time" he was released on probation. R. 1123, Pg. ID 10969. Lovejoy also testified that he faced life in prison for his crimes but that the government would recommend a thirty-month sentence if it was satisfied with his testimony. And Lovejoy agreed that he cooperated with the government so that he could stay with his wife and seven children. Because the undisclosed evidence here "merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence," it is cumulative and therefore immaterial. *Montgomery*, 654 F.3d at 681 (citation omitted).[4]

VI.

Brown argues that his RICO conspiracy conviction must be reversed because the jury returned inconsistent verdicts. The jury found that Brown committed a RICO predicate act—first-degree murder—but it acquitted him of a racketeering charge under section 1959 on that same factual basis.

There is nothing inconsistent about the jury's verdicts. To convict a defendant for a racketeering charge under section 1959, the government needed to prove that the defendant committed a violent crime "for the purpose of gaining entrance to or maintaining or increasing

---

[4] The defendants also argue that the failure to disclose this evidence violates the Jencks Act, 18 U.S.C. § 3500. But for similar reasons, any Jencks Act error in not producing the text messages is harmless. *See United States v. Susskind*, 4 F.3d 1400, 1406 (6th Cir. 1993) (en banc) (reviewing Jencks Act error for harmless error). And, again, there is no reasonable probability that the alleged error here affected the verdict.

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a); *see Hackett*, 762 F.3d at 500. The RICO predicate act does not contain that element. Thus, a defendant can logically be convicted of a RICO predicate act but acquitted of a section 1959 charge that rests on the same underlying facts.[5]

That said, Brown would not be entitled to relief even if the jury's verdicts on these counts were inconsistent. After all, "inconsistent verdicts are generally held not to be reviewable." *United States v. Lawrence*, 555 F.3d 254, 262 (6th Cir. 2009) (collecting cases). And this case is no different.

VII.

Shy, Brown, and Bailey argue that the district court's admission of four rap videos was an abuse of discretion under Federal Rule of Evidence 403. They argue that the danger of unfair prejudice substantially outweighs the probative value of the videos because they were "offensive, filled with profanity, sexism, and references to drug use and violence." Shy Br. 56.

Under Rule 403, a district court may exclude evidence if "its probative value is substantially outweighed by" a danger of unfair prejudice. Fed. R. Evid. 403. This rule favors admission, and district courts have broad discretion in making such determinations. *United States v. Asher*, 910 F.3d 854, 860 (6th Cir. 2018). We view the evidence in the light most favorable to the government, maximizing its probative value and minimizing its prejudicial effect. *See id.*

The district court here did not abuse its discretion. To be sure, there was potential for unfair prejudice—the rap videos reference drug dealing and violence, and they contain explicit and sexual language. But the videos also had substantial probative value. To prove its case, the government

---

[5] Brown relies on the same inconsistency argument to contend that his sentence was procedurally unreasonable. But as explained, there is no inconsistency. So this argument also fails.

needed to show that SMB was an enterprise and that the racketeering acts—including murders and attempted murders—related to that enterprise. *Salinas*, 522 U.S. at 62. The rap videos were critical evidence that helped establish both. In the videos, some defendants trumpet their membership in SMB and describe specific acts committed by the group, including lyrics about shooting someone in the "e-y-e." The videos also direct intimidating and threatening messages at rivals. They therefore help establish that SMB was an enterprise that shared common goals and purposes. And this evidence was especially helpful for establishing the existence of an enterprise here because the government lacked evidence of a formal structure. In short, the district court did not abuse its discretion by concluding that any danger of unfair prejudice did not substantially outweigh the evidence's significant probative value. *See United States v. Smith*, 967 F.3d 1196, 1205–06 (11th Cir. 2020) (rejecting a similar argument).

## VIII.

Next, Bailey argues that the district court abused its discretion by admitting two statements that were inadmissible hearsay. But under Federal Rule of Evidence 801(d)(2)(E), a statement made "by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. "To invoke this hearsay exclusion, the government must demonstrate by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant was a member of the conspiracy, and (3) the co-conspirator's statement was made in furtherance of the conspiracy." *United States v. Bailey*, 973 F.3d 548, 560 (6th Cir. 2020).

A statement is made in furtherance of a conspiracy if it's meant to promote the conspiracy's objectives. *United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009). That's true when, for example, the statements "identify other co-conspirators and their roles, apprise other co-conspirators of the status of the conspiracy, or indicate the source or purchaser of controlled

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

substances." *Id.* (cleaned up). But it's not true if the statement is "mere idle chatter or casual conversation about past events." *Id.* (citation omitted). Even so, a statement may be in furtherance of the conspiracy even if it's not primarily made for that reason. *Id.* And where the "admissibility is a close call, the trial judge's findings should generally remain undisturbed." *Bailey*, 973 F.3d at 560 (citation omitted).

## A.

First, Bailey argues that the district court abused its discretion by admitting certain testimony from Kennedy (an SMB member and cooperating witness). Kennedy testified that in December 2014, he asked Michael Rogers (Bailey's brother) why rival gangs were threatening Bailey. Rogers told him that the rival gangs threatened Bailey because he was in the car from which Arnold shot Djuan Page (a member of a rival gang) and that Bailey's "dumb a-- was out the window with a red flag when they were pulling off." R. 1182, Pg. ID 15322. According to Bailey, this was inadmissible hearsay.

Although we think it's a close call, we conclude that Rogers's statement was made in furtherance of the conspiracy. As the district court found, this statement "identified other co-conspirators and their roles, and apprised other co-conspirators of the status of the conspiracy." R. 1182, Pg. ID 15322 (cleaned up). The July 14, 2014, murder of Djuan Page "was the spark that ignited a violent gang war between SMB and the Hustle Boys." *Id.* at 15322–23. Rogers's statement, which was made during the thick of SMB's gang war, informed Kennedy that another co-conspirator (Bailey) was at risk of retribution from rival gang members and that other SMB members and associates could be as well. *Id.* at 15323. After all, Rogers noted that Bailey had waved SMB's colors out the car's window. Thus, Rogers's statement "put Kennedy on notice that (1) as an SMB member or associate he could be targeted for revenge, and (2) he could be targeted

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

specifically any time he is with Arnold or Bailey, the actual perpetrators." *Id.* And when district courts make difficult judgment calls like this, we generally defer to them. Because Rogers's statement "apprise[d] other co-conspirators of the status of the conspiracy," *Warman*, 578 F.3d at 338, we hold that the district court did not abuse its discretion in determining that the statement was made "in furtherance of" the conspiracy, Fed. R. Evid. 801(d)(2)(E).[6]

### B.

Bailey also challenges the district court's admission of a statement made by McClure, an SMB leader killed during the gang violence. Scott (McClure's partner) testified that she, McClure, and Bailey went to a Hustle Boys party at local strip club because McClure wanted to "start some stuff." R. 1128, Pg. ID 11791.

McClure's statement is admissible under Rule 801(d)(2)(E). In the district court's words, McClure's statement "induced continued participation in the conspiracy," R. 1182, Pg. ID 15320 (cleaned up) (quoting *United States v. Kelsor*, 665 F.3d 684, 694 (6th Cir. 2011)), and "prompted a listener to act in a manner that facilitates the carrying out of the conspiracy," *id.* (cleaned up) (quoting *United States v. Jerkins*, 871 F.2d 598, 606 (6th Cir. 1989)). Here, starting a fight with a rival gang—the Hustle Boys—furthered SMB's conspiracy. More specifically, telling other gang members—Bailey included—that McClure wanted to "start some stuff" with a rival gang encouraged illicit violence between the two gangs, which would further the conspiracy. Thus, the district court did not err.

---

[6] To the extent Bailey argues that the government failed to put forward "independent, corroborating evidence of defendant's knowledge of and participation in the conspiracy," he's wrong. *United States v. Clark*, 18 F.3d 1337, 1341 (6th Cir. 1994). As we explained in Part II.A, there's plenty of evidence connecting Bailey to the conspiracy.

IX.

Bailey also challenges the district court's admission of another statement made by McClure. Shortly after entering the club, McClure ran out with Bailey and was "banging" on the car's door. R. 1128, Pg. ID 11792. Blood was "rushing from the top of his head" and he told Scott that "Neff" hit him on the head with a bottle. *Id.* The district court concluded that this statement was an admissible co-conspirator statement. But it also concluded that the statement was admissible as an excited utterance.

The district court did not err. To constitute an excited utterance, (1) there must be "an event startling enough to cause nervous excitement"; (2) "the statement must be made before there is time to contrive or misrepresent"; and (3) "the statement must be made while the person is under the stress of the excitement caused by the event." *United States v. Davis*, 577 F.3d 660, 669 (6th Cir. 2009) (citation omitted); *see United States v. Arnold*, 486 F.3d 177, 184 (6th Cir. 2007) (en banc).

As the district court correctly concluded, McClure's statement satisfies all three requirements. Scott testified that ten minutes after entering the club, McClure came out with blood "rushing from the top of his head" and said that "Neff" had struck him with a bottle. R. 1128, Pg. ID 11792. Being struck on the head with enough force to send blood rushing out of the wound constitutes an "event startling enough to cause nervous excitement." *Davis*, 577 F.3d at 669. And that statement was made right after the assault, as evidenced by the blood still streaming down his head. McClure's behavior—running out of the club and "banging" on the door—shows he was still under the stress of the excitement caused by the assault. R. 1128, Pg. ID 11792; *Davis*, 577 F.3d at 669. This quick chain of events means McClure didn't have time to contrive a lie about

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

what happened, and he remained under the stress of the assault. The statement was therefore admissible as an excited utterance.[7]

## X.

Brown further argues that the district court erred by admitting four clips from a 2014 interview Bailey gave the Detroit police. In the interview clips, Bailey: (1) explained that there was "beef" with the "Hustle Bums" and the "Gutta Boys"; (2) described how the "Hustle Bums" got pills; (3) mentioned "Neff" getting shot; (4) referenced "B-Man" (Arnold), a member of SMB; and (5) discussed how "Block" (McClure) got a gun and gave it to Bailey. R. 1064, Pg. ID 9777–78; R. 1125, Pg. ID 11413–18; R. 1151, Pg. ID 14159–61. Because of a technical error, the clips were played twice, and the district court gave a limiting instruction both times, telling the jury it could only consider the clips against Bailey. According to Brown, introducing these statements from Bailey violated his rights under the Sixth Amendment's Confrontation Clause.[8]

The Confrontation Clause protects a criminal defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. With few exceptions, this clause prohibits district courts from admitting a testimonial statement made by a witness who is not testifying at trial.

---

[7] Bailey and Brown also challenge some of Kennedy's testimony. During cross-examination, defense counsel asked probing questions about Kennedy's family, work, and home. For example, defense counsel asked Kennedy what his wife's name was. Kennedy was reluctant to answer, explaining that "people [are] trying to kill me. I don't know if your client is the one sending them or who." R. 1140, Pg. ID 13685. Likewise, Kennedy was reluctant to reveal where he was living because "[s]omebody sent somebody to kill me when I was out, since I've been out on bond." *Id.* at 13634. Bailey and Brown argue on appeal that the district court erred by not sua sponte striking this testimony under Rules 403 and 404(b)(1). Nobody objected on these grounds below, so we review for plain error.

First, it's not clear that the district court erred. After all, "threat evidence" sometimes "bears directly on a specific credibility issue regarding the threatened witness." *United States v. Thomas*, 86 F.3d 647, 654 (7th Cir. 1996); *see also United States v. Cordero*, 973 F.3d 603, 619 (6th Cir. 2020) ("We have consistently held that other-acts evidence involving threats or attempted acts of violence by defendants against trial witnesses is admissible to show consciousness of guilt."). In any event, there is not a "reasonable probability that, but for" these stray, passing remarks—made in the midst of a nearly three-month trial that included substantial evidence and dozens of witnesses— "the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (citation omitted).

[8] We assume without deciding that these statements are sufficiently incriminating to trigger analysis under the Confrontation Clause. *See, e.g.*, *Vincent v. Parke*, 942 F.2d 989, 991–92 (6th Cir. 1991).

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

*See Crawford v. Washington*, 541 U.S. 36, 68 (2004). When the statement is a confession made by the defendant, however, the Confrontation Clause does not apply—the government may introduce the defendant's own confession against him. *See United States v. Vasilakos*, 508 F.3d 401, 410 (6th Cir. 2007) (citing Fed. R. Evid. 801(d)(2)(A)).

But when multiple defendants are tried jointly, things are more complicated. What happens when one defendant's confession implicates another defendant? Under the Confrontation Clause, the confession is only admissible against the confessing defendant. After all, one defendant's confession "cannot be admitted against the other [defendant] unless the confessing defendant takes the stand." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). In the past, courts resolved this issue by admitting the confession but instructing the jury to consider it against only the confessing defendant. And the Supreme Court sanctioned this approach in *Delli Paoli v. United States*, 352 U.S. 232 (1957).

Yet the Court reversed course just ten years later. In *Bruton v. United States*, the Court overruled *Delli Paoli*. 391 U.S. 123 (1968). It reasoned that, even with a limiting instruction, there was still a "substantial risk" that the jury considered the codefendant's statement when determining the defendant's guilt. *Id.* at 126. According to the Court, the jury instruction was not an "adequate substitute for [the defendant's] constitutional right of cross-examination." *Id.* at 137. The Court therefore held that "a defendant is deprived of his rights under the Confrontation Clause when his nontestifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." *Richardson*, 481 U.S. at 201–02.

After *Bruton*, courts settled on a new approach for handling one defendant's confession in a joint trial: redacting any reference to the other defendant. In *Richardson*, for example, the

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

government sought to admit one defendant's confession in a joint trial. The confession implicated the other defendant by name, but the government redacted "all reference" to anyone other than the confessing defendant. *Id.* at 203. The Court found that this cured any Confrontation Clause issue. It held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. Since *Richardson*, the Court has clarified that a redaction which "simply replace[s] a name with an obvious blank space or a word such as 'deleted'" still violates the Confrontation Clause. *Gray v. Maryland*, 523 U.S. 185, 192 (1998). But redacted statements that "incriminate inferentially"— that is, only in connection with other evidence at trial—are sufficiently protective. *Id.* at 195.

With these principles in mind, the admission of Bailey's statements did not violate Brown's rights under the Confrontation Clause. Under *Richardson*, introducing a nontestifying codefendant's statement into evidence "does not violate the Confrontation Clause where it does not name the defendant[] and implicates him *only* in light of other evidence presented at trial." *United States v. Alkufi*, 636 F. App'x 323, 335 (6th Cir. 2016) (citing *Richardson*, 481 U.S. at 207– 08). And even if some redacted statements "may still violate *Bruton* where the redactions make clear a specific name was omitted, or where the statement itself contains information that makes it obvious any redacted name is the defendant's," neither is true in this case. *Id.* (citations omitted). The clips incriminate Brown only in light of other evidence presented at trial. They don't name him. Nor do they contain redactions that make clear Brown's name was omitted. Thus, their admission did not violate the Confrontation Clause.

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

## XI.

Porter challenges the admission of cellphone records against him. In November 2015, an undercover police officer arranged two controlled heroin buys with a person at a phone number ending in 0837. Porter showed up to complete both deals. That phone number was in the contact list on Bailey's phone under the name "KP," Porter's nickname. The cellphone records also confirm that the 0837 number moved in tandem with Arnold's phone around the time of the May 8, 2015, shooting of Dvante Roberts and three others. And the location information further established that both phones were near that crime scene.

Porter contends that the admission of this evidence violated Federal Rules of Evidence 401 and 403, which govern the admission of relevant and prejudicial evidence, respectively. The district court did not abuse its discretion in admitting the cellphone records under Rules 401 or 403. To be admitted under Rule 401, the evidence need only be "relevant"—it must make a fact more or less probable. Fed. R. Evid. 401. As discussed above, Porter's participation in the November 2015 drug transactions associated him with the 0837 phone number. And cellphone records connected that phone to the May 8, 2015 shooting. Thus, the phone records were "relevant" evidence under Rule 401. Although Porter challenges the records' association with him on several grounds, such arguments go "to the weight of the evidence, not its admissibility." *United States v. Smith-Kilpatrick*, 942 F.3d 734, 741 (6th Cir. 2019). Thus, it was not an abuse of discretion to admit the records as associated with Porter under Rule 401.

Nor was it an abuse of discretion to admit the records under Rule 403. Under that rule, the "trial judge may exclude relevant evidence only if its probative value is substantially outweighed by the danger of unfair prejudice." *Asher*, 910 F.3d at 860 (cleaned up). In this context, unfair prejudice "refers to evidence which tends to suggest decision on an improper basis." *United States*

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

*v. Sherill*, 972 F.3d 752, 765 (6th Cir. 2020) (citation omitted). But the cellphone records do not suggest an "improper basis" for the jury's decision. *Id.* Instead, the records supply a proper basis for the jury's decision—evidence tying Porter to the charged crimes. And at worst, any danger of unfair prejudice was minimal and did not substantially outweigh the evidence's probative value. So admitting the records did not violate Rule 403.

## XII.

During cross-examination, defense counsel sought to ask Kennedy, a cooperating witness for the government, about Jonathan Murphy's testimony in a prior case. Murphy had testified in an earlier round of trials against SMB members, but he was not called as a witness in this trial. The government objected on hearsay grounds, and the district court sustained the objection. On appeal, Brown purports to challenge this ruling. But Brown's opening brief doesn't develop any argument with legal authority. He merely contends that the evidence was important to his case and asserts that he should have been allowed to admit it, waiting until his reply brief to advance any meaningful legal argument. So he's forfeited his challenge. *See United States v. Crumpton*, 824 F.3d 593, 619 n.7 (6th Cir. 2016).

## XIII.

The government sought to recall its case agent, Agent Ruiz, throughout the trial rather than having him testify once during a single session. Bailey (joined by Brown) filed a motion in limine to preclude the government from recalling Agent Ruiz, but the district court denied the motion. Bailey and Brown argue that was an abuse of the district court's discretion.

Both the Federal Rules of Evidence and our caselaw give district courts broad discretion over how to present testimony. *See* Fed. R. Evid. 611(a); *Bailey*, 973 F.3d at 563. We don't

reverse unless a district court's decision affects "the defendant's substantial rights." *Bailey*, 973 F.3d at 563; *United States v. Fields*, 763 F.3d 443, 465 (6th Cir. 2014).

Here it did not.  In complicated conspiracy cases such as this one—the facts of which spanned more than a decade, covered many crimes, and involved dozens of witnesses and other evidence—allowing a case agent to testify in installments may be the most effective method of presenting evidence.  *Bailey*, 973 F.3d at 564.  The district court determined that permitting the case agent to be recalled would make it "easier to follow the evidence that was coming in" because the subject of the case agent's testimony roughly corresponded to the presentation of evidence at trial.  R. 1412, Pg. ID 18486–87.  In reaching this conclusion, the court drew on its experience in an earlier trial:  The court noted that it had permitted the same case agent to be recalled before and that was a "very big success."  *Id.* at 18486.  And it noted that the defense's concerns about prejudice "didn't seem to be a problem at all" in the earlier trial and in fact "break[ing] up the testimony" gave the defense an "opportunity to weigh in" immediately.  *Id.* at 18486–87.  Plus, Agent Ruiz was recalled before the defendants had presented any evidence.  When that happens, "it is unlikely that prejudice sufficient to establish an abuse of discretion can be established."  *Bailey*, 973 F.3d at 563 (quoting *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985)).  We find no abuse of discretion.

## XIV.

Bailey and Brown also challenge the content of Agent Ruiz's testimony.  Among other things, Ruiz identified individuals in pictures and described "common symbols" and "hand gestures" that he saw during his investigation and in social media posts admitted into evidence.  R. 1118, Pg. ID 10209.  He also explained terminology and commented on the gang's rap videos.  But the government never qualified him as an expert witness.  Bailey and Brown argue that the

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

district court "erred in allowing Agent Ruiz to testify essentially as a gang expert without first qualifying him as such, for allowing him to offer his interpretations of writings on social media or on videos, and for otherwise permitting Agent Ruiz to offer his opinions on what SMB signs and tattoos meant." Brown Br. 39; *see* Bailey Br. 78.

The problem? The defendants did not preserve this error. To preserve an error for appellate review, a litigant usually must timely object. *Puckett v. United States*, 556 U.S. 129, 134 (2009). And the defendants never raised this objection below. So they forfeited it. *Id.*

This rule, the contemporaneous-objection rule, serves important interests. Chief among them, it "preserves systemic judicial resources." *United States v. Williams*, 641 F.3d 758, 771 (6th Cir. 2011) (Thapar, J., concurring). How? By encouraging parties to "seek a fair and accurate trial the first time around." *Johnson v. United States*, 520 U.S. 461, 466 (1997). After all, "judges are not like the supercomputer Watson"—despite their best efforts, they will not catch every issue. *Williams*, 641 F.3d at 770 (Thapar, J., concurring) (cleaned up). But if a party brings an issue to the district court's attention, the court can focus on it and often correct it in real time. *See Puckett*, 556 U.S. at 134; *United States v. del Carpio Frescas*, 932 F.3d 324, 333 (5th Cir. 2019) (Oldham, J., concurring) (noting that the contemporaneous-objection rule "conserves judicial resources by fixing errors before they necessitate retrials").

What's more, the contemporaneous-objection rule keeps appellate review from turning into "gotcha" review. If unobjected-to trial errors resulted in reversal, a party would be free to sandbag the district court—that is, raise his objection only if the case comes out against him. *See Puckett*, 556 U.S. at 134. But the contemporaneous-objection rule deters that sort of gamesmanship by requiring parties to raise their issues before the district court. *See del Carpio Frescas*, 932 F.3d at

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

334 (Oldham, J., concurring) (describing how the "absence of an enforceable raise-it-or-lose-it rule incentivized" sandbagging).

That said, the contemporaneous-objection rule is not absolute. Over time, the Supreme Court developed a narrow exception that "tempers the blow of a rigid application of the contemporaneous-objection requirement." *United States v. Young*, 470 U.S. 1, 15 (1985). Since *Wiborg v. United States*, the Court has recognized an exception for certain "plain errors." 163 U.S. 632 (1896). In *Wiborg*, the Court stated that "if a plain error is committed in a manner so absolutely vital to defendants, we feel ourselves at liberty to correct it." *Id.* at 658 (cleaned up). And it elaborated on this exception some forty years later. In *United States v. Atkinson*, the Court held that in "exceptional circumstances" appellate courts may correct unobjected-to errors "if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings." 297 U.S. 157, 160 (1936).

The plain-error exception was later codified as Federal Rule of Criminal Procedure 52(b). As it stands today, Rule 52(b) provides that a "plain error that affects substantial rights may be considered even though it was not brought to the court's attention." The Court has boiled this rule down to a four-prong test. *Puckett*, 556 U.S. at 135. First, there must be an error—that is, a "deviation from a legal rule" that has not been waived. *Id.* (cleaned up). Second, that error must be plain; it must be "clear or obvious, rather than subject to reasonable dispute." *Id.* Third, the defendant must show that the plain error affected his "substantial rights." *Id.* In other words, he must establish a "reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 141 S. Ct. 2090, 2096 (2021) (citation omitted). If those three requirements are met, the appellate court may correct the error if it

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

seriously affects the "fairness, integrity or public reputation of judicial proceedings." *Id.* at 2097

(citation omitted); *see United States v. Olano*, 507 U.S. 725, 735–37 (1993).

Even assuming the district court committed a plain error, the defendants have not established that it affected their substantial rights. After all, two other witnesses—Kennedy and Lovejoy—echoed much of Ruiz's testimony. For example, the defendants complain that the district court allowed Agent Ruiz to testify "about SMB signs and tattoos and his interpretations regarding writings on social media or text messages." Brown Br. 44. But Lovejoy also described SMB hand gestures, tattoos, colors, and lingo. And Kennedy interpreted the rap videos and other SMB phrases and terms.

The defendants also contend that the district court erred by allowing Agent Ruiz to give "his opinions and interpretations about SMB and its purported members." Brown Br. 43. But, again, these facts were largely reiterated by other witnesses. Lovejoy, for instance, testified about the origins and structure of SMB, its members and leaders, and their drug-trafficking efforts. And Kennedy gave detailed testimony about the inner workings of the gang. Taken together, the defendants have not established a reasonable probability that the outcome of the proceedings would have been different without the alleged error. *See Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016).

In any event, the defendants cannot satisfy the plain-error test's fourth prong—whether the alleged error seriously affected the "fairness, integrity or public reputation of judicial proceedings." *Greer*, 141 S. Ct. at 2097 (citation omitted). We approach the decision to exercise our discretion under prong four with a "high degree of caution." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018). After all, ruling for the defendants here would require us to vacate their convictions, which would entail a burdensome retrial. *See id.*; *cf. Molina-Martinez*, 578 U.S.

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

at 204 (explaining that "a remand for resentencing, while not costless, does not invoke the same difficulties as a remand for retrial" (citation omitted)). And on top of that, any time we reverse for error we "encourage[] litigants to abuse the judicial process and bestir[] the public to ridicule it." *Johnson*, 520 U.S. at 470 (quoting Roger J. Traynor, *The Riddle of Harmless Error* 50 (1970)). Thus, we are mindful that we should grant relief only in "exceptional circumstances." *Atkinson*, 297 U.S. at 160.

With this in mind, we conclude that the alleged error here did not seriously affect the "fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation omitted). As we documented above, the record is full of evidence that Bailey and Brown were SMB members and participated in the gang's conspiracy. *See Johnson*, 520 U.S. at 470. We thus cannot conclude that the alleged error seriously affected the "fairness, integrity or public reputation of judicial proceedings." *Greer*, 141 S. Ct. at 2097 (citation omitted). Indeed, given the substantial evidence in the record before us, it is reversing—not affirming—that would cast doubt on the fairness, integrity, and public reputation of judicial proceedings. *See Johnson*, 520 U.S. at 470; *cf. United States v. Cotton*, 535 U.S. 625, 634 (2002) ("[T]he fairness and integrity of the criminal justice system depends on meting out to those inflicting the greatest harm on society the most severe punishments.").

XV.

Shy argues next that the district court erred by denying a motion to suppress his Facebook records. According to Shy, the government's search warrant was not supported by probable cause. But even if that's true (and we have our doubts), the district court properly denied Shy's motion to suppress. As the Supreme Court has long recognized, the exclusionary rule does not apply when the evidence at issue was "seized in reasonable, good-faith reliance on a search warrant that is

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

subsequently held to be defective." *United States v. Leon*, 468 U.S. 897, 905 (1984); *see United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc). After all, the "error in such a case rests with the issuing magistrate." *Davis v. United States*, 564 U.S. 229, 239 (2011). And "punishing the errors of judges is not the office of the exclusionary rule." *Id.* (citation omitted and cleaned up).

Shy acknowledges this exception to the exclusionary rule. But he contends that it doesn't apply here because the affidavit supporting the warrant is "so lacking in indicia of probable cause that a belief in its existence [was] objectively unreasonable." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005). True, the good-faith exception doesn't apply to warrants supported by affidavits that are "bare bones"—that "merely state[] suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Christian*, 925 F.3d at 312 (citation omitted).

But the 31-page affidavit that supports the warrant here easily surpasses this low bar. *See id.* at 313. It recounts the existence of SMB, the gang's interstate drug-trafficking efforts, its members (including Shy), Shy's related criminal history, and how Shy has been observed associating with SMB members at a local strip club. It also explains that Shy is "friends" with SMB members on Facebook, discusses how Facebook is used as a communication tool between SMB members, and describes the information the government is seeking. Simply put, the affidavit supporting the warrant here is a far cry from "bare bones." *Laughton*, 409 F.3d at 748. Thus, the good-faith exception applies, and the district court properly denied Shy's motion to suppress.

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

XVI.

Shy also argues that the district court abused its discretion by admitting his Facebook records because the records were produced late. Here, the government searched Shy's Facebook records in 2016. But it failed to share those records with Shy until May 18, 2018—about a month before opening statements were to be made. The government turned over the records the day after discovering the oversight.

District courts have "considerable discretion" to choose between several remedies for a late disclosure, including suppression, a continuance, or any other remedy it deems appropriate. *United States v. Maples*, 60 F.3d 244, 246 (6th Cir. 1995); *see* Fed. R. Crim. P. 16(d)(2). When deciding whether suppression is appropriate, courts must consider several factors: "(1) the reasons for the government's delay in producing the materials, including whether it acted intentionally or in bad faith; (2) the degree of prejudice, if any, to the defendant; and (3) whether the prejudice to the defendant can be cured with a less severe course of action, such as granting a continuance or a recess." *Maples*, 60 F.3d at 247.

The district court did not abuse its discretion by refusing to suppress Shy's Facebook records. Here, the court found that the government did not act intentionally or in bad faith by failing to timely produce the records. And it reasonably concluded that the prejudice to Shy was minimal and that a less severe action was appropriate. As the court observed, Shy was represented by two attorneys who could sift through the records. Yet the court still agreed to appoint a third attorney who would be dedicated to helping the defense go through the materials (which were likely in Shy's possession and already familiar to him). It also noted that the government agreed not to introduce the records until late July, some seven weeks from the date defense counsel received them. Finally, the district court observed that the trial would be conducted with half days

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

and that a two-week recess was built in, giving the defense ample time to process the records.  We find no abuse of discretion.

XVII.

Bailey and Brown next challenge the government's warrantless acquisition of their cell-site location information under the Stored Communications Act.  A cellphone's cell-site location information documents the phone's "time-stamped location" every time it connects to a wireless carrier's antenna.  *United States v. Carpenter*, 926 F.3d 313, 314 (6th Cir. 2019).  This produces a detailed record of a person's physical movements.  *See Carpenter v. United States*, 138 S. Ct. 2206, 2216–17 (2018).  And under the Stored Communications Act, the government may obtain this record without securing a search warrant supported by probable cause.  Instead, it need only have "reasonable grounds" to believe the record is "relevant and material to an ongoing criminal investigation."  18 U.S.C. § 2703(d).

Here, the government acquired Brown's and Bailey's cell-site location information under the Stored Communications Act and sought to admit those records at trial.  Bailey and Brown moved to suppress the evidence, arguing that the government violated their Fourth Amendment rights by obtaining their cell-site location information without a warrant.  The district court denied their motions and admitted the records.

Bailey and Brown are correct that the government's warrantless acquisition of their cell-site records violated their Fourth Amendment rights.  In *Carpenter*, the Supreme Court held that the government "must generally obtain a warrant supported by probable cause before acquiring" an individual's cell-site records.  138 S. Ct. at 2221.  And it concluded that section 2703(d)'s "reasonable grounds" standard falls "well short of the probable cause required for a warrant."  *Id.*  So, the Court explained, section 2703(d) is "not a permissible mechanism for accessing historical

- 42 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

cell-site records." *Id.* Under *Carpenter*, then, the government's warrantless acquisition of Brown's and Bailey's cell-site records violated their Fourth Amendment rights.

But that doesn't mean the cell-site records must be excluded from evidence. The "sole purpose" of excluding unlawfully obtained evidence is to "deter future Fourth Amendment violations." *Davis*, 564 U.S. at 236–37 (citation omitted). Exclusion is appropriate only when the "deterrence benefits" that come with suppressing the evidence "outweigh its heavy costs." *Id.* at 237. And when government agents obtain evidence in good-faith "reliance on a statute," *Illinois v. Krull*, 480 U.S. 340, 349 (1987), any deterrence benefits do not outweigh the "heavy costs" of excluding "reliable, trustworthy evidence bearing on guilt or innocence," *Davis*, 564 U.S. at 237.

Since that is exactly what the agents did here, exclusion is not warranted. *Krull*, 480 U.S. at 349. As we've explained before, the Stored Communications Act specifies "some instances where warrants are necessary," but cell-site location information was not one of them. *Carpenter*, 926 F.3d at 318 (cleaned up). So it was reasonable for agents to believe that a warrant was not required here. *Id.* Even our court once agreed that a warrant was unnecessary to acquire cell-site records under section 2703(d). *See United States v. Carpenter*, 819 F.3d 880, 886–90 (6th Cir. 2016). Because the government agents reasonably relied on a subsequently invalidated statute, the exclusionary rule's good-faith exception applies. *Davis*, 564 U.S. at 239.

XVIII.

Shy argues that his sentence is procedurally unreasonable because his base offense level should have been 19 rather than 43. When considering the procedural reasonableness of a

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

sentence, we review the district court's interpretation of the Guidelines de novo and its factual findings for clear error. *See United States v. Rios*, 830 F.3d 403, 435 (6th Cir. 2016).

      Shy was convicted of RICO conspiracy under section 1962(d), with a special finding that Shy conspired to assault rival gang members with intent to murder. That special finding increased his statutory maximum sentence from twenty years to life. From there, the district court calculated Shy's Guidelines range. Under the Sentencing Guidelines, his base offense level is the greater of 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1. A defendant's "underlying racketeering activity" includes "relevant conduct as defined in U.S.S.G. § 1B1.3." *United States v. Tocco*, 306 F.3d 279, 286 (6th Cir. 2002). And section 1B1.3 defines relevant conduct to include "all acts and omissions" that were: (1) "within the scope of the jointly undertaken criminal activity"; (2) "in furtherance of that criminal activity"; and (3) "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *see United States v. Rich*, 14 F.4th 489, 495–96 (6th Cir. 2021). The district court must find the existence of relevant conduct by a preponderance of the evidence. *Corrado*, 227 F.3d at 542.

      When sentencing Shy, the district court found that the May 8, 2015, shooting—which included the murder of Dvante Roberts and the attempted murders of three others—was relevant conduct under section 1B1.3. That finding was not clearly erroneous. Shy points out that he didn't participate in that shooting and that the jury found that he was not responsible for that shooting. But whether Shy participated or not, the conduct fell within the scope of the conspiracy that Shy agreed to, was in furtherance of that conspiracy, and was reasonably foreseeable to him. SMB's conspiracy "involved murders and attempted murders." R. 1523, Pg. ID 20225. Indeed, the jury found Shy's codefendants guilty of murder in aid of racketeering. And the jury found beyond a

- 44 -

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

reasonable doubt that Shy himself conspired to assault rival gang members with intent to murder. So the district court's finding was supported by the evidence.

Although Shy complains that the district court relied on acquitted conduct to make these findings, acquitted conduct is still relevant conduct under the Sentencing Guidelines. *See Rios*, 830 F.3d at 439–40. After all, in "determining relevant conduct, a court may consider a broad range of information, including uncharged crimes, crimes where charges have been dismissed, and crimes for which the defendant has been acquitted." *Id.* at 440 (citation omitted). Thus, Shy has not shown that the district court clearly erred.

## XIX.

Bailey argues that the district court imposed a substantively unreasonable sentence because it considered an impermissible factor at sentencing—Bailey's refusal to accept responsibility. Bailey continued to dispute the charges at his sentencing hearing: "All of these accusations, they not true. I ain't committed no RICO." R. 1513, Pg. ID 20151. The district court noted that Bailey's codefendants had accepted responsibility and observed, "I was hopeful that I might hear during this hearing some indication that he is accepting the responsibility that he has for the wrongdoing." *Id.* at 20154. Contrary to Bailey's argument, it is not error for a district court at sentencing to consider a defendant's lack of remorse or failure to take responsibility. *See, e.g.*, *United States v. Mitchell*, 681 F.3d 867, 884 (6th Cir. 2012) (concluding that the district court did not err by considering the defendant's failure to "accept responsibility for his crime" when weighing the 18 U.S.C. § 3553(a) factors (citation omitted)).

## XX.

Finally, Brown argues that he was deprived of effective assistance of counsel. This court's normal practice is to reserve consideration of ineffective-assistance claims for collateral review so

Nos. 19-2280/2281/2354/20-1235, *United States v. Bailey, et al.*

that parties may develop an adequate record. *See United States v. Gonzalez*, 501 F.3d 630, 644 (6th Cir. 2007). Because this claim involves a "fact-specific examination" and a "full understanding" is not "readily discernable from the present record," we leave it for collateral review. *Id.*

*       *       *

We affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 19-2280/2281/2354/20-1235

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

COREY BAILEY (19-2280);  ARLANDIS SHY, II
(19-2281);   ROBERT   BROWN,   II   (19-2354);
KEITHON PORTER (20-1235),

    Defendants - Appellants.

> **FILED**
> Jul 05, 2022
> DEBORAH S. HUNT, Clerk

Before:  BOGGS, THAPAR, and BUSH, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the defendants' convictions and sentences are AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk